Robert H. Sloss (Bar No. 87757)
Mark G. Budwig (Bar No. 126045)
Victor M. Felix (Bar No. 179622)
Mike Nolan (Bar No. 265658)
Procopio, Cory, Hargreaves & Savitch LLP
12544 High Bluff Drive, Suite 400
San Diego, CA 92130
Telephone: 858.720.6300
Facsimile: 619.235.0398
E-mail: robert.sloss@procopio.com
E-mail: mark.budwig@procopio.com
E-mail: victor.felix@procopio.com
E-mail: mike.nolan@procopio.com

Attorneys for Claimant Vertiv Corporation, (formerly Liebert Corporation)

AMERICAN ARBITRATION ASSOCIATION

LIEBERT CORPORATION, an Ohio corporation,

Claimant,

v.

SVO BUILDING ONE, LLC, a Delaware limited liability company

Respondent.

Case No. 01-18-0003-1318

**FOURTH AMENDED COMPLAINT FOR:**

1. **BREACH OF CONTRACT**
2. **OPEN BOOK ACCOUNT**
3. **REASONABLE VALUE**
4. **DECLARATORY RELIEF**
5. **VIOLATION OF UNFAIR COMPETITION LAW**
6. **MISAPPROPRIATION OF TRADE SECRETS**
7. **PATENT INFRINGEMENT**
8. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
9. **DEFAMATION**
10. **FRAUD**
11. **NEGLIGENT MISREPRESENTATION**
12. **CIVIL CONSPIRACY**

Claimant Liebert Corporation alleges as follows:

1. Claimant Liebert Corporation (which changed its name to Vertiv Corporation on August 30, 2018 and shall hereinafter be referred to as "Vertiv") is, and at all times mentioned herein was, a corporation organized and existing under and by virtue of the laws of the State of Ohio, authorized to do business in California, and a duly licensed contractor in substantial compliance with the licensure laws of the State of California.



EXH. B-1

2. Vertiv is informed and believes, and based thereon alleges, that Respondent SVO Building One, LLC ("SVO") is, and at all times mentioned herein was, a limited liability company organized and existing under and by virtue of the laws of the State of Delaware.

## BACKGROUND FACTS

*Vertiv's history as a data center supplier*

3. Data centers power the modern world as they house the equipment that is essential to the Internet and all other forms of advanced communications. For more than 50 years, Vertiv has been the leading supplier of power and thermal equipment, services and solutions for data centers, and more recently Vertiv has also designed and erected the buildings that make up a data center.

4. Vertiv has been at the forefront in developing products and technologies that make a data center function, including uninterruptable power supplies and the components of thermal management systems that keep the atmosphere inside data centers at appropriate levels of temperature and humidity. As a result of its development work, Vertiv has created thousands of proprietary designs, methods and devices for which it has obtained hundreds of patents. For designs, methods and devices that are not protected by patents, Vertiv has treated such designs, methods and devices, as well as the know-how regarding how to design and outfit data centers it has acquired through its many years of supplying (and now building) those structures, as trade secrets.

*SVO's McClellan Park data center project*

5. In late 2016, SVO reached out to Vertiv, then known as Liebert, to lead the design and construction efforts for a data center SVO was building at 2407 AK Street, Sacramento, California (the "Project"). The Project was to consist of three two-megawatt data halls for a total capacity of six megawatts. The data center industry measures size in terms of the amount of power a data center consumes as measured in megawatts. A six-megawatt data center is considered a fairly large data center.

*Agreements between SVO and Vertiv*

6. In connection with the Project, Vertiv and SVO entered into several agreements.

Initially, in or about December 2016, the parties entered into a "Consultant Agreement" and purchase order whereby Vertiv agreed to perform certain design services on the Project. A true and correct copy of the Consultant Agreement, excluding appendices, is attached hereto as Exhibit A and incorporated herein by reference.

7. In or about May 2017, Vertiv and SVO executed a "Lump Sum Turnkey Agreement" (the "Turnkey Agreement") pursuant to which Vertiv agreed, once certain condition precedents were satisfied, to provide certain design, engineering, procurement, installation, construction, testing, commissioning and start up services on the Project. A true and correct copy of the Turnkey Agreement, excluding appendices and subsequently issued purchase orders and amendments, is attached hereto as Exhibit B and incorporated herein by this reference.

8. The Project was to be developed in three phases with each phase completing one of the three data halls. In recognition of the fact that this work would involve substantial numbers of Vertiv's patents, trade secrets and other intellectual property, Vertiv requested terms in both the Consultant Agreement and the Turnkey Agreement that specified (a) Vertiv would retain ownership of all Intellectual Property and Work Product (which the Agreement broadly defined) used in the Project; and (b) Vertiv would grant SVO "a limited, non-exclusive, not-transferable, *revocable* license" to use Vertiv's Intellectual Property and Work Product solely in connection with the Project.

9. Because of the importance it gives its Intellectual Property, Vertiv took pains in negotiating both the Consultant Agreement and the Turnkey Agreement to ensure the inclusion of provisions that make it abundantly clear that Vertiv would own the Intellectual Property used in the work performed by Vertiv regarding the Project.

10. Vertiv's ownership rights extended beyond what the above-mentioned Agreements defined as Intellectual Property, as Vertiv also retained ownership of its "Work Product," which Section 1.2 of the Turnkey Agreement defines to include: (1) all business and technical information and know-how resulting from Vertiv's performance under the Agreement; and (2) all designs, inventions, discoveries, techniques, technologies, copyright works – including computer programs and drawings – trade secrets and other intellectual property of any kind embodied in

Vertiv's work. The definition of Vertiv's ownership rights to include Work Product was not happenstance, but a deliberate effort by Vertiv to keep ownership of all that it created to the fullest extent possible.

11. At the same time, recognizing SVO's need to use Vertiv's Intellectual Property and Work Product, in Section 8.7 of the Turnkey Agreement Vertiv granted SVO a limited, non-exclusive, revocable license to use its Intellectual Property and Work Product in connection with the development and operation of the Project.

12. To ensure that there could be no possible ambiguity regarding the scope of the license, Section 8.8 of the Turnkey Agreement explicitly prohibits SVO from using the Work Product and Intellectual Property in any way outside the scope of the Turnkey Agreement. Vertiv and SVO negotiated these terms extensively.

*Agreement between SVO and DPR Construction*

13. Prior to contacting Vertiv to provide services on the Project, Vertiv understood that SVO had retained DPR Construction ("DPR") in or about February 2016 to design and build the Project.

14. In performing its obligations, DPR submitted a building permit application, obtained the building permit for the Project, and was listed as the contractor on the building permit for the Project.

15. Ultimately, SVO decided to retain Vertiv to complete the Project rather than proceed with DPR. To that end, in December 2017, a supplement/change to the building permit was made changing the general contractor from DPR to Vertiv.

16. Unbeknownst to Vertiv at the time, SVO did not terminate its agreement with DPR upon retaining Vertiv to provide services on the Project. Instead, SVO and DPR agreed upon an amendment to their agreement, effective on or about January 11, 2017, under which some of the scope of DPR's work was reduced but other portions remained DPR's obligation to perform. Additionally, a term of the amendment provided that, if DPR was not subsequently engaged to continue work at the Project (i.e., as a subcontractor to Vertiv), that SVO would be obligated pay DPR a "Concession Amount," the amount of which at this time SVO has refused to disclose to

Vertiv.

17. At the time of its engagement and negotiation with DPR to perform work at the Project, Vertiv was unaware of the terms of DPR's amended agreement; in particular that DPR would receive a "Concession Amount" payment from SVO if DPR did not obtain the subcontract from Vertiv.

18. Vertiv is informed and believes, and based thereon alleges, that DPR's undisclosed "Concession Amount" agreement with SVO hindered Vertiv's ability to negotiate fair and equitable terms with DPR and ultimately resulted in Vertiv incurring increased costs on the Project that it otherwise would not have incurred had SVO disclosed to Vertiv this secret arrangement with DPR.

*Vertiv's patents*

19. The designs, products, systems, configurations and techniques used by Vertiv to design, construct and outfit the Project contain Vertiv's Intellectual Property, which Vertiv has protected with patents and trade secrets.

20. Throughout its history, Vertiv has created innovative products and systems for use in the construction, operation and management of data centers. As evidence of its role as a leader in the development of new technologies, Vertiv has received over 1,000 patents, many of which disclose inventions in the fields of power supply, thermal control and uninterruptible power sources.

21. Any number of Vertiv's patents relate to the cutting-edge products and systems provided to SVO for the Project, including the following patents which cover products and systems that are essential to SVO's data center:

a. U.S. Patent No. 7,352,082 entitled "Transfer Switch Device and Method" and issued on April 1, 2008 (the "'082 Patent");

b. U.S. Patent No. 7,459,804 entitled "Static Transfer Switch Device and Method" and issued on December 2, 2008 (the "'804 Patent");

c. U.S. Patent No. 9,038,404 entitled "High Efficiency Cooling System" and issued on May 26, 2015 (the "'404 Patent");

d. U.S. Patent No. 9,316,424 entitled "Multi-Stage Cooling System with Tandem Compressors and Optimized Control of Sensible Cooling and Dehumidification" and issued on April 19, 2016 (the "'424 Patent");

e. U.S. Patent No. 6,917,124 entitled "Uninterruptible Power Supply" and issued on July 12, 2005 (the "'124 Patent"); and

f. U.S. Patent No. 6,563,048 entitled "Ancillary Cabinet System for an Uninterruptible Power Supply" and issued on May 13, 2003 (the "'048 Patent").

*Vertiv's trade secrets*

22. Although data centers share many of the same features – e.g., racks for servers, power supplies, cooling systems, fire suppressant systems, cabling, control systems and structural systems – the way in which these various features are equipped and configured differs greatly from data center to data center, depending on environmental factors such as the size of the data halls, the shape and condition of the building that houses the data center, the weather conditions throughout the year in the data center's location and the way in which the data center will be used. No two data centers are the same.

23. As the designer of and supplier of equipment for Phase 1 of the data center, Vertiv's engineers had to make thousands of decisions regarding what equipment to specify (both in terms of each piece of equipment's function and size), where to place each piece of equipment, how to calibrate and connect each piece of equipment so that all the equipment working together would function as desired, how to control the equipment, both individually and as a whole, and how to monitor and maintain the equipment – all of which (the decision on what equipment to specify and the use of the specific equipment chosen) constitute the proprietary means and methods developed by Vertiv for designing and equipping a data center. These design decisions and selection processes manifested themselves in several ways: (a) in the hundreds of drawings, specifications and other design documents prepared by Vertiv; (b) in the specific components chosen and requisitioned by Vertiv; (c) in the placement and manner of connection of each component; (d) in the countless engineering calculations performed; and (e) in the numerous manuals and operating instructions created by Vertiv for the Project. These design decisions were unique to Phase 1 of the

SVO Project, were maintained as confidential information by Vertiv and would be of tremendous value to someone else designing or building a data center, such as the designers and builders of Phases 2 and 3 of the SVO Project.

24. Vertiv produced three sets of drawings for Phase 1 of the Project that varied in detail and completeness – schematic drawings, design drawings and construction drawings – as well as an entirely different kind of drawings that Vertiv submitted to equipment suppliers (including itself) as part of the requisition process. In all, Vertiv generated well over 500 drawings. The drawings are stamped as Vertiv confidential information. Vertiv's drawings were created for, and are unique to, Phase 1 of the SVO Project, were maintained as confidential information by Vertiv and would be of tremendous value to someone else designing or building a data center, such as the designers and builders of Phases 2 and 3 of the SVO Project.

25. Data centers are extraordinarily complex facilities that require the integration of many systems (power, thermal, control, etc.) in a coordinated manner so that the combined systems operate precisely, reliably and predictably. To accomplish these goals, Vertiv employees performed thousands of engineering calculations that ensured they were specifying the right components connected in the optimal configuration. Vertiv's engineering calculations, which were the results of years of experience designing data centers, created for and are unique to Phase 1 of the SVO Project, were maintained as confidential information by Vertiv and would be of tremendous value to someone else designing or building a data center, such as the designers and builders of Phases 2 and 3 of the SVO Project.

26. Although Vertiv designed and constructed much of Phase 1 (and was under contract to design and construct Phases 2 and 3), its primary function was to supply the equipment that goes into a data center to make it operate – components such as modular infrastructure, power supplies, thermal management and the control systems that allow the data center to operate efficiently. Vertiv has thousands of products that perform various data center functions and to the extent those products are not covered by patents, the features or operations of the products are Vertiv trade secrets. In addition, the products typically come with manuals that explain the workings of the products and what a user needs to know in order ensure the proper operation of the products.

Vertiv's manuals are also protected as trade secrets. Many aspects of the products and manuals provided for Phase 1 of the project (such as the way in which each component was calibrated and integrated into the data center) were unique to Phase 1 of the SVO Project, were maintained as confidential information by Vertiv and would be of tremendous value to someone else designing or building a data center, such as the designers and builders of Phases 2 and 3 of the SVO Project.

27. The information and inventions Vertiv protected as trade secrets are different than the information and inventions disclosed in the patents obtained by Vertiv. Vertiv's patents do not disclose its trade secrets or confidential information.

*SVO's termination of the Agreement and Vertiv's revocation of the license*

28. Over the course of Vertiv's work on the Project, numerous disputes arose between Vertiv and SVO regarding such things as scope of work and payment. Ultimately, SVO wrongfully terminated the Turnkey Agreement in July 2018 after Vertiv had substantially completed Phase 1 of the Project.

29. Following SVO's termination of the Turnkey Agreement, Vertiv properly revoked SVO's license in writing on August 9, 2018 pursuant to the terms of the Turnkey Agreement.

*SVO's continued improper disclosure and use of Vertiv's patented and trade secret information*

30. Notwithstanding Vertiv's revocation of the license to SVO, it has continued to wrongfully disclose and use Vertiv's trade secret information and patented technology. For example, Vertiv has learned that SVO has given drawings and calculations prepared by Vertiv to designers and builders of data centers, including designers and builders retained by SVO to develop Phases 2 and 3 of the Project. Upon information and belief, SVO has also shared information with designers and builders of data centers regarding the products specified and installed in Phase 1, how the various data center components have been configured and how to operate, monitor and maintain those components and the data center systems. Vertiv's allegations regarding the disclosure of its trade secrets and the use SVO has made of Vertiv's trade secrets and patented technology as alleged herein is not to be considered comprehensive or limiting in any way; discovery in this case will likely reveal other unauthorized and illegal disclosures and uses of Vertiv's intellectual property by SVO and those working on its behalf.

31. The companies to whom SVO provided Vertiv's highly valuable intellectual property are competitors of Vertiv in the business of designing, building and/or outfitting data centers, and the delivery of such trade secret information and patented technology to those competitors has caused and will continue to cause irreparable injury to Vertiv.

**FIRST CAUSE OF ACTION**

**(Breach of Contract as Against SVO)**

32. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 31, as though set forth fully herein.

33. The Turnkey Agreement sets forth separate and distinct obligations to be performed by Vertiv, including engineering and design services, procurement of equipment and supplies, and construction of the Project.

34. The Project was to proceed in three (3) phases and performance was not to commence until SVO issued a written Purchase Order authorizing the work for a particular phase. SVO issued a Purchase Order with respect to Phase 1 ("Purchase Order"). SVO thereafter, and without proper cause, wrongfully terminated the Turnkey Agreement prior to the issuance of the Purchase Orders for the remaining two phases.

35. Vertiv has fully performed all terms, conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement and Purchase Order, except as prevented and/or excused by SVO.

36. SVO breached the Turnkey Agreement and subsequently issued Purchase Order, including the implied covenant of good faith and fair dealing, by, among other things: (1) improperly administering the Agreement, the Purchase Orders and the Project, resulting in, among other things, delays to the Project, out of sequence work, and associated extra work and costs; (2) failing to pay for all work Vertiv performed under the Agreement and Purchase Order, including the engineering and design work, equipment and supplies procured for the Project, and construction services provided pursuant to the separate and distinct obligations set forth in the Agreement and schedule of values; (3) violating Vertiv's rights to intellectual property, trade secrets and work product; (4) intentionally attempting to delay the approval of Change Order

Requests and to delay the completion of the Project in order to, among other things, improperly assess liquidated damages against Vertiv; and (5) wrongfully terminating the Turnkey Agreement and Purchase Order.

37. As a direct and proximate cause of the breach of Turnkey Agreement by SVO, Vertiv has been damaged in a sum in excess of $9,000,000, plus interest thereon at the maximum legally permissible rate, according to proof at trial. Said damage amount is comprised of unpaid amounts owed for separate and distinct categories of work including but not limited to unpaid design services, material and equipment supply, and construction services and performance.

38. Pursuant to California Civil Code sections 8800 and 8818, Vertiv is further entitled to two percent (2%) interest per month on any amounts which were not paid by SVO to Vertiv within the statutory time periods.

39. Further, Vertiv has retained the law firm of Procopio, Cory, Hargreaves & Savitch, LLP to enforce the terms of the Agreement and prosecute this action. Pursuant to the Agreement and the above identified code provisions, Vertiv is entitled to recover its reasonable attorneys' fees and costs incurred in connection with this action.

**SECOND CAUSE OF ACTION**

**(Open Book Account as Against SVO)**

40. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 39, as though set forth fully herein.

41. SVO became indebted on an open book account for a sum in excess of $9,000,000 for engineering and design services, the procurement and provision of certain equipment and supplies, and the furnishing of certain materials, labor, supplies, and/or services Vertiv furnished to SVO pursuant to the Agreement.

42. No part of said sum has been paid, despite demand, and there is now due, owing and unpaid to Vertiv a sum in excess of $9,000,000, plus interest thereon at the maximum legally permissible rate according to proof at trial.

43. Vertiv alleges that this cause of action is based on an Open Book Account entered into on or after January 1, 1987, as defined in California Civil Code § 1717.5. On this additional

basis, Vertiv is entitled to its reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**

**(Reasonable Value as Against SVO)**

44. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 43, as though set forth fully herein.

45. Vertiv furnished design services, equipment, materials, labor, supplies, and/or services to SVO at their special request, and for which they promised to pay Vertiv the reasonable value therefor.

46. At all times mentioned herein, the total reasonable value of the above mentioned materials, labor, supplies, and/or services furnished by Vertiv to the Project was, and is, the sum in excess of $9,000,000.

47. No part of said sum has been paid, despite demand, and there is now due, owing and unpaid to Vertiv the sum in excess of $9,000,000, plus interest thereon at the maximum legally permissible rate according to proof at trial.

**FOURTH CAUSE OF ACTION**

**(Declaratory Relief as Against SVO)**

48. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 47, as though set forth fully herein.

49. Vertiv is informed and believes, and thereon alleges, that an actual controversy has arisen and now exists between Vertiv and SVO concerning their respective rights and duties under the Agreement, specifically regarding the parties' rights with respect to Vertiv's intellectual property and work product, and Vertiv's right to revoke the limited use license granted to SVO relating to certain intellectual property and work product in connection with the Project.

50. Vertiv contends that the Turnkey Agreement expressly provides that the limited use license granted to SVO is revocable and Vertiv is permitted to revoke said license at any time, with or without cause. Accordingly, on or about August 9, 2018, Vertiv served notice to SVO revoking the license, and Vertiv contends that SVO must cease using the intellectual property and work product that is the subject of the license. Vertiv is informed and believes, and thereon alleges, that

SVO contends the license may not be revoked and that it may continue to utilize Vertiv's intellectual property and work product in connection with the completion of all Phases of the Project and in connection with the operation of the completed Project.

51. Vertiv desires a judicial determination of the parties' respective rights and duties, and a declaration that Vertiv may revoke, and has properly revoked, the license and SVO must cease using the intellectual property and work product.

**FIFTH CAUSE OF ACTION**

**(Violation of Unfair Competition Law as Against SVO)**

52. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 51, as though set forth fully herein.

53. The acts of SVO as described herein, and otherwise, constitute unlawful, unfair and fraudulent business practices as defined by California Business & Professions Code § 17200, et seq.

54. Without limitation, at least the following acts by SVO were unlawful business acts: the use of Vertiv's intellectual property and work product without Vertiv's permission, on information and belief, both to finish Phase 1 of the Project and to design and construct Phases 2 and 3 of the Project; and requesting that Vertiv assist them in defrauding SVO's lender by changing or withholding Change Order Requests.

55. Without limitation, at least the following acts by SVO were unfair business acts: the use of Vertiv's intellectual property and work product without Vertiv's permission, on information and belief, both to finish Phase 1 of the Project and to design and construct Phases 2 and 3 of the Project; requesting that Vertiv assist them in defrauding SVO's lender by changing or withholding Change Order Requests; seeking and/or causing third parties to issue false reports regarding the commissioning of equipment on the Project; intentionally inducing Vertiv to retain DPR as a subcontractor to perform work at the Project for the purpose of avoiding an obligation to pay DPR a "Concession Amount" pursuant to a deal between SVO and DPR that was hidden from Vertiv, and, as a result, limiting Vertiv's ability to negotiate with DPR causing Vertiv to incur excessive construction costs; and intentionally attempting to delay the approval of Change Order

Requests and to delay the completion of the Project in order to, among other things, be able to charge Vertiv with delay penalties.

56. Without limitation, at least the following acts by SVO were fraudulent business acts: requesting that Vertiv assist them in defrauding SVO's lender by changing or withholding Change Order Requests; seeking and/or causing third parties to issue false reports regarding the commissioning of equipment on the Project; seeking and/or causing third parties to issue false reports regarding the commissioning of equipment on the Project; intentionally attempting to delay the approval of Change Order Requests and to delay the completion of the Project in order to, among other things, be able to charge Vertiv with delay penalties.

57. As a direct and proximate cause of the wrongful conduct of SVO , Vertiv has been injured in fact. For example, as a direct consequence of the acts of SVO , SVO are using Vertiv's intellectual property and work product to complete Phase 1 of the Project and to design and construct Phases 2 and 3 of the Project, which erodes Vertiv's reputation as a designer and builder of data centers and provides an unjustified cost savings to SVO . Such harm will continue unless the acts of SVO are enjoined by the Court. Vertiv has no adequate remedy at law for the continued acts of unlawful, unfair and fraudulent business practices by SVO .

**SIXTH CAUSE OF ACTION**

**(Claim for Misappropriation of Trade Secrets in Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 Against SVO)**

58. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 57, as though set forth fully herein.

59. Vertiv is the owner of certain valuable trade secrets, as alleged above, relating to the design, construction and outfitting of data centers, including but not limited to drawings, technical products, manuals, engineering calculations, knowhow, and techniques. Examples of trade secrets used in the Project and disclosed to SVO include but are not limited to drawings showing the layout of the components contained in the data center; engineering calculations used to determine the size and optimal function of the components specified for the data center; and the sequence of operations of the control systems that monitor, operate and calibrate the equipment so that the data

center as a whole functions as intended.

60. The trade secrets owned by Vertiv and were not disclosed in any Vertiv patents, patent applications or other publications available to the public. Likewise, Vertiv did not share the trade secrets with anyone outside of the company without the existence of a non-disclosure agreement.

61. Vertiv's trade secrets are related to Vertiv's products and services that are used or sold in interstate and foreign commerce.

62. Vertiv has at all times taken reasonable measures to keep its trade secret information secret and confidential, such as limiting who has access to its trade secrets and requiring any non-Vertiv employee who is shown such information to sign a non-disclosure agreement.

63. Vertiv's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure of the information.

64. In violation of Vertiv's rights, SVO misappropriated Vertiv's trade secret information in the improper and unlawful manner as alleged herein. For example, SVO have shared drawings and engineering calculations prepared by Vertiv with other data center designers and builders.

65. As a proximate result of SVO 's misappropriation of Vertiv's trade secrets, Vertiv has suffered damages in an amount to be proven at trial pursuant to 18 U.S.C § 1836(b)(3)(B).

66. SVO's trade secret misappropriation has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A).

67. In misappropriating Vertiv's trade secrets, SVO acted willfully and maliciously as Vertiv gave SVO written notice in August 2018 that Vertiv was revoking SVO's license to use Vertiv's intellectual property and that any further disclosure or use of that intellectual property by SVO would be unlawful. Vertiv is thus entitled to exemplary damages pursuant to 18 U.S.C. §

1836(b)(3)(C) and an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SEVENTH CAUSE OF ACTION

**(Claim for Misappropriation of Trade Secrets under in Violation of California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426-3426.11, Against)**

68. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 67, as though set forth fully herein.

69. Vertiv is the owner of certain valuable trade secrets, as alleged above, relating to the design, construction and outfitting of data centers, including but not limited to drawings, technical products, manuals, engineering calculations, knowhow, and techniques. Examples of trade secrets used in the Project and disclosed to SVO include but are not limited to drawings showing the layout of the components contained in the data center; engineering calculations used to determine the size and optimal function of the components specified for the data center; and the sequence of operations of the control systems that monitor, operate and calibrate the equipment so that the data center as a whole functions as intended.

70. The trade secrets are owned by Vertiv and were not disclosed in any Vertiv patents, patent applications or other publications available to the public. Likewise, Vertiv did not share the trade secrets with anyone outside of company without the existence of a non-disclosure agreement.

71. Vertiv has at all times taken reasonable measures to keep its trade secret information secret and confidential, such as limiting who has access to its trade secrets and requiring any non-Vertiv employee who is shown such information to sign a non-disclosure agreement.

72. Vertiv's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure of the information.

73. In violation of Vertiv's rights, SVO misappropriated Vertiv's trade secret information in the improper and unlawful manner as alleged herein. For example, SVO has shared drawings and engineering calculations prepared by Vertiv with other competing data center designers and builders.

74. As a proximate result of SVO 's misappropriation of Vertiv's trade secrets, Vertiv

has suffered damages in an amount to be proven at trial pursuant to Cal. Civ. Code § 3426.3(a)-(b).

75. SVO 's trade secret misappropriation has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief pursuant to Cal. Civ. Code § 3426.2.

76. In misappropriating Vertiv's trade secrets, SVO acted willfully and maliciously as Vertiv gave SVO written notice in August 2018 that Vertiv was revoking SVO's license to use Vertiv's intellectual property and that any further disclosure or use of that intellectual property by SVO would be unlawful. Vertiv is thus entitled to exemplary damages pursuant to Cal. Civ. Code § 3426.3(c) and an award of reasonable attorneys' fees pursuant to Cal. Civ. Code § 3426.4.

**EIGHTH CAUSE OF ACTION**

**(Claim for Infringement of Patent No. 7,352,082 Against SVO )**

77. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 76, as though set forth fully herein.

78. The '082 Patent entitled "Transfer Switch Device and Method" was duly and lawfully issued on April 1, 2008. A true and correct copy of the '082 Patent is attached hereto as Exhibit C and incorporated herein by reference.

79. Vertiv is the owner of all rights, title and interest in the '082 Patent, including the right to bring this suit for injunctive relief and damages.

80. The '082 Patent is valid and enforceable.

81. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '082 Patent by using in the United States without authority certain transfer switch devices.

82. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded STS2 Static Transfer Switch 2 for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the STS2 Static Transfer Switch 2, but, upon information and belief, continues to do so.

83. SVO infringe at least claim 4 of the '082 Patent because that claim was drafted to incorporate the features of the STS2 Static Transfer Switch. Thus, the STS2 Static Transfer Switch being used by SVO has:

a. A first switch connectable to a voltage source;

b. A second switch connectable to a second voltage source;

c. A controller connected to the first and second switches to activate and deactivate the first and second switches to selectively connect the first or second switch to a load via a transformer;

d. The controller having inputs for receiving signals representing voltage levels of the first and second voltage sources and the voltage applied to the load transformer, wherein upon a predetermined condition, the controller:

i. Deactivates the first switch to disconnect the first voltage source from the load;

ii. Computes in substantially real time the volt-second areas under voltage waveforms of the first and second voltage sources;

iii. Assigns a polarity to each voltage-second area based on the polarity of the corresponding voltage;

iv. Determines a switching time to minimize downstream saturation current based on the sum of the absolute values of the areas under the waveforms of the first and second voltage sources being approximately equal to the absolute value of the area under the waveform of a complete half cycle of the second voltage, and their polarities being the same; and

v. Connects the second voltage source to the load at the determined switching time.

84. As a proximate result of SVO 's infringement of the '082 Patent, Vertiv has suffered damages in an amount to be proven at trial.

85. SVO 's infringement of the '082 Patent has caused and continues to cause Vertiv

irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

86. In infringing the '082 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Complaint in the United States District Court for the District of Delaware in the case tilted *Vertiv Corporation v. SVO Building One, LLC*, Case No. 1:18-cv-01776 (the "Delaware Complaint"), that it was infringing the '082 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '082 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

87. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**NINTH CAUSE OF ACTION**

**(Claim for Infringement of Patent No. 7,459,804 Against SVO )**

88. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 87, as though set forth fully herein.

89. The '804 Patent entitled "Static Transfer Switch Device and Method" was duly and lawfully issued on December 2, 2008. A true and correct copy of the '804 Patent is attached hereto as Exhibit D and incorporated herein by reference.

90. Vertiv is the owner of all rights, title and interest in the '804 Patent, including the right to bring this suit for injunctive relief and damages.

91. The '804 Patent is valid and enforceable.

92. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '804 Patent by using in the United States without authority certain static transfer switch devices.

93. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded STS2 Static Transfer Switch 2 for use in the Project.

When Vertiv properly revoked the license in August 2018. SVO no longer had the right to use the STS2 Static Transfer Switch 2. but, upon information and belief, continues to do so.

94. SVO infringe at least claims 1. 7 and 8 of the '804 Patent because those claims were drafted to incorporate the features of the STS2 Static Transfer Switch. Thus, the STS2 Static Transfer Switch being used by SVO has, as recited in claim 7, for example:

a. A first silicon controlled rectifier connected to a voltage source;

b. A second silicon controlled rectifier connected a second voltage source; and

c. A controller connected to the first and second silicon controlled rectifiers to activate and deactivate the first and second silicon controlled rectifiers to selectively connect the first or the second silicon controlled rectifiers to a load;

d. the controller having inputs for receiving signals representing the voltage levels of the first and second voltage sources and the voltage applied to the load, wherein upon a predetermined condition, the controller temporarily pulses on the second silicon controlled rectifier and thereafter, indefinitely turns on the second silicon controlled rectifier to maintain power to the load.

95. As a proximate result of SVO 's infringement of the '804 Patent, Vertiv has suffered damages in an amount to be proven at trial.

96. SVO 's infringement of the '804 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

97. In infringing the '804 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '804 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '804 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

98. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**TENTH CAUSE OF ACTION**

**(Claim for Infringement of Patent No. 9,038,404 Against SVO )**

99. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 98, as though set forth fully herein.

100. The '404 Patent entitled "High Efficiency Cooling System" was duly and lawfully issued on May 26, 2015. A true and correct copy of the '404 Patent is attached hereto as Exhibit E and incorporated herein by reference.

101. Vertiv is the owner of all rights, title and interest in the '404 Patent, including the right to bring this suit for injunctive relief and damages.

102. The '404 Patent is valid and enforceable.

103. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '404 Patent by using in the United States without authority certain thermal devices.

104. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded DSE cooling system (e.g., DA150 and DA125) for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the DSE cooling system, but, upon information and belief, continues to do so.

105. SVO infringe at least claim 1 of the '404 Patent because that claim was drafted to incorporate the features of the DSE cooling system. Thus, the DSE cooling system being used by SVO has:

a. A cabinet having an air inlet and an air outlet;

b. An air moving unit disposed in the cabinet;

c. A plurality of separate cooling stages including an upstream cooling stage and a downstream cooling stage, at least the upstream cooling stage having a variable capacity cooling circuit;

d. Each cooling stage including a cooling circuit having an evaporator, a condenser, a compressor and an expansion device;

e. At least the cooling circuit of the upstream cooling stage having a pumped refrigerant economizer mode and a direct expansion mode wherein each cooling circuit that has both the pumped refrigerant economizer mode and the direct expansion mode also has a liquid pump wherein when that cooling circuit is operated in the direct expansion mode a compressor of that cooling circuit is on and compresses a refrigerant in a vapor phase to raise the refrigerant pressure and thus the refrigerant condensing temperature and the refrigerant is circulated around the cooling circuit by the compressor of that cooling circuit and wherein when that cooling circuit is operated in the pumped refrigerant economizer mode the compressor of that cooling circuit is off and the liquid pump of that cooling circuit is on and pumps the refrigerant in a liquid phase and refrigerant is circulated around that cooling circuit by the liquid pump of that cooling circuit and without compressing the refrigerant in its vapor phase;

f. The evaporator of the cooling circuit of the upstream cooling stage and the evaporator of the cooling circuit of the downstream cooling stage arranged in the cabinet so that air to be cooled passes over the evaporator of the cooling circuit of the upstream cooling stage and the evaporator of the cooling circuit of the downstream cooling stage in serial fashion, first over the evaporator of the cooling circuit of the upstream cooling stage and then over the evaporator of the cooling circuit of the downstream cooling stage;

g. A controller that determines which of the cooling circuits to operate to provide cooling and for each of the cooling circuits to be operated to provide cooling that has both the pumped refrigerant economizer mode and direct expansion mode, determining whether to operate each such cooling circuit in the pumped refrigerant economizer mode or the direct expansion mode;

h. The controller operating each cooling circuit having both the pumped refrigerant economizer mode and the direct expansion mode in the pumped

refrigerant economizer mode when an outside air temperature is low enough to provide sufficient heat rejection from the refrigerant flowing through the condenser to the outside air without compressing the refrigerant and when the outside air temperature is not low enough to provide such sufficient heat rejection operating that cooling circuit in the direct expansion mode;

i. The controller when a Call for Cooling first reaches a point where cooling is needed, operating the upstream cooling circuit to provide cooling and not operating the downstream cooling circuit to provide cooling and when the Call for Cooling has increased to a second point, additionally operating the downstream cooling circuit to provide cooling, wherein the cooling capacity at which the upstream cooling circuit is being operated to provide is less than the full cooling capacity of the upstream cooling circuit when the Call for Cooling reaches the second point;

j. Wherein the compressor of each cooling circuit is a tandem compressor including a fixed capacity compressor and variable capacity digital scroll compressor, the controller controlling the fixed capacity compressor and variable capacity digital scroll compressor of each of the tandem compressors based on the Call for Cooling, which of a plurality of ranges that the Call for Cooling falls within and whether the Call for Cooling is ramping up or ramping down; and

k. Wherein when there is an unmet Call for Dehumidification, the controller controls the tandem compressors based on the Call for Cooling and which of a plurality of dehumidification ranges that the Call for Cooling falls within including determining which of the variable capacity digital scroll compressors to ramp and controls the ramping of each variable capacity digital scroll compressor being ramped based on a the Call for Dehumidification and wherein control based on which of the plurality of dehumidification control ranges the Call for Cooling falls within and on the

Call for Dehumidification takes precedence when there is an unmet Call for Dehumidification.

106. As a proximate result of SVO 's infringement of the '404 Patent, Vertiv has suffered damages in an amount to be proven at trial

107. SVO 's infringement of the '404 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

108. In infringing the '404 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '404 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '404 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

109. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**ELEVENTH CAUSE OF ACTION**

**(Claim for Infringement of Patent No. 9,316,424 Against SVO )**

110. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 109 as though set forth fully herein.

111. The '424 Patent entitled "Multi-Stage Cooling System with Tandem Compressors and Optimized Control of Sensible Cooling and Dehumidification" was duly and lawfully issued on April 19, 2016. A true and correct copy of the '424 Patent is attached hereto as Exhibit F and incorporated herein by reference.

112. Vertiv is the owner of all rights, title and interest in the '424 Patent, including the right to bring this suit for injunctive relief and damages.

113. The '424 Patent is valid and enforceable.

114. SVO have infringed and continue to infringe, literally or through the doctrine of

equivalents, the '424 Patent by using in the United States without authority a certain thermal system.

115. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded DSE cooling system (e.g., DA150 and DA125) for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the DSE cooling system, but, upon information and belief, continues to do so.

116. SVO infringe at least claim 1 of the '424 Patent because that claim was drafted to incorporate the features of the DSE cooling system. Thus, the DSE cooling system used by SVO has:

a. A cabinet having an air inlet and an air outlet;

b. An air moving unit disposed in the cabinet;

c. A plurality of separate cooling stages including an upstream cooling stage and a downstream cooling stage, the upstream cooling stage having an upstream cooling circuit and the downstream cooling stage having a downstream cooling circuit;

d. The upstream and downstream cooling circuits are each a direct expansion refrigeration cooling circuit including an evaporator, a condenser, a tandem compressor and an expansion device, the evaporator having an inlet coupled to an outlet of the expansion device and an outlet coupled to an inlet of the tandem compressor, the tandem compressor having an outlet coupled to an inlet of the condenser and the condenser having an outlet coupled to an inlet of the expansion device;

e. Each tandem compressor including a fixed capacity compressor and a variable capacity compressor;

f. The evaporator of the upstream cooling circuit and the evaporator of the downstream cooling circuit arranged in the cabinet so that air to be cooled passes over them in serial fashion, first over the evaporator of the upstream cooling circuit and then over the evaporator of the downstream cooling

circuit; and

g. A controller coupled to the tandem compressors that in a sensible cooling control controls the fixed capacity compressor and variable capacity compressor of each of the tandem compressors based on a Call for Cooling, also based on which of a plurality of sensible cooling control ranges that the Call for Cooling falls within and also based on whether the Call for Cooling is ramping up or ramping down, wherein when there is an unmet Call for Dehumidification, the controller switching from the sensible cooling control to a dehumidification control and controls the fixed capacity compressor and variable capacity compressor of each of the tandem compressors based on the Call for Dehumidification and also based on which of a plurality of dehumidification control ranges that the Call for Cooling falls within until the Call for Dehumidification has been met and then switching back to the sensible cooling control.

117. As a proximate result of SVO 's infringement of the '424 Patent, Vertiv has suffered damages in an amount to be proven at trial.

118. SVO 's infringement of the '424 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

119. In infringing the '424 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '424 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '424 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

120. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## TWELFTH CAUSE OF ACTION

**(Claim for Infringement of Patent No. 6,917,124 Against SVO )**

121. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 120, as though set forth fully herein.

122. The '124 Patent entitled "Uninterruptible Power Supply" was duly and lawfully issued on July 12, 2005. A true and correct copy of the '124 Patent is attached hereto as Exhibit G and incorporated herein by reference.

123. Vertiv is the owner of all rights, title and interest in the '124 Patent, including the right to bring this suit for injunctive relief and damages.

124. The '124 Patent is valid and enforceable.

125. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '124 Patent by using in the United States without authority certain uninterruptible power supplies.

126. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded EXL S1 UPS for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the EXL S1 UPS, but, upon information and belief, continues to do so.

127. SVO infringe at least claim 1 of the '124 Patent because that claim was drafted to incorporate the features of the EXL S1 UPS. Thus, the EXL S1 UPS used by SVO has:

a. A controlled rectifier having an input coupled to receive AC power and an output coupled to a DC bus;

b. A battery coupled to the DC bus;

c. An inverter having an input coupled to the DC bus and an output coupled to a load; and

d. A control system coupled to the controlled rectifier and the inverter the control system comprising three microprocessors, wherein a first microprocessor functions as an overall controller, a second microprocessor controls the rectifier, and a third microprocessor controls the inverter;

e. Wherein the three microprocessors communicate via a common global memory.

128. As a proximate result of SVO's infringement of the '124 Patent, Vertiv has suffered damages in an amount to be proven at trial.

129. SVO 's infringement of the '124 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

130. In infringing the '124 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '124 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '124 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

131. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## THIRTEENTH CAUSE OF ACTION

**(Claim for Infringement of Patent No. 6,563,048 Against)**

132. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 131, as though set forth fully herein.

133. The '048 Patent entitled "Ancillary Cabinet System for an Uninterruptible Power Supply" was duly and lawfully issued on May 13, 2003. A true and correct copy of the '048 Patent is attached hereto as Exhibit H and incorporated herein by reference.

134. Vertiv is the owner of all rights, title and interest in the '048 Patent, including the right to bring this suit for injunctive relief and damages.

135. The '048 Patent is valid and enforceable.

136. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '048 Patent by using in the United States without authority certain ancillary

cabinet systems for use with an uninterruptible power source.

137. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded PPC Second Generation Power Distribution Cabinet for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the PPC Second Generation Power Distribution Cabinet, but, upon information and belief, continues to do so.

138. SVO infringed at least claims 7 and 18 of the '048 Patent because that claim was drafted to incorporate the features of the PPC Second Generation Power Distribution Cabinet. Thus, the PPC Second Generation Power Distribution Cabinet being used by SVO has:

a. At least one bay in the battery cabinet;

b. At least one guide attached to the bay;

c. A tray supported on the at least one guide; and

d. An adjustable service shelf attachable to the battery cabinet and supporting the tray when removed from the bay.

139. As a proximate result of SVO 's infringement of the '048 Patent, Vertiv has suffered damages in an amount to be proven at trial.

140. SVO's infringement of the '048 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

141. In infringing the '048 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '048 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '048 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

142. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**FOURTEENTH CAUSE OF ACTION**

**(Intentional Interference with Contractual Relationship Against SVO)**

143. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 142, as though set forth fully herein.

144. In or about January 2018, Vertiv executed a subcontract agreement with DPR whereby DPR was to perform certain services in connection with the Project.

145. SVO knew Vertiv contracted with DPR in connection with the Project as SVO had previously contracted with DPR to perform services at the Project and recommended DPR to Vertiv.

146. SVO improperly and intentionally interfered with Vertiv's contract with DPR in various manners, including but not limited to routinely engaging in secretive and unauthorized direct communications with DPR personnel regarding the work and services DPR was performing for Vertiv on the jobsite and disparaging Vertiv's work.

147. SVO engaged in such conduct for the purpose and with the intent of interfering with Vertiv's performance at the Project and disrupting Vertiv and DPR's contractual relationship. SVO's conduct actually did result in Vertiv's performance being disrupted.

148. As a direct and proximate result of SVO's conducted and interference alleged herein, Vertiv's performance was delayed, obstructed, and rendered more difficult causing Vertiv to incur additional costs, expenses and damages in an amount to be proven at the arbitration of this matter.

149. In intentionally interfering with Vertiv's contract with DPR, SVO acted, willfully, maliciously and fraudulently, entitling Vertiv to an award of exemplary or punitive damages.

**FIFTEENTH CAUSE OF ACTION**

**(Defamation Against SVO)**

150. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through149, as though set forth fully herein.

151. During Vertiv's performance at the Project and following its termination, SVO engaged in conduct aimed at disparaging Vertiv's work and reputation. Such conduct includes

making numerous false statements to third parties on the jobsite and within the industry, including but not limited, falsely stating that commencement of equipment commissioning at the Project was delayed as the result of Vertiv's inability to manage the Project. At the time such statements were made, SVO was aware that commissioning of equipment on the Project had already commenced.

152. SVO knew the foregoing statements and representations were false and/or failed to use reasonable care to determine the truth or falsity of such statements. SVO made these statements to, among others, representatives of DPR, Critical Project Services, LLC, and BCSFM, LLC, for the purpose of harming Vertiv's reputation.

153. As a direct and proximate result of SVO publishing false and defamatory statements, Vertiv has been damaged in an amount to be proven at the arbitration of this matter.

154. Moreover, in making the above false statements with the intention of harming Vertiv, SVO acted with malice, oppression, and/or fraud and Vertiv is entitled to the recovery of punitive damages.

**SIXTEEN CAUSE OF ACTION**

**(Fraud Against SVO)**

155. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 154, as though set forth fully herein.

156. Section 4.2 of the Turkey Agreement sets forth the procedures for Vertiv to accomplish Facility Substantial Completion. One of the procedures called for the successful achievement of facility mechanical completion and startup, testing and commissioning.

157. In or about May 2018, Vertiv reported to SVO that it understood that it had successfully performed facility mechanical completion and startup, testing and commissioning as approved by SVO's retained commissioning consultant. However, SVO and its agents, Nicholas Laag, Ulrich Pelz, and others, represented to Vertiv that such facility mechanical completion and startup, testing and commissioning had not successfully passed and that Vertiv needed to do additional work and run new tests to achieve facility mechanical completion and startup, testing and commissioning.

158. These representations were false. Vertiv had, in fact, attained facility mechanical

completion and startup, testing and commissioning that met the requirements of the Turnkey Agreement as determined by SVO's retained commissioning consultant. As David Keith, a former employee of one of SVO's commissioning consultants for the Project, testified in a deposition, the facility mechanical completion and startup, testing and commissioning had been successfully completed in or about May 2017, and SVO and its agents were aware of the successful completion of such work.

159. At the time SVO and its agents made these representations to Vertiv, they knew the representations were false, yet they made the representations with the intent that Vertiv rely on them.

160. At the time SVO and its agents made these representations to Vertiv, Vertiv relied on the representations made by SVO and its agents, Mr. Laag, Mr. Pelz and others, by, among other things, performing additional work demanded by SVO to allegedly meet the requirement in Section 4.2 of the Turnkey Agreement to achieve facility mechanical completion and startup, testing and commissioning.

161. As a proximate result of SVO's fraud, Vertiv has suffered damages in an amount to be proven at trial.

162. In committing the fraud based on the false representation that in or about May 2017 Vertiv had not achieved facility mechanical completion and startup, testing and commissioning, SVO acted, willfully, maliciously and fraudulently, entitling Vertiv to an award of exemplary or punitive damages.

## SEVENTEENTH CAUSE OF ACTION

### (Negligent Misrepresentation Against SVO)

163. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 162, as though set forth fully herein.

164. As alleged herein, Section 4.2 of the Turkey Agreement set forth the procedures for Vertiv to accomplish Facility Substantial Completion. One of the procedures called for the successful achievement of facility mechanical completion and startup, testing and commissioning.

165. In or about May 2018, Vertiv reported to SVO that it had successfully performed

facility mechanical completion and startup, testing and commissioning. SVO and its agents, Nicholas Laag, Ulrich Pelz, and others, represented to Vertiv that such facility mechanical completion and startup, testing and commissioning had not successfully passed and that Vertiv needed to do additional work and run new tests to achieve facility mechanical completion and startup, testing and commissioning.

166. These representations were false. Vertiv had, in fact, attained facility mechanical completion and startup, testing and commissioning that met the requirements of the Turnkey Agreement. As David Keith, a former employee of one of SVO's commissioning consultants for the Project, testified in a deposition, the facility mechanical completion and startup, testing and commissioning had been successfully completed in or about May 2017, and SVO and its agents were aware of the successful completion of such work.

167. At the time SVO and its agents made these representations to Vertiv, they had no reasonable basis for believing them to be true, yet they made the representations with the intent that Vertiv rely on them.

168. At the time SVO and its agents made these representations to Vertiv, Vertiv reasonably relied on the representations made by SVO and its agents, Mr. Laag, Mr. Pelz and others, by, among other things, performing additional work demanded by SVO to allegedly meet the requirement in Section 4.2 of the Turnkey Agreement to achieve facility mechanical completion and startup, testing and commissioning.

169. As a proximate result of SVO's negligent misrepresentation, Vertiv has suffered damages in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION

**(Civil Conspiracy Against SVO)**

170. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 169, as though set forth fully herein.

171. In or about May 2018, Defendant SVO and its agents, Nicholas Laag, Ulrich Pelz, and others, knowingly and intentionally engaged in a civil conspiracy to defraud Vertiv by falsely representing to Vertiv that the data center facility mechanical completion and startup, testing and

commissioning had not been completed and that Vertiv needed to do additional work and run new tests to achieve facility mechanical completion and startup, testing and commissioning.

172. As a proximate result of SVO's civil conspiracy to defraud Vertiv, Vertiv has suffered damages in an amount to be proven at trial.

173. In engaging in this civil conspiracy to defraud Vertiv, SVO acted, willfully, maliciously and fraudulently, entitling Vertiv to an award of exemplary or punitive damages.

**PRAYER**

WHEREFORE, Vertiv prays for judgment as follows:

**On the First, Second and Third Causes of Action**

1. For a principal sum in excess of $9,000,000, according to proof at trial;

2. For two percent (2%) interest per month of the amount found to be due to Liebert pursuant to California Civil Code Sections 8800 and 8818.

3. For interest thereon at the maximum legally permissible rate;

4. For reasonable attorneys' fees incurred in prosecuting this action;

5. For costs of suit incurred herein;

6. For such other and further relief as the Court deems just and proper.

**On the Fourth Cause of Action**

1. For a declaration of Liebert's rights, specifically a declaration that Liebert may revoke, and has properly revoked, the license it issued to SVO and that SVO must cease using the intellectual property and work product that is the subject of the license;

2. For reasonable attorneys' fees;

3. For costs of suit incurred herein; and

4. For such other and further relief as the Court deems just and proper.

**On the Fifth Cause of Action**

1. For preliminary and permanent injunctive relief requiring SVO , and their agents, servants and employees, all persons acting under, in concert with or for them, to refrain from engaging in unlawful, unfair and fraudulent business practices;

2. For disgorgement of the unjust enrichment realized by SVO from their unlawful,

unfair and fraudulent business practices, according to proof;

3. For costs of suit incurred herein;

4. For such other and further relief as the Court deems just and proper.

**On the Sixth and Seventh Causes of Action**

1. For judgement that SVO misappropriated Vertiv's trade secrets in violation of Defend Trade Secrets Act, 18 U.S.C. § 1836;

2. For judgement that SVO misappropriated Vertiv's trade secret in violation of California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426-3426.11;

3. For damages according to proof;

4. For preliminary and permanent injunctive relief requiring SVO , and their agents, servants and employees, all persons acting under, in concert with or for them, to refrain, from using or disclosing any of Vertiv's trade secrets, confidential know-how or proprietary information regarding Vertiv's design, construction or outfitting of the SVO data center at McClellan Park pursuant to 18 U.S.C. § 1836(b)(3)(A) Cal. Civ. Code § 3426.2;

5. For exemplary damages as may be provided by law pursuant to 18 U.S.C. § 1836(b)(3)(C) Cal. Civ. Code § 3426.3(c);

6. For reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) Cal. Civ. Code § 3426.4;

7. For prejudgment and post-judgment interest;

8. For costs of suit incurred herein; and

9. For such other and further relief as the Court deems just and proper.

**On the Eighth through Thirteenth Causes of Action**

1. For judgement that SVO have infringed and are infringing the '082, '804, '404, '424, '124 and '048 Patents;

2. For damages according to proof;

3. For the entry of a preliminary injunction and a permanent injunction to prevent SVO , and their agents, servants and employees, all persons acting under, in concert with or for them, to

refrain from making, using, selling or offering to make, use or sell devices covered by the '082, '804, '404, '424, '124 or '048 Patents pursuant to 35 U.S.C. § 283;

4. For a finding that the infringement by SVO is and has been willful entitling Vertiv to enhanced damages pursuant to 35 U.S.C. § 284;

5. For a finding that this case represents an exceptional case entitling Vertiv to its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

6. For prejudgment and post-judgment interest;

7. For costs of suit incurred herein; and

8. For such other relief as the Court may deem just and proper.

**On the Fourteenth Cause of Action**

1. For a principal sum according to proof at trial;

2. For interest thereon at the maximum legally permissible rate;

3. For exemplary damages as may be provided by law;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court deems just and proper.

**On the Fifteenth Cause of Action**

1. For a principal sum according to proof at trial;

2. For interest thereon at the maximum legally permissible rate;

3. For exemplary damages as may be provided by law;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court deems just and proper.

**On the Sixteenth Cause of Action**

1. For a principal sum according to proof at trial;

2. For interest thereon at the maximum legally permissible rate;

3. For exemplary damages as may be provided by law;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court deems just and proper.

6.

**On the Seventeenth Cause of Action**

1. For a principal sum according to proof at trial;
2. For interest thereon at the maximum legally permissible rate;
3. For costs of suit incurred herein; and
4. For such other and further relief as the Court deems just and proper.

**On the Eighteenth Cause of Action**

1. For a principal sum according to proof at trial;
2. For interest thereon at the maximum legally permissible rate;
3. For exemplary damages as may be provided by law;
4. For costs of suit incurred herein; and
5. For such other and further relief as the Court deems just and proper.

Dated: July 11, 2019

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: ______________________

Robert H. Sloss
Mark G. Budwig
Victor M. Felix
Mike Nolan

Attorneys for Claimant
Vertiv Corporation (formerly Liebert Corporation)