Shawn Shaffie (SBN 262002)
shaffie@parkershaffiellp.com
Bruce T. Smyth (SBN 89171)
smyth@parkershaffiellp.com
**PARKER SHAFFIE LLP**
800 W. 6th Street, Suite 500
Los Angeles, California 90017
Telephone: (213) 622-4441
Facsimile: (213) 622-1444

Steven W. Murray (SBN 41493)
swm@psilaw.com
**STEVEN W. MURRAY, APC**
14930 Ventura Boulevard #205
Sherman Oaks, CA 91403
Telephone: (818) 501-2277
Facsimile: (818) 501-8441

Attorneys for Defendant and Counterclaimant
**SVO BUILDING ONE, LLC**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, WESTERN DIVISION

NAVIGATORS SPECIALTY INSURANCE COMPANY,

Plaintiff,

v.

SVO BUILDING ONE, LLC,

Defendant.

SVO BUILDING ONE, LLC

Counterclaimant,

v.

NAVIGATORS SPECIALTY INSURANCE COMPANY,

Counter-defendant.

Case No. 3:22-CV-07102-AMO
[Assigned to Hon. Araceli Martinez-Olguin]

**DECLARATION OF BRUCE T. SMYTH IN SUPPORT OF MOTION OF DEFFNDANT SVO BUILDING ONE. LLC FOR SUMMARY JUDGMENT**

Date: March 5, 2026
Time: 2:00 p.m.
Dept.: Courtroom 10, 19th Floor

*[Filed concurrently with Motion for Summary Judgment or Partial Summary Judgment; Memorandum of Points and Authorities]*

/ / /

/ / /

# DECLARATION OF BRUCE T. SMYTH

I, Bruce T. Smyth, declare as follows:

1. I am an attorney at law licensed to practice before the Courts of the State of California and have been admitted to the Bar of the United States District Court for the Northern District of California. I am Senior Counsel with Parker Shaffie, LLP, counsel of record for defendant and counterclaimant SVO Building One, LLC ("SVO"). In that capacity, I am aware of the facts set forth herein of my own personal knowledge.

2. I submit this declaration in support of SVO's motion for summary judgment.

3. Attached hereto as Exhibit 1 for convenient reference is a true and correct copy of the Amended Complaint in this matter filed by Plaintiff and Counter-defendant Navigators Specialty Insurance Company ("Navigators"). Navigators has attached to that Amended Complaint most of the relevant documents in this case, the Navigators policy of insurance (Ex. A-1 through A-96; the Fourth Amended Complaint in the underlying action, Ex. B-1 through B-36; the dismissal without prejudice of the defamation cause of action in the underlying action, Ex. C-1 through C-4; the 10/28/2019 letter from Navigators reserving rights in the underlying action, Ex. E-1 through E-15; the letter dated 3/31/2012 from Angle Muth of Navigators withdrawing the defense of SVO, Ex. F-1 through F-2; the letter dated May 3, 2021 from Steven Murray disputing the withdrawal of the defense; Ex. G-1 through G-3; and the letter dated May 18, 2021 from David Simantob on behalf of Navigators purporting to resume the defense, Ex. H-1 through H-2.

4. Attached hereto as Exhibit 2 is a true and correct copy of the First Set of Interrogatories propounded by SVO to Navigators.

5. Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the Responses to Interrogatory Nos. 1 through 5 served by Navigators in response to SVO's First Set of Interrogatories.

6. Attached hereto as Exhibit 4 is a true and correct copy of the transcript of the hearing on SVO's motion to compel further responses on November 5, 2025 before the Hon. Robert Illman.

7. Attached hereto as Exhibit 5 is a true and correct copy of the Amended Responses

to Interrogatory Nos. 1 through 5 served by Navigators in response to SVO's First Set of Interrogatories.

8. Attached hereto as Exhibit 6 is a true and correct copy of the report served by Navigators' designated expert, Andre Jardini.

9. Attached hereto as Exhibit 7 are true and correct copies of excerpts from the certified copy of the deposition of Andre Jardini, which I took by video on November 18, 2025.

10. Attached hereto as Exhibit 8 is a copy of the Rebuttal Report of the expert retained by SVO, Kenneth Moscaret, who is responding to the contentions of Andre Jardini in his report.

11. Attached as Exhibit 9 are copies of pages produced by Navigators in discovery in this action bearing production numbers N9905-N9908.

12. Attached hereto as Exhibit 10 is a true and correct copy of the invoice for services to Navigators' counsel produced by Andre Jardini in connection with his deposition and which was identified in his deposition as Exhibit 7 thereto.

13. Attached hereto as Exhibit 11 are true and correct copies of pages produced by Navigators in its production of documents from the Legal Xchnge bill review service bearing Production No. N08397 dated 7/10/2021; Production No. 07812 dated 9/29/2021 and Production No. 07818 dated 9/30/2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed December 1, 2025 at Los Angeles, California

Bruce T. Smyth

Bruce T. Smyth

# EXHIBIT "1"

David Simantob, SBN 155790
Email: David.Simantob@wilsonelser.com
Shannon L. Santos, SBN 260112
Email: Shannon.Santos@wilsonelser.com
**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, CA 90071-2407
Telephone: 213.443.5100
Facsimile: 213.443.5101

*Attorneys for Plaintiff Navigators Specialty Insurance Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>SVO BUILDING ONE, LLC,<br><br>Defendant. | Case No. 3:22-cv-07102-AMO<br>Hon. Araceli Martínez-Olguín<br>Courtroom 10<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff Navigators Specialty Insurance Company ("Navigators") hereby makes its First Amended Complaint for Declaratory Relief against Defendant SVO Building One, LLC ("SVO") and alleges as follows:

**INTRODUCTION**

1. Navigators brings this action for declarations that it is entitled to reimbursement of all defense fees and costs incurred in the action entitled *Liebert Corporation v. SVO Building One, LLC*, American Arbitration Association, Case No. 01-18-0003-1318 ("Underlying Action") after March 24, 2021 and for any and all other amounts paid in defense of uncovered claims under Navigators Policy No. LA17CGL219162IC, issued to SVO, effective from July 12, 2017 to August 12, 2019 ("Policy"). Navigators does not contend it has a right to reimbursement of attorneys' fees and costs incurred in SVO's defense of claims that were potentially covered under the Policy.

## PARTIES

2. Navigators is now and was at all relevant times a corporation formed under the laws of the State of New York with its principal place of business in Connecticut. At all times mentioned in this First Amended Complaint, Navigators has been authorized to do business in the State of California.

3. SVO is a limited liability company, registered in Delaware, with its principal place of business in McClellan, California. Nicholas Laag is the only member or manager of SVO identified with the Secretary of State of California. Navigators believes and on that basis alleges that Mr. Laag resides in San Francisco, California.

## JURISDICTION AND VENUE

4. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201 and Federal Rules of Civil Procedure, Rule 57 to resolve an actual controversy between the parties as set forth herein. This Court has jurisdiction over this action pursuant to 28 U.S.C § 1332, because there is complete diversity of citizenship between Navigators and SVO and there is more than $75,000 in controversy.

5. Venue is proper pursuant to 28 U.S.C. § 1391(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because this is a civil action in which subject matter jurisdiction is founded only on diversity of citizenship and the action is brought in a judicial district where SVO's solely identified member resides.

## THE POLICY

6. The Policy was issued to "SVO Building One, LLC", effective from July 12, 2017 to August 12, 2019, with "Each Occurrence" limits of $2 million, "Personal Injury/Advertising" limits of $1 million, and "General Aggregate" limits of $2 million. The "bodily injury" and "property damage" coverages are subject to a $5,000 deductible for each "occurrence." A true and correct copy of the Policy is attached as **Exhibit "A"** hereto.

7. The Policy lists the business description for SVO as an "8 Month OCP Data Center Construction Project" for the McClellan Park Building 637 located at 2407 AK Street, McClellan California 95652 ("Property"). The Policy's "Limitation of Coverage to Designated Premises or

Project" endorsement [Form CG 21 44 07 98] limits coverage to the designated premises of the Property. (Exh. A, Policy, pp. A-17, 51.)

8. The Policy contains Commercial General Liability Coverage Form [Form CG 00 01 04 13], which provides in pertinent part as follows:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. …

* * *

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. ...

* * *

**j. Damage To Property**

"Property damage" to:

* * *

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured … .

* * *

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

* * *

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement

* * *

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

* * *

**Continuous or Progressive Injury and Damage** *(as added by "Continuous of Progressive Injury and Damage Exclusion" Endorsement [Form NPC-670 06 09] ("Continuous Injury Endorsement"))*

"Bodily injury" or "property damage"

**(1)** which first existed, or is alleged to have first existed, prior to the inception date of this Policy; or

**(2)** which are, or are alleged to be, in the process of taking place prior to the inception date of this Policy, even if the actual or alleged "bodily injury" or "property damage" continues during this policy period; or

**(3)** which were caused, or are alleged to have been caused, by a condition that first existed prior to the inception date of this Policy.

* * *

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. …

* * *

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

* * *

**i. Infringement of Copyright, Patent, Trademark, Trade Secret, Trade Dress or Advertising Ideas** *(as amended by "Intellectual Property Amendment" Endorsement [Form NPC 642 11 08] ("IP Endorsement"))*

"Personal and Advertising Injury" arising out of:

**(a)** Infringement, disparagement, dilution, diminishment of or damage to:

- **i.** Copyright, slogan or title;
- **ii.** Patent;
- **iii.** Trademark, service mark, collective mark, or certification mark, including without limitation any word, name, symbol, device or any combination thereof used to identify or distinguish the origin of a good, product or service;
- **iv.** Trade secret;
- **v.** Trade dress including without limitation, any shape, color, design or appearance used to distinguish the origin of a good, product or service;

**vi.** Advertising ideas, concepts, campaigns, or style of doing business; or

**vii.** Any other intellectual property rights recognized or implied by law.

**(b)** False designation of the origin of a good, product or service.

* * *

**Continuous or Progressive Injury and Damage** *(as added by the Continuous Injury Endorsement)*

"Personal and advertising injury"

**(1)** which first existed, or is alleged to have first existed, prior to the inception date of this Policy; or

**(2)** which are, or are alleged to be, in the process of taking place prior to the inception date of this Policy, even if the actual or alleged "personal and advertising injury" continues during this policy period; or

**(3)** which were caused, or are alleged to have been caused, by a condition that first existed prior to the inception date of this Policy.

* * *

**SECTION V – DEFINITIONS**

* * *

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

* * *

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury including consequential "bodily injury" arising out of one or more of the following offenses *(as amended by IP Endorsement)*:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner landlord or

lesser;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication of material that violates a person's right of privacy.

* * *

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. …

* * *

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

(Exh. A, Policy, pp. A-18, 19, 21-23, 30, 32, 33, 37, 38, 66.)

9. The Policy contains the "Punitive and Exemplary Damages, Fines, Penalties and Multiplication of Damages Exclusion" [Form NPC-635 05 14] ("Punitive Damages Exclusion"), which provides:

> The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages, Coverage A Bodily Injury and Property Damage Liability** and Paragraph **2. Exclusions** of **Section I, Coverage B Personal and Advertising Injury Liability**:
>
> This insurance does not apply to:
>
> > Punitive damages, exemplary damages, fines, penalties, treble damages or other increase in damages resulting from the multiplication of compensatory damages, in whatever form assessed. If a "suit" is brought against the insured seeking damages to which this insurance applies and punitive or exemplary damages, we will provide a defense to such "suit". However, we will have no obligation to pay for any costs, interest, or judgment attributable to punitive or exemplary damages. Provisions of this exclusion do not apply in any state where such exclusion is expressly prohibited by state law or insurance department regulation.

(Exh. A, Policy, p. A-61.)

/ / /

## THE UNDERLYING ACTION

10. The underlying plaintiff, Liebert Corporation ("Claimant"), filed the Underlying Action with the American Arbitration Association.

11. On July 11, 2019, the Claimant filed the Fourth Amended Complaint ("FAC"), asserting eighteen causes of action against SVO as follows: (a) breach of contract; (b) open book account; (c) reasonable value; (d) declaratory relief; (e) violation of unfair competition law; (f) misappropriation of trade secrets (asserted as two causes of action under separate statutes); (g) patent infringement (asserted as six causes of action under separate patents); (h) intentional interference with contractual relations; (i) defamation; (j) fraud; (k) negligent misrepresentation; and (l) civil conspiracy. A true and correct copy of the FAC, without exhibits, is attached as **Exhibit "B"** hereto.

12. The FAC alleged that the Claimant entered into agreements with SVO regarding the design and construction for a data center that SVO was building at the Property ("Project"). The agreements included:

a. A "Consultant Agreement," dated December 2016, whereby the Claimant was "to perform certain design services on the Project"; and

b. A "Lump Sum Turnkey Agreement," dated May 2017, whereby the Claimant was "to provide certain design, engineering, procurement, installation, construction, testing, commissioning and start up services on the Project."

(Exh. B, FAC, ¶¶ 5-7, pp. B-2, 3.)

13. Under these agreements, the FAC alleged the Claimant would retain ownership of all intellectual property and work product used in the Project and the Claimant granted SVO "a limited, non-exclusive, non-transferable revocable license" to use the Claimant's intellectual property and work product solely in connection with the Project. (Exh. B, FAC, ¶¶ 8, 11, pp. B-3, 4.)

14. The FAC further alleged that, prior to entering into the agreements with the Claimant, SVO entered into a construction agreement with DPR Construction ("DPR") in February 2016 and did not terminate it prior to the Claimant's agreements. (Exh. B, FAC, ¶¶ 13,

16, p. B-4.) The FAC alleged that, in December 2017, a supplement/change to the building permit was completed, changing the general contractor from DPR to the Claimant. (Exh. B, FAC, ¶ 15, p. B-4.) SVO allegedly agreed without the Claimant's knowledge to provide DPR a concession amount if the Claimant did not hire DPR to work on the Property, purportedly hindering the Claimant's "ability to negotiate fair and equitable terms with DPR and ultimately resulted in [the Claimant] incurring increased costs on the Project." (Exh. B, FAC, ¶¶ 16-18, pp. B-4, 5.)

15. The FAC alleged that, in July 2018, after the Claimant "substantially completed Phase 1 of the Project," SVO terminated the "Turnkey Agreement" with the Claimant. (Exh. B, FAC, ¶ 28, p. B-8.) The Claimant thereafter revoked SVO's license in writing on August 9, 2018. (Exh. B, FAC, ¶ 29, p. B-8.)

16. SVO allegedly "continued to wrongfully disclose and use [the Claimant's] trade secret information and patented technology." (Exh. B, FAC, ¶ 30, p. B-8.) SVO purportedly gave drawings, shared information, the Claimant's trade secrets, and patented technology with other designers and builders of data centers or the Claimant's competitors. (Exh. B, FAC, ¶¶ 30 31, pp. B-8, 9.)

17. Through the fifteenth cause of action for defamation, the Claimant alleged that, during the Claimant's performance of work at the Project and following its termination, SVO "disparaged" the Claimant's work and reputation through conduct including "making numerous false statements to third parties on the jobsite and within the industry, including but not limited [to], falsely stating that commencement of equipment commissioning at the Project was delayed as a result of [the Claimant's] inability to manage the Project." (Exh. B, FAC, ¶ 151, pp. B-29, 30.) The Claimant alleged that statements were made to competitors "for purposes of harming [the Claimant's] reputation." (Exh. B, FAC, ¶ 152, p. B-30.)

18. The FAC sought recovery of compensatory damages, attorneys' fees, interest, and punitive damages as well as declaratory and injunctive relief. (Exh. B, FAC, p. B-33-36.)

19. On March 24, 2021, the Claimant dismissed the defamation cause of action from the FAC. A true and correct copy of the dismissal is attached as **Exhibit "C"** hereto.

20. The Underlying Action proceeded to arbitration on the Phase I trial from August 3-11, 2021 and on the Phase II trial from November 16, 2021 through December 10, 2021.

21. There was no mention of defamation at the arbitration of the Underlying Action.

22. After conclusion of the arbitration, Navigators was informed by SVO that the parties to the Underlying Action agreed to a settlement in resolution of the dispute without payment from Navigators. Navigators was told the settlement would result in a dismissal of all claims with prejudice. While Navigators inquired as to the terms of the settlement from SVO, the information was not provided. Navigators has no information as to whether the settlement includes a payment by SVO to the Claimant.

23. On January 5, 2022, the parties to the Underlying Action filed a Joint Notice of Dismissal with Prejudice of all claims. A true and correct copy of the joint notice is attached as **Exhibit "D"** hereto.

## THE CLAIM

24. Upon SVO's tender of the claim, Navigators agreed to defend SVO in the Underlying Action on October 28, 2019 pursuant to a reservation of rights, including the right to withdraw from the defense. Navigators advised SVO that it was defending the action, subject to the Policy's terms and conditions and only because the FAC included an allegation of defamation, which potentially qualified as an enumerated offense for "personal or advertising injury". A true and correct copy of the reservation of rights letter is attached as **Exhibit "E"** hereto.

25. Navigators agreed to pay for SVO's independent counsel to handle the defense of the Underlying Action pursuant to California Civil Code section 2860. (Ex. E, p. E-11.)

26. After the Claimant's dismissal of the defamation cause of action from the FAC on March 24, 2021, eliminating any potential for coverage for SVO's defense of the Underlying Action under the Policy, Navigators advised SVO on March 31, 2021 that there was no coverage for the Underlying Action and that Navigators would be withdrawing from the defense. A true and correct copy of the March 31, 2021 letter is attached as **Exhibit "F"** hereto.

27. On May 3, 2021, SVO objected to Navigators' withdrawal from the defense. A true and correct copy of the May 3, 2021 letter is attached as **Exhibit "G"** hereto.

28. In light of SVO's objection, Navigators agreed to continue defending the Underlying Action pending adjudication by a court as to any coverages owed under the Policy. A true and correct copy of the May 18, 2021 letter is attached as **Exhibit "H"** hereto.

**FIRST CAUSE OF ACTION**

**(For Declaratory Relief Re: Right to Reimbursement from March 24, 2021)**

29. Navigators hereby incorporates and re-alleges the allegations in each of the foregoing paragraphs as if fully set forth herein.

30. Navigators' initial acceptance of SVO's defense of the Underlying Action was pursuant to a reservation of rights, including the right to seek reimbursement of amounts spent in defense of uncovered claims.

31. Navigators advised SVO that it was withdrawing from the defense of the Underlying Action seven days after the defamation cause of action was dismissed. When SVO objected to the withdrawal, Navigators agreed to continue defending the Underlying Action pursuant to a reservation of rights, including the right to seek reimbursement of defense fees paid as to uncovered claims.

32. Since that time, Navigators has incurred attorneys' fees and costs associated with SVO's defense of the Underlying Action. The amount Navigators has incurred in defense of SVO since March 24, 2021 exceeds the jurisdictional limit of this Court under diversity jurisdiction.

33. There exists a genuine and bona fide dispute and an actual controversy and disagreement between Navigators and SVO regarding whether Navigators had a continuing duty to defend SVO in connection with the Underlying Action after March 24, 2021 when the defamation cause of action was dismissed and, thus, a right to reimbursement of attorneys' fees and costs incurred since that time.

34. Navigators contends it had no continuing duty to defend SVO in the Underlying Action after March 24, 2021 under the Policy and has the right to reimbursement of attorneys' fees and costs incurred since that time pursuant to *Buss v. Super. Ct.*, 16 Cal. 4th 35 (1997) and *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643 (2005). Upon information and belief, SVO

disputes this contention.

35. In accordance with the insuring agreements, provisions, terms, conditions, exclusions, and endorsements of the Policy, Navigators had no duty to defend SVO in the Underlying Action after March 24, 2021 under the Policy or applicable law, in whole or in part, for the following reasons:

a. The Underlying Action did not allege "damages" to trigger coverage under the Policy;

b. The Underlying Action did not allege injuries caused by an enumerated offense for "personal and advertising injury" to trigger Coverage B under the Policy;

c. If the Underlying Action alleged injuries for the enumerated offense of "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services" to trigger Coverage B under the Policy, such a trigger of coverage ended when the defamation cause of action was dismissed on March 24, 2021;

d. If the Underlying Action alleged "personal and advertising injury" to trigger Coverage B under the Policy, the "Infringement of Copyright, Patent, Trademark, Trade Secret, Trade Dress or Advertising Ideas" exclusion applies to bar coverage;

e. If the Underlying Action alleged "personal and advertising injury" to trigger Coverage B under the Policy, the "Breach Of Contract" exclusion applies to bar coverage;

f. If the Underlying Action alleged "personal and advertising injury" to trigger Coverage B under the Policy, the "Contractual Liability" exclusion applies to bar coverage;

g. If the Underlying Action alleged "personal and advertising injury" to trigger Coverage B under the Policy, the "Knowing Violation Of Rights Of

Another" exclusion applies to bar coverage;

h. If the Underlying Action alleged "personal and advertising injury" to trigger Coverage B under the Policy, the "Material Published With Knowledge Of Falsity" exclusion applies to bar coverage;

i. If the Underlying Action alleged "personal and advertising injury" to trigger Coverage B under the Policy, the "Material Published Prior To Policy Period" exclusion applies to bar coverage;

j. If the Underlying Action alleged "personal and advertising injury" to trigger Coverage B under the Policy, the "Criminal Acts" exclusion applies to bar coverage;

k. The Underlying Action did not allege "bodily injury" or "property damage" caused by an "occurrence" as those terms are defined in the Policy to trigger Coverage A under the Policy;

l. If the Underlying Action alleged "bodily injury" or "property damage" to trigger Coverage A under the Policy, the "Expected Or Intended Injury" exclusion applies to bar coverage;

m. If the Underlying Action alleged "bodily injury" or "property damage" to trigger Coverage A under the Policy, the "Contractual Liability" exclusion applies to bar coverage;

n. If the Underlying Action alleged "property damage" to trigger Coverage A under the Policy, the "Damage To Property" exclusion applies for "[p]roperty loaned to you";

o. If the Underlying Action alleged "property damage" to trigger Coverage A under the Policy, the "Damage To Property" exclusion applies for "[p]ersonal property in the care, custody or control of the insured";

p. If the Underlying Action alleged "property damage" to trigger Coverage A under the Policy, the "Damage To Your Product" exclusion applies to bar coverage;

q. If the Underlying Action alleged "property damage" to trigger Coverage A under the Policy, the "Damage To Your Work" exclusion applies to bar coverage;

r. If the Underlying Action alleged "property damage" to trigger Coverage A under the Policy, the "Damage To Impaired Property Or Property Not Physically Injured" exclusion applies to bar coverage;

s. If the Underlying Action alleged "personal and advertising injury," "bodily injury," or "property damage" to trigger coverage under the Policy, the Continuous Injury Exclusion applies to bar coverage; and

t. If the Underlying Action alleged "personal and advertising injury," "bodily injury," or "property damage" to trigger coverage under the Policy, the Punitive Damages Exclusion applies to that claim for damage.

36. Navigators also relies upon all additional terms, definitions, exclusions, conditions, and endorsements in the Policy not specifically identified herein that potentially limit or preclude its duty to defend SVO in the Underlying Action as of March 24, 2021.

37. Navigators seeks a declaration from this Court that Navigators has the right to reimbursement of all attorneys' fees and costs incurred in defense of the Underlying Action as of March 24, 2021 as it had no duty to defend SVO under the Policy as of that time.

## SECOND CAUSE OF ACTION

**(For Declaratory Relief Re: Right of Reimbursement for Uncovered Claims)**

38. Navigators hereby incorporates and re-alleges the allegations in each of the foregoing paragraphs as if fully set forth herein.

39. Navigators' initial acceptance of SVO's defense of the Underlying Action was pursuant to a reservation of rights, including the right to seek reimbursement of amounts spent in defense of uncovered claims pursuant to *Buss*, 16 Cal. 4th 35 and *Scottsdale Ins. Co.*, 36 Cal. 4th 643.

40. Navigators has incurred attorneys' fees and costs associated with SVO's defense of the Underlying Action, including in defense of uncovered claims as shown through the

Case 3:22-cv-07102-AMO Document 14-1 Filed 01/25/24 Page 17 of 18

arbitration transcripts, which evidence that a covered claim was not brought to trial. The amount Navigators has incurred in defense of SVO on uncovered claims exceeds the jurisdictional limit of this Court under diversity jurisdiction.

41. There exists a genuine and bona fide dispute and an actual controversy and disagreement between Navigators and SVO regarding whether Navigators has a right to reimbursement of attorneys' fees and costs incurred in defense of uncovered claims on behalf of SVO in the Underlying Action under the Policy.

42. Navigators contends it has a right to reimbursement of attorneys' fees and costs incurred in defense of uncovered claims on behalf of SVO in the Underlying Action under the Policy. Upon information and belief, SVO disputes this contention. Navigators does not contend it has a right to reimbursement of attorneys' fees and costs incurred in defense of claims in the Underlying Action that were potentially covered under the Policy.

43. In accordance with the insuring agreements, provisions, terms, conditions, exclusions, and endorsements of the Policy, certain attorneys' fees and costs were incurred in defense of uncovered claims on behalf of SVO in the Underlying Action under the Policy or applicable law, in whole or in part, based upon the coverage defenses set forth in paragraph 35 of the First Cause of Action herein.

44. Navigators also relies upon all additional terms, definitions, exclusions, conditions, and endorsements in the Policy not specifically identified therein that potentially limit or preclude its duty to defend SVO in the Underlying Action.

45. Navigators seeks a declaration from this Court that Navigators has the right to reimbursement of attorneys' fees and costs incurred in defense of uncovered claims on behalf of SVO in the Underlying Action under the Policy.

## PRAYER FOR RELIEF

WHEREFORE, Navigators prays for judgment against SVO as follows:

1. That the Court determine, decree, and adjudge that Navigators has the right to reimbursement of all attorneys' fees and costs incurred in defense of the Underlying Action as of March 24, 2021 as it had no duty to defend SVO under

the Policy as of that time;

2. That the Court determine, decree, and adjudge that Navigators has the right to reimbursement of attorneys' fees and costs incurred in defense of uncovered claims on behalf of SVO in the Underlying Action under the Policy;

3. For attorneys' fees and costs;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court deems fit and proper under the circumstances and evidence.

Dated: February 15, 2024

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By: */s/ Shannon L. Santos*
David Simantob
Shannon L. Santos
*Attorneys for Plaintiff Navigators Specialty Insurance Company*

Prepare. Protect. Prevail.

THE HARTFORD

Business Insurance
Employee Benefits
Auto
Home

July 06, 2021

Re: Insured: SVO BUILDING ONE LLC
Policy Number: LA17CGL219162IC
Policy Term: 7/12/2017 – 8/12/2019
Writing Company: Navigators Insurance Company

This will verify that, to the best of the undersigned s knowledge, the attached is a complete and accurate representation of insurance policy referenced above. Documents and/or information produced herewith are kept and maintained in the ordinary course of business.




Tim Ryan CPCU, ASLI - Head of Navigators Wholesale

EXH. A-1

Navigators

2017 POLICY

# Thank you
## for being our policyholder

2016 BUSINESS INSURANCE BEST PLACES TO WORK 2014 | 2015

Forbes | 2016 AMERICA'S MOST TRUSTWORTHY FINANCIAL COMPANIES MULTI-YEAR RECIPIENT

EXH. A-2

# COMMERCIAL LINES POLICY

**A STOCK COMPANY**

## Navigators Specialty Insurance Company

**1 Penn Plaza, New York, New York 10119**

**THIS POLICY CONSISTS OF:**

- **DECLARATIONS**
- **COMMON POLICY CONDITIONS**
- **ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:**
  - **ONE OR MORE COVERAGE FORMS**
  - **APPLICABLE FORMS AND ENDORSEMENTS**

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

**A. CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least
   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.
3. We will mail or deliver our notice to the first Named Insured-s last mailing address known to us.
4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. CHANGES**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy-s terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. EXAMINATION OF YOUR BOOKS AND RECORDS**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. INSPECTIONS AND SURVEYS**

We have the right but are not obliged to:

1. Make inspections and surveys at any time;
2. Give you reports on the conditions we find; and
3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful: or
2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**E. PREMIUMS**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums, and
2. Will be payee for any return premiums we pay.

**F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Emily B. Miner, Secretary

Stanley A. Galanski, President


Includes copyrighted material of Insurance Services Office, Inc., with its premission.
Copyright, Insurance Services Office, Inc., 1982, 1983

## COMMON POLICY DECLARATIONS

| | |
|---|---|
| POLICY NUMBER: LA17CGL219162IC | Renewal of Policy No: |

COVERAGE IS PROVIDED BY

**Navigators Specialty Insurance Company**

**One Penn Plaza, New York, NY 10119**

| | |
|---|---|
| Named Insured and Mailing Address | SVO BUILDING ONE, LLC<br><br>5170 GOLDEN FOOTHILL PARKWAY<br>EL DORADO HILLS , CA 95762 |
| Policy Period | From: 12 July 2017 To: 12 March 2018<br>**at 12:01 A.M., Standard Time at your mailing address shown above.** |
| Agent or Broker | Brown and Riding Insurance Services, Inc.<br>777 S Figueroa St Ste 2550<br>Los Angeles, CA 90017-5805 |

In return for the payment of premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. WHERE NO PREMIUM IS SHOWN, THERE IS NO COVERAGE. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | **PREMIUM** |
|---|---|
| Commercial General Liability Coverage Part | |
| Products/Completed Operations Liability Coverage Part | |
| Liquor Liability Coverage Part | |
| Employee Benefits Liability Coverage Part | |
| Terrorism Risk Insurance Act - Certified Acts Coverage | **REDACTED** |
| **TOTAL PREMIUM** | |
| State Surcharge | |
| Policy Fee | |
| Engineering Fee | |
| Policy Total shown is payable at inception **POLICY TOTAL** | |

Forms and Endorsements:

**See Schedule of Forms and Endorsements NPC-903 08/07**

POLICY NUMBER: LA17CGL219162IC

# SCHEDULE OF FORMS AND ENDORSEMENTS

The following are the forms attached to and forming a part of the policy at inception:

| | |
|---|---|
| OPUS Cover Sheet (02/17) | OPUS Cover Sheet |
| NIC GL PJ 01 07 | Policy Jacket and Common Policy Conditions with Validation Signatures |
| NPC-901 03 09 | Common Policy Declarations - Navigators Specialty Insurance Company |
| NPC-903 08 07 | Schedule of Forms and Endorsements |
| NPC-400 05 06 | Schedule of Named Insured(s) |
| IL 00 21 05 04 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| NPC-909 11 08 | Service of Suit |
| NAV-PHN-200 10 13 | Claim Reporting Procedures |
| NAV-ML-002 11 12 | OFAC ENDORSEMENT |
| NAV-ML-TERRA 02 15 | Disclosure Pursuant to TRIA |
| CG 21 70 01 15 | CAP On Losses from Certified Acts of Terrorism |
| NPC-905 03 09 | Commercial General Liability Coverage Part Declarations |
| CG 00 01 04 13 | Commercial General Liability Coverage Form |
| NPC-611 11 08 | Cross Suits Exclusion |
| NPC-605 11 08 | Asbestos Exclusion |
| NPC-827 04 13 | Exclusion - Designated Operations Covered by a Consolidated (Wrap-Up) Insurance Program |
| NPC-642 11 08 | Intellectual Property Amendment |
| NPC-900 07 10 | Minimum Earned Premium and Premium Audit Endorsement |
| NPC-624 11 08 | Lead Exclusion |
| NPC-713 11 08 | Definition of Employee Amendment |
| CG 21 86 12 04 | Exclusion - Exterior Insulation & Finish Systems |
| CG 21 47 12 07 | Employment-Related Practices Exclusion |
| CG 21 96 03 05 | Silica or Silica Related Dust Exclusion |
| CG 21 35 10 01 | Exclusion - Coverage C - Medical Payments |
| CG 21 55 09 99 | Total Pollution Exclusion With A Hostile Fire Exception |
| CG 21 67 12 04 | Fungi Or Bacteria (Mold) Exclusion |
| CG 20 38 04 13 | Additional Insured - Owners, Lessees or Contractors - Automatic Status For Other Parties When Required in Written Construction Agreement |
| CG 21 44 07 98 | Limitation Of Coverage To Designated Premises Or Projects |
| NPC-660 06 09 | Residential Construction Exclusion With an Apartment Exception |
| CG 22 34 04 13 | Exclusion - Construction Management Errors And Omissions |
| CG 23 01 04 13 | Exclusion - Real Estate Agents or Brokers Errors Or Omissions |
| CG 20 18 04 13 | Additional Insured - Mortgagee, Assignee Or Receiver |
| CG 20 12 04 13 | Additional Insured - Political Subdivisions Permits or Authorizations |
| CG 20 34 04 13 | Additional Insured - Lessor Of Leased Equipment - Automatic Status When Required In Lease Agreement With You |
| CG 20 18 04 13 | Additional Insured - Mortgagee, Assignee Or Receiver |

| | |
|---|---|
| CG 21 53 01 96 | Exclusion - Designated Ongoing Operations |
| CG 21 34 01 87 | Exclusion - Designated Work |
| NPC-635 05 14 | Punitive And Exemplary Damages, Fines, Penalties And Multiplication Of Damages Exclusion |
| NPC-834 12 14 | Exclusion - Cyber Injury |
| NPC-806 01 13 | Non-Pyramiding of Limits Endorsement |
| CG 22 79 04 13 | Exclusion - Contractors Professional Liability |
| CG 24 04 05 09 | Waiver of Transfer of Rights of Recovery Against Others to Us |
| NPC-670 06 09 | Continuous or Progressive Injury and Damage Exclusion |
| NPC-847 05 15 | Hazardous Materials Exclusion |
| NPC-700 11 08 | Aggregate Limits Apply to Policy Term |
| NPC-717 04 14 | General Contractor Conditional Coverage - Deductible Amount Applies If Conditions Not Met |
| CG 21 04 11 85 | Exclusion - Products-Completed Operations Hazard |
| CG 21 45 07 98 | Exclusion - Fire Damage Legal Liability |
| NPC-500 03 15 | Deductible Liability Insurance |
| NSIC CA NOTICE 09 16 | CALIFORNIA COMPLAINT NOTICE |

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# NAMED INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
BUSINESS AUTO COVERAGE PART

The Named Insured is completed to read as follows:

SVO BUILDING ONE, LLC & SVO BUILDING TWO, LLC
SACRAMENTO VENTURE ONE, LLC
XTREAM DATA CENTER CORPORATION

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear


© ISO Properties, Inc., 2001

facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "Special nuclear material" or "by-product material"; "Source material", "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2001 

# SERVICE OF SUIT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

It is understood and agreed that in the event of a failure by us to pay any amount claimed to be due hereunder, we, at the request of the first named insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States of America. The foregoing shall not constitute a waiver of any of our rights to remove, remand, or transfer such suit to any other court of competent jurisdiction in accordance with the applicable statutes of the United States of America or any state therein. In any suit instituted against us upon this contract by said court, we will abide by the final decision of the court or of any appellate court in the event of an appeal.

It is further agreed that service of process upon us in such suit may be made upon the Superintendent, Commissioner, or Director of Insurance or other person specified for that purpose in the applicable statute governing service of process in the state or jurisdiction in which a cause of action arises under this contract of insurance, or his successor or successors in office as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of this contract of insurance.

We hereby designate the President of Navigators Specialty Insurance Company, One Penn Plaza, 32nd Floor, New York, NY 10119, as the person to who the said Superintendent, Commissioner, or Director of Insurance is authorized to mail such process or a true copy thereof, in compliance with the applicable statutes governing said service of process in the state or jurisdiction in which a cause of action under this contract of insurance arises.

Case 2:22-07102-AMO Document 1-13-1 Filed 02/15/24 Page 35 of 96

**Policyholder Notice**

# CLAIM REPORTING PROCEDURES

Conditions of the policy require that in the event of a claim, you notify us as soon as practicable. All claim notifications are to be reported to the Schaumburg Claims Office by electronic mail to RBClaims@navg.com.

In the alternative, claim notices may also be:

- Mailed to the Schaumburg Claims Office at:

  Navigators Management Co., Inc.
  Claims Division
  1375 E. Woodfield Road, Suite 720
  Schaumburg, IL 60173

- Or faxed to 203-658-1824

- Or telephone 855-444-4796

All claims notifications must be accompanied by an ACORD loss form and should contain current contact information for the insured and claimant(s) as well as a detailed description of the loss.

If the insured files a claim with the agent, it is the agent's responsibility to forward the claim to the Schaumburg Claims Office.



EXH. A-13

# OFAC ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## U.S. ECONOMIC AND TRADE SANCTIONS LIMITATIONS CLAUSE

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that insurer to any sanction, prohibition or restriction under the trade or economic sanctions, laws or regulations of the United States of America.

The United States of America trade or economic sanctions, laws or regulations shall include, but not be limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms, conditions and exclusions of this Policy remain unchanged.

**POLICYHOLDER DISCLOSURE**
**NOTICE OF TERRORISM**
**INSURANCE COVERAGE**

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury— in consultation with the Secretary of Homeland Security, and the Attorney General of the United States— to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is **REDACTED** and does not include any charges for the portion of losses covered by the United States government under the Act.

YOU SHOULD ALSO KNOW THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER YOUR POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT AND MAY BE SUBJECT TO A $100 BILLION CAP THAT MAY REDUCE YOUR COVERAGE. THE PORTION OF YOUR PREMIUM ATTRIBUTABLE TO SUCH COVERAGE IS SHOWN ABOVE.

If you have any questions about this notice, please contact your agent or Broker.

NAV-ML-TERRA (02/15)

Contains copyrighted material of the National Association of Insurance Commissioners

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

 © Insurance Services Office, Inc., 2015 

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

**Policy Number:** LA17CGL219162IC

**Effective Date:** July 12, 2017
12:01 A.M., Standard Time

**LIMITS OF INSURANCE**

| | |
|---|---|
| Each Occurrence | $2,000,000 |
| General Aggregate | $2,000,000 |
| Products / Completed Operations Aggregate | $0 Excluded |
| Personal Injury / Advertising | $1,000,000 |
| Fire Legal Liability | $0 Excluded |
| Medical Payments | Excluded Any One Person |

**RETROACTIVE DATE (CG 00 02 only)**

Coverage A of this insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date, if any, shown here: None

**BUSINESS DESCRIPTION AND LOCATION OF PREMISES**

Form of Business:

☐ Individual ☐ Partnership ☐ Joint Venture ☒ Limited Liability Company ☐ Other ☐ Trust

Business Description: 8 Month OCP Data Center Construction Project
McClellan Park Building 637 2407 AK Street McClellan CA 95652

**PREMIUM**

| Classification | Code No. | Rate | Premium Basis | Exposure | Premium |
|---|---|---|---|---|---|
| | | | REDACTED | | |

**Total Advance Premium** REDACTED

**Forms and Endorsements:**

**See Schedule of Forms and Endorsements NPC-903 08/07**

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERAGES

### COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

 © Insurance Services Office, Inc., 2012 

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".


© Insurance Services Office, Inc., 2012

Case 3:22-cv-07107-JMA Document 143-1 Filed 12/15/25 Page 42 of 96

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".


© Insurance Services Office, Inc., 2012

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of


© Insurance Services Office, Inc., 2012

those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;


© Insurance Services Office, Inc., 2012

Case 4:23-cv-01474-AMO Document 143-1 Filed 12/11/24 Page 23 of 96

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

## COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".


© Insurance Services Office, Inc., 2012

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

 © Insurance Services Office, Inc., 2012 

**COVERAGE C - MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

 © Insurance Services Office, Inc., 2012 

Case 4:22-cv-00102-DMO Document 1-1 Filed 02/01/24 Page 26 of 96

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II - WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you

 © Insurance Services Office, Inc., 2012 

Case 3:22-cv-07102-AMO Document 104-1 Filed 12/15/25 Page 276 of 364

are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

Case 4:23-cv-01204-AMO Document 141-1 Filed 02/05/24 Page 28 of 96

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.


© Insurance Services Office, Inc., 2012

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

 © Insurance Services Office, Inc., 2012 

Case 2:22-cv-07102-AMO Document 104-1 Filed 12/15/24 Page 30 of 96

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or


© Insurance Services Office, Inc., 2012

Case 3:22-cv-07101-AMO Document 143-1 Filed 12/16/24 Page 316 of 364

agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building

 © Insurance Services Office, Inc., 2012 

Case 3:22-cv-07102-AMO Document 104-1 Filed 12/15/25 Page 325 of 431

cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.**"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.**"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, **reconditioned or reclaimed.**

**16.**"Products-completed operations hazard":

**a.**Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or


© Insurance Services Office, Inc., 2012

Case 4:23-cv-01214-O Document 103-1 Filed 12/15/25 Page 55 of 431

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.


© Insurance Services Office, Inc., 2012

# CROSS SUITS EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A Bodily Injury And Property Damage Liability:**

**2. Exclusions**
This insurance does not apply to:
**Cross Suits**
"Bodily injury" or "property damage" arising from claims or "suits" brought by any insured identified in the declarations or policy as a Named Insured against any other Named Insured.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**
This insurance does not apply to:
**Cross Suits**
"Personal and advertising injury" arising from claims or "suits" brought by any insured identified in the declarations or policy as a Named Insured against any other Named Insured.

Case 3:22-cv-01072-AMO Document 104-1 Filed 12/15/25 Page 57 of 96



# ASBESTOS EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**2. Exclusions**
This insurance does not apply to:
**Asbestos**
"Bodily injury" or "property damage" arising out of the actual, alleged, suspected or threatened ingestion of, inhalation of, contact with, exposure to, existence of, or presence of "asbestos".

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**
This insurance does not apply to:
**Asbestos**
"Personal and advertising injury" arising out of the actual, alleged, suspected or threatened ingestion of, inhalation of, contact with, exposure to, existence of, or presence of "asbestos".

**C.** The following definition is added to the **Definitions** Section:
"Asbestos" means the mineral in any form.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Description and Location of Operation(s):**

**ALL OPERATIONS AT LOCATIONS AT WHICH THE INSURED WAS AT ANY TIME:**

1. **COVERED, OFFERED COVERAGE, OR DENIED COVERAGE; OR**
2. **ENROLLED, OFFERED ENROLLMENT, OR NOT ALLOWED TO ENROLL UNDER A WRAP-UP PROGRAM.**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph **2.,** Exclusions of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section **I** - Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at the location described in the Schedule of this endorsement, as the construction project in which you are involved is or was subject to a consolidated (wrap-up) insurance program obtained by the prime contractor/project manager or owner of the construction project.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**(1)** Provides coverage identical to that provided by this Coverage Part;

**(2)** Has limits adequate to cover all claims;

**(3)** Remains in effect; or

**(4)** Enrolled you in the program.

This Exclusion does not apply to “bodily injury” or “property damage” not included in the “products-completed operations hazard” that is related to but does not take place at the location of a project covered by a Wrap-up Program.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INTELLECTUAL PROPERTY AMENDMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**I.** Item **14.** of **SECTION V - DEFINITIONS**. Is deleted in its entirety and replaced with the following:

**14.** "Personal and advertising injury" means injury including consequential "bodily injury" arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner landlord or lesser;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication of material that violates a person's right of privacy.

**II.** Under **SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions,** exclusion i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**, is deleted in its entirety and replaced with the following:

**i. Infringement of Copyright, Patent, Trademark, Trade Secret, Trade Dress or Advertising Ideas**

"Personal and Advertising Injury" arising out of:

**(a)** Infringement, disparagement, dilution, diminishment of or damage to:

**i.** Copyright, slogan or title;

**ii.** Patent;

**iii.** Trademark, service mark, collective mark, or certification mark, including without limitation any word, name, symbol, device or any combination thereof used to identify or distinguish the origin of a good, product or service;

**iv.** Trade secret;

**v.** Trade dress including without limitation, any shape, color, design or appearance used to distinguish the origin of a good, product or service;

vi. Advertising ideas, concepts, campaigns, or style of doing business; or

vii. Any other intellectual property rights recognized or implied by law.

(b) False designation of the origin of a good, product or service;

# MINIMUM EARNED PREMIUM AND AUDIT PREMIUM

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMON POLICY CONDITIONS
COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Item **5.** of section **A. CANCELLATION** of the **Common Policy Conditions** is replaced by the following:

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due.

**a.** If we cancel, the refund will be pro rata.

**b.** Cancellation at the request of the first Named Insured:
This policy is subject to a Minimum Earned Premium which is 25% of the premium for this policy as shown in the applicable Coverage Part(s) Declarations unless scheduled here otherwise: NA%
This Minimum Earned Premium is the least amount of premium we shall retain as earned premium, regardless of the term. If the first Named Insured cancels, the refund will be determined as follows:

**(1)** If at the time of cancellation the earned premium is greater than the Minimum Earned Premium, the refund will be 90% of the pro rata return.

**(2)** If at the time of cancellation the earned premium is equal to or less than the Minimum Earned Premium, the refund will be the premium paid in excess of the Minimum Earned Premium.

**(3)** If the policy is a project specific policy with a policy term in excess of one year, the pro rata return premium will be calculated based on the number of days for which the policy was in force, divided against the date when the policy becomes fully earned.

Cancellation for non-payment of premium will be considered cancellation at the request of the first Named Insured.

**B.** If this policy is subject to premium audit, paragraph **b.** of item **5. Premium Audit** in **SECTION IV-COMMERCIAL GENERAL LIABILITY CONDITIONS** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM** is replaced by the following:

**b.** Premium shown in the **Commercial General Liability Coverage Part Supplemental Declarations** as Advance Premium is a deposit premium only which will be credited toward the amount of earned premium. The Advance Premium is the minimum premium for the policy period, is payable in full at the inception of coverage and is not refundable. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured.

This policy has a minimum amount of premium that applies to the term of insurance as listed on the policy. The Minimum Term Premium is 100% of the advanced and deposit premium as stated in the policy declarations and in subsequent endorsements. In the event that audit premiums are greater than the advance and deposit premium, the additional premium is due and payable upon notice to the insured. If audit premiums are less than the Minimum Term Premium, then no return premium is owed to the Insured.

**C.** If this policy is written with a designated construction project endorsement, the policy will be fully earned and no premium will be returned at the time of "substantial completion" or 8 months after inception of policy, whichever occurs earlier.

**D.** As used in this endorsement the term "substantial completion" means whichever of the following occurs first:

**1)** The date of the final inspection of the construction project by the applicable public agency.

**2)** The date of recordation of a valid notice of completion

**3)** The date of use or occupancy of the construction project or improvement.

**4)** One year after termination or cessation of work on the construction project.

Case 3:21-cv-01244-AMO Document 104-1 Filed 12/05/24 Page 64 of 96



# LEAD EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**2. Exclusions**
This insurance does not apply to:
**Lead**
"Bodily injury" or "property damage" arising out of the actual, alleged, suspected or threatened ingestion of, inhalation of, contact with, exposure to, existence of, or presence of "lead".

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**
This insurance does not apply to:
**Lead**
"Personal and advertising injury" arising out of the actual, alleged, suspected or threatened ingestion of, inhalation of, contact with, exposure to, existence of, or presence of "lead".

**C.** The following definition is added to the **Definitions** Section:

"Lead" means the element in any form.

# DEFINITION OF EMPLOYEE AMENDMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Section V - Definitions, 5. “Employee” is deleted and replaced by the following:

5. “Employee” includes “leased worker” and “temporary worker”.



EXH. A-42

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

1. The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or
2. "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

1. A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;
2. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;
3. A reinforced or unreinforced base coat;
4. A finish coat providing surface texture to which color may be added; and
5. Any flashing, caulking or sealant used with the system for any purpose.

 © ISO Properties, Inc., 2003 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.


© ISO Properties, Inc., 2006


EXH. A-44

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

 © ISO Properties, Inc., 2004 

POLICY NUMBER: LA17CGL219162IC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – COVERAGE C – MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Description And Location Of Premises Or Classification:**<br>Any location or job site. |
|---|

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

1. Section **I** – Coverage **C** – Medical Payments does not apply and none of the references to it in the Coverage Part apply: and

2. The following is added to Section **I** – Supplementary Payments:

   **h.** Expenses incurred by the insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

 © ISO Properties, Inc., 2000 

EXH. A-46

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(a)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(b)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 Copyright, Insurance Services Office, Inc., 1998 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

 © ISO Properties, Inc., 2003 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – AUTOMATIC STATUS FOR OTHER PARTIES WHEN REQUIRED IN WRITTEN CONSTRUCTION AGREEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II - Who Is An Insured** is amended to include as an additional insured:

**1.** Any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy; and

**2.** Any other person or organization you are required to add as an additional insured under the contract or agreement described in Paragraph **1.** above.

Such person(s) or organization(s) is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**a.** Your acts or omissions; or

**b.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

However, the insurance afforded to such additional insured described above:

**a.** Only applies to the extent permitted by law; and

**b.** Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when your operations for the person or organization described in Paragraph **1.** above are completed.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

**a.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**b.** Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of, or the failure to render, any professional architectural, engineering or surveying services.

**2.** "Bodily injury" or "property damage" occurring after:

**a.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

 © Insurance Services Office, Inc., 2012 

**b.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement described in Paragraph **A.1**.; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.


© Insurance Services Office, Inc., 2012

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Premises:**<br>MCCLELLAN PARK BUILDIND 637, 2407 AK STREET, MCCLELLAN, CA 95652 |
| **Project:**<br>. |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" and medical expenses arising out of:

**1.** The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

**2.** The project shown in the Schedule.

 Copyright, Insurance Services Office, Inc., 1997 

EXH. A-51

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RESIDENTIAL CONSTRUCTION EXCLUSION WITH AN APARTMENT EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Residential Construction**

"Bodily injury" or "property damage" arising out of your ongoing operations or "your work" performed upon any "residential property".

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Residential construction**

"Personal and advertising injury" arising out of your ongoing operations or "your work" performed upon any "residential property;"

**C.** The following definition is added to the **Definitions** Section:

"Residential property" means single-family dwellings, townhomes, condominiums, timeshares or multifamily dwellings in which each unit is individually titled. "Residential property" does not include a multi-unit structure of units held for rental in which all units are owned by the same person or organization and the units are not individually titled

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONSTRUCTION MANAGEMENT ERRORS AND OMISSIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

**1.** The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager; or

**2.** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph **1.** or **2.**

This exclusion does not apply to "bodily injury" or "property damage" due to construction or demolition work done by you, your "employees" or your subcontractors.

 © Insurance Services Office, Inc., 2012 

Case 3:22-cv-07102-AMO Document 101-1 Filed 12/15/25 Page 54 of 96



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – REAL ESTATE AGENTS OR BROKERS ERRORS OR OMISSIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of any misrepresentation, error or omission by you or any real estate agent or broker who is either employed by you or performing work on your behalf in such capacity.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved any misrepresentation, error or omission by you or any real estate agent or broker who is either employed by you or performing work on your behalf in such capacity.

 © Insurance Services Office, Inc., 2012 
EXH. A-54

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s) | Designation Of Premises |
|---|---|
| Any person or organization when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. | . |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.


© Insurance Services Office, Inc., 2012


EXH. A-55

Case 4:22-cv-07102-AMO Document 104-1 Filed 02/05/24 Page 56 of 96



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - STATE OR GOVERNMENTAL AGENCY OR SUBDIVISION OR POLITICAL SUBDIVISION - PERMITS OR AUTHORIZATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **State Or Governmental Agency Or Subdivision Or Political Subdivision:**<br>Any State Or Governmental Agency Or Subdivision Or Political Subdivision for whom during the policy period you and such State Or Governmental Agency Or Subdivision Or Political Subdivision have agreed in writing in a contract or agreement that such State Or Governmental Agency Or Subdivision Or Political Subdivision be added as an additional insured on your policy. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured any state or governmental agency or subdivision or political subdivision shown in the Schedule, subject to the following provisions:

**1.** This insurance applies only with respect to operations performed by you or on your behalf for which the state or governmental agency or subdivision or political subdivision has issued a permit or authorization.

However:

**a.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**b.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**2.** This insurance does not apply to:

**a.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the federal government, state or municipality; or

**b.** "Bodily injury" or "property damage" included within the "products-completed operations hazard".

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.


© Insurance Services Office, Inc., 2012

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - LESSOR OF LEASED EQUIPMENT - AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) from whom you lease equipment when you and such person(s) or organization(s) have agreed in writing in a contract or agreement that such person(s) or organization(s) be added as an additional insured on your policy. Such person (s) or organization(s) is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However, the insurance afforded to such additional insured:

**1.** Only applies to the extent permitted by law; and

**2.** Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement you have entered into with the additional insured; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

 © Insurance Services Office, Inc., 2012 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s) | Designation Of Premises |
|---|---|
| Specialty Credit Holding, LLC, ISAOA/ATIMA<br>Two Greenwich Plaza, 1st Floor<br>Greenwich, CT 06830 | . |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and
2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or
2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

 © Insurance Services Office, Inc., 2012 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - DESIGNATED ONGOING OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Description of Designated Ongoing Operation(s):**

1. All work insured elsewhere under project specific policies.

2. Any and all construction operations in the state of New York.

**Specified Location (If Applicable):**

.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph **2.**, Exclusions of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section **I** – Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such operations are conducted by you or on your behalf. If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described ongoing operations conducted at that "location".

For the purpose of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

 Copyright, Insurance Services Office, Inc., 1994 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED WORK

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

**Description of your work:**

1. All work insured elsewhere under project specific policies.

2. Any and all construction operations in the state of New York.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of "your work" shown in the Schedule.

 Copyright, Insurance Services Office, Inc., 1986 

# PUNITIVE AND EXEMPLARY DAMAGES, FINES, PENALTIES AND MULTIPLICATION OF DAMAGES EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverages, Coverage A Bodily Injury and Property Damage Liability and** Paragraph **2. Exclusions** of **Section I, Coverage B Personal and Advertising Injury Liability:**

This insurance does not apply to:

Punitive damages, exemplary damages, fines, penalties, treble damages or other increase in damages resulting from the multiplication of compensatory damages, in whatever form assessed. If a "suit" is brought against the insured seeking damages to which this insurance applies and punitive or exemplary damages, we will provide a defense to such “suit”. However, we will have no obligation to pay for any costs, interest, or judgment attributable to punitive or exemplary damages. Provisions of this exclusion do not apply in any state where such exclusion is expressly prohibited by state law or insurance department regulation.



EXH. A-61

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – CYBER INJURY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following is added to **SECTION I – COVERAGES, COVERAGE A, BODILY INJURY AND PROPERTY DAMAGE** and **COVERAGE B, PERSONAL AND ADVERTISING INJURY, 2. Exclusions**:

This insurance does not apply to:

1. "bodily injury", "personal and advertising injury" or "property damage" arising out of "cyber injury;" or
2. any loss cost or expense arising out of any:
   a. request, demand, order or statutory or regulatory requirement that any insured or others monitor, notify or in any way respond to an actual or alleged "cyber injury;"
   b. claim or suit by or on behalf of a governmental authority for damages because of monitoring, notifying or in any way responding to a "cyber injury;"

   incurred by you or others.

B. The following are added to **SECTION V – DEFINITIONS**:

1. "Cyber injury" means any actual or suspected, intentional or unintentional breach of any data, software or hardware, wherever located, that results in:
   a. loss; destruction; disclosure; disruption; inspection; modification; recording; release; review; or use of "personal information;"
   b. inability to access any website or any electronic system;
   c. release, introduction or facilitation of any "malicious code;"
   d. forensic or investigative expenses;
   e. extortion or terrorism threats;
   f. monitoring or notification costs or expenses ;
   g. crisis management and public relations expenses;
   h. data or system recovery, repair, replacement or restoration expenses; or
   i. business interruption expenses.

2. "Malicious code" includes, but is not limited to any virus, Trojan horse, worm, spyware, logic bomb, adware, malware or other similar software program;

3. "Personal information" means any personal, or personally, identifiable, or identifying, information, as defined by federal, state or local laws, statutes or regulations.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED**

# NON-PYRAMIDING OF LIMITS ENDORSMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

A. Notwithstanding any provision of this policy to the contrary, if this policy and any other policy issued to you by us or any company affiliated with us, apply to the same occurrence, offense or accident, the maximum Limit of Insurance under all such policies shall not exceed the highest applicable Limit of Insurance under any one policy. However, this provision does not apply to any other insurance issued to you by us or any company affiliated with us, which is specifically intended to be excess of the policy to which this endorsement is attached.

B. Furthermore, in no event will coverage be provided after:

1. The applicable aggregate Limit of Insurance under any one policy has been exhausted due to such occurrence (s) or offense (s); or

2. The applicable Limit of Insurance under any one policy would have been exhausted had all covered claims due to such occurrence (s) or offense (s) been submitted under that one policy rather than under two or more policies.

## ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**1.** This insurance does not apply to "bodily injury", "property damage " or " personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

**a.** Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

**b.** Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above.

**2.** Subject to Paragraph **3.** below, professional services include:

**a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

**b.** Supervisory or inspection activities performed as part of any related architectural or engineering activities.

**3.** Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

 © Insurance Services Office, Inc., 2012 

Case 3:22-cv-07024-AMO Document 104-1 Filed 02/05/24 Page 63 of 96



# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name Of Person Or Organization:**<br>Any person or organization when you and such person or organization have agreed in writing in a contract or agreement that you will waive any right of recovery against such person or organization. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV - Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

 © Insurance Services Office, Inc., 2008 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTINUOUS OR PROGRESSIVE INJURY AND DAMAGE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section I - Coverages, - Coverage A - Bodily Injury And Property Damage Liability, 1. Insuring Agreement, B.(3)**, is deleted.

**B. Section I - Coverages, - Coverage A - Bodily Injury And Property Damage Liability, 1. Insuring Agreement, c**. is deleted and replaced by the following:

c. "bodily injury" or "property damage" which occurs during the policy period includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**C. Section I - Coverages, Coverage A. Bodily Injury And Property Damage Liability, 1. Insuring Agreement, d**. is deleted.

**D.** The following exclusion is added to paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Continuous or Progressive Injury and Damage**

"Bodily injury" or "property damage"

**(1)** which first existed, or is alleged to have first existed, prior to the inception date of this Policy; or

**(2)** which are, or are alleged to be, in the process of taking place prior to the inception date of this Policy, even if the actual or alleged "bodily injury" or "property damage" continues during this policy period; or

**(3)** which were caused, or are alleged to have been caused, by a condition that first existed prior to the inception date of this Policy.

**E.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I -Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Continuous or Progressive Injury and Damage**

"Personal and advertising injury"

**(1)** which first existed, or is alleged to have first existed, prior to the inception date of this Policy; or

**(2)** which are, or are alleged to be, in the process of taking place prior to the inception date of this Policy, even if the actual or alleged "personal and advertising injury" continues during this policy period; or

**(3)** which were caused, or are alleged to have been caused, by a condition that first existed prior to the inception date of this Policy.

# HAZARDOUS MATERIALS EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and **Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Hazardous Materials**

(1) "Bodily Injury," "property damage" or "personal and advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, ingestion, inhalation, dispersal, seepage, migration, release or escape of "hazardous materials" at any time.

(2) Any loss, cost or expense arising out of any:

a. Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "hazardous materials"; or

b. Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "hazardous materials."

(3) Any obligations to share damages with or indemnify another party whom must pay damages because of injury or damage relating to "hazardous materials."

(4) Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with paragraphs (1), (2), or (3) above.

This exclusion applies whether or not such "hazardous material(s)" has any function in your business, operations, premises, site or location.

B. **SECTION V – DEFINTITONS** is amended to include the following:

"Hazardous materials" means "pollutants," and materials that are radioactive, corrosive, oxidizers, asphyxiants, biohazardous, toxic, pathogen or allergen substances and organisms. "Hazardous materials" include but are not limited to sulfates, arsenic, formaldehyde, and any material(s) containing those materials. It also includes any "hazardous materials" as shown on the OSHA List of Highly Hazardous Chemicals, Toxics and Reactives.

C. This endorsement shall supplement any other exclusion contained within the Policy, including but not limited to any "Pollution" exclusion. Nothing contained within this endorsement shall be deemed to be a waiver of the coverage limitations imposed by any other applicable exclusion.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED**

Case 4:22-cv-01073-MWB Document 104-1 Filed 12/05/25 Page 90 of 431



# AGGREGATE LIMITS APPLY TO POLICY TERM

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The Final paragraph of **Section III - Limits Of Insurance** is deleted and replaced by the following:

The Limits of Insurance of this Coverage Form apply to the entire policy period and will not reinstate.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL CONTRACTOR CONDITIONAL COVERAGE - DEDUCTIBLE AMOUNT APPLIES IF CONDITIONS NOT MET

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** of this policy is amended to include:

**Additional Conditions - Certificates of Insurance and Hold Harmless Agreements - Deductible Amount Applies if Conditions Not Met**

**a.** You must obtain from your general contractor or any contractor with whom you sign a contract with directly, prior to commencement of any work performed on your behalf by that contractor; certificates of insurance evidencing:

**(1)** Commercial General Liability limits of insurance of $10,000,000.00 for Each Occurrence, $10,000,000.00 for the General Aggregate and $10,000,000.00 for the Products- Completed Operations Aggregate, inclusive of applicable Excess Liability or Umbrella policies; and

**(2)** Workers compensation insurance in compliance with the statutes of the applicable state.

**b.** You must obtain written hold harmless agreements from your contractor indemnifying you against all losses for the work performed for you by any and all subcontractors or independent contractors, prior to the commencement of any work performed on your behalf by that contractor; and

**c.** You must be endorsed as an Additional Insured for both premises-operations and products-completed operations on the contractor's General Liability policies, prior to the commencement of any work performed on your behalf by that contractor.

At the time of an “occurrence” involving the general contractor or any contractor with whom you sign a contract with directly, if any of the above conditions are not met with regard to such contractor,then, any deductible endorsement to the contrary notwithstanding, a deductible of $25,000.00 per “occurrence” is applicable to all damages, defense costs and/or claims expenses for “bodily injury”, “property damage”, and “personal and advertising injury” arising out of any covered acts of such contractor working for you or on your behalf.

**Designated contractor for the above mentioned conditions:** Liebart Corporation

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – PRODUCTS-COMPLETED OPERATIONS HAZARD

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

This insurance does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard".

 Copyright, Insurance Services Office, Inc., 1984 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – DAMAGE TO PREMISES RENTED TO YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The last paragraph ("Exclusions **c.** through **n.** do not apply . . . ") of Paragraph **2., Exclusions** under Section **I – Coverage A – Bodily Injury And Property Damage Liability** is deleted.

**B.** The first exception ("Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply . . . ") to Exclusion **j., Damage To Property** of Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is deleted.

**C.** Paragraph **6.** of **Section III – Limits Of Insurance** is deleted.

**D.** Any reference in the Declarations to "Damage To Premises Rented To You" is deleted.

 Copyright, Insurance Services Office, Inc., 1997 

# DEDUCTIBLE LIABILITY INSURANCE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SCHEDULE OF DEDUCTIBLES**

| Coverage | Amount and Basis of Deductible |
|---|---|
| Bodily Injury Liability | $. |
| Property Damage Liability | $. |
| Bodily Injury and Property Damage Liability Combined | $**5,000 each occurrence** |
| Coverage B Personal and Advertising Injury Liability | $. |
| Bodily Injury, Property Damage and Personal and Advertising Injury Liability Combined | $. |
| Liquor Liability – Each Common Cause | $. |

*If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.*

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury", "property damage" and/or "personal and advertising injury", however caused):

**I.** Our obligation under the Bodily Injury Liability, Property Damage Liability and Personal and Advertising Injury Liability coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages, and the limits of insurance applicable to Each Occurrence for such coverages will be reduced by the amount of such deductible. The applicable Aggregate limit for such coverages shall not be reduced by the application of such deductible amount.

**II.** The deductible amounts stated in the Schedule apply as follows:

**A. PER CLAIM BASIS** - if the deductible is on a "per claim" basis, the deductible amount applies:

**1.** Under the Bodily Injury Liability or Property Damage Liability Coverage, respectively:

**a.** To all damages because of "bodily injury" sustained by one person, or

Case 3:22-cv-07374-AMO Document 143-1 Filed 12/16/24 Page 395 of 431

**b**. To all damages because of "property damage" sustained by one person or organization, as a result of any one "occurrence".

**2.** Under Bodily Injury Liability and Property Damage Liability Coverage combined to all damages because of "bodily injury" and "property damage" sustained by one person or organization as the result of any one "occurrence".

**3.** Under Coverage B, to all damages sustained by any one person because of “personal injury and or advertising injury” as a result of any one claim or “occurrence”.

**4.** Under Bodily Injury Liability, Property Damage Liability and “Personal and Advertising Injury” combined, to all damages because of "bodily injury", "property damage" and “personal and advertising injury” and sustained by one person or organization as the result of any one claim or "occurrence".

**5.** Under Liquor Liability Coverage, to all damages sustained by any one person or organization. because of "injury" as a result of the selling, serving or furnishing of any alcoholic beverage.

**B. PER OCCURRENCE BASIS** - if the deductible is on “per occurrence" basis, the deductible amount applies:

**1.** Under the Bodily Injury Liability or Property Damage Liability Coverage, respectively:

**a.** To all damages because of "bodily injury" as the result of any one "occurrence", or

**b.** regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**2.** Under Bodily Injury Liability and Property Damage Liability Coverage combined to all damages because of "bodily injury" and "property damage" as the result of any one "Occurrence" regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**3.** Under Coverage B, to all damages sustained by any one person because of “personal injury and or advertising injury” as a result of any one claim or “occurrence”.

**4.** Under Bodily Injury Liability, Property Damage Liability and “Personal and Advertising Injury” combined, to all damages because of "bodily injury", "property damage" and “personal and advertising injury” and sustained by one person or organization as the result of any one claim or "occurrence".

**5.** Under Liquor Liability Coverage, to all damages sustained by any one person or organization. because of "injury" as a result of the selling, serving or furnishing of any alcoholic beverage.

**C. LEGAL AND LOSS ADJUSTMENT EXPENSES**
The applicable deductible amount(s) stated in the Schedule of Deductibles above shall also apply to all legal and loss adjustment expenses.

**D. SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**
The applicable deductible amount(s) stated in the Schedule of Deductibles above shall also apply to all payments made under SUPPLEMENTARY PAYMENTS - COVERAGES A and B.

**III**. The terms of this insurance, including those with respect to:

**A.** Our right and duty to defend any "suits" seeking those damages; and

**B.** Your duties in the event of an "occurrence", claim, or suit apply irrespective of the application of the deductible amount.

**IV**. We may pay any part or all of the deducible amount to effect settlement of any claim or suit and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as have been paid by us.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED**

# CALIFORNIA COMPLAINT NOTICE

In the event you need to contact someone regarding a dispute about your policy, premium or a claim that you have filed, please contact your broker or agent. If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:

**Navigators Specialty Insurance Company**
**One Penn Plaza, 32nd Floor**
**New York, NY 10119**

**Telephone Number: 1 (888) 222-2642**

If you have been unable to contact or obtain satisfaction from the broker, agent, or company, you may contact the Consumer Services Division at:

**Consumer Services Division**
**California Department of Insurance**
**300 South Spring Street, South Tower**
**Los Angeles, CA 90013**
**www.insurance.ca.gov**

**Toll Free Number: (800) 927-4357 or (213) 897-8921**

Please be informed that written correspondence is preferred so that a record of your inquiry is maintained. In addition, have your policy number available when contacting your broker, agent, company, or the Consumer Services Division.

This notice is for information only and does not become a part or condition of this policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

It is hereby amended and agreed that the following changes have been made to the policy:

Effective 2/6/2018, the mailing address has been changed to:

c/o Prime Data Centers, Corp
3140 Peacekeeper Way, Suite 101A
McClellan Park, CA 95652

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: **. Premium: REDACTED**

ENDORSEMENT NO : 001 Effective: 2/6/2018 12:00:00 AM
is attached to and forms part of your evidence of insurance no.: LA17CGL219162IC

Issued by: Navigators Specialty Insurance Company

Executive Offices: 230 W Monroe Street, Suite 1575, Chicago, IL 60606

Insured: SVO BUILDING ONE, LLC

Date Issued 02/06/2018 Authorized Representative:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

It is hereby amended and agreed that the following changes have been made to the policy:

In consideration of the additional premium shown below effective 3/12/2018 the expiration date of the policy is amended to show: 5/12/2018

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: **Additional Premium:** **REDACTED**

ENDORSEMENT NO : 002 Effective: 3/12/2018 12:00:00 AM

is attached to and forms part of your evidence of insurance no.: LA17CGL219162IC

Issued by: Navigators Specialty Insurance Company

Case 3:22-cv-07102-AMO Document 141-1 Filed 12/15/25 Page 79 of 95

Executive Offices: 230 W Monroe Street, Suite 1575, Chicago, IL 60606

Insured: SVO BUILDING ONE, LLC

Date Issued 03/06/2018 Authorized Representative:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

It is hereby amended and agreed that the following changes have been made to the policy:

In consideration of the additional premium shown below effective 5/12/2018 the expiration date of the policy is amended to show: 7/12/2018

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: **Additional Premium:** **REDACTED**

ENDORSEMENT NO : 003 Effective: 5/12/2018 12:00:00 AM

is attached to and forms part of your evidence of insurance no.: LA17CGL219162IC

Issued by: Navigators Specialty Insurance Company

Executive Offices: 230 W Monroe Street, Suite 1575, Chicago, IL 60606

Insured: SVO BUILDING ONE, LLC

Date Issued 05/08/2018 Authorized Representative:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

It is hereby amended and agreed that the following changes have been made to the policy:

Effective 7/12/2018, in consideration of the additional premium shown, it is hereby understood and agreed that the policy has been extended to 1/12/2019.

Construction Costs from 7/12/2018 - 1/12/2019: $6,800,000

The following forms have been added:

| | |
|---|---|
| CG 20 18 04 13 | ADDITIONAL INSURED – MORTGAGEE, ASSIGNEE OR RECEIVER (specific) |
| CG 24 04 05 09 | WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US (specific) |

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: **Additional Premium: REDACTED**

ENDORSEMENT NO : 004 Effective: 7/12/2018 12:00:00 AM
is attached to and forms part of your evidence of insurance no.: LA17CGL219162IC

Issued by: Navigators Specialty Insurance Company

Executive Offices: 230 W Monroe Street, Suite 1575, Chicago, IL 60606

Insured: SVO BUILDING ONE, LLC

Date Issued 07/17/2018 Authorized Representative:

POLICY NUMBER:LA17CGL219162IC

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s) | Designation Of Premises |
|---|---|
| Sequoia Investment Management Co., Ltd<br>Its Successors and/or Assigns, as their interest may appear<br>11-13 Market Place<br>London W1W 8AH | . |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.


© Insurance Services Office, Inc., 2012

POLICY NUMBER: LA17CGL219162IC

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name Of Person Or Organization:**<br>Sequoia Investment Management Co., Ltd<br>Its Successors and/or Assigns, as their interest may appear<br>11-13 Market Place<br>London W1W 8AH |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV - Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

 © Insurance Services Office, Inc., 2008 

Case 3:22-cv-07142-AMO Document 43-1 Filed 01/15/24 Page 86 of 95

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

It is hereby amended and agreed that the following changes have been made to the policy:

Effective 7/24/2018, the following forms have been added:

| | |
|---|---|
| CG 20 18 04 13 | ADDITIONAL INSURED – MORTGAGEE, ASSIGNEE OR RECEIVER (specific) |
| NPC 801 11 08 | PRIMARY AND NON-CONTRIBUTORY |
| CG 24 04 05 09 | WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US (specific) |

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: . **Premium: REDACTED**

ENDORSEMENT NO : 005 Effective: 7/24/2018 12:00:00 AM
is attached to and forms part of your evidence of insurance no.: LA17CGL219162IC

Issued by: Navigators Specialty Insurance Company

Executive Offices: 230 W Monroe Street, Suite 1575, Chicago, IL 60606

Insured: SVO BUILDING ONE, LLC

Date Issued 08/06/2018 Authorized Representative:

Case 4:23-cv-07102-AMO Document 104-1 Filed 02/05/24 Page 81 of 65



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s) | Designation Of Premises |
|---|---|
| The Bank of New York Mellon, As Administrative Agent, Its Successors and/or Assigns And Sequoia Investment Management Co., Ltd., Its Successors and/or Assigns, as their interest may appear<br>500 Ross Street, 12th Floor<br>Pittsburgh, PA 15262 | . |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.


© Insurance Services Office, Inc., 2012

**ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIMARY AND NON-CONTRIBUTORY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Name of Person or Organization:

The Bank of New York Mellon, As Administrative Agent, Its Successors and/or Assigns And Sequoia Investment Management Co., Ltd., Its Successors and/or Assigns, as their interest may appear
500 Ross Street, 12th Floor
Pittsburgh, PA 15262

A. The following is added to **4. c. Method of Sharing, Section IV - Commercial General Liability Conditions**:

However, we will not seek contribution from other insurance available to the person or organization shown above, when you have agreed in a written contract prior to the loss, to provide such person or organization primary and non-contributing insurance.

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name Of Person Or Organization:**<br>The Bank of New York Mellon, As Administrative Agent, Its Successors and/or Assigns And Sequoia Investment Management Co., Ltd., Its Successors and/or Assigns, as their interest may appear<br>500 Ross Street, 12th Floor<br>Pittsburgh, PA 15262 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV - Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

 © Insurance Services Office, Inc., 2008 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

It is hereby amended and agreed that the following changes have been made to the policy:

Per the insured's request, the policy term has been amended to reflect the following:

07/12/2017 - 07/12/2019

AND

Form NPC 700 11 08 - Aggregate Limits Apply to Policy Term still applies

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: **Additonal Premium: REDACTED**

ENDORSEMENT NO : 006 Effective: 01/12/2019 12:00:00 AM

is attached to and forms part of your evidence of insurance no.: LA17CGL219162IC

Issued by: Navigators Specialty Insurance Company

Executive Offices: 230 W Monroe Street, Suite 1575, Chicago, IL 60606

Insured: SVO BUILDING ONE, LLC

Date Issued 01/10/2019 Authorized Representative:

NPC-907 03 09



EXH. A-92

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

It is hereby amended and agreed that the following changes have been made to the policy:

Per the Insured's request, the policy term has been amended to reflect the following:

07/12/2017 - 08/11/2019

AND

Form NPC 700 11 08 - Aggregate Limits Apply to Policy Term is still applicable

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

---

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: **Additional Premium: REDACTED**

ENDORSEMENT NO : 007 Effective: 07/12/2019 12:00:00 AM
is attached to and forms part of your evidence of insurance no.: LA17CGL219162IC

Issued by: Navigators Specialty Insurance Company

Case 4:23-cv-07102-AMO Document 104-1 Filed 12/11/24 Page 94 of 95

Executive Offices: 230 W Monroe Street, Suite 1575, Chicago, IL 60606

Insured: SVO BUILDING ONE, LLC

**Date Issued** 07/11/2019 **Authorized Representative:**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

It is hereby amended and agreed that the following changes have been made to the policy:

Per the Insured's request, the policy's expiration date has been amended to reflect the following:

08/12/2019

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: **. Premium: REDACTED**

ENDORSEMENT NO : 008 Effective: 7/12/2019 12:00:00 AM

is attached to and forms part of your evidence of insurance no.: LA17CGL219162IC

Issued by: Navigators Specialty Insurance Company

Executive Offices: 230 W Monroe Street, Suite 1575, Chicago, IL 60606

Insured: SVO BUILDING ONE, LLC

Date Issued 07/26/2019 Authorized Representative: [signature]

Case 4:23-cv-07102-AMO Document 41-2 Filed 12/05/24 Page 119 of 431

Robert H. Sloss (Bar No. 87757)
Mark G. Budwig (Bar No. 126045)
Victor M. Felix (Bar No. 179622)
Mike Nolan (Bar No. 265658)
Procopio, Cory, Hargreaves & Savitch LLP
12544 High Bluff Drive, Suite 400
San Diego, CA 92130
Telephone: 858.720.6300
Facsimile: 619.235.0398
E-mail: robert.sloss@procopio.com
E-mail: mark.budwig@procopio.com
E-mail: victor.felix@procopio.com
E-mail: mike.nolan@procopio.com

Attorneys for Claimant Vertiv Corporation, (formerly Liebert Corporation)

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| LIEBERT CORPORATION, an Ohio corporation,<br><br>Claimant,<br><br>v.<br><br>SVO BUILDING ONE, LLC, a Delaware limited liability company<br><br>Respondent. | Case No. 01-18-0003-1318<br><br>**FOURTH AMENDED COMPLAINT FOR:**<br><br>**1. BREACH OF CONTRACT**<br>**2. OPEN BOOK ACCOUNT**<br>**3. REASONABLE VALUE**<br>**4. DECLARATORY RELIEF**<br>**5. VIOLATION OF UNFAIR COMPETITION LAW**<br>**6. MISAPPROPRIATION OF TRADE SECRETS**<br>**7. PATENT INFRINGEMENT**<br>**8. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>**9. DEFAMATION**<br>**10. FRAUD**<br>**11. NEGLIGENT MISREPRESENTATION**<br>**12. CIVIL CONSPIRACY** |

Claimant Liebert Corporation alleges as follows:

1. Claimant Liebert Corporation (which changed its name to Vertiv Corporation on August 30, 2018 and shall hereinafter be referred to as "Vertiv") is, and at all times mentioned herein was, a corporation organized and existing under and by virtue of the laws of the State of Ohio, authorized to do business in California, and a duly licensed contractor in substantial compliance with the licensure laws of the State of California.

2. Vertiv is informed and believes, and based thereon alleges, that Respondent SVO Building One, LLC ("SVO") is, and at all times mentioned herein was, a limited liability company organized and existing under and by virtue of the laws of the State of Delaware.

## BACKGROUND FACTS

*Vertiv's history as a data center supplier*

3. Data centers power the modern world as they house the equipment that is essential to the Internet and all other forms of advanced communications. For more than 50 years, Vertiv has been the leading supplier of power and thermal equipment, services and solutions for data centers, and more recently Vertiv has also designed and erected the buildings that make up a data center.

4. Vertiv has been at the forefront in developing products and technologies that make a data center function, including uninterruptable power supplies and the components of thermal management systems that keep the atmosphere inside data centers at appropriate levels of temperature and humidity. As a result of its development work, Vertiv has created thousands of proprietary designs, methods and devices for which it has obtained hundreds of patents. For designs, methods and devices that are not protected by patents, Vertiv has treated such designs, methods and devices, as well as the know-how regarding how to design and outfit data centers it has acquired through its many years of supplying (and now building) those structures, as trade secrets.

*SVO's McClellan Park data center project*

5. In late 2016, SVO reached out to Vertiv, then known as Liebert, to lead the design and construction efforts for a data center SVO was building at 2407 AK Street, Sacramento, California (the "Project"). The Project was to consist of three two-megawatt data halls for a total capacity of six megawatts. The data center industry measures size in terms of the amount of power a data center consumes as measured in megawatts. A six-megawatt data center is considered a fairly large data center.

*Agreements between SVO and Vertiv*

6. In connection with the Project, Vertiv and SVO entered into several agreements.



EXH. B-2

Initially, in or about December 2016, the parties entered into a "Consultant Agreement" and purchase order whereby Vertiv agreed to perform certain design services on the Project. A true and correct copy of the Consultant Agreement, excluding appendices, is attached hereto as Exhibit A and incorporated herein by reference.

7. In or about May 2017, Vertiv and SVO executed a "Lump Sum Turnkey Agreement" (the "Turnkey Agreement") pursuant to which Vertiv agreed, once certain condition precedents were satisfied, to provide certain design, engineering, procurement, installation, construction, testing, commissioning and start up services on the Project. A true and correct copy of the Turnkey Agreement, excluding appendices and subsequently issued purchase orders and amendments, is attached hereto as Exhibit B and incorporated herein by this reference.

8. The Project was to be developed in three phases with each phase completing one of the three data halls. In recognition of the fact that this work would involve substantial numbers of Vertiv's patents, trade secrets and other intellectual property, Vertiv requested terms in both the Consultant Agreement and the Turnkey Agreement that specified (a) Vertiv would retain ownership of all Intellectual Property and Work Product (which the Agreement broadly defined) used in the Project; and (b) Vertiv would grant SVO "a limited, non-exclusive, not-transferable, *revocable* license" to use Vertiv's Intellectual Property and Work Product solely in connection with the Project.

9. Because of the importance it gives its Intellectual Property, Vertiv took pains in negotiating both the Consultant Agreement and the Turnkey Agreement to ensure the inclusion of provisions that make it abundantly clear that Vertiv would own the Intellectual Property used in the work performed by Vertiv regarding the Project.

10. Vertiv's ownership rights extended beyond what the above-mentioned Agreements defined as Intellectual Property, as Vertiv also retained ownership of its "Work Product," which Section 1.2 of the Turnkey Agreement defines to include: (1) all business and technical information and know-how resulting from Vertiv's performance under the Agreement; and (2) all designs, inventions, discoveries, techniques, technologies, copyright works – including computer programs and drawings – trade secrets and other intellectual property of any kind embodied in

Vertiv's work. The definition of Vertiv's ownership rights to include Work Product was not happenstance, but a deliberate effort by Vertiv to keep ownership of all that it created to the fullest extent possible.

11. At the same time, recognizing SVO's need to use Vertiv's Intellectual Property and Work Product, in Section 8.7 of the Turnkey Agreement Vertiv granted SVO a limited, non-exclusive, revocable license to use its Intellectual Property and Work Product in connection with the development and operation of the Project.

12. To ensure that there could be no possible ambiguity regarding the scope of the license, Section 8.8 of the Turnkey Agreement explicitly prohibits SVO from using the Work Product and Intellectual Property in any way outside the scope of the Turnkey Agreement. Vertiv and SVO negotiated these terms extensively.

*Agreement between SVO and DPR Construction*

13. Prior to contacting Vertiv to provide services on the Project, Vertiv understood that SVO had retained DPR Construction ("DPR") in or about February 2016 to design and build the Project.

14. In performing its obligations, DPR submitted a building permit application, obtained the building permit for the Project, and was listed as the contractor on the building permit for the Project.

15. Ultimately, SVO decided to retain Vertiv to complete the Project rather than proceed with DPR. To that end, in December 2017, a supplement/change to the building permit was made changing the general contractor from DPR to Vertiv.

16. Unbeknownst to Vertiv at the time, SVO did not terminate its agreement with DPR upon retaining Vertiv to provide services on the Project. Instead, SVO and DPR agreed upon an amendment to their agreement, effective on or about January 11, 2017, under which some of the scope of DPR's work was reduced but other portions remained DPR's obligation to perform. Additionally, a term of the amendment provided that, if DPR was not subsequently engaged to continue work at the Project (i.e., as a subcontractor to Vertiv), that SVO would be obligated pay DPR a "Concession Amount," the amount of which at this time SVO has refused to disclose to

Vertiv.

17. At the time of its engagement and negotiation with DPR to perform work at the Project, Vertiv was unaware of the terms of DPR's amended agreement; in particular that DPR would receive a "Concession Amount" payment from SVO if DPR did not obtain the subcontract from Vertiv.

18. Vertiv is informed and believes, and based thereon alleges, that DPR's undisclosed "Concession Amount" agreement with SVO hindered Vertiv's ability to negotiate fair and equitable terms with DPR and ultimately resulted in Vertiv incurring increased costs on the Project that it otherwise would not have incurred had SVO disclosed to Vertiv this secret arrangement with DPR.

*Vertiv's patents*

19. The designs, products, systems, configurations and techniques used by Vertiv to design, construct and outfit the Project contain Vertiv's Intellectual Property, which Vertiv has protected with patents and trade secrets.

20. Throughout its history, Vertiv has created innovative products and systems for use in the construction, operation and management of data centers. As evidence of its role as a leader in the development of new technologies, Vertiv has received over 1,000 patents, many of which disclose inventions in the fields of power supply, thermal control and uninterruptible power sources.

21. Any number of Vertiv's patents relate to the cutting-edge products and systems provided to SVO for the Project, including the following patents which cover products and systems that are essential to SVO's data center:

a. U.S. Patent No. 7,352,082 entitled "Transfer Switch Device and Method" and issued on April 1, 2008 (the "'082 Patent");

b. U.S. Patent No. 7,459,804 entitled "Static Transfer Switch Device and Method" and issued on December 2, 2008 (the "'804 Patent");

c. U.S. Patent No. 9,038,404 entitled "High Efficiency Cooling System" and issued on May 26, 2015 (the "'404 Patent");

d. U.S. Patent No. 9,316,424 entitled "Multi-Stage Cooling System with Tandem Compressors and Optimized Control of Sensible Cooling and Dehumidification" and issued on April 19, 2016 (the "'424 Patent");

e. U.S. Patent No. 6,917,124 entitled "Uninterruptible Power Supply" and issued on July 12, 2005 (the "'124 Patent"); and

f. U.S. Patent No. 6,563,048 entitled "Ancillary Cabinet System for an Uninterruptible Power Supply" and issued on May 13, 2003 (the "'048 Patent").

*Vertiv's trade secrets*

22. Although data centers share many of the same features – e.g., racks for servers, power supplies, cooling systems, fire suppressant systems, cabling, control systems and structural systems – the way in which these various features are equipped and configured differs greatly from data center to data center, depending on environmental factors such as the size of the data halls, the shape and condition of the building that houses the data center, the weather conditions throughout the year in the data center's location and the way in which the data center will be used. No two data centers are the same.

23. As the designer of and supplier of equipment for Phase 1 of the data center, Vertiv's engineers had to make thousands of decisions regarding what equipment to specify (both in terms of each piece of equipment's function and size), where to place each piece of equipment, how to calibrate and connect each piece of equipment so that all the equipment working together would function as desired, how to control the equipment, both individually and as a whole, and how to monitor and maintain the equipment – all of which (the decision on what equipment to specify and the use of the specific equipment chosen) constitute the proprietary means and methods developed by Vertiv for designing and equipping a data center. These design decisions and selection processes manifested themselves in several ways: (a) in the hundreds of drawings, specifications and other design documents prepared by Vertiv; (b) in the specific components chosen and requisitioned by Vertiv; (c) in the placement and manner of connection of each component; (d) in the countless engineering calculations performed; and (e) in the numerous manuals and operating instructions created by Vertiv for the Project. These design decisions were unique to Phase 1 of the

SVO Project, were maintained as confidential information by Vertiv and would be of tremendous value to someone else designing or building a data center, such as the designers and builders of Phases 2 and 3 of the SVO Project.

24. Vertiv produced three sets of drawings for Phase 1 of the Project that varied in detail and completeness – schematic drawings, design drawings and construction drawings – as well as an entirely different kind of drawings that Vertiv submitted to equipment suppliers (including itself) as part of the requisition process. In all, Vertiv generated well over 500 drawings. The drawings are stamped as Vertiv confidential information. Vertiv's drawings were created for, and are unique to, Phase 1 of the SVO Project, were maintained as confidential information by Vertiv and would be of tremendous value to someone else designing or building a data center, such as the designers and builders of Phases 2 and 3 of the SVO Project.

25. Data centers are extraordinarily complex facilities that require the integration of many systems (power, thermal, control, etc.) in a coordinated manner so that the combined systems operate precisely, reliably and predictably. To accomplish these goals, Vertiv employees performed thousands of engineering calculations that ensured they were specifying the right components connected in the optimal configuration. Vertiv's engineering calculations, which were the results of years of experience designing data centers, created for and are unique to Phase 1 of the SVO Project, were maintained as confidential information by Vertiv and would be of tremendous value to someone else designing or building a data center, such as the designers and builders of Phases 2 and 3 of the SVO Project.

26. Although Vertiv designed and constructed much of Phase 1 (and was under contract to design and construct Phases 2 and 3), its primary function was to supply the equipment that goes into a data center to make it operate – components such as modular infrastructure, power supplies, thermal management and the control systems that allow the data center to operate efficiently. Vertiv has thousands of products that perform various data center functions and to the extent those products are not covered by patents, the features or operations of the products are Vertiv trade secrets. In addition, the products typically come with manuals that explain the workings of the products and what a user needs to know in order ensure the proper operation of the products.

Vertiv's manuals are also protected as trade secrets. Many aspects of the products and manuals provided for Phase 1 of the project (such as the way in which each component was calibrated and integrated into the data center) were unique to Phase 1 of the SVO Project, were maintained as confidential information by Vertiv and would be of tremendous value to someone else designing or building a data center, such as the designers and builders of Phases 2 and 3 of the SVO Project.

27. The information and inventions Vertiv protected as trade secrets are different than the information and inventions disclosed in the patents obtained by Vertiv. Vertiv's patents do not disclose its trade secrets or confidential information.

*SVO's termination of the Agreement and Vertiv's revocation of the license*

28. Over the course of Vertiv's work on the Project, numerous disputes arose between Vertiv and SVO regarding such things as scope of work and payment. Ultimately, SVO wrongfully terminated the Turnkey Agreement in July 2018 after Vertiv had substantially completed Phase 1 of the Project.

29. Following SVO's termination of the Turnkey Agreement, Vertiv properly revoked SVO's license in writing on August 9, 2018 pursuant to the terms of the Turnkey Agreement.

*SVO's continued improper disclosure and use of Vertiv's patented and trade secret information*

30. Notwithstanding Vertiv's revocation of the license to SVO, it has continued to wrongfully disclose and use Vertiv's trade secret information and patented technology. For example, Vertiv has learned that SVO has given drawings and calculations prepared by Vertiv to designers and builders of data centers, including designers and builders retained by SVO to develop Phases 2 and 3 of the Project. Upon information and belief, SVO has also shared information with designers and builders of data centers regarding the products specified and installed in Phase 1, how the various data center components have been configured and how to operate, monitor and maintain those components and the data center systems. Vertiv's allegations regarding the disclosure of its trade secrets and the use SVO has made of Vertiv's trade secrets and patented technology as alleged herein is not to be considered comprehensive or limiting in any way; discovery in this case will likely reveal other unauthorized and illegal disclosures and uses of Vertiv's intellectual property by SVO and those working on its behalf.

31. The companies to whom SVO provided Vertiv's highly valuable intellectual property are competitors of Vertiv in the business of designing, building and/or outfitting data centers, and the delivery of such trade secret information and patented technology to those competitors has caused and will continue to cause irreparable injury to Vertiv.

**FIRST CAUSE OF ACTION**

**(Breach of Contract as Against SVO)**

32. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 31, as though set forth fully herein.

33. The Turnkey Agreement sets forth separate and distinct obligations to be performed by Vertiv, including engineering and design services, procurement of equipment and supplies, and construction of the Project.

34. The Project was to proceed in three (3) phases and performance was not to commence until SVO issued a written Purchase Order authorizing the work for a particular phase. SVO issued a Purchase Order with respect to Phase 1 ("Purchase Order"). SVO thereafter, and without proper cause, wrongfully terminated the Turnkey Agreement prior to the issuance of the Purchase Orders for the remaining two phases.

35. Vertiv has fully performed all terms, conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement and Purchase Order, except as prevented and/or excused by SVO.

36. SVO breached the Turnkey Agreement and subsequently issued Purchase Order, including the implied covenant of good faith and fair dealing, by, among other things: (1) improperly administering the Agreement, the Purchase Orders and the Project, resulting in, among other things, delays to the Project, out of sequence work, and associated extra work and costs; (2) failing to pay for all work Vertiv performed under the Agreement and Purchase Order, including the engineering and design work, equipment and supplies procured for the Project, and construction services provided pursuant to the separate and distinct obligations set forth in the Agreement and schedule of values; (3) violating Vertiv's rights to intellectual property, trade secrets and work product; (4) intentionally attempting to delay the approval of Change Order

Requests and to delay the completion of the Project in order to, among other things, improperly assess liquidated damages against Vertiv; and (5) wrongfully terminating the Turnkey Agreement and Purchase Order.

37. As a direct and proximate cause of the breach of Turnkey Agreement by SVO, Vertiv has been damaged in a sum in excess of $9,000,000, plus interest thereon at the maximum legally permissible rate, according to proof at trial. Said damage amount is comprised of unpaid amounts owed for separate and distinct categories of work including but not limited to unpaid design services, material and equipment supply, and construction services and performance.

38. Pursuant to California Civil Code sections 8800 and 8818, Vertiv is further entitled to two percent (2%) interest per month on any amounts which were not paid by SVO to Vertiv within the statutory time periods.

39. Further, Vertiv has retained the law firm of Procopio, Cory, Hargreaves & Savitch, LLP to enforce the terms of the Agreement and prosecute this action. Pursuant to the Agreement and the above identified code provisions, Vertiv is entitled to recover its reasonable attorneys' fees and costs incurred in connection with this action.

**SECOND CAUSE OF ACTION**

**(Open Book Account as Against SVO)**

40. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 39, as though set forth fully herein.

41. SVO became indebted on an open book account for a sum in excess of $9,000,000 for engineering and design services, the procurement and provision of certain equipment and supplies, and the furnishing of certain materials, labor, supplies, and/or services Vertiv furnished to SVO pursuant to the Agreement.

42. No part of said sum has been paid, despite demand, and there is now due, owing and unpaid to Vertiv a sum in excess of $9,000,000, plus interest thereon at the maximum legally permissible rate according to proof at trial.

43. Vertiv alleges that this cause of action is based on an Open Book Account entered into on or after January 1, 1987, as defined in California Civil Code § 1717.5. On this additional

basis, Vertiv is entitled to its reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**

**(Reasonable Value as Against SVO)**

44. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 43, as though set forth fully herein.

45. Vertiv furnished design services, equipment, materials, labor, supplies, and/or services to SVO at their special request, and for which they promised to pay Vertiv the reasonable value therefor.

46. At all times mentioned herein, the total reasonable value of the above mentioned materials, labor, supplies, and/or services furnished by Vertiv to the Project was, and is, the sum in excess of $9,000,000.

47. No part of said sum has been paid, despite demand, and there is now due, owing and unpaid to Vertiv the sum in excess of $9,000,000, plus interest thereon at the maximum legally permissible rate according to proof at trial.

**FOURTH CAUSE OF ACTION**

**(Declaratory Relief as Against SVO)**

48. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 47, as though set forth fully herein.

49. Vertiv is informed and believes, and thereon alleges, that an actual controversy has arisen and now exists between Vertiv and SVO concerning their respective rights and duties under the Agreement, specifically regarding the parties' rights with respect to Vertiv's intellectual property and work product, and Vertiv's right to revoke the limited use license granted to SVO relating to certain intellectual property and work product in connection with the Project.

50. Vertiv contends that the Turnkey Agreement expressly provides that the limited use license granted to SVO is revocable and Vertiv is permitted to revoke said license at any time, with or without cause. Accordingly, on or about August 9, 2018, Vertiv served notice to SVO revoking the license, and Vertiv contends that SVO must cease using the intellectual property and work product that is the subject of the license. Vertiv is informed and believes, and thereon alleges, that

SVO contends the license may not be revoked and that it may continue to utilize Vertiv's intellectual property and work product in connection with the completion of all Phases of the Project and in connection with the operation of the completed Project.

51. Vertiv desires a judicial determination of the parties' respective rights and duties, and a declaration that Vertiv may revoke, and has properly revoked, the license and SVO must cease using the intellectual property and work product.

**FIFTH CAUSE OF ACTION**

**(Violation of Unfair Competition Law as Against SVO)**

52. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 51, as though set forth fully herein.

53. The acts of SVO as described herein, and otherwise, constitute unlawful, unfair and fraudulent business practices as defined by California Business & Professions Code § 17200, et seq.

54. Without limitation, at least the following acts by SVO were unlawful business acts: the use of Vertiv's intellectual property and work product without Vertiv's permission, on information and belief, both to finish Phase 1 of the Project and to design and construct Phases 2 and 3 of the Project; and requesting that Vertiv assist them in defrauding SVO's lender by changing or withholding Change Order Requests.

55. Without limitation, at least the following acts by SVO were unfair business acts: the use of Vertiv's intellectual property and work product without Vertiv's permission, on information and belief, both to finish Phase 1 of the Project and to design and construct Phases 2 and 3 of the Project; requesting that Vertiv assist them in defrauding SVO's lender by changing or withholding Change Order Requests; seeking and/or causing third parties to issue false reports regarding the commissioning of equipment on the Project; intentionally inducing Vertiv to retain DPR as a subcontractor to perform work at the Project for the purpose of avoiding an obligation to pay DPR a "Concession Amount" pursuant to a deal between SVO and DPR that was hidden from Vertiv, and, as a result, limiting Vertiv's ability to negotiate with DPR causing Vertiv to incur excessive construction costs; and intentionally attempting to delay the approval of Change Order

Requests and to delay the completion of the Project in order to, among other things, be able to charge Vertiv with delay penalties.

56. Without limitation, at least the following acts by SVO were fraudulent business acts: requesting that Vertiv assist them in defrauding SVO's lender by changing or withholding Change Order Requests; seeking and/or causing third parties to issue false reports regarding the commissioning of equipment on the Project; seeking and/or causing third parties to issue false reports regarding the commissioning of equipment on the Project; intentionally attempting to delay the approval of Change Order Requests and to delay the completion of the Project in order to, among other things, be able to charge Vertiv with delay penalties.

57. As a direct and proximate cause of the wrongful conduct of SVO , Vertiv has been injured in fact. For example, as a direct consequence of the acts of SVO , SVO are using Vertiv's intellectual property and work product to complete Phase 1 of the Project and to design and construct Phases 2 and 3 of the Project, which erodes Vertiv's reputation as a designer and builder of data centers and provides an unjustified cost savings to SVO . Such harm will continue unless the acts of SVO are enjoined by the Court. Vertiv has no adequate remedy at law for the continued acts of unlawful, unfair and fraudulent business practices by SVO .

**SIXTH CAUSE OF ACTION**

**(Claim for Misappropriation of Trade Secrets in Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 Against SVO)**

58. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 57, as though set forth fully herein.

59. Vertiv is the owner of certain valuable trade secrets, as alleged above, relating to the design, construction and outfitting of data centers, including but not limited to drawings, technical products, manuals, engineering calculations, knowhow, and techniques. Examples of trade secrets used in the Project and disclosed to SVO include but are not limited to drawings showing the layout of the components contained in the data center; engineering calculations used to determine the size and optimal function of the components specified for the data center; and the sequence of operations of the control systems that monitor, operate and calibrate the equipment so that the data

center as a whole functions as intended.

60. The trade secrets owned by Vertiv and were not disclosed in any Vertiv patents, patent applications or other publications available to the public. Likewise, Vertiv did not share the trade secrets with anyone outside of the company without the existence of a non-disclosure agreement.

61. Vertiv's trade secrets are related to Vertiv's products and services that are used or sold in interstate and foreign commerce.

62. Vertiv has at all times taken reasonable measures to keep its trade secret information secret and confidential, such as limiting who has access to its trade secrets and requiring any non-Vertiv employee who is shown such information to sign a non-disclosure agreement.

63. Vertiv's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure of the information.

64. In violation of Vertiv's rights, SVO misappropriated Vertiv's trade secret information in the improper and unlawful manner as alleged herein. For example, SVO have shared drawings and engineering calculations prepared by Vertiv with other data center designers and builders.

65. As a proximate result of SVO 's misappropriation of Vertiv's trade secrets, Vertiv has suffered damages in an amount to be proven at trial pursuant to 18 U.S.C § 1836(b)(3)(B).

66. SVO's trade secret misappropriation has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A).

67. In misappropriating Vertiv's trade secrets, SVO acted willfully and maliciously as Vertiv gave SVO written notice in August 2018 that Vertiv was revoking SVO's license to use Vertiv's intellectual property and that any further disclosure or use of that intellectual property by SVO would be unlawful. Vertiv is thus entitled to exemplary damages pursuant to 18 U.S.C. §

1836(b)(3)(C) and an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SEVENTH CAUSE OF ACTION

**(Claim for Misappropriation of Trade Secrets under in Violation of California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426-3426.11, Against)**

68. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 67, as though set forth fully herein.

69. Vertiv is the owner of certain valuable trade secrets, as alleged above, relating to the design, construction and outfitting of data centers, including but not limited to drawings, technical products, manuals, engineering calculations, knowhow, and techniques. Examples of trade secrets used in the Project and disclosed to SVO include but are not limited to drawings showing the layout of the components contained in the data center; engineering calculations used to determine the size and optimal function of the components specified for the data center; and the sequence of operations of the control systems that monitor, operate and calibrate the equipment so that the data center as a whole functions as intended.

70. The trade secrets are owned by Vertiv and were not disclosed in any Vertiv patents, patent applications or other publications available to the public. Likewise, Vertiv did not share the trade secrets with anyone outside of company without the existence of a non-disclosure agreement.

71. Vertiv has at all times taken reasonable measures to keep its trade secret information secret and confidential, such as limiting who has access to its trade secrets and requiring any non-Vertiv employee who is shown such information to sign a non-disclosure agreement.

72. Vertiv's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure of the information.

73. In violation of Vertiv's rights, SVO misappropriated Vertiv's trade secret information in the improper and unlawful manner as alleged herein. For example, SVO has shared drawings and engineering calculations prepared by Vertiv with other competing data center designers and builders.

74. As a proximate result of SVO 's misappropriation of Vertiv's trade secrets, Vertiv

has suffered damages in an amount to be proven at trial pursuant to Cal. Civ. Code § 3426.3(a)-(b).

75. SVO 's trade secret misappropriation has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief pursuant to Cal. Civ. Code § 3426.2.

76. In misappropriating Vertiv's trade secrets, SVO acted willfully and maliciously as Vertiv gave SVO written notice in August 2018 that Vertiv was revoking SVO's license to use Vertiv's intellectual property and that any further disclosure or use of that intellectual property by SVO would be unlawful. Vertiv is thus entitled to exemplary damages pursuant to Cal. Civ. Code § 3426.3(c) and an award of reasonable attorneys' fees pursuant to Cal. Civ. Code § 3426.4.

**EIGHTH CAUSE OF ACTION**

**(Claim for Infringement of Patent No. 7,352,082 Against SVO )**

77. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 76, as though set forth fully herein.

78. The '082 Patent entitled "Transfer Switch Device and Method" was duly and lawfully issued on April 1, 2008. A true and correct copy of the '082 Patent is attached hereto as Exhibit C and incorporated herein by reference.

79. Vertiv is the owner of all rights, title and interest in the '082 Patent, including the right to bring this suit for injunctive relief and damages.

80. The '082 Patent is valid and enforceable.

81. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '082 Patent by using in the United States without authority certain transfer switch devices.

82. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded STS2 Static Transfer Switch 2 for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the STS2 Static Transfer Switch 2, but, upon information and belief, continues to do so.

83. SVO infringe at least claim 4 of the '082 Patent because that claim was drafted to incorporate the features of the STS2 Static Transfer Switch. Thus, the STS2 Static Transfer Switch being used by SVO has:

a. A first switch connectable to a voltage source;

b. A second switch connectable to a second voltage source;

c. A controller connected to the first and second switches to activate and deactivate the first and second switches to selectively connect the first or second switch to a load via a transformer;

d. The controller having inputs for receiving signals representing voltage levels of the first and second voltage sources and the voltage applied to the load transformer, wherein upon a predetermined condition, the controller:

i. Deactivates the first switch to disconnect the first voltage source from the load;

ii. Computes in substantially real time the volt-second areas under voltage waveforms of the first and second voltage sources;

iii. Assigns a polarity to each voltage-second area based on the polarity of the corresponding voltage;

iv. Determines a switching time to minimize downstream saturation current based on the sum of the absolute values of the areas under the waveforms of the first and second voltage sources being approximately equal to the absolute value of the area under the waveform of a complete half cycle of the second voltage, and their polarities being the same; and

v. Connects the second voltage source to the load at the determined switching time.

84. As a proximate result of SVO 's infringement of the '082 Patent, Vertiv has suffered damages in an amount to be proven at trial.

85. SVO 's infringement of the '082 Patent has caused and continues to cause Vertiv

irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

86. In infringing the '082 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Complaint in the United States District Court for the District of Delaware in the case tilted *Vertiv Corporation v. SVO Building One, LLC*, Case No. 1:18-cv-01776 (the "Delaware Complaint"), that it was infringing the '082 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '082 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

87. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**NINTH CAUSE OF ACTION**

**(Claim for Infringement of Patent No. 7,459,804 Against SVO )**

88. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 87, as though set forth fully herein.

89. The '804 Patent entitled "Static Transfer Switch Device and Method" was duly and lawfully issued on December 2, 2008. A true and correct copy of the '804 Patent is attached hereto as Exhibit D and incorporated herein by reference.

90. Vertiv is the owner of all rights, title and interest in the '804 Patent, including the right to bring this suit for injunctive relief and damages.

91. The '804 Patent is valid and enforceable.

92. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '804 Patent by using in the United States without authority certain static transfer switch devices.

93. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded STS2 Static Transfer Switch 2 for use in the Project.

When Vertiv properly revoked the license in August 2018. SVO no longer had the right to use the STS2 Static Transfer Switch 2. but, upon information and belief, continues to do so.

94. SVO infringe at least claims 1. 7 and 8 of the '804 Patent because those claims were drafted to incorporate the features of the STS2 Static Transfer Switch. Thus, the STS2 Static Transfer Switch being used by SVO has, as recited in claim 7, for example:

a. A first silicon controlled rectifier connected to a voltage source;

b. A second silicon controlled rectifier connected a second voltage source; and

c. A controller connected to the first and second silicon controlled rectifiers to activate and deactivate the first and second silicon controlled rectifiers to selectively connect the first or the second silicon controlled rectifiers to a load;

d. the controller having inputs for receiving signals representing the voltage levels of the first and second voltage sources and the voltage applied to the load. wherein upon a predetermined condition, the controller temporarily pulses on the second silicon controlled rectifier and thereafter, indefinitely turns on the second silicon controlled rectifier to maintain power to the load.

95. As a proximate result of SVO 's infringement of the '804 Patent. Vertiv has suffered damages in an amount to be proven at trial.

96. SVO 's infringement of the '804 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

97. In infringing the '804 Patent. SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '804 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '804 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

98. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**TENTH CAUSE OF ACTION**

**(Claim for Infringement of Patent No. 9,038,404 Against SVO )**

99. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 98, as though set forth fully herein.

100. The '404 Patent entitled "High Efficiency Cooling System" was duly and lawfully issued on May 26, 2015. A true and correct copy of the '404 Patent is attached hereto as Exhibit E and incorporated herein by reference.

101. Vertiv is the owner of all rights, title and interest in the '404 Patent, including the right to bring this suit for injunctive relief and damages.

102. The '404 Patent is valid and enforceable.

103. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '404 Patent by using in the United States without authority certain thermal devices.

104. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded DSE cooling system (e.g., DA150 and DA125) for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the DSE cooling system, but, upon information and belief, continues to do so.

105. SVO infringe at least claim 1 of the '404 Patent because that claim was drafted to incorporate the features of the DSE cooling system. Thus, the DSE cooling system being used by SVO has:

a. A cabinet having an air inlet and an air outlet;

b. An air moving unit disposed in the cabinet;

c. A plurality of separate cooling stages including an upstream cooling stage and a downstream cooling stage, at least the upstream cooling stage having a variable capacity cooling circuit;

d. Each cooling stage including a cooling circuit having an evaporator, a condenser, a compressor and an expansion device;

e. At least the cooling circuit of the upstream cooling stage having a pumped refrigerant economizer mode and a direct expansion mode wherein each cooling circuit that has both the pumped refrigerant economizer mode and the direct expansion mode also has a liquid pump wherein when that cooling circuit is operated in the direct expansion mode a compressor of that cooling circuit is on and compresses a refrigerant in a vapor phase to raise the refrigerant pressure and thus the refrigerant condensing temperature and the refrigerant is circulated around the cooling circuit by the compressor of that cooling circuit and wherein when that cooling circuit is operated in the pumped refrigerant economizer mode the compressor of that cooling circuit is off and the liquid pump of that cooling circuit is on and pumps the refrigerant in a liquid phase and refrigerant is circulated around that cooling circuit by the liquid pump of that cooling circuit and without compressing the refrigerant in its vapor phase;

f. The evaporator of the cooling circuit of the upstream cooling stage and the evaporator of the cooling circuit of the downstream cooling stage arranged in the cabinet so that air to be cooled passes over the evaporator of the cooling circuit of the upstream cooling stage and the evaporator of the cooling circuit of the downstream cooling stage in serial fashion, first over the evaporator of the cooling circuit of the upstream cooling stage and then over the evaporator of the cooling circuit of the downstream cooling stage;

g. A controller that determines which of the cooling circuits to operate to provide cooling and for each of the cooling circuits to be operated to provide cooling that has both the pumped refrigerant economizer mode and direct expansion mode, determining whether to operate each such cooling circuit in the pumped refrigerant economizer mode or the direct expansion mode;

h. The controller operating each cooling circuit having both the pumped refrigerant economizer mode and the direct expansion mode in the pumped

refrigerant economizer mode when an outside air temperature is low enough to provide sufficient heat rejection from the refrigerant flowing through the condenser to the outside air without compressing the refrigerant and when the outside air temperature is not low enough to provide such sufficient heat rejection operating that cooling circuit in the direct expansion mode;

i. The controller when a Call for Cooling first reaches a point where cooling is needed, operating the upstream cooling circuit to provide cooling and not operating the downstream cooling circuit to provide cooling and when the Call for Cooling has increased to a second point, additionally operating the downstream cooling circuit to provide cooling, wherein the cooling capacity at which the upstream cooling circuit is being operated to provide is less than the full cooling capacity of the upstream cooling circuit when the Call for Cooling reaches the second point;

j. Wherein the compressor of each cooling circuit is a tandem compressor including a fixed capacity compressor and variable capacity digital scroll compressor, the controller controlling the fixed capacity compressor and variable capacity digital scroll compressor of each of the tandem compressors based on the Call for Cooling, which of a plurality of ranges that the Call for Cooling falls within and whether the Call for Cooling is ramping up or ramping down; and

k. Wherein when there is an unmet Call for Dehumidification, the controller controls the tandem compressors based on the Call for Cooling and which of a plurality of dehumidification ranges that the Call for Cooling falls within including determining which of the variable capacity digital scroll compressors to ramp and controls the ramping of each variable capacity digital scroll compressor being ramped based on a the Call for Dehumidification and wherein control based on which of the plurality of dehumidification control ranges the Call for Cooling falls within and on the

Call for Dehumidification takes precedence when there is an unmet Call for Dehumidification.

106. As a proximate result of SVO 's infringement of the '404 Patent, Vertiv has suffered damages in an amount to be proven at trial

107. SVO 's infringement of the '404 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

108. In infringing the '404 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '404 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '404 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

109. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**ELEVENTH CAUSE OF ACTION**

**(Claim for Infringement of Patent No. 9,316,424 Against SVO )**

110. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 109 as though set forth fully herein.

111. The '424 Patent entitled "Multi-Stage Cooling System with Tandem Compressors and Optimized Control of Sensible Cooling and Dehumidification" was duly and lawfully issued on April 19, 2016. A true and correct copy of the '424 Patent is attached hereto as Exhibit F and incorporated herein by reference.

112. Vertiv is the owner of all rights, title and interest in the '424 Patent, including the right to bring this suit for injunctive relief and damages.

113. The '424 Patent is valid and enforceable.

114. SVO have infringed and continue to infringe, literally or through the doctrine of

equivalents, the '424 Patent by using in the United States without authority a certain thermal system.

115. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded DSE cooling system (e.g., DA150 and DA125) for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the DSE cooling system, but, upon information and belief, continues to do so.

116. SVO infringe at least claim 1 of the '424 Patent because that claim was drafted to incorporate the features of the DSE cooling system. Thus, the DSE cooling system used by SVO has:

a. A cabinet having an air inlet and an air outlet;

b. An air moving unit disposed in the cabinet;

c. A plurality of separate cooling stages including an upstream cooling stage and a downstream cooling stage, the upstream cooling stage having an upstream cooling circuit and the downstream cooling stage having a downstream cooling circuit;

d. The upstream and downstream cooling circuits are each a direct expansion refrigeration cooling circuit including an evaporator, a condenser, a tandem compressor and an expansion device, the evaporator having an inlet coupled to an outlet of the expansion device and an outlet coupled to an inlet of the tandem compressor, the tandem compressor having an outlet coupled to an inlet of the condenser and the condenser having an outlet coupled to an inlet of the expansion device;

e. Each tandem compressor including a fixed capacity compressor and a variable capacity compressor;

f. The evaporator of the upstream cooling circuit and the evaporator of the downstream cooling circuit arranged in the cabinet so that air to be cooled passes over them in serial fashion, first over the evaporator of the upstream cooling circuit and then over the evaporator of the downstream cooling

circuit; and

g. A controller coupled to the tandem compressors that in a sensible cooling control controls the fixed capacity compressor and variable capacity compressor of each of the tandem compressors based on a Call for Cooling. also based on which of a plurality of sensible cooling control ranges that the Call for Cooling falls within and also based on whether the Call for Cooling is ramping up or ramping down, wherein when there is an unmet Call for Dehumidification, the controller switching from the sensible cooling control to a dehumidification control and controls the fixed capacity compressor and variable capacity compressor of each of the tandem compressors based on the Call for Dehumidification and also based on which of a plurality of dehumidification control ranges that the Call for Cooling falls within until the Call for Dehumidification has been met and then switching back to the sensible cooling control.

117. As a proximate result of SVO 's infringement of the '424 Patent, Vertiv has suffered damages in an amount to be proven at trial.

118. SVO 's infringement of the '424 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

119. In infringing the '424 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '424 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '424 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

120. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## TWELFTH CAUSE OF ACTION

**(Claim for Infringement of Patent No. 6,917,124 Against SVO )**

121. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 120, as though set forth fully herein.

122. The '124 Patent entitled "Uninterruptible Power Supply" was duly and lawfully issued on July 12, 2005. A true and correct copy of the '124 Patent is attached hereto as Exhibit G and incorporated herein by reference.

123. Vertiv is the owner of all rights, title and interest in the '124 Patent, including the right to bring this suit for injunctive relief and damages.

124. The '124 Patent is valid and enforceable.

125. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '124 Patent by using in the United States without authority certain uninterruptible power supplies.

126. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded EXL S1 UPS for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the EXL S1 UPS, but, upon information and belief, continues to do so.

127. SVO infringe at least claim 1 of the '124 Patent because that claim was drafted to incorporate the features of the EXL S1 UPS. Thus, the EXL S1 UPS used by SVO has:

a. A controlled rectifier having an input coupled to receive AC power and an output coupled to a DC bus;

b. A battery coupled to the DC bus;

c. An inverter having an input coupled to the DC bus and an output coupled to a load; and

d. A control system coupled to the controlled rectifier and the inverter the control system comprising three microprocessors, wherein a first microprocessor functions as an overall controller, a second microprocessor controls the rectifier, and a third microprocessor controls the inverter;

e. Wherein the three microprocessors communicate via a common global memory.

128. As a proximate result of SVO's infringement of the '124 Patent, Vertiv has suffered damages in an amount to be proven at trial.

129. SVO 's infringement of the '124 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

130. In infringing the '124 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '124 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '124 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

131. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## THIRTEENTH CAUSE OF ACTION

**(Claim for Infringement of Patent No. 6,563,048 Against)**

132. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 131, as though set forth fully herein.

133. The '048 Patent entitled "Ancillary Cabinet System for an Uninterruptible Power Supply" was duly and lawfully issued on May 13, 2003. A true and correct copy of the '048 Patent is attached hereto as Exhibit H and incorporated herein by reference.

134. Vertiv is the owner of all rights, title and interest in the '048 Patent, including the right to bring this suit for injunctive relief and damages.

135. The '048 Patent is valid and enforceable.

136. SVO have infringed and continue to infringe, literally or through the doctrine of equivalents, the '048 Patent by using in the United States without authority certain ancillary

cabinet systems for use with an uninterruptible power source.

137. Under the license granted to SVO under the Agreement, Vertiv provided SVO with a Liebert-designed, manufactured and branded PPC Second Generation Power Distribution Cabinet for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the PPC Second Generation Power Distribution Cabinet, but, upon information and belief, continues to do so.

138. SVO infringed at least claims 7 and 18 of the '048 Patent because that claim was drafted to incorporate the features of the PPC Second Generation Power Distribution Cabinet. Thus, the PPC Second Generation Power Distribution Cabinet being used by SVO has:

a. At least one bay in the battery cabinet;

b. At least one guide attached to the bay;

c. A tray supported on the at least one guide; and

d. An adjustable service shelf attachable to the battery cabinet and supporting the tray when removed from the bay.

139. As a proximate result of SVO 's infringement of the '048 Patent, Vertiv has suffered damages in an amount to be proven at trial.

140. SVO's infringement of the '048 Patent has caused and continues to cause Vertiv irreparable harm that cannot be fully redressed through damages alone. Preliminary and permanent injunctive relief are necessary to protect Vertiv's legitimate business interests. Vertiv will continue to suffer irreparable harm absent injunctive relief pursuant to 35 U.S.C. § 283.

141. In infringing the '048 Patent, SVO acted willfully and maliciously as Vertiv gave SVO written notice at least as early as the date of SVO's receipt of the Delaware Complaint that it was infringing the '048 Patent. Notwithstanding such written notice, SVO have continued to use in the United States without authority devices covered by the '048 Patent and, therefore, to infringe that patent in violation of Vertiv's rights. SVO have thus acted reckless and/or egregiously, entitling Vertiv to enhanced damages as determined by the Court, pursuant to 35 U.S.C. § 284.

142. The conduct of SVO makes this an exceptional case, entitling Vertiv to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**FOURTEENTH CAUSE OF ACTION**

**(Intentional Interference with Contractual Relationship Against SVO)**

143. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 142, as though set forth fully herein.

144. In or about January 2018, Vertiv executed a subcontract agreement with DPR whereby DPR was to perform certain services in connection with the Project.

145. SVO knew Vertiv contracted with DPR in connection with the Project as SVO had previously contracted with DPR to perform services at the Project and recommended DPR to Vertiv.

146. SVO improperly and intentionally interfered with Vertiv's contract with DPR in various manners, including but not limited to routinely engaging in secretive and unauthorized direct communications with DPR personnel regarding the work and services DPR was performing for Vertiv on the jobsite and disparaging Vertiv's work.

147. SVO engaged in such conduct for the purpose and with the intent of interfering with Vertiv's performance at the Project and disrupting Vertiv and DPR's contractual relationship. SVO's conduct actually did result in Vertiv's performance being disrupted.

148. As a direct and proximate result of SVO's conducted and interference alleged herein, Vertiv's performance was delayed, obstructed, and rendered more difficult causing Vertiv to incur additional costs, expenses and damages in an amount to be proven at the arbitration of this matter.

149. In intentionally interfering with Vertiv's contract with DPR, SVO acted, willfully, maliciously and fraudulently, entitling Vertiv to an award of exemplary or punitive damages.

**FIFTEENTH CAUSE OF ACTION**

**(Defamation Against SVO)**

150. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through149, as though set forth fully herein.

151. During Vertiv's performance at the Project and following its termination, SVO engaged in conduct aimed at disparaging Vertiv's work and reputation. Such conduct includes

making numerous false statements to third parties on the jobsite and within the industry, including but not limited, falsely stating that commencement of equipment commissioning at the Project was delayed as the result of Vertiv's inability to manage the Project. At the time such statements were made, SVO was aware that commissioning of equipment on the Project had already commenced.

152. SVO knew the foregoing statements and representations were false and/or failed to use reasonable care to determine the truth or falsity of such statements. SVO made these statements to, among others, representatives of DPR, Critical Project Services, LLC, and BCSFM, LLC, for the purpose of harming Vertiv's reputation.

153. As a direct and proximate result of SVO publishing false and defamatory statements, Vertiv has been damaged in an amount to be proven at the arbitration of this matter.

154. Moreover, in making the above false statements with the intention of harming Vertiv, SVO acted with malice, oppression, and/or fraud and Vertiv is entitled to the recovery of punitive damages.

**SIXTEEN CAUSE OF ACTION**

**(Fraud Against SVO)**

155. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 154, as though set forth fully herein.

156. Section 4.2 of the Turkey Agreement sets forth the procedures for Vertiv to accomplish Facility Substantial Completion. One of the procedures called for the successful achievement of facility mechanical completion and startup, testing and commissioning.

157. In or about May 2018, Vertiv reported to SVO that it understood that it had successfully performed facility mechanical completion and startup, testing and commissioning as approved by SVO's retained commissioning consultant. However, SVO and its agents, Nicholas Laag, Ulrich Pelz, and others, represented to Vertiv that such facility mechanical completion and startup, testing and commissioning had not successfully passed and that Vertiv needed to do additional work and run new tests to achieve facility mechanical completion and startup, testing and commissioning.

158. These representations were false. Vertiv had, in fact, attained facility mechanical

completion and startup, testing and commissioning that met the requirements of the Turnkey Agreement as determined by SVO's retained commissioning consultant. As David Keith, a former employee of one of SVO's commissioning consultants for the Project, testified in a deposition, the facility mechanical completion and startup, testing and commissioning had been successfully completed in or about May 2017, and SVO and its agents were aware of the successful completion of such work.

159. At the time SVO and its agents made these representations to Vertiv, they knew the representations were false, yet they made the representations with the intent that Vertiv rely on them.

160. At the time SVO and its agents made these representations to Vertiv, Vertiv relied on the representations made by SVO and its agents, Mr. Laag, Mr. Pelz and others, by, among other things, performing additional work demanded by SVO to allegedly meet the requirement in Section 4.2 of the Turnkey Agreement to achieve facility mechanical completion and startup, testing and commissioning.

161. As a proximate result of SVO's fraud, Vertiv has suffered damages in an amount to be proven at trial.

162. In committing the fraud based on the false representation that in or about May 2017 Vertiv had not achieved facility mechanical completion and startup, testing and commissioning, SVO acted, willfully, maliciously and fraudulently, entitling Vertiv to an award of exemplary or punitive damages.

**SEVENTEENTH CAUSE OF ACTION**

**(Negligent Misrepresentation Against SVO)**

163. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 162, as though set forth fully herein.

164. As alleged herein, Section 4.2 of the Turkey Agreement set forth the procedures for Vertiv to accomplish Facility Substantial Completion. One of the procedures called for the successful achievement of facility mechanical completion and startup, testing and commissioning.

165. In or about May 2018, Vertiv reported to SVO that it had successfully performed

facility mechanical completion and startup, testing and commissioning. SVO and its agents, Nicholas Laag, Ulrich Pelz, and others, represented to Vertiv that such facility mechanical completion and startup, testing and commissioning had not successfully passed and that Vertiv needed to do additional work and run new tests to achieve facility mechanical completion and startup, testing and commissioning.

166. These representations were false. Vertiv had, in fact, attained facility mechanical completion and startup, testing and commissioning that met the requirements of the Turnkey Agreement. As David Keith, a former employee of one of SVO's commissioning consultants for the Project, testified in a deposition, the facility mechanical completion and startup, testing and commissioning had been successfully completed in or about May 2017, and SVO and its agents were aware of the successful completion of such work.

167. At the time SVO and its agents made these representations to Vertiv, they had no reasonable basis for believing them to be true, yet they made the representations with the intent that Vertiv rely on them.

168. At the time SVO and its agents made these representations to Vertiv, Vertiv reasonably relied on the representations made by SVO and its agents, Mr. Laag, Mr. Pelz and others, by, among other things, performing additional work demanded by SVO to allegedly meet the requirement in Section 4.2 of the Turnkey Agreement to achieve facility mechanical completion and startup, testing and commissioning.

169. As a proximate result of SVO's negligent misrepresentation, Vertiv has suffered damages in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION

**(Civil Conspiracy Against SVO)**

170. Vertiv hereby incorporates by reference each and every allegation contained in paragraphs 1 through 169, as though set forth fully herein.

171. In or about May 2018, Defendant SVO and its agents, Nicholas Laag, Ulrich Pelz, and others, knowingly and intentionally engaged in a civil conspiracy to defraud Vertiv by falsely representing to Vertiv that the data center facility mechanical completion and startup, testing and

commissioning had not been completed and that Vertiv needed to do additional work and run new tests to achieve facility mechanical completion and startup, testing and commissioning.

172. As a proximate result of SVO's civil conspiracy to defraud Vertiv, Vertiv has suffered damages in an amount to be proven at trial.

173. In engaging in this civil conspiracy to defraud Vertiv, SVO acted, willfully, maliciously and fraudulently, entitling Vertiv to an award of exemplary or punitive damages.

**PRAYER**

WHEREFORE, Vertiv prays for judgment as follows:

**On the First, Second and Third Causes of Action**

1. For a principal sum in excess of $9,000,000, according to proof at trial;

2. For two percent (2%) interest per month of the amount found to be due to Liebert pursuant to California Civil Code Sections 8800 and 8818.

3. For interest thereon at the maximum legally permissible rate;

4. For reasonable attorneys' fees incurred in prosecuting this action;

5. For costs of suit incurred herein;

6. For such other and further relief as the Court deems just and proper.

**On the Fourth Cause of Action**

1. For a declaration of Liebert's rights, specifically a declaration that Liebert may revoke, and has properly revoked, the license it issued to SVO and that SVO must cease using the intellectual property and work product that is the subject of the license;

2. For reasonable attorneys' fees;

3. For costs of suit incurred herein; and

4. For such other and further relief as the Court deems just and proper.

**On the Fifth Cause of Action**

1. For preliminary and permanent injunctive relief requiring SVO , and their agents, servants and employees, all persons acting under, in concert with or for them, to refrain from engaging in unlawful, unfair and fraudulent business practices;

2. For disgorgement of the unjust enrichment realized by SVO from their unlawful,

unfair and fraudulent business practices, according to proof;

3. For costs of suit incurred herein;

4. For such other and further relief as the Court deems just and proper.

**On the Sixth and Seventh Causes of Action**

1. For judgement that SVO misappropriated Vertiv's trade secrets in violation of Defend Trade Secrets Act, 18 U.S.C. § 1836;

2. For judgement that SVO misappropriated Vertiv's trade secret in violation of California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426-3426.11;

3. For damages according to proof;

4. For preliminary and permanent injunctive relief requiring SVO , and their agents, servants and employees, all persons acting under, in concert with or for them, to refrain, from using or disclosing any of Vertiv's trade secrets, confidential know-how or proprietary information regarding Vertiv's design, construction or outfitting of the SVO data center at McClellan Park pursuant to 18 U.S.C. § 1836(b)(3)(A) Cal. Civ. Code § 3426.2;

5. For exemplary damages as may be provided by law pursuant to 18 U.S.C. § 1836(b)(3)(C) Cal. Civ. Code § 3426.3(c);

6. For reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) Cal. Civ. Code § 3426.4;

7. For prejudgment and post-judgment interest;

8. For costs of suit incurred herein; and

9. For such other and further relief as the Court deems just and proper.

**On the Eighth through Thirteenth Causes of Action**

1. For judgement that SVO have infringed and are infringing the '082, '804, '404, '424, '124 and '048 Patents;

2. For damages according to proof;

3. For the entry of a preliminary injunction and a permanent injunction to prevent SVO , and their agents, servants and employees, all persons acting under, in concert with or for them, to

refrain from making, using, selling or offering to make, use or sell devices covered by the '082, '804, '404, '424, '124 or '048 Patents pursuant to 35 U.S.C. § 283;

4. For a finding that the infringement by SVO is and has been willful entitling Vertiv to enhanced damages pursuant to 35 U.S.C. § 284;

5. For a finding that this case represents an exceptional case entitling Vertiv to its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

6. For prejudgment and post-judgment interest;

7. For costs of suit incurred herein; and

8. For such other relief as the Court may deem just and proper.

**On the Fourteenth Cause of Action**

1. For a principal sum according to proof at trial;

2. For interest thereon at the maximum legally permissible rate;

3. For exemplary damages as may be provided by law;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court deems just and proper.

**On the Fifteenth Cause of Action**

1. For a principal sum according to proof at trial;

2. For interest thereon at the maximum legally permissible rate;

3. For exemplary damages as may be provided by law;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court deems just and proper.

**On the Sixteenth Cause of Action**

1. For a principal sum according to proof at trial;

2. For interest thereon at the maximum legally permissible rate;

3. For exemplary damages as may be provided by law;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court deems just and proper.

6.

**On the Seventeenth Cause of Action**

1. For a principal sum according to proof at trial;
2. For interest thereon at the maximum legally permissible rate;
3. For costs of suit incurred herein; and
4. For such other and further relief as the Court deems just and proper.

**On the Eighteenth Cause of Action**

1. For a principal sum according to proof at trial;
2. For interest thereon at the maximum legally permissible rate;
3. For exemplary damages as may be provided by law;
4. For costs of suit incurred herein; and
5. For such other and further relief as the Court deems just and proper.

Dated: July 11, 2019

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: ______________________

Robert H. Sloss
Mark G. Budwig
Victor M. Felix
Mike Nolan

Attorneys for Claimant
Vertiv Corporation (formerly Liebert Corporation)

Robert H. Sloss (Bar No. 87757)
Mark G. Budwig (Bar No. 126045)
Laurence R. Phillips (Bar No. 190152)
Scott R. Omohundro (Bar No. 1794210
PROCOPIO, CORY, HARGREAVES
& SAVITCH LLP
12544 High Bluff Drive, Suite 400
San Diego, CA 92130
Telephone: 858.720.6300
Facsimile: 619.235.0398
E-mail: robert.sloss@procopio.com
mark.budwig@procopio.com
laurence.phillips@procopio.com
scott.omohundro@procopio.com

Attorneys for Claimant/Counter-Respondent
VERTIV CORPORATION (fka LIEBERT CORPORATION)

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| LIEBERT CORPORATION, an Ohio corporation,<br><br>Claimant,<br><br>v.<br><br>SVO BUILDING ONE, LLC, a Delaware limited liability company,<br><br>Respondents. | Case No. 01-18-0003-1318<br><br>**PARTIAL DISMISSAL WITHOUT PREJUDICE**<br><br>Arbitrator: George C. Fisher |
| AND RELATED COUNTERCLAIM. | |

TO: ARBITRATOR GEORGE C. FISHER AND SVO BUILDING ONE, LLC AND ITS ATTORNEYS OF RECORD:

NOTICE is given that Vertiv Corporation (fka Liebert Corporation) hereby **dismisses without prejudice** the following causes of action in its Fourth Amended Complaint: Thirteenth Cause of Action (Claim for Infringement of Patent No. 6,563,048), Fifteenth Cause of Action (Defamation), Sixteenth Cause of Action (Fraud), Seventeenth Cause of Action (Negligent Misrepresentation), and Eighteenth Cause of Action (Civil Conspiracy).

DATED: March 24, 2021

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: ______________________

Robert H. Sloss
Mark G. Budwig
Laurence R. Phillips
Scott R. Omohundro
Attorneys for Claimant/Counter-Respondent VERTIV CORPORATION (fka LIEBERT CORPORATION)

Liebert Corporation v. SVO Building One, LLC
Case No. 01-18-0003-1318

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is PROCOPIO, CORY, HARGREAVES & SAVITCH LLP, 12544 High Bluff Drive, Suite 400, San Diego, CA 92130. On March 24, 2021, I served the within documents:

- **PARTIAL DISMISSAL WITHOUT PREJUDICE**

☐ **BY U.S. MAIL** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

☐ **BY OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight envelope and depositing it for overnight delivery at San Diego, California, addressed as set forth below. I am readily familiar with the practice of this firm for collection and processing of correspondence for processing by overnight mail. Pursuant to this practice, correspondence would be deposited in the overnight box located at 12544 High Bluff Drive, Suite 300, San Diego, CA 92130 in the ordinary course of business on the date of this declaration.

☑ **BY E-MAIL OR ELECTRONIC SERVICE** based on an agreement of the parties to accept service by electronic transmission, by electronically mailing the document(s) listed above to the e-mail address(es) set forth below, or as stated on the attached service list and/or by electronically notifying the parties set forth below that the document(s) listed above can be located and downloaded from the hyperlink provided. No error was received, within a reasonable time after the transmission, nor any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| George C. Fisher<br>American Arbitration Association<br>Email: georgecfisher@gmail.com | Arbitrator |
| David M. Frishman, Esq.<br>Richard P. Dieffenbach, Esq.<br>Cindy Mader, Esq.<br>Jamie R. Nazemi Tabrizi, Esq.<br>Tyson & Mendes<br>445 South Figueroa Street, Suite 3100<br>Los Angeles, CA 90017<br>Telephone: (213) 745-8600<br>Facsimile: (213) 745-8604<br>Email: dfrishman@tysonmendes.com<br>rdieffenback@tysonmendes.com<br>jtabrizi@tysonmendes.com<br>cmader@tysonmendes.com<br>gescobar@tysonmendes.com | Attorneys for Respondent/Counter-Claimant SVO BUILDING ONE, LLC |



EXH. C-3

☑ *(State)* I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 24, 2021, at San Diego, California.

Leslie D. Sharpe

Robert H. Sloss (Bar No. 87757)
Mark G. Budwig (Bar No. 126045)
Scott R. Omohundro (Bar No. 179421)
Laurence R. Phillips (Bar No. 190152)
PROCOPIO, CORY, HARGREAVES
& SAVITCH LLP
12544 High Bluff Drive, Suite 400
San Diego, CA 92130
Telephone: 858.720.6300
Facsimile: 619.235.0398
E-mail: robert.sloss@procopio.com
mark.budwig@procopio.com
scott.omohundro@procopio.com
laurence.phillips@procopio.com

Attorneys for Claimant/Counter-Respondent
VERTIV CORPORATION (fka LIEBERT CORPORATION)

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| LIEBERT CORPORATION, an Ohio corporation,<br><br>Claimant,<br><br>v.<br><br>SVO BUILDING ONE, LLC, a Delaware limited liability company,<br><br>Respondent. | Case No. 01-18-0003-1318<br><br>**JOINT NOTICE OF DISMISSAL WITH PREJUDICE**<br><br>Arbitrator: George C. Fisher |
| AND RELATED COUNTERCLAIM. | |

Notice is hereby given that Claimant/Counter-Respondent VERTIV CORPORATION (fka Liebert Corporation) and Respondent/Counter-Claimant SVO BUILDING ONE, LLC dismiss their respective claims and counter-claims asserted in the above-captioned American Arbitration Association proceeding in their entirety and with prejudice.

DATED: January 4, 2022

PROCOPIO, CORY, HARGREAVES
& SAVITCH LLP

By: ______________________________
Robert H. Sloss
Mark G. Budwig
Scott R. Omohundro
Laurence R. Phillips
Attorneys for Claimant/Counter-Respondent
VERTIV CORPORATION
(fka LIEBERT CORPORATION)

DATED: January 5, 2022

TYSON & MENDES LLP

By: ______________________________
David M. Frishman
Richard Dieffenbach
Attorneys for Respondent/Counter-Claimant
SVO BUILDING ONE, LLC

WILSON ELSER
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

October 28, 2019

David Simantob
Direct (213) 330-8819
David.Simantob@wilsonelser.com

***Via Email (upelz@PRIMEDATACENTERS.COM)and***
***U.S. Mail, Return Receipt Requested***

Mr. Ulrich Pelz
SVO Building One, LLC
3140 Peacekeeper Way, Suite 101A
McClellan Park, CA 95652

Re: *Liebert Corporation v. SVO Building One, LLC*
American Arbitration Association Fourth Amended Complaint
Case No. 01-18-0003-1318
Named Insured: SVO Building One, LLC
Policy No.: LA17CGL219162IC
(effective 07/12/17 to 03/12/18, extended to 8/12/19)
WEMED No: 18753-318

Dear Mr. Pelz:

Please be advised that we are coverage counsel for Navigators Specialty Insurance Company ("Navigators") with regard to the above-referenced action ("Litigation"). Navigators is in receipt of your tender on behalf of the named insured, SVO Building One, LLC ("SVO") of the Litigation submitted to the American Arbitration Association ("AAA") under the above-referenced policy ("Policy") issued to SVO.

Navigators will agree to defend the SVO in the Litigation under the Policy under a full reservation of rights, as further discussed below. It is important that SVO understand that Navigators' defense of SVO in the Litigation is subject to the full and complete reservation of rights under the Policy as described below. The purpose of this letter is to confirm, set forth in detail, and explain the nature of the reservation.

Please be advised that Navigators' position is based on the allegations contained in the Litigation as they are currently pled and the facts and circumstances presently known to it. Navigators recognizes that the allegations in the Litigation may be unsubstantiated and nothing in this letter is intended to suggest that the allegations have any legal or factual merit. Again, if you have any facts, legal arguments or other information that you believe may impact Navigators' coverage position for the Litigation, Navigators requests that you immediately bring it to Navigators' attention. Similarly, if you learn of any information that may impact Navigators' coverage position as matters proceed, Navigators requests that you immediately notify Navigators so that

it may evaluate the new information. Navigators reserves its right to supplement, amend, or change its coverage position at any time, including, but not limited to in circumstances where additional information and/or amended pleadings are submitted to it.

## I. **The Policy.**

Navigators issued Policy Number LA17CGL219162IC effective July 12, 2017 to March 12, 2018 to SVO Building One, LLC ("Policy"). The effective date of the Policy was extended by endorsements to August 12, 2019. The Policy contains a $2 million per "occurrence" limit and a $2 million aggregate limit. Please note, however, that the discussion in this letter is only a partial recitation of the terms, conditions, exclusions, and definitions contained in the Policy. It is not intended to supplement, amend, supersede or otherwise alter the Policy. Navigators does not intend to waive any of the provisions of the Policy by virtue of its synopsis. Please consult SVO's copies of the Policy for a complete listing of all of the terms, conditions, exclusions, and definitions contained therein.

The Policy lists the business description for SVO as an "8 Month OCP Data Center Construction Project" McClellan Park Building 637 at 2407 AK Street in McClellan CA 95652. The Policy includes a limitation of coverage to designated premises or project endorsement for the McClellan Park Building 637, 2407 AK Street in McClellan, CA 95652.

The Policy contains the following relevant provisions, in pertinent part:

> **SECTION I COVERAGES**
> **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
> **1. Insuring Agreement**
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
> (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and
> (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

***

**2. Exclusions**

This insurance does not apply to:

a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. . . .

***

o. Personal And Advertising Injury

"Bodily injury" arising out of "personal and advertising injury".

***

**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**
**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

c. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

WILSON ELSER



***

**2. Exclusions**

This insurance does not apply to:

a. Knowing Violation Of Rights Of Another
"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. Material Published With Knowledge Of Falsity
"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

c. Material Published Prior To Policy Period
"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

d. Criminal Acts
"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. Contractual Liability
"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. Breach Of Contract
"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

The Policy contains an IP Amendment Endorsement Form Number, NPC 642 11 08, which provides in relevant part, as follows:

I. Item 14. of SECTION V - DEFINITIONS. Is deleted in its entirety and replaced with the following:

14. "Personal and advertising injury" means injury including consequential "bodily injury" arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment:

b. Malicious prosecution:

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner landlord or lesser:

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services:

e. Oral or written publication of material that violates a person's right of privacy.

II. Under SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions, exclusion i. Infringement Of Copyright, Patent, Trademark Or Trade Secret, is deleted in its entirety and replaced with the following:

i. Infringement of Copyright, Patent, Trademark, Trade Secret, Trade Dress or Advertising Ideas "Personal and Advertising Injury" arising out of:

(a) Infringement, disparagement, dilution, diminishment of or damage to:

i. Copyright, slogan or title:

ii. Patent:

iii. Trademark, service mark, collective mark, or certification mark, including without limitation any word, name, symbol, device or any combination thereof used to identify or distinguish the origin of a good, product or service:

iv. Trade secret;

v. Trade dress including without limitation, any shape, color, design or appearance used to distinguish the origin of a good, product or service:

vi. Advertising ideas, concepts, campaigns, or style of doing business; or

vii. Any other intellectual property rights recognized or implied by law.

(b) False designation of the origin of a good, product or service;

## II. Litigation.

The Plaintiff, Liebert Corporation ("Plaintiff") filed a Fourth Amended Complaint with the American Arbitration Association ("AAA") against the named insured, SVO Building One, LLC. The Fourth Amended Complaint alleges the following twelve causes of action:

1. Breach of Contract
2. Open Book Account
3. Reasonable Value
4. Declaratory Relief

5. Violation of Unfair Competition
6. Misappropriation of Trade Secrets
7. Patent Infringement
8. Intentional interference with contractual relations
9. Defamation
10. Fraud
11. Negligent Misrepresentation
12. Civil Conspiracy

Plaintiff alleges it entered into several agreements with SVO regarding the design and construction for a data center that SVO was building at 2407 AK Street, Sacramento, California ("Project"). The first contract was allegedly a Consultant Agreement dated December 2016 where Plaintiff was to perform certain design services for the Project. Plaintiff and SVO also allegedly entered into a Lump Sum Turnkey Agreement in May 2017 to provide certain design, engineering, procurement, installation, construction, testing, commissioning and start up services at the Project. The Project was allegedly developed in three phases with each phase completing one of the three data halls.

Plaintiff allegedly granted SVO a limited, non-exclusive, not transferable revocable license to use Plaintiff's Intellectual property and work product solely in connection with the Project.

SVO also allegedly entered into a separate construction agreement with DPR Construction in February 2016. Plaintiff alleges that, unbeknownst to Plaintiff, SVO did not terminate its agreement with DPR. In December 2017, Plaintiff alleges a supplement/change to the building permit was completed changing the general contractor from DPR to the Plaintiff. Plaintiff alleges that SVO agreed to provide DPR a concession amount if Plaintiff did not hire DPR as a subcontractor. Plaintiff alleges this this hindered its ability to negotiate fair and equitable terms with DPR and increased costs on the Project.

SVO allegedly terminated the Turnkey Agreement in July 2018 after Plaintiff substantially completed Phase 1 of the Project. Thereafter, Plaintiff allegedly revoked SVO's license in writing on August 9, 2018. Plaintiff alleges that SVO gave drawings, shared information, Plaintiff's trade secrets and patented technology with other designers and builders of data centers or Plaintiff's competitors.

## III. <u>Coverage Position</u>.

Navigators will agree to defend the SVO in the Litigation under the Policy under a reservation of rights, as further discussed below.

The Insuring Agreement in the Policy for "bodily injury" and "property damage" provides, in relevant part that Navigators "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."

WILSON ELSER



The Insuring Agreement of the Policy also provides that the insurance only applies if "[t]he 'bodily injury' or 'property damage'" takes place "during the policy period . . . ." The Policy defines "bodily injury" in part as "bodily injury, sickness or disease sustained by a person. . ." The Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . or . . . [l]oss of use of tangible property that is not physically injured." The Policy defines "occurrence" to mean an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Litigation does not allege "bodily injury" or "property damage" caused by an "occurrence", as those terms are defined in the Policy. Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent the Litigation does not allege covered "bodily injury" or "property damage" caused by an "occurrence" which takes place during the policy period.

The Policy is subject to a "Contractual Liability" exclusion which provides in part that the policy does not apply to "[b]odily injury or property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement," among certain exceptions. The Litigation alleges Breach of Contract. Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent the Contractual Liability Exclusion applies to preclude or limit coverage under each of the Policy.

The Policy is subject a "Personal and Advertising Injury" exclusion which provides in part that the Policy does not apply to "'[b]odily injury' arising out of 'personal and advertising injury'." Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent the Personal and Advertising Injury Exclusion applies to preclude or limit coverage under each of the Policy.

The Policy also contains an "expected or intended" exclusion which provides in part that the policy does not apply to "bodily injury" or "property damage" "expected or intended from the standpoint of the insured." The Litigation alleges various intentional conduct against SVO including, but not limited to, intentional interference with contractual relations, fraud, negligent misrepresentation and civil conspiracy, among others. Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent the "expected or intended" exclusion applies to preclude or limit coverage under each of the Policy.

The Insuring Agreement for the "personal and advertising injury" coverage part of the Policy provides, in part, that "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The Policy further provides that "[t]his insurance applies to 'personal and advertising injury' caused by an offense arising out of your business but only if the offense was committed in the 'coverage territory' during the policy period."

The Policy defines "personal and advertising injury" in part, as follows:

> "Personal and advertising injury" means injury including consequential "bodily injury" arising out of one or more of the following offenses:
>
> a. False arrest, detention or imprisonment:
> b. Malicious prosecution:
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner landlord or lesser:
> d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services:
> e. Oral or written publication of material that violates a person's right of privacy.

The Litigation alleges defamation against SVO, which is the only allegation contained in the Litigation which potentially qualifies as an enumerated "personal or advertising injury" offense. Under the defamation cause of action, Plaintiff alleges during Plaintiff's performance of work at the Project and following its termination, SVO "disparaged" Plaintiff's work and reputation by "making numerous false statements to third parties on the jobsite and within the industry, including but not limited, falsely stating that commencement of equipment commissioning at the Project was delayed as a result of Veritiv's inability to manage the Project." Plaintiff alleges that statements were made to competitors including "DPR, Critical Project Services, LLC and BCSFM, LLC for purposes of harming Veritiv's reputation." Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent the defamation claim does not fall within the "personal and advertising injury" offense of "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services" committed during the Policy period. Navigators also reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent the Litigation does not allege an enumerated "personal and advertising injury" offense, a "personal injury" offense or an "advertising injury" offense arising out of SVO's business and committed during the policy period, as required by the Policy.

The Policy contains a Knowledge of Falsity Exclusion under the "personal and advertising injury" coverage part, which provides that the insurance does not apply to:

> **b. Material Published With Knowledge Of Falsity**
> "Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

To the extent SVO published defamatory statements with knowledge that those statements are false, this exclusion may apply to preclude coverage. Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent this exclusion applies to preclude or limit coverage under the Policy.

The Policy also contains an Intellectual Property Exclusion, as modified by endorsement, under the "personal and advertising injury" coverage part, which provides that the insurance does not apply to:

> **i. Infringement of Copyright, Patent, Trademark, Trade Secret, Trade Dress or Advertising Ideas "Personal and Advertising Injury" arising out of:**
>
> (a) Infringement, disparagement, dilution, diminishment of or damage to:
>
> i. Copyright, slogan or title:
>
> ii. Patent:
>
> iii. Trademark, service mark, collective mark, or certification mark, including without limitation any word, name, symbol, device or any combination thereof used to identify or distinguish the origin of a good, product or service:
>
> iv. Trade secret;
>
> v. Trade dress including without limitation, any shape, color, design or appearance used to distinguish the origin of a good, product or service:
>
> vi. Advertising ideas, concepts, campaigns, or style of doing business; or
>
> vii. Any other intellectual property rights recognized or implied by law.
>
> (b) False designation of the origin of a good, product or service;

The Litigation alleges patent infringement and misappropriation of trade secrets, which are excluded by the Intellectual Property Exclusion. Navigators has no duty to indemnify SVO for any damages because of patent infringement or misappropriation of trade secrets. Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent this exclusion applies to preclude or limit coverage under the Policy.

The Policy contains contractual liability and breach of contract exclusions under the "personal and advertising injury" coverage part, which provides in pertinent part, as follows:

> **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**
>
> ***
>
> **2. Exclusions**
>
> **This insurance does not apply to:**
>
> ***

e. Contractual Liability
"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. Breach Of Contract
"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

The Litigation alleges breach of contract. Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent the above exclusions apply to preclude or limit coverage under the Policy.

The Policy also excludes coverage for "personal and advertising injury" "[a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period." Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent this exclusion applies to preclude or limit coverage under the Policy.

The Policy also excludes coverage for "personal and advertising injury" "[a]rising out of a criminal act committed by or at the direction of the insured." The Litigation alleges fraud and civil conspiracy against SVO. Navigators reserves its rights to withdraw from the defense, deny a defense and/or indemnity and to seek reimbursement of any defense and/or indemnity to the extent this exclusion applies to preclude or limit coverage under the Policy.

The Policy also contains a punitive damages exclusion, by endorsement NPC-635 05 14, which provides in relevant part:

> This insurance does not apply to:
>
> Punitive damages, exemplary damages, fines, penalties, treble damages or other increase in damages resulting from the multiplication of compensatory damages, in whatever form assessed. If a "suit" is brought against the insured seeking damages to which this insurance applies and punitive or exemplary damages, we will provide a defense to such "suit". However, we will have no obligation to pay for any costs, interest, or judgment attributable to punitive or exemplary damages. Provisions of this exclusion do not apply in any state where such exclusion is expressly prohibited by state law or insurance department regulation.

To the extent the Litigation seeks punitive damages and those damages are not insurable, Navigators has no duty to indemnify SVO for any award of punitive damages.

WILSON ELSER



Navigators also reserves its rights to deny indemnity for any equitable relief such as injunctive relief as they do not qualify as covered damages under the Policy. In addition, Navigators reserves its rights to deny indemnity for any causes of action that do not fall within a covered enumerated "personal or advertising injury" offense or qualify as a covered "property damage" or "bodily injury" caused by an "occurrence", including the causes of action for breach of contract, open book account, reasonable value, violation of unfair competition, misappropriation of trade secrets, patent infringement, intentional interference with contractual relations, fraud, negligent misrepresentation or civil conspiracy.

The Policy contains a limit of liability. Navigators will not pay any claim or judgment under the Policy to the extent that it exceeds the limits of the Policy. Any damage award in excess of the limit of liability, even for a loss that would be covered otherwise, will not be paid by Navigators.

**IV. Defense Counsel.**

Navigators agrees to provide independent defense counsel selected by SVO in the Litigation from the date of tender of the Amended Complaint pursuant to California Civil Code §2860 which addresses the duties for independent counsel. As outlined in Civil Code Section 2860, the defense attorney selected by SVO to represent them must meet certain minimum qualifications. Pursuant to that statute, the defense attorney selected must have five (5) years of tort litigation practice, including substantial defense experience in the subjects and issues involved in the claim. They must also carry errors and omissions coverage.

Under California Civil Code §2860, Navigators' obligation to pay the reasonable fees incurred by defense counsel chosen by SVO is limited to rates which are actually paid by Navigators to its attorneys that it retains in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended. California Civil Code §2860(c). Accordingly, Navigators will only agree to reimburse at hourly rates which are actually paid by Navigators in accord with California Civil Code §2860(c). Should counsel selected by SVO charge hourly rates in excess of these rates, SVO bears the full responsibility to pay the difference in rates.

Please note that SVO may choose to agree to waive its right to independent counsel pursuant to California Civil Code Section 2860, in which case Navigators will select and pay for defense counsel to defend SVO in this Litigation. ***Should SVO agree to waive its right to independent counsel, Navigators requests that it acknowledge its agreement to do so by signing the statement (which is required under California Civil Code Section 2860(e)) set forth at the end of this letter and returning it to my attention.***

Please be advised that Navigators will not pay any defense fees or costs relating to any insurance coverage action or advice, any non-legal fees and costs incurred for items such as crisis management or public relations, or any fees or costs incurred relative to any cross-claim SVO may file in this matter. To the extent that Navigators pays for the defense of claims that do not

fall within the scope of coverage, it reserves all rights under applicable law to seek reimbursement of those amounts from SVO.

Consistent with the provisions of the Policy and Civil Code § 2860, Navigators requests that SVO and defense counsel selected by SVO provide Navigators with all updates, pleadings, reports and analyses prepared detailing the evaluation of the Litigation, including an evaluation of the damages exposure, costs of defense through trial, and the amounts recommended for settlement of the Litigation. ***Please send all defense invoices and reports via email to the undersigned for review.*** Navigators reserves the right to review fees and costs billed by defense counsel chosen by SVO and to determine whether they are reasonable and reasonably incurred.

Please advise if another insurance carrier is providing coverage and/or a defense to SVO in the Litigation. Navigators will share the defense fees and costs of SVO in the Litigation with any other participating carrier defending SVO. If any other valid and collectible insurance is available to SVO for the defense of the Litigation, Navigators' obligations may be further limited under the Policy. Pursuant to the "other insurance" provision in the Policy, Navigators reserves the right to seek contribution for any defense and indemnity payments from all other valid and collectible insurance, whether issued to SVO or to others. Navigators also expressly reserves the right to assert its subrogation rights. Navigators requests that SVO immediately notify, if it has not already, any other insurance carriers whose coverage might apply to the claims asserted in this action and ask that the other carriers participate in the defense and indemnity of these claims. Please provide a copy of any such notification letters, any responses and their policies.

## V. Additional Reservation Of Rights.

Navigators also reserves the right to deny coverage for any uncovered damages alleged in the Litigation and/or where any damages are prohibited by applicable law, including, but not limited to Plaintiff's claim for punitive damages. The Policy also contains limits of insurance. Navigators will not pay any damages under the Policy to the extent any damages exceed the policy limit. Any damage award in excess of the limit of insurance, even for a loss that would be covered otherwise, will not be paid by Navigators.

Navigators wants SVO to know that by continuing with its investigation, by paying for lawyers to defend SVO in the Litigation, and by doing anything which Navigators feels is necessary to keep any loss to a minimum, Navigators is not necessarily agreeing to pay any judgment if one is obtained against SVO. Navigators will assert any and all of its applicable coverage defenses. Indeed, Navigators is not waiving its right to deny coverage, to further supplement or modify its reservation of rights, to raise any additional coverage defenses as they arise, or to refuse to defend SVO further at any future time. Navigators further reserves its right to seek reimbursement from SVO, independent counsel chosen by SVO, or from other persons not insured, and/or from other insurers, for all or a portion of all sums paid or advanced by Navigators towards attorneys' fees, costs, investigation, or any other sums paid by Navigators in

connection with the Litigation (including any indemnity payments) based on allocation between potentially covered claims and other claims, or based on any other reason.

Navigators agrees to defend SVO in the Litigation subject to a full reservation of rights, but will indemnify SVO only for those claims that come within the insuring agreements of, and are not excluded by, the Policy. Navigators will not indemnify SVO for any claims that are not so covered under the Policy. Any other damages awarded against SVO, or for which SVO assumes responsibility, would be the responsibility of SVO. Similarly, as noted above, should there be any award of punitive and/or exemplary damages, those would likewise be the responsibility of SVO.

Navigators expressly reserves its right to allocate between any covered and non-covered items of damages and payments (if any) of settlements and/or judgments and to seek reimbursement from SVO or others for any such non-covered indemnity payments. Navigators has no duty to indemnify SVO for any damages to the extent that those damages exceed the limits of insurance.

No payment by Navigators of any settlements and/or judgments shall constitute a waiver by Navigators of its rights under the Policy to later seek allocation and reimbursement of sums paid for any such settlements and/or judgments on the ground that there is no duty to indemnify SVO against all or a portion of this claim.

There may be additional terms, conditions, provisions and/or exclusions that bar or limit coverage under the Policy. Navigators reserves its rights to deny any duty to defend or indemnify and/or raise any and all coverage defenses.

## VI. Conclusion.

This letter is not intended as a comprehensive statement of each and every potentially applicable term, condition, exclusion, limitation, defense or right that Navigators may have under the Policy or in law. Navigators reserves the right to cite other provisions of the Policy not already cited in this letter. Navigators also reserves the right to raise and rely on all potentially applicable coverage defenses to disclaim coverage, whether or not stated in this letter. Navigators may rely on additional or different exclusionary terms or provisions in the Policy if, in the course of subsequent investigation, Navigators discovers facts which would make other terms of the Policy applicable. Navigators reserves the right to amend the coverage position set forth in this letter and to advise you of the grounds upon which any modifications are made.

Please note that nothing set forth in this letter should be deemed to amount to a waiver on the part of Navigators to assert the applicability of any of the provisions, terms, definitions, or exclusions of the Policy. Navigators expressly reserves the right to raise any additional coverage defenses, including the right to disclaim coverage on any other basis that may become apparent as this matter progresses and to file a declaratory judgment action to obtain a ruling on any disputed coverage issue.

Nothing contained herein should be construed as an estoppel or waiver of any rights or defenses, whether or not stated herein, which Navigators may possess under the Policy and/or applicable law. It should be understood further that any actions, including investigations, taken to date by Navigators and/or its agents and representatives do not constitute and are not intended as an estoppel or waiver of any rights or defenses available to Navigators, whether or not stated herein, that may be available now or at any point in time. Navigators specifically reserves its right to rely on the language of the Policy, and to deny coverage for any valid reason that may subsequently appear. Navigators shall not waive any of its rights unless expressly so stated in writing by Navigators.

Pursuant to the California Code of Regulations, Title 10, Chapter 5, Subchapter 7.5, Fair Lawsuits Settlement Practices Regulations, if insureds believe all or part of this claim has been wrongfully denied or rejected, they may have this matter reviewed by the following entity:

California Department of Insurance
Consumer Services Division
300 S. Spring Street
Los Angeles, CA 90013
1-800-927-4357-HELP

Should you have any questions, please do not hesitate to contact the undersigned.

Sincerely,

Wilson Elser Moskowitz Edelman & Dicker, LLP

David Simantob

cc: Mary Ann Vorndran ***(Via email only MVorndran@navg.com)***

Lisa D. Nicolls (***Via email only lnicolls@murphyaustin.com***)
Murphy Austin Adams Schoenfeld LLP
555 Capitol Mall, Suite 850, Sacramento, CA 95814

Marianne Evans (***Via email only mevans@hoffmanbrown.com***)
Hoffman Brown Company

**WAIVER PURSUANT TO CALIFORNIA CIVIL CODE SECTION 2860**

This waiver is in connection with the matter entitled *Liebert Corporation v. SVO Building One, LLC,* American Arbitration Association, Case No. 01-18-0003-1318. The Insurer herein is Navigators Specialty Insurance Company.

SVO BUILDING ONE, LLC ("SVO") HAS BEEN ADVISED AND INFORMED OF ITS RIGHT TO SELECT INDEPENDENT COUNSEL TO REPRESENT IT IN THIS MATTER. IT HAS CONSIDERED THIS MATTER FULLY AND FREELY WAIVE ITS RIGHTS TO SELECT INDEPENDENT COUNSEL AT THIS TIME. SVO AUTHORIZES THE INSURER TO SELECT A DEFENSE ATTORNEY TO REPRESENT IT IN THIS MATTER.

DATED: ______________, 2019 SVO Building One, LLC

By: ________________________________
Its: ________________________________

83 Wooster Heights Road
Danbury, CT 06810

Navigators
A BRAND OF THE HARTFORD

March 31, 2021

CERTIFIED MAIL & EMAIL: *upelz@PRIMEDATACENTERS.COM*
Ulrich Pez
SVO Building one, LLC
3140 Peacekeeper Way, Suite 101A
McClellan Park, CA 95652

RE: Liebert Corporation v. SVO Building One, LLC
American Arbitration Association Case No. 01-18-0003-1318

| | |
|---|---|
| Insured: | SVO Building One, LLC |
| Claim No.: | CGL325269 |
| Policy: | LA17CGL219162IC, effective 07/12/17 to 08/12/19 |
| Litigation: | *Liebert Corporation v. SVO Building One, LLC* |
| American Arbitration | Association Case No. 01-18-0003-1318Date of Loss: TBD |
| Project: | OCP Data Center Construction Project |
| Loss Location: | McClellan Park Building 637, 2407 AK Street, McClellan, CA |

Dear Mr. Pez:

As you know, Navigators has been providing a defense to SVO Building One, LLC ("SVO") with respect to the above referenced Arbitration matter (the "Litigation") under a full reservation of rights, as set forth in correspondence to you dated October 28, 2019.

As is set forth in the October 28, 2019 reservation of rights letter, the Litigation does not allege "bodily injury" or "property damage" caused by an "occurrence", as those terms are defined in the above-referenced policy (the "Policy"). As such, there would be no coverage for this matter under Coverage A of the policy. Furthermore, the allegation of defamation against SVO is the only allegation contained in the Litigation that potentially qualifies as an enumerated "personal or advertising injury" offense under Coverage B of the policy. In our October 28, 2019 reservation of rights letter, Navigators specifically reserved its rights to withdraw from the defense, deny a defense and/or indemnity, and to seek reimbursement from SVO for all or a portion of all sums paid or advanced by Navigators toward attorneys' fees, costs, investigation or any other sums paid by Navigators in connection with the Litigation based on allocation between potentially covered claims and non-covered claims.

We are in receipt of Liebert Corporation's Partial Dismissal Without Prejudice of various claims against SVO, including its defamation claim. Navigators has determined there is no coverage under the Policy for


© 2021 by The Hartford. Classification: Company Confidential. No part of this document may be reproduced, published or used without the permission of The Hartford.

the remaining claims asserted against SVO in the Lawsuit. As Navigators has no duty to defend SVO for any "suit" seeking damages to which this insurance does not apply, **Navigators is withdrawing its defense of SVO in the Lawsuit on April 15, 2021, fifteen (15) days from the date of this correspondence**. Starting on that date, Navigators will no longer pay for any legal fees or expenses incurred on behalf of SVO in the Litigation. Navigators will also not contribute to any settlement involving, or judgment against, SVO in the Litigation. Tyson & Mendes, LLP is copied on this correspondence. Tyson & Mendes has been appointed by Navigators to defend SVO with respect to the Litigation, and SVO approved that appointment. Additionally, Navigators understands that SVO has entered into a separate engagement with Tyson & Mendes with respect to prosecution of SVO's affirmative claims in the Litigation. It is your responsibility to contact Tyson & Mendes regarding any continued engagement regarding representation of SVO in the Litigation.

Navigators continues to reserve all rights, including the right to seek reimbursement for all or a portion of all sums paid or advanced by Navigators toward attorneys' fees, costs, investigation or any other sums paid by Navigators in connection with the Litigation based on allocation between potentially covered claims and non-covered claims.

In the event you believe all or part of this claim has been wrongfully denied or rejected, you may have this matter reviewed by the California Department of Insurance, Claims Service Bureau, 300 South Spring Street, 11th Floor, Los Angeles, CA 90013; 800-927-4357 or 213-897-8921.

If you believe that any relevant facts are misunderstood by Navigators, or if you have any questions about Navigators' position, please feel free to contact me.

Sincerely,

Angel L. Muth
Claims Specialist
Direct #: (949) 255-4850
E-mail: angel.muth@thehartford.com

cc: David Frishman
Tyson & Mendes
[Email Only: DFrishman@TysonMendes.com]

Marianne Evans
Hoffman Brown Company
5000 Van Nuys Blvd., 6th Floor
Sherman Oaks, CA 91403
[US Mail & Email: mevans@hoffmanbrown.com]

209654810_1 LAW

© 2021 by The Hartford. Classification: Company Confidential. No part of this document may be reproduced, published or used without the permission of The Hartford.

EXH. F-2

STEVEN W. MURRAY
a law corporation

SUITE 205
14930 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91403

(818) 501-2277
fax (818) 501-6441
info@psilaw.com

May 3, 2021

David Simantob, Esq.
WILSON ELSER
555 S. Flower St., Ste. 2900
Los Angeles, CA 90071

Re: *Liebert Corporation vs. SVO Building One*
Navigators' Cl. No. 01-18-0003-1318

Dear Mr. Simantob:

SVO disagrees with Navigators' denial of coverage set forth in its March 31, 2021, letter stating it was withdrawing its defense in fifteen days.

> "the allegation of defamation against SVO is the *only* allegation contained in the Litigation that potentially qualifies as an enumerated 'personal or advertising injury' offense . . . ¶ We are in receipt of Liebert Corporation's . . . Dismissal . . . of . . . its defamation claim. *Navigators has determined there is no coverage under the Policy for the remaining claims asserted against SVO in the Lawsuit.* As Navigators has no duty to defend SVO . . . , **Navigators is withdrawing its defense of SVO in the Lawsuit on April 15, 2021, fifteen (15) days from the date of this letter.**" (Italics added.)

This determination is factually and legally unsupportable.

**1. Vertiv's 4th Amended Complaint Alleges Covered Claims.**

**A. Disparagement.** The policy provides coverage for the "personal injury" offenses of slander, libel and disparagement. Vertiv alleges this:

> "causing third parties to issue false reports regarding the commissioning of equipment on the Project;" (¶55, p. 12:23-24; ¶56, p.13:5-7.)

> SVO's conduct "erodes Vertiv's reputation as a designer and builder . . . ." (¶57, p. 13:13.)

> Communications "disparaging Vertiv's work" were made by SVO to DPR. (¶146, p. 29:13.)

**B. Property Damage.** The policy provides coverage for property damage which includes loss of use of tangible property which has not been physically injured. Vertiv alleges this:

> "SVO has given drawings and calculations prepared by Vertiv to designers and builders of data centers . . . ."(¶30, p. 8:19-20.)

> "Vertiv provided SVO with a Liebert-designed, manufactured and branded STS2 Static Transfer Switch 2 for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the STS2 Static Transfer Switch 2, but . . . continues to do so." (¶82, p. 16:25-28.)

> "SVO have [sic] continued to use in the United States without authority devices covered by the '082 Patent . . . ." (¶86, p. 18:8-9.)

> "Vertiv provided SVO with a Liebert-designed, manufactured and branded STS2 Static Transfer Switch 2 for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the STS2 Static Transfer Switch 2, but . . . continues to do so." (¶93, p. 18:27-28 to p. 19:1-2.)

> "SVO have [sic] continued to use in the United States without authority devices covered by the '804 Patent . . . ." (¶97, p. 19:25-26.)

> "Vertiv provided SVO with a Liebert-designed, manufactured and branded DSE cooling system (e.g., DA150 and DA125) for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the DSE cooling system, but . . . continues to do so." (¶104, p. 20:15-18.)

> "SVO have [sic] continued to use in the United States without authority devices covered by the '404 Patent . . . ." (¶108, p. 23:11-12.)

> "Vertiv provided SVO with a Liebert-designed, manufactured and branded DSE cooling system (e.g., DA150 and DA125) for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the DSE cooling system, but . . . continues to do so." (¶115, p. 24:3-6.)

> "SVO have [sic] continued to use in the United States without authority devices covered by the '424 Patent . . . ." (¶119, p. 25:23-24.)

> "Vertiv provided SVO with a Liebert-designed, manufactured and branded EXL S1 UPS for use in the Project. When Vertiv properly revoked the license in August 2018, SVO no longer had the right to use the EXL S1 UPS, but . . . continues to do so." (¶126, p. 26:14-17.)

> "SVO have [sic] continued to use in the United States without authority devices covered by the '124 Patent . . . ." (¶130, p. 27:11-12.)

**2. Navigators' Duty To Defend Continues.**

The dismissal of the Defamation Cause has no effect on Navigators' defense obligations because the other covered claims asserted against SVO remain in full force and effect. The continued pendency of the action triggers Navigators' duty to defend.

> "The duty commences upon tender of the defense, and continues until the underlying lawsuit is concluded." (*Lambert vs. Commonwealth Land Title* (1991) 53 Cal.3d 1072, 1077.)

**3. Summary.**

SVO is entitled to the policy benefits it bought and which California law protects. It continues to be entitled to a defense in the *Liebert* action. Navigators should revisit its coverage denial and withdrawal, and agree to protect SVO and make it whole. A written favorable response is requested within ten (10) days.

Very truly yours,

STEVEN W. MURRAY

SWM:dr
cc: SVO

WILSON ELSER
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

May 18, 2021

David Simantob
Direct (213) 330-8819
David.Simantob@wilsonelser.com

***Via Email (swm@psilaw.com)***

Steven W. Murray, Esq.
14930 Ventura Blvd.
Suite 205
Sherman Oaks, California 91403

Re: *Liebert Corporation v. SVO Building One, LLC*
American Arbitration Association Fourth Amended Complaint
Case No. 01-18-0003-1318
Named Insured: SVO Building One, LLC
Policy No.: LA17CGL219162IC
(effective 07/12/17 to 03/12/18, extended to 8/12/19)
WEMED No: 18753-318

Dear Mr. Murray:

As you know, we are coverage counsel for Navigators Specialty Insurance Company ("Navigators") with regard to your tender on behalf of the named insured, SVO Building One, LLC ("SVO") of the above-referenced arbitration ("Litigation") before the American Arbitration Association ("AAA") under the above-referenced policy ("Policy") issued to SVO.

By our letter of October 28, 2019, Navigators agreed to defend SVO in the Litigation subject to a full and complete reservation of rights including, among other things, the right to withdraw from the defense. On March 24, 2021, however, the claimant Vertiv Corporation fka Liebert Corporation ("Vertiv") dismissed without prejudice, among other things, the Fifteenth Cause of Action for Defamation in its Fourth Amended Complaint ("Complaint"). On March 31, 2021, Navigators wrote to SVO and advised that, in light of the dismissal of defamation cause of action, Navigators no longer had a duty to defend SVO and was withdrawing its defense of SVO in the Litigation on April 15, 2021. We are in receipt of your letter of May 3, 2021, wherein you state that "SVO disagrees with Navigators' denial of coverage set forth in its March 31, 2021, letter" and assert that SVO "continues to be entitled to a defense in the [Litigation]."

While Navigators continues to believe it no longer has a duty to defend SVO in the Litigation, in light of your May 3, 2021 letter, Navigators will not withdraw from the defense of SVO in the Litigation at this time. Navigators' continued defense of SVO is subject to its full and complete reservation of rights as set forth in its October 28, 2019 letter and other correspondence with SVO. Specifically, as set forth in its October 28, 2019 letter, Navigators reserved its right "to

WILSON ELSER
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP



seek reimbursement of any defense" to the extent that it was for a non-covered claim and "[t]o the extent that Navigators pays for the defense of claims that do not fall within the scope of coverage, it reserves all rights under applicable law to seek reimbursement of those amounts from SVO." Navigators continues to reserve all such rights pursuant to *Buss v. Superior Court*, 16 Cal.4th 35 (1997), *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal.4th 643 (2005), *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489 (2001), and *Hartford Cas. Ins. Co. v. J.R. Marketing, Inc.*, 61 Cal.4th 988, (2015). Navigators also specifically reserves the right to file an action seeking declaratory and/or other relief on any issue raised herein, or which has been previously communicated to SVO, or which may be raised in the future, including, but not limited to, a declaratory relief action seeking a judicial determination that Navigators has no duty to defend or indemnify SVO and or is entitled to reimbursement.

In the meantime, nothing contained herein should be construed as an estoppel or waiver of any rights or defenses, whether or not stated herein, which Navigators may possess under the Policy and/or applicable law. It should be understood further that any actions by Navigators and/or its agents and representatives do not constitute and are not intended as an estoppel or waiver of any rights or defenses available to Navigators, whether or not stated herein, that may be available now or at any point in time. Navigators specifically reserves its right to rely on the language of the Policy, and to deny coverage for any valid reason that may subsequently appear. Navigators shall not waive any of its rights unless expressly so stated in writing by Navigators.

Pursuant to the California Code of Regulations, Title 10, Chapter 5, Subchapter 7.5, Fair Lawsuits Settlement Practices Regulations, if insureds believe all or part of this claim has been wrongfully denied or rejected, they may have this matter reviewed by the following entity:

California Department of Insurance
Consumer Services Division
300 S. Spring Street
Los Angeles, CA 90013
1-800-927-4357-HELP

Should you have any questions, please do not hesitate to contact the undersigned.

Sincerely,

Wilson Elser Moskowitz Edelman & Dicker, LLP

/s/

David Simantob

EXH. H-2

# EXHIBIT “2”

Shawn Shaffie (SBN 262002
shaffie@parkershaffiellp.com
Bruce T. Smyth (SBN 89171)
smyth@parkershaffiellp.com
Jessica B. King (SBN 295282)
king@parkershaffiellp.com
**PARKER SHAFFIE LLP**
800 W. 6th Street, Suite 500
Los Angeles, California 90017
Telephone: (213) 622-4441
Facsimile: (213) 622-1444

Steven W. Murray (SBN 41493)
swm@psilaw.com
**STEVEN W. MURRAY, APC**
14930 Ventura Boulevard #205
Sherman Oaks, CA 91403
Telephone: (818) 501-2277
Facsimile: (818) 501-8441

Attorneys for **Defendant/Counterclaimant SVO BUILDING ONE, LLC**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>SVO BUILDING ONE, LLC,<br><br>Defendant. | Case No. 3:22-CV-07102-AMO<br><br>**SVO BUILDING ONE, LLC'S INTERROGATORIES, SET ONE TO PLAINTIFF/COUNTER-DEFENDANT NAVIGATORS SPECIALTY INSURANCE COMPANY** |
| SVO BUILDING ONE, LLC,<br><br>Counterclaimants,<br><br>v.<br><br>NAVIGATORS SPECIALTY INSURANCE COMPANY; and DOES 1-10.<br><br>Counter-defendants. | |

**PROPOUNDING PARTY:** **DEFENDANT AND COUNTERCLAIMANT SVO BUILDING ONE, LLC**

**RESPONDING PARTY:** **PLAINTIFF AND COUNTER-DEFENDANT NAVIGATORS SPECIALTY INSURANCE COMPANY**

**SET NO.:** **ONE**

Pursuant to Federal Rules of Civil Procedure, Rule 33, Defendant and Counterclaimant SVO Building One, LLC ("SVO") hereby propounds the following Interrogatories, Set One, to Plaintiff and Counter-defendant Navigators Specialty Insurance Company ("Navigators). Within thirty (30) days of service, Navigators is required to serve written responses to these Interrogatories under oath.

## DEFINITIONS

The following definitions apply to each of the Interrogatories herein and are deemed to be incorporated into each such request:

1. The terms "YOU" or "YOUR" means and refers to Plaintiff and Counter-defendant Navigators Specialty Insurance Company, its officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on its behalf.

2. The term "COMMUNICATIONS" means and refers to any written, oral, telephonic, or other inquiry, examination, notice, representation, discussion, conversation, correspondence, electronic mail, telegram, negotiation, review, agreement, understanding, meeting or interview, including any written evidence of oral communications and communications between any individual or entity.

3. The terms "DOCUMENT" or "DOCUMENTS" are intended to include each and every "writing" and "recording" as defined in Rule 1001(1) of the Federal Rules of Evidence, and includes, but is not limited to, all documents and writings of every kind and nature, including, but not limited to, letters, correspondence, memoranda, reports, notes, summaries, files, and electronic mail and all electronically stored information ("ESI") versions of such writings, including without limitation, any printed, typewritten, handwritten, computer-created or machine-readable manner or reproduction thereof, of whatever character, including without limitation, correspondence, letters, memoranda, facsimiles, facsimile cover sheets, handwritten notations, intra office and intra office

departmental communications, work papers, diaries, calendar notations, appointment notes of minutes of meetings, conferences or conversations, drawings, reports, opinions, studies, analysis, maps, evaluations, contracts, licenses, agreements, expense account reports, bonds, time reports or records, tables, tabulations, journals, bank account records, checks, check ledgers or registers, check stubs, billing statements and/or descriptions of billed amounts, financial statements, graphs, charts, photographs, photo records, data processing reports and forms, data compilations form which information may be obtained or translated through the use of detection devices into reasonable usable forms, microfiche, microfilm, diagrams, symbols, telegrams, telexes, cables, telephone records or logs, brochures, and any non-identical copies of any of the foregoing, or combinations of any of the foregoing, whether original, draft or copy. ESI refers to any form of electronic data that is created, stored, or transmitted on any electronic device or system. This includes, but is not limited to, emails, documents, spreadsheets, databases, social media posts, instant messages, audio and video files, metadata, and backups.

4. The term "GRSM" as used herein means the law firm of Gordon, Rees, Scully & Mansukhani, LLP, and any partner, associate, attorney, employee, contractor, or agent, whether employed or otherwise retained to act on its behalf.

5. The term "SVO" means defendant and counter-claimant SVO Building One, LLC, its members, officers, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on its behalf.

6. The term "UNDERLYING ACTION" means and includes the arbitration before the American Arbitration Association titled *Liebert Corporation v. SVO Building One. LLC*, Case No. 01-18-0003-1318.

7. The term "BILLING ENTRY" means each separate time entry by an attorney, paralegal or staff employee on a bill or invoice submitted to YOU by any law firm retained to provide representation to SVO in the UNDERLYING ACTION.

8. The term "IDENTIFY" with respect to a BILLING ENTRY means the name of the person billing the time billed, the date the time was billed, and the billing rate.

/ / /

9. The term "IDENTIFY" with respect to a DOCUMENT, means to describe the document's type, subject matter, date, author, addressee, and recipient.

10. The term "IDENTIFY" with respect to a PERSON, means to state the PERSON's name, address, and telephone number.

11. The term "IDENTIFY" with respect to a cost, expense, consulting or expert fee incurred in the defense of SVO in the UNDERLYING ACTION, means the amount of the expense, the nature of the expense, the vendor, and the date the cost or expense was incurred.

12. The terms "PERSON" and "PERSONS" as used herein means a natural person, corporation, partnership, limited liability company, or other legal entity, including associations and groups.

13. The term "NAVIGATORS POLICY" means the policy of insurance issued by YOU to SVO bearing Policy No. LA17CGL219162IC for the policy period of July 12, 2017 to August 12, 2019.

14. The term "NON-POTENTIALLY COVERED CLAIM" means a claim or cause of action asserted in the UNDERLYING ACTION that YOU contend is not potentially covered under the NAVIGATORS POLICY.

15. The term "SUBJECT ACTION" as used herein means the instant coverage action initiated by Plaintiff and Counter-defendant Navigators Specialty Insurance Company against Defendant and Counterclaimant SVO Building One, LLC and bearing United States District Court for the Northern District of California Case No. 3:22-CV-07102-AMO.

16. The term "TYSON & MENDES" as used herein means the law firm of Tyson & Mendes, LLP and any partner, associate, attorney, employee, contractor, or agent, whether employed or otherwise retained to act on its behalf.

17. If, for any reason, including but not limited to claim of privilege or work-product, YOU do not produce a DOCUMENT called for by this Request, for each DOCUMENT: (1) state the type of DOCUMENT; (2) state the date of the DOCUMENT; (3) IDENTIFY the PERSON who prepared the DOCUMENT; (4) IDENTIFY each person (if any) who signed the DOCUMENT;

(5) IDENTIFY each person to whom it was directed, circulated, or distributed; (6) IDENTIFY each person now in possession of the DOCUMENT or any identical or non-identical copy thereof; (7) state the subject matter of the DOCUMENT; and (8) state the grounds upon which the DOCUMENT has been withheld.

18. The terms "AND" and "OR" shall be construed conjunctively or disjunctively as necessary to make the following requests inclusive rather than exclusive; the singular includes the plural and vice-versa; the use of the verb in any tense shall be construed as to use the verb in all other tenses whenever necessary to bring within the scope of the request that might otherwise be construed to be outside the scope.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

IDENTIFY each and every BILLING ENTRY of attorney's fees that YOU paid to TYSON & MENDES that YOU contend is solely allocable to a NON-COVERED CLAIM in the UNDERLYING ACTION.

**INTERROGATORY NO. 2:**

IDENTIFY each and every BILLING ENTRY of attorney's fees that YOU paid to TYSON & MENDES in the UNDERLYING ACTION that YOU contend is recoverable by YOU under *Buss v. Superior Court*, 16 Cal. 4th 35 (1997).

**INTERROGATORY NO. 3:**

IDENTIFY each and every BILLING ENTRY of attorney's fees that YOU paid to GRSM that YOU contend is solely allocable to a NON-POTENTIALLY COVERED CLAIM in the UNDERLYING ACTION.

**INTERROGATORY NO. 4:**

IDENTIFY each and every cost or expense YOU paid during the defense of SVO in the UNDERLYING ACTION that YOU contend is solely allocable to a NON-POTENTIALLY COVERED CLAIM in the UNDERLYING ACTION.

/ / /

/ / /

**INTERROGATORY NO. 5:**

IDENTIFY each and every expert fee or consultant fee YOU paid during the defense of SVO in the UNDERLYING ACTION that YOU contend is solely allocable to a NON-POTENTIALLY COVERED CLAIM in the UNDERLYING ACTION.

**INTERROGATORY NO. 6:**

State the total amount of attorneys' fees and costs including expert and consultants' fees, YOU paid for the defense of SVO in the UNDERLYING ACTION.

**INTERROGATORY NO. 7:**

Please state how YOU calculated the total amount of attorneys' fees and costs including expert and consultants' fees YOU paid for the defense of SVO in the UNDERLYING ACTION.

**INTERROGATORY NO. 8:**

Please state the amount of attorney's fees YOU paid to GRSM for the defense of SVO in the UNDERLYING ACTION.

**INTERROGATORY NO. 9:**

Please state whether YOU obtained a reduction in the attorney's fees billed to YOU by GRSM because of its conflict of interest requiring its withdrawal from the defense of SVO in the UNDERLYING ACTION.

**INTERROGATORY NO. 10:**

Please state the amount of legal work in the defense of SVO in the UNDERLYING ACTION which had to be performed again by TYSON & MENDES after GRSM withdrew from the defense because of a conflict of interest.

**INTERROGATORY NO. 11:**

If YOU contend that YOU had no obligation to provide a defense to SVO after the defamation claim for relief was dismissed in the UNDERLYING ACTION, state each and every fact upon which you base such contention.

**INTERROGATORY NO. 12:**

If YOU contend that you had no obligation to provide a defense to SVO in the UNDERLYING ACTION based on the coverage in the NAVIGATORS POLICY for property

**INTERROGATORY NO. 21:**

Please state each and every fact why TYSON & MENDES did not comply with the Arbitrator's April 26, 2021 Order to produce DOCUMENTS prior to April 30, 2021.

**INTERROGATORY NO. 22:**

Pease state each and every fact why TYSON & MENDES did not produce all DOCUMENTS reviewed or relied upon by SVO's experts in the UNDERLYING ACTION.

**INTERROGATORY NO. 23**

If YOU contend that the order entered by the Arbitrator precluding evidence of some of the affirmative claims of SVO in the UNDERLYING ACTION was not the fault of TYSON & MENDES in whole or in part, please state each and every fact upon which YOU base such contention.

**INTERROGATORY NO. 24:**

If YOU contend that SVO consented to TYSON & MENDES's concurrent legal representation of both YOU and SVO, state all facts that support YOUR contention.

**INTERROGATORY NO. 25:**

IDENTIFY each PERSON who has knowledge of facts supporting YOUR contention that SVO consented to TYSON & MENDES's concurrent legal representation of both YOU and SVO, if YOU so contend.

DATED: July 18, 2025

**PARKER SHAFFIE LLP**

By: [signature]

Bruce T. Smyth
Jessica B. King
Attorneys for Defendant and Counterclaimant
**SVO BUILDING ONE, LLC**

**PROOF OF SERVICE**

**Case No. 3:22-CV-07102-AMO**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 800 W. 6th Street, Suite 500, Los Angeles, CA 90017.

On July 18, 2025, I served true copies of the following document(s) described as **DEFENDANT AND COUNTERCLAIMANT SVO BUILDING ONE, LLC'S INTERROGATORIES, SET ONE TO PLAINTIFF/COUNTER-DEFENDANT NAVIGATORS SPECIALTY INSURANCE COMPANY** on the interested parties in this action as follows:

David Simantob, Esq.
Shannon Santos, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
555 S. Flower Street, Suite 2900
Los Angeles, CA 90071-2407

Attorneys for Plaintiff
Telephone: (213) 443-5100
Facsimile: (213) 443-5101
E-mail: david.simantob@wilsonelser.com
E-mail: Shannon.Santos@wilsonelser.com

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address rodriguez@parkershaffiellp.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 18, 2025, at Los Angeles, California.

Ben Barragan



PS PARKER SHAFFIE LLP

# EXHIBIT “3”

David Simantob, SBN 155790
Email: David.Simantob@wilsonelser.com
Shannon L. Santos, SBN 260112
Email: Shannon.Santos@wilsonelser.com
**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, CA 90071-2407
Telephone: 213.443.5100
Facsimile: 213.443.5101

*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>SVO BUILDING ONE, LLC,<br><br>Defendant. | Case No. 3:22-cv-07102-AMO<br>Hon. Araceli Martínez-Olguín<br>Courtroom 10<br><br>**NAVIGATORS SPECIALTY INSURANCE COMPANY'S RESPONSES TO SVO BUILDING ONE, LLC'S INTERROGATORIES, SET NO. ONE**<br><br>Action Filed: November 14, 2022<br>Trial Date: July 14, 2026 |
| SVO BUILDING ONE, LLC,<br><br>Counterclaimant,<br><br>vs.<br><br>NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Counter-Defendant. | |

PROPOUNDING PARTY: Defendant/Counterclaimant SVO Building One, LLC

RESPONDING PARTY: Plaintiff/Counter-Defendant Navigators Specialty Insurance Company

SET NO.: One

/ / /

/ / /

Plaintiff/Counter-Defendant Navigators Specialty Insurance Company ("Navigators") hereby responds to the Interrogatories, Set No. One, propounded by Defendant/Counterclaimant SVO Building One, LLC ("SVO").

**GENERAL OBJECTIONS**

1. Navigators objects to the extent the Interrogatories are vague, ambiguous, uncertain, overly broad, calls for speculation, or are not reasonably calculated to lead to the discovery of admissible evidence.

2. Navigators objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the litigation privilege, or any other lawfully recognized privilege or immunity which may attach to the information requested.

3. Navigators objects to the Interrogatories to the extent they seek information protected from disclosure as trade secret, proprietary, and/or confidential.

4. Navigators objects to the Interrogatories to the extent they seek information not within the care, custody, or control of Navigators.

5. Navigators objects to the Interrogatories to the extent they seek information which is equally available to SVO.

6. Navigators objects to the Interrogatories to the extent they seek information which can be obtained by less intrusive means or is already in the SVO's care, custody, or control.

7. Navigators objects to the Interrogatories to the extent they are burdensome and seek information which is not proportional to the needs of the case.

8. Navigators objects to the Interrogatories as vague and ambiguous as, under the "DEFINITIONS" section, there appear to be instructions as far as the responses to the Interrogatories are concerned. As these instructions as identified as "DEFINITIONS," the information is unclear and nonsensical.

9. Navigators objects to the Interrogatories as any instructions under the "DEFINITIONS" section attempt to impose on Navigators obligations that exceed the discovery rules under the Federal Rules of Civil Procedure and Local Rules.

Navigators has not yet completed its investigation and discovery of this matter. The following responses are provided to the best of Navigators' ability and understanding at this time. Discovery is continuing, and Navigators reserves the right to supplement these responses as additional information becomes available.

These General Objections are incorporated by reference as though fully set forth into each response to the Requests.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

IDENTIFY each and every BILLING ENTRY of attorney's fees that YOU paid to TYSON & MENDES that YOU contend is solely allocable to a NON-COVERED CLAIM in the UNDERLYING ACTION.

**RESPONSE TO INTERROGATORY NO. 1:**

Navigators incorporates by reference the General Objections set forth above as though fully set forth herein. Navigators objects to the definition of "IDENTIFY" in connection with a "BILLING ENTRY" as seeking four types of information, making the Interrogatory inherently compound and exceeding the discovery limits imposed by statute. Navigators objects to the definition of "YOU" as unduly burdensome and harassing by seeking information in possession of Navigators' "officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on" Navigators' behalf, which necessarily seeks information outside of Navigators' care, custody, and control. Navigators objects that the phrase "NON-COVERED CLAIM" is capitalized, suggesting it is a defined phrase, but SVO's discovery does not include such a definition. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it calls for a legal conclusion and expert testimony, which is not obligated to be produced at this point in discovery. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and harassing by seeking identification of individual time entries incurred over more than two years of Navigators' defense of SVO despite Navigators' prior production of the invoices.

Subject to and without waiving the foregoing objections, Navigators responds as follows: As Navigators previously advised SVO, all fees and costs incurred after the March 24, 2021 dismissal of the allegations of defamation in the action entitled *Liebert Corporation v. SVO Building One, LLC*, American Arbitration Association, Case No. 01-18-0003-1318 ("Underlying Action") were not potentially covered under Navigators Policy No. LA17CGL219162IC issued to SVO effective July 12, 2017 to August 12, 2019 ("Policy"). Navigators paid approximately $2,998,457.50 for such fees and costs. Prior to the dismissal, all fees and costs incurred in defense of any claim other than allegations that SVO disparaged the underlying claimant, Vertiv (formerly known as Liebert Corporation) ("Claimant"), were not potentially covered under the Policy. These defamation allegations were limited to one of 18 causes of action asserted by the Claimant in the Fourth Amended Complaint. Navigators paid approximately $2,497,187.09 for all fees and costs incurred prior to the March 24, 2021 dismissal of the defamation cause of action. Virtually all (if not all) of that amount was incurred in defense of uncovered claims. Navigators is entitled to recovery of all fees and costs incurred in defense of such uncovered claims. Discovery is continuing, and Navigators reserves the right to amend this response accordingly, including once expert analysis has been completed.

**INTERROGATORY NO. 2:**

IDENTIFY each and every BILLING ENTRY of attorney's fees that YOU paid to TYSON & MENDES in the UNDERLYING ACTION that YOU contend is recoverable by YOU under *Buss v. Superior Court*, 16 Cal. 4th 35 (1997).

**RESPONSE TO INTERROGATORY NO. 2:**

Navigators incorporates by reference the General Objections set forth above as though fully set forth herein. Navigators objects to the definition of "IDENTIFY" in connection with a "BILLING ENTRY" as seeking four types of information, making the Interrogatory inherently compound and exceeding the discovery limits imposed by statute. Navigators objects to the definition of "YOU" as unduly burdensome and harassing by seeking information in possession of Navigators' "officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on" Navigators' behalf, which necessarily seeks information outside of

Navigators' care, custody, and control. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it calls for a legal conclusion and expert testimony, which is not obligated to be produced at this point in discovery. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and harassing by seeking identification of individual time entries incurred over more than two years of Navigators' defense of SVO despite Navigators' prior production of the invoices.

Subject to and without waiving the foregoing objections, Navigators responds as follows: Navigators' response to this Interrogatory is the same as the response set forth above with respect to Interrogatory No. 1. Navigators' response to Interrogatory No. 1 is incorporated herein by reference as if set forth in full.

**INTERROGATORY NO. 3:**

IDENTIFY each and every BILLING ENTRY of attorney's fees that YOU paid to GRSM that YOU contend is solely allocable to a NON-POTENTIALLY COVERED CLAIM in the UNDERLYING ACTION.

**RESPONSE TO INTERROGATORY NO. 3:**

Navigators incorporates by reference the General Objections set forth above as though fully set forth herein. Navigators objects to the definition of "IDENTIFY" in connection with a "BILLING ENTRY" as seeking four types of information, making the Interrogatory inherently compound and exceeding the discovery limits imposed by statute. Navigators objects to the definition of "YOU" as unduly burdensome and harassing by seeking information in possession of Navigators' "officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on" Navigators' behalf, which necessarily seeks information outside of Navigators' care, custody, and control. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it calls for a legal conclusion and expert testimony, which is not obligated to be produced at this point in discovery. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and

harassing by seeking identification of individual time entries incurred over more than two years of Navigators' defense of SVO despite Navigators' prior production of the invoices.

Subject to and without waiving the foregoing objections, Navigators responds as follows: Navigators' response to this Interrogatory is the same as the response set forth above with respect to Interrogatory No. 1. Navigators' response to Interrogatory No. 1 is incorporated herein by reference as if set forth in full.

**INTERROGATORY NO. 4:**

IDENTIFY each and every cost or expense YOU paid during the defense of SVO in the UNDERLYING ACTION that YOU contend is solely allocable to a NON-POTENTIALLY COVERED CLAIM in the UNDERLYING ACTION.

**RESPONSE TO INTERROGATORY NO. 4:**

Navigators incorporates by reference the General Objections set forth above as though fully set forth herein. Navigators objects to the definition of "IDENTIFY" in connection with a "cost, expense, consulting or expert fee" as seeking four types of information, making the Interrogatory inherently compound and exceeding the discovery limits imposed by statute. Navigators objects to the definition of "YOU" as unduly burdensome and harassing by seeking information in possession of Navigators' "officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on" Navigators' behalf, which necessarily seeks information outside of Navigators' care, custody, and control. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it calls for a legal conclusion and expert testimony, which is not obligated to be produced at this point in discovery. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and harassing by seeking identification of individual costs incurred over more than two years of Navigators' defense of SVO despite Navigators' prior production of the invoices.

Subject to and without waiving the foregoing objections, Navigators responds as follows: Navigators' response to this Interrogatory is the same as the response set forth above with respect to Interrogatory No. 1. Navigators' response to Interrogatory No. 1 is incorporated herein by reference

as if set forth in full.

**INTERROGATORY NO. 5:**

IDENTIFY each and every expert fee or consultant fee YOU paid during the defense of SVO in the UNDERLYING ACTION that YOU contend is solely allocable to a NON-POTENTIALLY COVERED CLAIM in the UNDERLYING ACTION.

**RESPONSE TO INTERROGATORY NO. 5:**

Navigators incorporates by reference the General Objections set forth above as though fully set forth herein. Navigators objects to the definition of "IDENTIFY" in connection with a "cost, expense, consulting or expert fee" as seeking four types of information, making the Interrogatory inherently compound and exceeding the discovery limits imposed by statute. Navigators objects to the definition of "YOU" as unduly burdensome and harassing by seeking information in possession of Navigators' "officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on" Navigators' behalf, which necessarily seeks information outside of Navigators' care, custody, and control. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it calls for a legal conclusion and expert testimony, which is not obligated to be produced at this point in discovery. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and harassing by seeking identification of individual fees and costs incurred over more than two years of Navigators' defense of SVO despite Navigators' prior production of the invoices.

Subject to and without waiving the foregoing objections, Navigators responds as follows: Navigators' response to this Interrogatory is the same as the response set forth above with respect to Interrogatory No. 1. Navigators' response to Interrogatory No. 1 is incorporated herein by reference as if set forth in full.

**INTERROGATORY NO. 6:**

State the total amount of attorneys' fees and costs including expert and consultants' fees, YOU paid for the defense of SVO in the UNDERLYING ACTION.

/ / /

on" Navigators' behalf, which necessarily seeks information outside of Navigators' care, custody, and control. Navigators objects to the extent the Interrogatory seeks information not reasonably calculated to lead to the discovery of admissible evidence. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and harassing.

Subject to and without waiving the foregoing objections, Navigators responds as follows: Ulrich Pez and Angel Muth.

Dated: August 25, 2025

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By: Shannon L. Santos

David Simantob
Shannon L. Santos
*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*

**VERIFICATION**

I, Angel L. Muth, am a Director of Global Specialty Claims for Navigators Specialty Insurance Company ("Navigators"), a party to the above-entitled action. I am authorized to execute this verification on behalf of Navigators. I have read the foregoing **NAVIGATORS SPECIALTY INSURANCE COMPANY'S RESPONSES TO SVO BUILDING ONE, LLC'S INTERROGATORIES, SET NO. ONE**, and know its contents. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true based on my own knowledge and my review of Navigators' records.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 25, 2025 at Los Angeles, California.

Angel Muth

Angel L. Muth

**PROOF OF SERVICE**

*Navigators Spec. Ins. Co. v. SVO Building One, LLC*
U.S.D.C., Northern District, Case No. 3:22-cv-07102-AMO

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071. My email address is Shannon.Santos@wilsonelser.com.

On August 25, 2025, I served the foregoing document described as **NAVIGATORS SPECIALTY INSURANCE COMPANY'S RESPONSES TO SVO BUILDING ONE, LLC'S INTERROGATORIES, SET NO. ONE.** on the interested parties in this action by sending a copy via e-mail to the electronic addresses included below:

Shawn Shaffie, Esq.
Bruce T. Smyth, Esq.
PARKER SHAFFIE LLP
800 W. 6th Street, Suite 500
Los Angeles, California 90017
Tel.: (213) 622-4441
Fax: (213) 622-1444
Email: shaffie@parkershaffiellp.com
smyth@parkershaffiellp.com
*Attorneys for Defendant/ Counterclaimant SVO Building One, LLC*

Steven W. Murray, Esq.
STEVEN W. MURRAY, APC
14930 Ventura Blvd., Suite 205
Sherman Oaks, California 91403
Tel.: (818) 501-2277
Email: swm@psilaw.com
*Attorneys for Defendant/ Counterclaimant SVO Building One, LLC*

☒ **BY ELECTRONIC SERVICE:** I electronically served the foregoing document in PDF format to the person at the electronic service addresses listed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 25, 2025 at Los Angeles, California.

Shannon L. Santos

# EXHIBIT "4"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Robert M. Illman, Magistrate Judge

| | | |
|---|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. C 22-07102-AMO |
| SVO BUILDING ONE, LLC, | ) | |
| Defendant. | ) | |

San Francisco, California
Wednesday, November 5, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 3:03 - 3:26 = 23 MINUTES

APPEARANCES:

For Plaintiff:
Wilson Elser Moskowitz Edelman Dicker LLP
555 S. Flower Street
Suite 2900
Los Angeles, California 90071
BY: SHANNON L. SANTOS, ESQ.

For Defendant:
Charlston, Revich and Wollitz LLP
1925 Century Park East
Suite 320
Los Angeles, California 91367
BY: BRUCE T. SMYTH, ESQ.

Transcribed by:
Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Wednesday, November 5, 2025 3:03 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: The court calls Navigator Specialty Insurance Company versus SVO Building One, LLC, case number 322CV7102AMO.

Parties, please state their appearances for the record, beginning with Plaintiff.

MS. SANTOS (via Zoom): Shannon Santos for Navigator Specialty.

MR. SMYTH (via Zoom): Bruce Smyth for Defendant and Counter-claimant SVO Building One, LLC.

THE COURT: All right. Good afternoon, everyone.

So let me ask for some clarification on this letter. With regard to the expert report that was Navigator's expert report, that's been turned over to SVO. Is that correct?

MS. SANTOS: Yes.

THE COURT: All right. And did that include the line by line allocations in it?

MS. SANTOS: No, it included the general opinion based on the expert's review of the line by line.

THE COURT: But it didn't show the basis for that math.

MS. SANTOS: Actually, I think it did. It said, like, this number of entries or this amount of time out of

this total time reflected defamation. That accounts to one-percent. Thus, we've attributed at least one-percent might have gone to the defamation claim. At most, you know, out of an abundances of caution, I think he gave three-percent.

THE COURT: Why -- as to the line by line allocation, when do you contend that they're entitled to that? If they're not entitled to it in fact discovery, when are they entitled to it?

MS. SANTOS: Well, if they're -- so we say we did give it post-dismissal, 100-percent, every single line item. But if you're talking about pre-dismissal, that he can -- he -- SVO can seek through expert discovery, which we're setting up the expert depositions. I imagine he's going to ask our expert, where did you come up with that one-percent of time that went to defamation?

THE COURT: So -- and their contention is that you're going to be using that information in forthcoming dispositive motions that I think are coming up at the end of expert discovery. Is that right?

MS. SANTOS: About two weeks later. The summary judgment motion has to be filed December 1st, and the fact -- expert discovery cutoff is November 20.

THE COURT: So from SVO's perspective, why can't you just get this through the expert discovery and asking the expert to identify the billing entries that were relied

on for making that determination?

MR. SMYTH: Yes, I think there's been a number of, I think, inaccurate statements. First, the expert report does not go line by line. It has a number of summaries based upon some kind of arbitrary determinations, but it does not do that. And that's what under Buss the Plaintiff's burden is. You know, these interrogatories were served at, you know, the closing of discovery. The case has been going for three years. They should be able to basically set forth the line by line entries of the billing amounts, of the expert fees, and of the expenses. That's what their burden is under the Buss case. And they didn't do it in responses to interrogatories. And, additionally, they haven't done it in the expert report.

But I think -- also, I think the expert report is a little bit of a red herring on their part because these are not determinations that really require expert testimony. You know, maybe it's admissible, but, you know, the issue is, what are the particular entries that are solely allocable to potentially non-covered claims? That's what the Buss standard is. And we're entitled to that information. They haven't done it. That is basically what the case is about. You know, in order to get reimbursement, you have to show that the fees and expenses are solely allocable to non-covered claims, and the burden is on the

insurer to do that. And we really can't respond until we see what the particular entries are in order to deal with them. What they -- what they've done in their -- what they've done in the interrogatory response is they say, "Well, it's 97-percent on the period prior to the dismissal of the defamation claim." Well, 97-percent of what? They -- if they've done a calculation and they -- you know, if they say they've done, they haven't identified. We can't really respond. On the period after the dismissal, they argue that it is a -- that it is 100-percent. And they have a legal argument on that, and they basically argue that there's no duty to defend after the defamation cause of action was dismissed. We disagree with that, but I asked the Plaintiff's counsel, look, if you don't win on your legal argument that it's 100-percent, do you agree that you're not going to introduce any evidence that it's allocable to non-covered claims? And the answer was no. So if they're going to make that argument in the alternative, they ought to disclose the fees and expenses that they contend now. So, you know, we submit that they should really -- you know, if they've got these calculations -- list -- you know, set forth the expenses, set forth the fee amounts, and set forth the expert fees, which are very substantial, which they contend make up their supposed calculations.

THE COURT: Why can't you get those coming up in the expert discovery that's going to be taking place in the next couple of weeks?

MR. SMYTH: Well, we can't do it because we have seven hours to do it, and there's 8,000 entries and 500 expense reports. So it's not in -- it's not in the expert report. What they have -- what has been done in the expert report is they've sort of categorized some of these expenses we think incorrectly, and it's -- you know, it's teed up, we think, for a Daubert motion. And it doesn't relate. It doesn't show the fees line by line and which ones are -- they contend are solely allocable. So it's not a -- it's not a -- it's not a possible task. And it's also -- you know, it -- the Buss case says it's a very difficult task. I mean, that's what Buss says. And it is a very difficult task, but the burden is on the insurer to satisfy that burden, and it hasn't done that.

MS. SANTOS: I pulled up the expert report. It does say that the expert determined 63.6 hours of the 5,242.9 hours potentially related to the defamation claim.

THE COURT: So -- but you're not pointing to where those specific allocations --

MS. SANTOS: The -- correct. The expert report did not put the line items on how the 63.6 was added up. Again, I imagine that's what he will be questioned about at

his deposition.

THE COURT: And let me ask you about the second portion, the time after that date, the 100-percent, and Mr. Smyth's argument in that regard. what is your response to that?

MS. SANTOS: Well, we did give the line by line allocation. Every -- after defamation was dismissed, no time was spent on the defamation allegations --

THE COURT: So then you're stuck with that if the determination by the district judge is that it's not 100-percent, right?

MS. SANTOS: I think what Defense counsel was speaking about is whether there was a continuing defense obligation, if there was a opportunity that defamation could be brought back in.

THE COURT: Right.

MS. SANTOS: And that doesn't change the fact that the time that was done in the underlying action was not on defamation, because defamation was never brought back in. So our expert in the report -- and he will testify and opine at trial that nothing after the defamation dismissal ever went to a potentially covered claim. All those time entries are reflected as working towards other non-covered claims.

MR. SMYTH: Well, that would be -- it is -- ultimately, it's a legal determination. You know, we

disagree -- we'll disagree the legal determination, because we think there were allegations that continued, and there are cases that say if something is dismissed without prejudice, that there's still an ongoing duty to defend, and we'll be able to argue some examples of that. But what I haven't heard is a commitment that they'll stick with that. If they want to make the legal argument on the 100-percent and live or die by that, that's fine. But if they're going to make the legal argument and then fail on that, and then want to make an allocation argument, I -- we submit that they should be required to do that now.

THE COURT: Ms. Santos?

MS. SANTOS: I don't think I understand the argument. The expert is prepared to testify that every time entry incurred after March 24th, 2021, was incurred in defense of uncovered claims. So --

THE COURT: So if that's his testimony, then that'll be his testimony, Mr. Smyth. That'll be locked in.

MR. SMYTH: Well, if that's what they're -- you know, they're committing that they're not going to make an allocation argument if that -- if, for example, the expert is excluded or they make a legal argument on a motion for, say, summary judgment or some kind of a motion in limine. That's fine if they would be bound by that. But I haven't heard that they're willing to stick to that if, for example,

you know, as I mentioned, the expert is excluded or something else happens. If they're going to make it in the alternative, we submit they should be able -- they should make that argument now and list the expenses.

MS. SANTOS: Okay. I think --

MR. SMYTH: And also, with respect, it says 100-percent of the expenses. They haven't listed the expenses, and we don't think the totals, in fact, total up, but they should set forth the expenses, the billing entries, and the expert fees.

THE COURT: It would be all of them? But they haven't turned over all of them is what you're saying? If you're saying 100-percent, then I don't understand what you mean.

MR. SMYTH: Well, there -- there's an element of what the calculation is on some of these things. And they have not -- they -- they've turned over documents, but the calculations that we've seen don't match up to what has been produced. And we think if they've done this calculation -- and they're going to have to prove it to the Court or the jury -- they should list the particular fee entries and the --

THE COURT: I see.

MR. SMYTH: -- expert expenses.

MS. SANTOS: I think -- so I want to first address

the expenses because I think we're wasting too much time on it.

All of the expert invoices were produced, and a spreadsheet that lists the amount, the invoice date, the invoice number, and thus the total that Navigators is seeking in reimbursement has been produced. So all of that calculation has already been given, and that's how Navigators is going to prove its reimbursement with respect to the experts.

THE COURT: Okay.

MS. SANTOS: The two issues that I think are being conflated with respect to an allocation and a defense obligation are what SVO is saying that a district court could find in response to a summary judgment motion. Summary judgment is going to say that from the date the defamation cause of action was dismissed, there was no duty to defend from that point forward, and thus everything is subject to reimbursement. If the summary judgment is denied and it says that there was an ongoing duty to defend, which we do not think is supported by law, then anything incurred after the dismissal is going to be subject to an expert allocation. And at that point, our expert comes in and says, "There is not one time entry after March 24th that went to defamation." So the result might be the same, but we're talking about two different argument -- two different

legal theories, and he's saying that I need to be bound by one in order to not -- in order to not be ordered to produce additional discovery now. And what I'm saying is, it's different ways of proving the same thing.

MR. SMYTH: Well, we would submit that, first, they haven't indicated which particular fees or expenses, and the spreadsheet that she's talked about does nothing of the sort. I don't know if it's even been -- we discussed it in mediation. I don't know whether it's even been formally produced. I don't think it has. And we don't -- if -- they say 100-percent, but they ought to list what those are, so we can at least run a total and see whether we agree with that. I don't think we do, because I've heard a number of numbers that are different from the ones we've calculated. So, in the first place, they ought to, you know, provide a listing of those particular entries or billing sheets or expert reports. And I should note that the -- two of the interrogatories here, numbers four and five specifically, ask them to list the expert and consulting fees and the costs. And they haven't responded to that. They've just given us a total. And if they've done these calculations, then it shouldn't be that difficult to come up with totals, you know, with particular billing entries listing expert expenses and listing costs. That's what they will be required to do at trial, and we should be -- we should be

entitled to that information now. And, you know, like I said, I still don't have -- you know, if they say they're going to live or die by the 100-percent, I still haven't heard that. They ought to -- they ought to commit to that a little bit more unequivocally (audio glitch).

THE COURT: Let's see here. All right. So I'm going to grant the request for the responses to the interrogatories. To the extent that Navigators has turned over things like the expert invoices already, then they simply need to point to that production -- that previous production. They do have a responsibility to turn over even those line items in response to these interrogatories based on the claims at present. In other cases that I've reviewed in advance of this hearing, the only times the court didn't do that was when there was an expert report coming out that was going to have that detailed information in it. The expert report here doesn't. It doesn't meet the factual information and documents underlying the report, so I'm going to order Navigators to respond to those interrogatories. By when can that be done?

MS. SANTOS: That's going to require our expert to prepare that, which can be done as a rebuttal expert report with the line by line. I would like it to be identifying the 63.6 hours --

THE COURT: Right.

MS. SANTOS: -- as opposed to the inverse, which would be something close to 5,200 hours.

THE COURT: Oh, it can be the 63. That's fine.

MS. SANTOS: Okay. So I can ask my expert if he can have it done. I can't remember the date we have picked for his deposition, but I can see if he can have it done in the next two weeks, so it's done in time for the deposition.

THE COURT: I believe that's sufficient.

MR. SMYTH: Okay. Can we get a listing of the particular fee bills that is the universe -- fee bills and expert reports and costs and expenses that is the universe for these two time periods? Because that's -- if we can look at that, then we can respond. So if there, for example, are fee bills up to a certain period, we can calculate the totals, and if we know what the source is of those, we can then be in a -- be in a position to respond.

And I should mention, just for background, there were fee bills initially, and then there were reduced fee bills that were done after the report, you know, by their bill reviewer was done. So we would like to know what particular documents and fee bills they're doing and identify which expert reports and which expenses within each of the periods prior to the dismissal and --

MS. SANTOS: So that's going to be far outside the scope of this motion. As a courtesy, I'll let Counsel know

that the spreadsheet was produced at N09905 to 09908. And that includes the line by line of each invoice, the amount, and the amount paid, and the calculations.

MR. SMYTH: It does not. It absolutely says nothing of the sort. It doesn't list the invoices, it doesn't list the numbers. It certainly does not list the expert reports or the consulting fees. They're not in there.

MS. SANTOS: Okay.

MR. SMYTH: I mean, I've gone through this fairly closely. They don't include the consulting fees. They don't include the expert fees. And -- and the totals don't match up.

MS. SANTOS: Again, it's outside the scope of interrogatories one through five. To the extent you're asking for a line by line of the 63.6 hours on the attorney's fees invoices, we can. The -- and I will point to where in the production the spreadsheet is, which includes each vendor and each payment made, and it totals the amount that Navigators has advised it is seeking in reimbursement.

MR. SMYTH: Well, I -- I'm not --

MS. SANTOS: That's pursuant to the --

MR. SMYTH: I've not seen --

MS. SANTOS: -- court order.

MR. SMYTH: -- that document.

MS. SANTOS: It's 9905 to 9908. Now my Google thinks I'm talking to it.

So, pursuant to the Court order, I will direct SVO to that portion of the production.

THE COURT: All right. And you said that production will occur prior to the deposition of the expert?

MS. SANTOS: It was already made.

THE COURT: I'm sorry, with regard to the entirety of my order today.

MS. SANTOS: Oh, the line by line allocation of the 63.6 hours of where defamation is potentially worked on, yes. I will ask my witness to have that done within 14 days.

THE COURT: Okay.

MR. SMYTH: And will we get a verified amended response?

THE COURT: What was the question, I'm sorry?

MR. SMYTH: Oh, I was going -- whether we'll get a verified amended response to the -- binding the party with this information.

THE COURT: I mean, that would be the normal course, yeah.

MR. SMYTH: Yeah. Okay.

MS. SANTOS: Within 14 days.

THE COURT: Yeah, within the 14 days.

All right. That's my ruling for you guys. Thank you, everyone. Have a good afternoon.

MR. SMYTH: Thank you.

THE COURT: All right.

(Proceedings adjourned at 3:26 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Monday, November 17, 2025

# EXHIBIT "5"

David Simantob, SBN 155790
Email: David.Simantob@wilsonelser.com
Shannon L. Santos, SBN 260112
Email: Shannon.Santos@wilsonelser.com
**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, CA 90071-2407
Telephone: 213.443.5100
Facsimile: 213.443.5101

*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>SVO BUILDING ONE, LLC,<br><br>Defendant.<br>———<br>SVO BUILDING ONE, LLC,<br><br>Counterclaimant,<br><br>vs.<br><br>NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Counter-Defendant. | Case No. 3:22-cv-07102-AMO<br>Hon. Araceli Martínez-Olguín<br>Courtroom 10<br><br>**NAVIGATORS SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES TO SVO BUILDING ONE, LLC'S INTERROGATORIES, SET NO. ONE**<br><br>Action Filed: November 14, 2022<br>Trial Date: July 14, 2026 |

PROPOUNDING PARTY: Defendant/Counterclaimant SVO Building One, LLC

RESPONDING PARTY: Plaintiff/Counter-Defendant Navigators Specialty Insurance Company

SET NO.: One

/ / /

Plaintiff/Counter-Defendant Navigators Specialty Insurance Company ("Navigators") hereby provides its amended responses to certain of the Interrogatories, Set No. One, propounded by Defendant/Counterclaimant SVO Building One, LLC ("SVO").

**GENERAL OBJECTIONS**

1. Navigators objects to the extent the Interrogatories are vague, ambiguous, uncertain, overly broad, calls for speculation, or are not reasonably calculated to lead to the discovery of admissible evidence.

2. Navigators objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the litigation privilege, or any other lawfully recognized privilege or immunity which may attach to the information requested.

3. Navigators objects to the Interrogatories to the extent they seek information protected from disclosure as trade secret, proprietary, and/or confidential.

4. Navigators objects to the Interrogatories to the extent they seek information not within the care, custody, or control of Navigators.

5. Navigators objects to the Interrogatories to the extent they seek information which is equally available to SVO.

6. Navigators objects to the Interrogatories to the extent they seek information which can be obtained by less intrusive means or is already in the SVO's care, custody, or control.

7. Navigators objects to the Interrogatories to the extent they are burdensome and seek information which is not proportional to the needs of the case.

8. Navigators objects to the Interrogatories as vague and ambiguous as, under the "DEFINITIONS" section, there appear to be instructions as far as the responses to the Interrogatories are concerned. As these instructions as identified as "DEFINITIONS," the information is unclear and nonsensical.

9. Navigators objects to the Interrogatories as any instructions under the "DEFINITIONS" section attempt to impose on Navigators obligations that exceed the discovery rules under the Federal Rules of Civil Procedure and Local Rules.

Navigators has not yet completed its investigation and discovery of this matter. The following responses are provided to the best of Navigators' ability and understanding at this time. Discovery is continuing, and Navigators reserves the right to supplement these responses as additional information becomes available.

These General Objections are incorporated by reference as though fully set forth into each response to the Requests.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

IDENTIFY each and every BILLING ENTRY of attorney's fees that YOU paid to TYSON & MENDES that YOU contend is solely allocable to a NON-COVERED CLAIM in the UNDERLYING ACTION.

**RESPONSE TO INTERROGATORY NO. 1:**

Navigators incorporates by reference the General Objections set forth above as though fully set forth herein. Navigators objects to the definition of "IDENTIFY" in connection with a "BILLING ENTRY" as seeking four types of information, making the Interrogatory inherently compound and exceeding the discovery limits imposed by statute. Navigators objects to the definition of "YOU" as unduly burdensome and harassing by seeking information in possession of Navigators' "officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on" Navigators' behalf, which necessarily seeks information outside of Navigators' care, custody, and control. Navigators objects that the phrase "NON-COVERED CLAIM" is capitalized, suggesting it is a defined phrase, but SVO's discovery does not include such a definition. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it calls for a legal conclusion and expert testimony, which is not obligated to be produced at this point in discovery. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and harassing by seeking identification of individual time entries incurred over more than two years of Navigators' defense of SVO despite Navigators' prior production of the invoices.

March 24, 2021 were for uncovered claims and subject to reimbursement for a total of $1,539,442.76. After the defamation cause of action was dismissed, no other claim in the Underlying Action was potentially covered under the Policy, and the costs are subject to reimbursement at 100% for a total of $1,937,111.44. Based on the expert analysis set forth in the Jardini Expert Report, Navigators is entitled to recovery of at least $3,476,554.20 in costs and expenses paid in defense of the Underlying Action as not potentially covered under the Policy.

**INTERROGATORY NO. 5:**

IDENTIFY each and every expert fee or consultant fee YOU paid during the defense of SVO in the UNDERLYING ACTION that YOU contend is solely allocable to a NON-POTENTIALLY COVERED CLAIM in the UNDERLYING ACTION.

**RESPONSE TO INTERROGATORY NO. 5:**

Navigators incorporates by reference the General Objections set forth above as though fully set forth herein. Navigators objects to the definition of "IDENTIFY" in connection with a "cost, expense, consulting or expert fee" as seeking four types of information, making the Interrogatory inherently compound and exceeding the discovery limits imposed by statute. Navigators objects to the definition of "YOU" as unduly burdensome and harassing by seeking information in possession of Navigators' "officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on" Navigators' behalf, which necessarily seeks information outside of Navigators' care, custody, and control. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it calls for a legal conclusion and expert testimony, which is not obligated to be produced at this point in discovery. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and harassing by seeking identification of individual fees and costs incurred over more than two years of Navigators' defense of SVO despite Navigators' prior production of the invoices.

Subject to and without waiving the foregoing objections, Navigators responds as follows: Navigators' response to this Interrogatory is the same as the response set forth above with respect to Interrogatory No. 1. Navigators' response to Interrogatory No. 1 is incorporated herein by reference

as if set forth in full.

**AMENDED RESPONSE TO INTERROGATORY NO. 5:**

Navigators incorporates by reference the General Objections set forth above as though fully set forth herein. Navigators objects to the definition of "IDENTIFY" in connection with a "cost, expense, consulting or expert fee" as seeking four types of information, making the Interrogatory inherently compound and exceeding the discovery limits imposed by statute. Navigators objects to the definition of "YOU" as unduly burdensome and harassing by seeking information in possession of Navigators' "officers, directors, employees, shareholders, agents, representatives, attorneys, and persons authorized to act on" Navigators' behalf, which necessarily seeks information outside of Navigators' care, custody, and control. Navigators objects to the extent the Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or the litigation privilege. Navigators objects to this Interrogatory on the ground that it calls for a legal conclusion and expert testimony, which is not obligated to be produced at this point in discovery. Navigators objects to this Interrogatory on the ground that it is overbroad, burdensome, and harassing by seeking identification of individual fees and costs incurred over more than two years of Navigators' defense of SVO despite Navigators' prior production of the invoices.

/ / /

/ / /

Subject to and without waiving the foregoing objections, and in accordance with the Court's November 5, 2025 order, Navigators responds as follows: Navigators previously produced its calculations on the total costs incurred in defense of SVO in the Underlying Action at N09905-09908. Navigators directs SVO to that portion of its production for the response to this Interrogatory, which provides identification of the expert and consultant fees incurred before and after the dismissal of the defamation cause of action in the Underlying Action. The produced spreadsheet at N09905-09908 shows which amounts were paid for each vendor. All expert and consultant fees and costs identified in the spreadsheet are recoverable at 100% as no experts in the Underlying Action were involved in SVO's defense of the defamation allegations.

Dated: November 19, 2025

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By: ______________________________

David Simantob
Shannon L. Santos
*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*

**VERIFICATION**

I, Angel L. Muth, am a Director of Global Specialty Claims for Navigators Specialty Insurance Company ("Navigators"), a party to the above-entitled action. I am authorized to execute this verification on behalf of Navigators. I have read the foregoing **NAVIGATORS SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES TO SVO BUILDING ONE, LLC'S INTERROGATORIES, SET NO. ONE**, and know its contents. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true based on my own knowledge and my review of Navigators' records.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 18, 2025 at Hartford, Connecticut.

Angel Muth

Angel L. Muth

**PROOF OF SERVICE**

*Navigators Spec. Ins. Co. v. SVO Building One, LLC*
U.S.D.C., Northern District, Case No. 3:22-cv-07102-AMO

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071. My email address is Shannon.Santos@wilsonelser.com.

On November 19, 2025, I served the foregoing document described as **NAVIGATORS SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSES TO SVO BUILDING ONE, LLC'S INTERROGATORIES, SET NO. ONE.** on the interested parties in this action by sending a copy via e-mail to the electronic addresses included below:

Shawn Shaffie, Esq.
Bruce T. Smyth, Esq.
PARKER SHAFFIE LLP
800 W. 6th Street, Suite 500
Los Angeles, California 90017
Tel.: (213) 622-4441
Fax: (213) 622-1444
Email: shaffie@parkershaffiellp.com
smyth@parkershaffiellp.com
*Attorneys for Defendant/ Counterclaimant SVO Building One, LLC*

Steven W. Murray, Esq.
STEVEN W. MURRAY, APC
14930 Ventura Blvd., Suite 205
Sherman Oaks, California 91403
Tel.: (818) 501-2277
Email: swm@psilaw.com
*Attorneys for Defendant/ Counterclaimant SVO Building One, LLC*

☒ **BY ELECTRONIC SERVICE:** I electronically served the foregoing document in PDF format to the person at the electronic service addresses listed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 19, 2025 at Los Angeles, California.

Shannon L. Santos

EXHIBIT "6"

David Simantob, SBN 155790
Email: David.Simantob@wilsonelser.com
Shannon L. Santos, SBN 260112
Email: Shannon.Santos@wilsonelser.com
**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, CA 90071-2407
Telephone: 213.443.5100
Facsimile: 213.443.5101

*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>SVO BUILDING ONE, LLC,<br><br>Defendant.<br><br>SVO BUILDING ONE, LLC,<br><br>Counterclaimant,<br><br>vs.<br><br>NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Counter-Defendant. | Case No. 3:22-cv-07102-AMO<br>Hon. Araceli Martínez-Olguín<br>Courtroom 10<br><br>**NAVIGATORS SPECIALTY INSURANCE COMPANY'S INITIAL EXPERT WITNESS DISCLOSURES**<br><br>Action Filed: November 14, 2022<br>Trial Date: July 14, 2026 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE that, pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiff/Counter-Defendant Navigators Specialty Insurance Company ("Navigators") hereby discloses the identity of witnesses that they may use at the trial to present evidence under Federal Rules of Evidence 702, 703, or 705:

**Andre E. Jardini**, Knapp Peterson Clarke, 550 North Brand Blvd., Suite 1500, Glendale, California 91203-1922, (818)547-5000. Mr. Jardini is expected to testify on the following issues: (1) Navigators' claim for reimbursement of attorneys' fees in connection with the defense of Defendant/Counterclaimant SVO Building One, LLC ("SVO") in the action entitled *Liebert Corporation v. SVO Building One, LLC*, American Arbitration Association, Case No. 01-18-0003-1318 ("Underlying Action"); (2) the determination that no fees and costs incurred after the March 24, 2021 dismissal of the defamation allegations in the Underlying Action related to the defamation claims; (3) analysis of which portions of fees and costs incurred before the March 24, 2021 dismissal of the defamation allegations in the Underlying Action related to the defamation claims; and (4) all matters addressed in the reports, depositions, and/or declarations of any experts retained by SVO in this matter, including any supplemental reports. Mr. Jardini's fee for providing testimony and consulting is $695 per hour. Mr. Jardini's Rule 26(a)(2)(b) written report is attached as **Exhibit A** hereto.

Navigators reserves the right to submit the names of additional expert witnesses for the purpose of expressing an opinion on a subject to be covered by experts designated by SVO. Navigators reserves the right to call any other experts that it deems necessary as rebuttal witnesses to any witnesses called by SVO or to impeach any expert witnesses called by SVO. Navigators reserves the right to designate additional expert witnesses in this action up to and including the time of trial.

Dated: October 15, 2025

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By: [signature]
David Simantob
Shannon L. Santos
*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*

# EXHIBIT A

RULE 26 EXPERT REPORT OF ANDRÉ E. JARDINI

I, André E. Jardini, submit the following expert report pursuant to Rule 26 in this matter, *Navigators Specialty Insurance Company, plaintiff v. SVO Building One, LLC,* defendant pending in the United States District Court for the Northern District of California bearing Case No. 3:22-cv-0701-AMO.

1. I have been retained by counsel for Navigators to conduct a review of certain attorney invoices and to allocate attorney services between covered and uncovered claims.

**QUALIFICATIONS**

2. I have practiced law, principally as a litigation attorney, in California, for 48 years. I have a Bachelor of Arts Degree from the University of Notre Dame, granted in 1973. I graduated from University of California College of the Law, San Francisco (formerly Hastings College of the Law) with a Juris Doctorate in 1976 and was admitted to the Bar of the State of California that same year. I have also been admitted to practice before the United States District Court for the Central District of California, as well as in the Southern District, Northern District and Eastern District. I am admitted to practice and have often appeared before the Ninth Circuit Court of Appeals.

3. I served as a law clerk to the Honorable Robert Firth of the United States District Court, Central District of California, in 1977 and 1978.

4. From time to time, I serve as an arbitrator in the Los Angeles County Bar Association Dispute Resolutions Services Program, which concerns attorney-client disputes over legal billings.

5. I have participated as an expert witness in arbitrations and hearings in various courts of general jurisdiction concerning attorney fee disputes throughout California and the U.S. I have testified on attorney fee issues in 37 states and a number of foreign countries.

6. I have been employed at Knapp, Petersen & Clarke since its inception as a law firm in 1981. I am currently President of the firm. My practice has consisted predominantly of trial work. I have tried 55 jury trials to conclusion during my tenure with

the firm. I am a member of the American Board of Trial Advocates, having achieved "Advocate" status with ABOTA based on the completion of more than 50 jury trials. (Attached hereto as **Exhibit 1** is a listing of some of my trial experience.) These trials cover a wide variety of subject areas. I have had extensive experience in litigating and trying cases in various Superior Courts in the State of California and in California Federal Courts.

7. I have often litigated sophisticated defamation unfair competition, intellectual property, trade secrets and other business tort claims in California state and federal courts.

8. Attached hereto as **Exhibit 2** is a listing of 4 years of cases in which I have appeared as an expert witness and reviewed attorneys' fees issues and testified at deposition or trial.

9. Since 1985, I have been retained by clients and actively engaged in the auditing of legal billings and consulting with companies to control legal expenditures. As a consultant or expert witness, I have personally audited the billings of a large proportion of the major law firms in California, as well as billings of numerous out-of-state firms. To date, I have performed more than 1,950 such legal fee audits, with billing reviewed in excess of $2.75 billion.

10. I have tried and arbitrated numerous cases in which the predominant issue involved is the reasonableness of attorneys' fees and costs and applicable attorney rates.

11. Attached as **Exhibit 3** is an outline of my qualifications to testify as an expert concerning attorneys' fees issues, including allocation of such fees.

12. Based on my significant experience relating to legal audit matters and our firm's belief that there was a need for such a service in the legal community, in October of 1991, Knapp, Petersen & Clarke established KPC Legal Audit Services, Inc. I am the founder and the President of that company.

13. KPC Legal Audit Services, Inc. is a dba of Knapp, Petersen & Clarke. The company specializes in the review and audit of legal billings and consulting and education on legal cost containment.

14. KPC Legal Audit has been a member of the National Association of Legal Fee Analysis ("NALFA") since its inception. I have often been a speaker on attorney fee topics at NALFA seminars and other MCLE events. NALFA has included me on its list of "The Nation's Top Fee Experts" since that listing was created. (Attached as **Exhibit 4** is a NALFA fact sheet describing its mission.)

15. I have taught attorney fee issues at UCLA Law School and USC Law School.

16. KPC Legal Audit has reviewed billing relating to a wide variety of different types of litigation including hundreds of matters involving business practices, unfair competition, consumer remedies, and many other topic areas including indemnity claim litigation, intellectual property litigation, civil rights claims, commercial law matters, transactional matters, real estate matters, public interest cases, environmental litigation, family law, bankruptcy and others. These cases include complex litigation involving attorney fee issues in the Superior Court in Los Angeles and in United States District Courts throughout the U.S.

17. I have testified as an expert witness, through declaration or live testimony, in more than 560 cases regarding reasonableness of legal fees, and/or allocation of such fees both on behalf of the proponent of such fees and on behalf of the opposing party.

18. On rare occasions, concerning past opinions, judges have disagreed with some or all of my conclusions. Far more frequently, in fact in most matters as to which I am informed of the result, the judge, arbitrator or jury has accepted most, if not all, of my reasoning and opinions. Given the volume of my opinions over the decades that I have presented testimony on attorney fee issues, the occasional, and specific, critical comments as have been made are understandable and minor. In no past court finding has any specific opinion on a specific audit issue reached the basis and underpinning of my opinions in this case. I am not aware of ever being excluded as an expert witness for any reason.

19. I have often been requested in litigated matters to provide opinion testimony as to an appropriate allocation of attorneys' fees which might be recoverable and those which might not. Those allocations have been done in at least 100 cases. The methodology

for such allocations is well established. Those allocations have been done based on claims, parties, time and other relevant issues.

20. My time in performing the services herein is billed at $695 an hour. Time spent by my auditors is billed $295; the time spent by assistant auditors is billed at $135; and $155 for project manager.

**BACKGROUND FACTS**

21. Navigators has undertaken the defense of its insured SVO Building in the action entitled *Liebert Corporation v. SVO Building One, LLC*, litigated in a AAA Arbitration bearing Case No. 01-18-0003-1318 ("underlying action"). Navigators defended SVO in the underlying action pursuant to an insurance policy issued to SVO effective from July 12, 2017 to August 12, 2019 ("policy").

22. The defense was tendered to SVO by Navigators based on the inclusion of a claim for defamation in the underlying action.

23. The defamation claim was one of 18 claims made in the underlying action. The Navigators policy provided coverage for "personal and advertising injury." That coverage extended to defamation under the definition "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organizations goods, products or services."

24. Navigation dutifully paid attorneys' fees for the defense of SVO in the underlying action. SVO was initially defended by Sean DeBruine. Thereafter, SVO was defended by Gordon & Rees. That firm withdrew based on a business conflict. Thereafter, SVO was defended in the action by Tyson & Mendes.

**THE UNDERLYING ACTION**

25. In the underlying action on July 11, 2019, Liebert Corporation ("claimant") filed its Fourth Amended Complaint ("FAC") asserting 18 causes of action against SVO as follows:

- Breach of Contract;
- Open Book Account;

- Reasonable Value;
- Declaratory Relief;
- Violation of Unfair Competition Law;
- Misappropriation of Trade Secrets (asserted as two causes of action under separate statutes);
- Patent infringement (asserted as six causes of action under separate patents);
- Intentional Interference with Contractual Relations;
- Defamation;
- Fraud;
- Negligent Misrepresentation; and
- Civil Conspiracy.

26. The FAC alleged that the claimant entered into agreements with SVO regarding the design and construction for a data center that SVO was building at a particular property.

27. It was alleged that under two agreements, claimant would retain ownership of all intellectual property and work product used at the property and that claimant granted SVO a license to use claimant's intellectual property solely in connection with the property.

28. The FAC further alleged that prior to entering into these agreements with the claimant, SVO entered into a construction agreement with BPR construction in February 2016 and did not terminate it prior to the claimant's agreements. In 2017, a change to the building permit was completed changing the general contractor from DPR to the claimant. SVO is alleged to have agreed without claimant's knowledge to provide DPR a concession amount if the claimant did not hire if the claimant did not hire DPR to work on the property, allegedly causing claimant harm.

29. The FAC alleged that in July 2018, SVO terminated its agreements with the claimant and the claimant's thereafter revoked SVO license.

////

30. Thereafter, SVO allegedly wrongfully disclosed trade secret information and patent in technology providing information and trade secrets to other parties, including claimant's competitors.

31. The defamation claim alleges that SVO "disparage(d)" claimant's work and reputation by making false statements to third parties including statements that certain aspects of the work was delayed as a result of claimant's inability to manage the project.

32. On March 24, 2021 the claimant dismissed the defamation cause of action from the FAC.

33. After March 24, 2021, the defamation count ceased to exist, was no further litigated and was no part of the underlying action.

34. The underlying action proceeded to arbitration in two phases in 2021. There was no mention of defamation at the arbitration of the underlying action. Defamation ceased to be a part of the case after the dismissal of the defamation count on March 24, 2021.

35. After the arbitration concluded, SVO apparently agreed to a settlement to resolve the underlying action. The settlement apparently resulted in dismissal of all remaining claims with prejudice.

**DOCUMENTS REVIEWED**

36. I have reviewed considerable information in connection with this matter and the underlying action to inform my opinions.

37. I have reviewed the first amended complaint for declaratory relief and the multiple exhibits attached thereto. Those exhibits include the relevant insurance policy, the fourth amended complaint in the underlying action, the March 24, 2021 dismissal of the defamation cause of action from the FAC and the other referenced exhibits.

38. I have reviewed SVO's answer to Navigators first amended complaint and its four counterclaims.

39. I have read Navigators responses to SVO interrogatories, set one.

////

40. I have been provided a complete copy of the voluminous claim file concerning Navigators' adjustment of the claim in the underlying action. That claim file has many thousands of pages.

41. The claim file material includes certain billing records which reflect the services rendered by Tyson & Mendes, Gordon & Rees, Morris James, Murphy Austin and Sean DeBruine.

42. These records reflect that Navigators paid approximately $2,497,187.09 in fees and costs incurred prior to the March 24, 2021 dismissal of the defamation cause of action. The records reflect that in total Navigators paid approximately $2,998,457.50 in fees and costs for the defense of the underlying action after the March 24, 2021 dismissal of the defamation cause of action. .

**APPLICABLE STANDARDS**

43. Pursuant to the court's decision in *Buss v. Superior Court* (Transamerica Ins. Co.) (1997) 16 Cal. 4th 35, the California Supreme Court determined that an insurer may seek reimbursement from an insured for defense cost. Recovery is permitted by an insurer against the insured as to claims that are not even potentially covered by the insurance policy.

44. The court discussed that an allocation need be made between those claims that are not even potentially covered and those that are potentially covered.

45. Here, it is undisputed that 17 of the 18 claims in the underlying action were not subject to coverage under the relevant insurance policy. No potential coverage existed as to these claims. Potential coverage existed only as to the defamation claim. On this basis, Navigators provided a complete defense to SVO in the underlying action. Navigators is entitled to reimbursement for all services that were dedicated to 17 of the 18 claims which are not subject to potential coverage. My allocation analysis in this matter is designed to determine which services and in what amounts were incurred as to the potentially covered claim as opposed to the remaining 17 claims.

////

KNAPP, PETERSEN & CLARKE

**REVIEW OF ATTORNEY BILLING RECORDS**

46. I have reviewed carefully the billing records of the firms that defended SVO.

47. I have caused to be prepared useful schedules based on the billing records to assist in my review.

48. For each firm (and before the critical March 24, 2021 date) the identifiable services were listed in chronological order. The following schedules were prepared:

- Outline of Services Performed – Murphy Austin Adams & Schoenfeld
- Outline of Services Performed – Morris James
- Outline of Services Performed – Sean DeBruine
- Outline of Services Performed – Gordon & Rees
- Outline of Services Performed – Tyson & Mendes

(These schedules are attached hereto **as Exhibits 5, 6, 7, 8 & 9** respectively.)

49. Each **Outline** batches the identifiable legal services chronologically. Each entry fairly summarized the language from the billing entries involved, lists the date range of each service, and lists the initials of the timekeepers involved.

50. This process has captured the great majority of all the time spent by these firms.

51. The **Outlines** are useful in assisting in the allocation analysis as to services rendered related to the defamation claim.

52. In addition, I have prepared schedules as to the **Total Fees and Costs Billed** by each firm (excluding fees and costs incurred after March 24, 2021.) Those schedules are attached hereto collectively as **Exhibit 10**.

**OPINION**

53. The services rendered after March 24, 2021, the date the defamation claim was formally dismissed, are subject to reimbursement in total. After that date, the potential for defamation claim did not exist. The claimant affirmatively withdrew that claim. The claim was thereafter not litigated at arbitration.

54. There is no evidence that any amount was paid by SVO as to any defamation

claim in settlement.

55. I have reviewed the Tyson & Mendez invoices after the date of March 24, 2021. That review reveals that no time at all was spent in connection with any service related to a defamation claim. This is not surprising as the defamation claim had been withdrawn and was nonexistent at the time those services were rendered.

56. As to the services rendered and fees incurred before March 24, 2021, very little time was expended related to the defamation claim. As discussed above, I have conducted a careful examination of the billing records before the defamation claim was dismissed. The term defamation occurs only 8 times over that period. Five of those hits occurred on March 24, 20210 concerning the dismissal of the defamation claim itself.

57. Review of the **Outline of Services** identified services mentioning defamation. Only 3.8 hours at Tyson & Mendes contained that description.

58. I identified services that were possibly partially related to a defamation claim. In making this analysis, I had in mind the overwhelming import in the case of the various trade secret claims as opposed to the defamation claim as shown by both Liebert and SVO.

59. This analysis showed a total of only 63.6 hours of the 5,242.9 hours which appear on the **Outlines of Services** as potentially related to defamation. This analysis puts defamation efforts at about 1% of all time spent.

60. To account for any shortcomings in this analysis, I am of the opinion that certainly less than 3% of the fees before March 24, 2021 even arguably related to defamation.

61. Based on my analysis, less than 3% of the time spent by counsel defending SVO before the defamation claim was dismissed related even remotely to the defamation claim.

62. I have reviewed information concerning expert witnesses hired to testify on behalf of SVO. No issue subject to expert testimony by these witnesses concerned defamation. Therefore, all funds paid to these experts by Navigators should be reimbursed by SVO.

////

**CONCLUSION**

63. Since no time after March 24, 2021 related to any defamation claim, all fees incurred thereafter are recoverable by Navigators.

64. As to the fees incurred before the defamation claim was dismissed, less than 3% related to the defamation claim. Therefore, 97% of fees and costs incurred before March 24, 2021 are recoverable by Navigators.

Executed on this 14th day of October, 2025, at Glendale, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

André E. Jardini

# EXHIBIT 1

Knapp Petersen Clarke
A PROFESSIONAL CORPORATION

**ANDRÉ E. JARDINI**
**TRIAL EXPERIENCE**

**December 2019** *LaFace v. Ralphs*

trial in Los Angeles Superior Court
Private Attorneys General Action to enforce wage order re seating for cashiers
4-week trial, and subsequent appeal

**October 2012** *Mendoza v. Nordstrom*

- trial in United States District Court
- enforcement of day of rest statutes (Labor Code sections 551 and 552)
- Nordstrom had employees work more than six consecutive days on more than 26,000 occasions
- case referred by Ninth Circuit Court of Appeals to California Supreme Court to answer questions regarding interpretation of statutes

**March 2010** *Mendoza v. ABM Industries*

- 6-week trial (Los Angeles Superior Court)
- prosecution of whistleblower case against employer of HR Director
- financial irregularities and labor violations were observed and reported
- jury finds that the violations and financial issues existed and were accurately reported
- jury finds that whistleblower's activity was not the direct cause of the termination

**August 2009** *Allstate Insurance v. Thacher, et al.*

- 5-day trial (U.S. District Court/Los Angeles)
- insurance coverage action against insurer who denied coverage and defense to a long-time insured for a personal injury accident at a rental property
- jury finds that primary and excess policies are in force
- jury finds arbitration result in underlying action was not collusive or unreasonable
- $780,000 awarded, to firm's clients. Judgment affirmed on appeal

Knapp Petersen Clarke
A PROFESSIONAL CORPORATION

**November 2008** *Selvin & Weiner v. Bench International Search, Inc.*

- 11-week trial (Los Angeles Superior Court – Malibu)
- defense of Bench International in a collection action by a law firm
- law firm sought approximately $643,000 (with interest)
- Bench International defended with suit for legal malpractice
- jury awarded only $200,000, without interest
- jury found legal malpractice and misrepresentations had occurred
- case resumed with new jury due to mistrial after 4 weeks

**April 2007** *Roy v. Edgetech, Inc.*

- 7-day trial (Los Angeles Superior Court)
- suit to enforce two-year employment contract
- defendant paid for only two months to employee who moved from France to take the job
- offer of $40,000; demand of $52,500
- jury finds for plaintiff
  with penalties, interest and attorneys' fees, award is $225,000

**April 2006** *Confidential Case Name*

- $30 million class action settlement
- case alleging wage and hour violations against an international package delivery company
- recovery for 13,000 California employees who were allegedly unpaid for hours worked and were not provided required meal and rest breaks
- defendant company altered its procedure at the time of the settlement to comply with California law

**August 2006** *HJF, Inc., Sitara Management v. Equilon*

- 15-day trial (Los Angeles Superior Court)
- suit for breach of contract and fraud against oil company by gas station owner client
- jury verdict for firm client that administration of lease program caused harm to gas station owner
- jury awards $225,000

**May 2005** *Goodwin v. City of San Bernardino*

- 5-day retrial (U.S. District Court/Riverside)
- civil rights case for unlawful entry and arrest
- second mistrial due to lack of jury unanimity

Knapp Petersen Clarke
A PROFESSIONAL CORPORATION

**October 2004** *Confidential Case Name*

- 22-day trial (Los Angeles Superior Court)
- legal malpractice case; lawyers lost summary judgment for failure to produce available evidence
- jury verdict (10-2) that firm client would have recovered for breach of contract and fraud in underlying case
- client deprived of partnership interest in 129 lot residential development
- jury awards $4.2 million

**June 2004** *Confidential Case Name*

- legal malpractice case
- Imperfect CCP § 998 offer in catastrophic injury case causes loss of hundreds of thousands of dollars
- settled first day of trial (Los Angeles Superior Court)

**March 2003** *Goodwin v. City of San Bernardino*

- 5-day trial (U.S. District Court/Riverside)
- civil rights case for unlawful entry and arrest
- mistrial due to lack of jury unanimity

**May 2002** *Amezquita v. John J. Fox, M.D., Inc.*

- 14-day trial (Los Angeles Superior Court - Glendale)
- medical malpractice case
- OB/GYN implants IUD in woman who is already pregnant resulting in premature birth of child with developmental delays

**January 2002** *Titus v. Randazzo*

- 6-day trial (Los Angeles Superior Court - Glendale)
- client, a juror on a prior case, causes automobile accident
- victim claims serious degenerative nerve problems with medical expenses of six figures
- jury finds accident did not cause claimed injuries

**November 2001** *Valdivia v. Burlington Northern Santa Fe Corporation*

- 11-day trial (San Bernardino Superior Court - Victorville)
- wrongful death of 10-year-old boy killed by train; accident is witnessed by seven-year-old sister
- settlement offer doubled during trial

**May 2001** *Orlandini v . San Gabriel Valley Medical Center*

- 6-day trial (Los Angeles Superior Court - Pasadena)
- medical malpractice case
- woman awakens under general anesthesia during hysterectomy

**December 2000** *Spaggiari v. 21st Century*

- trial (Los Angeles Superior Court - Van Nuys)
- insurance bad faith case
- insurer discontinues living expense coverage necessary for family displaced by Northridge earthquake
- settled for firm client for $525,000 on first day of trial

**October 2000** *Gaggero v. Stacey*

- 10-day trial (Los Angeles Superior Court - Norwalk)
- firm client, a developer, sues former attorney for legal malpractice
- attorney failed to advise concerning California's anti-SLAPP
- statute before filing suit for malicious prosecution against neighborhood activists protesting Venice Beach development, resulting in award of attorneys' fees of $102,000
- jury awards $332,177 to firm client

**April 2000** *Barraza v. Stephenson, Acquisto & Colman*

- 6-day trial (Los Angeles Superior Court - Glendale)
- suit for wrongful termination on account of pregnancy
- law firm fires employee in same telephone conversation in which it learns she is pregnant

**July 1999** *Briggs v. Villa Esperanza*

- 5-day trial (Los Angeles Superior Court)
- firm client, a registered nurse, seeks unpaid overtime, interest, penalties and attorney's fees
- compensation awarded by the Department of Labor
- employer appealed; trial de novo in Superior Court
- $59,000 award, plus interest, costs and attorney's fees

**February 1999** *Erath v. UCLA, et al.*

- 8-day trial (Los Angeles Superior Court)
- scientific records loaned to UCLA by firm client are lost
- question to be decided is value of the lost documents
- UCLA offers $50,000 before trial, and argues at trial that the documents have no value
- jury awards $125,000 to firm client

**March 1998** *Hughes Aircraft v. Associated Aviation Underwriters, et al.*

- 12-day trial (Los Angeles Superior Court)
- representation of AAU, excess carrier in a complicated multi-issue suit for insurance coverage for environmental contamination at Hughes' facility in Fullerton
- damages of $35,000,000 claimed; $25,000,000 had been paid by primary insurers
- jury determines that only 32% of contamination is from a sudden and accidental cause; also, jury diminishes claimed damages by more than $5,000,000
- on appeal award is reduced to nothing based on verdict and offsets

**March 1998** *Liberty Paper v. San Paolo Bank, et al.*

- 5-day trial (Los Angeles Superior Court)
- retrial of punitive damage phase of suit for fraud in real estate transaction against Italian bank
- $150,000 offered by defendant bank before trial
- jury awards $1,700,000 to firm's client

**February 1998** *Del Babb v. Property Tax Assistance, Inc.*

- 2-day trial (Martinez Superior Court)
- former employee sues to recover unpaid overtime compensation and unpaid bonuses in the amount of $750,000 against firm client
- case dismissed by plaintiff upon ruling of no entitlement to overtime compensation

**January 1998** *Hugo Valdivia v. MCE Corporation, Hardy & Harper, Inc.*

- 8-day trial (Los Angeles Superior Court)
- personal injury case, involving knee injury to firefighter at station caused by a defective rolling gate
- $100,000 statutory offer by defendants to firm's client
- client had returned to work 10 months after the accident and had worked without restriction for 20 months before trial
- jury awards $1.5 million to firm's client (12-0 vote)

**November 1997** *Associated Aviation Underwriters v. Wolfe Air, et al.*

- 12-day trial (Los Angeles Superior Court - Central Civil West)
- insurance bad faith case
- $18,000,000 sought by air carrier for damages caused by alleged failure to pay benefits by insurer due to alleged prior cancellation of insurance policy, all arising out of helicopter accident
- air carrier contended cancellation was ineffective and won summary judgment on this issue
- court finds that insurance company's coverage position is reasonable and judgment awarded for firm's client

**August 1997** *Liberty Paper v. San Paolo Bank, et al.*

- 5-day trial (Los Angeles Superior Court)
- suit to recover damages for defendant bank's failure to complete sale of commercial office building to firm's client
- $25,000 offered by defendant bank before trial
- jury awards $2,505,000 (including punitive damages) to firm's client

Knapp Petersen Clarke
A PROFESSIONAL CORPORATION

**June 1997** *Hospital Learning Centers v. Century Properties, et al.*

- 6-day trial (Los Angeles Superior Court - Van Nuys)
- suit to recover value of business property destroyed by post-earthquake demolition of office building
- no offer by defendant building owner
- jury awards $370,000 to firm client (with pre-judgment interest, costs and attorneys' fees, award exceeds $700,000)

**April 1997** *Moshfegh v. California Pizza Kitchen*

- 7-day trial (Los Angeles Superior Court - Malibu)
- false imprisonment and discrimination case
- party of eight kept from leaving restaurant and arrested for failure to pay tip

**October 1996** *Investor's Thrift v. Old Republic Insurance Company*

- 8-day trial (Orange County Superior Court - Harbor)
- suit to recover loan losses covered by insurance for firm's thrift client
- $200,000 offered by defendants before trial
- jury awards $437,096 (with pre-judgment interest and costs, award exceeds $600,000) to firm's client

**May 1996** *Steven Lenarth v. Stephanie Pacetti, Mount Vernon Foods*

- 13-day trial (Los Angeles Superior Court - Burbank)
- casualty case, personal injury from rear end accident; firm represents defendants
- $4,050,000 settlement demand by plaintiff injured on LADOT DASH bus hit by minivan
- Plaintiff suffered fractured knee and torn meniscus allegedly resulting in reflex sympathetic dystrophy. Plaintiff in wheelchair, had not used leg in two years, and would not walk again
- C.C.P. §998 formal offer to compromise of $250,000 made; structured settlement with present value of $286,000 offered
- plaintiff dismissed case with prejudice on 13th day of trial for no payment and waiver of costs

Knapp Petersen Clarke
A PROFESSIONAL CORPORATION

**January 1996** *RGP Orthopedic Appliances v. Atlantic Mutual Insurance Company*

- 13-day trial (San Diego Superior Court)
- insurance bad faith case
- $11,250,000 sought by company and two severely injured judgment creditors for failure to pay $2,000,000 limits of umbrella insurance policy for damages incurred in a very serious automobile accident
- insured asserted exclusion was missing key language due to a clerical error; court finds exclusion unenforceable
- award of $1,225,000 in extra-contractual damages; (defendant insurer had offered $1,400,000 in settlement)

**October 1995** *Landers v. State Farm Fire and Casualty Company*

- 29-day trial (Los Angeles Superior Court)
- insurance bad faith case
- $150,000 sought for alleged failure to pay no-fault benefits under a New York insurance policy
- award of $50,000 to plaintiff

**August 1995** *Rosenfield v. (Confidential - two defendants)*

- trial (Los Angeles Superior Court - Santa Monica)
- wrongful termination on the basis of sexual orientation settlement during trial; firm's client receives $575,000

**July 1995** *Nationwide Insurance Company v. Great American Insurance Company*

- 7-day trial (Los Angeles Superior Court - Santa Monica)
- recovery sought for progressive loss arising out of soil settlement at residence in Pacific Palisades
- believed to be first jury trial after Supreme Court decision in
- Montrose Chemical Corporation v. Admiral Insurance Company regarding allocation between insurers for continuous loss
- 10-2 jury verdict for client finding defendant insurer should participate in paying loss; $125,000 awarded, including interest

**December 1994** *Glick v. State Farm Fire and Casualty Company*

- 5-day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $338,000 sought, plus consequential damages, for business personal property lost in theft and for lost income caused by business interruption
- 8-0 defense verdict for client, State Farm

**July 1994** *Brown v. South Los Angeles Mortuary*

- 25-day trial (Los Angeles Superior Court - Central Civil West)
- mortuary malpractice case involving 17 plaintiffs who were relatives of a decedent whose remains were mishandled and exposed to insects
- more than $5 million sought for emotional distress and punitive damages
- jury verdict finding firm client only 10 percent responsible (cemetery found 90 percent responsible)
- total award against firm client $97,000 - more than $300,000 had been offered in settlement

**April 1994** *Edison v. Labowe, Labowe & Hoffman*

- 30-day trial (Los Angeles Superior Court)
- legal malpractice case against firm client
- $2.7 million sought for law firm errors in complicated real estate transaction involving loss of 65 percent interest in a commercial property
- jury verdict for plaintiff for $430,000; reversed on appeal on statute of limitations grounds; plaintiff takes nothing

**September 1993** *International Registered Nurses of America, Inc. v. State Farm Fire and Casualty Company*

- 1 day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $1,424,000 sought, plus consequential damages, for lost business income and failure to pay claim
- judgment in favor of client, State Farm

Knapp Petersen Clarke
A PROFESSIONAL CORPORATION

**September 1993** *Smith v. Battalia, Remax South Bay Realty*

- 3-day binding arbitration per real estate purchase contract
- real estate fraud
- $150,000 sought for misrepresentation in sale of real estate, failing to disclose movement from subsurface soil condition
- judgment in favor of client seller

**March 1993** *Esters v. State Farm Mutual Automobile Insurance Company*

- 7-day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $250,000 sought for five-year delay in paying
- uninsured motorist claim and for unreasonably low offer
- 8-0 defense verdict for client

**September 1992** *Block v. State Farm Mutual Automobile Insurance Company*

- 6-day trial (Los Angeles Superior Court - Beverly Hills)
- insurance bad faith case
- $100,000 sought for failure to settle uninsured motorist claim and failure to pay medical bills
- 12-0 defense verdict for firm client

**May 1992** *Shane v. Neil Lloyd & Co., Daniel Monnin*

- 5-day trial (Los Angeles Superior Court - Glendale)
- wrongful death of four-year-old child by drunk driver
- represented employer of drunk driver, good Samaritan who attempted to drive the drunk driver home and his employer
- tried on liability issues only
- motion for non-suit and directed verdict granted for all three firm clients

**March 1992** *Reid v. Ulysses M. Carbajal, M.D.*

- 8-day trial (Los Angeles Superior Court - Central Civil West)
- medical malpractice action
- unnecessary surgery for acute sinusitis
- $72,000 award for plaintiff client

**January 1992** *Stern v. State Farm Mutual Automobile Insurance Company*

- 3-day binding arbitration (JAMS Santa Monica)
- insurance bad faith case
- alleged mishandling of claims re collision and UM coverages
- award for client defendant on all claims

**November 1991** *Tucker v. Westminster Memorial Park*

- trial (Orange County Superior Court)
- crematory misfeasance case
- settled for our initial offer of $120,000 during trial

**September 1991** *Bohall v. ARCS Mortgage, Bank of New York*

- 10-day trial (Los Angeles Superior Court)
- retrial of wrongful termination case
- branch manager fired with cause
- $2 million dollar demand; $2,718 award

**May/June 1991** *Proposition 103 Hearings*

- 4 weeks of hearings (San Francisco and Los Angeles)
- cross-examination of Department of Insurance expert witnesses on rate of return, leverage, allowable expense, executive compensation and other issues

Knapp Petersen Clarke
A PROFESSIONAL CORPORATION

**January 1991** *Bohall v. ARCS Mortgage, Bank of New York*

- 10-day trial (Los Angeles Superior Court)
- wrongful termination, defamation and conversion case
- $1.5 million dollar demand; $300,000 offer
- $1.2 million dollar award, including $6,500 punitive damages, new trial motion granted

**October 1990** *Smoke Island Interiors v. General Accident Insurance*

- trial (Los Angeles Superior Court)
- insurance bad faith case
- allegations of unreasonable claims handling and denial of claim for stolen artwork; claim for $180,000 plus consequential and punitive damages
- settled for $17,500 during trial

**June 1990** *The Austin Company v. J.H. Baxter Company*

- 5-day trial (United States District Court - Los Angeles)
- product defect case
- failure of three-acre roof with a $2.5 million dollar replacement cost allegedly due to corrosion caused by fire retardant chemicals used by J.H. Baxter
- 6-0 defense verdict for our client J.H. Baxter

**May 1990** *Blanchard v. State Farm Fire and Casualty Company*

- 10-day trial (Los Angeles Superior Court - Santa Monica)
- insurance bad faith case
- $450,000 sought for failure to provide independent counsel in defense of covered construction defect litigation
- 10-2 defense verdict for our client, upheld on appeal

**February 1990** *Sykes, et al., v. Associated Farm Management*

- 9-day trial (United States District Court - Los Angeles)
- federal securities law case
- 100+ plaintiffs sought recovery of amounts lost in investments in nine limited partnerships in farmland - grapes, tree fruit, citrus - in California's Central Valley
- $29 million recovery requested; judgment rendered for $8.6 million

**June 1989** — *Aetna Insurance Company v. Centennial Insurance Company*

- 5-day trial (United States District Court - Los Angeles)
- insurance equitable subrogation case
- Aetna sought contribution re two-thirds of $725,000 in defense costs expended in defending underlying patent litigation
- court agreed with our position that two-sevenths was proper allocation and that attorney bills were unreasonably high; upheld on appeal

**February 1989** — *Della Ripa v. Kaiser Hospital*

- 5-day binding arbitration
- medical malpractice case
- $187,000 award for our client for defendant's failure to diagnose "panic disorder"

**November 1988** — *Transtechnology, Inc. v. Allied Signal Corporation*

- 11-day binding arbitration (3 arbitrator panel)
- environmental case
- second ever arbitration to apportion fault for groundwater pollution under California Health and Safety Code
our client, Allied Signal, found responsible for 4 percent of response costs of $1.5 million dollars

**June 1988** — *Wolf v. Fisher*

- 6-day trial (Los Angeles Superior Court)
- suit for violation of rent control ordinance and intentional infliction of emotional distress
- 12-0 defense verdict for our clients, property owners

**October 1987** — *Frederick v. Ambassador Insurance*

- trial (Los Angeles Superior Court)
- insurance bad faith case
- insurer and parent company sued for failing to defend and indemnify in personal injury case
- client insurer insolvent per Vermont liquidation and dismissed; client employee pays $2,000; parent company, represented by another law firm, suffers $2 million dollar verdict

**September 1987** *Olson/Hurston v. L.B. Foster Company*

- 8-day trial (United States District Court - Los Angeles)
- product defect case
- two pile drivers suffered multiple leg fractures when a ground release shackle failed and dropped a 900-pound sheet pile
- 6-0 defense verdict for our client, the distributor of the device

**May 1986** *Noma Corporation v. Centennial Insurance Company*

- 7-day trial (United States District Court - Los Angeles)
- insurance bad faith case
- insured franchisor sought payment of $243,000 in legal fees for defense of covered suits by franchisees and $18,000,000 in consequential damages for failure to defend
- determined that $19,000 was only amount due

**April 1986** *Shea v. Owen, Century 21 Realty*

- trial/stipulated judgment
- real estate fraud case
- fraudulent trade of primary residence for two unsecured greenhouses
- client plaintiff recovered $115,000 from defendants for fraudulent real estate transaction

**December 1985/ January 1986** *Stotts v. Wallace and Tiernan Division of Pennwalt Corporation*

- 28-day trial (Los Angeles Superior Court)
- product defect case
- client manufacturer's valve cracks exposing plaintiff to chlorine gas and causing serious impairment of lung function
- award $400,000

# EXHIBIT 2

## ANDRÉ E. JARDINI'S DEPOSITION AND TRIAL TESTIMONY
## (LAST FOUR YEARS)

| | File Name | Type Of Testimony | Case Number | Court/Jurisdiction |
|---|---|---|---|---|
| 1 | Gadinis v. United Services (2018) | Deposition | 37-2018-00015334-cu-UM-CTL | Superior Court State of California County of San Diego, Central |
| 2 | Pech v. Morgan | Deposition and Trial | 18STCV02178 | LASC Central District |
| 3 | Averon v. The Crosby & AMS Paving | Deposition | 19-cv-02369-WQH-NLS | USDC Southern District |
| 4 | Mesa Water District v. KDC, Inc., et al. | Trial | 30-2016-00832860-cu-BC-CJC | OCSC |
| 5 | In Re Marriage of Skylar Peak and Janet Freisen Peak | Trial | 19STFL09382 | LASC |
| 6 | Simplot v. McCain | Deposition | 1:16-cv-00449-DCN | US District Court District of Idaho (Boise) |
| 7 | Greenberg Glusker v. Amin S. Lakha | Deposition | 1210036873 (JAMS) | JAMS Arbitration |
| 8 | Fraissl v. Moore | Deposition | BC535745 | LASC |
| 9 | Mark Hughes Family Trust | Deposition | BP 063500 | LASC |
| 10 | Travelers Insurance v. Salesforce | Deposition | JAMS Ref. 1100111905 | JAMS San Francisco |
| 11 | Golden Pacific Bank v. Kronick, Moskovich, Tiedeman & Girard | Deposition and Trial | 34-2018-00236905 | Superior Court State of California County of Sacramento |
| 12 | Premier Reimbursement Solutions v. Koetsier | Deposition | VCU281481 | Superior Court of the State of California County of Tulare |
| 13 | Dryit Inc. dba Jarvis Restoration v. Allstate Insurance Company | Deposition | 30-2020-01149888-CU-BC-CJC | Superior Court of the State of California County of Orange |
| 14 | Hughes v. Libeu | Deposition and Trial | SCv-261621 | Superior Court of California County of Sonoma |
| 15 | Hakkasan USA Inc. v. Endurance American Specialty Insurance, et al. | Deposition | A-20-816145-B | District Court clarke County, Nevada |
| 16 | Madeline8, LLC, et al. v. Alvaradosmith, APC, et al. | Deposition | 30-2020-01124146-CU-PN-CJC | Superior Court of California County of Orange Central Division |
| 17 | Green Solar Technologies, Inc. v. Raymond McElfish, et al. | Deposition | BC712758 | LASC |

| | File Name | Type Of Testimony | Case Number | Court/Jurisdiction |
|---|---|---|---|---|
| 18 | Miller Marital Deduction Trust, et al. v. Estate of Mark B. Dubois, et al. | Deposition and Trial | 2:16-cv-01883-SB | US District Court Eastern District of California |
| 19 | Google LLC v. Sonos | Deposition | 3:21-cv-07559-WHA | US District Court Northern District of California |
| 20 | Tutor Perini v. First Mercury | Deposition | 2:20-cv-09329-CAS-GJSx.(aco) | US District Court Central District of California |
| 21 | Caruso Affiliated v. Allied World | Deposition and Trial | 21STCV12443 | LASC |
| 22 | Clean & Sober Media, et al. v. HUB International Insurance Services | Deposition and Trial | 21STCV20391 | LASC |
| 23 | Richard Pech v. Thomas E. Morgan, III, et al. | Trial | 18STCV02178 | LASC |
| 24 | Epicgenetics/Gillis v. Gibson, Dunn & Crutcher | Deposition | Ref. No.5210000295 | JAMS |
| 25 | Motavassel v. Mokhtarzadeh | Deposition andTrial | 20 STCV02243 | LASC |
| 26 | The Charles Company v. Bryan Cave | Deposition | Ref. No. 1200059383 | JAMS |
| 27 | Barbizon School of San Francisco, et al. v. Putterman Landry & Yu | Deposition | Ref. No. 11300110356 | JAMS |
| 28 | Fashion Nova, LLC v. Citizens Insurance Company of America | Deposition | 23STCV01107 | USDC Central District |
| 29 | Katab v. Performance Team | Deposition | 2:23-cv-05811-ODW-JPR | USDC California Western Division |
| 30 | In Re Power Property v. DC-19-00695 | Deposition | DC-19-00695 | USDC Dallas, TX |
| 31 | White, Arnold & Dowd v. TomPaul ACIPCO LLC | Deposition | 2:23-cv01372-ACA | USDC of Alabama Southern District |
| 32 | Hogs & Heifers v. 201 North 3rd Street LV | Deposition | A-19-795091-B | District Clark County, Nevada |
| 33 | Peiffer Wolf Carr, et al. v. Valley Forge Insurance Co. | Deposition | 2:23-CV-06235 | USDC Eastern District of Louisiana |
| 34 | Jenee Child v. Certain Underwriters | Deposition | CIVSB2300838 | San Bernardino Superior Court |

| | File Name | Type Of Testimony | Case Number | Court/Jurisdiction |
|---|---|---|---|---|
| 35 | Maria Fresonke v. Navy Military Personnel Command, et al. | Deposition | OWCP No. 18-090613; 18-304964; 18-486100; 18-100991; 18-486103 and other OALJ case numbers | United States Department of Labor, Office of Administrative Law Judges |

# EXHIBIT 3

# OUTLINE OF BACKGROUND AND QUALIFICATIONS
# ANDRÉ E. JARDINI

- Practicing lawyer, principally as a trial attorney, in California since 1976.
- B.A. University of Notre Dame 1973; J.D. Hastings College of the Law 1976; admitted to the State Bar, December 1976.
- Clerkship in 1977 and 1978 in United States District Court in Los Angeles with Judge Robert Firth.
- Admitted to practice in all courts in the State of California, including four United States District Courts and the Ninth Circuit Court of Appeals. Admitted in the District Court for the Eastern District of Michigan.
- Partner at Knapp, Petersen & Clarke, a law firm providing litigation and transactional services to its clients. Currently serving as President of the firm.
- Founder and President of KPC Legal Audit Services, Inc.
- Trial and arbitration of numerous cases in which the predominant issue was the reasonableness of attorney's fees.
- Since 1986, has personally audited the billings of a large proportion of the major law firms in California, has conducted audits throughout the U.S., and internationally. More than 1,800 audits performed.
- Has audited billings exceeding cumulatively $2 billion.
- Has been under contract to the State of California (Cal PERS, California Lottery, Attorney General’s Office) and numerous other government entities regarding audit services.
- Arbitrator in the Los Angeles County Bar Association Dispute Resolution Services Program regarding attorney/client disputes over legal billings.
- Qualified as an expert witness with regard to reasonableness of attorney's fees issues and ethical and attorney performance issues.
- Testimony as an expert witness at trial and in arbitration concerning attorney fee disputes.
- Experience as an attorney for litigants in matters concerning attorney fee disputes.

- Practice consists predominantly of trial work. More than 50 jury trials conducted to conclusion.

- Member, American Board of Trial Advocates. (Advocate status.)

- Articles written, seminars conducted and speaking engagements on the subject of reasonableness of attorney's fees and auditing practices.

- Martindale-Hubbell, rated AV, "Preeminent."

- Super Lawyer 2012 – 2020.

- The National Association of Legal Fee Analysis ("NALFA") ranks André E. Jardini as a "Top Attorney Fee Expert," and ranks KPC Legal Audit Services, Inc. as one of nation's top outside legal bill review programs, which follows Best Practices in Legal Fee Analysis.

- Representative cases on appeal:

  **Simon v. San Paolo U.S. Holding Co., Inc.** (2005) 35 Cal. 4th 1159
  California Supreme Court case establishing Constitutional limits on punitive damages.

  **Blanchard v. State Farm** (1991) 2 Cal. App. 4th 345
  Case finding no entitlement to independent counsel in construction defect case.

  **Kliger v. Superior Court** (1990) 52 Cal. 3d 65
  California Supreme Court case establishing parameters for suits for employer conduct in violation of public policy.

  **Trope v. Katz (1995)** 11 Cal. 4th 274
  Trial testimony in case establishing that attorneys cannot recover fees representing themselves in a fee collection action.

  **Lance Camper v. Republic Indemnity** (2001) 90 Cal App. 4th 1151
  Trial testimony concerning *Brandt* fees in insurance bad faith case.

# EXHIBIT 4

NALFA **NATIONAL ASSOCIATION OF LEGAL FEE ANALYSIS**
Specializing in Legal Billing & Attorney Fees
A Network of Experts & Ethics

The National Association of Legal Fee Analysis (NALFA) is a 501(c)(6) non-profit professional association for the legal fee analysis field. Our members provide a range of services on attorney fee and legal billing matters. We serve as the organizing and governing body for the legal fee analysis profession.

Courts and clients turn to us for expertise when attorney fees and expenses are at issue in large, complex cases. NALFA members are fully qualified attorney fee experts, special masters, bankruptcy fee examiners, fee dispute neutrals, and legal bill auditors. All our members follow Best Practices in Legal Fee Analysis.

**NALFA Fact Sheet:**

NALFA is an approved 501(c)(6) federal tax-exempt organization under the IRS Code.

NALFA is an A.M. Best Recommended Expert Service Provider (2008-Present).

NALFA has recommended qualified attorney fee experts on legal fee and billing matters ranging from $42,000-$500 million.

Since 2008, NALFA has hosted over 45 different CLE and professional development programs on attorney fees and legal billing topics. Our CLE faculty has included 23 sitting federal judges.

Every year, NALFA announces, "The Nation's Top Attorney Fee Experts".

Every year, NALFA conducts an hourly rate survey of civil litigation in the U.S. This is the nation's largest and most comprehensive survey or study of hourly billing rates in litigation.

NALFA offers a Certificate in Ethical Billing & Reasonable Fees, the nation's first and only certificate of its kind for registered guests of multiple CLE programs.

NALFA has established Best Practices in Outside Legal Fee Analysis, a peer-review driven code of professional conduct for professionals who routinely perform outside legal fee analysis.

NALFA's News Blog covers legal billing and attorney fee issues from across the U.S.

NALFA filed Amicus Briefs in *Worley v. Storage USA*, *Pipefitters v. Oakley* in California appellate courts and in the landmark ADA case, *Covington v. McNeese State University* in the Louisiana Supreme Court.

NALFA has been cited or quoted by over 20 different media outlets and/or publications: The Wall Street Journal, Bloomberg News, ALM's American Lawyer, The Chicago Tribune, Bloomberg BNA, CNBC, Thomson Reuters, Insurance Journal, Minneapolis-St. Paul Business Journal, Daily Journal, ALM's Daily Business Review, ALM's National Law Journal, FindLaw.com, The Florida Bar Journal, Law 360, Politico, ALM's Law.com, Missouri Lawyers Media, ALM's Critical Mass, Portland Business Journal, Detroit Free Press, and ABA Journal.

NALFA houses a body of scholarship on reasonable attorney fees including surveys, reports, articles, and studies. NALFA also recognizes the nation's most influential scholarship on attorney fees.

NALFA conducts custom design hourly rate surveys for law firms and corporate legal departments. A federal judge cited a NALFA hourly rate survey in his attorney fee award in the *Vortens* class settlement.

# EXHIBIT 5

# NAVIGATORS V. SVO FEE REVIEW
## Re: Murphy Austin Adams Schoenfeld LLP
## Outline of Services Performed

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 7/1/2019 | | Review draft of escrowing settlement agreement | SAL | 3.00 | |
| 7/1/2019 | | Review Bladeroom documents | SAL | 3.00 | |
| 7/1/2019 | 7/2/2019 | Draft letter re 4th amended complaint; legal research owner as "stranger" to general-sub contract | SMJ, SAL | 6.20 | |
| 7/1/2019 | 7/31/2019 | Document review, import and download, database updates | SAL, LFB | 37.90 | |
| 7/3/2019 | 7/8/2019 | Draft motion for severance; legal research doctrine of impossibility | SMJ, SAL | 10.10 | |
| 7/7/2019 | | Draft memo re gross negligence | SMJ | 2.30 | |
| 7/8/2019 | | Draft outline MSJ re baseball arbitration | SMJ | 1.80 | |
| 7/9/2019 | 7/15/2019 | Draft motion to compel reply papers re corporate retention policies | SAL, SMJ, LDN | 32.90 | |
| 7/10/2019 | 7/15/2019 | Draft contractor 7031 motion | SMJ, LDN, SAL | 18.40 | |
| 7/15/2019 | | Prepare for hearing | SAL | 3.00 | |
| 7/16/2019 | | Travel and attend hearing on pending arbitration motions | SAL, LDN | 16.00 | |
| 7/17/2019 | | Comprehenseive email re pending and pressing matters | SAL | 4.50 | |
| 7/18/2019 | | Draft opposition to motion to compel Ulrich and Keith laptops | SAL | 3.40 | |
| 7/19/2019 | 8/23/2019 | Document review re licensure | SAL | 40.20 | |
| 7/24/2019 | | Meeting with client re status | LDN, SAL | 6.00 | |
| 7/26/2019 | 7/30/2019 | Review AEO documents re designation | SAL, LFB | 18.20 | |
| 7/31/2019 | 9/4/2019 | Review Vertiv latest document request and prepare response | SAL, LDN | 7.70 | |
| 8/1/2019 | 8/5/2019 | Review terms of protective order | SAL | 3.00 | |
| 8/1/2019 | 8/12/2019 | Review Vertiv documents re lessons learned | SAL | 6.50 | |
| 8/1/2019 | 8/30/2019 | Document review, import and download, database updates | SAL, LFB | 74.70 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 8/5/2019 | | Review documents re A. Weeks | SAL | 1.00 | |
| 8/5/2019 | 8/7/2019 | Draft answer to 4th amended complaint | SAL, SMJ, LDN | 22.00 | **P** |
| 8/7/2019 | 8/12/2019 | Prepare statement for additional depositions and hearing continuance | SAL | 6.00 | |
| 8/12/2019 | | Draft memo re SVO production deficiencies | LFB | 3.20 | |
| 8/13/2019 | 8/14/2019 | Review "briefs" from opposing counsel | SAL | 5.10 | |
| 8/13/2019 | 8/16/2019 | Draft request for production to Leibert | SMJ | 3.50 | |
| 8/13/2019 | 8/16/2019 | Draft DPR organizational chart and protocol | LFB, SAL | 6.30 | |
| 8/14/2019 | | Attend meeting with client re document review | SAL, LFB | 6.00 | |
| 8/15/2019 | | Prepare for hearing | SAL | 1.50 | |
| 8/16/2019 | | Draft reply to objections to statement for additional depositions | SAL | 2.30 | |
| 8/19/2019 | | Review arbitration proposed agenda and prepare outline | SAL | 2.00 | |
| 8/19/2019 | 8/23/2019 | Review and analysis REI stipulation and protective order | SAL | 3.00 | |
| 8/19/2019 | 9/4/2019 | Additional subpoenas to third party outside consultants | SAL, SMJ | 9.10 | |
| 8/20/2019 | | Travel and attend arbitration | LDR, SAL | 16.00 | |
| 8/21/2019 | 8/29/2019 | Review documents for production | SAL, SMJ | 9.30 | |
| 8/22/2019 | | Telephone conference with client re documents | LDR | 1.70 | |
| 8/26/2019 | | Document review re R. Nichols termination | SAL | 26.00 | |
| 8/27/2019 | 8/28/2019 | Draft request for production to Vertiv in DPR case | SAL | 5.00 | |
| 8/29/2019 | | Review orders from arbitration | SAL | 2.50 | |
| 9/1/2019 | 9/23/2019 | Document review, import and download, database updates | LFB | 27.70 | |
| 9/3/2019 | 10/21/2019 | Draft amended cross-claim | SAL, SMJ | 51.10 | |
| 9/4/2019 | | Attend meeting at MAAS re status; meeting with clients | SAL, SMJ | 11.60 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 9/5/2019 | 9/17/2019 | Meet and confer re Bladeroom case issues | SAL | 13.40 | |
| 9/5/2019 | 9/19/2019 | Draft objections to subpoenas, including Collusum | SMJ, SAL | 3.50 | |
| 9/9/2019 | | Review ACP documents | SAL | 1.00 | |
| 9/9/2019 | 10/1/2019 | Draft Wall subpoena | SAL | 7.80 | |
| 9/10/2019 | 9/12/2019 | Draft R. Nichols subpoena | SAL | 3.00 | |
| 9/10/2019 | 9/30/2019 | Review AEO documents | LFB, SAL | 15.40 | |
| 9/10/2019 | 10/1/2019 | Draft A. Weeks subpoena | SAL | 5.50 | |
| 9/11/2019 | | Review additional facts from County re PRAR | SAL | 2.00 | |
| 9/12/2019 | | Draft K. Little subpoena | SAL | 1.00 | |
| 9/16/2019 | 9/27/2019 | Review documents re licensure and acceleration | SAL | 13.50 | |
| 9/17/2019 | | Review Vertiv objections and response to request for production 4 | SAL | 1.50 | |
| 9/18/2019 | | Review objections to request for production in DPR case | SAL | 6.00 | |
| 9/19/2019 | | Review permits transfer issue | SAL | 2.00 | |
| 9/19/2019 | 9/23/2019 | Review proposed scheduling order | SAL | 6.50 | |
| 9/20/2019 | | Legal research and draft 7031.5 motion | SMJ | 2.30 | |
| 9/20/2019 | | Review issues re Coates and Ulrich laptops | SAL | 1.50 | |
| 9/23/2019 | 9/30/2019 | Legal research building permit codes | SMJ | 9.60 | |
| 9/24/2019 | 9/26/2019 | Prepare release of additional CPS documents | SAL | 4.30 | |
| 9/25/2019 | | Draft proposed list of lay deponents | SAL | 2.00 | |
| 9/26/2019 | | Draft protective order re Rosendin Electric | SAL | 2.40 | |
| 9/30/2019 | | Legal research foreclosure of mechanics liens | SMJ | 2.70 | |
| 10/1/2019 | | Draft subpoenas to third party Linesight | SAL | 1.30 | |

| Date | | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| From | To | | | | |
| 10/1/2019 | | Review BCSFM motion re non-payment | SAL | 2.00 | |
| 10/1/2019 | 10/29/2019 | Continued document review re licensure | SAL, SMJ | 9.70 | |
| 10/1/2019 | 10/31/2019 | Document review, import and download, database updates | SAL, LFB | 78.30 | |
| 10/2/2019 | | Review Realtime CFO documents | SMJ | 1.20 | |
| 10/2/2019 | 10/25/2019 | Draft opposition to numerous motions to stay proceeding | SAL, LDN | 17.30 | |
| 10/4/2019 | | Meeting with consultants | SAL | 3.80 | |
| 10/4/2019 | 10/7/2019 | Review project records re sales tax issues | SAL | 9.00 | |
| 10/8/2019 | | Legal research fraud cause of action | LDN | 4.00 | |
| 10/11/2019 | | Review Vertiv request for production #6 | SAL | 3.40 | |
| 10/21/2019 | | Attend hearing with arbitrator re discovery | LDN, SAL | 2.00 | |
| 10/22/2019 | 10/23/2019 | Legal research discoverability of joint defense agreements | SAL, SMJ | 7.90 | |
| 10/24/2019 | | Review discovery response from G. Reed | SAL | 1.80 | |
| 10/24/2019 | 10/25/2019 | Review DPR records re status of lien release | SAL | 3.10 | |
| 10/25/2019 | | Draft letter to arbitrator re motion to amend complaint | SAL, SMJ | 5.20 | |
| 10/28/2019 | | Review Building Department response to public record request | SMJ | 1.40 | |
| 10/29/2019 | 10/31/2019 | Draft motion for leave to file amended cross complaint | SAL, SMJ | 11.80 | |
| 10/29/2019 | 10/31/2019 | Review DPR documents | SAL | 6.70 | |
| 10/31/2019 | | Draft letter to ACCO re designation of documents | SMJ | 1.00 | |
| 11/1/2019 | 11/26/2019 | Draft reply in support of motion to stay | SAL, SMJ | 45.90 | |
| 11/1/2019 | 11/26/2019 | Continued document review, importing documents, database updates and privilege review | SAL, LFB | 147.20 | |
| 11/6/2019 | 11/15/2019 | Draft motion to compel joint defense agreements | SAL, SMJ | 19.70 | |
| 11/10/2019 | | Prepare for meeting with experts | LDN | 2.20 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 11/11/2019 | | Prepare for and attend meeting with experts, including K. Dines | LDN, SAL | 14.50 | |
| 11/11/2019 | 11/19/2019 | Prepare motion to compel, including document review of DPR correspondence and MAAS re settlement offers | SAL, SMJ | 5.80 | |
| 11/12/2019 | | Legal research common interest doctrine | SMJ | 4.60 | |
| 11/15/2019 | | Attend hearing re motion for leave to file first amended complaint | SAL | 2.50 | |
| 11/15/2019 | | Draft subpoena to Swinerton | SAL | 2.50 | |
| 11/15/2019 | 2/6/2020 | Import and review Swinerton production | LFB, SAL | 14.50 | |
| 11/17/2019 | | Attend hearing on motion to strike | LDN | 3.00 | |
| 11/18/2019 | | Prepare for deposition of R. Pfleging | SAL | 1.70 | |
| 11/18/2019 | 11/20/2019 | Review and revise subpoenas and deposition notice to be issued by Fisher | SAL | 8.40 | |
| 11/18/2019 | 11/30/2019 | Review documents for lay depositions | SAL, LDN | 25.40 | |
| 11/19/2019 | | Review third party documents from CHD | SAL | 2.00 | |
| 11/21/2019 | | Review status of Rosendin Electric documents | SAL | 2.00 | |
| 11/22/2019 | | Review Building Permit documents | SMJ | 6.10 | |
| 11/26/2019 | 11/27/2019 | Review AEO records | SAL | 9.90 | |
| 1/2/2020 | | Document review for consultant HKA | SAL | 1.90 | |
| 1/2/2020 | 1/3/2020 | Review documents re Bladeroom case | SAL | 4.90 | |
| 1/6/2020 | 1/8/2020 | Prepare for deposition of B. Brooks | SAL, LFB | 14.00 | |
| 1/6/2020 | 1/30/2020 | Continued document review, importing documents, database updates and privilege review | LFB | 13.90 | |
| 1/7/2020 | | Deposition preparation re Vertiv licensure | LDN | 1.20 | |
| 1/7/2020 | 1/8/2020 | Prepare for upcoming discovery | SAL | 4.90 | |
| 1/8/2020 | 1/29/2020 | Review AEO documents re discovery proceeding | SAL | 5.10 | |
| 1/9/2020 | | Travel and attend deposition of B. Brooks | SAL | 12.00 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 1/13/2020 | 1/17/2020 | Review and revise proposed scheduling order | SAL | 6.20 | |
| 1/13/2020 | 1/28/2020 | Draft objections to request for production #8 | SAL | 6.10 | |
| 1/14/2020 | 1/30/2020 | Review Vertiv and DPR documents and update timeline | SAL | 35.00 | |
| 1/15/2020 | | Review issues re recording lien release bond | SAL | 1.10 | |
| 1/22/2020 | 1/23/2020 | Review construction progress videotapes | SAL | 5.10 | |
| 1/27/2020 | | Draft audit response | SMJ | 1.10 | |
| 1/28/2020 | 1/31/2020 | Review documents re ACCO subpoena | SAC, SMJ | 4.90 | |
| 1/29/2020 | | Draft letter re Bladeroom issues | LDN | 1.20 | |
| 2/3/2020 | 2/12/2020 | Continued document review | LFB | 4.70 | |
| 2/10/2020 | | Review three additional subpoenas from opposing counsel | SAL | 2.60 | |
| 2/10/2020 | 2/18/2020 | Communication and emails re transfer of file to Gordon | SAL | 35.40 | |
| | | **Total** | | **1,277.70** | |

| | Allocation | Hours Billed |
|---|---|---|
| P | Potentially Defamation | 22.00 |
| | | 22.00 |

# EXHIBIT 6

# NAVIGATORS V. SVO FEE REVIEW
## Re: Morris James LLP
## Outline of Services Performed

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 2/5/2019 | 2/28/2019 | Communication with co-counsel | KLD, TAS | 2.20 | |
| 3/28/2019 | 10/2/2019 | Communication with co-counsel | KLS, TAS, EEL | 3.20 | |
| 4/2/2019 | | Review and analysis pleadings, order and opinion denying motion to dismiss | EEL | 1.60 | |
| | | **Total** | | **7.00** | |

# EXHIBIT 7

# NAVIGATORS V. SVO FEE REVIEW
## Re: Law Office of Sean DeBruine
## Outline of Services Performed

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 11/12/2018 | | Review complaint | SD | 1.10 | **P** |
| 11/20/2018 | | Draft Lamon letter to Budwig to drop complaint | SD | 1.20 | **P** |
| 12/3/2018 | | Research experts re technologies at issue | SD | 1.30 | |
| 12/6/2018 | | Review first amended complaint and legal research opposition to preliminary injunction | SD | 2.50 | |
| 12/11/2018 | 12/21/2018 | Draft motion to dismiss | SD | 28.00 | |
| 12/18/2018 | 12/26/2018 | Review proposed stipulation re preliminary inunction motion and motion to extend time\stay | SD | 5.90 | |
| 12/28/2018 | | Draft discovery to Vertiv re PI issues | SD | 3.60 | |
| 1/9/2020 | 1/10/2020 | Review notice of supplemental authority | SD | 2.30 | |
| 1/17/2020 | 1/23/2020 | Draft reply in support of motion to dismiss | SD | 10.70 | |
| 1/27/2020 | 1/31/2020 | Draft amended reply in support of motion to dismiss | SD | 3.30 | |
| 2/6/2020 | 2/22/2020 | Draft opinion re injunction | SD | 12.50 | |
| 2/11/2020 | 3/1/2020 | Drat opposition to motion for preliminary injunction, including document review and supporting declaration of K. Knott | SD | 51.30 | |
| 3/4/2020 | | Draft notice of supplemental authority re opposition to preliminary injunction | SD | 1.00 | |
| 3/4/2020 | 3/1/2032 | Draft response to request for production and interrogatories | SD | 8.20 | |
| 3/15/2020 | | Draft meet and confer re SVO discovery responses | SD | 1.30 | |
| 3/21/2020 | 3/27/2020 | Draft objections to depositions and subpoenas, including legal research motion to compel third party compliance with subpoenas | SD | 5.30 | |
| 3/29/2020 | 4/1/2020 | Letter brief opposing Laag deposition | SD | 2.50 | |
| 4/4/2020 | 4/24/2020 | Revise demurrer | SD | 3.60 | |
| 4/24/2020 | | Telephone conference hearing re motion to strike and objections to subpoenas re PI | SD | 1.30 | |
| 4/30/2020 | | Travel and attend hearing on motion to strike | SD | 2.00 | |

| Date | | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| From | To | | | | |
| 5/2/2020 | 5/20/2020 | Draft opposition to preliminary injunction motion | SD | 35.00 | |
| 5/9/2020 | 5/14/2020 | Draft reply in support of demurrer | SD | 7.70 | |
| 5/21/2020 | | Travel, prepare for and attend hearing on demurrer | SD | 5.00 | |
| 5/21/2020 | 6/13/2020 | Prepare letter to Sloss on motion to compel trade secret disclosures | SD | 21.10 | |
| 5/30/2020 | 5/31/2020 | Draft IP request for production | SD | 4.00 | |
| 6/4/2020 | | Research expert witness candidates | SD | 2.60 | |
| 6/13/2020 | | Attend telephone conference for status conference | SD | 1.40 | |
| 7/8/2020 | 7/9/2020 | Draft reply to response re letter on trade secret disclosures | SD | 9.80 | |
| 7/11/2020 | 7/15/2020 | Prepare for PI hearing | SD | 8.80 | |
| 7/11/2020 | 7/31/2020 | Prepare letter to Sloss re Vertiv objections to third request for production | SD | 5.80 | |
| 7/16/2020 | | Prepare for and attend preliminary injunction motion hearing | SD | 6.30 | |
| 7/29/2020 | | Prepare list of search terms | SD | 1.00 | |
| 8/5/2020 | | Meet and confer re SVO 3rd request for production and patent contentions | SD | 1.10 | |
| 8/14/2020 | | Review amended trade secret disclosures | SD | 2.80 | |
| 8/18/2020 | | Prepare for and attend telephone conference with Ulrich re IP strategy | SD | 1.10 | |
| 8/19/2020 | | Telephone conference with G. Brannigan re expert for Bladeroom | SD | 1.00 | |
| 8/19/2020 | | Prepare for hearing | SD | 1.50 | |
| 8/20/2020 | | Prepare for and attend hearing | SD | 3.60 | |
| 8/28/2020 | | Attend meeting with Ulrich; follow-up | SD | 2.00 | |
| 8/30/2020 | | Revise response to 4th set of request for production | SD | 1.10 | |
| 9/5/2020 | 9/6/2020 | Draft additional IP production of document requests | SD | 3.20 | |
| 9/12/2020 | | Meet and confer re SVO RFP3 and VertivRFP4 | SD | 1.20 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 9/12/2020 | 9/17/2020 | Meet and confer letter and motion to compel | SD | 7.20 | |
| 9/20/2020 | 9/23/2020 | Prepare for hearing | SD | 4.50 | |
| 9/24/2020 | | Prepare for and attend hearing; summary | SD | 5.20 | |
| 9/25/2020 | 10/15/2020 | Draft Myers declaration | SD | 10.60 | |
| 10/7/2020 | 10/9/2020 | Review Vertiv patent infringement disclosures | SD | 4.50 | |
| 10/14/2020 | | Review commissioning scripts documents | SD | 1.00 | |
| 10/14/2020 | 10/15/2020 | Review proposed order re Vertiv RFP4 | SD | 2.40 | |
| 10/25/2020 | 11/12/2020 | Draft motion to strike\motion to dismiss re trade secrets, including Bladeroom trade secrets | SD | 33.10 | |
| 10/29/2020 | | Review drafted amended cross claims | SD | 1.00 | |
| 11/6/2020 | 11/7/2020 | Meet and confer re Bladeroom document issues | SD | 1.50 | |
| 11/11/2020 | | Meeting with Ulrich and HKA | SD | 1.00 | |
| 11/19/2020 | | Prepare for and attend telephone conference hearing re Bladeroom documents and motion to strike | SD | 3.70 | |
| 11/20/2020 | 11/22/2020 | Draft letter to arbitrator re Bladeroom documents | SD | 4.70 | |
| | | **Total** | | **356.40** | |

| Allocation | | Hours Billed |
|---|---|---|
| P | Potentially Defamation | 2.30 |
| | | 2.30 |

# EXHIBIT 8

**NAVIGATORS V. SVO FEE REVIEW**
**Re: Gordon & Rees LLP**
**Outline of Services Performed**

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 12/30/2019 | 3/22/2020 | Patent issue and case history review and explanations of patent procedure | DH | 44.90 | |
| 1/18/2020 | | Travel and attend meeting with N. Lang | DH | 10.40 | |
| 2/4/2020 | 2/10/2020 | Document review and status letter to client and carrier | DB, IHB | 8.90 | |
| 2/11/2020 | | Conference call with former counsel S. Lamon re transition | DS, IHB | 5.00 | |
| 2/18/2020 | 7/29/2020 | Communication with HKA expert K. Baker, quantum and delay expert engineer | DH, KM, IHB | 1.90 | |
| 2/18/2020 | 7/29/2020 | Prepare for deposition of HKA expert Ken Baker, including quantum and delay expert issues engineer | IHB | 1.20 | |
| 2/26/2020 | | Telephone conference with K. Baker | DS, IHB, DH | 2.70 | |
| 2/26/2020 | | Telephone conference with S, DeBruine re patent and trademark issues | DH, DS | 2.00 | |
| 2/26/2020 | | Travel and attend meeting with S. Sorooshian | DH, DS | 6.90 | |
| 2/26/2020 | 3/31/2020 | Document review for discovery responses and drafting request for production #10 | DB, IHB, KM | 23.90 | |
| 2/28/2020 | | Conference call with S. DeBruine re trademark and patent issues | DB, IHB | 1.80 | |
| 2/28/2020 | 3/4/2020 | Draft status letter to client re document received | DB, IHB | 4.80 | |
| 2/28/2020 | 8/11/2020 | Prepare for deposition of N. Lang, expert re Business Trade Secrets; documents review | DS IHB | 32.30 | |
| 3/2/2020 | 4/24/2020 | Draft chronology of events | IHB, KM | 7.00 | **P** |
| 3/3/2020 | 8/31/2020 | Document review re licensing agreement and licensing expert, including review documents from Call State Licensing Board | IHB, DH, DB | 23.50 | |
| 3/5/2020 | | Prepare for and attend meeting with arbitrator | IHB, DS | 1.40 | **P** |
| 3/10/2020 | | Prepare for and attend meeting with J. Goode, Swinerton Builders | IHB | 1.00 | |
| 3/10/2020 | 8/25/2020 | Review documents re former CPS employee expert D. Keith, C. Dunn and E. Phillips | IHB, KM | 11.50 | |
| 3/19/2020 | | Prepare for and attend call with opposing counsel on status | DH, IHB, DS | 2.00 | |
| 3/24/2020 | | Prepare for and attend meeting with former counsel | IHB, DH | 1.70 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 3/24/2020 | | Prepare for and attend call with arbitrator; summary to client | IHB, DH, DS | 1.60 | **P** |
| 3/25/2020 | 6/25/2020 | Review subcontractor Swinerton Builders IP documents | DH, IBH, KM | 13.50 | |
| 4/1/2020 | | Conference call with Swinerton | IHB, DDS | 1.10 | |
| 4/6/2020 | 4/30/2020 | Continued document review for discovery and production | DH, KM, IHB, DB | 99.20 | |
| 4/8/2020 | | Prepare for and attend call with arbitrator | DH, IHB, DS | 1.40 | **P** |
| 4/8/2020 | 4/9/2020 | Prepare for deposition of Crow forensic ESI computer expert | IHB | 2.30 | |
| 4/9/2020 | | Review argument on client's 2019 demurrer and motion to strike | IHB | 1.10 | **P** |
| 4/9/2020 | | Review documents re Bank of New York Melon funding | IHB | 2.80 | |
| 4/13/2020 | 4/20/2020 | Document review re response to meet and confer for production meeting minutes | KM, DB | 14.20 | |
| 4/14/2020 | | Attend conference call with K. Baker | DH, IHB, DS | 3.50 | |
| 4/14/2020 | | Prepare for arbitration | KM | 1.00 | |
| 4/24/2020 | 5/6/2020 | Review ROA in underlying lawsuits to determine claims and support for defense | IHB, JM | 9.00 | |
| 5/1/2020 | | Draft letter to opposing counsel re production of AEO documents | DB | 2.40 | |
| 5/1/2020 | 5/31/2020 | Continued document review for preparation and responses to discovery and production | KM, DH, IHB, DB, DS | 71.70 | |
| 5/6/2020 | | Prepare for and attend call with arbitrator Fisher | DH, IHB | 1.90 | **P** |
| 5/10/2020 | | Analysis of CA law re communication with unrepresented parties | DB | 2.50 | |
| 5/13/2020 | 5/28/2020 | Review documents and create timeline of discovery and activity by prior counsel | KM | 11.50 | |
| 5/17/2020 | 5/18/2020 | Draft email motion re AEO issue | DB, IHB | 4.30 | |
| 5/18/2020 | | Draft subpoenas to subcontractors | KM | 1.40 | |
| 5/20/2020 | | Conference call with arbitrator Fisher | DS, DH, IHB | 5.70 | |
| 5/22/2020 | | Attorney fees patent research | DH | 1.70 | |
| 5/27/2020 | | Review Murphy Austin file re attorney client privilege and custodian production issue | DB, KM | 4.80 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 5/28/2020 | 5/29/2020 | Review documents and prepare letter to arbitrator re Vertiv production issues | DB, IHB, KM | 8.50 | |
| 5/29/2020 | | Revie email from Ulrich re limiting process | DH | 1.50 | |
| 6/1/2020 | 6/30/2020 | Continued document review for discovery and production | KM, IHB | | |
| 6/4/2020 | 6/18/2020 | Search patent related documents in Relativity | DH | 18.70 | |
| 6/19/2020 | | Attend meet and confer with claimants on discovery disputes | IHB, DS | 3.70 | |
| 6/19/2020 | | Attend conference with carrier for update | IHB, DS | 1.60 | |
| 6/22/2020 | | Lengthy call with client re discovery dispute | IHB, DS | 1.40 | |
| 6/24/2020 | | Update letter to carrier | IHB | 1.20 | |
| 6/25/2020 | | Attend client status call | DH, IHB | 1.20 | |
| 6/29/2020 | | Attend client status call | DH, IHB | 1.00 | |
| 7/1/2020 | 7/31/2020 | Document review for discovery and production | IHB, KM | 19.30 | |
| 7/2/2020 | | Participate in meet and confer with Vertiv re depositions | DS, DH | 1.00 | |
| 7/6/2020 | | Attend meet and confer conference with Vertiv | DS, DH, IHB | 1.80 | |
| 7/7/2020 | 7/8/2020 | Prepare for hearing before arbitrator, including presentation and oral argument on 11 motions | IHB, DB | 4.80 | **P** |
| 7/8/2020 | | Conference with arbitrator Fisher | DH, DS, IHB | 6.10 | **P** |
| 7/10/2020 | | Draft letter to arbitrator summarizing AEO issue | DB | 1.00 | |
| 7/14/2020 | | Attend conference call with opposing counsel re arbitrator ordered conference | DH, DS, IHB | 1.40 | |
| 7/14/2020 | | Conference with arbitrator Fisher re depositions and scheduling | DH, DS, IHB | 1.50 | |
| 7/16/2020 | | Prepare for and attend meeting with client | DH, IHB | 1.60 | |
| 7/27/2020 | | Conference call with client to prepare for depositions | DS, IHB | 3.50 | |
| 7/27/2020 | | Attend deposition preparation session with N. Lang | DH, IHB | 6.30 | |
| 7/29/2020 | | Attend deposition preparation meeting with N. Lang and U. Pelz | DH, IHB | 4.10 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 7/30/2020 | | Attend deposition preparation meeting with N. Lang and U. Pelz | DH, IHB | 3.40 | |
| 7/31/2020 | | Prepare for and attend oral argument with arbitrator on continuances | DH, IHB | 2.00 | **P** |
| 8/1/2020 | 8/31/2020 | Review and analysis of documents in preparation for discovery and production | IHB, DS, KB, KM | 26.90 | |
| 8/4/2020 | | Attend deposition preparation meeting with N. Lang and U. Pelz | DH, DS, IHB | 5.60 | |
| 8/5/2020 | | Meet and confer as ordered by arbitrator | DH, IHB, DS | 2.80 | |
| 8/5/2020 | | Attend deposition preparation meeting with N. Lang and U. Pelz | DH, IHB | 2.50 | |
| 8/6/2020 | | Attend deposition preparation meeting with N. Lang and U. Pelz | DH, IHB | 2.40 | |
| 8/7/2020 | | Attend deposition preparation meeting with N. Lang and U. Pelz | DH, IHB | 4.10 | |
| 8/12/2020 | | Attend deposition of N. Lang | DS | 8.20 | |
| 8/12/2020 | | Attend deposition of U. Pelz | IHB | 9.10 | |
| 8/13/2020 | 8/14/2020 | Draft status letter to carrier | IHB, DS | 4.60 | |
| 8/24/2020 | | Attend call with arbitrator Fisher re document production | DH, DS, IHB | 2.70 | |
| 8/27/2020 | | Draft status letter re deposition of N. Lang | IHB | 1.30 | |
| 9/1/2020 | 9/4/2020 | Prepare for deposition of U. Pelz | IHB, KB | 3.50 | |
| 9/1/2020 | 9/30/2020 | Document review and analysis of DPR emails; analysis re AEO designation | KM, KB, IHB | 25.60 | |
| 9/3/2020 | | Attend deposition preparation meeting with U. Pelz | IHB | 1.80 | |
| 9/4/2020 | | Attend deposition preparation meeting with U. Pelz | IHB. DS | 3.50 | |
| 9/7/2020 | | Attend deposition preparation meeting with U. Pelz | IHB, DS | 4.00 | |
| 9/8/2020 | | Attend deposition preparation meeting with U. Pelz | IHB, DS, DH | 6.10 | |
| 9/8/2020 | | Attend call with expert re "claim" analysis | IHB | 1.00 | |
| 9/8/2020 | | Attend call with expert re "claim" analysis | IHB | 1.70 | |
| 9/14/2020 | | Prepare patent defense arguments | DH | 16.50 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 9/15/2020 | 9/28/2020 | Prepare for deposition of A. Miller | IHB, KM, KB | 17.00 | |
| 9/18/2020 | | Prepare expert disclosure | IHB | 1.20 | |
| 9/19/2020 | 9/30/2020 | Draft arbitration motion re document production, including research enforcement of subpoenas | IHB, DB | 11.30 | |
| 9/21/2020 | | Prepare for and attend deposition of J. Goode, Swinerton | IHB | 4.80 | |
| 9/23/2020 | | Attend deposition of U. Pelz | DH | 7.10 | |
| 9/25/2020 | | Attend deposition of U. Pelz | DH | 2.70 | |
| 9/27/2020 | | Call with client re deposition of A. Miller | IHB | 3.60 | |
| 9/28/2020 | | Attend deposition of A. Miller | DH | 8.30 | |
| 10/1/2020 | 10/20/2020 | Prepare for deposition of R. Fetters | IHB, DS, KM | 29.80 | |
| 10/6/2020 | | Prepare for and attend telephone conference with HKA experts | IHB | 1.40 | |
| 10/6/2020 | | Research non-retained expert issue for meet and confer | DB | 2.50 | |
| 10/8/2020 | | Call with client re Fetters deposition | IHB | 1.20 | |
| 10/8/2020 | 10/12/2020 | Review site inspection confidential agreement | DH | 1.70 | |
| 10/8/2020 | 10/26/2020 | Document review re Vertiv email production | KM | 6.10 | |
| 10/9/2020 | | Attend call with arbitrator Fisher | DH, IHB | 2.20 | **P** |
| 10/9/2020 | | Draft deposition summary of A. Miller | KM | 5.80 | |
| 10/11/2020 | | Prepare for interview with M. Arroyo | IHB | 1.10 | |
| 10/12/2020 | 10/14/2020 | Draft opposition to Motion to Compel production of withheld documents | DB | 17.80 | |
| 10/13/2020 | | Litigation strategy meeting to prepare for trial | DH, IHB, DS, KB | 10.70 | |
| 10/14/2020 | | Attend Prime Data Systems Facility inspection | DH | 7.00 | |
| 10/15/2020 | | Document review re engineer Kleinfelder | IHB | 1.30 | |
| 10/20/2020 | | Attend deposition of R. Fetters | IHB | 8.30 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 10/20/2020 | | Draft deposition summary of R. Fetters | KM | 1.80 | |
| 10/20/2020 | | Draft letter to carrier re depositions and interviews | IHB | 1.80 | |
| 10/21/2020 | | Prepare for hearing on Vertiv motion to compel | DS | 1.00 | |
| 10/22/2020 | | Draft response to arbitrator re withheld documents | IHB | 2.10 | |
| 10/22/2020 | 10/27/2020 | Prepare for deposition of S. Ford | IHB, KM | 9.10 | |
| 10/26/2020 | | Prepare for and attend hearing on Vertiv Motion to Compel | DS | 1.70 | |
| 10/27/2020 | 10/28/2020 | Prepare for deposition of CPS PMK B. McDaniel | IHB, DS | 2.40 | |
| 10/28/2020 | | Prepare for and attend deposition of B. McDaniel | DSD | 8.10 | |
| 10/29/2020 | 10/30/2020 | Draft SVO motion to postpone arbitration | DS | 4.40 | |
| 11/16/2020 | | Telephone conference with new attorneys at Tyson | KM | 2.30 | |
| 12/22/2020 | | Phone call with new counsel | IHB | 13.00 | |
| 3/1/2021 | | Video conference meeting with SVO litigation team | SW, JF, BB, DDF, CM, JT | 13.20 | |
| 3/1/2021 | | Continued work with expert HKA K. Baker | DF | 1.70 | |
| 3/1/2021 | | Analysis of expert testimony re construction permits | CM | 3.60 | |
| 3/1/2021 | 3/24/2021 | Document review for production and for experts | SW, DF, RD, CM, AR, JT | 102.40 | |
| 3/2/2021 | | Meeting with SVO litigation team | SW, DF, JT | 5.10 | |
| 3/2/2021 | | Draft deposition subpoena to D. Runte, DPR | JT | 39.00 | |
| 3/2/2021 | | Strategy and alignment conference | AR, DF, CM, JT | 4.00 | |
| 3/2/2021 | | Analysis of expert testimony re Security System | CM | 3.70 | |
| 3/3/2021 | 3/1/2038 | Draft opposition to Vertiv motion re non-retained experts automatically becoming retained with further information | RD, JT, CM, DF | 37.60 | |
| 3/4/2021 | | Conference call with KDL (ESI consultant) | DF, CM | 2.20 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 3/4/2021 | | Strategy and alignment conference | EK, RD, AR, JF, BB, DF, CM | 14.00 | |
| 3/4/2021 | 3/16/2021 | Review deposition of A. Miller re timeline of SVO termination | DF | 4.40 | |
| 3/5/2021 | | Strategy and alignment call with client | AR, JF, DF, JT, CM | 3.40 | |
| 3/5/2021 | | Conference call with KDL (ESI consultant) | DF, CM, SW | 5.70 | |
| 3/8/2021 | | Conference call with Dunn & Phelps (IP expert) | CM, SW, DF | 3.30 | |
| 3/8/2021 | 3/12/2021 | Review documents and status report re defects and delay claims | BB | 3.80 | **P** |
| 3/8/2021 | 3/17/2021 | Review and analysis re transfer of power from DPR | DF, JT | 6.90 | |
| 3/8/2021 | 3/23/2021 | Communication and review documents re P. Vermeulen, contractor licensure expert | RD, AR | 25.80 | |
| 3/9/2021 | | Strategy and alignment conference | EK, AR, JF, BB, DF, CM, JT | 9.80 | |
| 3/9/2021 | | Prepare for hearing on non-retained expert motion | RD, JT, DF | 8.80 | |
| 3/9/2021 | | Prepare meet and confer letter re ESI protocol | DM | 2.30 | |
| 3/10/2021 | | Attend post hearing SVO litigation team meeting | DR, DF | 1.00 | |
| 3/10/2021 | | Attend conference with KLD re ESI issues | CM, DF | 2.80 | |
| 3/10/2021 | | Review IP trade secret documents for Dunn & Phelps | SW | 4.20 | |
| 3/10/2021 | | Attend hearing before arbitrator re Motion to Compel further disclosures | JT, DF, RD | 51.00 | |
| 3/10/2021 | | Attend meeting with prior counsel, Murphy Autin re ESI | CM | 2.00 | |
| 3/10/2021 | 3/17/2021 | Draft motion to compel post JDA documents from Vertiv | JT, DF | 10.30 | |
| 3/11/2021 | | Attend meeting with prior counsel re ESI issue | DF | 1.40 | |
| 3/11/2021 | 3/12/2021 | Research service of T. Marchese before subpoena | JT | 7.90 | |
| 3/12/2021 | | Attend meet and confer with opposing counsel re document production protocols | RD, JT, DF | 3.30 | |
| 3/12/2021 | | Strategy and alignment call with client | AR, DF, JT, EK, CM, RD, SW | 7.50 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 3/12/2021 | 3/23/2021 | Prepare for deposition of S. Ford | EK, JT, AR | 48.50 | |
| 3/15/2021 | 3/24/2021 | Review documents for IP consultant I. Bitterlin | CM, AR | 26.80 | |
| 3/16/2021 | | Prepare proposed protocol for evidentiary hearing | JT | 3.10 | |
| 3/16/2021 | | Strategy and alignment call with client | AR, JF, DF, JT, RD | 5.00 | |
| 3/17/2021 | | Attend conference with IP expert Duff & Phelps | DF, SW, CM | 4.00 | |
| 3/18/2021 | 3/19/2021 | Review documents re subcontractor Main Freight and others | AR, EK | 8.30 | |
| 3/19/2021 | | Review document re trade secrets at issue | CM | 3.10 | |
| 3/19/2021 | | Review documents re Baker Williams engineering | AR | 3.20 | |
| 3/19/2021 | | Strategy and alignment call with client | AR, BB, JF, DF, JT, CM, EK, RD | 11.80 | |
| 3/19/2021 | | Interview of Ted Martin, fact witness | RD, EK | 3.80 | |
| 3/20/2021 | | Draft letter to client re preliminary arbitration hearing | DF | 1.30 | |
| 3/20/2021 | | Telephone conference with fact witness M. Wall | RD, EK | 4.60 | |
| 3/21/2021 | | Meet and confer conference with DPR re custodian of records subpoena | DF | 1.20 | |
| 3/22/2021 | | Attend conference with I. Bitterlin re trademark claims | CM | 1.90 | |
| 3/23/2021 | | Review documents re breach of contract claims | BB | 1.20 | |
| 3/23/2021 | | Strategy and alignment call with client | M | 8.70 | |
| 3/24/2021 | | Legal research and review and analysis authority re patent related claims and dismissal of 13th cause of action | JT | 4.50 | |
| 3/24/2021 | | Draft letter to DPR re evidentiary hearing subpoena | JT | 3.10 | |
| 3/24/2021 | | Telephone conference with D. Bunch re Vertiv's role, fact witness re contractor licensure | RD, EK | 3.00 | |
| 3/24/2021 | | Prepare for and attend telephone conference with fact witness K. Knott, architect | RD, EK | 3.30 | |

| Date From | To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| | | **Total** | | **1,427.00** | |

| Allocation | | Hours Billed |
|---|---|---|
| P | Potentially Defamation | 33.30 |
| | | 33.30 |

# EXHIBIT 9

# NAVIGATORS V. SVO FEE REVIEW
## Re: Tyson and Mendes LLP
## Outline of Services Performed

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 11/3/2020 | 12/14/2020 | Initial intake of file and review file, complaint regarding IP and discovery disputes | GS, CM, JT, DP, DF | 17.10 | |
| 11/5/2020 | | Lengthy telephone conference with Hosshie of Gordon & Rees regarding allegations | GS | 1.10 | |
| 11/5/2020 | 11/16/2020 | Review Turn Key Agreement to determine obligations | AR, DF | 8.30 | |
| 11/8/2020 | | Emails to and from client at SVO regarding background information, facts and documents to introduce | DF | 1.40 | |
| 11/8/2020 | 11/11/2020 | Review production of documents, production of emails and privilege issues to analyze discovery dispute for production strategy | GS, CM, DF, RD | 4.20 | |
| 11/9/2020 | | Review and analyze 23 IP claims of plaintiff | GS | 3.70 | |
| 11/9/2020 | | Review of arbitration hearing transcript regarding licensing issue and demurrer defense | DF | 4.80 | |
| 11/9/2020 | | Calls and emails with client regarding prior discussions regarding production by DPR and background facts | DF | 0.90 | |
| 11/9/2020 | 12/9/2020 | Review DPR documents previously produced and discovery dispute and prepare list | DF, AR | 8.30 | |
| 11/10/2020 | | Analysis of Professions and Vocation regarding licensure issues regarding breach of contract in complaint | GS | 1.20 | |
| 11/10/2020 | | Prepare memorandum regarding general scope of lawsuit | GS | 0.80 | **P** |
| 11/10/2020 | | Prepare for and call with prior counsel regarding liability analysis | GS, DF, RD | 4.30 | |
| 11/10/2020 | 11/20/2020 | Review client's PowerPoint regarding defenses protection manipulation by plaintiff | JF, DF | 2.20 | |
| 11/11/2020 | | Analysis of arbitration transcript regarding MSJ hearing | RD | 0.90 | |
| 11/11/2020 | 11/16/2020 | Analysis of excel spreadsheet of emails between plaintiffs and subcontractors and review timeline | RD | 2.10 | |
| 11/11/2020 | 11/25/2020 | Review 4th amended complaint and review client's counter claims | RD, JT, DF | 3.60 | |
| 11/12/2020 | | File assessment regarding liability and damages and prepare outline | DF | 3.30 | **P** |
| 11/12/2020 | 11/24/2020 | Analysis of Business and Professional Code 7031 regarding licensing and requirements | RD | 3.70 | |
| 11/13/2020 | 11/19/2020 | Review and analyze letter brief on discovery issues to prepare for new matter and develop facts | RD, CM | 3.30 | |
| 11/16/2020 | | Prepare for and attend lengthy telephone conference with client [1.2, 2.1, 1.2] | GS, RD, DF | 4.50 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 11/17/2020 | | Prepare for and attend lengthy telephone conference with client [1.7, 1.7, 1.7] | GS, RD, DF | 5.10 | |
| 11/17/2020 | | Assessment of non-witness identified and areas of anticipated testimony and assess expert witness designation | DF | 5.10 | |
| 11/17/2020 | 11/23/2020 | Review and analyze deposition of N. Lang, review exhibits and prepare summary | RD, JT, CM | 16.50 | |
| 11/17/2020 | 11/24/2020 | Analysis of Lump Sum contract | RD, JT, GS | 3.50 | |
| 11/17/2020 | 12/4/2020 | Review deposition of Andrew Miller, Financial manager and review his emails and production and prepare page line summary | RD, JT, CM | 21.00 | |
| 11/17/2020 | 12/4/2020 | Review and analyze deposition of client Ulrich Pelz and draft summary | CM, RD, DF, JT | 13.60 | |
| 11/18/2020 | | Review deposition of Randy Fetter | DF | 1.40 | |
| 11/18/2020 | | Review and analyze prior demurrer and motion to strike | DF | 1.20 | |
| 11/18/2020 | | Call with prior counsel regarding strategy for lifting stay | RD, JT | 1.20 | |
| 11/18/2020 | | Review deposition of B. McDaniel | DF | 1.30 | |
| 11/18/2020 | | Review stay order and related documents for status conference and stipulated protective order to prepare for conference with prior counsel | RD | 1.70 | |
| 11/19/2020 | | Review arbitration agreement in preparation for developing argument for further disclosure of documents | RD | 1.10 | |
| 11/19/2020 | 11/25/2020 | Analysis of best practice outlining issues and evidence for defense strategy for arbitration and moving case forward | RD, GS, DF | 2.50 | |
| 11/19/2020 | 11/30/2020 | Extensive analysis of trade secret disclosure and remaining trade secrets to determine the nature of the trade secrets | GS, DF | 3.80 | |
| 11/20/2020 | | Review allegations in D. Keith complaints to defend against Vertiv malfeasance by SVO | RD, DF | 1.00 | |
| 11/20/2020 | | Review and access strategy regarding SVO's motion to continue and plaintiff's opposition and prepare response | DF | 1.00 | |
| 11/20/2020 | | Lengthy call with client regarding strategy and motion to continue | DF | 1.60 | |
| 11/20/2020 | | Prepare outline of key issues and claims against Vertiv for further strategy | JT | 5.20 | |
| 11/22/2020 | | Several email communication with client | DF | 1.50 | |
| 11/23/2020 | | Conference with client regarding background of case | DF | 2.30 | |
| 11/23/2020 | | Analyze letters to arbitrator regarding motion to compel production | JT | 1.20 | |
| 11/23/2020 | 12/22/2020 | Review MSJ, pleadings and prior production responses for factual background and for use in motion to lift stay and motion to compel the production of further documents, prepare outline and prepare motions | JT, RD, CM, DF, AR | 45.60 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 11/24/2020 | | Review and analyze timeline specifically to determine dates related to licensure issues | RD | 1.90 | |
| 11/24/2020 | | Prepare for and lengthy call with Gordon & Rees regarding patent specifications | GS, AR | 5.50 | |
| 11/25/2020 | | Prepare section pertaining to discovery issues with Vertiv and Vertiv's damages and SVO damages | JT | 4.50 | |
| 11/27/2020 | | Review and analyze work orders regarding construction defect prepared by Casey Dunn | DF | 4.10 | |
| 11/30/2020 | | Call with client Ulrich Pelz regarding arbitration hearing | GS, DF, RD | 7.80 | |
| 11/30/2020 | | Research case law regarding discovery and lifting stay and review client's points regarding withdrawal of counsel | CM, DF | 3.40 | |
| 12/1/2020 | | Analysis of joint defense agreement between DPR and Vertiv for opening and expanding discovery and positive and negative impact | RD | 4.90 | |
| 12/1/2020 | | Attend SVO litigation team status and strategy conference call | DF, CM, JT | 3.90 | |
| 12/1/2020 | 12/7/2020 | Research and analyze case law regarding arbitrator's inability to enforce subpoena against non-party DPR | CM, RD | 6.10 | |
| 12/2/2020 | | Review and analyze interview questions for Erin Phillips | RD | 0.90 | |
| 12/2/2020 | | Review and analyze interview questions for Matt Arroyo | RD | 1.30 | |
| 12/2/2020 | | Review and analyze prior document analysis regarding Vertiv's retention protocol and policies | DF | 1.40 | |
| 12/3/2020 | | Analysis of Business and Professional Code 7031 regarding defenses to unfair business practices claim | RD | 1.40 | |
| 12/3/2020 | | Review and analyze statement from Relativity regarding contract and prepare memorandum regarding storage and costs | AR | 2.70 | |
| 12/3/2020 | 12/7/2020 | Prepare outline regarding issues to be addressed in formal appearance | RD | 1.60 | |
| 12/3/2020 | 12/7/2020 | Case law analysis relating to licensure issues and review MSA documents for licensure issues | RD | 3.40 | |
| 12/4/2020 | | Strategy call with client | DF | 1.10 | |
| 12/4/2020 | 12/7/2020 | Review 12 boxes of documents and report by KLD on 300K documents to determine the contents of data the client has access to for discovery | AR, CM | 5.80 | |
| 12/7/2020 | | Review and analyze 5,800 documents related to IP claim and prepare outline | GS | 1.50 | |
| 12/7/2020 | | Review and analyze documents regarding Tim Coate | CM | 4.10 | |
| 12/8/2020 | | Review Relativity documents relating to Swinerton Builders | CM | 4.00 | |
| 12/8/2020 | | Attend SVO litigation meeting | DF, GS, RD | 4.20 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 12/8/2020 | 12/11/2020 | Review Relativity documents relating to Ulrich Perez and develop questions for him | CM, RD, GS | 4.50 | |
| 12/8/2020 | 12/16/2020 | Review documents from Gordon Rees to determine production and format document, organize and upload into Worldox and prepare memorandum | AR | 32.10 | |
| 12/9/2020 | | Review Relativity for documents regarding Aaron Weeks | CM | 3.70 | |
| 12/9/2020 | | Review and analyze Relativity productions regarding ACCO engineer system | CM | 4.40 | |
| 12/10/2020 | | Draft letter to arbitrator regarding representation of TM and motion for continuance | DF | 1.70 | |
| 12/10/2020 | | Prepare for and strategy call with client | DF | 1.10 | |
| 12/10/2020 | | Review and analyze 4th amended complaint and turnkey agreement for allegations of patent infringement | JL, RD, GS | 7.40 | |
| 12/11/2020 | | Attend strategy meeting with client | RD, DF, GS | 3.90 | |
| 12/11/2020 | | Review scope of discovery, interviews and subpoenas for status report | GS | 1.20 | |
| 12/11/2020 | 12/14/2020 | Review summaries and charts for strategy for depositions and experts | CM | 3.00 | |
| 12/12/2020 | | Review prior counsel's notes and outlines | CM | 1.90 | |
| 12/13/2020 | | Telephone conference with client regarding status, formal appearance and request for continuance | DF | 1.10 | |
| 12/14/2020 | | Review prior counsel's correspondence with arbitrator and order and prepare outline of hearing and orders | CM | 1.40 | |
| 12/14/2020 | | Extensive review of statements of new contractor Jeff Goode | JT | 4.60 | |
| 12/14/2020 | | Review and analysis of deposition exhibits of Brandon McDaniel regarding contract breach | RD, AR | 3.50 | |
| 12/15/2020 | | Meet and confer with opposing counsel | RD, GS, DF | 2.20 | |
| 12/15/2020 | | Prepare for and conference call with client and alignment of strategy | DF | 2.30 | |
| 12/15/2020 | | Telephone conference with Ulrich Pelz | RD, GS | 2.80 | |
| 12/15/2020 | | Prepare summary of Randy Fetters deposition | JT | 5.80 | |
| 12/15/2020 | 12/16/2020 | Review and analyze Vertiv's responses to multiple sets of discovery regarding patent issues and defenses for meet and confer | JT | 6.30 | |
| 12/15/2020 | 12/21/2020 | Review arbitration rules, case law and research CCP 998 regarding settlement and draft memorandum regarding settlement options | CM | 19.80 | |
| 12/16/2020 | | Review history of background of dispute for arbitration | RD | 2.50 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 12/16/2020 | | Review and analyze transcript of motion for injunction to evaluate for trade secret claims | RD | 1.20 | |
| 12/16/2020 | | Commence review of extensive electronic file of prior counsel to assess | DF | 3.20 | |
| 12/16/2020 | 12/17/2020 | Review orders and amended claims to prepare for discussion with Murphy Austin attorneys for strategy for prosecution of defenses against breach of contract claims | RD, GS | 2.80 | |
| 12/16/2020 | 12/28/2020 | Analysis of defamation cause of action compared with other causes of action | GS, RD | 2.10 | **D** |
| 12/17/2020 | | Prepare for conference call with prior counsel, Murphy Austin and client | DF, JT, GS | 3.40 | |
| 12/17/2020 | | Review and analyze prior orders regarding motion to compel documents for trade secrets misappropriation | JL | 2.10 | |
| 12/17/2020 | | Review pre-mediation brief to prepare for further hearing of meet and confer for production of missing documents | GS | 1.70 | |
| 12/17/2020 | | Prepare updated status report | DF | 1.50 | |
| 12/17/2020 | 12/21/2020 | Review and assess pending discovery motions and status of work and prepare oppositions to plaintiff's motions | DF, JT | 7.30 | |
| 12/17/2020 | 12/23/2020 | Review and analyze documents from prior counsel Murphy Austin regarding outstanding discovery issues and meet and confer issues | JT, DF, CM, GS | 11.90 | |
| 12/18/2020 | | Preliminary review of detailed chronology prepared by prior counsel regarding construction events | DF | 4.10 | |
| 12/18/2020 | | Team strategy conference | DF, RD, JT, CM | 5.20 | |
| 12/18/2020 | | Review case summaries regarding misappropriation of IP | GS | 0.90 | |
| 12/18/2020 | | Discussions with prior counsel | DF, RD, CM | 3.50 | |
| 12/18/2020 | 12/19/2020 | Prepare outline of meet and confer topics and review discovery | RD, CM | 7.50 | |
| 12/21/2020 | | Review motion to compel in preparation of call with client and attend call | RD, GS, DF | 5.30 | |
| 12/21/2020 | | Prepare list of questions for call with prior counsel | JT | 2.30 | |
| 12/21/2020 | | Call with data center expert Ian Bitterlin | GS | 1.40 | |
| 12/21/2020 | 12/30/2020 | Review and triage of Relativity database | DF | 28.30 | |
| 12/22/2020 | | Prepare for and conference with prior counsel | CM, RD, JT, DF | 6.00 | |
| 12/22/2020 | | Conference with litigation team | CM, JT | 3.30 | |
| 12/22/2020 | | Call with client regarding law and motion moving forward | GS, RD, DF, JF, JT | 10.50 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 12/22/2020 | 12/30/2020 | Prepare section analyzing status of written discovery and production of documents for meet and confer conferences ordered by arbitration for January 4 and January 6 | JT, DF | 26.40 | |
| 12/23/2020 | | Review and analyze 294 page 4th mended complaint and outline key issues | CM, RD | 2.30 | **P** |
| 12/23/2020 | | Review and analyze MSJ hearing transcript and docket | RD | 1.60 | |
| 12/23/2020 | | Review transcript of several meet and confer hearings with opposing counsel and hearing order | CM | 8.30 | |
| 12/23/2020 | | Email exchange with client regarding discovery motions | DF | 1.10 | |
| 12/23/2020 | 12/28/2020 | Review Lump Sum Turnkey agreement for scope of authority of arbitrator, and appealability | CM | 5.00 | |
| 12/24/2020 | | Review and analyze Murphy Austin file regarding David Keith's suspect emails | CM | 3.20 | |
| 12/24/2020 | 12/28/2020 | Review and analyze Murphy Austin's file regarding SVO's non-retained expert designation | CM | 3.60 | |
| 12/26/2020 | | Review and analyze Murphy Austin's file regarding background and 78 claims | CM | 6.50 | |
| 12/28/2020 | | Conference call with client | DF | 1.50 | |
| 12/28/2020 | | Review and analyze Murphy Austin's file regarding Delaware Federal Court | CM | 2.60 | |
| 12/28/2020 | | Review case law regarding matters which may fall outside Business and Professional code section 7031 for impact on Rico and defamation defense | RD | 1.70 | **D** |
| 12/28/2020 | | Review and analyze documents relevant to exhibit A in Relativity (180 pages) | AR | 2.80 | |
| 12/28/2020 | | Strategy call with client regarding status and ordered meet and confer | DF, RD, CM, JT | 4.40 | |
| 12/28/2020 | | Draft and revise expert witness log | AR | 2.60 | |
| 12/29/2020 | | Telephone conference with prior counsel regarding appealability of arbitration award | CM | 1.70 | |
| 12/29/2020 | | Litigation team conference call with client | JT, CM, AR, RD, SW | 7.00 | |
| 12/29/2020 | | Draft memorandum regarding Vertiv's discovery motions | CM | 8.20 | |
| 12/29/2020 | | Prepare for and telephone call with Bill Finegan regarding Erin Phillips interview efforts | RD | 2.00 | |
| 12/30/2020 | | Prepare chart detailing emails by Vertiv's custodian versus total emails sent | JT | 1.60 | |
| 12/30/2020 | | Create search in Relativity to contest document production | AR | 2.40 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 12/30/2020 | | Review and analyze various platforms of data from past counsel for document organization plan | SW, AR | 7.00 | |
| 12/30/2020 | 12/31/2020 | Review and analyze (Attorney eyes only) Vertiv's documents to prepare for contesting validity and meet and confer and prepare memorandum | DM, RD, AR | 25.50 | |
| 12/31/2020 | | Review and analyze Vertiv's document designation regarding merit of confidentiality designation and demand for withdrawal | DF | 4.60 | |
| 1/1/2021 | 1/31/2021 | Prepare for and attend documents production by opposing counsel designated as attorneys eyes only, review documents for production and production by subcontractors | AR, JJF, DF, JT, CM, SW, GS, JL, TM, GA | 439.70 | |
| 1/2/2021 | 2/8/2021 | Prepare for interview with E. Phillips; memorandum | AR, RP | 12.50 | |
| 1/4/2021 | | Telephone conference with U. Pelz re discovery strategy | AR, RD, JT, DF, GS | 8.40 | |
| 1/4/2021 | | Conference with Tyson litigation team | CM, JL | 2.00 | |
| 1/4/2021 | | Prepare and attend meet and confer letter re discovery issues | JR, JT, DF, RD, GS, JL | 13.80 | |
| 1/5/2021 | | Telephone conference with SVO team re arbitration | DRD | 1.40 | |
| 1/6/2021 | | Attend interview with E. Phillips | RD | 1.70 | |
| 1/6/2021 | 1/11/2021 | Legal research appealability of motions for summary judgment and discovery for letter to arbitrator | CM, GS, JT | 83.60 | |
| 1/7/2021 | | Prepare for and attend meet and confer | DF, JT, RD, CM | 4.70 | |
| 1/8/2021 | | Meeting call with team | SW | 1.20 | |
| 1/8/2021 | | Telephone conference with client re arbitration and meet and confer | JT, JF, DF | 43.00 | |
| 1/12/2021 | | Legal research challenging denial of motion to transfer | RD | 1.30 | |
| 1/12/2021 | | Telephone conference with client re arbitration and meet and confer | JT | 1.00 | |
| 1/12/2021 | 1/13/2021 | Prepare for arbitration, including review orders | JT, CM, RD, SW, GS, DF | 26.90 | |
| 1/13/2021 | | Status letter to client re arbitration | CM | 3.20 | |
| 1/13/2021 | | Attend arbitration | JT, DF, CM, GS, DF | 45.00 | |
| 1/14/2021 | | Telephone conference with client re arbitration brief | JT, GS | 4.90 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 1/14/2021 | | Review and work up of IP issues | DF | 2.70 | |
| 1/14/2021 | | Conference with client | CM, RD, JF, DF | 8.80 | |
| 1/14/2021 | 2/26/2021 | Prepare for deposition of and declaration re HKA ESI claims | CM, DF, SW, AR | 22.30 | |
| 1/15/2021 | | Prepare for and attend Tyler litigation meeting | CM, AR, GS, JF, JT | 10.70 | |
| 1/15/2021 | | Review and analysis SVO documents re breach of contract claim | DF | 4.10 | |
| 1/15/2021 | | Prepare for site inspection | GS | 1.40 | |
| 1/15/2021 | 1/25/2021 | Draft meet and confer re ESI compliance, including declaration of KLD, redaction and privilege log | CM, JT, RD, DF | 32.60 | |
| 1/18/2021 | | Conference with client re IP issues | GS, JF | 2.90 | |
| 1/19/2021 | | Analysis of patent claims re patent exhaustion | GS | 6.10 | |
| 1/19/2021 | 1/25/2021 | Draft petition to Sacramento CA Superior Court for case number | DF, CM | 5.10 | |
| 1/19/2021 | 1/26/2021 | Draft opposition to Vertiv motion to compel records withheld by SVO | JT | 21.70 | |
| 1/19/2021 | 1/29/2021 | Draft motion to compel petition for subpoenas to contractors | JF, CM, DF | 28.00 | |
| 1/20/2021 | | Conference with client | RD, JT | 4.00 | |
| 1/20/2021 | 1/28/2021 | Outline of Vertiv expert witnesses and potential exhibits | DF, AR, SW | 11.70 | |
| 1/20/2021 | 2/1/2021 | Search of communication with all experts between the Gordon and Murphy firms, including legal research independent contractors and employees | SW, DF, AR, CM | 23.00 | |
| 1/21/2021 | | Draft memo re evidentiary rules at arbitration | CM | 2.70 | |
| 1/22/2021 | | Conference with client | CM, GS, SW, RD, JF, DF, JT, AF | 16.50 | |
| 1/22/2021 | | Prepare equipment payment schedule | GS | 1.40 | |
| 1/22/2021 | 2/3/2021 | Prepare brief for February 3 arbitration, including arbitrator's failure to control discovery abuse, Building Management Systems defect | JT, JF, CM, JT | 78.90 | |
| 1/25/2021 | | Prepare for and attend telephone conference with T. Coates re contract breaches and delay | RD | 4.50 | |
| 1/26/2021 | | Conference with experts HKA | CM, AR, GS, SW, RD, JF, DF | 17.20 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 1/26/2021 | | Telephone conference with HKA | GS, JT | 4.60 | |
| 1/26/2021 | 1/29/2021 | Draft declaration of T. Coates | RD | 13.10 | |
| 1/27/2021 | | Telephone conference with client | CM | 1.10 | |
| 1/28/2021 | 2/25/2021 | Prepare for deposition of A. Weeks, Vertiv project manager, review documents and prepare chronology | AF, AR, GS, BB | 126.50 | |
| 1/29/2021 | | Conference with client | RD, JT | 3.30 | |
| 2/1/2021 | 2/8/2021 | Continued preparation of arbitration brief, including case assessment, evidentiary issue and review complaint re defenses | CM, DF, RD, EK, AR | 56.70 | |
| 2/1/2021 | 2/24/2021 | Draft joint defense agreement between DPR and Vertiv | CM, RD | 5.60 | |
| 2/1/2021 | 2/27/2021 | Prepare for and review documents produced bsy opposing counsel designated a attorneys eyes only, review documents for production and production by subcontractors | SW, AR, JT, DF, CM | 130.20 | |
| 2/2/2021 | 2/10/2021 | Prepare for arbitration hearing | CM | 2.70 | |
| 2/4/2021 | 2/9/2021 | Draft reply in support of arbitration brief | RD, JT | 20.80 | |
| 2/5/2021 | | Attend conference call with client | DF, CM, JF, RD | 5.20 | |
| 2/8/2021 | | Attend team meeting | SW, JT | 2.40 | |
| 2/8/2021 | 2/25/2021 | Document review and conference with IT for issues expert J. Losado | CM, JT, RD | 4.00 | |
| 2/10/2021 | | Attend team meeting | DF, RD, JT | 6.30 | |
| 2/10/2021 | 2/12/2021 | Analysis of Liebert's claims for reasonable value for motion to defend | AR | 14.50 | |
| 2/11/2021 | 2/19/2021 | Post arbitration meet and confer for subcontractor subpoenas production | CM, JT | 23.70 | |
| 2/12/2021 | | Attend call with client | CM, JF, RD, JT, AR | 6.60 | |
| 2/12/2021 | | Opposition to Vertiv motion to compel SVO compliance with ESI protocol | CM | 8.70 | |
| 2/12/2021 | | Outline SVO cross-claims | CM | 1.70 | |
| 2/14/2021 | | Attend call with client | DF | 2.20 | |
| 2/15/2021 | | Review client list of non-retained experts | AR | 1.80 | |
| 2/15/2021 | 2/18/2021 | Prepare for deposition of J. Goode | DF, CM | 8.40 | |

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 2/16/2021 | | Conference with experts HKA | CM, AR, RD, JF, JT | 6.60 | |
| 2/16/2021 | 2/19/2021 | Draft summary of letter notices by SVO in support of defense | JT | 11.30 | |
| 2/19/2021 | | Attend deposition of J. Goode | CM, DF | 17.40 | |
| 2/20/2021 | 2/26/2021 | Deposition summary of J. Goode | CM | 12.90 | |
| 2/23/2021 | | Telephone conference with opposing counsel for meet and confer | DF, CM, RD, JT | 4.50 | |
| 2/25/2021 | | Strategy conference call with client | DF, CM | 2.40 | |
| 2/26/2021 | | Prepare for and attend deposition of A. Weeks | JT, RD | 16.10 | |
| | | **Total** | | **2,181.80** | |

| | Allocation | Hours Billed |
|---|---|---|
| D | Defamation | 3.80 |
| P | Potentially Defamation | 6.40 |
| | | 10.20 |

# EXHIBIT 10

**NAVIGATORS V. SVO FEE REVIEW**
**Re: Murphy Austin Adams Schoenfeld LLP**
**Fees and Costs Billed**

| Statement Date | Invoice | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|---|
| **Pre March 24, 2021** | | | | |
| 8/12/2019 | 975831 | $91,668.50 | $1,608.74 | $93,277.24 |
| 9/18/2019 | 976596 | $87,166.50 | $9,006.90 | $96,173.40 |
| 10/10/2019 | 977212 | $85,017.00 | $1,223.30 | $86,240.30 |
| 11/13/2019 | 977930 | $83,269.00 | $3,825.88 | $87,094.88 |
| 12/5/2019 | 978436 | $116,783.50 | $2,489.34 | $119,272.84 |
| 2/12/2020 | 979855 | $61,500.50 | $27,453.98 | $88,954.48 |
| 2/12/2020 | 979856 | $0.00 | $65.65 | $65.65 |
| 3/10/2020 | 980413 | $17,962.50 | $7,366.62 | $25,329.12 |
| 3/10/2020 | 980414 | $206.00 | $0.00 | $206.00 |
| **Pre March 24, 2021 Total** | | **$543,573.50** | **$53,040.41** | **$596,613.91** |
| **Grand Total** | | **$543,573.50** | **$53,040.41** | **$596,613.91** |

**NAVIGATORS V. SVO FEE REVIEW**
**Re: Morris James LLP**
**Fees and Costs Billed**

| Statement Date | Invoice | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|---|
| **Pre March 24, 2021** | | | | |
| 3/19/2019 | 535185 | $1,860.00 | $0.00 | $1,860.00 |
| 4/15/2019 | 536243 | $8,615.00 | $0.00 | $8,615.00 |
| 5/14/2019 | 537252 | $1,470.00 | $0.00 | $1,470.00 |
| 11/18/2019 | 544441 | $397.50 | $0.00 | $397.50 |
| 3/16/2020 | 549407 | $115.50 | $0.00 | $115.50 |
| **Pre March 24, 2021 Total** | | **$12,458.00** | **$0.00** | **$12,458.00** |
| **Grand Total** | | **$12,458.00** | **$0.00** | **$12,458.00** |

**NAVIGATORS V. SVO FEE REVIEW**
**Re: Law Office of Sean DeBruine**
**Fees and Costs Billed**

| Statement Date | Invoice | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|---|
| **Pre March 24, 2021** | | | | |
| 12/4/2018 | 20181204 | $2,760.00 | $0.00 | $2,760.00 |
| 1/8/2019 | 20190108 | $30,615.00 | $0.00 | $30,615.00 |
| 2/6/2019 | 20190206 | $14,365.00 | $0.00 | $14,365.00 |
| 3/6/2019 | 20190306 | $33,072.00 | $500.00 | $33,572.00 |
| 4/5/2019 | 20190405 | $22,230.00 | $0.00 | $22,230.00 |
| 5/6/2019 | 20190506 | $10,440.00 | $0.00 | $10,440.00 |
| 6/14/2019 | 20190614 | $37,440.00 | $70.00 | $37,510.00 |
| 7/8/2019 | 20190708 | $12,420.00 | $0.00 | $12,420.00 |
| 8/5/2019 | 20190805 | $21,660.00 | $0.00 | $21,660.00 |
| 9/13/2019 | 20190913 | $8,880.00 | $0.00 | $8,880.00 |
| 10/15/2019 | 20191015 | $21,120.00 | $0.00 | $21,120.00 |
| 11/4/2019 | 20191104 | $18,240.00 | $0.00 | $18,240.00 |
| 12/5/2019 | 20191205 | $24,540.00 | $0.00 | $24,540.00 |
| 3/1/2020 | 16 | $12,480.00 | $0.00 | $12,480.00 |
| **Pre March 24, 2021 Total** | | **$270,262.00** | **$570.00** | **$270,832.00** |
| **Grand Total** | | **$270,262.00** | **$570.00** | **$270,832.00** |

**NAVIGATORS V. SVO FEE REVIEW**
**Re: Gordon & Rees LLP**
**Fees and Costs Billed**

| Statement Date | Invoice | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|---|
| **Pre March 24, 2021** | | | | |
| 3/5/2020 | 20758044 | $27,033.00 | $113.68 | $27,146.68 |
| 6/7/2020 | 20795661 | $110,819.50 | $0.00 | $110,819.50 |
| 9/18/2020 | 20840908 | $109,160.00 | $7,109.29 | $116,269.29 |
| 12/15/2020 | 20880394 | $115,448.50 | $71,048.74 | $186,497.24 |
| 3/15/2021 | 20918793 | $2,466.00 | $16,577.31 | $19,043.31 |
| **Pre March 24, 2021 Total** | | **$364,927.00** | **$94,849.02** | **$459,776.02** |
| **Grand Total** | | **$364,927.00** | **$94,849.02** | **$459,776.02** |

**NAVIGATORS V. SVO FEE REVIEW**
**Re: Tyson and Mendes LLP**
**Fees and Costs Billed**

| Statement Date | Invoice | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|---|
| **Pre March 24, 2021** | | | | |
| 12/28/2020 | 69380 | $53,392.50 | $0.00 | $53,392.50 |
| 1/6/2021 | 69624 | $0.00 | $10,000.00 | $10,000.00 |
| 1/19/2021 | 70077 | $113,883.00 | $0.00 | $113,883.00 |
| 2/25/2021 | 71980 | $212,739.50 | $1,882.30 | $214,621.80 |
| 3/19/2021 | 72765 | $119,304.00 | $388.80 | $119,692.80 |
| 4/29/2021 | 74764 | $121,819.00 | $8,858.54 | $130,677.54 |
| **Pre March 24, 2021 Total** | | **$621,138.00** | **$21,129.64** | **$642,267.64** |
| **Post March 24, 2021** | | | | |
| 4/29/2021 | 74764 | $40,670.50 | $1,035.00 | $41,705.50 |
| 6/8/2021 | 76222 | $207,044.00 | $3,530.71 | $210,574.71 |
| 7/9/2021 | 77565 | $194,998.50 | $12,763.85 | $207,762.35 |
| 8/23/2021 | 79821 | $273,175.50 | $17,652.04 | $290,827.54 |
| 8/30/2021 | 80276 | $352,267.00 | $13,480.05 | $365,747.05 |
| 10/18/2021 | 90149 | $250,361.00 | $4,272.58 | $254,633.58 |
| 11/18/2021 | 91756 | $205,081.50 | $9,381.78 | $214,463.28 |
| 12/20/2021 | 93312 | $246,283.50 | $4,760.51 | $251,044.01 |
| 1/18/2022 | 94549 | $240,190.00 | $3,440.18 | $243,630.18 |
| 2/7/2022 | 95662 | $279,066.00 | $3,795.92 | $282,861.92 |
| 3/30/2022 | 98380 | $879.38 | $7,817.91 | $8,697.29 |
| 5/4/2022 | 100030 | $0.00 | $42,929.14 | $42,929.14 |
| **Post March 24, 2021 Total** | | **$2,290,016.88** | **$124,859.67** | **$2,414,876.55** |
| **Grand Total** | | **$2,911,154.88** | **$145,989.31** | **$3,057,144.19** |

**PROOF OF SERVICE**

*Navigators Spec. Ins. Co. v. SVO Building One, LLC*
U.S.D.C., Northern District, Case No. 3:22-cv-07102-AMO

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071. My email address is Shannon.Santos@wilsonelser.com.

On October 15, 2025, I served the foregoing document described as **NAVIGATORS SPECIALTY INSURANCE COMPANY'S INITIAL EXPERT WITNESS DISCLOSURES** on the interested parties in this action by sending a copy via e-mail to the electronic addresses included below:

Shawn Shaffie, Esq.
Bruce T. Smyth, Esq.
PARKER SHAFFIE LLP
800 W. 6th Street, Suite 500
Los Angeles, California 90017
Tel.: (213) 622-4441
Fax: (213) 622-1444
Email: shaffie@parkershaffiellp.com
smyth@parkershaffiellp.com
*Attorneys for Defendant/ Counterclaimant SVO Building One, LLC*

Steven W. Murray, Esq.
STEVEN W. MURRAY, APC
14930 Ventura Blvd., Suite 205
Sherman Oaks, California 91403
Tel.: (818) 501-2277
Email: swm@psilaw.com
*Attorneys for Defendant/ Counterclaimant SVO Building One, LLC*

☒ **BY ELECTRONIC SERVICE:** I electronically served the foregoing document in PDF format to the person at the electronic service addresses listed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 15, 2025 at Los Angeles, California.

Shannon L. Santos

# EXHIBIT "7"

CERTIFIED COPY

Express Deposition Services
by ExpressNetwork

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Navigators Specialty Insurance Company vs SVO Building One, LLC

Andre Jardini - Expert

November 18, 2025

Laurie A. Schmidt, CSR No. 12719, Job No. 11711

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br>Plaintiff,<br>v.<br>SVO BUILDING ONE, LLC<br>Defendant. | Case No. 3:22-CV-07102-AMO |
| AND RELATED CROSS-ACTION | |

VIDEOCONFERENCE DEPOSITION OF

ANDRE JARDINI - EXPERT

TUESDAY, NOVEMBER 18, 2025, 9:27 A.M.

Reported by Laurie A. Schmidt, CSR No. 12719

Job #11711

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY, Plaintiff, v. SVO BUILDING ONE, LLC Defendant. | Case No. 3:22-CV-07102-AMO |
| AND RELATED CROSS-ACTION | |

VIDEOCONFERENCE DEPOSITION OF ANDRE JARDINI, EXPERT, taken on behalf of the Defendant and Counterclaimant, commencing at 9:29 a.m., Tuesday, November 18th, 2025, remotely, via Zoom, before Laurie A. Schmidt, Certified Shorthand Reporter No. 12719.

Job No.: 11711

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF NAVIGATORS SPECIALTY INSURANCE COMPANY:

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
BY: SHANNON L. SANTOS, ESQ.
555 South Flower Street
Suite 2900
Los Angeles, California 90071
(213) 443-5100
Shannon.Santos@wilsonelder.com

FOR THE DEFENDANT AND COUNTERCLAIMANT SVO BUILDING ONE, LLC:

PARKER SHAFFIE LLP
BY: BRUCE T. SMYTH, ESQ. (SBN 89171)
800 West 6th Street
Suite 500
Los Angeles, California 90017
(213) 622-4441
smyth@parkershaffiellp.com

ALSO PRESENT: Brad Bissegger, Videographer

# I N D E X


| DEPONENT: ANDRE JARDINI, EXPERT | PAGE: |
|---|---|
| EXAMINED BY MR. SMYTH | 6 |


## E X H I B I T S


| EXHIBIT NOS.: | | PAGE: |
|---|---|---|
| EXHIBIT 6: | NOTICE OF VIDEO DEPOSITION OF EXPERT WITNESS ANDRE JARDINI | 7 |
| EXHIBIT 7: | Expert Documents (N10515-N10519) | 11 |
| EXHIBIT 8: | NAVIGATORS SPECIALTY INSURANCE COMPANY'S INITIAL EXPERT WITNESS DISCLOSURES | 13 |
| EXHIBIT 9: | Buss v. Superior Court 16 Cal.4th 35 (1997) | 26 |
| EXHIBIT 10: | Navigators' Document Production (redacted) (N03168-N03170) | 40 |


QUESTIONS INSTRUCTED NOT TO ANSWER:

PAGE LINE

(None.)

VIA ZOOM VIDEOCONFERENCING;

TUESDAY, NOVEMBER 18, 2025; 9:27 A.M.

THE VIDEOGRAPHER: Okay. My name is Brad Bissegger. I am a videographer associated with Express Deposition Services.

Today's date is November 18th, 2025, and the time is 9:27 a.m. Pacific Standard Time.

This deposition is being taken via Zoom in the matter of Navigators Specialty Insurance Company versus SVO Building One, LLC, and related cross-actions, in the United States District Court, Northern District of California. Case Number 3:22-CV-07102-AMO.

This is the videotaped deposition of Andre Jardini. This deposition is being taken on behalf of the Defendant and Counterclaimant.

Will Counsel please introduce themselves for the record?

MR. SMYTH: Bruce Smyth of Parker Shaffie LLP, Counsel for SVO Building One, LLC.

MS. SANTOS: Shannon Santos for Navigators Specialty Insurance Company.

MR. SMYTH: Thank you.

Will the court reporter please swear in the witness?

CERTIFIED SHORTHAND STENOGRAPHER: Certainly.
Thank you.

(ANDRE JARDINI,
EXPERT WITNESS
Deponent, was sworn and examined
and testified as follows:)

CERTIFIED SHORTHAND STENOGRAPHER: Do you solemnly state that the testimony that you shall give in this matter shall be the truth, the whole truth, and nothing but the truth, so help you God?
MR. JARDINI: I do.
CERTIFIED SHORTHAND STENOGRAPHER: Thank you.
I will state, my name is Laurie Schmidt. I am a Certified Shorthand Stenographer. My License Number is 12719.
Counsel, you may proceed.
MR. SMYTH: Okay.

EXAMINATION

BY MR. SMYTH:
Q. Mr. Jardini, could you just give your full name for the record, please?
A. My full name is Andre, middle name Emilio,

E-m-i-l-i-o, last name Jardini, J-a-r-d-i-n-i.
Q. Mr. Jardini, you are testifying as an expert witness on behalf of the Plaintiff Navigators in this case; is that correct?
A. That is correct.
Q. Okay. I know you've had your deposition taken probably over a hundred times. Can I dispense with the admonitions?
A. I'm perfectly fine with that, if you choose to do that.
Q. Okay. Are you under any medication or suffering from any condition that would prevent you from giving your best testimony today?
A. No.
MR. SMYTH: Okay. Okay. I'd like to bring up as Exhibit Number 1 the Notice of Deposition in this matter.
MS. SANTOS: Are we going to mark this as Exhibit 6?
MR. SMYTH: Yes.
(Exhibit 6 was marked for identification and is attached hereto.)
Q. BY MR. SMYTH: Mr. Jardini, were you provided a copy of this notice of deposition?
A. Yes, I was.

MR. SMYTH: Okay. Okay. If we could go to the document request in this. I'd like you to draw your attention to the Request No. 1.
Q. Have you provided a copy of the resum  or CV of any person employed or retained by you who assisted you in any way in connection with this matter?
A. I provided my CV attached to my report. There's no other CV that exists concerning any other person.
Q. Okay. Were there employees or staff who assisted you in preparing the report?
A. Yes.
Q. Okay. And who were they?
A. My auditors, principally, Karen Smith -- I'm sorry. Karen Scott -- my goodness. Karen Scott and Lila Rosenberger, and then, Assistant Auditors, Kim Galloway and John Murphy.
Q. Okay. What does -- or strike that.
Does Karen Scott have a position with your company?
A. She's an auditor, full-time, all the time.
Q. Okay. Does she have a law degree?
A. No.
Q. Okay. And how about Lila Rosenberger?
A. How about -- what about her?
Q. Does she -- what is her position?

A. She's an auditor.
Q. And does she have a law degree?
A. No.
Q. Okay. And what is Kim Goldberg's [sic] position?
A. Assistant auditor.
Q. Okay. The -- actually, let me -- let me move down to the next request, which was -- asks for [as read]:

"All court orders, issued in any case in which you were retained as an expert determining that any of your opinion or testimony was not admissible or where the court limited your opinion or testimony in any way."

Do you have any documents in response to that request?
A. I do not.
Q. Okay. Let me ask you, are there any court orders in your possession where you were -- where it was determined that your testimony was not admissible or where the court limited your opinion?
A. I'm not aware of any opinion not admitting my testimony. I don't know how to deal with limiting the remaining part of your question about limiting my testimony. I'm not sure what you're asking. I've been allowed to testify in every case in which I've been

Q. A subsequent bill will be prepared of the additional time; is that right?
A. That's my expectation.
Q. Okay. Now, there is a listing in the Timekeeper Summary, "JARDINI, A E Director," and it says 23.60 hours.
Does that reflect the time that you had spent on this matter as of the time of that invoice being prepared?
A. Yes.
Q. Okay. And the rest of the hours, let's see, of the total of 173.70 -- well, let me rephrase that.
A total of 173.7 hours were spent on the project as of the time of this billing?
A. Yes, that's correct.
Q. Okay. And all the time, other than 23.60 hours, was spent by the non-attorney personnel employed by KPC; is that right?
A. Yes, I had the benefit of their work.
MR. SMYTH: Okay. Now, you prepared -- and let's -- actually, let's go -- exhibit next in order, will be -- and we're going on hold onto this one, but we might as well make another exhibit, is the Initial Expert Witness Disclosures. I would like to make that as Exhibit Number, I believe it's "8."

Q. Okay. Now, when these outlines were prepared, did you provide Karen Scott or any other auditors instructions as to how they were to be prepared?
A. An outline of services is a basic schedule that we prepare in every audit. I've been retained in audits more than 1,900 times, 40 or 50 times a year. In every single case, an auditor prepares an outline of services. It serves numerous important functions. It makes the review of the invoices more readily ascertainable and transparent, and it doesn't require separate instruction. These are functions that these auditors do every day, all day, and in Karen Scott's case, for more than 20 years.
Q. Okay. And in doing that -- well, let me back up a little bit.
If you look at the one that we've talked about, the "P" there, it says "Timekeeper," and there are three timekeepers listed.
Do you see that?
A. I do.
Q. Okay. Now, first, how does Karen Scott, or whoever is preparing the outline, know how to amalgamate time from various time entries into a summary of multiple time entries?
A. The function of an auditor in this part of their

differently -- it's a preponderance of the evidence.

Q. Okay.

A. That's 51 percent, you know, preponderance.

MR. SMYTH: Okay. Okay. Well, let's -- while we're on this, I would like to call up the next exhibit, which I guess will be No. 9, which is the Buss case.

(Exhibit 9 was marked for identification and is attached hereto.)

MR. SMYTH: Okay. And could you go to -- this is going to be a little difficult. Go to Page 53 in the case, which is a good ways down. Yeah. No, you've got to be back. I believe it's on Page 10 of this document.

Q. Okay. So, Mr. Jardini, I want to draw your attention to the entry under Sub-Section C, at Page 10 of this exhibit. And let me just read it.

The first two paragraphs it says:

"The second question, which follows from the first, is this: In a 'mixed' action, for what specific defense costs may the insurer obtain reimbursement from the insured?"

And next paragraph reads:

"The answer is: Defense costs that can be allocated solely to the claims that are not even potentially covered."

Is that what you understand to be the standard

for the allocation of costs in a mixed action under Buss?

A. The general overview, and then, in making that determination, the burden is the preponderance of the evidence.

Q. Okay. And let me ask a preliminary fact that it -- the language in there refers to a mixed action.

Do you understand a mixed action under Buss is an action in which there are both potentially covered and potentially uncovered causes of action?

A. Yes, mixed would mean that there are parts of the case that should not have been paid by the insurance company, if they can show that they're -- that they're not one of the covered --

Q. Okay. Now, the statement in this that says:

"Defense costs that can be allocated solely to the claims that are not even potentially covered."

Do you have an understanding under Buss that you should look to the cost first in making the allocation, and not to dividing up by claim?

MS. SANTOS: Objection. Calls for a legal conclusion.

THE WITNESS: I'm not sure what you're asking. If you're talking about costs, like court

reporter fees, experts, and so on, I don't -- that's a disconnect for me.
MR. SMYTH: Okay. Let me -- let me rephrase it.
Q. Do you -- do you have an understanding that under this standard in Buss, that one looks at an individual time entry to determine whether it can be allocated solely to claims that are not even potentially covered?
MS. SANTOS: Objection. Calls for a legal conclusion.
THE WITNESS: The methodology can be whatever is reasonable in terms of deciding that. As I say, a jury could decide one out of 18. They're entitled to do that based on a case where one potentially covered claim exists, and 17 clearly not covered claims exist. It is not specified that it be done in any particular way.
We do look at the billing entries in order to have more particular information about the case as a whole, but it's not militated that it be one approach versus another.
So, that's the best I can answer that.
Q. BY MR. SMYTH: Okay. Is it correct to say that dividing up the claims by covered and non-covered, and then, assessing which expenses go in each category, is acceptable under the Buss case, in your view?
A. Whatever evidence is persuasive as a

preponderance of the evidence, that is admitted and is considered by the jury, is appropriate. And that would be one way to do it. That's not the way I did it, but it is certainly a factor that could be considered because this is a case in which the immensity of the litigation was totally unrelated to defamation, and it would be an over-statement, frankly, in my mind, to have one out of 18 hours be compensated.

Q. So, let me see if I understand.

I understood that you had divided them up by covered and uncovered, and then, evaluated which ones were potentially covered and which ones were not potentially covered.

Did you use a different methodology than that?

A. I'm not sure what you're asking. Only defamation was covered. The defense was triggered by the personal injury coverage of defamation, as stated in the insurance policy. That's why they defended. The case was principally about many, many other things, many other things much more complicated that required many, many more services by the lawyers than anything related to defamation, which was thought of as such a weak claim that it was dismissed by the Claimants at a critical juncture.

So, there's only one potentially covered claim,

and most of the work was done on things that weren't that covered claim.

Q. Okay. Is it correct to say then that you -- in going through the determination as to what was covered or not covered, you determined which expenses were -- you believed -- well, let me rephrase that.

Is it correct to say that in doing your review, you looked at particular expenses, and then, determined whether they had any relation to the covered claim of defamation; is that the approach?

A. I didn't look at expenses, I looked at fees, and in looking at fees, to answer what I think is the import of your question, I determined whether or not in the real world it had, more likely than not, a relationship to a defamation claim. And if it didn't, I decided that it wasn't part of the defamation defense.

Q. Okay. Now, the statement in this -- in the case that, "Defense costs that can be allocated solely for the claims that are not even potentially covered," is that a different standard than the one you applied in determining which fees related to defamation?

A. No.

Q. It's not. Okay. So, let's take the example of a billing entry for an, you know, undifferentiated task, like "Attend deposition," if it said something like

that, is it correct, you would allocate that as not relating to defamation?

A. Yes. Because in the circumstances of this case, it's more likely than not that it was not related to defamation.

Q. Okay. What if the case -- or what if the deposition involved questioning on defamation, would that change your view?

A. I'd have to see what the questioning actually was, and if somebody came forward with that, I would take new information into account, and maybe the field would shift by five or six hours. That's what we're talking about.

Q. Okay. And are you of the view that the determination as to whether the questioning involved defamation is something that is not the burden of the insurer?

A. That's a legal question. I will tell you this: That in allocation work by any auditor, and well accepted in the audit community, you don't parcel out defamation testimony line by line, you have to make a rather more broad determination. Nor can you go through interrogatories line by line, and the like. That level of micro-scrutiny does not help the analytical process. In fact, it hinders it. And so, that someone would come

forward and say the word "defamation" was said on Page 98 of a 200-page deposition, that doesn't move the needle.

Q. Okay. When you have conducted fee audits in the past, the last 10 years, can you give an estimate as to what proportion would be for insurers, as opposed to policyholders?

A. The principal of people that retain me are lawyers; they're involved in lawsuits. I'm involved right now in Epic Games versus Google, in a $170 million fee claim. That's not insurance at all. Most cases don't involve insurance. And the lawyer that retains me may be a lawyer that represents an insurer or maybe a lawyer that represents an insured, but insurance being involved is a -- is a smaller proportion of my total work, if you look at the whole of it.

So, breaking it down by which side, insurer versus insured, isn't very meaningful in the work that I do because I've been on both sides repeatedly.

Q. Okay. Of the cases that involve a policyholder on one side, and an insurance company on the other side, do you know what proportion you represented -- or rather, your services were retained on behalf of the policyholder, as opposed to those on behalf of the insurer?

THE WITNESS: It sounds like a legal question to me. I'm not here to --
MS. SANTOS: And --
THE WITNESS: -- interpret the policy.
MS. SANTOS: And I spoke over the expert, saying, "Objection, legal conclusion."
CERTIFIED SHORTHAND STENOGRAPHER: Thank you.
Q. BY MR. SMYTH: Well, do you have an understanding as to whether disparagement is listed in the policy as one of the covered offenses under personal and advertising injury coverage?
A. That's -- again, it's a legal question. I've cited the language, defamation was alleged, a defense was picked up based on that basis.
Q. Okay. In order to know whether there was a duty to defend on the part of Navigators, wouldn't you have to know what the potentially covered causes of action or claims in a lawsuit entailed?
MS. SANTOS: Objection. Outside the scope of his retention. Calls for a legal conclusion.
THE WITNESS: Yeah, that's a legal conclusion, that question, and asking for a coverage opinion, and in the somewhat irrelevant area of duty to defend, which is not what I'm talking about in my testimony. So, I really don't want to get involved in that.

or disparagement; it's a claim for damages for interference with a contract.

In any event, that is a coverage issue that you have to debate with your opposing Counsel, and not seek an answer from me about, because I'm not here to provide that kind of testimony.

Q. Okay. Well, in determining the fees that were allocable to potentially covered and potentially non-covered claims, is it correct that you did not evaluate any fees that might have been incurred as covered in defense of an allegation of disparagement?

A. I looked at the entirety of the invoices. Any aspect of them that had to do with defamation, there's nothing specific to disparagement in those invoices, as you're suggesting something that doesn't exist, and I reviewed them in their totality against the backdrop of the case as it existed as to entry by entry whether it, more likely than not, related to defamation or to something else.

Q. When you said you looked at the entirety of the invoices, did you look at each individual entry?

A. I generally do look at the invoices, and I think I did. I don't recall specifically, but my auditors review every line with care in doing their work and preparing the outline of services, which is a very

stated by invoice date and date in complete detail as to all of the five or six firms involved.

Q. Okay. Is it correct that the totals in Paragraph 42 were not based on a calculation that you made?

A. I don't recall. I have assistant auditors that do the total fees and costs billed analysis, and I was probably provided with a number, so that's the best I can tell you.

Q. Okay. Okay. Let's go to Paragraph 45 of your report. And the line is first:

"Here, it is undisputed that 17 of the 18 claims in the underlying action were not subject to coverage under the relevant insurance policy."

Would you agree that Mr. Murray's letter disputed that?

A. I guess you could review that as a position taken by him. I don't think there's anything seeking damages for reputational harm, other than the defamation count, based on the complaint that I saw. So, I thought it would be undisputed, but apparently, he has different thoughts.

Q. Okay. And let's go to Paragraph 46. It says:

"I have reviewed carefully the billing records of the firms that defended SVO."

things we have to do in order to have a fair interpretation of the document to do the analysis correctly.

Also, you'd be stymied by all the modest entries for review e-mail from Bob, send e-mail to Tony. This gives you no information whatsoever that allows for an appropriate allocation, but if you batch the time by litigation event, identifiable litigation event, recognizes that litigated matters go through a process where those particular events can be described and isolated and batched as to time, you can make one decision as to 25 entries, instead of 25 separate decisions, which is not only burdensome, but enhances the possibility of mistakes.

So, doing it the way we do it is better, more efficient, more transparent, and allows for clarity in the decision-making. Doing it line by line is just entering into a mud hole and coming out with an answer and I thinking it's the right answer. It doesn't help the process.

Q. Well, isn't it true that your categorization of multiple entries is not based on any specific determination under the Buss case?

A. I don't know what you're asking. I have no --

[Simultaneous discussion.]

it, that allows for the process to develop meaning and doesn't get bogged down in every stray entry that's made on the invoice.

Q. Do you know what percentage of invoice entries were not included in the outlines?

A. We list at the end of the outline the total hours on the outline, and you can compare it to the total hours billed, and you would define that readily. I don't have -- it's five or six different firms, it's probably five or six different answers.

Q. Now, let's -- I think I gave an example of -- earlier, and I want to go back to it, of attending a conference with the arbitrator.

And would you agree that somebody defending a defamation claim would have to attend a conference with the arbitrator as part of the defense of that claim?

A. Yes, the question is, was that -- was that event about defamation in any way, shape, or form, and I opted, even though it's very likely that it isn't going to be mentioned in that kind of conference in this case, I did opt to include that in the -- in the defamation-related -- very broadly stated defamation-related category.

Q. Well, let me ask you the question, though. Would a -- an arbitration conference is scheduled. Would you

agree that somebody defending a defamation claim would have to attend that conference?

A. That's a, kind of, duty-to-defend kind of analysis.

Here, we are looking at whether it's more likely than not that it related to defamation, and the answer to that is, it's very unlikely that they're separately discussing defamation.

I included it anyway, in an abundance of caution, as a -- as a part of defamation, distantly defamation-related categories, that is, meeting with the arbitrator, but not on the basis that you're stating that you're there for the whole case, therefore, you're there for defamation. That's a duty-to-defend-type analysis that has no place in what we're doing here.

Q. You would -- the question I have, or the issue of whether the attorney has to defend some general conference, or not, does -- you believe that that does not go to the issue of whether the expense for that can be solely allocable to non-covered claims?

A. In all likelihood -- remember, the issue is more likely than not. In all likelihood, it's not related to that, but I permitted it, in any event. So, it's a bit of an academic question.

Q. Let's look at Exhibit 8 to your report. Let's go

to that.
MS. SANTOS: It's Page 52 of the PDF.
MR. SMYTH: It's Exhibit 8. Let's see. Yes.
Q. Okay. Let me -- let's go to the next page. And I would like to draw your attention to the entry at "5/20/2020 Conference call with arbitrator Fisher."
Do you see that?
A. Yes.
Q. Okay. That is not listed with your -- either your "P" or your "D" designation.
Do you know why that is?
A. Yeah, I made a mistake. It should be.
So, if you add 5.7 hours, you're still well short of the three percent of my opinion.
Q. Okay. Now, let's look at -- let's look at Page 4 of 9, and there's an entry there, "Review and analysis of documents in preparation for discovery and production," and it's 26.9 hours. Now -- and it's not -- it's not marked.
How can you determine whether the review and analysis of documents in that circumstance is solely allocable to potentially non-covered claims?
A. So, you're addressing a notion that could it be possible that one second of that time was spent in connection with something that might be distantly

related to defamation.

I'm looking at it in the context of a case in which defamation was dismissed voluntarily; meaning, it's not an important part of the case; that it was only one of 18 claims, and that that discovery, more likely than not, was related to things not defamation.

And so, under that kind of an analysis, the preponderance-of-the-evidence-type analysis, it's extremely unlikely, and that puts it, you know, below the 51 percent on preponderance of evidence.

Q. So, when you are evaluating whether an expense is solely allocable to non-covered claims, you're applying a standard of whether it's more likely than not that it's not covered; is that right?

A. Right. There's the standard, and then, there's the burden of proving that standard. And the burden of proof is 51 percent, or 50.1 percent, as some people argue, or less than that even.

And so, in this case, involving trademark, intellectual property, trade secrets, involving complicated business transactions, the clear likelihood is, this is not related to defamation, and I think that's a fair conclusion.

Q. So, in this particular case, if there were 50 pages that dealt with allegations relating to

Q. Okay. Were you aware of any -- or strike that.
Did you -- was there any costs incurred with respect to the defense of allegations of disparagement in the post-March 24, 2021 time period?
A. There was no claim for damages for reputational harm in the complaint under any claim after the defamation claim was dismissed, even in the intentional interference with contractual relations. That's not a -- that's not a reputational harm claim.
Q. Okay. We'll go back to that later.
Now, in preparing the various exhibits that were the outlines of services, which you included services up to March 24, 2021, when did you start those calculations? You know, which time period did you begin those calculations?
A. I think the outlines will reflect that there's a -- there's a tender date, that's one issue, and then, there's the non-recoverable period that we were informed about. So, we applied those dates.
Q. Okay. What date did you use as the tender date?
A. I don't remember exactly. It's reflected in the records somewhere.
Q. Okay.
A. But we were aware of the tender date, and then, the period during which there was non-cooperation, which

was going to be defined as the non-recoverable period.

So, for instance, the Murphy Austin review started at -- at least on the outline of services, as July 1. You can look at the invoice list to see the exact invoice that is involved, and hence, Sean DeBruine started November 12, Morris James started February 5th, 2019. I should tell you the year, I suppose. This is on the outline of services.

The outline of services for Gordon & Rees started December 30th, 2019.

The outline of services for Tyson & Mendes started November 3rd, 2020.

And again, if you want to see the invoices that were reviewed, they're all listed out by date on Exhibit 10.

Q. Okay. Let's go to Exhibit 5, the Murphy Austin fees?

A. Okay.

Q. First page.

A. Okay. I'm there.

Q. Okay. Brad, can you -- yeah, I just want to -- okay.

Now, I have a tender date of July 24, 2019.

If my date is, in fact, correct, the first 14 entries were prior to the tender date.

A. Okay.
Q. Do you have any reason to question the tender date of July 24, 2019?
A. I mean, I don't think you would tell me the wrong date.
Q. Okay.
A. But I just don't happen to know the date, but somewhere in the file materials the date is stated.
Q. Okay. And do you have an understanding that Navigators did not pay for defense fees prior to the tender date?
A. Yeah, that's customary. I didn't review that in detail certainly, but obviously, there's no obligation to defend until there's a tender. I mean, that's just black letter principles that apply.
Q. Okay. So, at least as to Murphy Austin, that cuts out probably well over a hundred hours.
As to --
A. Well, it was counted by me, and they're getting three percent of that. So, bank error in your favor.
Q. That's an interesting way of putting it. I don't think I agree, but okay.
Let's go to -- on, Morris James, it basically -- if you use the correct tender date, it excludes virtually all of those fees, if you look at Exhibit 6.

A. Okay.
Q. Okay. And if you look at Exhibit 7, it excludes seven of the entries, all of which are in 2018 on the Sean DeBruine fees; is that right?
A. There are entries before the date of July 24, 2019.
Q. Okay. Now, do these outlines -- or strike that.
It's correct that these outlines do not necessarily include the fees that Navigators paid; is that right?
A. The outlines are information taken from the invoices themselves. The invoices from which they're taken are listed on Exhibit 10. The amounts paid, as it turns out I now know, were from interrogatories that Navigators answered under oath.
So, my Paragraph 42, as to the amounts paid, are the amounts paid as detailed in answers to your discovery.
So, whether those should be the same or different, I don't have an answer for you, but what we looked at is the Exhibit 10 invoices, and produced the outlines of services, which you've been going through.
Q. But it's correct though that the outlines of services include time periods for which Navigators did not reimburse?

A. I don't know that for sure because I haven't lined up payments according to dates. You've shown me a few entries here and there, where pretender entries appear on our outline of services, they also appear on the invoices.

You're suggesting that that wasn't paid. Okay, it wasn't paid. But if that's the case, it doesn't change my opinion.

Q. Now, you know, you testified earlier that not all of the time entries in the bills were included in your outline of services performed.

How was the determination made as to which time entries would be included in the outlines and which ones would not?

A. All time entries which relate to an identifiable legal service are included, and batched to be put in one place. If it's a minor entry, telephone call, short letter, e-mail, that doesn't refer to any particular litigation service that's been rendered, it's not included because to include it is simply to regurgitate the bill, and this is meant to be a tool that permits analysis and extrapolation, and there's no point in putting a stray e-mail onto the outline of services, and so it's not included. That's part of the normal procedure. You don't end up with a hundred percent of

defamation.

Q. Let's go to -- on the Murphy Boston bills, let's go to the last page on those, which is 6 of 6 of this exhibit. Now -- I think you overshot it just a little bit. I think we're on Exhibit -- yeah.

THE VIDEOGRAPHER: Which exhibit is it? Is that it?

MR. SMYTH: Yeah, there we go. Oh, wait a second. No, maybe -- that's 7.

MS. SANTOS: Murray Austin is Exhibit 6 of his report.

THE VIDEOGRAPHER: You said Exhibit 6?

MS. SANTOS: Sorry. Murray Austin is Exhibit 5.

MR. SMYTH: I misspoke. I think it's "5."

THE VIDEOGRAPHER: Okay.

MR. SMYTH: Okay. Great.

Q. Now, the last entry on that is:

"Communication and emails re transfer of file to Gordon."

Now, you understand that this is the, basically, time, and it's 35.40 hours that was spent transferring the files in the case for Murphy Austin, who is the panel Counsel -- excuse me -- from Murphy Austin to the panel Counsel Gordon Rees; is that right?

A. They're transferring the file, they say, to

Gordon, but that's got to be Gordon & Rees.

Q. Okay. Now, wouldn't that task relate to all of the causes of action that are being defended, including defamation?

A. That task is the transfer of the file, and it's more likely than not that it is not separately related in any way to defamation. It's simply, here's the file, we're set for arbitration on such and such a date, you know, they're not saying beware of the defamation claim.

I mean, there's no indication there that that would be anything more than normal transfer, and it's more likely than not that it doesn't relate to defamation.

Q. Well, if defamation is one of the claims that's being defended, why would it not be included in the transfer of the file to Gordon Rees?

A. The total file was transferred, but you're approaching it on a duty-to-defend-type basis. That's beside the point. The case is already being defended. You're saying, well, if it's -- if defamation appears somewhere in the stack of documents, therefore, you have to pay the whole amount.

This is the -- here, the burden of proof is preponderance of the evidence. The evidence in this case is that defamation is a minor claim, one of 18, and

it isn't specifically called out in any way in these entries by SAL over that one-week period in February of 2020.

So, it's more likely than not that it's basic transfer-type activity, and in no way, shape, or form specific to defamation. I think that's -- that's the fair way to look at that in the real world, not in the, does it invoke a duty to defend kind of way. This is really, what does the evidence show? What's -- where is the weight of the evidence? The weight of the evidence says, this doesn't relate to defamation.

Q. Okay. So, it's correct that your standard is whether it's more probable than not that there was a specific discussion of defamation in these communications in order for it to be --

A. No, that's putting several things together.

The standard is preponderance of the evidence, which is, more likely than not, as the standard, and then, the question becomes is this particular entry more likely than not related to defamation. And knowing everything you know about the case, the lawyers, what they're doing, and when and how they've described it, how does that come down, you know, on the -- is it on the 51 percent side or the 49 percent side?

Q. So, you're -- is it correct that you're saying

attorneys-eyes-only documents. Meaning, this is a trade secrets set of issues. So, no, in fact, it's almost certain that this doesn't relate at all to defamation, but to trade secrets and intellectual property.

Q. Well, isn't it true that the allegations involving trade secrets and violation of intellectual property can include allegations of defamation or disparagement?

A. That's not what they alleged. I mean, what could happen in a different world than this case, you know, I don't know, but that isn't what's alleged. They allege they were late in their work. There's very specific allegations. It doesn't have to do with these people spending, you know, 439 hours looking at attorney's eyes only documents in the way -- it's probably a complicated way that that was permitted to be done, which resulted in a lot of time and a lot of people being involved, but that's -- that's almost certainly not related at all to defamation. It's not just more likely than not, it's almost certainly not.

Q. Okay. Let's go to Page 9 of this exhibit, and there is an entry on 2/1/2021 through 2/8/2021:

"Continued preparation of arbitration brief, including case assessment, evidentiary issue and review complaint re defenses 56.70 hours."

Why would these tasks not include an, at least, review or assessment of the claim for defamation and the defenses to that?

A. My belief is that it's very likely that this did not involve, to any meaningful degree at all, or perhaps, at all, defamation. I mean, this is the defamation count that within a few short weeks would be dismissed. They've just spent hundreds of hours looking at trade secret documents in the previous period. They're looking at evidence -- evidentiary issues which wouldn't implicate defamation in any way, to my view, anyway. And so -- and they did spend a little bit of time early on, and I've noted that when they said they did, of defamation defenses, but the defenses here are likely not defamation defenses, given that this case is rolling toward an involved arbitration of a complicated business dispute involving intellectual property and trade secrets.

So, I think the weight of the evidence would be that this does not involve defamation.

Q. Okay. Did you review the brief, and the complaint, and the defenses to determine whether it was solely allocable to non-covered claims?

A. I reviewed the complaint, as I had mentioned earlier in my testimony. Pleadings in the case were not

A. Yes, in two ways. We did the word search of those -- for defamation, perhaps, other words. There wasn't anything that came up from that. And we looked at the services, in general, about preparing an outline of services, to ensure that they weren't picking up defamation in some other way, or discussing it, or litigating it, and they weren't.

Q. Do you know who, when you say "we," was looking at the services, in general, from your office?

A. Karen Scott would be eyes on those invoices.

Q. Okay. Let's go to your fee bill. I'll ask which exhibit that is.

MS. SANTOS: "7."

MR. SMYTH: Okay. Let's go to Exhibit 7 then.

Q. Are there any entries on Exhibit 7 that reflect the review of the post-March 24, 2021 fee bills?

A. Probably. I haven't gone back and looked through the invoice in its totality.

Q. Okay. Let's scroll down. Okay. Let's start here.

I'm looking for -- under the entries for Karen Scott, I don't see anything about review of entries for time after March 24, 2021. Do you?

A. Well, there's no dates in most entries.

Lila Rosenberger is reviewing and analyzing

invoices of Tyler -- Tyson & Mendes for significant work performed.

Are you saying that that's somehow limited to one period, instead of another? There's no dates, I don't know how you can make a blanket statement like that.

Q. Okay. I'm just asking you for which entries would reflect, if any, the review of time after March 24, 2021?

A. I don't know. I mean, you can see in each entry what they were doing, they say whose invoices they're looking at. That means invoices in their totality.

Q. Now, is it correct with respect to the determinations in your opinions that you did not consider whether there were fees allocable to the defense of the tort of disparagement?

MS. SANTOS: Objection. Mischaracterizes the prior testimony.

THE WITNESS: The complaint doesn't allege a tort of disparagement. It's mentioned, but only in connection with intentional interference with contractual advantage or with contract. It's not a separate standalone claim. There was no work done with regard to that particular point of an allegation in paragraph, whatever it is, 146.

So, there's a complete review of all of the

invoices for whether there is a relationship to defamation, "defamation" broadly cast. If you think disparagement is part of defamation, I think some people would, and analyzing each entry with regard to whether or not it relates principally to the non-covered claims, or might somehow relate to defamation, and an independent judgement is made line by line on the basis of what's really happening in the case, not, you know, an unlitigated line in paragraph 146.

Q. BY MR. SMYTH: So, that's a long answer, but is your response that you did not give consideration as to whether the tort of disparagement was potentially covered in doing the review of the attorney's fees bills?

MS. SANTOS: Objection. Mischaracterizes the prior testimony and the response.

THE WITNESS: I think I just answered that. You know, I would give you the same answer. It isn't alleged that tort, quote-unquote, and the rest of my answer flows from that.

Q. BY MR. SMYTH: Okay. So, your view is, the tort is not alleged, so you did not do that review; is that right?

A. No --

[Simultaneous discussion.]

defending them. You can't say they have no import or value.

At the end of the day, settlements are entered into for a host of reasons. Some of them economic, some of them with trade-offs that you're not mentioning.

And I don't have the settlement agreement in front of me, so it's really unfair to have you have me characterize who won what in the settlement.

They spent $5 million defending those claims. They're not nothing claims. They're worth at least $5 million of attorney's fees.

Q. In your review, is it correct that you did not review the non-attorney expenses incurred in the defense of SVO?

A. You mean costs?

Q. Costs.

A. It's not correct that we didn't review them. They are part of every invoice; at least the costs that were fronted by the lawyers. The cost would travel in the same atmosphere as the fees. Meaning, that if you had a maximum of three percent of the fees being non-reimbursable to Navigators, it's fair to conclude that three percent of the costs would follow in the same way, rough justice.

Q. Okay. Is it correct, though, that you did not

look at each cost in order to determine how it should be allocated?
A. I didn't make separate decisions on costs, other than that they should follow in the same proportion. They're not litigating in the cost arena defamation, anymore so than in the fee arena.
Q. And is it correct that you did not look at the expert fees to determine how those should be allocated?
A. I did, actually. I was informed and believe that none of the experts had anything to do with defamation, and that all of the amounts paid for the experts should be reimbursed to Navigators.
Q. And who --
[Simultaneous discussion.]
Q. I'm sorry.
A. Since they had nothing to do with defamation.
Q. Okay. Did you review those expert bills?
A. No, I did not.
Q. Okay. Did you review the consultant bills?
A. Well, most of the consultants were experts. You mean, document people or something like that? I'm not sure who you mean.
Q. Well, let's take -- well, let's take consultants who became experts. You didn't -- you didn't review those bills; is that right?

that referred to the review of the fees after --
A. I think --
Q. -- March 24, 2021?
A. -- what you see -- sorry.
CERTIFIED SHORTHAND STENOGRAPHER: Counsel, you went out in the middle of that sentence. I'm so sorry.
THE WITNESS: I talked too soon. My apologies.
MR. SMYTH: Did you miss my question?
CERTIFIED SHORTHAND STENOGRAPHER: I did.
MR. SMYTH: Okay.
CERTIFIED SHORTHAND STENOGRAPHER: The middle was cut out.
MR. SMYTH: Okay.
Q. My question is, did you see any entries in the bill that referred to the review of attorney's fees after the March 24, 2021 dismissal?
A. There are references to reviewing the claim file where the invoices were; there's references to reviewing the invoices without specificity as to date.
I can tell you that I did look at that time, not line by line. My auditors also looked at that time, and we did word searches for that time as well.
Q. Well, do you have some specific entries in mind as to where you had done that work?
A. No. I mean, where it says "Review invoices,"

that's probably where it is.
Q. Okay. And is it correct that there's no entry for the review of expert bills or invoices?
A. Well, there's, "Review claim file," and I don't recall if that would have included that. So, there's no specific entry that mentions experts or expert invoices.
MR. SMYTH: Okay. Okay. I don't have anything further.
THE VIDEOGRAPHER: Ms. Santos, before we go off record, did you need a copy of the transcript?
MS. SANTOS: Transcript, yes; video, no.
THE VIDEOGRAPHER: All right. Thank you.
This concludes today's deposition. The time is 2:15 p.m., the date is November 18th, 2025, and we're off the record.

(Whereupon the deposition proceeding was concluded at 2:15 p.m.)

I have read the foregoing deposition transcript and by signing hereafter, approve same.

Dated______________________.

________________________________
ANDRE JARDINI - EXPERT

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA )
)s.s.
COUNTY OF LOS ANGELES )

I, Laurie A. Schmidt, hereby certify:

I am a duly qualified Certified Shorthand Reporter, in the State of California, holder of Certificate Number CSR 12719 issued by the Court Reporters Board of California and which is in full force and effect. (Bus. & Prof. 8016)

I am not financially interested in this action and am not a relative or employee of any attorney of the parties, or of any of the parties. (Civ. Proc. 2025.320(a))

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the retrained was first placed under oath or affirmation by me. (Civ. Proc. 2025.320, 2025.540(a))

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given. (Civ. Proc. 2025.540(a))

I have not, and shall not, offer or provide any services or products to any party's attorney or third party who is financing all or part of the action without first offering same to all parties or their attorneys attending the deposition and making same available at the same time to all parties or their attorneys. (Civ. Proc. 2025.320(b))

I shall not provide any service or product consisting of the deposition officer's notations or comments regarding the demeanor of any witness, attorney, or party present at the deposition to any party or any party's attorney or third party who is financing all or part of the action, nor shall I collect any personal identifying information about the witness as a service or product to be provided to any party or third party who is financing all or part of the action. (Civ. Proc. 2025.320(c))

Dated: November 24, 2025

Laurie A. Schmidt

# EXHIBIT "8"

# Navigators v. SVO

Rebuttal Report of Kenneth M. Moscaret

November 5, 2025

# I. <u>INTRODUCTION</u>

1. This rebuttal expert report is submitted on behalf of Defendant and Counterclaimant SVO Building One LLC ("SVO") in response to the opinions, statements, and data in the October 15, 2025 Expert Report of Andre E. Jardini in the current action. Mr. Jardini has been disclosed as an expert for Plaintiff and Counter-defendant Navigators Specialty Insurance Company (hereinafter "plaintiff's expert").

# II. <u>REBUTTAL OPINIONS AND BASES</u>

## A. <u>I Could Not Discern What Methodology Plaintiff's Expert Relied On in His Purported *Buss* Allocation</u>

2. I simply could not tell what methodology or "reliable principles and methods" plaintiff's expert used in his purported *Buss* allocation to conclude that only less than 3% of the defense fees billed by SVO's different defense counsel in the underlying AAA arbitration were directly or potentially related to Vertiv's defamation claim against SVO.

3. It appears that plaintiff's expert based his above conclusion upon the following steps:

(i) first he sorted line items of verbiage which he says described pre-March 24, 2021 defense "services" performed by SVO's various defense counsel in the underlying AAA arbitration (hereinafter "line items of services") onto his several Outlines of Services.[1] Those Outlines of Services were schedules/charts attached as exhibits to his opening report ("Outlines");[2]

---

[1] S*ee* plaintiff's expert's opening report, at paragraphs 53-59.

[2] Plaintiff's expert did not sort any post-March 24, 2021 defense services performed in the underlying AAA arbitration onto his Outlines because he concluded that 100% of the post-March 24, 2021 defense services (all of which were billed by Tyson & Mendes) automatically related to non-covered claims and were therefore 100% reimbursable to Navigators.

As indicated in my own opening report and as explained further herein, I did not purport to make a *Buss* allocation myself because I was not asked to do so as part of my engagement.

(ii) he then conducted a word search for "defamation among all of those line items of services;

(iii) he then indicated in which line items of services he found the word "defamation," tagging those line items of services with the letter "D" in the far right-hand column of his Outlines (i.e., the column labeled "Allocation");

(iv) he then tagged with the letter "P" in the Allocation column those line items of services that did not actually contain the word "defamation," but which he nonetheless concluded may have potentially related to defamation (with no explanation as to why); and

(v) he quantified what he opined were the total number of defense hours directly related to defamation, as well as the total number of defense hours potentially related to defamation.

4. As a longtime fee expert myself who has reviewed tens of thousands of law firm invoices in my career both as a billing "gatekeeper" for a major institutional client in California for 12 years and as a testifying expert, I had significant doubts about the accuracy and reliability of plaintiff's expert's purported *Buss* allocation approach.

5. First, I question why plaintiff's expert even created line items of services on his Outlines in the first place, rather than listing the verbatim time entries by SVO's defense counsel in the same fashion as those time entries appear on the defense invoices themselves. Listing the actual time entries would have been a far more accurate, reliable approach to take.

6. Focusing for the moment only on plaintiff's expert's 10-page Exhibit 9 of Tyson's purported defense "services" prior to March 24, 2021, none of the line items of services on Exhibit 9 are the actual verbatim time entries from Tyson's invoices in the underlying AAA arbitration. I reviewed each of those invoices as part of my expert investigation. The Tyson time entries were typically very descriptive with lots of verbiage. In fact, if I put the Tyson invoices next to plaintiff's expert's Exhibit 9 for a side-by-side comparison, the line items of services on Exhibit 9 would bear no resemblance whatsoever to the actual Tyson time entries on Tyson's invoices in terms of their wording.

7. I have no idea who created the line items of services on Exhibit 9. They are nothing more than very brief, simplistic "paraphrases" of the actual Tyson time entries. I have no idea if they are even accurate paraphrases, or why they were worded as they were. The line items of services even appear to lump together different tasks by different Tyson timekeepers on particular days.

8. Next, plaintiff's expert's Exhibit 9 lists approximately 205 total Tyson line items of services which predated March 24, 2021. On Exhibit 9, the reviewer can see that plaintiff's expert is opining that only five of those 205 Tyson line items of services directly or potentially related to defamation. Two of those 5 line items of services (tagged with a "D" in the Allocation column on Exhibit 9) actually contain the word "defamation," so those line items of services are obviously related to defamation and need no further explanation.

9. The other three line items of services, however (tagged with a "P" in the Allocation column to denote potentially related to defamation, but without any explanation), appear to be "open-ended" in their wording and format, with no clear evidence whether they related to the defamation claim or not.

10. Next, I saw *dozens more* pre-March 24, 2021 Tyson line items of services on Exhibit 9 which appeared to be just as open-ended in their wording and format as the three line items of services that plaintiff's expert tagged with a "P." Below, as representative samples, are a handful of those other open-ended Tyson line items of services on Exhibit 9 which plaintiff's expert appears to have assumed (without any explanation) did not relate *in any way* to Vertiv's defamation claim against SVO:

| | | | | |
|---|---|---|---|---|
| 1/13/2021 | | Attend arbitration | JT, DF, CM, GS, DF<br>JF, DF, JT, AF | 45.00 |
| 1/22/2021 | 2/3/2021 | Prepare brief for February 3 arbitration, including arbitrator's failure to control discovery abuse, Building Management Systems defect | JT, JF, CM, JT | 78.90 |
| 1/29/2021 | | Conference with client | RD, JT | 3.30 |
| 2/2/2021 | 2/10/2021 | Prepare for arbitration hearing | CM | 2.70 |
| 2/8/2021 | 2/25/2021 | Document review and conference with IT for issues expert J. Losado | CM, JT, RD | 4.00 |

| | | | |
|---|---|---|---|
| 2/10/2021 | Attend team meeting | DF, RD, JT | 6.30 |
| 2/25/2021 | Strategy conference call with client | DF, CM | 2.40 |

11. To repeat, the above representative line items of services are as open-ended and unclear as the three Tyson line items of services which plaintiff's expert tagged with a "P" for some unexplained reason on Exhibit 9. So are dozens of other Tyson line items of services on Exhibit 9. Yet plaintiff's expert has *somehow* concluded that these representative samples and the dozens of other Tyson line items of services just like them are *somehow* solely allocable to non-covered claims and have nothing to do with Vertiv's defamation claim.

12. Put another way, plaintiff's expert offers no understandable methodology, criteria, or reasoning to justify his opinion that 200 of the 205 total Tyson line items of services on Exhibit 9 could not possibly relate to defamation. For this reason, his purported *Buss* allocation approach seems arbitrary and internally inconsistent.

13. I would repeat the exact same criticisms for the exact same reasons as stated above regarding plaintiff's expert's Exhibits 5 - 8 showing pre-March 24, 2021 line items of services by Murphy Austin, Morris James, Law Offices of Sean DeBruine, and Gordon Rees in the underlying AAA arbitration.

14. Although I did not purport to make a *Buss* allocation in my opening report since the insurer bears the burden of doing so in the current action, I am aware that that burden requires an insurer to show which defense time entries were solely allocable to claims which are not even potentially covered. As a billing gatekeeper and fee expert, I do not see how an insurer can possibly meet that burden if the insurer does not review and categorize each defense time entry according to the nature and purpose of the work described therein, e.g., covered vs. non-covered.

15. Perhaps that is why California published appellate cases have emphasized how difficult that burden becomes for an insurer to accurately and reliably meet. Plaintiff's expert has

certainly not done so here by creating convenient "paraphrases" for defense services performed, in lieu of categorizing the actual defense time entries themselves at issue here.[3]

**B. <u>I Found Plaintiff's Expert's Purported *Buss* Allocation Approach to Be Factually Flawed</u>**

16. An accurate, reliable allocation of defense time entries becomes more critical in instances such as the current action, where Navigators' claim of entitlement to *Buss* defense fee reimbursement from SVO rests entirely upon the defense time entries in the underlying AAA arbitration being properly categorized according to covered vs. non-covered claims. For example:

(i) I saw many line items of services on plaintiff's expert's Outlines which described different motions, briefs, written discovery, and other written work product prepared by the law firms on both sides. Plaintiff's expert did not indicate that he reviewed each specific piece of written work product described in those line items of services which he considered to be entirely for non-covered work in his purported *Buss* allocation. He did not indicate whether any portions of each such piece of written work product actually discussed the defamation claim.

(ii) I also saw line items of services on Plaintiff's expert's Outlines which described deposition preparation and deposition attendance for various witnesses. Plaintiff's expert did not indicate that he reviewed each specific deposition transcript, and whether any portions of such transcripts contained any questions or answers related to defamation.

---

[3] For example, in *State of California v. Pacific Indemnity Co.* (1998) 63 Cal.App.4th 1535, the court said:

"If Pacific Indemnity, *after providing an entire defense*, can prove that a claim was 'not even potentially covered because it did not even possibly embrace any triggering harm of the specified sort within its policy period or periods caused by an included occurrence,' it should have that opportunity. (citation omitted) This task ' 'if ever feasible,' may be 'extremely difficult.' ' (*Buss*, *supra*, 16 Cal.4th at pp. 57-58, quoting *Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553, 564 [91 Cal.Rptr. 153, 476 P.2d 825].)"

*Id.* at 1550 (original emphasis) (court recognized defending insurer's heavy burden of proof in establishing entitlement to defense fee reimbursement under *Buss*).

**C. Proof of Fee Reasonableness is a Prima Facie Element of a *Buss* Defense Fee Reimbursement to An Insurer**

17. In his opening report, plaintiff's expert did not address the reasonableness of the approximately 97% of defense timekeeper fees (both before and after March 24, 2021) in the underlying AAA arbitration which he opines are solely allocable to non-covered claims.[4]

18. I have opposed plaintiff's expert in other past fee dispute cases, some of which have been insurance coverage disputes. I have seen plaintiff's expert cite the Rule 1.5/4-200 factors as judicially-accepted standards for fee reasonableness in California. *See* Exhibit A attached hereto (pages 3-4, paragraphs 15-16 thereof).

## III. RESERVATION OF RIGHTS

19. I reserve the right to update, amend, and/or supplement this report based upon any new and/or additional facts, evidence, or other documents which may come to my attention, or based upon any other information, including other expert reports, declarations, or affidavits which may be produced.

Kenneth M. Moscaret

[4] To reiterate, the scope of my engagement in my own opening report was to opine on the reasonableness of Tyson's timekeeper fees. I applied fee reasonableness standards derived from certain Rule 1.5 factors to Tyson's fees.

# EXHIBIT "A"

James G. Bohm, Esq. (State Bar No. 132430)
Matthew Troncali (State Bar No. 286677)
BOHM WILDISH, LLP
695 Town Center Drive, Suite 700
Costa Mesa, CA 92626
Phone: (714) 384-6500
Fax: (714) 384-6551

Attorneys for Plaintiff
SHERRY L. LUND

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
08/07/2014 at 02:49:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| SHERRY L. LUND, an individual,<br><br>Plaintiff,<br><br>v.<br><br>DOMINIQUE MERRICK, an individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. 30-2011-00464163<br>Assigned for all purposes to:<br>Hon. Ronald L. Bauer<br><br>**DECLARATION OF ANDRE E. JARDINI IN SUPPORT OF PLAINTIFF SHERRY LUND'S OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR AWARD OF ATTORNEYS' FEES**<br><br>*[Opposition, Declaration of James G. Bohm, and Evidentiary Objections concurrently filed]*<br><br>**Hearing Date: August 18, 2014**<br>**Time: 9:00 a.m.**<br>**Department: CX103**<br><br>Complaint Filed: April 6, 2011<br>Trial Date: None set |



Bohm Matsen, LLP
695 Town Center Dr., Ste 700
Costa Mesa, CA 92626
(714) 384-6500

DECLARATION OF ANDRE E. JARDINI
IN OPPOSITION TO DEFENDANTS'
MOTION FOR ATTORNEYS' FEES

I, Andre E. Jardini, declare as follows:

1. I am an attorney licensed to practice law in the State of California and a member of the firm Knapp, Petersen & Clarke. Sherry L. Lund asked me to present opinion testimony, by way of declaration, regarding my analysis of attorneys' fees requested by defendant Dominique Merrick in the matter entitled *Lund v. Merrick,* Orange County case number 30-2011-00464163. Except where noted, the following facts are within my personal knowledge and if called as a witness, I could and would competently testify thereto.

QUALIFICATIONS

2. I have practiced law, as a trial attorney in California, for more than 37 years. I have a Bachelor of Arts degree from the University of Notre Dame, granted in 1973. I graduated from Hastings College of the Law in 1976. I was admitted to the Bar of the State of California in December of that year. I have also been admitted to practice before the United States District Court for the Central District of California, as well as in the Southern District, Northern District and Eastern District. I am admitted to practice and have appeared before the Ninth Circuit Court of Appeals.

3. I served as a law clerk to the Honorable Robert Firth in the United States District Court, Central District of California, in 1977 and 1978.

4. From time to time, I serve as an arbitrator in the Los Angeles County Bar Association Dispute Resolutions Services Program, which concerns attorney-client disputes over legal billings. I have participated, both as counsel and as an expert witness, in arbitrations and hearings in various courts of general jurisdiction concerning attorney fee disputes and requests for attorneys' fees.

5. I have been employed at Knapp, Petersen & Clarke since its inception as a law firm in 1981. I have been a director (partner) at the firm since 1984. My practice consists predominantly of trial work. I have tried 55 jury trials to conclusion during my tenure with the

firm. I am a member of the American Board of Trial Advocates, having achieved Advocate status in the organization requiring completion of more than 50 trials (attached hereto as **Exhibit 1** is a listing of some of my trial experience). These trials cover a wide variety of subject areas, general business matters, environmental cases, employment cases, and other areas.

6. I have, since 1985, been retained by clients regarding, and actively engaged in, the auditing of legal billings and consulting with companies to control legal expenditures. I have tried and arbitrated numerous cases in which the predominant issue involved is the reasonableness of attorneys' fees and costs. I have personally audited the billings of a large proportion of the major law firms in this state over the past twenty years. I have also audited the billings of numerous out-of-state firms. I have performed more than 1,000 such audits, and audited well more than $1 billion in legal fees. An outline of my qualifications concerning review and allocation of attorneys' fees is attached as **Exhibit 2**.

7. Based on my significant experience related to legal audit matters and our firm's belief that there was a need for such a service in the legal community, in October of 1991, Knapp, Petersen & Clark established KPC Legal Audit Services, Inc. I am the founder and the president of that company.

8. KPC Legal Audit Services, Inc. is a dba of Knapp, Petersen & Clarke. The company specializes in the review and audit of legal billings and consulting on legal cost containment.

9. Since 1991 KPC Legal Audit Services, Inc. has conducted hundreds of audits throughout the state of California as well as in other states.

10. KPC Legal Audit, under my direction, has reviewed billing relating to a wide variety of litigated matters, including insurance coverage and bad faith cases, business torts, intellectual property, defamation, employment matters, and many others.

11. I have litigated and audited numerous anti-SLAPP matters.

12. I have both handled, and reviewed, attorney invoices in connection with a wide variety of different types of litigation including public interest cases, business litigation, intellectual

property, employment cases, appellate matters, civil rights matters, commercial law matters, real estate and lease matters, transactional matters, and corporate legal work.

13. I have testified as an expert witness, in court or by way of declaration, in more than 150 Superior Court or U.S. District Court matters regarding reasonableness of legal fees, both on behalf of the proponent of such fees and on behalf of the opposing party.

STANDARD OF REVIEW

14. I am guided by DR 2-106 of the ABA Code of Professional Responsibility. That section discusses factors to be considered in determining the reasonableness of attorneys' fees. The Code provides:

a. A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

b. A fee is clearly excessive when, after review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.

15. I am also guided by the California Rules of Professional Conduct Rule 4-200 which states:

a. A member shall not enter into an agreement for, charge, or collect an illegal or unconscionable fee.

b. Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. Among the factors to be considered, where appropriate, in determining the conscionability of a fee are the following:

(1) The amount of the fee in proportion to the value of the services performed.

(2) The relative sophistication of the member and the client.

(3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly.

(4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member.

(5) The amount involved and the results obtained.

(6) The time limitations imposed by the client or by the circumstances.

(7) The nature and length of the professional relationship with the client.

(8) The experience, reputation, and ability of the member or members performing the services.

(9) Whether the fee is fixed or contingent.

(10) The time and labor required.

(11) The informed consent of the client to the fee.

16. These standards are regularly applied by courts in California to determine the reasonableness of attorneys' fees.

17. The United States Supreme Court opinion in *Hensley v. Eckerhart* (1983) 461 U.S. 424 [103 S.Ct. 1933] is instructive. The court, in discussing an award of attorneys' fees to a prevailing party, enumerated the factors which should be considered in making such an award. The starting point in analysis is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." (*Id.* at 433.) The court stated hours that were not reasonably expended should be excluded from the calculation, stating:

> Cases may be overstaffed and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fees submission.

(*Id.* at 434.)

18. The standard of reasonableness which will be applied to this matter is based on these principles, on my experience in litigation, and my experience in the legal audit practice. In this matter, my ultimate opinion will reflect a determination of the reasonable number of hours which should have been expended in rendering services, multiplied by a reasonable rate.

///

///

SUBJECT ACTION

19. Lund filed a complaint for intentional infliction of emotional distress and slander against conservator Dominique Merrick regarding a conversation between Merrick and her conservatee Michelle Lund.

20. An anti-SLAPP motion to strike was filed by defendant in response to the complaint. The hearing on the motion was held on July 11, 2011. The trial court denied the motion and defendant appealed. The appellate court reversed the decision, directed the trial court to grant the anti-SLAPP motion, and required the trial court to determine the amount of reasonable attorney fees.

21. An original fee motion was filed in January 2013 by defendants and this Court awarded $195,766. However, the order was reversed and remanded by the Court of Appeal for additional billing invoice information. By its current motion, defendant Merrick is seeking the recovery of fees incurred for services rendered by five attorneys. Defendant stated a lodestar amount of $185,572 based upon a claim of 445.1 hours of attorney time committed to this case.

22. Attached is a schedule entitled **Index of Billing Personnel**. The Index states the rates, hours and bar admission date for each attorney and specifies the hourly rate sought by each timekeeper.

BACKGROUND INFORMATION REGARDING OPINIONS

23. Attached as **Exhibit 3** are schedules which were prepared directly from the documentation attached to the attorney fee motion. They include:

- Fees and Costs Billed
- Index of Billing Personnel
- Hours Billed Per Statement
- 2011 ALM Survey of Law Firm Economics
- Outline of Services Performed
- Overhead

24. In order to develop the opinions contained in this declaration, I completed a review and analysis of all the billing information submitted with defendant's motion for attorneys' fees in

the award of fees against plaintiff, including the memorandum of points and authorities, and the declarations attached thereto (the "fees motion".) I reviewed the exhibits to defendant's request for judicial notice. I also reviewed defendant's anti-SLAPP motion to strike, her reply to the opposition to the anti-SLAPP motion to strike, defendant's appellate brief and reply and well as the supplemental appellate brief.

25. I reviewed the appeal docket for Case No. G045654, and the civil docket for Case No. 30-2011-00464163.

REQUESTED HOURS TO NOT MATCH INVOICE DETAIL

26. Defendant is asking for reimbursement of 445.1 hours and $185,572 in fees. In support of this request, defendant provided 18 invoices dated from May 31, 2011 to November 4, 2012. These invoices were redacted and no summaries or totals were provided.

27. A tally of the hours presented in the invoices shows a discrepancy of hours and, therefore, fees. My calculation shows 444.4 hours and $184,182 rather than the requested 445.1 and $185,572, a difference of .6 hours and $1,390. I will use my calculated numbers as the actual requested hours and fees.

REQUESTED HOURLY RATE IS EXCESSIVE

28. Defendants seek the recovery of attorneys' fees at hourly rates between $285 and $595.

29. I believe these rates are excessive and led to an excessive fee amount, especially given the total exclusion of non-attorney personnel.

30. Plaintiff attaches a copy of PricewaterhouseCoopers LLP's **2011 Billing Rate & Associate Salary Survey**. Mr. Daucher states in his declaration, paragraph 2, that the hourly rates for equity partners are $520 to $750. I cannot see these rates in the survey for either 1st Quartile or Median rates. I also did not see reference to the definition or description of what firms were included in the five "Natl" groupings. As such, it is impossible to determine if the rates set forth in this survey duly and properly support the hourly rates requested by plaintiff or are reflective, at all, of hourly rates in this community.

31. Since plaintiff believes that reimbursement of fees should be at hourly rates that were reasonable in 2011, I evaluated the rates sought using the **2011 Survey of Law Firm Economics**, formerly published by the Altman Weil Publishing Corporation, and now under the auspices of ALM, see attached ALM Survey of Law Firm Economics. This comprehensive survey provides a reliable tool for analysis of hourly rates by law firms and attorneys by state throughout the United States. It evaluates utilizing a number of criteria, including years of experience of the attorney, firm size, geographic location and specialty.

32. I believe the ALM rates provided by years of experience and firm size, to be very helpful to determine appropriate compensation or as a comparison for actual rates charged. (See attached ALM Survey data). These rates are consistent with rates regularly charged by attorneys in this community.

33. The five attorneys who worked on this matter range in experience from 1 (Luther) to 32 years (Godshall) at the time services were provided. Based on the 2011 ALM Survey, the rates for attorneys within the size of a firm such as Sheppard in California range from $225 - $471 per hour. Using this standard, Adrienne W. Lee, a two-year lawyer who billed almost 60% of hours on this matter, should be compensated at the rate of $260 per hour; the next highest biller was Brian M. Daucher, , a 32-year lawyer who billed 28% of the hours on this matter, who should be compensated at the rate of $406 per hour. The ALM rates for California and years of experience show the hourly rates of $255 for Ms. Lee and $379 for Mr. Daucher.

34. I attach a rate analysis to my Index of Billing Personnel, see **Rate Adjustments,** in keeping with these ALM rates. Application of the specific ALM rates to the experience level of attorneys at the Sheppard firm shows a rounded global average between $291 and $302. This represents a 29% to 27% reduction, respectively, of the excessive average hourly rate of $414.45 sought on behalf of Sheppard.

35. I recommend reimbursement at the hourly rates as listed by the ALM Survey. Calculating these individual rates against the hours billed results in an average hourly rate of $302 for all services. I believe this rate, reflective of each of the ALM Survey rates for these attorneys, is appropriate to compensate for reasonable hours spent in the anti-SLAPP proceedings.

<u>EXCESSIVE BILLING FOR SERVICES PERFORMED</u>

36. In my opinion, after reviewing the billing statements by the attorneys, I believe that billing for discrete services was excessive.

37. The **Outline of Services Performed** schedule, attached to this declaration, is a listing of the significant tasks performed by Sheppard attorneys. The tasks are identified chronologically. The time for the preparation of each task is batched, with an aggregate total of time tallied for each service. The timekeepers responsible for the specific services are also included. Of the 444.4 hours billed by Sheppard in the fees motion, the outline of services accounts for 408.2 hours, or approximately 92 percent. The remaining time is captured on an issue schedule (overhead) or is transactional in nature and does not specifically relate to an identifiable litigation service.

38. Certain of these tasks I believe involved excessive billing. This includes the 132.9 hours billed in connection with the anti-SLAPP motion. This commitment of time by <u>four</u> attorneys is clearly excessive. The anti-SLAPP motion consisted of 14-pages of legal discussion. A more reasonable, yet generous time, for drafting and compiling such a motion would be 16 hours, the briefing concerned basic and accepted legal principles, and a discussion of procedural issues, such as previous litigation. The underlying facts as to the alleged defamation were not complex. It is also unreasonable to have billed 29.8 hours on the basic 10-page reply brief. The reply was largely argument. Commensurate hours to the issues briefed are eight hours.

39. Attorneys Lee and Daucher billed a total of 72.4 hours to draft Appellant's Opening Brief. After review of the brief, a time of 40 hours is more in line with the arguments and record cited. The issues and discussion were virtually identical to those raised in the anti-SLAPP motion. I also do not believe that the 42.9 and 75.4 hours billed for the reply and supplemental appellate brief, respectively, by these same attorneys as well as Douglas Luther was reasonable. A more appropriate time is 16 hours for briefing of the issues in the reply and six hours for the supplemental appellate brief. The excessive time is most likely due to the involvement of multiple attorneys.

40. It is my opinion the time billed on these briefs was excessive and unreasonable. It is appropriate to apply a reduction to the hours billed in the amount of 267.4 hours for the drafting of these briefs.

OVERHEAD TASKS

41. Billing entries in the invoices included 10.4 hours for tasks which are noncompensable, overhead activities. These entries are included in the attached schedule entitled **Overhead**. Overhead activities include issues regarding filing and service, research assignments and compilation of table of contents and communication with a court reporter regarding a transcript.

42. These administrative functions are not legal services appropriately subject to compensation, in my opinion. There is a presumption that the hourly rates charged by attorneys are sufficient to encompass overhead associated with doing business in a law firm.

43. Illustrative of this point, in the matter entitled *In Re Sonic Blue, Inc.*, 2004 WL856624 (Bankr. N.D. Cal. Feb. 25, 2004), the court held that administrative tasks are not compensable regardless of whether an attorney performed the tasks:

> Services that are clerical in nature are properly chargeable to the firm as overhead expenses . . . services such as filing, assembling or compiling documents, organizing files, calendaring dates, making copies, facsimile or transmitting, serving pleadings or oversight of the same are inherently clerical. Fees for services which are purely clerical, ministerial, or administrative should be disallowed.

44. Further, *Davis v. City and County of San Francisco* 976 F.2d 1536 (9th Cir. 1992), 1543 states in part that "the City correctly argues that time spent on clerical matters should not have been included in the attorneys' fee award."

45. A reduction of 10.4 hours is recommended for inappropriately requested work associated with overhead tasks.

CONCLUSION RE: REQUESTED FEES

46. Defendant cites in their moving papers, at Page 8, to *Hogar v. Community Development Com. of the City of Escondido* (2007) 157 Cal.App.4th 1358, 1369, "where success is achieved in the representation, **all** hours expended should receive **full** compensation" (emphasis

added). This is incorrect. I believe they are actually citing to Hogar's reference to *Hensley, v. Eckerhart, Supra.* at 435-436, where the compensatory fee "will encompass all hours **reasonably** expended on the litigation" (emphasis added). *Hogar* does not suggest a blanket reimbursement of all hours. In addition, the *Hogar* trial court used its discretion to determine a reasonable hourly rate.

47. For the reasons above-stated, the fees requested should be significantly reduced. Defendant's reasonable fees are (1) $48,480.60 if the Court applies a $291 hourly rate based on average California attorneys fees, or (2) $50,313.20 if the Court applies a $302 hourly rate based upon fees tied to firm size.A summary of my findings is listed below.

| **Summary of Reductions/Reimbursment of Reasonableness** | | |
|---|---|---|
| **Fees Requested** | | **$ 184,182.00** |
| **Hours Requested** | | **444.40** |
| Recommended Reductions in Hours | | |
| | Excessive Work Product | (267.40) |
| | Overhead | (10.40) |
| **Reasonable Hours** | | **166.60** |
| Reimbursment ($291 hourly rate) | | $48,480.60 |
| Reimbursment ($302 hourly rate) | | $50,313.20 |

Executed on this 5th of August 2014, at Glendale, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Andre E. Jardini

Exhibit "1"

$700,000 awarded, to firm's clients. Judgment affirmed on appeal

**November 2008** *Selvin & Weiner v. Bench International Search, Inc.*

- 11 week trial (Los Angeles Superior Court – Malibu)
- defense of Bench International in a collection action by a law firm
- law firm sought approximately $643,000 (with interest)
- Bench International defended with suit for legal malpractice
- jury awarded only $200,000, without interest
- jury found legal malpractice and misrepresentations had occurred
- case resumed with new jury due to mistrial after 4 weeks



Knapp
Petersen
Clarke
A PROFESSIONAL CORPORATION

**ANDRÉ E. JARDINI**
**TRIAL EXPERIENCE**

**March 2010** *Mendoza v. ABM Industries*

- 6 week trial (Los Angeles Superior Court)
- prosecution of whistleblower case against employer of HR Director
- financial irregularities and labor violations were observed and reported
- jury finds that the violations and financial issues existed and were accurately reported
- jury finds that whistleblower's activity was not the direct cause of the termination

**August 2009** *Allstate Insurance v. Thacher, et al.*

Knapp Petersen Clarke

**April 2007** *Roy v. Edgetech, Inc.*

- 7 day trial (Los Angeles Superior Court)
- suit to enforce two year employment contract
- defendant paid for only two months to employee who moved from France to take the job
- offer of $40,000; demand of $52,500
- jury finds for plaintiff
- with penalties, interest and attorneys' fees, award is $225,000

**April 2006** *Confidential Case Name*

- $30 million class action settlement
- case alleging wage and hour violations against an international package delivery company
- recovery for 13,000 California employees who were allegedly unpaid for hours worked and were not provided required meal and rest breaks
- defendant company altered its procedure at the time of the settlement to comply with California law

**August 2006** *HJF, Inc., Sitara Management v. Equilon*

- 15 day trial (Los Angeles Superior Court)
- suit for breach of contract and fraud against oil company by gas station owner client
- jury verdict for firm client that administration of lease program caused harm to gas station owner
- jury awards $225,000

**May 2005** *Goodwin v. City of San Bernardino*

- 5 day retrial (U.S. District Court/Riverside)
- civil rights case for unlawful entry and arrest
- second mistrial due to lack of jury unanimity

Knapp
Petersen
Clarke

| | | |
|---|---|---|
| **October 2004** | | *Confidential Case Name* |
| | - | 22 day trial (Los Angeles Superior Court) |
| | - | legal malpractice case; lawyers lost summary judgment for failure to produce available evidence |
| | - | jury verdict (10-2) that firm client would have recovered for breach of contract and fraud in underlying case |
| | - | client deprived of partnership interest in 129 lot residential development |
| | - | jury awards $4.2 million |
| **June 2004** | | *Confidential Case Name* |
| | - | legal malpractice case |
| | - | Imperfect CCP § 998 offer in catastrophic injury case causes loss of hundreds of thousands of dollars |
| | - | settled first day of trial (Los Angeles Superior Court) |
| **March 2003** | | *Goodwin v. City of San Bernardino* |
| | - | 5 day trial (U.S. District Court/Riverside) |
| | - | civil rights case for unlawful entry and arrest |
| | - | mistrial due to lack of jury unanimity |
| **May 2002** | | *Amezquita v. John J. Fox, M.D., Inc.* |
| | - | 14 day trial (Los Angeles Superior Court - Glendale) |
| | - | medical malpractice case |
| | - | OB/GYN implants IUD in woman who is already pregnant resulting in premature birth of child with developmental delays |
| **January 2002** | | *Titus v. Randazzo* |
| | - | 6 day trial (Los Angeles Superior Court - Glendale) |
| | - | client, a juror on a prior case, causes automobile accident |
| | - | victim claims serious degenerative nerve problems with medical expenses of six figures |
| | - | jury finds accident did not cause claimed injuries |

Knapp Petersen Clarke

| | | |
|---|---|---|
| **November 2001** | | *Valdivia v. Burlington Northern Santa Fe Corporation* |
| | - | 11 day trial (San Bernardino Superior Court - Victorville) |
| | - | wrongful death of 10 year old boy killed by train; accident is witnessed by seven year old sister |
| | - | settlement offer doubled during trial |
| **May 2001** | | *Orlandini v. San Gabriel Valley Medical Center* |
| | - | 6 day trial (Los Angeles Superior Court - Pasadena) |
| | - | medical malpractice case |
| | - | woman awakens under general anesthesia during hysterectomy |
| **December 2000** | | *Spaggiari v. 21st Century* |
| | - | trial (Los Angeles Superior Court - Van Nuys) |
| | - | insurance bad faith case |
| | - | insurer discontinues living expense coverage necessary for family displaced by Northridge earthquake |
| | - | settled for firm client for $525,000 on first day of trial |
| **October 2000** | | *Gaggero v. Stacey* |
| | - | 10 day trial (Los Angeles Superior Court - Norwalk) |
| | - | firm client, a developer, sues former attorney for legal malpractice |
| | - | attorney failed to advise concerning California's anti-SLAPP |
| | - | statute before filing suit for malicious prosecution against neighborhood activists protesting Venice Beach development, resulting in award of attorneys' fees of $102,000 |
| | - | jury awards $332,177 to firm client |
| **April 2000** | | *Barraza v. Stephenson, Acquisto & Colman* |
| | - | 6 day trial (Los Angeles Superior Court - Glendale) |
| | - | suit for wrongful termination on account of pregnancy |
| | - | law firm fires employee in same telephone conversation in which it learns she is pregnant |

Knapp Petersen Clarke

**July 1999** *Briggs v. Villa Esperanza*

- 5 day trial (Los Angeles Superior Court)
- firm client, a registered nurse, seeks unpaid overtime, interest, penalties and attorney's fees
- compensation awarded by the Department of Labor
- employer appealed; trial de novo in Superior Court
- $59,000 award, plus interest, costs and attorney's fees

**February 1999** *Erath v. UCLA, et al.*

- 8 day trial (Los Angeles Superior Court)
- scientific records loaned to UCLA by firm client are lost
- question to be decided is value of the lost documents
- UCLA offers $50,000 before trial, and argues at trial that the documents have no value
- jury awards $125,000 to firm client

**March 1998** *Hughes Aircraft v. Associated Aviation Underwriters, et al.*

- 12 day trial (Los Angeles Superior Court)
- representation of AAU, excess carrier in a complicated multi-issue suit for insurance coverage for environmental contamination at Hughes' facility in Fullerton
- damages of $35,000,000 claimed; $25,000,000 had been paid by primary insurers
- jury determines that only 32% of contamination is from a sudden and accidental cause; also, jury diminishes claimed damages by more than $5,000,000
- on appeal award is reduced to nothing based on verdict and offsets

**March 1998** *Liberty Paper v. San Paolo Bank, et al.*

- 5 day trial (Los Angeles Superior Court)
- retrial of punitive damage phase of suit for fraud in real estate transaction against Italian bank
- $150,000 offered by defendant bank before trial
- jury awards $1,700,000 to firm's client

Knapp Petersen Clarke

**February 1998** *Del Babb v. Property Tax Assistance, Inc.*

- 2 day trial (Martinez Superior Court)
- former employee sues to recover unpaid overtime compensation and unpaid bonuses in the amount of $750,000 against firm client
- case dismissed by plaintiff upon ruling of no entitlement to overtime compensation

**January 1998** *Hugo Valdivia v. MCE Corporation, Hardy & Harper, Inc.*

- 8 day trial (Los Angeles Superior Court)
- personal injury case, involving knee injury to firefighter at station caused by a defective rolling gate
- $100,000 statutory offer by defendants to firm's client
- client had returned to work 10 months after the accident and had worked without restriction for 20 months before trial
- jury awards $1.5 million to firm's client (12-0 vote)

**November 1997** *Associated Aviation Underwriters v. Wolfe Air, et al.*

- 12 day trial (Los Angeles Superior Court - Central Civil West)
- insurance bad faith case
- $18,000,000 sought by air carrier for damages caused by alleged failure to pay benefits by insurer due to alleged prior cancellation of insurance policy, all arising out of helicopter accident
- air carrier contended cancellation was ineffective and won summary judgment on this issue
- court finds that insurance company's coverage position is reasonable and judgment awarded for firm's client

**August 1997** *Liberty Paper v. San Paolo Bank, et al.*

- 5 day trial (Los Angeles Superior Court)
- suit to recover damages for defendant bank's failure to complete sale of commercial office building to firm's client
- $25,000 offered by defendant bank before trial
- jury awards $2,505,000 (including punitive damages) to firm's client

Knapp Petersen Clarke

| | | |
|---|---|---|
| **June 1997** | | *Hospital Learning Centers v. Century Properties, et al.* |
| | - | 6 day trial (Los Angeles Superior Court - Van Nuys) |
| | - | suit to recover value of business property destroyed by post-earthquake demolition of office building |
| | - | no offer by defendant building owner |
| | - | jury awards $370,000 to firm client (with pre-judgment interest, costs and attorneys' fees, award exceeds $700,000) |
| **April 1997** | | *Moshfegh v. California Pizza Kitchen* |
| | - | 7 day trial (Los Angeles Superior Court - Malibu) |
| | - | false imprisonment and discrimination case |
| | - | party of eight kept from leaving restaurant and arrested for failure to pay tip |
| **October 1996** | | *Investor's Thrift v. Old Republic Insurance Company* |
| | - | 8 day trial (Orange County Superior Court - Harbor) |
| | - | suit to recover loan losses covered by insurance for firm's thrift client |
| | - | $200,000 offered by defendants before trial |
| | - | jury awards $437,096 (with pre-judgment interest and costs, award exceeds $600,000) to firm's client |
| **May 1996** | | *Steven Lenarth v. Stephanie Pacetti, Mount Vernon Foods* |
| | - | 13 day trial (Los Angeles Superior Court - Burbank) |
| | - | casualty case, personal injury from rear end accident; firm represents defendants |
| | - | $4,050,000 settlement demand by plaintiff injured on LADOT DASH bus hit by minivan |
| | - | Plaintiff suffered fractured knee and torn meniscus allegedly resulting in reflex sympathetic dystrophy. Plaintiff in wheelchair, had not used leg in two years, and would not walk again |
| | - | C.C.P. §998 formal offer to compromise of $250,000 made; structured settlement with present value of $286,000 offered |
| | - | plaintiff dismissed case with prejudice on 13th day of trial for no payment and waiver of costs |

Knapp Petersen Clarke

| | | |
|---|---|---|
| **January 1996** | | *RGP Orthopedic Appliances v. Atlantic Mutual Insurance Company* |
| | - | 13 day trial (San Diego Superior Court) |
| | - | insurance bad faith case |
| | - | $11,250,000 sought by company and two severely injured judgment creditors for failure to pay $2,000,000 limits of umbrella insurance policy for damages incurred in a very serious automobile accident |
| | - | insured asserted exclusion was missing key language due to a clerical error; court finds exclusion unenforceable |
| | - | award of $1,225,000 in extra-contractual damages; (defendant insurer had offered $1,400,000 in settlement) |
| **October 1995** | | *Landers v. State Farm Fire and Casualty Company* |
| | - | 29 day trial (Los Angeles Superior Court) |
| | - | insurance bad faith case |
| | - | $150,000 sought for alleged failure to pay no-fault benefits under a New York insurance policy |
| | - | award of $50,000 to plaintiff |
| **August 1995** | | *Rosenfield v. (Confidential - two defendants)* |
| | - | trial (Los Angeles Superior Court - Santa Monica) |
| | - | wrongful termination on the basis of sexual orientation settlement during trial; firm's client receives $575,000 |
| **July 1995** | | *Nationwide Insurance Company v. Great American Insurance Company* |
| | - | 7 day trial (Los Angeles Superior Court - Santa Monica) |
| | - | recovery sought for progressive loss arising out of soil settlement at residence in Pacific Palisades |
| | - | believed to be first jury trial after Supreme Court decision in |
| | - | Montrose Chemical Corporation v. Admiral Insurance Company regarding allocation between insurers for continuous loss |
| | - | 10-2 jury verdict for client finding defendant insurer should participate in paying loss; $125,000 awarded, including interest |

Knapp
Petersen
Clarke

**December 1994** *Glick v. State Farm Fire and Casualty Company*

- 5 day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $338,000 sought, plus consequential damages, for business personal property lost in theft and for lost income caused by business interruption
- 8-0 defense verdict for client, State Farm

**July 1994** *Brown v. South Los Angeles Mortuary*

- 25 day trial (Los Angeles Superior Court - Central Civil West)
- mortuary malpractice case involving 17 plaintiffs who were relatives of a decedent whose remains were mishandled and exposed to insects
- more than $5 million sought for emotional distress and punitive damages
- jury verdict finding firm client only 10 percent responsible (cemetery found 90 percent responsible)
- total award against firm client $97,000 - more than $300,000 had been offered in settlement

**April 1994** *Edison v. Labowe, Labowe & Hoffman*

- 30 day trial (Los Angeles Superior Court)
- legal malpractice case against firm client
- $2.7 million sought for law firm errors in complicated real estate transaction involving loss of 65 percent interest in a commercial property
- jury verdict for plaintiff for $430,000; reversed on appeal on statute of limitations grounds; plaintiff takes nothing

**September 1993** *International Registered Nurses of America, Inc. v. State Farm Fire and Casualty Company*

- 1 day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $1,424,000 sought, plus consequential damages, for lost business income and failure to pay claim
- judgment in favor of client, State Farm

Knapp Petersen Clarke

**September 1993** *Smith v. Battalia, Remax South Bay Realty*

- 3 day binding arbitration per real estate purchase contract
- real estate fraud
- $150,000 sought for misrepresentation in sale of real estate, failing to disclose movement from subsurface soil condition
- judgment in favor of client seller

**March 1993** *Esters v. State Farm Mutual Automobile Insurance Company*

- 7 day trial (United States District Court - Los Angeles)
- insurance bad faith case
- $250,000 sought for five year delay in paying
- uninsured motorist claim and for unreasonably low offer
- 8-0 defense verdict for client

**September 1992** *Block v. State Farm Mutual Automobile Insurance Company*

- 6 day trial (Los Angeles Superior Court - Beverly Hills)
- insurance bad faith case
- $100,000 sought for failure to settle uninsured motorist claim and failure to pay medical bills
- 12-0 defense verdict for firm client

**May 1992** *Shaner v. Neil Lloyd & Co., Daniel Monnin*

- 5 day trial (Los Angeles Superior Court - Glendale)
- wrongful death of four year old child by drunk driver
- represented employer of drunk driver, good Samaritan who attempted to drive the drunk driver home and his employer
- tried on liability issues only
- motion for non-suit and directed verdict granted for all three firm clients

Knapp Petersen Clarke

| | | |
|---|---|---|
| **March 1992** | | *Reid v. Ulysses M. Carbajal, M.D.* |
| | - | 8 day trial (Los Angeles Superior Court - Central Civil West) |
| | - | medical malpractice action |
| | - | unnecessary surgery for acute sinusitis |
| | - | $72,000 award for plaintiff client |
| **January 1992** | | *Stern v. State Farm Mutual Automobile Insurance Company* |
| | - | 3 day binding arbitration (JAMS Santa Monica) |
| | - | insurance bad faith case |
| | - | alleged mishandling of claims re collision and UM coverages |
| | - | award for client defendant on all claims |
| **November 1991** | | *Tucker v. Westminster Memorial Park* |
| | - | trial (Orange County Superior Court) |
| | - | crematory misfeasance case |
| | - | settled for our initial offer of $120,000 during trial |
| **September 1991** | | *Bohall v. ARCS Mortgage, Bank of New York* |
| | - | 10 day trial (Los Angeles Superior Court) |
| | - | retrial of wrongful termination case |
| | - | branch manager fired with cause |
| | - | $2 million dollar demand; $2,718 award |
| **May/June 1991** | | *Proposition 103 Hearings* |
| | - | 4 weeks of hearings (San Francisco and Los Angeles) |
| | - | cross-examination of Department of Insurance expert witnesses on rate of return, leverage, allowable expense, executive compensation and other issues |

Knapp
Petersen
Clarke

**January 1991** *Bohall v. ARCS Mortgage, Bank of New York*

- 10 day trial (Los Angeles Superior Court)
- wrongful termination, defamation and conversion case
- $1.5 million dollar demand; $300,000 offer
- $1.2 million dollar award, including $6,500 punitive damages, new trial motion granted

**October 1990** *Smoke Island Interiors v. General Accident Insurance*

- trial (Los Angeles Superior Court)
- insurance bad faith case
- allegations of unreasonable claims handling and denial of claim for stolen art work; claim for $180,000 plus consequential and punitive damages
- settled for $17,500 during trial

**June 1990** *The Austin Company v. J.H. Baxter Company*

- 5 day trial (United States District Court - Los Angeles)
- product defect case
- failure of three acre roof with a $2.5 million dollar replacement cost allegedly due to corrosion caused by fire retardant chemicals used by J.H. Baxter
- 6-0 defense verdict for our client J.H. Baxter

**May 1990** *Blanchard v. State Farm Fire and Casualty Company*

- 10 day trial (Los Angeles Superior Court - Santa Monica)
- insurance bad faith case
- $450,000 sought for failure to provide independent counsel in defense of covered construction defect litigation
- 10-2 defense verdict for our client, upheld on appeal

**February 1990** *Sykes, et al., v. Associated Farm Management*

- 9 day trial (United States District Court - Los Angeles)
- federal securities law case
- 100+ plaintiffs sought recovery of amounts lost in investments in nine limited partnerships in farmland - grapes, tree fruit, citrus - in California's Central Valley
- $29 million recovery requested; judgment rendered for $8.6 million

Knapp
Petersen
Clarke

**June 1989** — *Aetna Insurance Company v. Centennial Insurance Company*

- 5 day trial (United States District Court - Los Angeles)
- insurance equitable subrogation case
- Aetna sought contribution re two-thirds of $725,000 in defense costs expended in defending underlying patent litigation
- court agreed with our position that two-sevenths was proper allocation and that attorney bills were unreasonably high; upheld on appeal

**February 1989** — *Della Ripa v. Kaiser Hospital*

- 5 day binding arbitration
- medical malpractice case
- $187,000 award for our client for defendant's failure to diagnose "panic disorder"

**November 1988** — *Transtechnology, Inc. v. Allied Signal Corporation*

- 11 day binding arbitration (3 arbitrator panel)
- environmental case
- second ever arbitration to apportion fault for groundwater pollution under California Health and Safety Code

our client, Allied Signal, found responsible for 4 percent of response costs of $1.5 million dollars

**June 1988** — *Wolf v. Fisher*

- 6 day trial (Los Angeles Superior Court)
- suit for violation of rent control ordinance and intentional infliction of emotional distress
- 12-0 defense verdict for our clients, property owners

**October 1987** — *Frederick v. Ambassador Insurance*

- trial (Los Angeles Superior Court)
- insurance bad faith case
- insurer and parent company sued for failing to defend and indemnify in personal injury case
- client insurer insolvent per Vermont liquidation and dismissed; client employee pays $2,000; parent company, represented by another law firm, suffers $2 million dollar verdict

Knapp Petersen Clarke

**September 1987** *Olson/Hurston v. L.B. Foster Company*

- 8 day trial (United States District Court - Los Angeles)
- product defect case
- two pile drivers suffered multiple leg fractures when a ground release shackle failed and dropped a 900 pound sheet pile
- 6-0 defense verdict for our client, the distributor of the device

**May 1986** *Noma Corporation v. Centennial Insurance Company*

- 7 day trial (United States District Court - Los Angeles)
- insurance bad faith case
- insured franchisor sought payment of $243,000 in legal fees for defense of covered suits by franchisees and $18,000,000 in consequential damages for failure to defend
- determined that $19,000 was only amount due

**April 1986** *Shea v. Owen; Century 21 Realty*

- trial/stipulated judgment
- real estate fraud case
- fraudulent trade of primary residence for two unsecured greenhouses
- client plaintiff recovered $115,000 from defendants for fraudulent real estate transaction

**December 1985/ January 1986** *Stotts v. Wallace and Tiernan Division of Pennwalt Corporation*

- 28 day trial (Los Angeles Superior Court)
- product defect case
- client manufacturer's valve cracks exposing plaintiff to chlorine gas and causing serious impairment of lung function
- award $400,000

# Exhibit “2”

# OUTLINE OF BACKGROUND AND QUALIFICATIONS
# ANDRÉ E. JARDINI

- Practicing lawyer, principally as a litigation attorney, in California since 1976.
- B.A. Degree University of Notre Dame 1973; J.D. degree Hastings College of the Law 1976; admitted to the State Bar December 1976.
- Clerkship in 1977 and 1978 in United States District Court in Los Angeles with Judge Robert Firth.
- Admitted to practice in all courts in the State of California, including four United States district courts and the Ninth Circuit Court of Appeals.
- Partner at Knapp, Petersen & Clarke, a law firm providing litigation and transactional services to its clients.
- Founder and president of KPC Legal Audit Services, Inc.
- Trial and arbitration of numerous cases in which the predominant issue was the reasonableness of attorney's fees and costs.
- Has personally audited the billings of a large proportion of the major law firms of this state since 1986. More than 1,000 audits performed.
- Has audited billings exceeding cumulatively $1 billion.
- Has been under contract to the State of California (Cal PERS, California Lottery, Attorney General's Office) regarding audit services.
- Under contract to the City of Los Angeles regarding audit services.
- Arbitrator in the Los Angeles County Bar Association Dispute Resolution Services Program regarding attorney/client disputes over legal billings.
- Qualified as an expert witness with regard to reasonableness of attorney's fees issues in superior court.
- Testimony as an expert witness in arbitrations concerning attorney fee disputes.

- Experience as attorney for litigants in matters concerning attorney fee disputes.
- Practice consists predominantly of trial work. More than 50 jury trials conducted, each with exposure or value in the six to seven-figure range.
- Member, American Board of Trial Advocates. (Advocate status.)
- Articles written, seminars conducted and speaking engagements on the subject of reasonableness of attorney's fees and auditing practices.
- Martindale-Hubbell, rated AV, "Preeminent."
- Super Lawyer 2012.
- Representative cases on appeal:

  **Simon v. San Paolo U.S. Holding Co., Inc.** (2005) 35 Cal. 4th 1159
  California Supreme Court case establishing Constitutional limits on punitive damages.

  **Blanchard v. State Farm** (1991) 2 Cal. App. 4th 345
  Case finding no entitlement to independent counsel in construction defect case.

  **Kliger v. Superior Court** (1990) 52 Cal. 3d 65
  California Supreme Court case establishing parameters for suits for employer conduct in violation of public policy.

  **Trope v. Katz (1995)** 11 Cal. 4th 274
  Trial testimony in case establishing that attorneys cannot recover fees representing themselves in a fee collection action.

  **Lance Camper v. Republic Indemnity** (2001) 90 Cal App. 4th 1151
  Trial testimony concerning Brandt fees in insurance bad faith case.

# Exhibit "3"

# FEE AND COSTS BILLED

**LUND V MERRICK FEE REVIEW**
**Re: Sheppard Mullin Richter & Hampton LLP**
**Fees and Costs Billed**

| Statement Date | Invoice | Fees Billed | Costs Billed | Total Billed |
|---|---|---|---|---|
| 5/31/2011 | 222867390 | $27,637.00 | $0.00 | $27,637.00 |
| 6/9/2011 | 222871150 | $32,421.00 | $0.00 | $32,421.00 |
| 7/6/2011 | 222877477 | $9,071.50 | $0.00 | $9,071.50 |
| 8/8/2011 | 222887491 | $11,867.50 | $0.00 | $11,867.50 |
| 9/6/2011 | 222894959 | $1,970.00 | $0.00 | $1,970.00 |
| 10/6/2011 | 222903599 | $1,268.00 | $0.00 | $1,268.00 |
| 11/7/2011 | 222911580 | $1,898.00 | $0.00 | $1,898.00 |
| 12/6/2011 | 222918707 | $27,876.00 | $0.00 | $27,876.00 |
| 1/5/2012 | 222926663 | $2,246.00 | $0.00 | $2,246.00 |
| 2/7/2012 | 222934671 | $4,553.00 | $0.00 | $4,553.00 |
| 3/7/2012 | 222942643 | $15,771.00 | $0.00 | $15,771.00 |
| 4/10/2012 | 222951988 | $3,117.00 | $0.00 | $3,117.00 |
| 5/3/2012 | 222958064 | $26,293.50 | $0.00 | $26,293.50 |
| 6/5/2012 | 222966179 | $2,565.50 | $0.00 | $2,565.50 |
| 7/17/2012 | 222978171 | $13,245.00 | $0.00 | $13,245.00 |
| 9/7/2012 | 222990432 | $1,121.00 | $0.00 | $1,121.00 |
| 10/5/2012 | 222998898 | $590.00 | $0.00 | $590.00 |
| 11/5/2012 | 223005949 | $671.00 | $0.00 | $671.00 |
| **Total** | | **$184,182.00** | **$0.00** | **$184,182.00** |

Note: Total does not include redacted fees.

Defendant fee motion states an incorrect fee amount of $185,572.

Defendant also requests an additional 6.5 hours\$3,250 for this fee motion reply & hearing attendance

# INDEX OF BILLING PERSONNEL

# LUND V MERRICK FEE REVIEW
## Re: Sheppard Mullin Richter & Hampton LLP
## Index of Billing Personnel

| Timekeeper | Bar Admittance Date | Rate | Hours Billed |
|---|---|---|---|
| **Partner** | | | |
| Daucher, Brian M. | 1994 CA | $560.00 | 77.40 |
| | 1994 CA | $590.00 | 47.80 |
| Godshall, Randolph B. | 1979 CA | $595.00 | 8.00 |
| **(2) $572.87 Partner Total (29.97%)** | | | **133.20** |
| **Associate** | | | |
| Lee, Adrienne W. | 2009 CA | $340.00 | 192.00 |
| | 2009 CA | $395.00 | 69.40 |
| Luther, Douglas | 2011 CA | $285.00 | 43.20 |
| Merlo, Ashley | 2006 CA | $435.00 | 6.60 |
| **(3) $346.65 Associate Total (70.03%)** | | | **311.20** |
| **(5) $414.45 All Timekeepers Total** | | | **444.40** |

Note: Does not include redacted hours. Hours listed on invoices totals 505.10.

# HOURS BILLED PER STATEMENT

**LUND V MERRICK FEE REVIEW**
**Re: Sheppard Mullin Richter & Hampton LLP**
**Hours Billed per Statement**

| Timekeeper | 5/31/2011 | 6/9/2011 | 7/6/2011 | 8/8/2011 | 9/6/2011 | 10/6/2011 | 11/7/2011 | 12/6/2011 | 1/5/2012 |
|---|---|---|---|---|---|---|---|---|---|
| Daucher, Brian M. | 17.0 | 14.6 | 3.1 | 12.1 | 2.0 | 1.9 | 0.9 | 24.4 | 1.4 |
| Godshall, Randolph B. | 3.8 | 0.4 | 0.5 | 3.3 | | | | | |
| Lee, Adrienne W. | 45.1 | 63.7 | 20.7 | 9.2 | 2.5 | 0.6 | 4.1 | 41.8 | 4.3 |
| Luther, Douglas | | | | | | | | | |
| Merlo, Ashley | 1.2 | 5.4 | | | | | | | |
| **Total** | **67.1** | **84.1** | **24.3** | **24.6** | **4.5** | **2.5** | **5.0** | **66.2** | **5.7** |

Note: Does not include redacted hours. Hours listed on invoices totals 505.10.

| 2/7/2012 | 3/7/2012 | 4/10/2012 | 5/3/2012 | 6/5/2012 | 7/17/2012 | 9/7/2012 | 10/5/2012 | 11/5/2012 | Total |
|---|---|---|---|---|---|---|---|---|---|
| 3.7 | 11.6 | 1.5 | 8.4 | 0.8 | 18.7 | 1.9 | 1.0 | 0.2 | **125.2** |
| | | | | | | | | | **8.0** |
| 6.0 | 22.6 | 0.6 | 27.9 | 5.3 | 5.6 | | | 1.4 | **261.4** |
| | | 7.0 | 36.2 | | | | | | **43.2** |
| | | | | | | | | | **6.6** |
| **9.7** | **34.2** | **9.1** | **72.5** | **6.1** | **24.3** | **1.9** | **1.0** | **1.6** | **444.4** |

2011 ALM SURVERY OF LAW FIRM ECONOMICS

# THE SURVEY OF LAW FIRM ECONOMICS

## *2011 Edition*

Conducted and Published by

**THE NATIONAL LAW JOURNAL**

**and**

**ALM LEGAL INTELLIGENCE**
120 Broadway, 5th Floor
New York, NY 10271
(888) 770-5647
almlegalintel@alm.com
www.almlegalintelligence.com

Release Date: July 2011

No part of this work may be reproduced or copied in any form or by any means, graphic, electronic or mechanical, including photocopying, recording, taping, or information and retrieval systems, without prior written permission of the publisher. For permission contact 800-888-8300 or reprintscustomerservice@alm.com.

© 2011 ALM Media Properties LLC

FIRM SIZE BY YEARS OF LEGAL EXPERIENCE
STANDARD HOURLY BILLING RATES
As of January 1, 2011

| Firm Size/Years of Experience | | Number of Offices | RATE | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Number of Lawyers | Average $ | Lower Quartile $ | Median $ | Upper Quartile $ | Ninth Decile $ |
| 41 to 75 Lawyers | Under 2 Years | 50 | 145 | 174 | 150 | 170 | 190 | 210 |
| | 2 or 3 Years | 54 | 191 | 194 | 165 | 180 | 220 | 250 |
| | 4 or 5 Years | 57 | 202 | 211 | 180 | 205 | 230 | 275 |
| | 6 or 7 Years | 54 | 150 | 225 | 195 | 215 | 251 | 295 |
| | 8 to 10 Years | 58 | 190 | 253 | 214 | 240 | 281 | 340 |
| | 11 to 15 Years | 67 | 332 | 277 | 235 | 265 | 310 | 375 |
| | 16 to 20 Years | 61 | 247 | 298 | 255 | 290 | 330 | 396 |
| | 21 to 30 Years | 72 | 535 | 314 | 260 | 300 | 345 | 435 |
| | 31 or More Years | 78 | 447 | 340 | 295 | 325 | 385 | 450 |
| 76 to 150 Lawyers | Under 2 Years | 60 | 201 | 192 | 160 | 185 | 215 | 249 |
| | 2 or 3 Years | 70 | 280 | 211 | 165 | 201 | 250 | 290 |
| | 4 or 5 Years | 75 | 291 | 230 | 179 | 225 | 265 | 335 |
| | 6 or 7 Years | 64 | 213 | 243 | 194 | 240 | 280 | 350 |
| | 8 to 10 Years | 76 | 305 | 250 | 180 | 255 | 299 | 350 |
| | 11 to 15 Years | 95 | 408 | 299 | 250 | 310 | 350 | 400 |
| | 16 to 20 Years | 81 | 303 | 336 | 285 | 340 | 398 | 450 |
| | 21 to 30 Years | 95 | 641 | 358 | 300 | 370 | 425 | 465 |
| | 31 or More Years | 82 | 472 | 408 | 355 | 405 | 450 | 510 |
| Over 150 Lawyers | Under 2 Years | 61 | 233 | 225 | 197 | 230 | 250 | 285 |
| | 2 or 3 Years | 90 | 339 | 260 | 225 | 265 | 295 | 325 |
| | 4 or 5 Years | 94 | 385 | 286 | 243 | 295 | 340 | 375 |
| | 6 or 7 Years | 96 | 315 | 293 | 222 | 285 | 360 | 420 |
| | 8 to 10 Years | 95 | 372 | 322 | 240 | 310 | 410 | 470 |
| | 11 to 15 Years | 118 | 589 | 363 | 275 | 355 | 450 | 520 |
| | 16 to 20 Years | 125 | 490 | 406 | 315 | 395 | 485 | 600 |
| | 21 to 30 Years | 134 | 890 | 430 | 335 | 420 | 525 | 640 |
| | 31 or More Years | 119 | 662 | 471 | 375 | 450 | 560 | 700 |

STATE BY YEARS OF LEGAL EXPERIENCE
STANDARD HOURLY BILLING RATES
As of January 1, 2011

| State/Years of Experience | | Number of Offices | Number of Lawyers | RATE Average $ | Lower Quartile $ | Median $ | Upper Quartile $ | Ninth Decile $ |
|---|---|---|---|---|---|---|---|---|
| AL | Under 2 Years | 3 | 4 | -- | -- | -- | -- | -- |
| | 2 or 3 Years | 4 | 4 | -- | -- | -- | -- | -- |
| | 4 or 5 Years | 2 | 2 | -- | -- | -- | -- | -- |
| | 6 or 7 Years | 4 | 9 | -- | -- | -- | -- | -- |
| | 8 to 10 Years | 2 | 2 | -- | -- | -- | -- | -- |
| | 11 to 15 Years | 5 | 17 | 273 | 223 | 265 | 315 | 361 |
| | 16 to 20 Years | 4 | 9 | -- | -- | -- | -- | -- |
| | 21 to 30 Years | 8 | 20 | 300 | 236 | 300 | 344 | 418 |
| | 31 or More Years | 6 | 25 | 295 | 210 | 280 | 383 | 421 |
| AZ | Under 2 Years | 4 | 14 | -- | -- | -- | -- | -- |
| | 2 or 3 Years | 6 | 17 | 254 | 225 | 275 | 275 | 296 |
| | 4 or 5 Years | 5 | 25 | 296 | 283 | 300 | 300 | 360 |
| | 6 or 7 Years | 6 | 19 | 315 | 300 | 325 | 350 | 380 |
| | 8 to 10 Years | 5 | 18 | 314 | 273 | 325 | 356 | 385 |
| | 11 to 15 Years | 7 | 36 | 370 | 335 | 375 | 400 | 433 |
| | 16 to 20 Years | 7 | 28 | 419 | 381 | 425 | 450 | 510 |
| | 21 to 30 Years | 8 | 51 | 445 | 425 | 450 | 510 | 525 |
| | 31 or More Years | 7 | 45 | 495 | 450 | 500 | 525 | 581 |
| CA | Under 2 Years | 7 | 17 | 220 | 180 | 215 | 255 | 275 |
| | 2 or 3 Years | 12 | 28 | 255 | 208 | 245 | 299 | 328 |
| | 4 or 5 Years | 12 | 24 | 278 | 225 | 278 | 324 | 370 |
| | 6 or 7 Years | 12 | 28 | 288 | 202 | 265 | 330 | 495 |
| | 8 to 10 Years | 8 | 19 | 307 | 179 | 300 | 415 | 495 |
| | 11 to 15 Years | 13 | 36 | 357 | 240 | 373 | 445 | 503 |
| | 16 to 20 Years | 11 | 28 | 379 | 303 | 375 | 469 | 544 |
| | 21 to 30 Years | 14 | 59 | 441 | 360 | 425 | 535 | 665 |
| | 31 or More Years | 13 | 30 | 491 | 419 | 478 | 591 | 650 |

(continued on next page)

# RATE ANALYSIS

**LUND V. MERRICK FEE REVIEW**
**Re: Sheppard Mullin Richter & Hampton LLP**
**Rate Analysis**

| | | | | ALM Survey | | | |
|---|---|---|---|---|---|---|---|
| | Requested Rates | Hours | Requested Fees | CA Avg. | CA Avg. Fees | Firm Size | Firm Size Fees |
| Daucher, Brian M. | $ 560.00 | 77.4 | $ 43,344.00 | $ 379.00 | $ 29,334.60 | $ 406.00 | $ 31,424.40 |
| Daucher, Brian M. | $ 590.00 | 47.8 | $ 28,202.00 | $ 379.00 | $ 18,116.20 | $ 406.00 | $ 19,406.80 |
| Godshall, Randolph B. | $ 595.00 | 8 | $ 4,760.00 | $ 491.00 | $ 3,928.00 | $ 471.00 | $ 3,768.00 |
| Lee, Andrienne W. | $ 340.00 | 192 | $ 65,280.00 | $ 255.00 | $ 48,960.00 | $ 260.00 | $ 49,920.00 |
| Lee, Andrienne W. | $ 395.00 | 69.4 | $ 27,413.00 | $ 255.00 | $ 17,697.00 | $ 260.00 | $ 18,044.00 |
| Luther, Douglas | $ 285.00 | 43.2 | $ 12,312.00 | $ 220.00 | $ 9,504.00 | $ 225.00 | $ 9,720.00 |
| Merlo, Ashley | $ 435.00 | 6.6 | $ 2,871.00 | $ 278.00 | $ 1,834.80 | $ 286.00 | $ 1,887.60 |
| | | 444.4 | $ 184,182.00 | | $ 129,374.60 | | $134,170.80 |
| | | Avg. Rates | $ 414.45 | | $ 291.12 | | $ 301.91 |

# OUTLINE OF SERVICES PERFORMED

**LUND V MERRICK FEE REVIEW**
**Re: Sheppard Mullin Richter & Hampton LLP**
**Outline of Services Performed**

| Date From | Date To | Description | Time-keeper | Hours Billed |
|---|---|---|---|---|
| 4/12/2011 | 5/12/2011 | Review complaint and draft anti-SLAPP motion, including research statute requirements, elements and defenses of IIED/slander | RBG, BMD, AWL, AM | 132.90 |
| 5/31/2011 | 6/2/2011 | Stipulation and order re: continued hearing on anti-SLAPP motion to strike | BMD, AWL | 1.70 |
| 6/28/2011 | 7/1/2011 | Reply to opposition to anti-SLAPP motion | BMD, AWL, RBG | 29.80 |
| 7/11/2011 | | Prepare for and attend hearing on anti-SLAPP motion [3.1; 3.5] | BMD, AWL | 6.60 |
| 10/26/2011 | 12/1/2011 | Draft appellate brief, including legal research burden of proof for malice, conservator duties and emotional distress | AWL, BMD | 72.40 |
| 1/10/2012 | 2/24/2012 | Draft reply to respondent's appellate brief | AWL, BMD | 42.90 |
| 3/28/2012 | 4/26/2012 | Draft supplemental appellate brief, including legal research publication in slander | DL, AWL, BMD | 75.40 |
| 5/30/2012 | 6/17/2012 | Prepare for appellate argument | AWL, BMD | 18.80 |
| 6/18/2012 | | Attend status conference in state court | AWL | 1.50 |
| 6/18/2012 | | Prepare for and attend oral argument [4.1 each] | BMD, AWL | 8.20 |
| 7/18/2012 | | Objections to supplemental declaration of S. Lund | AWL | 0.60 |
| 7/22/2012 | | Review tentative to motion to strike | BMD, AWL | 1.40 |
| 7/24/2012 | | Prepare for anti-SLAPP hearing | AWL | 1.30 |
| 7/25/2012 | | Prepare for and attend anti-SLAPP hearing, travel [4.2; 3.1] | BMD, AWL | 7.30 |
| 8/4/2012 | 8/12/2012 | Research and draft notice of appeal | BMD, AWL | 1.50 |
| 8/18/2012 | | Notice of designation of record | BMD, AWL | 1.70 |
| 8/27/2012 | | Review appeal reversing opinion denying anti-SLAPP | BMD | 1.70 |
| 9/6/2012 | 9/9/2012 | Joint proposed briefing schedule | BMD, AWL | 1.10 |
| 10/24/2012 | | Proposed judgment, memo of costs | AWL | 1.40 |

| Date From | To | Description | Time-keeper | Hours Billed |
|---|---|---|---|---|
| | | Total | | 408.20 |

OVERHEAD

# LUND V MERRICK FEE REVIEW
## Re: Sheppard Mullin Richter & Hampton LLP
## Overhead

| Statement Date | Entry Date | Time-keeper | Description | Apprx Hours | Apprx Fees |
|---|---|---|---|---|---|
| 5/31/2011 | 4/13/2011 | RBG | Prepared emails to Dominique re representation | 0.20 | $119.00 |
| 5/31/2011 | 4/15/2011 | BMD | Prepared initial research assignments; communications regarding timing sequence | 1.00 | $560.00 |
| 6/9/2011 | 5/10/2011 | AWL | Compiled exhibits for request for judicial notice | 3.00 | $1,020.00 |
| 6/9/2011 | 5/11/2011 | AWL | Compiled exhibits | 2.30 | $782.00 |
| 8/8/2011 | 7/1/2011 | BMD | Analyzed issues regarding filing and service | 0.30 | $168.00 |
| 9/6/2011 | 8/18/2011 | AWL | Corresponded with court reporter re transcript | 0.30 | $102.00 |
| 10/6/2011 | 9/9/2011 | BMD | Analyzed issues regarding filing and service | 0.20 | $112.00 |
| 11/7/2011 | 10/26/2011 | AWL | Compiled table of contents for appendix | 1.20 | $408.00 |
| 11/7/2011 | 10/27/2011 | AWL | Compiled table of contents for appendix for appeal | 0.50 | $170.00 |
| 12/6/2011 | 11/30/2011 | BMD | Analyzed issues regarding filing and service | 0.30 | $168.00 |
| 1/5/2012 | 12/2/2011 | BMD | Confirmed filing of appeal brief | 0.20 | $112.00 |
| 3/7/2012 | 2/24/2012 | BMD | Analyzed issues regarding filing and service | 0.40 | $236.00 |
| 4/10/2012 | 3/12/2012 | BMD | Reviewed notice of oral argument; calendared dates | 0.50 | $295.00 |
| | | | Total | 10.40 | $4,252.00 |

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the City of Costa Mesa, County of Orange, State of California. I am over the age of 18 years and not a party to the within action. My business address is 695 Town Center Drive, Suite 700, Costa Mesa, California 92626. On August 7, 2014, I served the documents named below on the parties in this action as follows:

DOCUMENT(S) SERVED: **DECLARATION OF ANDRE E. JARDINI IN SUPPORT OF PLAINTIFF SHERRY LUND'S OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR AWARD OF ATTORNEYS' FEES**

SERVED UPON: **SEE ATTACHED SERVICE LIST**

☐ (BY MAIL) I caused each such envelope, with postage thereon fully prepaid, to be placed in the United States mail at Costa Mesa, California. I am readily familiar with the practice of the Law Offices of Bohm Matsen, LLP., for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is placed for collection. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ (BY PERSONAL SERVICE) I **caused** the above-referenced documents to be personally delivered to the addresses listed on the attached Service List by close of business on August 7, 2014.

☐ BY OVERNIGHT MAIL) I am readily familiar with the practice of the Law Offices of Bohm Matsen, LLP., for the collection and processing of correspondence for overnight delivery and known that the document(s) described herein will be deposited in a box or other facility regularly maintained by overnight mail service for overnight delivery.

☐ (BY FACSIMILE WHERE INDICATED) The above-referenced document was transmitted by facsimile transmission and the transmission was reported as complete and without error. Pursuant to C.R.C. 2009(I), I caused the transmitting facsimile machine to issue properly a transmission report, a copy of which is attached to this Declaration.

☒ (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court, at whose direction this service was made.

Executed on August 7, 2014, at Costa Mesa, California.

Brittney Sanchez

## Service List

***Lund v. Merrick***

***Orange County Superior Court- Central Justice Center***

***Case No. 30-2011-00464163***

| | |
|---|---|
| Sheppard, Mullin, Richter & Hampton, LLP<br>Brian Daucher, Esq.<br>650 Town Center Drive, 4th Floor<br>Costa Mesa, CA 92626<br>(714) 513-5100- tel<br>(714) 513-5130- fax | *Attorney for Dominique Merrick* |

# EXHIBIT "9"

GURU

| | Payee | Payee Type | Transaction Type Group | Transaction Type | Transaction Date | Invoice Date | Invoice Amnt | Base Currency (USD) Base Paid | Base Reserve | Base Movement | Settlement Currency Currency | Sett Paid | Sett Reserve | Sett Movement | Original Currency Currency | Orig Paid | Orig Reserve | Orig Movement |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | American Arbitration Associatio | Vendor | Expense | Expense Expense | 02-May-23 4:06:00 PM | | | (7,122.89) | [redacted] | [redacted] | US Dollar | (7,122.89) | [redacted] | [redacted] | US Dollar | (7,122.89) | [redacted] | [redacted] |
| 12 | [redacted] | | | | | | | | | | | | | | | | | |
| 18 | KLDISCOVERY ONTRACK | Vendor | Expense | Expense Expense | 08-Dec-22 5:55:00 PM | 11/2/2022 | 25.00 | 12.50 | [redacted] | [redacted] | US Dollar | 12.50 | [redacted] | [redacted] | US Dollar | 12.50 | [redacted] | [redacted] |
| 19 | KLDISCOVERY ONTRACK | Vendor | Expense | Expense Expense | 08-Dec-22 5:44:00 PM | 10/4/2022 | 25.00 | 12.50 | [redacted] | [redacted] | US Dollar | 12.50 | [redacted] | [redacted] | US Dollar | 12.50 | [redacted] | [redacted] |
| 21 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 22-Nov-22 12:01:00 PM | | | 1,522.61 | [redacted] | [redacted] | US Dollar | 1,522.61 | [redacted] | [redacted] | US Dollar | 1,522.61 | [redacted] | [redacted] |
| 22 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 22-Nov-22 12:00:00 PM | 7/9/2021 | 26,745.16 | 791.09 | [redacted] | [redacted] | US Dollar | 791.09 | [redacted] | [redacted] | US Dollar | 791.09 | [redacted] | [redacted] |
| 23 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 22-Nov-22 11:57:00 AM | 8/23/2021 | 62,832.43 | 1,429.99 | [redacted] | [redacted] | US Dollar | 1,429.99 | [redacted] | [redacted] | US Dollar | 1,429.99 | [redacted] | [redacted] |
| 24 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 22-Nov-22 11:57:00 AM | 8/23/2021 | 17,652.04 | 8,826.02 | [redacted] | [redacted] | US Dollar | 8,826.02 | [redacted] | [redacted] | US Dollar | 8,826.02 | [redacted] | [redacted] |
| 25 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 22-Nov-22 11:55:00 AM | 1/18/2022 | 38,972.69 | 280.79 | [redacted] | [redacted] | US Dollar | 280.79 | [redacted] | [redacted] | US Dollar | 280.79 | [redacted] | [redacted] |
| 26 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 15-Nov-22 12:44:00 PM | 5/12/2021 | 15,337.00 | 7,668.50 | [redacted] | [redacted] | US Dollar | 7,668.50 | [redacted] | [redacted] | US Dollar | 7,668.50 | [redacted] | [redacted] |
| 27 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 15-Nov-22 12:41:00 PM | 5/12/2021 | 1,640.00 | 820.00 | [redacted] | [redacted] | US Dollar | 820.00 | [redacted] | [redacted] | US Dollar | 820.00 | [redacted] | [redacted] |
| 28 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 15-Nov-22 12:39:00 PM | 9/9/2021 | 13,000.93 | 6,500.46 | [redacted] | [redacted] | US Dollar | 6,500.46 | [redacted] | [redacted] | US Dollar | 6,500.46 | [redacted] | [redacted] |
| 29 | KLDISCOVERY ONTRACK | Vendor | Expense | Expense Expense | 15-Nov-22 12:28:00 PM | 10/4/2022 | 25.00 | 12.50 | [redacted] | [redacted] | US Dollar | 12.50 | [redacted] | [redacted] | US Dollar | 12.50 | [redacted] | [redacted] |
| 32 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 07-Nov-22 4:33:00 PM | 11/18/2021 | 59,470.77 | 2,367.04 | [redacted] | [redacted] | US Dollar | 2,367.04 | [redacted] | [redacted] | US Dollar | 2,367.04 | [redacted] | [redacted] |
| 33 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 04-Nov-22 2:56:00 PM | 10/18/2021 | 65,496.46 | 7,978.20 | [redacted] | [redacted] | US Dollar | 7,978.20 | [redacted] | [redacted] | US Dollar | 7,978.20 | [redacted] | [redacted] |
| 34 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 31-Oct-22 4:52:00 PM | 12/20/2021 | 56,715.17 | 4,452.24 | [redacted] | [redacted] | US Dollar | 4,452.24 | [redacted] | [redacted] | US Dollar | 4,452.24 | [redacted] | [redacted] |
| 35 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 31-Oct-22 4:52:00 PM | 12/20/2021 | 4,497.21 | 2,248.61 | [redacted] | [redacted] | US Dollar | 2,248.61 | [redacted] | [redacted] | US Dollar | 2,248.61 | [redacted] | [redacted] |
| 36 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 31-Oct-22 4:51:00 PM | 8/30/2021 | 98,254.08 | 3,289.24 | [redacted] | [redacted] | US Dollar | 3,289.24 | [redacted] | [redacted] | US Dollar | 3,289.24 | [redacted] | [redacted] |
| 37 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 13-Oct-22 12:58:00 PM | 3/19/2021 | 18,412.13 | 3,798.42 | [redacted] | [redacted] | US Dollar | 3,798.42 | [redacted] | [redacted] | US Dollar | 3,798.42 | [redacted] | [redacted] |
| 38 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 06-Oct-22 10:18:00 AM | 2/25/2021 | 18,867.20 | 313.50 | [redacted] | [redacted] | US Dollar | 313.50 | [redacted] | [redacted] | US Dollar | 313.50 | [redacted] | [redacted] |
| 39 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 03-Oct-22 2:21:00 PM | 1/19/2021 | 7,793.19 | 192.31 | [redacted] | [redacted] | US Dollar | 192.31 | [redacted] | [redacted] | US Dollar | 192.31 | [redacted] | [redacted] |
| 40 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 03-Oct-22 2:20:00 PM | 12/28/2020 | 2,240.77 | 225.86 | [redacted] | [redacted] | US Dollar | 225.86 | [redacted] | [redacted] | US Dollar | 225.86 | [redacted] | [redacted] |
| 42 | American Arbitration Associatio | Vendor | Expense | Expense Expense | 02-Sep-22 4:00:00 PM | | | 7,122.89 | [redacted] | [redacted] | US Dollar | 7,122.89 | [redacted] | [redacted] | US Dollar | 7,122.89 | [redacted] | [redacted] |
| 43 | AMERICAN ARBITRATION ASSO | Vendor | Expense | Expense Expense | 02-Sep-22 3:57:00 PM | | | (7,122.89) | [redacted] | [redacted] | US Dollar | (7,122.89) | [redacted] | [redacted] | US Dollar | (7,122.89) | [redacted] | [redacted] |
| 44 | AMERICAN ARBITRATION ASSO | Vendor | Expense | Expense Expense | 03-Aug-22 3:37:00 PM | | | (7,122.89) | [redacted] | [redacted] | US Dollar | (7,122.89) | [redacted] | [redacted] | US Dollar | (7,122.89) | [redacted] | [redacted] |
| 45 | AMERICAN ARBITRATION ASSO | Vendor | Expense | Expense Expense | 03-Aug-22 3:37:00 PM | | | 7,122.89 | [redacted] | [redacted] | US Dollar | 7,122.89 | [redacted] | [redacted] | US Dollar | 7,122.89 | [redacted] | [redacted] |
| 47 | DSU DISCOVERY | Vendor | Expense | Expense Expense | 15-Jul-22 11:58:00 AM | 12/7/2021 | 957.89 | 531.90 | [redacted] | [redacted] | US Dollar | 531.90 | [redacted] | [redacted] | US Dollar | 531.90 | [redacted] | [redacted] |
| 48 | DSU DISCOVERY | Vendor | Expense | Expense Expense | 15-Jul-22 11:57:00 AM | 11/11/2021 | 105.90 | 52.95 | [redacted] | [redacted] | US Dollar | 52.95 | [redacted] | [redacted] | US Dollar | 52.95 | [redacted] | [redacted] |
| 49 | LITIGATION-TECH LLC | Vendor | Expense | Expense Expense | 03-Jun-22 5:04:00 PM | 11/17/2021 | 16,099.25 | 8,049.63 | [redacted] | [redacted] | US Dollar | 8,049.63 | [redacted] | [redacted] | US Dollar | 8,049.63 | [redacted] | [redacted] |
| 50 | LITIGATION-TECH LLC | Vendor | Expense | Expense Expense | 03-Jun-22 5:02:00 PM | 10/20/2021 | 8,932.75 | 4,466.38 | [redacted] | [redacted] | US Dollar | 4,466.38 | [redacted] | [redacted] | US Dollar | 4,466.38 | [redacted] | [redacted] |
| 51 | LITIGATION-TECH LLC | Vendor | Expense | Expense Expense | 03-Jun-22 5:01:00 PM | 9/20/2021 | 438.75 | 219.38 | [redacted] | [redacted] | US Dollar | 219.38 | [redacted] | [redacted] | US Dollar | 219.38 | [redacted] | [redacted] |
| 52 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 13-May-22 4:44:00 PM | 5/4/2022 | 42,929.14 | 21,358.73 | [redacted] | [redacted] | US Dollar | 21,358.73 | [redacted] | [redacted] | US Dollar | 21,358.73 | [redacted] | [redacted] |
| 54 | PETERSON REPORTING VIDEO & | Vendor | Expense | Expense Expense | 06-May-22 2:02:00 PM | 7/1/2021 | 3,036.08 | 1,518.04 | [redacted] | [redacted] | US Dollar | 1,518.04 | [redacted] | [redacted] | US Dollar | 1,518.04 | [redacted] | [redacted] |
| 55 | PETERSON REPORTING VIDEO & | Vendor | Expense | Expense Expense | 06-May-22 2:01:00 PM | 9/22/2021 | 1,878.75 | 939.38 | [redacted] | [redacted] | US Dollar | 939.38 | [redacted] | [redacted] | US Dollar | 939.38 | [redacted] | [redacted] |
| 56 | PETERSON REPORTING VIDEO & | Vendor | Expense | Expense Expense | 06-May-22 2:00:00 PM | 6/14/2021 | 5,429.89 | 2,714.94 | [redacted] | [redacted] | US Dollar | 2,714.94 | [redacted] | [redacted] | US Dollar | 2,714.94 | [redacted] | [redacted] |
| 57 | [redacted] | | | | | | | | | | | | | | | | | |
| 58 | KLDISCOVERY ONTRACK | Vendor | Expense | Expense Expense | 11-Apr-22 1:09:00 PM | 2/10/2022 | 9,460.47 | 3,730.23 | [redacted] | [redacted] | US Dollar | 3,730.23 | [redacted] | [redacted] | US Dollar | 3,730.23 | [redacted] | [redacted] |
| 59 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 08-Apr-22 7:11:00 PM | 3/30/2022 | 779.50 | 328.14 | [redacted] | [redacted] | US Dollar | 328.14 | [redacted] | [redacted] | US Dollar | 328.14 | [redacted] | [redacted] |
| 60 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 08-Apr-22 7:11:00 PM | 3/30/2022 | 7,817.91 | 3,597.41 | [redacted] | [redacted] | US Dollar | 3,597.41 | [redacted] | [redacted] | US Dollar | 3,597.41 | [redacted] | [redacted] |
| 62 | Inventus LLC Receivable | Vendor | Expense | Expense Expense | 21-Mar-22 3:41:00 PM | 12/10/2021 | 14,405.63 | 7,202.82 | [redacted] | [redacted] | US Dollar | 7,202.82 | [redacted] | [redacted] | US Dollar | 7,202.82 | [redacted] | [redacted] |
| 64 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 11-Mar-22 4:08:00 PM | 1/6/2022 | 19,284.14 | 9,642.07 | [redacted] | [redacted] | US Dollar | 9,642.07 | [redacted] | [redacted] | US Dollar | 9,642.07 | [redacted] | [redacted] |
| 65 | Kroll LLC | Vendor | Expense | Expense Expense | 18-Feb-22 1:51:00 PM | 1/26/2022 | 36,852.45 | 18,426.23 | [redacted] | [redacted] | US Dollar | 18,426.23 | [redacted] | [redacted] | US Dollar | 18,426.23 | [redacted] | [redacted] |
| 66 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 16-Feb-22 3:33:00 PM | 2/7/2022 | 279,066.00 | 110,443.81 | [redacted] | [redacted] | US Dollar | 110,443.81 | [redacted] | [redacted] | US Dollar | 110,443.81 | [redacted] | [redacted] |
| 67 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 16-Feb-22 3:33:00 PM | 2/7/2022 | 3,795.92 | 1,897.96 | [redacted] | [redacted] | US Dollar | 1,897.96 | [redacted] | [redacted] | US Dollar | 1,897.96 | [redacted] | [redacted] |
| 68 | CLC Contractors Licensing Cent | Vendor | Expense | Paid Expert Fees | 15-Feb-22 5:34:00 PM | 2/7/2022 | 1,751.25 | 1,751.25 | [redacted] | [redacted] | US Dollar | 1,751.25 | [redacted] | [redacted] | US Dollar | 1,751.25 | [redacted] | [redacted] |
| 69 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 28-Jan-22 3:29:00 PM | 1/18/2022 | 240,190.00 | 100,008.10 | [redacted] | [redacted] | US Dollar | 100,008.10 | [redacted] | [redacted] | US Dollar | 100,008.10 | [redacted] | [redacted] |
| 70 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 28-Jan-22 3:29:00 PM | 1/18/2022 | 3,440.18 | 1,683.34 | [redacted] | [redacted] | US Dollar | 1,683.34 | [redacted] | [redacted] | US Dollar | 1,683.34 | [redacted] | [redacted] |
| 71 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 25-Jan-22 2:44:00 PM | 1/6/2022 | 49,393.50 | 24,696.75 | [redacted] | [redacted] | US Dollar | 24,696.75 | [redacted] | [redacted] | US Dollar | 24,696.75 | [redacted] | [redacted] |
| 72 | Technology Infrastructure Cons | Vendor | Expense | Paid Expert Fees | 25-Jan-22 2:39:00 PM | 12/31/2021 | 5,625.00 | 2,812.50 | [redacted] | [redacted] | US Dollar | 2,812.50 | [redacted] | [redacted] | US Dollar | 2,812.50 | [redacted] | [redacted] |
| 73 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 25-Jan-22 12:54:00 PM | 12/31/2021 | 37,631.25 | 18,815.63 | [redacted] | [redacted] | US Dollar | 18,815.63 | [redacted] | [redacted] | US Dollar | 18,815.63 | [redacted] | [redacted] |
| 74 | LITIGATION-TECH LLC | Vendor | Expense | Expense Expense | 25-Jan-22 11:13:00 AM | 1/5/2022 | 148,352.25 | 74,176.13 | [redacted] | [redacted] | US Dollar | 74,176.13 | [redacted] | [redacted] | US Dollar | 74,176.13 | [redacted] | [redacted] |
| 75 | KROLL, LLC | Vendor | Expense | Expense Expense | 24-Jan-22 6:04:00 PM | 12/27/2021 | 1,206.25 | 603.13 | [redacted] | [redacted] | US Dollar | 603.13 | [redacted] | [redacted] | US Dollar | 603.13 | [redacted] | [redacted] |
| 76 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 24-Jan-22 2:17:00 PM | 6/8/2021 | 28,412.48 | 833.25 | [redacted] | [redacted] | US Dollar | 833.25 | [redacted] | [redacted] | US Dollar | 833.25 | [redacted] | [redacted] |
| 78 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 10-Jan-22 3:44:00 PM | 12/6/2021 | 19,155.56 | 9,577.78 | [redacted] | [redacted] | US Dollar | 9,577.78 | [redacted] | [redacted] | US Dollar | 9,577.78 | [redacted] | [redacted] |
| 79 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 10-Jan-22 3:43:00 PM | 11/9/2021 | 52,753.95 | 27,376.98 | [redacted] | [redacted] | US Dollar | 27,376.98 | [redacted] | [redacted] | US Dollar | 27,376.98 | [redacted] | [redacted] |
| 80 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 10-Jan-22 2:44:00 PM | 12/22/2021 | 196,062.10 | 98,031.05 | [redacted] | [redacted] | US Dollar | 98,031.05 | [redacted] | [redacted] | US Dollar | 98,031.05 | [redacted] | [redacted] |
| 81 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 30-Dec-21 5:37:00 PM | 12/20/2021 | 249,283.50 | 99,133.06 | [redacted] | [redacted] | US Dollar | 99,133.06 | [redacted] | [redacted] | US Dollar | 99,133.06 | [redacted] | [redacted] |
| 82 | KROLL, LLC | Vendor | Expense | Expense Expense | 30-Dec-21 10:16:00 AM | 11/30/2021 | 8,275.00 | 4,137.50 | [redacted] | [redacted] | US Dollar | 4,137.50 | [redacted] | [redacted] | US Dollar | 4,137.50 | [redacted] | [redacted] |
| 83 | KROLL, LLC | Vendor | Expense | Expense Expense | 30-Dec-21 9:57:00 AM | 10/4/2021 | 500.19 | 250.10 | [redacted] | [redacted] | US Dollar | 250.10 | [redacted] | [redacted] | US Dollar | 250.10 | [redacted] | [redacted] |
| 84 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 29-Dec-21 3:07:00 PM | 12/6/2021 | 86,037.90 | 43,018.95 | [redacted] | [redacted] | US Dollar | 43,018.95 | [redacted] | [redacted] | US Dollar | 43,018.95 | [redacted] | [redacted] |
| 85 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 22-Dec-21 1:34:00 PM | 11/27/2021 | 4,018.75 | 4,018.75 | [redacted] | [redacted] | US Dollar | 4,018.75 | [redacted] | [redacted] | US Dollar | 4,018.75 | [redacted] | [redacted] |
| 87 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 21-Dec-21 4:45:00 PM | 11/19/2021 | 22,214.37 | 11,107.19 | [redacted] | [redacted] | US Dollar | 11,107.19 | [redacted] | [redacted] | US Dollar | 11,107.19 | [redacted] | [redacted] |
| 88 | ESQUIRE DEPOSITION SOLUTIO | Vendor | Expense | Court Reporting Fee | 21-Dec-21 3:00:00 PM | 7/27/2021 | 1,670.20 | 583.60 | [redacted] | [redacted] | US Dollar | 583.60 | [redacted] | [redacted] | US Dollar | 583.60 | [redacted] | [redacted] |
| 89 | [redacted] | | | | | | | | | | | | | | | | | |
| 90 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 03-Dec-21 1:46:00 PM | 11/30/2021 | (14,008.13) | (14,008.13) | [redacted] | [redacted] | US Dollar | (14,008.13) | [redacted] | [redacted] | US Dollar | (14,008.13) | [redacted] | [redacted] |
| 91 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 01-Dec-21 4:51:00 PM | 11/18/2021 | 205,081.50 | 77,967.55 | [redacted] | [redacted] | US Dollar | 77,967.55 | [redacted] | [redacted] | US Dollar | 77,967.55 | [redacted] | [redacted] |
| 92 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 01-Dec-21 4:51:00 PM | 11/18/2021 | 9,381.78 | 4,659.74 | [redacted] | [redacted] | US Dollar | 4,659.74 | [redacted] | [redacted] | US Dollar | 4,659.74 | [redacted] | [redacted] |
| 93 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 01-Dec-21 2:30:00 PM | 11/5/2021 | 1,725.34 | 862.67 | [redacted] | [redacted] | US Dollar | 862.67 | [redacted] | [redacted] | US Dollar | 862.67 | [redacted] | [redacted] |
| 94 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 30-Nov-21 6:46:00 PM | 10/6/2021 | 22,007.41 | 11,003.71 | [redacted] | [redacted] | US Dollar | 11,003.71 | [redacted] | [redacted] | US Dollar | 11,003.71 | [redacted] | [redacted] |
| 95 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 30-Nov-21 6:44:00 PM | 8/6/2021 | 64,208.41 | 32,104.21 | [redacted] | [redacted] | US Dollar | 32,104.21 | [redacted] | [redacted] | US Dollar | 32,104.21 | [redacted] | [redacted] |
| 97 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 30-Nov-21 2:02:00 PM | 12/6/2021 | 14,008.13 | 14,008.13 | [redacted] | [redacted] | US Dollar | 14,008.13 | [redacted] | [redacted] | US Dollar | 14,008.13 | [redacted] | [redacted] |
| 98 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 27-Nov-21 12:29:00 PM | 11/5/2021 | 26,063.70 | 13,031.85 | [redacted] | [redacted] | US Dollar | 13,031.85 | [redacted] | [redacted] | US Dollar | 13,031.85 | [redacted] | [redacted] |
| 99 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 19-Nov-21 5:46:00 PM | 10/17/2021 | 5,085.00 | 2,541.50 | [redacted] | [redacted] | US Dollar | 2,541.50 | [redacted] | [redacted] | US Dollar | 2,541.50 | [redacted] | [redacted] |
| 100 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 16-Nov-21 5:23:00 PM | 9/30/2021 | 2,801.25 | 1,400.63 | [redacted] | [redacted] | US Dollar | 1,400.63 | [redacted] | [redacted] | US Dollar | 1,400.63 | [redacted] | [redacted] |
| 101 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 16-Nov-21 5:19:00 PM | 9/15/2021 | 11,081.25 | 5,540.63 | [redacted] | [redacted] | US Dollar | 5,540.63 | [redacted] | [redacted] | US Dollar | 5,540.63 | [redacted] | [redacted] |
| 102 | KROLL, LLC | Vendor | Expense | Expense Expense | 12-Nov-21 5:16:00 PM | 10/22/2021 | 812.50 | 406.25 | [redacted] | [redacted] | US Dollar | 406.25 | [redacted] | [redacted] | US Dollar | 406.25 | [redacted] | [redacted] |
| 103 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 12-Nov-21 12:08:00 PM | 10/21/2021 | 76,169.60 | 38,084.80 | [redacted] | [redacted] | US Dollar | 38,084.80 | [redacted] | [redacted] | US Dollar | 38,084.80 | [redacted] | [redacted] |
| 104 | Crowe LLP | Vendor | Expense | Paid Expert Fees | 09-Nov-21 5:39:00 PM | | | 4,641.25 | [redacted] | [redacted] | US Dollar | 4,641.25 | [redacted] | [redacted] | US Dollar | 4,641.25 | [redacted] | [redacted] |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 105 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 08-Nov-21 9:28:00 PM | 10/13/2021 | 77,853.79 | 38,926.90 | [redacted] | US Dollar | 38,926.90 | [redacted] | US Dollar | 38,926.90 | [redacted] |
| 106 | GORDON & REES | Vendor | Expense | Lawyers Fees | 06-Nov-21 1:41:00 PM | | | 13,626.45 | [redacted] | US Dollar | 13,626.45 | [redacted] | US Dollar | 13,626.45 | [redacted] |
| 107 | GORDON & REES | Vendor | Coverage | Coverage | 06-Nov-21 1:41:00 PM | | | (13,626.45) | [redacted] | US Dollar | (13,626.45) | [redacted] | US Dollar | (13,626.45) | [redacted] |
| 108 | AMERICAN ARBITRATION ASSO | Vendor | Expense | Expense Expense | 01-Nov-21 1:02:00 PM | 10/1/2021 | | 7,122.89 | [redacted] | US Dollar | 7,122.89 | [redacted] | US Dollar | 7,122.89 | [redacted] |
| 109 | PETERSON REPORTING VIDEO A | Vendor | Expense | Expense Expense | 01-Nov-21 12:59:00 PM | 9/10/2021 | 1,581.80 | 790.75 | [redacted] | US Dollar | 790.75 | [redacted] | US Dollar | 790.75 | [redacted] |
| 110 | PETERSON REPORTING VIDEO A | Vendor | Expense | Expense Expense | 01-Nov-21 12:58:00 PM | 9/9/2021 | 1,612.49 | 806.23 | [redacted] | US Dollar | 806.23 | [redacted] | US Dollar | 806.23 | [redacted] |
| 111 | PETERSON REPORTING VIDEO A | Vendor | Expense | Expense Expense | 01-Nov-21 12:56:00 PM | 9/9/2021 | 2,058.63 | 1,029.32 | [redacted] | US Dollar | 1,029.32 | [redacted] | US Dollar | 1,029.32 | [redacted] |
| 112 | PETERSON REPORTING VIDEO A | Vendor | Expense | Expense Expense | 01-Nov-21 12:54:00 PM | 9/10/2021 | 1,837.98 | 918.99 | [redacted] | US Dollar | 918.99 | [redacted] | US Dollar | 918.99 | [redacted] |
| 113 | PETERSON REPORTING VIDEO A | Vendor | Expense | Expense Expense | 01-Nov-21 12:52:00 PM | 9/9/2021 | 1,758.29 | 879.15 | [redacted] | US Dollar | 879.15 | [redacted] | US Dollar | 879.15 | [redacted] |
| 114 | PETERSON REPORTING VIDEO A | Vendor | Expense | Expense Expense | 01-Nov-21 12:51:00 PM | 9/9/2021 | 2,131.54 | 1,065.77 | [redacted] | US Dollar | 1,065.77 | [redacted] | US Dollar | 1,065.77 | [redacted] |
| 115 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 25-Oct-21 10:06:00 AM | 10/18/2021 | 250,361.00 | 100,348.53 | [redacted] | US Dollar | 100,348.53 | [redacted] | US Dollar | 100,348.53 | [redacted] |
| 116 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 25-Oct-21 10:06:00 AM | 10/18/2021 | 4,272.58 | 2,136.29 | [redacted] | US Dollar | 2,136.29 | [redacted] | US Dollar | 2,136.29 | [redacted] |
| 117 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 21-Oct-21 2:22:00 PM | 9/23/2021 | 76,633.70 | 38,316.85 | [redacted] | US Dollar | 38,316.85 | [redacted] | US Dollar | 38,316.85 | [redacted] |
| 118 | Inventus LLC Receivable | Vendor | Expense | Paid Expert Fees | 13-Oct-21 2:10:00 PM | 8/19/2021 | 10,070.77 | 5,035.39 | [redacted] | US Dollar | 5,035.39 | [redacted] | US Dollar | 5,035.39 | [redacted] |
| 119 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 13-Oct-21 1:41:00 PM | 8/31/2021 | 33,750.00 | 18,875.00 | [redacted] | US Dollar | 18,875.00 | [redacted] | US Dollar | 18,875.00 | [redacted] |
| 120 | KROLL, LLC | Vendor | Expense | Paid Expert Fees | 12-Oct-21 10:47:00 AM | 9/10/2021 | 4,576.80 | 2,378.40 | [redacted] | US Dollar | 2,378.40 | [redacted] | US Dollar | 2,378.40 | [redacted] |
| 121 | KROLL, LLC | Vendor | Expense | Paid Expert Fees | 12-Oct-21 10:43:00 AM | 9/10/2021 | 128,625.00 | 64,312.50 | [redacted] | US Dollar | 64,312.50 | [redacted] | US Dollar | 64,312.50 | [redacted] |
| 122 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 12-Oct-21 10:39:00 AM | 9/15/2021 | 24,817.00 | 12,408.50 | [redacted] | US Dollar | 12,408.50 | [redacted] | US Dollar | 12,408.50 | [redacted] |
| 123 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 12-Oct-21 10:33:00 AM | 6/24/2021 | 1,104.13 | 501.88 | [redacted] | US Dollar | 501.88 | [redacted] | US Dollar | 501.88 | [redacted] |
| 124 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 12-Oct-21 10:31:00 AM | 6/24/2021 | 3,176.51 | 1,443.87 | [redacted] | US Dollar | 1,443.87 | [redacted] | US Dollar | 1,443.87 | [redacted] |
| 126 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 17-Sep-21 1:31:00 PM | 8/16/2021 | 3,993.75 | 1,996.88 | [redacted] | US Dollar | 1,996.88 | [redacted] | US Dollar | 1,996.88 | [redacted] |
| 127 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 14-Sep-21 1:12:00 PM | 8/20/2021 | 80,177.97 | 40,088.99 | [redacted] | US Dollar | 40,088.99 | [redacted] | US Dollar | 40,088.99 | [redacted] |
| 128 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 14-Sep-21 1:05:00 PM | 8/10/2021 | 1,828.75 | 914.38 | [redacted] | US Dollar | 914.38 | [redacted] | US Dollar | 914.38 | [redacted] |
| 129 | LITIGATION-TECH LLC | Vendor | Expense | Expense Expense | 14-Sep-21 12:58:00 PM | 8/18/2021 | 47,441.00 | 23,720.50 | [redacted] | US Dollar | 23,720.50 | [redacted] | US Dollar | 23,720.50 | [redacted] |
| 130 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 13-Sep-21 11:55:00 AM | 8/30/2021 | 352,267.00 | 131,697.91 | [redacted] | US Dollar | 131,697.91 | [redacted] | US Dollar | 131,697.91 | [redacted] |
| 131 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 13-Sep-21 11:55:00 AM | 8/30/2021 | 13,480.05 | 6,692.43 | [redacted] | US Dollar | 6,692.43 | [redacted] | US Dollar | 6,692.43 | [redacted] |
| 132 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 09-Sep-21 4:26:00 PM | 7/29/2021 | 1,710.00 | 855.00 | [redacted] | US Dollar | 855.00 | [redacted] | US Dollar | 855.00 | [redacted] |
| 133 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 08-Sep-21 4:28:00 PM | 7/21/2021 | 375.00 | 375.00 | [redacted] | US Dollar | 375.00 | [redacted] | US Dollar | 375.00 | [redacted] |
| 134 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 07-Sep-21 4:02:00 PM | 7/30/2021 | 5,169.06 | 2,584.53 | [redacted] | US Dollar | 2,584.53 | [redacted] | US Dollar | 2,584.53 | [redacted] |
| 135 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 07-Sep-21 4:00:00 PM | 7/29/2021 | 3,417.88 | 1,708.94 | [redacted] | US Dollar | 1,708.94 | [redacted] | US Dollar | 1,708.94 | [redacted] |
| 136 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 07-Sep-21 3:37:00 PM | 8/23/2021 | 273,175.50 | 108,065.01 | [redacted] | US Dollar | 108,065.01 | [redacted] | US Dollar | 108,065.01 | [redacted] |
| 137 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 22-Aug-21 5:32:00 PM | 7/31/2021 | 29,250.00 | 14,625.00 | [redacted] | US Dollar | 14,625.00 | [redacted] | US Dollar | 14,625.00 | [redacted] |
| 138 | GORDON & REES, LLP | Vendor | Expense | Lawyers Fees | 20-Aug-21 5:10:00 PM | 12/15/2020 | 23,407.42 | 2,484.04 | [redacted] | US Dollar | 2,484.04 | [redacted] | US Dollar | 2,484.04 | [redacted] |
| 139 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 20-Aug-21 10:02:00 AM | 8/5/2021 | 99,816.60 | 49,908.30 | [redacted] | US Dollar | 49,908.30 | [redacted] | US Dollar | 49,908.30 | [redacted] |
| 140 | ESQUIRE DEPOSITION SOLUTIO | Vendor | Expense | Court Reporting Fee | 16-Aug-21 10:54:00 AM | 7/27/2021 | 1,670.20 | 835.10 | [redacted] | US Dollar | 835.10 | [redacted] | US Dollar | 835.10 | [redacted] |
| 141 | ESQUIRE DEPOSITION SOLUTIO | Vendor | Expense | Court Reporting Fee | 16-Aug-21 10:51:00 AM | 7/27/2021 | 1,457.60 | 728.80 | [redacted] | US Dollar | 728.80 | [redacted] | US Dollar | 728.80 | [redacted] |
| 142 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 16-Aug-21 9:36:00 AM | 7/16/2021 | 1,991.00 | 995.50 | [redacted] | US Dollar | 995.50 | [redacted] | US Dollar | 995.50 | [redacted] |
| 143 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 16-Aug-21 9:30:00 AM | 7/15/2021 | 1,142.96 | 571.48 | [redacted] | US Dollar | 571.48 | [redacted] | US Dollar | 571.48 | [redacted] |
| 144 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 16-Aug-21 8:51:00 AM | 7/9/2021 | 17,684.92 | 8,842.46 | [redacted] | US Dollar | 8,842.46 | [redacted] | US Dollar | 8,842.46 | [redacted] |
| 145 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 13-Aug-21 5:42:00 PM | 7/15/2021 | 1,035.00 | 517.50 | [redacted] | US Dollar | 517.50 | [redacted] | US Dollar | 517.50 | [redacted] |
| 146 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 13-Aug-21 5:41:00 PM | 7/15/2021 | 2,390.34 | 1,195.17 | [redacted] | US Dollar | 1,195.17 | [redacted] | US Dollar | 1,195.17 | [redacted] |
| 147 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 13-Aug-21 5:39:00 PM | 7/14/2021 | 2,456.88 | 1,228.44 | [redacted] | US Dollar | 1,228.44 | [redacted] | US Dollar | 1,228.44 | [redacted] |
| 148 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 13-Aug-21 5:36:00 PM | 7/14/2021 | 5,172.47 | 2,586.24 | [redacted] | US Dollar | 2,586.24 | [redacted] | US Dollar | 2,586.24 | [redacted] |
| 149 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 13-Aug-21 5:34:00 PM | 7/13/2021 | 1,938.40 | 969.20 | [redacted] | US Dollar | 969.20 | [redacted] | US Dollar | 969.20 | [redacted] |
| 150 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 13-Aug-21 5:32:00 PM | 7/12/2021 | 1,272.50 | 636.25 | [redacted] | US Dollar | 636.25 | [redacted] | US Dollar | 636.25 | [redacted] |
| 151 | Crowe LLP | Vendor | Expense | Paid Expert Fees | 11-Aug-21 10:30:00 AM | 4/28/2021 | 1,580.00 | 790.00 | [redacted] | US Dollar | 790.00 | [redacted] | US Dollar | 790.00 | [redacted] |
| 152 | Crowe LLP | Vendor | Expense | Paid Expert Fees | 11-Aug-21 10:26:00 AM | 2/25/2021 | 9,282.50 | 4,641.25 | [redacted] | US Dollar | 4,641.25 | [redacted] | US Dollar | 4,641.25 | [redacted] |
| 153 | Crowe LLP | Vendor | Expense | Paid Expert Fees | 11-Aug-21 10:25:00 AM | 3/17/2021 | 7,307.50 | 3,653.75 | [redacted] | US Dollar | 3,653.75 | [redacted] | US Dollar | 3,653.75 | [redacted] |
| 154 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 11-Aug-21 10:14:00 AM | 7/14/2021 | 2,489.14 | 1,244.57 | [redacted] | US Dollar | 1,244.57 | [redacted] | US Dollar | 1,244.57 | [redacted] |
| 155 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 11-Aug-21 10:11:00 AM | 7/13/2021 | 2,894.99 | 1,447.50 | [redacted] | US Dollar | 1,447.50 | [redacted] | US Dollar | 1,447.50 | [redacted] |
| 156 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 11-Aug-21 10:05:00 AM | 7/9/2021 | 3,847.50 | 1,923.75 | [redacted] | US Dollar | 1,923.75 | [redacted] | US Dollar | 1,923.75 | [redacted] |
| 157 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 10-Aug-21 5:10:00 PM | 7/23/2021 | 115,143.60 | 57,571.80 | [redacted] | US Dollar | 57,571.80 | [redacted] | US Dollar | 57,571.80 | [redacted] |
| 158 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 09-Aug-21 2:45:00 PM | 6/29/2021 | 1,435.00 | 1,435.00 | [redacted] | US Dollar | 1,435.00 | [redacted] | US Dollar | 1,435.00 | [redacted] |
| 159 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 06-Aug-21 4:51:00 PM | 6/29/2021 | 2,778.52 | 2,778.52 | [redacted] | US Dollar | 2,778.52 | [redacted] | US Dollar | 2,778.52 | [redacted] |
| 160 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 06-Aug-21 4:27:00 PM | 7/2/2021 | 4,001.17 | 4,001.17 | [redacted] | US Dollar | 4,001.17 | [redacted] | US Dollar | 4,001.17 | [redacted] |
| 161 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 06-Aug-21 4:22:00 PM | 7/19/2021 | 125,198.90 | 62,599.45 | [redacted] | US Dollar | 62,599.45 | [redacted] | US Dollar | 62,599.45 | [redacted] |
| 162 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 06-Aug-21 4:18:00 PM | 7/16/2021 | 28,016.25 | 14,008.13 | [redacted] | US Dollar | 14,008.13 | [redacted] | US Dollar | 14,008.13 | [redacted] |
| 163 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 26-Jul-21 9:40:00 AM | 7/9/2021 | 194,998.50 | 83,870.15 | [redacted] | US Dollar | 83,870.15 | [redacted] | US Dollar | 83,870.15 | [redacted] |
| 164 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 26-Jul-21 9:40:00 AM | 7/9/2021 | 12,763.85 | 6,381.93 | [redacted] | US Dollar | 6,381.93 | [redacted] | US Dollar | 6,381.93 | [redacted] |
| 165 | KROLL, LLC | Vendor | Expense | Paid Expert Fees | 23-Jul-21 3:16:00 PM | 5/7/2021 | 12,175.00 | 6,087.50 | [redacted] | US Dollar | 6,087.50 | [redacted] | US Dollar | 6,087.50 | [redacted] |
| 166 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 23-Jul-21 2:17:00 PM | 6/30/2021 | 5,175.00 | 2,587.50 | [redacted] | US Dollar | 2,587.50 | [redacted] | US Dollar | 2,587.50 | [redacted] |
| 167 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 23-Jul-21 11:31:00 AM | 6/13/2021 | 8,392.50 | 8,392.50 | [redacted] | US Dollar | 8,392.50 | [redacted] | US Dollar | 8,392.50 | [redacted] |
| 168 | American Arbitration Associatio | Vendor | Expense | Expense Expense | 20-Jul-21 1:41:00 PM | 7/19/2021 | 68,000.00 | 68,000.00 | [redacted] | US Dollar | 68,000.00 | [redacted] | US Dollar | 68,000.00 | [redacted] |
| 169 | [redacted] | | | | | | | | | | | | | | |
| 170 | | | | | | | | | | | | | | | |
| 171 | | | | | | | | | | | | | | | |
| 172 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 12-Jul-21 2:44:00 PM | 5/31/2021 | 11,178.00 | 11,718.00 | [redacted] | US Dollar | 11,718.00 | [redacted] | US Dollar | 11,718.00 | [redacted] |
| 173 | Vermeulen & Associates LLC | Vendor | Expense | Paid Expert Fees | 12-Jul-21 11:30:00 AM | 6/25/2021 | 19,500.00 | 9,750.00 | [redacted] | US Dollar | 9,750.00 | [redacted] | US Dollar | 9,750.00 | [redacted] |
| 174 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 12-Jul-21 11:21:00 AM | 4/13/2021 | 4,650.57 | 4,650.57 | [redacted] | US Dollar | 4,650.57 | [redacted] | US Dollar | 4,650.57 | [redacted] |
| 175 | KROLL, LLC | Vendor | Expense | Paid Expert Fees | 12-Jul-21 10:39:00 AM | 6/25/2021 | 105,143.75 | 105,143.75 | [redacted] | US Dollar | 105,143.75 | [redacted] | US Dollar | 105,143.75 | [redacted] |
| 177 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 12-Jul-21 10:24:00 AM | 6/24/2021 | 285,863.50 | 142,931.75 | [redacted] | US Dollar | 142,931.75 | [redacted] | US Dollar | 142,931.75 | [redacted] |
| 178 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 09-Jul-21 4:59:00 PM | 5/7/2021 | 145,557.10 | 145,557.10 | [redacted] | US Dollar | 145,557.10 | [redacted] | US Dollar | 145,557.10 | [redacted] |
| 179 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 09-Jul-21 4:19:00 PM | 5/18/2021 | 143,656.40 | 143,656.40 | [redacted] | US Dollar | 143,656.40 | [redacted] | US Dollar | 143,656.40 | [redacted] |
| 180 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 09-Jul-21 4:12:00 PM | 6/11/2021 | 165.214.40 | 165,214.40 | [redacted] | US Dollar | 165,214.40 | [redacted] | US Dollar | 165,214.40 | [redacted] |
| 181 | KLDiscovery Ontrack, LLC | Vendor | Expense | Expense Expense | 07-Jul-21 5:52:00 PM | 6/10/2021 | 19,075.30 | 19,075.30 | [redacted] | US Dollar | 19,075.30 | [redacted] | US Dollar | 19,075.30 | [redacted] |
| 182 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 22-Jun-21 4:59:00 PM | 6/8/2021 | 207,044.00 | 163,526.18 | [redacted] | US Dollar | 163,526.18 | [redacted] | US Dollar | 163,526.18 | [redacted] |
| 183 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 22-Jun-21 4:59:00 PM | 6/8/2021 | 3,530.71 | 3,530.71 | [redacted] | US Dollar | 3,530.71 | [redacted] | US Dollar | 3,530.71 | [redacted] |
| 184 | KROLL, LLC | Vendor | Expense | Paid Expert Fees | 22-Jun-21 2:11:00 PM | 4/27/2021 | 111,118.35 | 111,118.35 | [redacted] | US Dollar | 111,118.35 | [redacted] | US Dollar | 111,118.35 | [redacted] |
| 185 | KROLL, LLC | Vendor | Expense | Paid Expert Fees | 22-Jun-21 2:11:00 PM | 4/27/2021 | 29,275.00 | 29,275.00 | [redacted] | US Dollar | 29,275.00 | [redacted] | US Dollar | 29,275.00 | [redacted] |
| 186 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 16-Jun-21 3:57:00 PM | 5/19/2021 | 6,017.05 | 6,017.05 | [redacted] | US Dollar | 6,017.05 | [redacted] | US Dollar | 6,017.05 | [redacted] |
| 187 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 16-Jun-21 3:54:00 PM | 5/19/2021 | 1,366.25 | 1,366.25 | [redacted] | US Dollar | 1,366.25 | [redacted] | US Dollar | 1,366.25 | [redacted] |
| 188 | [redacted] | | | | | | | | | | | | | | |
| 189 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 03-Jun-21 12:25:00 PM | 5/7/2021 | 1,276.50 | 1,276.50 | [redacted] | US Dollar | 1,276.50 | [redacted] | US Dollar | 1,276.50 | [redacted] |
| 190 | PETERSON REPORTING VIDEO & | Vendor | Expense | Court Reporting Fee | 03-Jun-21 12:24:00 PM | 5/4/2021 | 1,781.59 | 1,781.59 | [redacted] | US Dollar | 1,781.59 | [redacted] | US Dollar | 1,781.59 | [redacted] |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 191 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 24-May-21 1:55:00 PM | 4/27/2021 | 81,310.67 | 81,310.67 | [redacted] | US Dollar | 81,310.67 | [redacted] | US Dollar | 81,310.67 | [redacted] |
| 192 | GORDON & REES | Vendor | Coverage | Coverage | 21-May-21 3:28:00 PM | 6/4/2020 | 29,809.25 | 13,626.45 | | US Dollar | 13,626.45 | | US Dollar | 13,626.45 | |
| 193 | Vermeulen & Associates LLC | Vendor | Expense | Paid Expert Fees | 12-May-21 11:20:00 AM | 4/15/2021 | 10,031.00 | 10,031.00 | | US Dollar | 10,031.00 | | US Dollar | 10,031.00 | |
| 194 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 10-May-21 3:29:00 PM | 4/29/2021 | 162,489.50 | 139,382.44 | | US Dollar | 139,382.44 | | US Dollar | 139,382.44 | |
| 195 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 10-May-21 3:29:00 PM | 4/29/2021 | 9,893.54 | 9,893.54 | | US Dollar | 9,893.54 | | US Dollar | 9,893.54 | |
| 196 | PETERSON REPORTING VIDEO & | Vendor | Expense | Expense Expense | 10-May-21 3:11:00 PM | 4/8/2021 | 1,178.25 | 1,178.25 | | US Dollar | 1,178.25 | | US Dollar | 1,178.25 | |
| 197 | PETERSON REPORTING VIDEO & | Vendor | Expense | Expense Expense | 10-May-21 3:10:00 PM | 4/13/2021 | 1,423.13 | 1,423.13 | | US Dollar | 1,423.13 | | US Dollar | 1,423.13 | |
| 198 | PETERSON REPORTING VIDEO & | Vendor | Expense | Expense Expense | 10-May-21 3:09:00 PM | 4/13/2021 | 1,445.00 | 1,445.00 | | US Dollar | 1,445.00 | | US Dollar | 1,445.00 | |
| 199 | KLDISCOVERY ONTRACK | Vendor | Expense | Expense Expense | 05-May-21 4:09:00 PM | 4/6/2021 | 19,635.85 | 19,635.85 | | US Dollar | 19,635.85 | | US Dollar | 19,635.85 | |
| 200 | American Arbitration Associatic | Vendor | Expense | Expense Expense | 05-May-21 1:19:00 PM | 3/25/2021 | 48,500.00 | 48,500.00 | | US Dollar | 48,500.00 | | US Dollar | 48,500.00 | |
| 201 | Mr I F Bitterlin | Vendor | Expense | Paid Expert Fees | 23-Apr-21 4:41:00 PM | 4/7/2021 | | 1,000.77 | | British Pou | 720.00 | | British Poun | 720.00 | |
| 202 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 23-Apr-21 10:03:00 AM | 4/5/2021 | 116,715.30 | 116,715.30 | | US Dollar | 116,715.30 | | US Dollar | 116,715.30 | |
| 203 | [redacted] | | | | | | | | | | | | | | |
| 204 | GORDON & REES | Vendor | Expense | Lawyers Fees | 19-Apr-21 2:09:00 PM | 3/15/2021 | 2,466.00 | 1,699.05 | | US Dollar | 1,699.05 | | US Dollar | 1,699.05 | |
| 205 | GORDON & REES | Vendor | Expense | Legal Expense Fee | 19-Apr-21 2:09:00 PM | 3/15/2021 | 16,577.31 | 16,266.38 | | US Dollar | 16,266.38 | | US Dollar | 16,266.38 | |
| 206 | CLC Contractors Licensing Cente | Vendor | Expense | Paid Expert Fees | 15-Apr-21 3:07:00 PM | 3/29/2021 | 4,875.00 | 4,875.00 | | US Dollar | 4,875.00 | | US Dollar | 4,875.00 | |
| 207 | Clarivate Analytics (Compumark | Vendor | Expense | Expense Expense | 15-Apr-21 3:01:00 PM | 9/25/2020 | 798.00 | 798.00 | | US Dollar | 798.00 | | US Dollar | 798.00 | |
| 209 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 13-Apr-21 10:10:00 AM | 2/8/2021 | 89,512.80 | 89,512.80 | | US Dollar | 89,512.80 | | US Dollar | 89,512.80 | |
| 210 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 13-Apr-21 9:58:00 AM | 3/3/2021 | 51,902.50 | 51,902.50 | | US Dollar | 51,902.50 | | US Dollar | 51,902.50 | |
| 211 | KLDISCOVERY ONTRACK | Vendor | Expense | Expense Expense | 06-Apr-21 1:54:00 PM | 3/9/2021 | 16,678.30 | 16,678.30 | | US Dollar | 16,678.30 | | US Dollar | 16,678.30 | |
| 212 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 30-Mar-21 6:05:00 PM | 3/19/2021 | 119,304.00 | 88,148.34 | | US Dollar | 88,148.34 | | US Dollar | 88,148.34 | |
| 213 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 30-Mar-21 6:05:00 PM | 3/19/2021 | 388.80 | 388.80 | | US Dollar | 388.80 | | US Dollar | 388.80 | |
| 214 | Sorooshian, Shayan | Vendor | Expense | Expense Expense | 18-Mar-21 4:18:00 PM | 3/1/2021 | 1,775.00 | 1,775.00 | | US Dollar | 1,775.00 | | US Dollar | 1,775.00 | |
| 215 | Sorooshian, Shayan | Vendor | Expense | Expense Expense | 18-Mar-21 4:17:00 PM | 2/1/2021 | 5,200.00 | 5,200.00 | | US Dollar | 5,200.00 | | US Dollar | 5,200.00 | |
| 216 | PETERSON REPORTING VIDEO & | Vendor | Expense | Expense Expense | 18-Mar-21 1:58:00 PM | 2/22/2021 | 1,753.75 | 1,753.75 | | US Dollar | 1,753.75 | | US Dollar | 1,753.75 | |
| 217 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 10-Mar-21 9:41:00 AM | 2/25/2021 | 212,739.50 | 169,258.93 | | US Dollar | 169,258.93 | | US Dollar | 169,258.93 | |
| 218 | TYSON & MENDES LLP | Vendor | Expense | Legal Expense Fee | 10-Mar-21 9:41:00 AM | 2/25/2021 | 1,882.30 | 1,882.30 | | US Dollar | 1,882.30 | | US Dollar | 1,882.30 | |
| 219 | KLDISCOVERY ONTRACK | Vendor | Expense | Expense Expense | 08-Mar-21 2:50:00 PM | 2/10/2021 | 11,250.56 | 11,250.56 | | US Dollar | 11,250.56 | | US Dollar | 11,250.56 | |
| 220 | Compex Legal Services, Inc. | Vendor | Expense | Expense Expense | 02-Mar-21 11:07:00 AM | 1/28/2021 | 130.40 | 130.40 | | US Dollar | 130.40 | | US Dollar | 130.40 | |
| 221 | Compex Legal Services, Inc. | Vendor | Expense | Expense Expense | 02-Mar-21 11:05:00 AM | 1/28/2021 | 125.40 | 125.40 | | US Dollar | 125.40 | | US Dollar | 125.40 | |
| 222 | Compex Legal Services, Inc. | Vendor | Expense | Expense Expense | 02-Mar-21 11:03:00 AM | 1/28/2021 | 104.70 | 104.70 | | US Dollar | 104.70 | | US Dollar | 104.70 | |
| 223 | Sorooshian, Shayan | Vendor | Expense | Expense Expense | 18-Feb-21 12:42:00 PM | 1/4/2021 | 1,700.00 | 1,700.00 | | US Dollar | 1,700.00 | | US Dollar | 1,700.00 | |
| 224 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 12-Feb-21 3:22:00 PM | 1/8/2021 | 65,633.10 | 65,633.00 | | US Dollar | 65,633.00 | | US Dollar | 65,633.00 | |
| 225 | KLDISCOVERY ONTRACK | Vendor | Expense | Expense Expense | 09-Feb-21 3:41:00 PM | 1/19/2021 | 8,063.88 | 8,063.88 | | US Dollar | 8,063.88 | | US Dollar | 8,063.88 | |
| 226 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 01-Feb-21 4:01:00 PM | 1/19/2021 | 113,883.00 | 91,003.72 | | US Dollar | 91,003.72 | | US Dollar | 91,003.72 | |
| 227 | GORDON & REES, LLP | Vendor | Expense | Lawyers Fees | 29-Jan-21 6:45:00 PM | 12/15/2020 | 115,448.50 | 74,557.61 | | US Dollar | 74,557.61 | | US Dollar | 74,557.61 | |
| 228 | GORDON & REES, LLP | Vendor | Expense | Legal Expense Fee | 29-Jan-21 6:45:00 PM | 12/15/2020 | 7,148.74 | 71,032.46 | | US Dollar | 71,032.46 | | US Dollar | 71,032.46 | |
| 229 | Compex Legal Services, Inc. | Vendor | Expense | Expense Expense | 21-Jan-21 4:08:00 PM | 9/28/2020 | 87.00 | 87.00 | | US Dollar | 87.00 | | US Dollar | 87.00 | |
| 230 | Compex Legal Services, Inc. | Vendor | Expense | Expense Expense | 21-Jan-21 4:06:00 PM | 9/28/2020 | 87.00 | 87.00 | | US Dollar | 87.00 | | US Dollar | 87.00 | |
| 231 | Compex Legal Services, Inc. | Vendor | Expense | Expense Expense | 21-Jan-21 4:05:00 PM | 9/28/2020 | 87.00 | 87.00 | | US Dollar | 87.00 | | US Dollar | 87.00 | |
| 232 | Compex Legal Services, Inc. | Vendor | Expense | Expense Expense | 21-Jan-21 4:03:00 PM | 9/28/2020 | 93.87 | 93.87 | | US Dollar | 93.87 | | US Dollar | 93.87 | |
| 233 | Compex Legal Services, Inc. | Vendor | Expense | Expense Expense | 21-Jan-21 4:02:00 PM | 9/28/2020 | 83.87 | 83.87 | | US Dollar | 83.87 | | US Dollar | 83.87 | |
| 234 | TYSON & MENDES LLP | Vendor | Expense | Lawyers Fees | 19-Jan-21 2:14:00 PM | 12/28/2020 | 53,392.50 | 45,924.88 | | US Dollar | 45,924.88 | | US Dollar | 45,924.88 | |
| 235 | Dunn Engineering, LLC | Vendor | Expense | Paid Expert Fees | 05-Jan-21 4:06:00 PM | 1/4/2021 | 15,000.00 | 15,000.00 | | US Dollar | 15,000.00 | | US Dollar | 15,000.00 | |
| 236 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 05-Jan-21 2:46:00 PM | 12/9/2020 | 80,997.80 | 80,997.80 | | US Dollar | 80,997.80 | | US Dollar | 80,997.80 | |
| 237 | American Arbitration Associatic | Vendor | Expense | Expense Expense | 05-Jan-21 9:38:00 AM | 11/30/2020 | 106,500.00 | 35,000.00 | | US Dollar | 35,000.00 | | US Dollar | 35,000.00 | |
| 238 | Sorooshian, Shayan | Vendor | Expense | Expense Expense | 05-Jan-21 9:13:00 AM | 10/25/2020 | 1,250.00 | 1,250.00 | | US Dollar | 1,250.00 | | US Dollar | 1,250.00 | |
| 242 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 11-Dec-20 10:04:00 AM | 11/10/2020 | 165,001.20 | 165,001.20 | | US Dollar | 165,001.20 | | US Dollar | 165,001.20 | |
| 243 | Sorooshian, Shayan | Vendor | Expense | Paid Expert Fees | 11-Dec-20 8:42:00 AM | 9/2/2020 | 1,500.00 | 1,500.00 | | US Dollar | 1,500.00 | | US Dollar | 1,500.00 | |
| 244 | Sorooshian, Shayan | Vendor | Expense | Paid Expert Fees | 11-Dec-20 8:40:00 AM | 9/2/2020 | 2,225.00 | 2,225.00 | | US Dollar | 2,225.00 | | US Dollar | 2,225.00 | |
| 245 | GORDON & REES | Vendor | Expense | Lawyers Fees | 16-Nov-20 11:24:00 AM | 3/5/2020 | 10,338.81 | 3,514.73 | | US Dollar | 3,514.73 | | US Dollar | 3,514.73 | |
| 246 | HKA GLOBAL INC | Vendor | Expense | Paid Expert Fees | 23-Oct-20 7:08:00 PM | 10/13/2020 | 52,943.80 | 52,943.80 | | US Dollar | 52,943.80 | | US Dollar | 52,943.80 | |
| 247 | OCHOA, CHRISTIAN RODRIGUEZ | Vendor | Expense | Paid Expert Fees | 23-Oct-20 7:02:00 PM | 9/28/2020 | 1,600.00 | 1,600.00 | | US Dollar | 1,600.00 | | US Dollar | 1,600.00 | |
| 248 | GORDON & REES | Vendor | Expense | Lawyers Fees | 20-Oct-20 10:49:00 AM | 9/18/2020 | 109,160.00 | 79,633.59 | | US Dollar | 79,633.59 | | US Dollar | 79,633.59 | |
| 249 | AMERICAN ARBITRATION ASSO | Vendor | Expense | Expense Expense | 02-Oct-20 2:02:00 PM | 9/15/2020 | 13,000.00 | (13,000.00) | | US Dollar | (13,000.00) | | US Dollar | (13,000.00) | |
| 250 | GORDON & REES | Vendor | Expense | Lawyers Fees | 14-Sep-20 12:36:00 PM | 6/4/2020 | 110,819.50 | 80,231.16 | | US Dollar | 80,231.16 | | US Dollar | 80,231.16 | |
| 251 | AMERICAN ARBITRATION ASSO | Vendor | Expense | Expense Expense | 20-Aug-20 6:41:00 PM | 8/4/2020 | 13,000.00 | 13,000.00 | | US Dollar | 13,000.00 | | US Dollar | 13,000.00 | |
| 256 | Sorooshian, Shayan | Vendor | Expense | Paid Expert Fees | 23-Jul-20 11:21:00 AM | 6/3/2020 | 2,200.00 | 2,200.00 | | US Dollar | 2,200.00 | | US Dollar | 2,200.00 | |
| 257 | Sorooshian, Shayan | Vendor | Expense | Paid Expert Fees | 23-Jul-20 11:20:00 AM | 6/30/2020 | 3,400.00 | 3,400.00 | | US Dollar | 3,400.00 | | US Dollar | 3,400.00 | |
| 258 | SVO Building One, LLC | Vendor | Expense | Lawyers Fees | 20-Jul-20 9:14:00 AM | 7/7/2020 | 58,335.74 | 58,335.74 | | US Dollar | 58,335.74 | | US Dollar | 58,335.74 | |
| 259 | AMERICAN ARBITRATION ASSO | Vendor | Expense | Expense Expense | 12-Jun-20 10:54:00 AM | 12/9/2020 | 8,500.00 | 8,500.00 | | US Dollar | 8,500.00 | | US Dollar | 8,500.00 | |
| 260 | SVO Building One, LLC | Vendor | Expense | Lawyers Fees | 07-May-20 2:34:00 PM | 4/28/2020 | 94,340.25 | 94,340.25 | | US Dollar | 94,340.25 | | US Dollar | 94,340.25 | |
| 261 | SVO Building One, LLC | Vendor | Expense | Expense Expense | 07-May-20 2:34:00 PM | 4/28/2020 | 15,635.17 | 15,635.17 | | US Dollar | 15,635.17 | | US Dollar | 15,635.17 | |
| 262 | GORDON & REES | Vendor | Expense | Lawyers Fees | 07-May-20 11:55:00 AM | 3/5/2020 | 27,033.00 | 16,574.19 | | US Dollar | 16,574.19 | | US Dollar | 16,574.19 | |
| 263 | GORDON & REES | Vendor | Expense | Legal Expense Fee | 07-May-20 11:55:00 AM | 3/5/2020 | 113.68 | 100.00 | | US Dollar | 100.00 | | US Dollar | 100.00 | |
| 264 | [redacted] | | | | | | | | | | | | | | |
| 265 | | | | | | | | | | | | | | | |
| 266 | | | | | | | | | | | | | | | |
| 267 | SVO Building One, LLC | Vendor | Expense | Lawyers Fees | 13-Apr-20 5:26:00 PM | 3/1/2020 | 6,240.00 | 6,240.00 | | US Dollar | 6,240.00 | | US Dollar | 6,240.00 | |
| 268 | SVO Building One, LLC | Vendor | Expense | Lawyers Fees | 28-Feb-20 2:54:00 PM | 2/11/2020 | 472,139.25 | 472,139.25 | | US Dollar | 472,139.25 | | US Dollar | 472,139.25 | |
| 269 | [redacted] | | | | | | | | | | | | | | |
| 270 | | | | | | | | | | | | | | | |
| 271 | | | | | | | | | | | | | | | |
| 272 | | | | | | | | | | | | | | | |
| 273 | | | | | | | | | | | | | | | |

[redacted]

[redacted]

[redacted]

# EXHIBIT "10"

KPC
Legal Audit Services Inc.
AUDITORS OF PROFESSIONAL BILLINGS

550 North Brand Boulevard, Suite 1500, Glendale, California 91203-1922 • (818) 547-2900 • Facsimile: (818) 547-5329
Federal I.D. No. 95-3628599

November 12, 2025

Invoice No. 342561

Wilson Elser Moskowitz Edelman & Dicker
Shannon Santos
555 S. Flower Street, Suite 2900
Los Angeles, CA 90071

jessica.edwards@thehartford.com; EBILL VIA BILLTRACKPRO

## INVOICE SUMMARY

**Our Matter No.: 03014 - 01809**

**RE: NAVIGATORS INSURANCE COMPANY V. SVO BUILDING ONE, LLC**
**Claim No.: 18753.00318**

| | |
|---|---|
| Total Fees | $ 47,115.50 |
| Total Disbursements and Costs Advanced | $ .00 |
| **TOTAL THIS INVOICE** | **$ 47,115.50** |
| Credits Applied | $ -3,000.00 |
| **BALANCE DUE THIS INVOICE** | **$ 44,115.50** |

EXHIBIT 7

N10515

# KPC - Legal Audit Services Inc.

Invoice No. 342561 November 12, 2025

**FOR PROFESSIONAL SERVICES RENDERED**

| Date | Description | Tkpr | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 9/30/25 | Review coverage complaint, answer and counterclaim, Navigator discovery responses re establishing protocol for audit; review Tyson & Mendes invoices re allocation parameters; confer with LR and KLS re same (Navigators v. SVO audit) | AEJ | 6.90 | 625.00 | 4,312.50 |
| 10/01/25 | Navigators - telephone conference with A. Jardini re background, causes of action and basis for allocation | KLS | .60 | 295.00 | 177.00 |
| 10/01/25 | Review documents from client and review invoices for prior to dismissal date, prepare list for auditing and discussion with AEJ regarding strategy and allocation | LKR | 2.70 | 295.00 | 796.50 |
| 10/02/25 | Review invoices re allocation analysis and confer with KLS re format issues | AEJ | .80 | 625.00 | 500.00 |
| 10/02/25 | Navigators - Begin review and analysis of Gordon & Reese invoices for time period before covered claim dismissal | KLS | 4.50 | 295.00 | 1,327.50 |
| 10/02/25 | Review and analyze invoices of Tyson and Mendes for significant work performed | LKR | 3.10 | 295.00 | 914.50 |
| 10/02/25 | Navigators v SVO; began entry of hours, and fees into database. | JPM | 6.60 | 155.00 | 1,023.00 |
| 10/03/25 | Continue the review and analysis of difficult invoices of Tyson and Mendes for outline of services | LKR | 4.20 | 295.00 | 1,239.00 |
| 10/03/25 | Navigators; continue tally of firm hours and fees for entry into database. | JPM | 5.10 | 155.00 | 790.50 |
| 10/06/25 | Review outline of services and data re significant billers re reasonableness analysis | AEJ | 2.20 | 625.00 | 1,375.00 |
| 10/06/25 | Navigators: Continued review and analysis of Gordon & Reese billing to isolate services performed and identify billing issues | KLS | 7.20 | 295.00 | 2,124.00 |
| 10/06/25 | Discussions regarding findings and research individual experts for allocation | LKR | 1.50 | 295.00 | 442.50 |
| 10/06/25 | Navigators; continue tally of timekeepers hours and fees for Tyson and Gordon firms on pages 1 through 322. | JPM | 6.40 | 155.00 | 992.00 |
| 10/07/25 | Begin review of the Tyson & Mendes invoices, #70077-A1 through #72765-A1, and Gordon Rees invoice #20880397-A1, and determine total hours billed per invoice. | KMG | 4.60 | 135.00 | 621.00 |
| 10/07/25 | Navigators; continued tally of hours and fees for PDF pages 290 through 361 | JPM | 3.20 | 155.00 | 496.00 |
| 10/08/25 | Call with counsel | AEJ | .60 | 625.00 | 375.00 |
| 10/08/25 | Confer with staff re report preparation | AEJ | .30 | 625.00 | 187.50 |

# KPC - Legal Audit Services Inc.

Invoice No. 342561 November 12, 2025

| Date | Description | Tkpr | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 10/08/25 | Continue review of the Gordon & Rees invoices, #20880397-A1 & 20918793, along with the Tyson Mendes invoice #74764, to determine total hours billed per invoice. | KMG | 5.80 | 135.00 | 783.00 |
| 10/08/25 | Navigators; continue tally of hours and fees for entry into database. | JPM | 7.20 | 155.00 | 1,116.00 |
| 10/09/25 | Review extensive claim file including subject invoices | AEJ | 2.60 | 625.00 | 1,625.00 |
| 10/09/25 | Prepare federal report | AEJ | 4.20 | 625.00 | 2,625.00 |
| 10/09/25 | Continued review and analysis of Gordon billing to isolate and tally time billed on identifiable services; finish review and begin preparation of Outline of Services; begin review and analysis for reasonableness of certain Tyson billing records, beginning January 2021 | KLS | 9.40 | 295.00 | 2,773.00 |
| 10/09/25 | Prepare outline of services as to work performed by Tyson and Mendes | LKR | 4.80 | 295.00 | 1,416.00 |
| 10/09/25 | Continue review of the Tyson Mendes invoice #74764, and begin review of the Gordon Rees invoice #20795661-A1 invoice to determine total number of hours billed per invoice. | KMG | 6.80 | 135.00 | 918.00 |
| 10/09/25 | Navigators; continue tally of timekeeper hours and fees for entry into database. | JPM | 7.10 | 155.00 | 1,100.50 |
| 10/10/25 | Continued review and analysis of Tyson billing records, including January and February 2021 and begin Outline of Services | KLS | 7.10 | 295.00 | 2,094.50 |
| 10/10/25 | Continue review of the Gordon Rees invoice #20795661-A1, to determine total number of hours billed. Begin investigation of bar admissions information for both the Gordon Rees and the Tyson firms for all the timekeepers. | KMG | 5.90 | 135.00 | 796.50 |
| 10/10/25 | Navigators; complete tally of timekeeper hours and fees. QC of all entries. Began entry of hours, fees and costs into database. | JPM | 7.70 | 155.00 | 1,193.50 |
| 10/11/25 | Review and analysis of DeBruin invoices and Morris invoices to isolate time spent on substantive tasks for coverage allocation | KLS | 5.80 | 295.00 | 1,711.00 |
| 10/11/25 | Navigators; entry of hours, fees and costs into database for Tyson and Gordon firms. QC of all entries and draft of Fees and Costs Billed, Index of Billing Personnel, and Costs Billed sub-reports. Began entry of vendor costs into database. | JPM | 4.90 | 155.00 | 759.50 |
| 10/12/25 | Finish Tyson, Gordon and Morris Outlines and begin review and analysis of Murphy invoices for reasonableness and allocation for coverage | KLS | 6.20 | 295.00 | 1,829.00 |
| 10/12/25 | Navigators; complete entry of vendor costs into database. | JPM | 3.90 | 155.00 | 604.50 |
| 10/13/25 | Review disclosure and comment, review 3 outlines of services and perform allocation analysis and edit comprehensive report | AEJ | 3.40 | 625.00 | 2,125.00 |

# KPC - Legal Audit Services Inc.

Invoice No. 342561 November 12, 2025

| Date | Description | Tkpr | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 10/13/25 | Continued review and analysis of Murphy law firm invoices to isolate and tally time spent on substantive tasks for allocation; review and analysis invoices from Morris for allocation; finalize Outline of Services for all firms | KLS | 8.80 | 295.00 | 2,596.00 |
| 10/13/25 | Navigators; QC of entries for Tyson, Gordon, DeBruine, Morris, and Murphy firms. Draft of Global Fees and Costs Billed sub-report. Revision to Outline of Services sub-reports for Gordon, DeBruine, Murphy and Tyson. | JPM | 4.90 | 155.00 | 759.50 |
| 10/14/25 | Finalize and edit report re expert opinions and review and approve accompanying schedules | AEJ | 1.50 | 625.00 | 937.50 |
| 10/14/25 | Finalize allocation for all firms; review and analysis Jardini report and edit | KLS | 1.10 | 295.00 | 324.50 |
| 10/14/25 | Navigators: revision to Fees and Costs Billed and Outline of Services sub-reports for Murphy, Morris, DeBruine, Tyson and Gordon firms. QC of AEJ report. | JPM | 1.70 | 155.00 | 263.50 |
| 10/16/25 | Call with counsel re edits to report | AEJ | .30 | 625.00 | 187.50 |
| 10/20/25 | Review and analysis SVO expert reports for data and detail for expert rebuttal | KLS | 1.30 | 295.00 | 383.50 |
| 10/22/25 | Review reports of opposing experts and call with counsel | AEJ | .80 | 625.00 | 500.00 |

**TOTAL FEES** **$ 47,115.50**

**TIMEKEEPER SUMMARY**

| Timekeeper | Title | Hours | Rate | Total |
|---|---|---|---|---|
| SCOTT, K L | Auditor | 52.00 | 295.00 | 15,340.00 |
| ROSENBERGER, L K | Auditor | 16.30 | 295.00 | 4,808.50 |
| GALLOWAY, K M | Asst. Auditor | 23.10 | 135.00 | 3,118.50 |
| JARDINI, A E | Director | 23.60 | 625.00 | 14,750.00 |
| MURPHY, J P | Project Manager | 58.70 | 155.00 | 9,098.50 |
| **Total** | | **173.70** | | **$ 47,115.50** |

**TOTAL THIS INVOICE** **$ 47,115.50**

Credits Applied $ -3,000.00

**BALANCE DUE THIS INVOICE** **$ 44,115.50**

KPC
Legal Audit Services Inc.
AUDITORS OF PROFESSIONAL BILLINGS

550 North Brand Boulevard, Suite 1500, Glendale, California 91203-1922 • (818) 547-2900 • Facsimile: (818) 547-5329
Federal I.D. No. 95-3628599

November 12, 2025

Wilson Elser Moskowitz Edelman & Dicker
Shannon Santos
555 S. Flower Street, Suite 2900
Los Angeles, CA 90071

Invoice No. 342561

## REMITTANCE ADVICE

**Our Matter No.: 03014 - 01809**

**RE: NAVIGATORS INSURANCE COMPANY V. SVO BUILDING ONE, LLC**

| | |
|---|---|
| **BALANCE DUE THIS INVOICE** | **$ 44,115.50** |

**All checks should be made payable to:**

**KPC - Legal Audit Services Inc.**

ATTN: Accounts Receivable
550 North Brand Blvd., Suite 1500
Glendale, CA 91203-1922

(Please return this page with payment.)

When making a payment, please reference Our Matter No. **03014.01809** and Invoice No. **342561**.

# EXHIBIT "11"

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | documents on relativity (300 documents) for assistance in compiling exhibits critical for use at arbitration for Phase II Exhibit" | |
| 07/10/2021 | 141 | L120 A103 | 1.00 | 1.00 | $345.42 | $0.00 | $345.42 | $0.00 | Preparation of section of briefing to arbitrator regarding Vertiv's unfair business claims, specifically, regarding Vertiv's contention that SVO Seeking and/or causing third parties to issue false reports regarding the commissioning of equipment on the project | | Time was Reasonable | As discussed with claims handler Angel Muth, this is a very unique case. The claims by Vertiv against SVO are multiple (see our prior pre-arbitration report of June 24, 2021). Those claims, which center around the construction of a data center and are highly complex and overlapping and involve multiple contractual issues and related claims, as well as Intellectual Property claims (i.e., alleged trade secret violations and patent infringement), as well as unfair business practices, etc. Time billed accurately reflects time spent drafting the Brief. The review and drafting of report (58 pages total) requires input from multiple attorneys across multiple entries. Further, drafting of the brief requires substantial time and effort to ensure that all necessary information is included. Extensive review and analysis of pertinent and key case files is necessary to ensure a thorough update and report is provided. It should be noted that Hallmark Insurance, which was sharing in fees and costs at 50% paid for this charge without deduction, or similar). | F. Document not attached |
| 07/10/2021 | 142 | L120 A109 | 1.00 | 1.00 | $118.74 | $0.00 | $118.74 | $0.00 | Preparation of section of briefing to | | Time was Reasonable | As discussed with claims handler Angel | F. Document not attached |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | summary with attention to pages 1-30 in preparation for arbitration. | | based on # an records/pages |
| 09/29/2021 | Richard Dieffenbach | 3436709 | L430 A104 | 0.20 | 0.20 | $215.00 | $215.00 | $43.00 | $20.43 | Review Vertiv's opposition to SVO Motion In Limine #14 | | |
| 09/29/2021 | David Frishman | 3441979 | L110 A103 | 1.70 | 1.70 | $225.00 | $225.00 | $382.50 | $181.77 | Attend strategy conference call, with client SVO contact Ulrich Pelz team SVO members Richard Dieffenbach and Jamie Tabrizi regarding strategy for argument in preliminary hearing for phase two of arbitration, effect of various options to potential rulings of arbitrator regarding Vertiv motion for reconsideration , order of proof, remaining claims to be litigated in phase II ( multiple attorney presence approved by Angel Muth of Navigators and Jason Smith of Hallmark) | | |
| 09/29/2021 | Richard Dieffenbach | 3436501 | L430 A104 | 0.60 | 0.60 | $215.00 | $215.00 | $129.00 | $61.30 | Review Motion In Limine #8, revise and expand same | | |
| 09/29/2021 | Alexander Randolph | 3440180 | L120 A106 | 0.40 | 0.40 | $165.00 | $165.00 | $66.00 | $31.36 | Call with client Ulrich Pelz regarding Motions In Limine | | |
| 09/29/2021 | Alexander Randolph | 3440175 | L250 A103 | 1.80 | 1.80 | $165.00 | $165.00 | $297.00 | $141.14 | Drafting and revising opposition to Motion In Limine #5 incorporating comments from client Ulrich Pelz (6 pages) | | |
| 09/29/2021 | Robyne Dew | 3446074 | L440 A109 | 1.30 | 1.30 | $80.00 | $80.00 | $104.00 | $49.42 | Attend telephone conference with Team SVO members David Frishman, Julee Fritsch, Richard Dieffenbach, Ethan Kraft, Alex Randolph, Cindy Mader and Robyn Dew regarding Motions in Limine, oppositions to Motions in Limine, exhibits status, witness folders, and strategy for argument regarding Vertiv's Motion for Reconsideration, multiple attorney and personnel attendance approved by Angel Muth and Jason Smith. | | |
| 09/29/2021 | CIndy Mader | 3446248 | L440 A103 | 1.30 | 1.30 | $215.00 | $215.00 | $279.50 | $132.83 | Revise opposition to Vertiv's motion in limine number 6 excluding testimony of IP expert, Erik Laykin. | | |
| 09/29/2021 | CIndy Mader | 3446254 | L440 A104 | 0.30 | 0.30 | $215.00 | $215.00 | $64.50 | $30.65 | Review and analyze Vertiv's opposition to motion in limine number 6 to preclude expert witness Phil Isaak from offering testimony regarding CFD analysis and trade secret numbers 2 and 4. | | |
| 09/29/2021 | Richard Dieffenbach | 3436697 | L430 A104 | 0.40 | 0.40 | $215.00 | $215.00 | $86.00 | $40.87 | Review Vertiv opposition to SVO Motion In Limine #6 | | |
| 09/29/2021 | Jamie Tabrizi | 3433619 | L440 A109 | 2.00 | 2.00 | $165.00 | $165.00 | $330.00 | $117.62 | Final preparation after comments by client and partner of SVO opposition to Motion in Limine 7 regarding exclusion of cumulative and unsubstantiated expert testimony | Insufficient Detail | 9.8 hours bille this response t Without furthe to complexity, i involved, lengt of documents/ documents prepared/revie reasonablenes spent cannot b determined. Pl a copy of this to any appeal. |
| 09/29/2021 | Richard Dieffenbach | 3436689 | L430 A104 | 0.20 | 0.20 | $215.00 | $215.00 | $43.00 | $20.43 | Review Vertiv's opposition to Motion In Limine #3 | | |
| 09/29/2021 | David Frishman | 3443991 | L440 A104 | 1.80 | 1.80 | $225.00 | $225.00 | $405.00 | $192.47 | Prepare for preliminary arbitration hearing Phase II | | |
| 09/29/2021 | Jamie Tabrizi | 3437077 | L440 A109 | 3.20 | 3.20 | $165.00 | $165.00 | $528.00 | $250.92 | Preparation for hearing on motion for reconsideration and other Phase II issues including detailed outline for team use during same | | |
| 09/29/2021 | Richard Dieffenbach | 3436553 | L440 A109 | 1.70 | 1.70 | $215.00 | $215.00 | $365.50 | $173.70 | Attend telephone conference with Ulrich Pelz, team SVO members David Frishman, Richard Dieffenbach and Jamie Tabrizi regarding strategy for argument in preliminary hearing for phase two of arbitration, effect of various options to potential rulings of arbitrator regarding reconsideration, order of proof, remaining claims to be litigated in phase two, multiple attorney presence approved by Angel Muth and Jason Smith | | |
| 09/29/2021 | David Frishman | 3442045 | L430 A103 | 1.60 | 1.60 | $225.00 | $225.00 | $360.00 | $171.08 | Review, revise and finalize updated Motions In Limine on behalf of client SVO | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | regarding hearing for SVO's Motion for Reconsideration, Application of the Baseball Clause, Timing for Phase 2, and Twitter Subpoena (Multiple timekeepers per authorization of Angel Muth of Navigators and Jason Smith of Hallmark) | | |
| 09/30/2021 | Richard Dieffenbach | 3439099 | L440 A109 | 0.70 | 0.70 | $215.00 | $215.00 | $150.50 | $71.52 | Attend telephone conference with Team SVO members Cindy Mader, David Frishman, Jamie Tabrizi, Julee Fritsch, and Richard Dieffenbach regarding strategy for initial preliminary hearing for Phase Two of Arbitration and for addressing Reconsideration, issues remaining, and Baseball Clause--multiple attorneys authorized by Angel Muth and Jason Smith | | |
| 09/30/2021 | David Frishman | 3444302 | L110 A106 | 0.20 | 0.20 | $225.00 | $225.00 | $45.00 | $21.39 | Telephone call with client SVO contact Ulrich Pelz regarding Vertiv proposal to continue opening statements for phase II arbitration to October 12 | | |
| 09/30/2021 | David Frishman | 3444121 | L110 A103 | 1.20 | 1.20 | $225.00 | $225.00 | $270.00 | $128.31 | Review, revise, supplement and finalize report to client SVO contact Ulrich Pelz regarding results of Vertiv's motion for reconsideration and Phase II arbitration preliminary hearing and related issues | | |
| 09/30/2021 | Richard Dieffenbach | 3439113 | L450 A109 | 1.60 | 1.60 | $215.00 | $215.00 | $344.00 | $163.48 | Attend hearing on Vertiv's motion for reconsideration and Phase II preliminary issues including Application of the Baseball Clause, Timing for Phase 2, and Twitter Subpoena with TM attorneys David Frishman, Richard Dieffenbach, Jamie Tabrizi, Cindy Mader, and Julee Fritsch (Multiple timekeepers per authorization of Angel Muth of Navigators and Jason Smith of Hallmark) | | |
| 09/30/2021 | CIndy Mader | 3446260 | L440 A109 | 0.70 | 0.70 | $215.00 | $215.00 | $150.50 | $71.52 | Telephone strategy conference call with TM attorneys David Frishman, Richard Dieffenbach, Jamie Tabrizi, Cindy Mader, and Julee Fritsch regarding hearing for SVO's Motion for Reconsideration, Application of the Baseball Clause, Timing for Phase 2, and Twitter Subpoena (Multiple timekeepers per authorization of Angel Muth of Navigators and Jason Smith of Hallmark). | | |
| 09/30/2021 | David Frishman | 3444033 | L450 A109 | 1.60 | 1.60 | $225.00 | $225.00 | $360.00 | $171.08 | Attend hearing on Vertiv's motion for reconsideration and Phase II preliminary issues including Application of the Baseball Clause, Timing for Phase 2, and Twitter Subpoena with TM attorneys Richard Dieffenbach, Jamie Tabrizi, Cindy Mader, and Julee Fritsch (Multiple attorney appearance per authority of Angel Muth of Navigators and Jason Smith of Hallmark) | | |
| 09/30/2021 | David Frishman | 3444151 | L430 A103 | 0.80 | 0.80 | $225.00 | $225.00 | $180.00 | $64.16 | Review, revise and annotate further draft motion to claw back documents regarding Twitter subpoena | Insufficient Detail | 29 hours billed motion to claw Without further to complexity, i involved, lengt of documents/ documents prepared/revie reasonablenes spent cannot b determined. Pl a copy of this c to any appeal. |
| 09/30/2021 | Jamie Tabrizi | 3437990 | L440 A109 | 1.60 | 1.60 | $165.00 | $165.00 | $264.00 | $125.46 | Attend hearing on Vertiv's motion for reconsideration and Phase II preliminary issues including Application of the Baseball Clause, Timing for Phase 2, and Twitter Subpoena with TM attorneys David Frishman, Richard Dieffenbach, Cindy Mader, and Julee Fritsch | | |

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 800 W. 6th Street, Suite 500, Los Angeles, CA 90017.

On December 1, 2025, I served true copies of the following document(s) described as **DECLARATION OF BRUCE T. SMYTH IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action as follows:

| | |
|---|---|
| David Simantob, Esq.<br>Shannon L. Santos, Esq.<br>Wilson Elser Moskowitz Edelman & Dicker LLP<br>555 South Flower Street, Suite 2900<br>Los Angeles, CA 90071 | Attorneys for Plaintiff **NAVIGATORS SPECIALTY INSURANCE COMPANY**<br>Telephone: (213) 443-5100<br>Facsimile: (213) 443-5101<br>E-mail: David.Simantob@wilsonelser.com<br>Shannon.Santos@wilsonelder.com |

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 1, 2025, at Los Angeles, California.

Ben Barragan