David Simantob, SBN 155790
Email: David.Simantob@wilsonelser.com
Shannon L. Santos, SBN 260112
Email: Shannon.Santos@wilsonelser.com
**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, CA 90071-2407
Telephone: 213.443.5100
Facsimile: 213.443.5101

*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

NAVIGATORS SPECIALTY INSURANCE COMPANY,

Plaintiff,

vs.

SVO BUILDING ONE, LLC,

Defendant.

SVO BUILDING ONE, LLC,

Counterclaimant,

vs.

NAVIGATORS SPECIALTY INSURANCE COMPANY,

Counter-Defendant.

Case No. 3:22-cv-07102-AMO
Hon. Araceli Martínez-Olguín
Courtroom 10

**NAVIGATORS SPECIALTY INSURANCE COMPANY'S OPPOSITION TO SVO BUILDING ONC, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

[Filed concurrently with Declaration of Shannon L. Santos]

| | |
|---|---|
| Hearing Date: | March 5, 2026 |
| Time: | 2:00 p.m. |
| Courtroom: | 10, 19th Floor |
| Action Filed: | November 14, 2022 |
| Trial Date: | July 14, 2026 |

/ / /

/ / /

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION .......... 7

II. BACKGROUND .......... 8

A. The Claim .......... 8

B. Discovery in the Coverage Litigation .......... 9

III. ARGUMENT .......... 10

A. SVO Materially Misconstrues the *Buss* Decision in a Convoluted Contortion of Law Designed to Avoid the Significant Reimbursement Proven by Navigators. .......... 10

1. What the *Buss* Case Requires for a Reimbursement Allocation. .......... 12

2. What the *Buss* Case Does Not Require for a Reimbursement Allocation. .......... 20

B. SVO Confuses the Duty to Defend Standard with the Question on Allocation. .......... 24

1. Any Defense Obligation Was Extinguished with the Dismissal of the Defamation Cause of Action. .......... 24

2. Stray Allegations in Excluded Causes of Action Did Not Require Navigators to Continue to Defend the FAC. .......... 27

3. There Was Never "Property Damage" Alleged in the FAC. .......... 30

IV. CONCLUSION .......... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aetna Cas. & Sur. Co., Inc. v. Centennial Ins. Co.*, 838 F.2d 346 (9th Cir. 1988) .......... 29

*Allstate Ins. Co. v. LaPore*, 762 F. Supp. 268 (N.D. Cal. 1991) .......... 29

*Aloha Pac., Inc. v. California Ins. Guar. Assn.*, 79 Cal. App. 4th 297 (2000) .......... 29

*Amex Assur. Co. v. Allstate Ins. Co.*, 112 Cal. App. 4th 1246 (2003) .......... 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 12

*Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal. App. 4th 1 (1996) .......... 28

*Avery Dennison Corp. v. Allendale Mut. Ins. Co*., 310 F.3d 1114 (9th Cir. 2002) .......... 30

*Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal. 4th 489 (2001) .......... 10

*Buss v. Super. Ct.*, 16 Cal. 4th 35 (1997) .......... 7, 8, 10-14, 16-21, 24, 31

*Cal. Union Ins. Co. v. Club Aquarius, Inc.*, 113 Cal. App. 3d 243 (1980) .......... 24

*Chatton v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 10 Cal. App. 4th 846 (1992) .......... 29

*Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787 (1994) .......... 30, 31

*Colony Ins. Co. v. Fladseth*, 2013 U.S. Dist. LEXIS 87738 (N.D. Cal. June 21, 2013) .......... 11

*Columbia Cas. Co. v. Abdou*, 2016 U.S. Dist. LEXIS 110900 (S.D. Cal. Aug. 18, 2016) .......... 11

*Coregis Ins. Co. v. Urbach, Kahn & Werlin, P.C.*, 201 F.3d 443 (9th Cir. 1999) .......... 11

*Crab Boat Owners Assn. v. Hartford Ins. Co. of the Midwest*,
2004 U.S. Dist. LEXIS 23615 (N.D. Cal. Nov. 15, 2004) .......... 26, 29, 31

*Dart Indust., Inc. v. Commercial Union Ins. Co*.,
28 Cal. 4th 1059 (2002) .......... 30

*Delgado v. Interinsurance Exch. of The Auto. Club of S. Cal.*,
47 Cal. 4th 302 (2009) .......... 29

*Fire Ins. Exch. v. Jiminez*,
184 Cal. App. 3d 437 (1986) .......... 28

*Gers, Inc. v. Atlantic Mut. Ins. Co*.,
2005 U.S. Dist. LEXIS 62937 (S.D. Cal. Oct. 19, 2005) .......... 24, 25

*Golden Eagle Ins. Corp. v. CEN-FED, Ltd.*,
148 Cal. App. 4th 976 (2007) .......... 30, 31

*Gray v. Zurich Ins. Co.*,
65 Cal. 2d 263 (1966) .......... 28

*Great Am. E&S Ins. Co. v. Theos Med. Sys., Inc*.,
357 F. Supp. 3d 953 (N.D. Cal. 2019) .......... 25

*Great Am. E&S Ins. Co. v. Theos Med. Sys., Inc*.,
799 Fed. Appx. 539 (9th Cir. Apr. 1, 2020) .......... 25

*Gunderson v. Fire Ins. Exch*.,
37 Cal. App. 4th 1106 (1995) .......... 26

*Hartford Cas. Ins. Co. v. J.R. Marketing, Inc.*,
61 Cal. 4th 988 (2015) .......... 10

*Hurley Constr. Co. v. State Farm Fire & Cas. Co*.,
10 Cal. App. 4th 533 (1992) .......... 26, 28

*Industrial Indem. Co. v. Apple Comp., Inc*.,
79 Cal. App. 4th 817 (1999) .......... 29

*Jaffe v. Cranford Ins. Co.*,
168 Cal. App. 3d 930 (1985) .......... 27

*Kazi v. State Farm Fire & Cas. Co*.,
24 Cal. 4th 871 (2001) .......... 30

*Low v. Golden Eagle Ins. Co*.,
99 Cal. App. 4th 109 (2002) .......... 29

*Lumbermens Mut. Cas. Co. v. Corning, Inc.*,
2008 U.S. Dist. LEXIS 126717 (C.D. Cal. Dec. 24, 2008) .......... 25

*Lumbermens Mut. Cas. Co. v. Corning Inc.*,
2009 U.S. Dist. LEXIS 139078 (C.D. Cal. May 22, 2009) ..... 11

*Millennium Lab., Inc. v. Darwin Select Ins. Co.*,
676 Fed. Appx. 734 (9th Cir. Jan. 27, 2017) ..... 25

*Murphy v. Federal Ins. Co.*,
2001 U.S. Dist. LEXIS 11578 (N.D. Cal. Aug. 1, 2001) ..... 30

*Pacific Coast Surgical Ctr., L.P. v. Scottsdale Ins. Co.*,
2019 U.S. Dist. LEXIS 169897 (C.D. Cal. June 25, 2019) ..... 25

*Palmer v. Truck Ins. Exch.*,
21 Cal. 4th 1109 (1999) ..... 29

*Penuliar v. Mukasey*,
528 F.3d 603 (9th Cir. 2008) ..... 11

*Royce Int'l Broad. Corp. v. Vigilant Ins. Co.*,
51 Fed. Appx. 229 (9th Cir. 2002) ..... 31

*San Miguel Comm. Assn. v. State Farm Gen. Ins. Co.*,
220 Cal. App. 4th 798 (2013) ..... 27

*Scottsdale Ins. Co. v. MV Transp.*,
36 Cal. 4th 643 (2005) ..... 8, 10, 11

*Spa De Soleil, Inc. v. General Star Indem. Co.*,
787 F. Supp. 2d 1091 (C.D. Cal. May 25, 2011) ..... 31

*State Farm Fire & Cas. Co. v. Plutsky*,
1988 U.S. App. LEXIS 22048 (9th Cir. May 23, 1988) ..... 24

*Storek v. Fidelity & Guar. Ins. Underwriters, Inc.*,
504 F. Supp. 2d 803 (N.D. Cal. 2007) ..... 25

*Tradewinds Escrow, Inc. v. Truck Ins. Exch.*,
97 Cal. App. 4th 704 (2002) ..... 31

*The Travelers Indem. Co. of Conn. v. Walking U Ranch, LLC*,
2022 U.S. Dist. LEXIS 44058 (C.D. Cal. Mar. 10, 2022) ..... 25

*The Upper Deck Co., LLC v. Federal Ins. Co.*
358 F.3d 608 (9th Cir. 2004) ..... 26

*The Vons Cos., Inc. v. U.S. Fire Ins. Co.*,
78 Cal. App. 4th 52 (2000) ..... 11

*Waller v. Truck Ins. Exch., Inc.*,
11 Cal. 4th 1 (1995) ..... 30

*WAWGD, Inc. dba Foresight Sports v. Sentinel Ins. Co.*,
2017 U.S. Dist. LEXIS 161361 (S.D. Cal. Sept. 29, 2017)........ 30

*Webcor Constr., LP v. Zurich Am. Ins. Co.*,
372 F. Supp. 3d 1061 (N.D. Cal. 2019)........ 28

*Westfield Ins. Co. v. TWT, Inc.*,
723 F. Supp. 492 (N.D. Cal. 1989)........ 26, 27

*Zox LLC v. West Am. Ins. Co.*,
2024 U.S. App. LEXIS 3095 (9th Cir. Feb. 9, 2024)........ 27

**Statutes**

Fed. R. Evid. 702........ 13

Fed. R. Civ. Proc. 26........ 16

Navigators Specialty Insurance Company ("Navigators") hereby submits its Opposition to the Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment [Doc. 101] ("Motion") filed by SVO Building One, LLC ("SVO").

## I. INTRODUCTION

In a desperate attempt to avoid the overwhelming evidence that shows SVO will be obligated to reimburse Navigators for **over $5.5 million** paid in defense of claims that were never even potentially covered, SVO attempts to confuse the reimbursement standard to take the allocation determination out of the hands of the trier of fact. The reason is simple: SVO knows that, if the allocation between covered and uncovered fees goes to the jury – separate from the duty to defend standard, which is currently before the Court through Navigators' Motion for Summary Judgment [Doc. 100] ("Navigators' MSJ") – the jury will undoubtedly agree with Navigators' allocation expert. André Jardini was the expert that developed the allocation standard in the seminal case, *Buss v. Super. Ct.*, 16 Cal. 4th 35, 60 (1997), a case like here where the insurer sought reimbursement for all claims defended other than the defamation cause of action. SVO is going to lose at trial, so it fabricated a reason to decide allocation at the summary judgment stage through the Motion. The Court should not be hoodwinked in this manner.

In defending SVO in the action entitled *Liebert Corp. v. SVO Building One, LLC*, American Arbitration Association, Case No. 01-18-0003-1318 ("Underlying Action"), Navigators did exactly what *Buss* requires when an action includes both covered and uncovered claims. Navigators provided a full defense to SVO, subject to the right to reimbursement. *Buss*, 16 Cal. 4th at 48. Through this action, Navigators is entitled to recovery of those fees that were never even potentially covered under Navigators' policy issued to SVO ("Policy"). In determining the amount of Navigators' recovery, *Buss* assigns a demanding allocation task to the trier of fact. It does **not** provide a summary judgment shortcut to the insured to avoid reimbursement. Through discovery, Navigators has disclosed its evidence, both through an experienced fee auditor's line-by-line review of the invoices, analytical schedules, interrogatory responses, and documentation of invoices and payments, more than sufficient to carry Navigators' *Buss* burden at trial and certainly sufficient to defeat SVO's Motion. SVO might not like Mr. Jardini's opinions, but that is not enough to preclude him from explaining to

the jury which portions of the fees were for defamation versus non-defamation claims. SVO elected not to rebut this opinion through designation of its own allocation expert, which the jury will undoubtedly consider in deciding the scope of the reimbursement.

At a minimum, SVO has not come close to demonstrating the absence of any triable issue with respect to allocation. Its criticisms of Navigators' discovery responses, its quarrel with the expert's methodology, and its misapprehension of *Buss* do not warrant summary judgment. The Motion should be denied so that the allocation can be decided by the trier of fact.

## II. BACKGROUND

### A. The Claim

When Navigators agreed to defend SVO in the Underlying Action based on the potentially covered 15th cause of action for defamation in the Fourth Amended Complaint ("FAC"), Navigators reserved the right to seek reimbursement of any defense fees or costs incurred in defense of the uncovered claims. [Doc. 101-1, pp. 161, 167-168, 172-173, October 28, 2019 Letter, EXH. E-1, 7-8, 12-13.][1] When the defamation allegations were dismissed, Navigators agreed to continue with the defense subject to the "right 'to seek reimbursement of any defense' to the extent that it was for a non-covered claim and '[t]o the extent that Navigators pays for the defense of claims that do not fall within the scope of coverage, it reserves all rights under appliable law to seek reimbursement of those amounts from SVO.'" [Doc. 101-1, pp. 181-182, May 18, 2021 Letter, EXH. H-1, 2.]

With this reservation, SVO demanded Navigators continue with the defense based on the expectation that reimbursement would be required. *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 656 (2005) ("[T]he insurer may unilaterally condition its proffer of a defense upon its reservation of a right later to seek reimbursement of costs advanced to defend claims that are not, and never were, potentially covered by the relevant policy. Such an announcement by the insurer permits the insured to decide whether to accept the insurer's terms for providing a defense, or instead to assume and control its own defense."). Navigators paid approximately **$2,998,457.50** to defend SVO between March 31, 2021 through conclusion of the Underlying Action in addition to the approximately **$2,497,187.09** Navigators paid for SVO's defense from tender through March 31,

[1] While SVO did not authenticate the documents attached as Exhibit 1 to the Declaration of Bruce Smyth, if the Court considers the evidence in support of the Motion, Navigators will cite to the same.

2021, subject to these reservations. [Doc. 100-1, Declaration of Angel Muth ("Muth Dec."), ¶ 13.]

**B. Discovery in the Coverage Litigation**

Navigators produced extensive discovery throughout this case with the evidence it intends to rely on to establish its reimbursement claim at trial. To establish the amounts Navigators paid in defense of uncovered claims, Navigators produced the following information to SVO:

- The invoices submitted by defense counsel from the Underlying Action as provided to Navigators with the narratives provided by each attorney;
- An internal Navigators chart that identified how much was paid on each invoice submitted in connection with defense of the Underlying Action;
- Evidence of Navigators' payments of each invoice submitted in connection with the defense, including for all experts and consultants;
- All pleadings from the Underlying Action that were provided to Navigators in connection with the insurance claim;
- Mr. Jardini's October 14, 2025 expert report ("Jardini Report"), which provided the expert's analysis of the time spent on defamation versus non-defamation claims and a summary of the general calculations for use in the allocation;
- An "Outline of Services Performed" for each law firm that submitted invoices in connection with SVO's defense as prepared by the allocation expert;
- Interrogatory responses that addressed SVO's requests for identification of the billing entries that were solely allocable to uncovered claims as billed by the two panel firms retained by Navigators in SVO's defense; and
- Interrogatory responses that responded to SVO's requests for identification of costs and expenses paid in SVO's defense that were solely allocable to uncovered claims.

(Declaration of Shannon Santos ("Santos Dec."), ¶¶ 2-3, Ex. A, Amended Responses to Interrogatories.) SVO elected not to notice the deposition of Navigators before the discovery cut-off. (Santos Dec., ¶ 4.) Therefore, Navigators had no obligation to provide SVO with the testimony the personnel will provide at trial in discovery. That does not preclude Navigators from introducing such evidence at trial.

## III. ARGUMENT

### A. SVO Materially Misconstrues the *Buss* Decision in a Convoluted Contortion of Law Designed to Avoid the Significant Reimbursement Proven by Navigators.

Navigators agrees that *Buss* will dictate the scope of reimbursement to which it is entitled for the period of time where a duty to defend was owed. For that reason, Navigators retained the expert involved in developing the *Buss* standard to provide the requisite allocation in this case. (Santos Dec., ¶ 5, Ex. B, Deposition of André Jardini ("Jardini Depo."), 18:24-19:3; 19:9-11, EX. B-7, 8.) Despite *Buss* being the driving factor of the reimbursement allocation, it does not seem SVO read *Buss* before filing the Motion. Therefore, first, Navigators will address what *Buss* does and does not say to clarify the record distorted through the Motion.

SVO does not even attempt to argue that Navigators does not have a right to seek reimbursement for fees and cost paid to defend claims that were never even potentially covered under the Policy. That case law authority in support of this proposition has been routinely and repeatedly upheld. *Buss*, 16 Cal. 4th at 50 ("As to the claims that are not even potentially covered, … the insurer may indeed seek reimbursement for defense costs."); *Scottsdale Ins. Co.*, 36 Cal. 4th at 656 ("[T]he insurer may unilaterally condition its proffer of a defense upon its reservation of a right later to seek reimbursement of costs advanced to defend claims that are not, and never were, potentially covered by the relevant policy."); *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal. 4th 489, 504 (2001) ("[S]uch a reimbursement right is implicit in the policy terms which provide indemnification only for *covered* claims.") (emphasis in original); *Hartford Cas. Ins. Co. v. J.R. Marketing, Inc.*, 61 Cal. 4th 988, 992 (2015) ("[T]he insurer may seek reimbursement from the insured of defense fees and expenses solely attributable to the claims that were clearly outside policy coverage."). The reasoning is simple: "where the insurer, acting under a reservation of rights, has prophylactically financed the defense of claims as to which it owed no duty of defense, it is entitled to restitution. Otherwise, the insured, who did not bargain for a defense of noncovered claims, would receive a windfall and would be unjustly enriched." *Scottsdale Ins. Co.*, 36 Cal. 4th at 659. SVO misattributes the quote "the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*" to the *Scottsdale Ins. Co.* decision. (Motion, 17:4-6, citing *Scottsdale Ins. Co.*, 36

Cal. 4th at 655 (emphasis in original).) This appears to be a hallucination as no such language appears in the *Scottsdale Ins. Co.* decision.

While SVO boasts of no reported cases on a *Buss* reimbursement claim as justification that such a recovery cannot be accomplished (Motion, 23:4-6), the reason is much simpler: such an allocation is decided by the trier of fact, not the judge in issuing a decision on coverage. There would be no reported decision creating such an allocation, only cases that address the duty to defend issue before an allocation determination is made. Regardless, courts have accepted the type of evidence Navigators produced as evidence to justify a reimbursement claim. *Columbia Cas. Co. v. Abdou*, 2016 U.S. Dist. LEXIS 110900, *5-6 (S.D. Cal. Aug. 18, 2016) ("Columbia submitted declarations by its claim consultant …; cancelled checks made to Abdou's defense counsel …, and invoices from Abdou's defense counsel … . The first two forms of evidence are each independently sufficient to establish that Columbia is entitled to reimbursement"); *Lumbermens Mut. Cas. Co. v. Corning Inc.*, 2009 U.S. Dist. LEXIS 139078, *6, 9 (C.D. Cal. May 22, 2009) ("AMICO has provided copies of invoices with detailed time entries, cancelled checks, 'Focus file' (claims file notes) entries showing authorization for payment, and detailed summaries that set out the basis for each of the amounts claimed. … Remembering that AMICO need not prove sole allocation by clear and convincing evidence, but only by a preponderance of the evidence, it is appropriate to consider what NetOptix puts forward to refute this *prima facie* showing."); *Colony Ins. Co. v. Fladseth*, 2013 U.S. Dist. LEXIS 87738, *10 (N.D. Cal. June 21, 2013) ("Plaintiff has shown that it is entitled to reimbursement in the amount of $239,280.05 for the money that it has already paid" under *Buss*).[2]

Given the burden imposed by *Buss*, the California Supreme Court anticipated that, "the insurer will probably pursue the matter only in apparently exceptional cases--for example, where the

[2] SVO cites to *Coregis Ins. Co. v. Urbach, Kahn & Werlin, P.C.*, 201 F.3d 443 (9th Cir. 1999), but that decision was made without a published opinion. (Motion, 6:28-7:7.) Regardless, in the uncitable decision, there is no reference as to what evidence was purportedly insufficient such that "a jury could reasonably find for" the insurer. *Coregis Ins. Co.*, 1999 U.S. App. LEXIS 26254, *3-4. It certainly does not stand for the proposition that all of the evidence provided by Navigators in this action warrants a summary judgment finding in SVO's favor. *Penuliar v. Mukasey*, 528 F.3d 603, 614 (9th Cir. 2008) ("Legal rulings in a prior opinion are applicable to future cases only to the degree one can ascertain from the opinion itself the reach of the ruling. Where the underlying facts do not appear, later courts are bound by any rule of law explicitly announced, but not by the application of that law to unstated factual circumstances."); *The Vons Cos., Inc. v. U.S. Fire Ins. Co.*, 78 Cal. App. 4th 52, 60 (2000) ("[I]t is important to remember that the language of an opinion must be construed in light of the facts of the particular case").

defense costs the insurer may obtain in reimbursement are clear and substantial *and* where the assets the insured has available for reimbursement are themselves of the same sort." *Buss*, 16 Cal. 4th at 58 (emphasis in original). The *Buss* Court anticipated correctly; for that reason, Navigators only sought reimbursement in this case where there was clear delineation between the covered and uncovered claims and where the vast majority of the fees and costs incurred in the Underlying Action from tender were subject to reimbursement.

**1. What the *Buss* Case Requires for a Reimbursement Allocation.**

To avoid the anticipated reimbursement, SVO focuses on what evidence is to be used in making the allocation between covered and uncovered claims. The *Buss* decision expressly stated that an insurer seeking reimbursement of fees paid in defense of uncovered claims must establish the allocation "by a preponderance of the evidence." *Buss*, 16 Cal. 4th at 40. SVO's representation that Navigators did not prove their damages claim through discovery is easily refuted, especially when weighed against the "preponderance of the evidence" standard set forth by the California Supreme Court. As shown above, Navigators produced more than enough "evidence on which the jury could reasonably find for the plaintiff." (Motion, 4:25-27, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).) More importantly, Navigators produced all the evidence it intends to rely on at trial for the jury to evaluate in deciding which fees are allocable to uncovered claims. The only other evidence that Navigators will rely on will be the testimony of Navigators' personnel. Since SVO did not notice Navigators' deposition (Santos Dec., ¶ 4), SVO lacks any information about the scope of testimony that will be presented in support of the damages claim yet boldly makes the assertion that Navigators does not have any evidence in support of its claims.

Through discovery responses and document productions, Navigators provided detailed information about the scope of its damages. Navigators original Interrogatory responses advised that SVO improperly sought expert discovery early. After the expert report was prepared, Navigators provided amended responses that provided the specific line-item allocation prepared by Navigators' expert. While Navigators' counsel said at a hearing that the original expert report did not include the line-by-line allocation, that was a mistake; the expert report as already produced to SVO included that information. (Santos Dec., ¶ 6.) Even though counsel's mistake was what was relied upon by

the Magistrate Judge in ordering amended responses, Navigators still provided the ordered discovery with the line-by-line review as determined by the expert, as shown in part as follows:

> Exhibit 9 to the Jardini Expert Report identifies the following time entries billed by Tyson & Mendes before the defamation cause of action was dismissed in the Underlying Action that are potentially covered under the Policy:
>
> * * *

| | | | | |
|---|---|---|---|---|
| | **TOTAL:** | | **10.2** | |
| | **Allocated to Defamation:**<br><br>**Allocated to Potentially Covered:** | | 3.8<br><br>6.4 | |

> Each and every other time entry billed by Tyson & Mendes is solely allocable to defense of a claim in the Underlying Action that did not come within the Policy's Insuring Agreement, was never potentially covered, and is recoverable by Navigators in this action.

(Santos Dec., ¶ 3, Ex. A, Amended Responses to Interrogatories, EX. A-5, 6, 9-11.) SVO does not argue that any of this discovery is not admissible at trial nor could it make such a claim.

Navigators' expert will further provide the trier of fact his opinions in evaluating the scope of the reimbursement claim. Federal Rule of Evidence 702 permits expert testimony where the witness is qualified, the testimony will help the trier of fact, and the opinions are based on sufficient facts and reliable methods. Mr. Jardini's qualifications are unassailable: 48 years of litigation practice; founder and president of a legal audit practice; more than 1,950 audits and $2.75 billion in legal fees reviewed; and frequent testimony on allocation and reasonableness. [Doc. 101-1, pp. 234-235, Jardini Report.] The expert method utilized includes a line-by-line review of defense counsel's invoices and evaluation of the litigation task in determining whether it was for defense of the defamation claim. This approach is routinely accepted in fee cases as evidenced by Mr. Jardini's impeccable record.

Unable to attack Mr. Jardini's qualifications to make a *Buss* allocation (including the fact that Mr. Jardini created the *Buss* allocation), SVO instead quarrels with how the expert review allocated the time entries. (Jardini Depo., 18:24-19:3; 19:9-11, EX. B-7, 8.) SVO may disagree with the

methodology and will undoubtedly argue that to the jury, but it does not render the expert opinion unreliable. In providing an expert analysis, Mr. Jardini explained that the outlines created by his office were instrumental in the allocation work necessary for the *Buss* determination. The "Outline of Services Performed" put the information from the voluminous defense invoices into a format that is useable by the trier of fact and the expert. (Jardini Depo., 56:19-23, EX. B-22 ("Invoices are designed for a very particular purpose. They tell you what a particular lawyer did that they want the client to pay for at the appropriate rate. … [T]hose records are not prepared to assist in an allocation analysis."); 78:12-79:13, EX. B-39, 40.) The outlines reflected the work performed by the expert's office in reviewing each and every individual time entry and batching them for an allocation determination by the expert. Mr. Jardini testified, "[t]here's no requirement that you look at every item of the invoice to do this work, and then, spell it out on a separate piece of paper, as if it's a separate piece of information. It isn't. It's all in the invoices. If you want to see what's in the invoices, the outline of services has the date range and the description of the service and the timekeepers involved. Often, just one person on one date. Meaning, it's the **exact entry from the time records**." (Jardini Depo., 54:25-55:9, EX. B-20, 21 (emphasis added).)

SVO falsely states the batching of time entries was done without "any guidance." (Motion, 11:19-21.) The expert testified that, "[a]n outline of services is a basic schedule that we prepare in every audit. I've been retained in audits more than 1,900 times, 40 or 50 times a year. In **every single case**, an auditor prepares an outline of services. It serves numerous important functions. It makes the review of the invoices more readily ascertainable and transparent, and it doesn't require separate instruction. **These are functions that these auditors do *every day, all day, and in Karen Scott's case, for more than 20 years.*"** (Jardini Depo., 15:1-13, EX. B-4 (emphasis added).) Any suggestion that the batching of time entries was done arbitrarily or without a standard procedure was presented in hope that the Court does not actually review the deposition testimony or the outlines themselves. (Motion, 11:13-15.)

The usefulness of the outlines is visible to any lay person, and the outlines are in a format that is easily digestible by the jury in a way the attorney invoices could never be. A portion of an "Outline of Services Performed" is shown below:

**NAVIGATORS V. SVO FEE REVIEW**
**Re: Tyson and Mendes LLP**
**Outline of Services Performed**

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 12/16/2020 | | Review and analyze transcript of motion for injunction to evaluate for trade secret claims | RD | 1.20 | |
| 12/16/2020 | | Commence review of extensive electronic file of prior counsel to assess | DF | 3.20 | |
| 12/16/2020 | 12/17/2020 | Review orders and amended claims to prepare for discussion with Murphy Austin attorneys for strategy for prosecution of defenses against breach of contract claims | RD, GS | 2.80 | |
| 12/16/2020 | 12/28/2020 | Analysis of defamation cause of action compared with other causes of action | GS, RD | 2.10 | D |

[Doc. 101-1, p. 296, Jardini Report.] Mr. Jardini confirmed at deposition that he marked a "P" on the Outline of Services to show "[t]he relationship to -- or at least the possible relationship to a defamation service," whereas the Jardini Report shows "D" was for a task confirmed as related to the defamation cause of action. (Jardini Depo., 14:12-17; 95:1-4, EX. B-3, 46; Doc. 101-1, p. 301, Jardini Report, Ex. 9.) The expert stated that he was "bending over backward" in favor of SVO to mark anything that could possibly include time on the defamation claim as "P." (Jardini Depo., 22:22-23:11; 62:14-63:15; 88:1-16, EX. B-11, 12, 28, 29, 41.) The designated expert was the **only person who performed that allocation**, not anyone else in his office. (Jardini Depo., 14:18-25; 58:2-14; 130:6-9, EX. B-3, 24, 52 (emphasis added).)

As additional evidence to establish Navigators' damages, Mr. Jardini testified in detail about how the allocation procedure was followed in his analysis and how he will present it to the jury:

> My place is to sort out between those services that were rendered in pursuit of … the defense of the defamation claim, as opposed to the other 17 claims. … I determined whether or not in the real world it had, more likely than not, a relationship to a defamation claim. And if it didn't, I decided that it wasn't part of the defamation defense. … [I]in allocation work by any auditor, and well accepted in the audit community, you don't parcel out defamation testimony line by line, you have to make a rather more broad determination. Nor can you go through interrogatories line by line, and the like. That level of micro-scrutiny does not help the analytical process. In fact, it hinders it.

(Jardini Depo., 20:3-14; 30:13-16; 31:19-25, EX. B-9, 14, 15.)

The Motion suggests that Mr. Jardini's analysis is flawed as determining which amounts are attributable to a covered claim based on the "preponderance of the evidence" standard as dictated by *Buss*. *Buss*, 16 Cal. 4th at 40. The expert already testified to the problem with SVO's reasoning and how the determination was made following *Buss*, which the jury will use in evaluating whether the amounts were solely allocable to an uncovered claim.

> Q. How can you determine whether the review and analysis of documents in that circumstance is solely allocable to potentially non-covered claims?
>
> A. So, you're addressing a notion that could it be possible that one second of that time was spent in connection with something that might be distantly related to defamation. I'm looking at it in the context of a case in which defamation was dismissed voluntarily; meaning, it's not an important part of the case; that it was only one of 18 claims, and that that discovery, more likely than not, was related to things not defamation. And so, under that kind of an analysis, the preponderance-of-the-evidence-type analysis, it's extremely unlikely, and that puts it, you know, below the 51 percent on preponderance of evidence. … There's the standard, and then, there's the burden of proving that standard. And the burden of proof is 51 percent, or 50.1 percent, as some people argue, or less than that even. And so, in this case, involving trademark, intellectual property, trade secrets, involving complicated business transactions, the clear likelihood is, this is not related to defamation, and I think that's a fair conclusion.

(Jardini Depo., 64:20-65:23, EX. B-30, 31.) Despite SVO's contention, the expert testified that he did **not** solely rely on whether the time entry referenced defamation. (Jardini Depo., 98:8-20, EX. B-47.)

Mr. Jardini did exactly what *Buss* contemplates for an expert allocation. His Rule 26 report explains his qualifications and methodology, attaches firm-by-firm outlines that chronologically group related time entries by task and timekeeper to assist in the analysis, and presents his conclusions as to the amount of time potentially related to defamation. Based on this expert analysis, he found only 63.6 hours of potentially defamation-related time of the 5,242.9 hours of time incurred before dismissal of the defamation claim, constituting **approximately 1% of the defense time**. By

any measure, this is competent, trial-ready evidence.

Critically, in conducting a post-March 24, 2021 allocation (in direct contradiction to SVO's contention that "Navigators did not perform an allocation under *Buss* pertaining to these fees and costs" (Motion, 22:17)), Navigators' expert found that there was **no time incurred after dismissal of the defamation cause of action that was allocable to defamation**. Mr. Jardini did not need to include such time on the outlines as there was no time allocable to defamation. While SVO falsely states that Navigators "provided no evidence of such expenses and its expert, Jardini, did not even review those fees" (Motion, 16:15-16), the deposition transcript reflects the actual expert findings:

Q. Now, in preparing these outline of services performed, it's correct that you did not provide any analysis for the time entries after March 24, 2021; is that right?

A. There's not an outline of services for that period of time, but we did word searches, and looked at those just to be sure that there was nothing about defamation, which there wasn't. … I don't know if we just used the word "defamation," but at least we used that word, and it doesn't come up in that period. Also, the defamation claim had been dismissed, so it's not unusual that it wouldn't have come up. But there was nothing to indicate that the position that no defamation-related defense activities happened after that date was correct. There was nothing that made me question that in any way.

Q. Well, what did you do, other than the word search, in order to make that determination?

A. Reviewed the bills, generally speaking, you know? I mean, kind of, understand the arc of what they were doing, preparing for arbitration, going to arbitration, and so on. … Settling the case.

Q. … Did you make a determination as to whether there were any attorney's fees that were incurred in connection with the defense of a disparagement claim?

A. There was no disparagement claim.

Q. … Did you -- was there any costs incurred with respect to the defense of allegations of disparagement in the post-March 24, 2021 time period?

A. There was no claim for damages for reputational harm in the complaint under any claim after the defamation claim was dismissed, even in the intentional interference with contractual relations. That's not a -- that's not a reputational harm claim.

* * *

Q. … Did you, or anyone from your firm, review the time entries for the law firms, I guess would just be Tyson & Mendes, for the period after March 24, 2021?

A. Yes, in two ways. We did the word search of those -- for defamation, perhaps, other words. There wasn't anything that came up from that. And we looked at the services, in general, about preparing an outline of services, to ensure that they weren't picking up defamation in some other way, or discussing it, or litigating it, and they weren't.

* * *

Q. My question is, did you see any entries in the bill that referred to the review of attorney's fees after the March 24, 2021 dismissal?

A. There are references to reviewing the claim file where the invoices were; there's references to reviewing the invoices without specificity as to date. I can tell you that I did look at that time, not line by line. My auditors also looked at that time, and we did word searches for that time as well.

(Jardini Depo., 71:13-72:16; 73:22-74:9; 109:23-110:7; 132:14-22, EX. B-32-35, 48, 49, 53.)

This expert opinion expressly refutes SVO's contention that there is no evidence available to support Navigators' first cause of action for declaratory relief regarding the right to reimbursement of fees incurred as of March 24, 2021. Ironically, the insured in *Buss* argued "that, under *Hogan*, the burden of proof that the insurer must carry [for a reimbursement claim] is 'undeniable evidence,' and that it can do so only if it can point to a prior 'watershed event'--what he formerly called a '"bright line" event'--separating the claims that are not even potentially covered from those that are." *Buss*, 16 Cal. 4th at 54. While the *Buss* court rejected this higher standard, that is the exact type of event that occurred in the Underlying Action when the defamation cause of action was dismissed on March

24, 2021. With this type of watershed event, the allocation question becomes very simple. No time incurred thereafter would be for defense of a covered claim.

Whether consultant or expert costs are reimbursable under *Buss* is likewise a fact question turning on whether they were incurred to defend uncovered claims.[3] For the same reasons as discussed above, Navigators has produced evidence to support its position that all costs paid to experts in the Underlying Action were for defense of uncovered claims. All such invoices have been produced and reflect that no work was completed on defamation. Navigators similarly produced the documents that show the amounts paid on such invoices. In addition, a Navigators representative will testify at trial that these experts were retained in defense of the 17 uncovered causes of action defended in the Underlying Action, including nine for intellectual property violations, four for contractual claims, three for fraudulent behavior, and one for declaratory relief. [Doc. 101-1, FAC.] While it is again understandable that SVO seeks to avoid a determination on this issue by the trier of fact given the non-attorneys' fees and costs total $3,524,165.83 (Santos Dec., ¶ 3, Ex. A, Amended Response No. 4, 12:23-25, EX. A-12), that does not mean that Navigators is not entitled to establish reimbursement at trial. The line items included in Navigators' chart of payments, which SVO acknowledges includes the totals of payments actually made (Motion, 15:13-19), will be explained to the jury along with the expert's testimony (Jardini Depo., 118:7-119:3, EX. B-50, 51). The jury can then decide, based on the evidence, which amounts were solely allocated to uncovered claims.

At a bare minimum, SVO has not shown that there is no triable issue of fact to resolve the allocation issue at the summary judgment stage. SVO bears the burden on its Motion to eliminate any genuine dispute as to Navigators' ability to meet its *Buss* burden. SVO's Motion turns on the assertion that Navigators has "no admissible evidence" to satisfy *Buss*, which, as shown, is categorically untrue. The expert testimony, expert report, accompanying schedules, document production, and discovery responses are more than sufficient to preclude summary judgment to avoid Navigators from seeking reimbursement at trial. SVO's challenges to Mr. Jardini's reliability and Navigators' discovery responses fall far short of a summary judgment showing.

[3] While SVO's absurd position that there is no authority "that expert and consultant fees and expenses are recoverable under *Buss*" (Motion, 15:4-5) hardly warrants a response, Navigators directs the Court to the *Buss* decision, which states an insurer may "seek reimbursement from the insured for defense costs … as to claims that are not even potentially covered." *Buss*, 16 Cal. 4th at 39.

### 2. What the *Buss* Case Does Not Require for a Reimbursement Allocation.

SVO contends that "Navigators Cannot Establish That Its Reimbursemnt [sic] Claims Satisfy The Requirements of *Buss*." (Motion, 4:9-10.) In so arguing, SVO fails to provide the Court with the actual language from the *Buss* case. SVO's Motion confuses two different concepts: (i) the expert's methodology and analysis, and (ii) the presentation format of the expert's opinions. *Buss* makes no statement that dictates how an expert should quantify the allocation and certainly does not require a report to replicate every time entry in allocation columns. No court would ever allow an insurer to show the jury each and every line of fees incurred in a defended action, which SVO contends is "about 8,000 fee entries" in the Underlying Action. (Jardini Depo., 43:9-10, EX. B-17.) Courts recognize that an insurer may carry its *Buss* burden by competent evidence, including expert testimony. Disputes over the expert's opinions are for the trier of fact to decide.

SVO blatantly misrepresents the *Buss* decision to the Court with the statement that the Jardini Report "and his deposition testimony blatantly disregard the applicable standard under *Buss* by failing to provide any evidence of the ***requisite*** line-by-line breakdown." (Motion, 10:12-14 (emphasis added).) The *Buss* decision says nothing of the sort. Nowhere does the California Supreme Court dictate that proof of a reimbursement claim must appear as a line-by-line allocation table embedded in an expert report. What *Buss* requires is proof, not a form. The task *Buss* describes, however difficult, is an evidentiary showing at trial. Mr. Jardini's analysis provides exactly what *Buss* contemplates: evidence that can be weighed by the trier of fact.

SVO mischaracterizes Mr. Jardini's analysis as a prohibited divide-by-18-causes-of-action exercise. (Motion, 12:5-6.) The expert's testimony expressly says otherwise. (Jardini Depo., 21:22-22:16, EX. B-10, 11.) Mr. Jardini derived potential defamation-related hours from the actual invoices, using the task-based schedules to pinpoint entries and time periods plausibly tied to defamation, and then stated a conservative percentage of pre-dismissal time "even arguably" related to defamation. That is neither a rote count nor speculation; it is the product of a seasoned legal fee auditor's review of actual work descriptions in light of the pleadings and litigation posture. *Buss* requires proof that the costs sought are solely allocable to uncovered claims. It does not prohibit the use of expert judgment to quantify the minor fraction of time in the Underlying Action that could

relate to the lone potentially covered claim, leaving the remainder subject to reimbursement.

Even though SVO manufactured the purported *Buss* requirement for a line-by-line allocation, Navigators' expert did in fact perform such an analysis. When asked about a review of each line item in the defense invoices from the Underlying Action, the expert testified that such a review was unequivocally completed:

Q. When you said you looked at the entirety of the invoices, did you look at each individual entry?

A. I generally do look at the invoices, and I think I did. I don't recall specifically, but my auditors review every line with care in doing their work and preparing the outline of services, which is a very critical tool which permits me to do my work, and provides clarity in making those assessments, much better, frankly than the line-by-line invoices themselves, because the meaning is lost in the volume of the entries … .

* * *

Q. … I was asking if you personally did it.

A. I looked at them in general to understand format, billing style, and such other things. I didn't duplicate the work done at much lower cost, and much more efficiently by my auditors.

Q. … Did, you, or anyone in connection with your review of the billing entries, investigate whether there was work performed in connection with the defense of the specific allegations set forth in Mr. Murray's letter under "disparagement"?

A. We looked at every line. We also, before doing that, did a word search. The word "disparagement," I don't believe, appears in the bills anywhere. We did a word search for "defamation," which appears a comparative handful of times. And that's an electronic word search, which doesn't substitute for a line-by-line review, which we did do, but it is an -- it is an adjunct which tells you I think fairly clearly that they're not litigating disparagement or defamation at least to any significant degree in a case that turns on intellectual property in a

complicated business transaction.

* * *

[SVO's expert] doesn't have an understanding of how we work, and have been accepted in doing that work across hundreds and hundreds of audits, every single audit, every single time, and have a profound expertise in doing it well in a way that delivers important information in an understandable way that simply reviewing the bills, which is what he's suggesting, cannot possibly do. Bills, in the way that they're kept, and in the level of detail that they're kept obfuscate key information that's necessary to do work … . So, doing it the way we do it is better, more efficient, more transparent, and allows for clarity in the decision-making. Doing it line by line is just entering into a mud hole and coming out with an answer and I thinking it's the right answer. It doesn't help the process.

* * *

Q. Okay. And I want to be clear on this. Is it correct to say that you believe that you do not need to evaluate each entry to determine whether it can be solely allocable to claims not potentially covered?

[] MS. SANTOS: Objection. Mischaracterizes testimony.

THE WITNESS: Our process does evaluate every entry, every entry that's -- that's dedicated to an identifiable litigation service, and that's most of the entries.

(Jardini Depo., 42:20-43:7; 43:14-44:16; 53:10-54:3; 57:15-20; 61:2-12, EX. B-16-20, 23, 27.)

SVO next falsely states that Mr. Jardini seeks "reimbursement" "for fees which Navigators did not pay." (Motion, 13:17-18; 14:15-23.) This strawman argument is merely an attempt to obscure the absurdity of SVO's position. First, Mr. Jardini is not seeking "reimbursement" for anyone. He is providing an expert opinion on the allocation between defamation and non-defamation claims. This opinion will be provided to the jury for consideration as the expert testified:

So, you or I don't get to decide who carries the burden of proof. The jury will decide that, and they'll hear everything. They'll know that defamation is only one of 18 counts; they'll know that counterclaims are not part of defamation, and aren't part of

> the duty to defend even. They'll know that the likelihood that the lawyers spent any time at all about defamation on this entry is extraordinarily unlikely, and the basis for their conclusion on that -- in that regard will be all of those facts, including that the defamation count was dismissed not that long after this entry, but also, my testimony. I mean, they're entitled to rely on that, that understanding the way litigation works, how lawyers work, how they describe their time, it's fair to conclude that this entry does not relate to defamation, or more likely than not, does not relate to defamation. That's a fair conclusion for them to reach, based on my conclusion. They could also reject it, but that's their choice, not yours.

(Jardini Depo., 91:5-23, EX. B-44.)

Second, the fact that Mr. Jardini did an allocation of fees that were incurred before tender of the FAC to Navigators does not mean that Navigators is seeking fees it did not pay. The allocation shows that Mr. Jardini's opinion was consistent for work performed throughout the Underlying Action. If anything, this expanded allocation analysis works to SVO's advantage: there would have been more time potentially spent on the defamation claim before tender than after given the claim was thereafter dismissed. (Jardini Depo., 76:16-20, EX. B-37 ("Well, it was counted by me, and they're getting three percent of that. So, bank error in [SVO's] favor.").)

SVO's desperation is further evidenced by a 14-line argument about calculation totals in Mr. Jardini's report compared to the exhibits. (Motion, 13:24-14:12.) Yet, Mr. Jardini testified that the totals in the report came from Navigators' Interrogatory responses, not calculations done by his office. (Jardini Depo., 77:8-18, EX. B-38 ("The outlines are information taken from the invoices themselves. The invoices from which they're taken are listed on Exhibit 10. The amounts paid, as it turns out I now know, were from interrogatories that Navigators answered under oath. So, my Paragraph 42, as to the amounts paid, are the amounts paid as detailed in answers to [SVO's] discovery.").) The Interrogatory response totals include all amounts Navigators paid in defense – both fees and defense costs. Given Mr. Jardini was only retained to evaluate the attorneys' fees and costs but not all consultant fees Navigators is seeking in reimbursement, the difference in the numbers is hardly surprising.

*Buss* dictates the burden for allocation to be completed at trial. SVO's attempt to transmute discovery skirmishes into a dispositive defect fails. At most, the parties have a factual dispute about how many hours are solely allocable to uncovered claims, a classic question for the trier of fact. That dispute defeats SVO's Motion.

**B. <u>SVO Confuses the Duty to Defend Standard with the Question on Allocation.</u>**

Navigators recognizes that the allocation matter is a question for the jury – which SVO, not Navigators, requested – whereas the duty to defend standard is to be adjudicated by the Court. For that reason, Navigators filed its MSJ solely on the duty to defend issue and left the allocation determination for the trier of fact. SVO's Motion does the opposite; it seeks a summary judgment ruling on allocation, but it relies on arguments on the duty to defend. As Navigators' MSJ discusses the duty to defend in detail, Navigators incorporates that brief herein. Navigators will only address the inaccuracies cited in SVO's Motion about the defense obligation owed for the Underlying Action even though the full standard is addressed at length in Navigators' MSJ.

**1. Any Defense Obligation Was Extinguished with the Dismissal of the Defamation Cause of Action.**

SVO's continued-defense obligation argument fails. The allegations asserted in support of the defamation cause of action in the FAC were the only allegations that ever potentially triggered coverage under the Policy. Once the only potentially covered defamation claim was dismissed on March 24, 2021, the duty to defend was "extinguished." *Buss*, 16 Cal. 4th at 46; *see also*, *Gers, Inc. v. Atlantic Mut. Ins. Co*., 2005 U.S. Dist. LEXIS 62937, *8 (S.D. Cal. Oct. 19, 2005) (holding the duty to defend "did not cover the arbitration proceedings, because the defamation claim was withdrawn from arbitration and therefore no potential for coverage applied."). Navigators no longer had a duty to defend and could withdraw from SVO's defense. *Cal. Union Ins. Co. v. Club Aquarius, Inc.*, 113 Cal. App. 3d 243, 247-248 (1980) (holding the insurer "had a right to withdraw from the defense once the federal court, by its findings, had made it clear that the case, in fact, did not involve the limited risk set forth in that policy. … [The insurer] need not defend against the remaining portion of the action, as to which it has no obligation to pay."); *State Farm Fire & Cas. Co. v. Plutsky*, 1988 U.S. App. LEXIS 22048, *5 (9th Cir. May 23, 1988) ("[I]f it is clearly established by a

court's findings that a case does not involve the risk set out in a policy, the insurer may withdraw"); *Pacific Coast Surgical Ctr., L.P. v. Scottsdale Ins. Co*., 2019 U.S. Dist. LEXIS 169897, *22 (C.D. Cal. June 25, 2019) ("[W]hile an insurer must initially provide a defense if coverage is in doubt, it is entitled to reject a tender of defense or withdraw from defending a claim if it is able to demonstrate, by reference to undisputed facts, that there is 'no potential for coverage.'"); *Lumbermens Mut. Cas. Co. v. Corning, Inc.*, 2008 U.S. Dist. LEXIS 126717, *23 (C.D. Cal. Dec. 24, 2008).

The "without prejudice" label on the dismissal does not create a perpetual defense obligation. Courts do not impose a duty to defend based on speculation that a dismissed claim might someday be reasserted. *Storek v. Fidelity & Guar. Ins. Underwriters, Inc*., 504 F. Supp. 2d 803, 813 (N.D. Cal. 2007); *Millennium Lab., Inc. v. Darwin Select Ins. Co*., 676 Fed. Appx. 734, 737 (9th Cir. Jan. 27, 2017) ("[B]y the time Millennium appealed and moved for a new trial, it was plain that the case contained no potentially covered claims. Ameritox did not press a disparagement claim, the jury never awarded damages for disparagement, and Ameritox did not appeal or move for a new trial. There was no evidence that an amendment to add a disparagement claim was likely. … Darwin's duty to defend therefore terminated with the June 16, 2014 judgment in *Ameritox*."). The defense obligation ceases when the covered claim is dismissed. *Gers, Inc.*, 2005 U.S. Dist. LEXIS 62937 at *7-8 (holding the insurer could cease its duty to defend an arbitration once the only covered claim – a defamation cause of action – was voluntarily withdrawn); *The Travelers Indem. Co. of Conn. v. Walking U Ranch, LLC*, 2022 U.S. Dist. LEXIS 44058, *52-53 (C.D. Cal. Mar. 10, 2022), quoting *Lumbermens Mut. Cas. Co.*, 2008 U.S. Dist. LEXIS 126717 at *53-54 ("The only claim by the Louderbacks that could have potentially been covered by the policy would have been a defamation claim. But the Louderbacks never amended their complaint to include a defamation claim, nor sought damages on account of defamation. Therefore, there is no potential that this appeal can include a defamation claim, because 'any appeal by the underlying plaintiffs cannot involve a defamation claim which they never brought.' … Accordingly, Travelers 'should not have to remain in the case and provide a defense where the facts make clear that the litigation [] only involves non-covered claims.'"); *Great Am. E&S Ins. Co. v. Theos Med. Sys., Inc*., 357 F. Supp. 3d 953, 968 (N.D. Cal. 2019), *aff'd*, 799 Fed. Appx. 539 (9th Cir. Apr. 1, 2020).

Based on this authority, Navigators was well within its right to withdraw from the defense of the Underlying Action once the defamation cause of action was dismissed and seek reimbursement of all fees incurred to that point in defense of uncovered claims. Instead, Navigators agreed to SVO's request to continue to defend the Underlying Action subject to the right to reimbursement, which not only SVO consented to but demanded. It is undisputed that Vertiv Corporation ("Claimant") never reasserted a defamation claim. [Doc. 100-1, Muth Dec., ¶ ¶¶ 3, 12.) SVO's contention that a defense obligation was owed because defense counsel was "guarding" against the possibility that defamation could be reasserted is without legal or factual support. (Motion, 21:21-25.)

Unable to show a triggering claim after the defamation dismissal, SVO has relied on *Westfield Ins. Co. v. TWT, Inc*., 723 F. Supp. 492 (N.D. Cal. 1989) to argue that, despite the fact that the only potentially covered claim was dismissed, Navigators had a continuing duty to defend, because the dismissal was "without prejudice." In that decision, the district court relied on the fact that a crossclaim could be reasserted as it had been dismissed without prejudice, thereby holding the dismissal did not eliminate the carrier's duty to defend. **The 1989 *Westfield* decision has never been followed for this proposition by any court in any subsequent decision**, explaining why this is the only case SVO has offered in support of its strained policy interpretation. Rather, as shown through the plethora of subsequent decisions cited above, California and federal appellate courts have repeatedly and consistently held after the *Westfield* decision that an insured cannot "manufacture" a duty to defend by speculating what a claimant might assert in the future when the operative complaint does not contain such claim. *See also*, *Amex Assur. Co. v. Allstate Ins. Co*., 112 Cal. App. 4th 1246, 1252 (2003) (holding an insured "cannot manufacture a duty to defend by speculating about facts that might be found or ways in which the underlying complaint might be amended at some future date."); *Gunderson v. Fire Ins. Exch*., 37 Cal. App. 4th 1106, 1117 (1995) (holding insureds "may not manufacture coverage by speculating about unpled third party claims."); *Hurley Constr. Co. v. State Farm Fire & Cas. Co*., 10 Cal. App. 4th 533, 538 (1992) (same); *The Upper Deck Co., LLC v. Federal Ins. Co.*, 358 F.3d 608, 616 (9th Cir. 2004) ("The possibility of an amendment does not require the insurer to speculate about any conceivable claim that a plaintiff might bring against the insured or to spin out wild theories of recovery for every conceivable damage."); *Crab Boat Owners*

*Assn. v. Hartford Ins. Co. of the Midwest*, 2004 U.S. Dist. LEXIS 23615, *17 (N.D. Cal. Nov. 15, 2004) ("[P]laintiffs' assertion that the carrier always has an obligation to defend when the third-party plaintiff remains free to amend his complaint is misplaced.").

The stray *Westfield Ins. Co.* decision, which has been intentionally excluded from all subsequent case law decisions, does not provide this Court with any basis to find a continuing duty to defend after the defamation claim was voluntarily dismissed from the FAC.

**2. Stray Allegations in Excluded Causes of Action Did Not Require Navigators to Continue to Defend the FAC.**

Unable to argue a continuing defense obligation for the defamation claim, SVO points to isolated phrases in the FAC to argue that "disparagement" remained in the case. That argument fails for multiple, independent reasons.

First, Coverage B of the Policy requires that the Claimant seek "damages" because of "personal and advertising injury." It is not enough for a version of the word "disparage" to be included in the FAC to trigger coverage for material that "disparages a person's or organization's goods, products or services." [Doc. 101-1, p. 59, Policy, EXH. A-37.] The Policy requires that the Claimant seek "damages" for the alleged injury for there to be a defense obligation. [Doc. 101-1, p. 45, Policy, EXH. A-23.] *San Miguel Comm. Assn. v. State Farm Gen. Ins. Co.*, 220 Cal. App. 4th 798, 800-801 (2013); *Jaffe v. Cranford Ins. Co.*, 168 Cal. App. 3d 930, 935 (1985). The non-defamation causes of action did not seek "damages" for disparagement to trigger coverage for "personal and advertising injury." Rather, paragraphs 55-57 and 146 in the fifth and fourteenth causes of action for unfair competition law violations and "intentional interference with contractual relationship" pursued equitable relief and purely economic losses. [Doc. 101-1, pp. 130-131, 147, FAC, EXH. B-12, 13, 29.]

Second, the allegations SVO cites include conclusory labels, not a pled claim of disparagement for the same reasons addressed in the Ninth Circuit's decision in *Zox LLC v. West Am. Ins. Co.*, 2024 U.S. App. LEXIS 3095, *3-4 (9th Cir. Feb. 9, 2024), which held:

> Zox cites eleven different paragraphs in the Pleadings as "facts" that allegedly "satisfy all the elements for a claim of disparagement." One of these paragraphs explicitly

> states that Zox "disparaged the goods, services, or business of another by false or misleading representations of fact." Though crediting factual assertions made in the pleadings, we are "not required to credit legal conclusions." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). We must look past labels and at the facts alleged. *See Swain*, 120 Cal. Rptr. 2d at 811-12. Here, Zox is unable to cite a single factual pleading in support of a disparagement claim. The quoted paragraph is merely a conclusory allegation that neither describes whose goods, services, or business were disparaged, nor does it describe what Zox said that was allegedly false or misleading. None of the remaining sections cited by Zox contain facts that would raise the potential for liability under a disparagement theory. The Zox Brothers never alleged that Zox had called their products inferior or defective. To the contrary, the Pleadings only offer descriptions of Zox allegedly imitating and profiting from the Zox Brothers' brand. This Court has long held that imitating a product or service mark does not trigger coverage for a disparagement offense.

A stray conclusory allegation in another cause of action after the Claimant disavowed the defamatory claims does not bring coverage back in. *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal. App. 4th 1, 110 (1996) ("[A]s a general rule conclusory allegations are not enough to give rise to a duty to defend."); *Fire Ins. Exch. v. Jiminez*, 184 Cal. App. 3d 437, 443, n.2 (1986), citing *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276 (1966) ("Our Supreme Court, however, anticipating imaginative counsel and the likelihood of artful drafting, has plainly indicated that '… we should hardly designate the third party [counsel for plaintiff in the underlying lawsuit] as the arbiter of the policy's coverage.' [Citation.] Were we to credit Jiminez' theory, mere allegations of 'general negligence' would erase exclusions in any policy."); *Hurley Constr. Co.*, 10 Cal. App. 4th at 538 (same); *Webcor Constr., LP v. Zurich Am. Ins. Co.*, 372 F. Supp. 3d 1061, 1074 (N.D. Cal. 2019) ("The underlying complaint did not include factual allegations of damage to property other than the curtainwall system itself. It is the *factual* allegations of the underlying complaint, and not boilerplate allegations of 'costs to repair property damaged by deficient work' that are the basis for the Court's analysis.") (emphasis in original). SVO cannot now impermissibly speculate that the Claimant might have substituted the

unfair competition or intentional interference causes of action for the very defamation cause of action it had voluntarily dismissed. *Crab Boat Owners Assn.*, 2004 U.S. Dist. LEXIS 23615 at *19-20 (citing *Low v. Golden Eagle Ins. Co*., 99 Cal. App. 4th 109, 114 (2002) as "holding that plaintiff impermissibly speculates when surmising an amendment to the third-party plaintiffs pleading that would 'in effect substitute one cause of action for another'").

Third, even if SVO was able to meet its burden to establish a trigger based on other allegations in the FAC, the Policy exclusions independently bar coverage for the fifth and fourteenth causes of action, eliminating any potential trigger of coverage. The intellectual property exclusion applies broadly to "personal and advertising injury" arising out of infringement, disparagement, dilution, or damage to intellectual property rights, which envelops the trade secret, patent, Lanham Act, and false designation claims that dominated the case. [Doc. 101-1, pp. 59-60, Policy, EXH. A-37, 38.] The fifth cause of action, alleging "unlawful business acts: the use of [the Claimant's] intellectual property and work product without [the Claimant's] permission," falls squarely within the language of this exclusion. [Doc. 101-1, p. 130, FAC, ¶ 54, EXH. B-12.] *Industrial Indem. Co. v. Apple Comp., Inc*., 79 Cal. App. 4th 817, 833 (1999); *Palmer v. Truck Ins. Exch*., 21 Cal. 4th 1109, 1117 (1999); *Aloha Pac., Inc. v. California Ins. Guar. Assn.*, 79 Cal. App. 4th 297, 322 (2000). Additionally, the "knowing violation" and "knowledge of falsity" exclusions bar coverage for SVO's intentional acts as alleged through the fourteen cause of action, which states "SVO improperly and intentionally interfered with [the Claimant's] contract with DPR in various manners" and "engaged in such conduct for the purpose and with the intent of interfering with [the Claimant's] performance at the Project and disrupting" the contractual relationship. [Doc. 101-1, pp. 45, 147, Policy, EXH. A-23; FAC, ¶¶ 146-147, EXH. B-29.] Courts routinely uphold exclusions for acts allegedly committed intentionally as these acts do not constitute the type of accidental harm intended to be covered by insurance policies. *Aetna Cas. & Sur. Co., Inc. v. Centennial Ins. Co.*, 838 F.2d 346, 352 (9th Cir. 1988); *Delgado v. Interinsurance Exch. of The Auto. Club of S. Cal.*, 47 Cal. 4th 302, 313-314 (2009); *Chatton v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 10 Cal. App. 4th 846, 861 (1992); *Allstate Ins. Co. v. LaPore*, 762 F. Supp. 268, 271 (N.D. Cal. 1991).

For these reasons, SVO's attempt to establish a different basis for coverage fails. Any

defense obligation terminated when the defamation cause of action was dismissed.

**3. There Was Never "Property Damage" Alleged in the FAC.**

Buried in the Opposition is the contention that the Underlying Action, which was an intellectual property business dispute between a designer and the customer, included allegations of "property damage" to trigger separate coverage under the Policy. (Motion, 18:10-13.) To trigger Coverage A, SVO has the burden to show "damages" because of "property damage" caused by an "occurrence" is alleged in the FAC. [Doc. 101-1, p. 40, Policy, EXH. A-18.] *Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 803 (1994); *Dart Indust., Inc. v. Commercial Union Ins. Co.*, 28 Cal. 4th 1059, 1071 (2002). Through the Motion, SVO has not met its coverage burden.

Violations of intellectual property rights, the vast majority of the claims at issue in the FAC, are not claims for "property damage." *Avery Dennison Corp. v. Allendale Mut. Ins. Co.*, 310 F.3d 1114, 1116 (9th Cir. 2002); *Murphy v. Federal Ins. Co.*, 2001 U.S. Dist. LEXIS 11578, *8 (N.D. Cal. Aug. 1, 2001). In addition, the FAC only sought recovery for economic losses, which do not qualify as "property damage." *Kazi v. State Farm Fire & Cas. Co.*, 24 Cal. 4th 871, 879 (2001); *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 17 (1995); *Golden Eagle Ins. Corp. v. CEN-FED, Ltd.*, 148 Cal. App. 4th 976, 987 (2007). SVO instead argues that the allegations of the "loss of use of transfer switches, cooling systems and other devices" triggered Coverage A. (Motion, 18:12-13.) The only time "transfer switch" or "cooling system" is referenced in the FAC is in connection with SVO's violations of the Claimant's patents. [Doc. 101-1, pp. 123-124, 134-143, FAC, ¶¶ 21-22, 78, 81-83, 89, 92-94, 104-105, 111, 115-116, EXH. B-5, 6, 16-25.] The language "other device" is not included in the FAC at all. SVO's argument is nonetheless flawed as the FAC does not make a claim for "damages" caused by the Claimant's "loss of use." The "loss of use" alleged in the FAC is actually ***SVO's*** legal loss of use of "transfer switches" and "cooling systems" given the unpermitted use of the Claimant's patents, not ***the Claimant's*** loss of use for which it is seeking "damages." [Doc. 101-1, pp. 134, 136-138, 142, 144, FAC, ¶¶ 82, 93, 104, 115, 126, EXH. B-16, 18-20, 24, 26.]

Even if the FAC could be read as alleging the Claimant's loss of use of anything, the cause of such "property damage" would not be an "occurrence." *WAWGD, Inc. dba Foresight Sports v. Sentinel Ins. Co.*, 2017 U.S. Dist. LEXIS 161361, *13-14 (S.D. Cal. Sept. 29, 2017) ("That Foresight

did not intend to infringe the Patents or intend to actually have to indemnify Dunn/GWNE for Max Out's infringement claims does not mean that Dunn/GWNE's injury was caused by an accident."). At most, the Claimant would be arguing a breach of agreement or conversion, neither of which constitute an "accident" to trigger coverage. *Golden Eagle Ins. Co.*, 148 Cal. App. 4th at 989 ("Cen-Fed's failure to discharge its contractual liabilities under the lease agreement was nothing more than a nonaccidental act of breach of contract. That is, whatever the nature of the managerial decisions made by Cen-Fed which led to its failure to fulfill its promised maintenance obligations, they were not the result of a fortuitous accident; and they thus could not have resulted in an 'occurrence.'"); *Royce Int'l Broad. Corp. v. Vigilant Ins. Co.*, 51 Fed. Appx. 229, 230 (9th Cir. 2002) (holding breach of contract arising out of a refusal to go through with a sale was not accidental and did not constitute an "occurrence"); *Spa De Soleil, Inc. v. General Star Indem. Co.*, 787 F. Supp. 2d 1091, 1097 (C.D. Cal. May 25, 2011); *Collin*, 21 Cal. App. 4th at 803-804 (holding conversion is not a covered "accident"); *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 97 Cal. App. 4th 704, 714 (2002); *Crab Boat Owners Assn.*, 2004 U.S. Dist. LEXIS 23615 at *12, n.1 ("California courts have concluded that conversion cannot be an 'occurrence' or 'accident' within the meaning of insurance policies."). There was never a trigger of coverage for "property damage" in the FAC.

## IV. CONCLUSION

As stated in *Buss*, "[w]hether [the insurer] will be able to carry its burden of proof by a preponderance of the evidence that specific costs can be allocated solely to the causes of action that were not even potentially covered is far from plain. **But there is at least a triable issue of material fact that it can. It must be allowed the attempt**." *Buss*, 16 Cal. 4th at 61 (emphasis added). The Court should deny SVO's Motion in its entirety and allow the allocation question, different from the duty to defend question, to proceed to the jury.

Dated: December 15, 2025

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By: */s/ Shannon L. Santos*
David Simantob
Shannon L. Santos
*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*