**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

NAVIGATORS SPECIALTY INSURANCE )
COMPANY,                       )
                               ) Case No.
            Plaintiff,         ) 3:22-CV-07102-AMO
                               )
    v.                         )
                               )
SVO BUILDING ONE, LLC          )
                               )
            Defendant.         )
                               )
_____)
                               )
AND RELATED CROSS-ACTION       )
_____)

**VIDEOCONFERENCE DEPOSITION OF**

**ANDRE JARDINI - EXPERT**

**TUESDAY, NOVEMBER 18, 2025, 9:27 A.M.**

Reported by Laurie A. Schmidt, CSR No. 12719

Job #11711

EX. B-1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


NAVIGATORS SPECIALTY INSURANCE   )
COMPANY,                         )
                                 ) Case No.
            Plaintiff,           ) 3:22-CV-07102-AMO
                                 )
      v.                         )
                                 )
SVO BUILDING ONE, LLC            )
                                 )
            Defendant.           )
                                 )
_____)
                                 )
AND RELATED CROSS-ACTION         )
_____)


    VIDEOCONFERENCE DEPOSITION OF ANDRE JARDINI,

    EXPERT, taken on behalf of the Defendant and

    Counterclaimant, commencing at 9:29 a.m.,

    Tuesday, November 18th, 2025, remotely, via

    Zoom, before Laurie A. Schmidt, Certified

    Shorthand Reporter No. 12719.


    Job No.: 11711

Q.    Okay.   Who of your staff prepared that outline?

A.    Karen Scott.

Q.    Okay.

A.    I believe.   I think Lila Rosenberger may have done one of the -- one of the law firms, but I believe this is Karen Scott.

Q.    Okay.   And then, if you go a little bit further down on that exhibit -- oh, yeah, if you stop.   Yeah, stop right at the entry for 8/5/2019.   There is a letter, and the entry is entitled "Draft answer to 4th amended complaint," and on the right, there is a letter "P."   What does the "P" signify?

A.    The relationship to -- or at least the possible relationship to a defamation service.

Q.    Okay.   Did -- who inserted the "P" on this particular schedule, if you know?

A.    I do know.   I did it.

Q.    Okay.   There are a number of letters "P" in the various outlines that are attached to this report.

Did you put the letter "P" in on all of them?

A.    I did.   I received a hard copy of each outline, I reviewed it in its entirety, and I made the allocation decisions using the initial P or D, and it's reflected at the conclusion of each outline the total of those decisions.

Q.   Okay.   Now, when these outlines were prepared, did you provide Karen Scott or any other auditors instructions as to how they were to be prepared?

A.   An outline of services is a basic schedule that we prepare in every audit.   I've been retained in audits more than 1,900 times, 40 or 50 times a year.   In every single case, an auditor prepares an outline of services.   It serves numerous important functions.   It makes the review of the invoices more readily ascertainable and transparent, and it doesn't require separate instruction.   These are functions that these auditors do every day, all day, and in Karen Scott's case, for more than 20 years.

Q.   Okay.   And in doing that -- well, let me back up a little bit.

If you look at the one that we've talked about, the "P" there, it says "Timekeeper," and there are three timekeepers listed.

Do you see that?

A.   I do.

Q.   Okay.   Now, first, how does Karen Scott, or whoever is preparing the outline, know how to amalgamate time from various time entries into a summary of multiple time entries?

A.   The function of an auditor in this part of their

work is to batch time concerning all the significant litigation events, not including stray e-mails, minor events, and other entries that don't go toward a particular litigation event.  All of the entries concerning that event happen in the same time frame, typically, could be across several invoice periods, could be for more than one person in the entry that you are listing over the date range, which is listed there from August 5th, 2019 to August 7th, 2019.  Those three individuals worked on the Draft Answer to the Fourth Amended Complaint.  That time is pulled together and put in one place.  You don't have to look at several entries, five entries, nine entries, whatever number of entries there might have been dedicated to that particular project.  You now know, based on that entry, that three people did that task, and collectively, they billed 22 hours.  That is useful information to know in any audit, and was useful information for me in this audit.

That process is the same across all invoices, including in cases with multiple, multiple millions of dollars, even well beyond the money involved in this case, and that is done daily by auditors in the same way, including breaking down block billing in order to do so, and performing a function that, in their

judgment, makes for an accurate recitation of the description and the total hours, and the total number of timekeepers. It is valuable information that any auditor would be happy to have in order to make audit decisions.

Q. Now, is this -- is this approach or methodology one that KPC uses in all of its audit work?

A. In every single audit that involves review of attorney's fees, an outline of services is prepared for every law firm that's involved, for every invoice that's involved. It is the most common schedule that we prepare in every case because it is so valuable in assisting in doing the work of auditing.

Q. Okay. So, if -- if I were -- I had retained KPC to evaluate the attorney's fees bills of a particular law firm to determine whether they were excessive, is this the methodology that would be applied?

A. It would be applied across all of the issues that might arise in an audit, short of ethics issues and contract formation issues, retainer agreement issues, and such that are separate from the billing process.

In any issue involving attorney billing, including allocation, reasonableness, and the like, an outline of services would be prepared whether you asked me or someone else asked me.

MR. SMYTH:  Now, let me go to your report, and I'd like to go to Page 7 of the report, Paragraph 43, entitled "APPLICABLE STANDARDS."

Brad, can you get to that page, or do you need further guidance?  It's -- yeah, back up.

THE VIDEOGRAPHER:  What was the description again?  I apologize.

MR. SMYTH:  Yeah, just go to the beginning of the report, and then --

THE VIDEOGRAPHER:  Okay.

MR. SMYTH:  -- go to page 7 of that.

THE VIDEOGRAPHER:  Okay.

MS. SANTOS:  It should be Page 10 of the PDF.

MR. SMYTH:  Yes.

Q.   Okay.  There's a statement at Paragraph 33 under the heading "APPLICABLE STANDARDS," and the first refers -- the first sentence refers to the case "Buss v. Superior Court."

Did you review that case in connection with preparing this report?

A.   I've reviewed it many times.  I was an auditor in that case in the underlying proceedings, so I'm very familiar with the case.

Q.   Have you done audits evaluating the fees that are subject to reimbursement under the Buss case in other

matters?

A. I did it in Buss, itself, and many times thereafter.

Q. Do you know how many times?

A. I don't. It's over a great many years. The Buss case is from 1997, so that's 28 years of potential. I'm retained, as I said, 40 or 50 times a year. So, the possibility is dozens, but probably less than that.

Q. Can you remember the name of a case where you've done a Buss allocation?

A. Yes, Buss.

Q. Other than Buss?

A. No, I can't remember another name of a case.

Q. Okay.

A. Though I do know that they've occurred.

Q. Okay. The second line of Paragraph 43 says:
"Recovery is permitted by an insurer against the insured as to claims that are not even potentially covered by the insurance policy."
And the next paragraph says:
"The court discussed that an allocation need be made between those claims that are not even potentially covered and those that are potentially covered."
Now, in -- do those two sentences set forth the

standard that you applied in determining what fees would be reimbursable to Navigators under the Buss case?

A.  In a very general way, a Buss allocation is a practical application of what actually happened in a case, measured against the obligation of the insurer to put on evidence that creates a preponderance on the issue of uncovered claims having been litigated.  It's just a general statement of Buss that you're separating out between covered and uncovered claims.  It's not meant to be a statement of the legal principles involved.  That's not my place.  My place is to sort out between those services that were rendered in pursuit of, for instance, in this case, the defense of the defamation claim, as opposed to the other 17 claims.

Q.  Okay.  Is it correct that you look at the particular claims in a case, and then, break them down into covered and uncovered?

A.  You have to understand the situation that's presented, and here, Navigators defended the entire case because -- up until a point -- well, it defended the case in its entirety, but up until a point there was a defamation count which they provided under their personal injury coverage a defense for that -- the defense -- duty to defend is quite broad, the allocation is a completely separate thing, but the defense was

provided. So, you have to sort out what was the defense relating to the defamation count, as opposed to the intellectual property counts, the other 17 counts that were involved, and that was -- that's the task of allocating to understand in the real world what was being done and for what reason, and then, the jury can decide. You know, they could decide one out of 18, that would be within their province to do, or they could decide in other ways based on my opinion or on somebody else's opinion, but the point is, what does the preponderance of the evidence show as to the amount of time spent with regard to defamation, a minor claim that was dismissed and never re-litigated, as opposed to the main body of the case, which is intellectual property, the use of information, and so on, in a complicated business transaction.

Q. So, if you look at Paragraph 45. There's a discussion about the claims, and it says:

"Here, it is undisputed that 17 of the 18 claims in the underlying action were not subject to coverage under the relevant insurance policy."

Is that how you approached this case? You divided the claim, which was potentially covered, the defamation, from the other claims when you were doing the review?

A.   I have to be informed by what actually was occurring.  In this case, there was one claim for damages for reputational injury, there were other claims for other kinds of damages, contractual damages, intellectual property, misuse damages, trade secrets, and so on, which are not related to defamation, and in the real world are not defamation.

So, you do have to understand that there are 17 claims that are not defamation, and that's a background fact.  The devil is always in the details. You have to look at what was actually being done and for what purpose, but in a case in which the main action is everything but defamation, and defamation is thought so unimportant as to be dismissed by the claimant, that it's not remarkable to find that most of the effort was for non-defamation services.

Q.   Well, let's take a circumstance where there is a billing entry that is fairly broad, you know, attend arbitration conference or attend -- strike that.

Let's take a broad undifferentiated one that says, "Attend conference with arbitrator."

How would you allocate that between defamation and the other non-potentially covered claims?

A.   Well, in this case, I don't believe, frankly, it's unlikely that defamation came up in these meetings

with the arbitrator, and there are a number of such meetings that are referenced in the billing, and I listed them as "P," and which I think is bending over backward, frankly, because defamation was unlikely to have been the topic of discussion.  Every other thing in the world that happens in an arbitration is probably being discussed, but not that, but as I said, I allowed for that.

So, in that particular example that you have provided, I put that in the column of compensable. I mean, of -- the column of, potentially defamation.

Q.   Okay.  Now, what about a circumstance where the billing says in the underlying case, "Review documents for production," words to that effect, how would you allocate that?

A.   I would say that, more likely than not, the standard that applies, that's not defamation because the documents in a case involving a number of sophisticated contracts, intellectual property, and trade secrets, those documents are not, let's say, an e-mail disparaging Liebert.  I mean, that is -- that is not going to be in the column where you'd allocate that as being related to defamation, because more likely than not, it's not.

Q.   Well, wouldn't you have to know the documents

preponderance of the evidence, that is admitted and is considered by the jury, is appropriate. And that would be one way to do it. That's not the way I did it, but it is certainly a factor that could be considered because this is a case in which the immensity of the litigation was totally unrelated to defamation, and it would be an over-statement, frankly, in my mind, to have one out of 18 hours be compensated.

Q. So, let me see if I understand.

I understood that you had divided them up by covered and uncovered, and then, evaluated which ones were potentially covered and which ones were not potentially covered.

Did you use a different methodology than that?

A. I'm not sure what you're asking. Only defamation was covered. The defense was triggered by the personal injury coverage of defamation, as stated in the insurance policy. That's why they defended. The case was principally about many, many other things, many other things much more complicated that required many, many more services by the lawyers than anything related to defamation, which was thought of as such a weak claim that it was dismissed by the Claimants at a critical juncture.

So, there's only one potentially covered claim,

and most of the work was done on things that weren't that covered claim.

Q.   Okay.  Is it correct to say then that you -- in going through the determination as to what was covered or not covered, you determined which expenses were -- you believed -- well, let me rephrase that.

Is it correct to say that in doing your review, you looked at particular expenses, and then, determined whether they had any relation to the covered claim of defamation; is that the approach?

A.   I didn't look at expenses, I looked at fees, and in looking at fees, to answer what I think is the import of your question, I determined whether or not in the real world it had, more likely than not, a relationship to a defamation claim.  And if it didn't, I decided that it wasn't part of the defamation defense.

Q.   Okay.  Now, the statement in this -- in the case that, "Defense costs that can be allocated solely for the claims that are not even potentially covered," is that a different standard than the one you applied in determining which fees related to defamation?

A.   No.

Q.   It's not.  Okay.  So, let's take the example of a billing entry for an, you know, undifferentiated task, like "Attend deposition," if it said something like

that, is it correct, you would allocate that as not relating to defamation?

A.  Yes.  Because in the circumstances of this case, it's more likely than not that it was not related to defamation.

Q.  Okay.  What if the case -- or what if the deposition involved questioning on defamation, would that change your view?

A.  I'd have to see what the questioning actually was, and if somebody came forward with that, I would take new information into account, and maybe the field would shift by five or six hours.  That's what we're talking about.

Q.  Okay.  And are you of the view that the determination as to whether the questioning involved defamation is something that is not the burden of the insurer?

A.  That's a legal question.  I will tell you this: That in allocation work by any auditor, and well accepted in the audit community, you don't parcel out defamation testimony line by line, you have to make a rather more broad determination.  Nor can you go through interrogatories line by line, and the like.  That level of micro-scrutiny does not help the analytical process. In fact, it hinders it.  And so, that someone would come

EX. B-15

or disparagement; it's a claim for damages for interference with a contract.

In any event, that is a coverage issue that you have to debate with your opposing Counsel, and not seek an answer from me about, because I'm not here to provide that kind of testimony.

Q.   Okay.  Well, in determining the fees that were allocable to potentially covered and potentially non-covered claims, is it correct that you did not evaluate any fees that might have been incurred as covered in defense of an allegation of disparagement?

A.   I looked at the entirety of the invoices.  Any aspect of them that had to do with defamation, there's nothing specific to disparagement in those invoices, as you're suggesting something that doesn't exist, and I reviewed them in their totality against the backdrop of the case as it existed as to entry by entry whether it, more likely than not, related to defamation or to something else.

Q.   When you said you looked at the entirety of the invoices, did you look at each individual entry?

A.   I generally do look at the invoices, and I think I did.  I don't recall specifically, but my auditors review every line with care in doing their work and preparing the outline of services, which is a very

critical tool which permits me to do my work, and provides clarity in making those assessments, much better, frankly than the line-by-line invoices themselves, because the meaning is lost in the volume of the entries, and the meaning is best deciphered in looking at the outline of services which permits the work to be done in a ready and accurate way.

Q.   Okay.  Well, when you say that -- or strike that.

There are about 8,000 fee entries in these invoices.  Probably more than that.  If you had looked at all of them, there would be a substantial amount of time reflected in your billing sheets; is that correct?

A.   I'm not sure what you're asking.

Q.   Yeah.  I mean, if you look -- if you looked at each entry, that would have taken a substantial period of time; is that right?

A.   Well, my auditors did bill substantial periods time, and they did look at every entry.

Q.   No.  I was asking if you personally did it.

A.   I looked at them in general to understand format, billing style, and such other things.  I didn't duplicate the work done at much lower cost, and much more efficiently by my auditors.

Q.   Now, did you look through -- or strike that.

Did, you, or anyone in connection with your

review of the billing entries, investigate whether there was work performed in connection with the defense of the specific allegations set forth in Mr. Murray's letter under "disparagement"?

A.   We looked at every line.  We also, before doing that, did a word search.  The word "disparagement," I don't believe, appears in the bills anywhere.  We did a word search for "defamation," which appears a comparative handful of times.  And that's an electronic word search, which doesn't substitute for a line-by-line review, which we did do, but it is an -- it is an adjunct which tells you I think fairly clearly that they're not litigating disparagement or defamation at least to any significant degree in a case that turns on intellectual property in a complicated business transaction.

Q.   Did you do a word search for "disparagement"?

A.   I don't recall.  Somebody could.  If they come up with the word, I'd be very surprised, and if it did come up, it would come up once, twice maybe.  I don't know.  I don't think it comes up at all, and I'll stick with that.

Q.   Okay.  Do you have an understanding as to whether a specific cause of action must be alleged in order to trigger the duty to defend?

And let's -- and you then, in the following paragraphs -- well, actually, in Paragraph 47, you have caused to be prepared useful schedules based on the billing records to assist in my review.

And is it correct that you caused to be prepared schedules directing auditors and other staff in your office to prepare the schedules?

A.   Yes, that's the ordinary course of business at our -- at our firm.

Q.   Okay.   Have you reviewed the rebuttal report of Ken Mosgaret [phonetic] in this matter?

A.   Yes.

Q.   Okay.   And in his report he questions why you created the outlines, instead of listing verbatim the time entries.

Do you have a response to that criticism?

A.   Sure.   He doesn't have an understanding of how we work, and have been accepted in doing that work across hundreds and hundreds of audits, every single audit, every single time, and have a profound expertise in doing it well in a way that delivers important information in an understandable way that simply reviewing the bills, which is what he's suggesting, cannot possibly do.

Bills, in the way that they're kept, and in the

level of detail that they're kept obfuscate key information that's necessary to do work either as to reasonableness -- by the way, he didn't do it in that arena as well. I mean, he should have, but he didn't. He didn't break out the bills in ways that make it meaningful, he didn't have schedules prepared, and so on. But certainly as to allocation, it is a key, key tool that if you -- if you simply say, "Oh, I don't want to use that tool," you are -- you are leaving meaning and import on the table. Also, you are making it much more difficult for the trier of fact to understand what is being presented. Why don't you just throw a stack of $5 million in bills in front of a group of people and say, "Figure it out for yourself"? I mean, that is apparently what he's suggesting, and that approach hides the true light of meaning that our approach reveals time and time again, and has been praised for revealing.

So, he just doesn't seem to understand -- which he should by the way. He does audit work for a living, apparently. He should understand that this is an important methodology and tool approved by NALFA, approved by auditing professionals, approved by courts, and so on, and then, he disparages it, as saying, "Well, you have to list every item of the invoice."

There's no requirement that you look at every

EX. B-20

item of the invoice to do this work, and then, spell it out on a separate piece of paper, as if it's a separate piece of information.  It isn't.  It's all in the invoices.

If you want to see what's in the invoices, the outline of services has the date range and the description of the service and the timekeepers involved.  Often, just one person on one date.  Meaning, it's the exact entry from the time records.

So, you have available all levels of information, synthesized information that permits the work, and a reference back to the source documents that you could -- that anybody could look at, at any time, if you suspect that our work is skewed in some fashion, which it is not, and nor does he suggest that it is.  I think he just had to say something in the rebuttal period. He didn't do an allocation analysis himself, he wasn't in a position to say, "The allocation analysis is incorrect," he says it's -- apparently, it's the position of SVO that a hundred percent of this case involving one dismissed claim for defamation and 17 unrelated claims, a hundred percent of it is related to covered claims, which is absurd, but that apparently is where he has to come down since he didn't do the allocation work himself.

So, if he -- if he did do it, in a meaningful way, he would come to a number. He might disagree with my three percent, but he certainly wouldn't come to a hundred percent. That would be patently absurd.

And so, he was left with just criticizing methodology which he doesn't understand.

And if I had a chance to sit down with him and talk to him about what we did, I think he'd agree that what we did is reasonable and appropriate, but he needed to say something in the rebuttal period, and he had to attract -- distract from the fact that he didn't have a contrary opinion, nor did anybody else, and to say that process was somehow flawed, but it's not.

Q. Okay. Now, how would looking at each individual entry and stating why it was either potentially solely non-covered claims or a covered claim, how would that obscure the knowledge of whether that expense was one that should be reimbursable or not?

A. Invoices are designed for a very particular purpose. They tell you what a particular lawyer did that they want the client to pay for at the appropriate rate. It's not prepared -- those records are not prepared to assist in an allocation analysis. In fact, oftentimes, when we do allocation analysis, we deal with block billing and redacted entries, and there's a lot of

things we have to do in order to have a fair interpretation of the document to do the analysis correctly.

Also, you'd be stymied by all the modest entries for review e-mail from Bob, send e-mail to Tony. This gives you no information whatsoever that allows for an appropriate allocation, but if you batch the time by litigation event, identifiable litigation event, recognizes that litigated matters go through a process where those particular events can be described and isolated and batched as to time, you can make one decision as to 25 entries, instead of 25 separate decisions, which is not only burdensome, but enhances the possibility of mistakes.

So, doing it the way we do it is better, more efficient, more transparent, and allows for clarity in the decision-making. Doing it line by line is just entering into a mud hole and coming out with an answer and I thinking it's the right answer. It doesn't help the process.

Q. Well, isn't it true that your categorization of multiple entries is not based on any specific determination under the Buss case?

A. I don't know what you're asking. I have no --

[Simultaneous discussion.]

Q.   Let me rephrase it.

In batching these various items, a determination is made by one of your staff members as to whether the items belong in a particular category.

A.   Wrong.

Q.   Right?

A.   Wrong.  They don't -- they don't determine any category; I determine that.  They -- they look at every identifiable billing service, batch all the time that was spent with regard to that service, identify the timekeepers and date range of that service, and present it on an outline of services.

They have not categorized it in any way, shape, or form.  The allocation analysis is mine alone.

So, the process of doing this has no impact on the ultimate answer to the question of how the entry should be allocated.

Q.   Now, after your staff does the categorization of these various elements of -- or various time entries, do you do any kind of analysis to check to see whether their categorization is correct?

MS. SANTOS:  Objection.  Mischaracterizes testimony and argumentative as to the use of the word --

THE WITNESS:  Yeah, they don't do a characterization, they do an objective batching of time.

Let's put it down to its elements.  They're working on answering interrogatories.  Six people do it over 38 days; there are 26 entries on doing that.  They're all put in one place, answering the interrogatories.  Here's all the people involved, here's the date range.  That doesn't categorize anything, other than to put all the time spent for doing that, answering the interrogatories, in one place so one decision could be made.

What apparently Mosgaret thinks is better is to make 26 separate decisions about the interrogatories, which is not helpful, by the way.

So, I reject your notion that the -- that the auditors categorize anything.  They batch time objectively as described by the lawyers doing the services, expecting that lawyers do the services that they do in litigated cases.  They don't invent new things every case.  They're doing pleadings; they're doing discovery; they're doing pre-trial; they're doing motions, and so on.  They're doing very specific things which they identify with those kinds of words in their billing because they're telling the client what they're doing, and it's valid to put all their time as to one thing.  Let's say they worked on a motion to dismiss, put all the time as to the motion to dismiss in one

EX. B-25

place, here's the 53 hours, here's the four people that billed on it, now how do we allocate that?

The thought that you have to allocate as to every separate entry that went into the motion to dismiss is just multiplying the work for no reason.

Q. BY MR. SMYTH: Well, I -- respectfully, I think you misunderstood my question, but let's use your language in terms of the batching.

After the staff does the batching, say on answering interrogatories, is there any kind of check to determine whether they've done that correctly?

A. Well, they do it all day, every day, and in most cases, for more than 20 years. We don't go back and redo the work that they do. We have quality control in the work that we do, and there are -- there's backup information if there's ever a question as to how that was done, but I don't go back and check. Anybody could. We give you the date range, we give you the people that did the work, we give you the description that generally is the description that they used, if not identical.

So, if you don't think it's correct, go back and check it. All the information is there. It's like the fourth grade. Check your work, go do it. It's not impossible. In fact, it's readily done, and if you went back and did it, you'd see that there was a high degree

of accuracy.

Q.  Okay.  And I want to be clear on this.  Is it correct to say that you believe that you do not need to evaluate each entry to determine whether it can be solely allocable to claims not potentially covered?

A.  Our process --

MS. SANTOS:  Objection.  Mischaracterizes testimony.

THE WITNESS:  Our process does evaluate every entry, every entry that's -- that's dedicated to an identifiable litigation service, and that's most of the entries.

Q.  BY MR. SMYTH:  Okay.  Now, let's take something -- some -- or strike that.

Is it correct that the analysis that was done in the outlines does not include all of the billing entries in the bills of the various law firms?

A.  The process identifies the litigation services as described by the lawyers.  There are minor entries, random e-mails, a phone call.  Adding those to the outline would impede the analysis.

The ultimate analysis is done against the time reviewed, and the assumption is that the minor events, like an e-mail or phone call, and so on, would follow in approximately that proportion.  That's a fair way to do

it, that allows for the process to develop meaning and doesn't get bogged down in every stray entry that's made on the invoice.

Q.  Do you know what percentage of invoice entries were not included in the outlines?

A.  We list at the end of the outline the total hours on the outline, and you can compare it to the total hours billed, and you would define that readily. I don't have -- it's five or six different firms, it's probably five or six different answers.

Q.  Now, let's -- I think I gave an example of -- earlier, and I want to go back to it, of attending a conference with the arbitrator.

And would you agree that somebody defending a defamation claim would have to attend a conference with the arbitrator as part of the defense of that claim?

A.  Yes, the question is, was that -- was that event about defamation in any way, shape, or form, and I opted, even though it's very likely that it isn't going to be mentioned in that kind of conference in this case, I did opt to include that in the -- in the defamation-related -- very broadly stated defamation-related category.

Q.  Well, let me ask you the question, though.  Would a -- an arbitration conference is scheduled.  Would you

agree that somebody defending a defamation claim would have to attend that conference?

A.   That's a, kind of, duty-to-defend kind of analysis.

Here, we are looking at whether it's more likely than not that it related to defamation, and the answer to that is, it's very unlikely that they're separately discussing defamation.

I included it anyway, in an abundance of caution, as a -- as a part of defamation, distantly defamation-related categories, that is, meeting with the arbitrator, but not on the basis that you're stating that you're there for the whole case, therefore, you're there for defamation.  That's a duty-to-defend-type analysis that has no place in what we're doing here.

Q.   You would -- the question I have, or the issue of whether the attorney has to defend some general conference, or not, does -- you believe that that does not go to the issue of whether the expense for that can be solely allocable to non-covered claims?

A.   In all likelihood -- remember, the issue is more likely than not.  In all likelihood, it's not related to that, but I permitted it, in any event.  So, it's a bit of an academic question.

Q.   Let's look at Exhibit 8 to your report.  Let's go

to that.

MS. SANTOS:  It's Page 52 of the PDF.

MR. SMYTH:  It's Exhibit 8.  Let's see.  Yes.

Q.  Okay.  Let me -- let's go to the next page. And I would like to draw your attention to the entry at "5/20/2020 Conference call with arbitrator Fisher."

Do you see that?

A.  Yes.

Q.  Okay.  That is not listed with your -- either your "P" or your "D" designation.

Do you know why that is?

A.  Yeah, I made a mistake.  It should be.

So, if you add 5.7 hours, you're still well short of the three percent of my opinion.

Q.  Okay.  Now, let's look at -- let's look at Page 4 of 9, and there's an entry there, "Review and analysis of documents in preparation for discovery and production," and it's 26.9 hours.  Now -- and it's not -- it's not marked.

How can you determine whether the review and analysis of documents in that circumstance is solely allocable to potentially non-covered claims?

A.  So, you're addressing a notion that could it be possible that one second of that time was spent in connection with something that might be distantly

related to defamation.

I'm looking at it in the context of a case in which defamation was dismissed voluntarily; meaning, it's not an important part of the case; that it was only one of 18 claims, and that that discovery, more likely than not, was related to things not defamation.

And so, under that kind of an analysis, the preponderance-of-the-evidence-type analysis, it's extremely unlikely, and that puts it, you know, below the 51 percent on preponderance of evidence.

Q.  So, when you are evaluating whether an expense is solely allocable to non-covered claims, you're applying a standard of whether it's more likely than not that it's not covered; is that right?

A.  Right.  There's the standard, and then, there's the burden of proving that standard.  And the burden of proof is 51 percent, or 50.1 percent, as some people argue, or less than that even.

And so, in this case, involving trademark, intellectual property, trade secrets, involving complicated business transactions, the clear likelihood is, this is not related to defamation, and I think that's a fair conclusion.

Q.  So, in this particular case, if there were 50 pages that dealt with allegations relating to

have myself here for this afternoon, as long as it takes.

MR. SMYTH:  Okay.  Thank you.

THE WITNESS:  All right.  Thank you.

MR. SMYTH:  Okay.

THE VIDEOGRAPHER:  Off record at 11:31 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record at 11:39 a.m.

EXAMINATION [CONTINUED]:

BY MR. SMYTH:

Q.  Now, in preparing these outline of services performed, it's correct that you did not provide any analysis for the time entries after March 24, 2021; is that right?

A.  There's not an outline of services for that period of time, but we did word searches, and looked at those just to be sure that there was nothing about defamation, which there wasn't.

Q.  And what -- how did you go about determining that there was nothing related to defamation in that time period --

A.  Well, first --

Q.  -- in the word searches?  I'm sorry.

A. Okay. From -- we -- I don't know if we just used the word "defamation," but at least we used that word, and it doesn't come up in that period. Also, the defamation claim had been dismissed, so it's not unusual that it wouldn't have come up. But there was nothing to indicate that the position that no defamation-related defense activities happened after that date was correct. There was nothing that made me question that in any way.

Q. Well, what did you do, other than the word search, in order to make that determination?

A. Reviewed the bills, generally speaking, you know? I mean, kind of, understand the arc of what they were doing, preparing for arbitration, going to arbitration, and so on.

Q. Okay.

A. Settling the case.

Q. Okay. If there were an entry that referred to researching whether business tort claims survived the dismissal of the contract claims, would that not potentially include a defense of defamation?

A. Defamation had been dismissed. There was no claim for defamation. There were other business torts being alleged, and so, there was an interest, perhaps, in that issue. I don't remember that particular research being done, but it wasn't related to defamation

or the fear of the return of defamation, which was just an unlikely, maybe impossible, turn of events, and if it had returned, then we'd deal with it.

Q. Okay. Were you of the view that the dismissal of the defamation claim without prejudice resolved the issue of whether there were any attorney's fees solely allocable to potentially non-covered claims?

A. It's -- I agree with the position taken by Navigators that there was no defamation claim after it was dismissed, and therefore, the services rendered by Tyson & Mendes after that date, do not relate to the defamation claim or -- you know, or a potential return to a defamation claim, which is not a realistic issue.

Q. Okay. Did you understand that that issue was out of the case, as to whether there would be costs incurred for the defense of that claim?

A. That issue was out of the case. There was no claim for damages for reputational harm for defamation in the case after the defamation count was dismissed.

Q. Did you make any determination as to whether there were any costs -- strike that.

Did you make a determination as to whether there were any attorney's fees that were incurred in connection with the defense of a disparagement claim?

A. There was no disparagement claim.

Q.   Okay.  Were you aware of any -- or strike that.

Did you -- was there any costs incurred with respect to the defense of allegations of disparagement in the post-March 24, 2021 time period?

A.   There was no claim for damages for reputational harm in the complaint under any claim after the defamation claim was dismissed, even in the intentional interference with contractual relations.  That's not a -- that's not a reputational harm claim.

Q.   Okay.  We'll go back to that later.

Now, in preparing the various exhibits that were the outlines of services, which you included services up to March 24, 2021, when did you start those calculations?  You know, which time period did you begin those calculations?

A.   I think the outlines will reflect that there's a -- there's a tender date, that's one issue, and then, there's the non-recoverable period that we were informed about.  So, we applied those dates.

Q.   Okay.  What date did you use as the tender date?

A.   I don't remember exactly.  It's reflected in the records somewhere.

Q.   Okay.

A.   But we were aware of the tender date, and then, the period during which there was non-cooperation, which

was going to be defined as the non-recoverable period.

So, for instance, the Murphy Austin review started at -- at least on the outline of services, as July 1.  You can look at the invoice list to see the exact invoice that is involved, and hence, Sean DeBruine started November 12, Morris James started February 5th, 2019.  I should tell you the year, I suppose.  This is on the outline of services.

The outline of services for Gordon & Rees started December 30th, 2019.

The outline of services for Tyson & Mendes started November 3rd, 2020.

And again, if you want to see the invoices that were reviewed, they're all listed out by date on Exhibit 10.

Q.  Okay.  Let's go to Exhibit 5, the Murphy Austin fees?

A.  Okay.

Q.  First page.

A.  Okay.  I'm there.

Q.  Okay.  Brad, can you -- yeah, I just want to -- okay.

Now, I have a tender date of July 24, 2019.

If my date is, in fact, correct, the first 14 entries were prior to the tender date.

A.  Okay.

Q.  Do you have any reason to question the tender date of July 24, 2019?

A.  I mean, I don't think you would tell me the wrong date.

Q.  Okay.

A.  But I just don't happen to know the date, but somewhere in the file materials the date is stated.

Q.  Okay.  And do you have an understanding that Navigators did not pay for defense fees prior to the tender date?

A.  Yeah, that's customary.  I didn't review that in detail certainly, but obviously, there's no obligation to defend until there's a tender.  I mean, that's just black letter principles that apply.

Q.  Okay.  So, at least as to Murphy Austin, that cuts out probably well over a hundred hours.

As to --

A.  Well, it was counted by me, and they're getting three percent of that.  So, bank error in your favor.

Q.  That's an interesting way of putting it.  I don't think I agree, but okay.

Let's go to -- on, Morris James, it basically -- if you use the correct tender date, it excludes virtually all of those fees, if you look at Exhibit 6.

EX. B-37

A.   Okay.

Q.   Okay.  And if you look at Exhibit 7, it excludes seven of the entries, all of which are in 2018 on the Sean DeBruine fees; is that right?

A.   There are entries before the date of July 24, 2019.

Q.   Okay.  Now, do these outlines -- or strike that.

It's correct that these outlines do not necessarily include the fees that Navigators paid; is that right?

A.   The outlines are information taken from the invoices themselves.  The invoices from which they're taken are listed on Exhibit 10.  The amounts paid, as it turns out I now know, were from interrogatories that Navigators answered under oath.

So, my Paragraph 42, as to the amounts paid, are the amounts paid as detailed in answers to your discovery.

So, whether those should be the same or different, I don't have an answer for you, but what we looked at is the Exhibit 10 invoices, and produced the outlines of services, which you've been going through.

Q.   But it's correct though that the outlines of services include time periods for which Navigators did not reimburse?

A.   I don't know that for sure because I haven't lined up payments according to dates.  You've shown me a few entries here and there, where pretender entries appear on our outline of services, they also appear on the invoices.

You're suggesting that that wasn't paid.  Okay, it wasn't paid.  But if that's the case, it doesn't change my opinion.

Q.   Now, you know, you testified earlier that not all of the time entries in the bills were included in your outline of services performed.

How was the determination made as to which time entries would be included in the outlines and which ones would not?

A.   All time entries which relate to an identifiable legal service are included, and batched to be put in one place.  If it's a minor entry, telephone call, short letter, e-mail, that doesn't refer to any particular litigation service that's been rendered, it's not included because to include it is simply to regurgitate the bill, and this is meant to be a tool that permits analysis and extrapolation, and there's no point in putting a stray e-mail onto the outline of services, and so it's not included.  That's part of the normal procedure.  You don't end up with a hundred percent of

the bill, or else you're just -- you just have the bill. You have a distillation to a meaningful level of the bill by litigation service, batched by each such service as they appear chronologically through the bill.  As litigation happens, you're doing one thing in one period, and then, the next thing, and the next thing, and the next thing.  Those all appear on the outline of services as identified by the lawyers and others who are billing the time.

So, it's a perfectly appropriate way to do it, and it's not necessarily required or helpful to include every modest little entry that doesn't relate to a litigation service.

Q.   Okay.  But is it correct that in excluding a fee entry that cannot be specifically identified, you are excluding fee entries that cannot be solely allocable to non-covered claims?

A.   No, they're -- if they mentioned defamation, they would be included or be picked up by our word search.

These are entries that don't relate to defamation in any identifiable way, and they are, without doubt, more likely than not, not defamation-related entries. Therefore, those extra few hours get compensated at three percent, even though there's -- there's no realistic probability that they have anything to do with

Q.   Well, if you look at -- let's look at the entry right above it:

"11/10/2020 Prepare memorandum regarding general scope of lawsuit 0.80."

You have included that as a "P," I guess potentially including defamation.

How does the general description there differ from the general description in the following entry?

A.   Well, the likelihood is that GS, on that day, is preparing a memo of the case as a whole, and may well have mentioned defamation separately, may not have, but that tipped the balance slightly.

You can't conclude that that was about defamation; likely, that it's mostly not about defamation, but in abundance of caution, I put it in that category.

Q.   Okay.  Now, the entry up at the top, 11/5/2020, has the same person, "GS," in a lengthy telephone conference with Hosshie of Gordon & Rees regarding allegations.

And then, on 11/10, that same person prepares a memorandum regarding general scope of the lawsuit.

Now, why would the memorandum, which presumably included information from the conference with the attorney from Gordon & Rees, be not exclusively related

to non-covered claims, and the call, you made a determination, was exclusively related to non-covered claims?

A. Well, they're two different entries described differently. One is a phone conversation. I don't assume in the phone conversation that it follows like an outline, like a memo does, about the case as a whole.

I think the tipping point, putting it maybe into the fringe of being about defamation, is that he's preparing a memorandum, which is a reasoned document that a lawyer would want to be complete.

In a phone conversation, they're going to talk about the important issues. That's my assumption.

And I gave you all the reasons why I think it's, more likely than not, not related to defamation.

Memorandum is different than a phone call. That's the way I differentiate.

You could convince me that the memorandum also is unlikely to be related to defamation, but I would still keep it in that category.

Q. Let's look at an entry below that, 11/11/2020 and 11/25/2020.

"Review 4th amended complaint and review client's counter claims 3.60 hours."

Now, it's correct, the 4th amended complaint

EX. B-42

includes a defamation cause of action at that point; isn't that right?

A. It does include a defamation count. It will be there for the next couple of months, yes.

Q. So, would you agree that at least some of the time in reviewing the counterclaim would be spent reviewing the defamation cause of action?

A. If so, it would be a minuscule part of the time, since it's not the main part of the case, and also, there's a reference to the counterclaims, which aren't part of the defense at all. Those are affirmative claims that are completely aside from this.

I thought the weight of that was that, more likely than not, it was not related in any meaningful way to defamation.

You're suggesting that the mere possibility that eyes glanced upon a particular claim that said at the top of it "defamation," means you get paid for all the time, even though most of it isn't related at all to defamation. I don't buy into that. I think this entry is, more likely than not, not related to defamation.

Q. Okay. So, you -- is it correct, you would say that the insurer, with respect to this entry, has borne the burden of proving that the review of the fourth amended complaint is an expense solely allocable to

non-covered claims?

MS. SANTOS:  Objection.  Mischaracterizes the testimony.  Exceeds the scope of the retention.  Calls for a legal conclusion.

THE WITNESS:  So, you or I don't get to decide who carries the burden of proof.  The jury will decide that, and they'll hear everything.  They'll know that defamation is only one of 18 counts; they'll know that counterclaims are not part of defamation, and aren't part of the duty to defend even.  They'll know that the likelihood that the lawyers spent any time at all about defamation on this entry is extraordinarily unlikely, and the basis for their conclusion on that -- in that regard will be all of those facts, including that the defamation count was dismissed not that long after this entry, but also, my testimony.  I mean, they're entitled to rely on that, that understanding the way litigation works, how lawyers work, how they describe their time, it's fair to conclude that this entry does not relate to defamation, or more likely than not, does not relate to defamation.  That's a fair conclusion for them to reach, based on my conclusion.  They could also reject it, but that's their choice, not yours.

Q.  BY MR. SMYTH:  Okay.  Is it correct that you're saying that the standard that the burden is on the

Is the applicable standard to determine whether an attorney fee entry is reimbursable under the Buss case, is whether that entry can be solely allocable to a claim which is not potentially covered?

MS. SANTOS: Objection. Calls for a legal conclusion.

THE WITNESS: Yeah, that does call for a legal conclusion. You've had us already look at the Buss case. You're free to argue whatever you like about it. I've told you the basis of what I am doing.

In the real world of litigation, what were these lawyers doing, and did it relate to defamation, or not, and that's the best I can do for you today.

MR. SMYTH: Okay. Well, I don't think you've answered the question, but we'll move on. I've asked it a few times.

Q. Let's go to an entry on 11/12/2020, again on the first page of the Tyson & Mendes outline.

"File assessment regarding liability and damages
     and prepare outline 3.3 hours."
     And you've given that a "P."
     I guess you're saying it's reimbursable.
     How does --
A. It's not reimbursable.
Q. I'm sorry?

A.  "P" means not reimbursable.  You said "reimbursable."  "Reimbursable" means, can the insurance company recover it; the "P" means, it might involve defamation, so the insurance company can't recover it.

Q.  You're right.  You're right.  I have it -- I have it turned around.

A.  I've done it myself.

Q.  Sorry.  That entry is -- the "P" indicates it's not reimbursable.

And why is that determination different from the entry right above it, reviewing the 4th amended complaint?  How -- well, let me rephrase it.

The 11/12 entry is not reimbursable, it includes a general discussion of file assessment regarding liability, and the entry in front of it involves reviewing the 4th amended complaint.

And how do those -- why is one not reimbursable, and the other one is, in this outline?

A.  Okay.  We start in each circumstance with the notion that you cannot know exactly what these people were doing, and whether or not defamation even came up.

However, in the 11/12/2020 entry, DF prepared an outline, again, on the assumption that the outline is prepared in a complete way that discussed every claim in the way that lawyers do.  And still without knowing

documents there would be, if any, regarding purported oral statements about reputation, or work, or tardiness, or whatever.

So, the weight of that evidence would be that, more likely than not, that related to non-defamation claims, part of the 17 out of 18 claims that were the main part of the case.

Q.  Is it correct to say that unless there was a reference to defamation in this entry, you would not include it among the fees which were solely allocable to non-covered claims?

A.  No.  A broad word search as to the entries in the invoices as a whole, and a word search as to the entries that show up on the outline of services, would show very, very, very few mentions of defamation, but additional entries were determined by me to be non-compensable to the insurer under their Buss claim. You have to look at what they were doing.  And in this case, the dispute over the documents, more likely than not, related to the other claims than defamation.

Q.  Okay.  When you say you'd have to look at what they were doing; is it correct that you did not actually make a determination as what documents from the prior Counsel were being viewed?

A.  No.  Those documents aren't available to me,

reasonably possible, given the nature of their work and that it could happen in a prevailing party context, or otherwise. I don't have any memory of that ever happening, however, as I sit here today.

Q. Okay. Would you have a record of it in your files as to whether you'd previously been retained by that law firm?

A. We don't keep records by name of attorney that hired us. So, I'm not sure, other than going through thousands of files to see if that did exist or didn't exist. I'm not sure how I would do that.

Q. You don't have a client list of clients who've retained you in the past?

A. No, I don't.

Q. Well, let's go to Paragraph 53 of your report. And there, you state that:

        "The services rendered after March 24, 2021, the
        date the defamation claim was formally dismissed,
        are subject to reimbursement in total."

        And what is the basis for that conclusion?

A. There's no claim for defamation after that date when the defamation claim was dismissed.

Q. Okay. Did you, or anyone from your firm, review the time entries for the law firms, I guess would just be Tyson & Mendes, for the period after March 24, 2021?

A.   Yes, in two ways.  We did the word search of those -- for defamation, perhaps, other words.  There wasn't anything that came up from that.  And we looked at the services, in general, about preparing an outline of services, to ensure that they weren't picking up defamation in some other way, or discussing it, or litigating it, and they weren't.

Q.   Do you know who, when you say "we," was looking at the services, in general, from your office?

A.   Karen Scott would be eyes on those invoices.

Q.   Okay.  Let's go to your fee bill.  I'll ask which exhibit that is.

MS. SANTOS:  "7."

MR. SMYTH:  Okay.  Let's go to Exhibit 7 then.

Q.   Are there any entries on Exhibit 7 that reflect the review of the post-March 24, 2021 fee bills?

A.   Probably.  I haven't gone back and looked through the invoice in its totality.

Q.   Okay.  Let's scroll down.  Okay.  Let's start here.

I'm looking for -- under the entries for Karen Scott, I don't see anything about review of entries for time after March 24, 2021.  Do you?

A.   Well, there's no dates in most entries.

Lila Rosenberger is reviewing and analyzing

A.   No, I didn't review expert bills.  There's no expert that gave testimony regarding defamation, though.

Q.   Did you review the testimony of the experts who gave testimony?

A.   No.  The deposition transcripts were not made available, unfortunately.

Q.   Okay.  And when you said none of them testified on issues on defamation; is that information you received from Counsel?

A.   It's an assumption that I make.  It could have come from Counsel, or something in the claim file.  I can't remember, but it's an assumption that I make, and I think it's true.  There is no expert that was designated, or consultant, that spoke to the issue of defamation.  It wouldn't have been done in the -- in all likelihood, given how the case went, and wasn't done, as my assumption.

Q.   But as you're sitting here today, you cannot identify a particular expert invoice and state whether or not it related to a non-covered claim exclusively?

A.   No, it's broader than that.  None of them related at all to defamation.  They weren't hired to speak to defamation; they didn't give opinions about defamation, and they can't be seen as related in any way, shape, or form to defamation.  Every one of them, whether a

consultant or an expert. If somebody wants to prove me wrong on that, they can go and look at that, but I'm convinced that that's true, based on what I assume.

Q. Based on -- okay. But you've not looked at any of the testimony, deposition or arbitration testimony, of any expert, and you've not looked at any of the bills of any expert; is that right?

A. That information has not been made available. The transcripts, not at all; actually, withheld. I don't remember seeing bills in the claims file.

In any event, my assumption is, none of them had anything to do with defamation, and I think that's true.

Q. Okay. But you did not look at the bills or the testimony; is that right; it's just an assumption on your part that there is no --

A. I don't recall in the claims file --

[Simultaneous discussion.]

A. I don't recall in the claims file if there were expert invoices. They may not have been. But given the nature of the case, and my review of what there was in the claim file, I assume that the experts had nothing to do with defamation.

And in a case like this, making decisions to hire experts, I would be shocked if any expert were hired to speak to defamation.

looks like what she's doing in that particular entry that we just referred to, and other kinds of entries that reflect information from the face of the bill, and don't require application of any auditing judgment, which is more part of what an auditor would do.

Q.   Okay.   So, is it correct to say that she would not be making a determination as to whether a fee entry related or not -- or did not relate to a covered claim?

A.   I'm the only one that did that.

Q.   Is there any of your time that shows review of the attorney's fees bills after dismissal of the defamation claim?

A.   I might have an entry somewhere that says, "Review invoices."

I did look at the post dismissal period, just to see what it was.   There's also a word search that was done for that period.   There would probably be some entry that would encompass that as well.

Q.   Well, there's only -- you only have, like, 23 hours on this.   Do you see any of the entries on it that refer to review of the fee bills in a post-dismissal period?

A.   You say, "only 23 hours."   That's a lot of time for me.   I'm a quick study.   That's -- that's -- I know, my entries are spread all over the place, and you're

EX. B-52

that referred to the review of the fees after --

A.  I think --

Q.  -- March 24, 2021?

A.  -- what you see -- sorry.

CERTIFIED SHORTHAND STENOGRAPHER:  Counsel, you went out in the middle of that sentence.  I'm so sorry.

THE WITNESS:  I talked too soon.  My apologies.

MR. SMYTH:  Did you miss my question?

CERTIFIED SHORTHAND STENOGRAPHER:  I did.

MR. SMYTH:  Okay.

CERTIFIED SHORTHAND STENOGRAPHER:  The middle was cut out.

MR. SMYTH:  Okay.

Q.  My question is, did you see any entries in the bill that referred to the review of attorney's fees after the March 24, 2021 dismissal?

A.  There are references to reviewing the claim file where the invoices were; there's references to reviewing the invoices without specificity as to date.

I can tell you that I did look at that time, not line by line.  My auditors also looked at that time, and we did word searches for that time as well.

Q.  Well, do you have some specific entries in mind as to where you had done that work?

A.  No.  I mean, where it says "Review invoices,"

**DEPOSITION OFFICER'S CERTIFICATE**

STATE OF CALIFORNIA         )
                            )s.s.
COUNTY OF LOS ANGELES       )


        I, Laurie A. Schmidt, hereby certify:

        I am a duly qualified Certified Shorthand Reporter, in the State of California, holder of Certificate Number CSR 12719 issued by the Court Reporters Board of California and which is in full force and effect.  (Bus. & Prof.   8016)

        I am not financially interested in this action and am not a relative or employee of any attorney of the parties, or of any of the parties.  (Civ. Proc. 2025.320(a))

        I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the retrained was first placed under oath or affirmation by me. (Civ. Proc.   2025.320, 2025.540(a))

        I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given.  (Civ. Proc.   2025.540(a))

I have not, and shall not, offer or provide any services or products to any party's attorney or third party who is financing all or part of the action without first offering same to all parties or their attorneys attending the deposition and making same available at the same time to all parties or their attorneys. (Civ. Proc. 2025.320(b))

I shall not provide any service or product consisting of the deposition officer's notations or comments regarding the demeanor of any witness, attorney, or party present at the deposition to any party or any party's attorney or third party who is financing all or part of the action, nor shall I collect any personal identifying information about the witness as a service or product to be provided to any party or third party who is financing all or part of the action. (Civ. Proc. 2025.320(c))

Dated: November 24, 2025

*Laurie A. Schmidt*