David Simantob, SBN 155790
Email: David.Simantob@wilsonelser.com
Shannon L. Santos, SBN 260112
Email: Shannon.Santos@wilsonelser.com
**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, CA 90071-2407
Telephone: 213.443.5100
Facsimile: 213.443.5101

*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>SVO BUILDING ONE, LLC,<br><br>Defendant. | Case No. 3:22-cv-07102-AMO<br>Hon. Araceli Martínez-Olguín<br>Courtroom 10<br><br>**NAVIGATORS SPECIALTY INSURANCE COMPANY'S OPPOSITION TO SVO BUILDING ONC, LLC'S MOTION TO EXCLUDE TESTIMONY OF EXPERT WITNESS ANDRÉ E. JARDINI**<br><br>[Filed concurrently with Declaration of Shannon Santos] |
| SVO BUILDING ONE, LLC,<br><br>Counterclaimant,<br><br>vs.<br><br>NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Counter-Defendant. | Hearing Date: March 5, 2026<br>Time: 2:00 p.m.<br>Courtroom: 10, 19th Floor<br><br>Action Filed: November 14, 2022<br>Trial Date: July 14, 2026 |

/ / /

/ / /

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 4

II. ARGUMENT .......... 5

A. Mr. Jardini Unquestionably Meets the Legal Standard for Expert Opinion. .......... 5

1. The Witness Is Sufficiently Qualified As an Expert. .......... 7

2. The Witness's Specialized Knowledge Will Help the Trier of Fact in Evaluating the Scope of Reimbursement Owed by SVO. .......... 7

3. The Expert's Opinion Is Based on Sufficient Facts or Data. .......... 10

4. The Expert's Opinions Are the Product of Reliable Principles and Methods. .......... 14

5. The Expert Has Reliably Applied the Relevant Principles and Methods to the Facts of This Case. .......... 15

B. SVO's Criticisms of the Expert Opinions Go to the Weight of the Evidence, Not Its Admissibility. .......... 16

1. SVO's Objections to Mr. Jardini's Methodology Stem from an Inherent Misunderstanding of the Buss Decision. .......... 17

2. SVO's Criticisms of the Expert's Opinions Dramatically Mischaracterize the Jardini Report and Deposition Testimony. .......... 20

C. The Motion Can Be Denied As SVO Failed to Comply with the Local Rules in Bringing the Motion. .......... 23

III. CONCLUSION .......... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buss v. Super. Ct.*,
16 Cal. 4th 35 (1997) .... 4, 5, 7, 8, 10, 14, 15, 17-20, 22

*City of Pomona* v. *SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) .... 6, 16

*Cooper v. Brown*,
2005 U.S. Dist. LEXIS 46232 (S.D. Cal. May 27, 2005) .... 6

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007) .... 6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .... 6

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) .... 6, 14, 16

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .... 6

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .... 6

*Lumbermens Mut. Cas. Co. v. Corning Inc.*,
2009 U.S. Dist. LEXIS 139078 (C.D. Cal. May 22, 2009) .... 14

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) .... 6, 7, 16

*U.S. v. Sandoval-Mendoza*,
472 F.3d 645 (9th Cir. 2005) .... 6, 16

**Statutes**

Fed. R. Evid. 702 .... 4-7, 24

L.R. 7-2 .... 23

Navigators Specialty Insurance Company ("Navigators") hereby submits its Opposition to the Motion to Exclude Testimony of Navigators' Expert Witness André E. Jardini [Doc. 102] ("Motion") filed by SVO Building One, LLC ("SVO").

# I. <u>INTRODUCTION</u>

In seeking to exclude testimony from Navigators' expert, retained to opine on the reimbursement allocation set forth in the seminal decision *Buss v. Super. Ct.*, 16 Cal. 4th 35 (1997), SVO ignores the most persuasive part of the expert's deposition testimony:

Q. Can you remember a case where you used the *Buss* allocation?

A. Yes. *Buss*.

(Declaration of Shannon Santos ("Santos Dec."), ¶ 2, Ex. A, Deposition of André Jardini ("Jardini Depo."), 19:9-12, EX. A-6.) That's right. Navigators' allocation expert, André Jardini, is the expert who was utilized in developing the *Buss* allocation. Yet, SVO comically asserts that Mr. Jardini is not qualified to opine on a *Buss* allocation. SVO's desperation to avoid testimony by perhaps the person most qualified to do so seeps out of the Motion.

Navigators has more than met its burden to satisfy the requirements for providing expert testimony. Federal Rule of Evidence 702 and controlling Ninth Circuit precedent impose a liberal standard of admissibility. Mr. Jardini's specialized knowledge, extensive experience in insurance billing, and application of a line-by-line invoice review methodology will help the trier of fact determine a central issue in this insurance-coverage dispute: Which defense costs are more likely than not attributable solely to uncovered claims such that Navigators is entitled to reimbursement of more than $5.5 million. Mr. Jardini's testimony is relevant and reliable and, thus, admissible.

SVO seeks to exclude Mr. Jardini's opinions by mischaracterizing both the California Supreme Court's *Buss* decision and the expert work performed in this case. Contrary to SVO's repeated contention, *Buss* does not require a written line-by-line allocation of each time entry billed by defense counsel to assign it to either defamation or non-defamation claims. Rather, *Buss* contemplates evaluation of billing records to identify and substantiate those fees that are fairly attributable solely to uncovered claims without a specific methodology required. The *Buss* analysis is precisely what Mr. Jardini did in this case. As the expert who developed the allocation approach

applied in the *Buss* litigation, Mr. Jardini is uniquely qualified to assist the Court and the trier of fact in evaluating Navigators' claim for reimbursement. By contrast, SVO elected not to disclose an allocation expert at all and now attempts to avoid the consequences of that strategic choice by seeking to bar the only allocation expert retained in the case. SVO's failure to adequately prepare its defense is not a reason to exclude part of Navigators' prosecution.

SVO's claim that Mr. Jardini did not apply the correct *Buss* standard is refuted by the first page of the *Buss* decision: "what is the burden of proof? Proof by a preponderance of the evidence." *Buss*, 16 Cal. 4th at 40. Yet, SVO states that the applicable standard of proof to an allocation analysis is not preponderance of the evidence but instead more akin to the standard applicable to the duty to defend. SVO's erroneous reading of *Buss* cannot be a basis to exclude Mr. Jardini's opinions.

Navigators recognizes that the arguments raised in SVO's Motion and this Opposition largely track the arguments in connection with SVO's Motion for Summary Judgment [Doc. 101] and apologizes to the Court for having to deal with the repetition. SVO's Motion to exclude should have been brought as a motion *in limine* before trial as Navigators will bring to exclude SVO's experts for reliance on documents not produced in discovery and assertions of incorrect propositions of law. For the reasons set forth in both of Navigators' Oppositions, Navigators requests the Court deny SVO's Motion and allow Mr. Jardini to educate the trier of fact on the reimbursement allocation.

## II. <u>ARGUMENT</u>

### A. <u>Mr. Jardini Unquestionably Meets the Legal Standard for Expert Opinion.</u>

Navigators meets the requirements of the Federal Rules of Evidence in presentation of its expert witness. Mr. Jardini's qualifications are unassailable: 48 years of litigation practice, founder and president of a legal audit practice, completion of more than 1,950 audits and $2.75 billion in legal fees reviewed, and frequent testimony on allocation and reasonableness. [Doc. 102-1, pp. 35-36, Expert Report ("Jardini Report"), ¶¶ 2, 6-13.] The Motion fails to refute this showing to exclude the expert witness under applicable statutory authority.

Rule 702 provides that expert opinion is admissible if (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a

fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702. In other words, to be admissible under Rule 702, expert testimony must be relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 2005 U.S. Dist. LEXIS 46232, *120 (S.D. Cal. May 27, 2005), *aff'd* 510 F.3d 870, 874 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony 'assist the trier of fact' 'goes primarily to relevance.'") (citations omitted). Reliability on the other hand means that the expert testimony must have "a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, "the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564.

While these factors are helpful, they are not definitive, "and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case.'" *Id.*, quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). "An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022). Insurance-industry and claims-handling experts are regularly permitted to testify where their opinions are tied to experience-based methodologies applied to the facts. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).

"If the proposed testimony meets the thresholds of relevance and reliability, its proponent is '**entitled to have the jury decide upon [its] credibility, rather than the judge.**'" *Elosu*, 26 F.4th at 1024, citing *U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2005) (emphasis added). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *City of Pomona* v. *SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Indeed, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

**The Rule 702 factors are not even *identified* in SVO's Motion let alone *analyzed.*** Mr. Jardini's expert retention meets all of the admissibility elements of Rule 702:

**1. The Witness Is Sufficiently Qualified As an Expert.**

Mr. Jardini's qualifications are unquestionable. He is a lawyer with 48 years of litigation practice. [Doc. 102-1, p. 35, Jardini Report, ¶¶ 2-3.] He is a member of the American Board of Trial Advocates having tried more than 50 jury trials. [Doc. 102-1, p. 36, Jardini Report, ¶ 6.] He is the founder and president of a legal audit law firm. [Doc. 102-1, pp. 35-36, Jardini Report, ¶¶ 6, 12.] As a legal auditor, he has conducted more than 1,950 audits and $2.75 billion in legal fees reviewed. [Doc. 102-1, p. 36, Jardini Report, ¶ 9.] He has served as consultant and expert witness in countless cases involving the allocation of fees in reimbursement coverage cases as well as on the reasonableness of fees. [Doc. 102-1, pp. 36, 46-59, 61-63, 65-66, Jardini Report, ¶¶ 8, 11, Exs. 1-3.]

Mr. Jardini was also the expert involved in creating the *Buss* allocation standard by working on the *Buss* case. (Jardini Depo., 18:24-19:3; 19:9-11, EX. A-6.) He has performed *Buss* allocations numerous times in the 28 years since then. (Jardini Depo., 19:4-8, EX. A-6.) As such, he is intimately familiar with the standards set forth in that case in a way no other expert could be. Mr. Jardini is uniquely qualified to testify in this case, which both parties agree is controlled by precepts imparted in *Buss*.

**2. The Witness's Specialized Knowledge Will Help the Trier of Fact in Evaluating the Scope of Reimbursement Owed by SVO.**

Mr. Jardini's testimony will help the trier of fact understand the evidence and determine the amount Navigators is entitled to as part of its reimbursement claim against SVO. Calculating this amount involves evaluating thousands of pages of legal invoices while making sense of each of those entries – an insurmountable process for a layperson. No court would ever allow an insurer to show the jury each and every line of fees incurred in a defended action, which SVO contends is "about 8,000 fee entries." (Jardini Depo., 43:9-10, EX. A-12.) With Mr. Jardini's testimony however, the trier of fact will be able to understand this information and process it in a more efficient way.

As part of the process of making the defense invoices digestible, Mr. Jardini's practice

involves consolidating time entries of the same task into a single line item. Indeed, Mr. Jardini explained that the outlines created by his office were instrumental in the allocation work necessary for the *Buss* determination. The "Outlines of Services Performed" put the information from the voluminous defense invoices into a format that is useable by the trier of fact, the Court, and the expert as explained at the expert's deposition:

> Q. … Now, how would looking at each individual entry and stating why it was either potentially solely non-covered claims or a covered claim, how would that obscure the knowledge of whether that expense was one that should be reimbursable or not?
>
> A. Invoices are designed for a very particular purpose. They tell you what a particular lawyer did that they want the client to pay for at the appropriate rate. It's not prepared -- those records are not prepared to assist in an allocation analysis. In fact, oftentimes, when we do allocation analysis, we deal with block billing and redacted entries, and there's a lot of things we have to do in order to have a fair interpretation of the document to do the analysis correctly. Also, you'd be stymied by all the modest entries for review e-mail from Bob, send e-mail to Tony. This gives you no information whatsoever that allows for an appropriate allocation, but if you batch the time by litigation event, identifiable litigation event, recognizes that litigated matters go through a process where those particular events can be described and isolated and batched as to time, you can make one decision as to 25 entries, instead of 25 separate decisions, which is not only burdensome, but enhances the possibility of mistakes. So, doing it the way we do it is better, more efficient, more transparent, and allows for clarity in the decision-making. Doing it line by line is just entering into a mud hole and coming out with an answer and [] thinking it's the right answer. It doesn't help the process.
>
> * * *
>
> Q. How was the determination made as to which time entries would be included in

the outlines and which ones would not?

A. All time entries which relate to an identifiable legal service are included, and batched to be put in one place. If it's a minor entry, telephone call, short letter, e-mail, that doesn't refer to any particular litigation service that's been rendered, it's not included because to include it is simply to regurgitate the bill, and this is meant to be a tool that permits analysis and extrapolation, and there's no point in putting a stray e-mail onto the outline of services, and so it's not included. That's part of the normal procedure. You don't end up with a hundred percent of the bill, or else you're just -- you just have the bill. You have a distillation to a meaningful level of the bill by litigation service, batched by each such service as they appear chronologically through the bill. As litigation happens, you're doing one thing in one period, and then, the next thing, and the next thing, and the next thing. Those all appear on the outline of services as identified by the lawyers and others who are billing the time. So, it's a perfectly appropriate way to do it, and it's not necessarily required or helpful to include every modest little entry that doesn't relate to a litigation service.

(Jardini Depo., 56:14-57:20; 78:12-79:13, EX. A-15, 21.)

The outlines reflect the work performed by the expert's office in reviewing each and every individual time entry and batching them for an allocation determination by the expert. Mr. Jardini testified, "[t]here's no requirement that you look at every item of the invoice to do this work, and then, spell it out on a separate piece of paper, as if it's a separate piece of information. It isn't. It's all in the invoices. If you want to see what's in the invoices, the outline of services has the date range and the description of the service and the timekeepers involved. Often, just one person on one date. Meaning, it's the **exact entry from the time records**." (Jardini Depo., 54:25-55:9, EX. A-15 (emphasis added).)

The outlines are in formats that are easily digestible by the jury in a way the attorney invoices could never be. A portion of one the "Outlines of Services Performed" is shown below:

/ / /

**NAVIGATORS V. SVO FEE REVIEW**
**Re: Tyson and Mendes LLP**
**Outline of Services Performed**

| Date From | Date To | Description | Timekeeper | Hours Billed | Allo-cation |
|---|---|---|---|---|---|
| 12/16/2020 | | Review and analyze transcript of motion for injunction to evaluate for trade secret claims | RD | 1.20 | |
| 12/16/2020 | | Commence review of extensive electronic file of prior counsel to assess | DF | 3.20 | |
| 12/16/2020 | 12/17/2020 | Review orders and amended claims to prepare for discussion with Murphy Austin attorneys for strategy for prosecution of defenses against breach of contract claims | RD, GS | 2.80 | |
| 12/16/2020 | 12/28/2020 | Analysis of defamation cause of action compared with other causes of action | GS, RD | 2.10 | D |

[Doc. 102-1, pp. 93, 97, Jardini Report, Ex. 9.] Mr. Jardini confirmed that he marked a "P" on the outline to show "[t]he relationship to -- or at least the possible relationship to a defamation service," whereas "D" was for a task confirmed as related to the defamation cause of action. (Jardini Depo., 14:12-17; 95:1-4, EX. A-5, 25; Doc. 102-1, p. 102, Jardini Report, Ex. 9.) The expert testified that he was "bending over backward" in favor of SVO to mark anything that could possibly include time on the defamation claim as "P." (Jardini Depo., 22:22-23:11; 62:14-63:15; 88:1-16, EX. A-7, 17, 23.) The designated expert was the only person who performed that allocation, not anyone else in his office. (Jardini Depo., 14:15-25; 58:2-14; 130:6-9, EX. A-5, 16, 34.)

Mr. Jardini's testimony is not only important but indispensable considering that he is the only reimbursement allocation expert in the case; SVO chose not to retain such an expert. (Santos Dec., ¶ 3.) Absent an expert to walk the trier of fact through the defense invoices, the jury will be asked to review years of invoices from numerous law firms with no understanding as to the type of work an attorney would do in defense of litigation. SVO is banking on the jury not being able to figure that out and deciding against any amount in reimbursement. To SVO's disappointment though, Navigators is entitled to utilize an expert opinion to educate the jury.

**3. The Expert's Opinion Is Based on Sufficient Facts or Data.**

SVO does not challenge the sufficiency of the data used by Mr. Jardini in his analysis. Mr. Jardini considered all of the data that is regularly considered by members of his profession and experts in his field. In fact, he testified that **he and his team reviewed *all* of the legal invoices and individual time entries** as part of the allocation determination even though there is no such *Buss* requirement:

Q. When you said you looked at the entirety of the invoices, did you look at each individual entry?

A. I generally do look at the invoices, and I think I did. I don't recall specifically, but my auditors review every line with care in doing their work and preparing the outline of services, which is a very critical tool which permits me to do my work, and provides clarity in making those assessments, much better, frankly than the line-by-line invoices themselves, because the meaning is lost in the volume of the entries … .

Q. … I was asking if you personally did it.

A. I looked at them in general to understand format, billing style, and such other things. I didn't duplicate the work done at much lower cost, and much more efficiently by my auditors.

Q. … Did, you, or anyone in connection with your review of the billing entries, investigate whether there was work performed in connection with the defense of the specific allegations set forth in Mr. Murray's letter under "disparagement"?

A. We looked at every line. We also, before doing that, did a word search. The word "disparagement," I don't believe, appears in the bills anywhere. We did a word search for "defamation," which appears a comparative handful of times. And that's an electronic word search, which doesn't substitute for a line-by-line review, which we did do, but it is an -- it is an adjunct which tells you I think fairly clearly that they're not litigating disparagement or defamation at least to any significant degree in a case that turns on intellectual property in a complicated business transaction.

* * *

Q. Do you have a response to [SVO's expert's] criticism?

A. Sure. He doesn't have an understanding of how we work, and have been accepted in doing that work across hundreds and hundreds of audits, every single audit, every single time, and have a profound expertise in doing it well in

a way that delivers important information in an understandable way that simply reviewing the bills, which is what he's suggesting, cannot possibly do. Bills, in the way that they're kept, and in the level of detail that they're kept obfuscate key information that's necessary to do work … .

* * *

Q. Okay. And I want to be clear on this. Is it correct to say that you believe that you do not need to evaluate each entry to determine whether it can be solely allocable to claims not potentially covered?

[] MS. SANTOS: Objection. Mischaracterizes testimony.

THE WITNESS: Our process does evaluate every entry, every entry that's -- that's dedicated to an identifiable litigation service, and that's most of the entries.

(Jardini Depo., 42:20-43:7; 43:14-44:16; 53:10-54:2; 61:2-12, EX. A-12, 14-16.)

Mr. Jardini further testified that, in deciding how to allocate the fee entries between defamation and non-defamation claims, he drew on his specialized knowledge and experience as a litigation lawyer and auditor:

Q. So, if you look at Paragraph 45. There's a discussion about the claims, and it says: "Here, it is undisputed that 17 of the 18 claims in the underlying action were not subject to coverage under the relevant insurance policy." Is that how you approached this case? You divided the claim, which was potentially covered, the defamation, from the other claims when you were doing the review?

A. I have to be informed by what actually was occurring. In this case, there was one claim for damages for reputational injury, there were other claims for other kinds of damages, contractual damages, intellectual property, misuse damages, trade secrets, and so on, which are not related to defamation, and in the real world are not defamation. So, you do have to understand that there are 17 claims that are not defamation, and that's a background fact. The devil is always in the details. You have to look at what was actually being done and for what

purpose, but in a case in which the main action is everything but defamation, and defamation is thought so unimportant as to be dismissed by the claimant, that it's not remarkable to find that most of the effort was for non-defamation services.

Q. … Let's take a broad undifferentiated one that says, "Attend conference with arbitrator." How would you allocate that between defamation and the other non-potentially covered claims?

A. Well, in this case, I don't believe, frankly, it's unlikely that defamation came up in these meetings with the arbitrator, and there are a number of such meetings that are referenced in the billing, and I listed them as "P," and which I think is bending over backward, frankly, because defamation was unlikely to have been the topic of discussion. Every other thing in the world that happens in an arbitration is probably being discussed, but not that, but as I said, I allowed for that. So, in that particular example that you have provided, I put that in the column of … potentially defamation.

Q. Okay. Now, what about a circumstance where the billing says in the underlying case, "Review documents for production," words to that effect, how would you allocate that?

A. I would say that, more likely than not, the standard that applies, that's not defamation because the documents in a case involving a number of sophisticated contracts, intellectual property, and trade secrets, those documents are not, let's say, an e-mail disparaging Liebert. I mean, that is -- that is not going to be in the column where you'd allocate that as being related to defamation, because more likely than not, it's not.

* * *

Q. Now, let's -- I think I gave an example of -- earlier, and I want to go back to it, of attending a conference with the arbitrator. And would you agree that somebody defending a defamation claim would have to attend a conference with

the arbitrator as part of the defense of that claim?

A. Yes, the question is, [] was that event about defamation in any way, shape, or form, and I opted, even though it's very likely that it isn't going to be mentioned in that kind of conference in this case, I did opt to include that [] in the defamation-related -- very broadly stated defamation-related category.

(Jardini Depo., 21:17-23:24; 62:11-23, EX. A-6, 7, 17.)

Mr. Jardini confirmed that he drew from his experience on how a litigated case works to conclude that a claim for defamation in an intellectual property dispute to be a minor claim. Such specialized knowledge and experience can serve as the basis upon which an expert renders an opinion. *Elosu*, 26 F.4th at 1024. It is undeniable that Mr. Jardini's opinions are based on sufficient facts or data.

**4. The Expert's Opinions Are the Product of Reliable Principles and Methods.**

Mr. Jardini's methodology is one that has been widely accepted and tested both in reimbursement allocation cases as well as in cases challenging the reasonableness of legal fees. (Jardini's Depo., 54:20-23 ("[T]his is an important methodology and tool approved by [National Association of Legal Fee Analysis], approved by auditing professionals, approved by courts, and so on").) The methodology utilized consistently meets the burden of proof set out in *Buss* and surpasses a mere line-by-line review of the subject invoices, which SVO seemingly asserts is the standard to be applied. *See Lumbermens Mut. Cas. Co. v. Corning Inc.*, 2009 U.S. Dist. LEXIS 139078, *6, 9 (C.D. Cal. May 22, 2009) (finding the "line-by-line analysis of the provided materials" constituted a "*prima facie* showing" to meet the "preponderance of the evidence" standard for reimbursement). Indeed, in his deposition Mr. Jardini testified that:

Q. ... Now, when these outlines were prepared, did you provide Karen Scott or any other auditors instructions as to how they were to be prepared?

A. An outline of services is a basic schedule that we prepare in every audit. I've been retained in audits more than 1,900 times, 40 or 50 times a year. In **every single case**, an auditor prepares an outline of services. It serves numerous

important functions. It makes the review of the invoices more readily ascertainable and transparent, and it doesn't require separate instruction. **These are functions that these auditors do every day, all day, and in Karen Scott's case, for more than 20 years.**

* * *

Q. Now, is this -- is this approach or methodology one that KPC uses in all of its audit work?

A. In **every single audit** that involves review of attorney's fees, an outline of services is prepared for every law firm that's involved, for every invoice that's involved. It is the most common schedule that we prepare in every case because it is so valuable in assisting in doing the work of auditing.

Q. … So, if -- if I were -- I had retained KPC to evaluate the attorney's fees bills of a particular law firm to determine whether they were excessive, is this the methodology that would be applied?

A. It would be applied across all of the issues that might arise in an audit, short of ethics issues and contract formation issues, retainer agreement issues, and such that are separate from the billing process. In any issue involving attorney billing, including allocation, reasonableness, and the like, an outline of services would be prepared whether you asked me or someone else asked me.

(Jardini Depo., 15:1-13; 17:6-25, EX. A-5 (emphasis added).)

As shown, Mr. Jardini's testimony is the product of reliable principles and methods used for decades, including through his time working on the *Buss* case, to qualify him to provide his opinions to the jury in this case.

**5. The Expert Has Reliably Applied the Relevant Principles and Methods to the Facts of This Case.**

Mr. Jardini's report as well as his deposition testimony reveal that he has reliably applied his regular, daily methodology process to the legal invoices involved in this case. He explained that his auditors painstakingly reviewed line-by-line each time entry, which were then grouped according to a

litigation event, and then he went through this information to allocate the fees between defamation and non-defamation claims. (Jardini Depo., 21:17-23:24; 42:20-43:7; 43:14-44:16; 53:10-54:2; 57:15-20; 61:2-12; 62:11-63:15; 78:12-79:13, EX. A-6, 7, 12, 14-17, 21.) He also testified that this is the process he follows in each case where he is asked to review legal fees and that this is the process approved by courts and other relevant institutions. (Jardini Depo., 15:1-13; 17:6-25, EX. A-5.)

In short, Mr. Jardini's opinions meet the threshold of relevance and reliability, such that Navigators is entitled to have the jury decide upon their credibility. *Elosu*, 26 F.4th at 1024, citing *Sandoval-Mendoza*, 472 F.3d at 656. There is no basis for the Court to grant SVO the relief requested through the Motion and deny the trier of fact the opportunity to evaluate this expert witness.

**B. <u>SVO's Criticisms of the Expert Opinions Go to the Weight of the Evidence, Not Its Admissibility.</u>**

Navigators realizes that SVO does not like the conclusions drawn by Mr. Jardini, particularly since the expert opined that "about 1% of all time spent" in defense of SVO in the subject action went towards defamation claims, which are not subject to reimbursement by Navigators. [Doc. 102-1, p. 43, Jardini Report, ¶ 59.] The remainder will be paid by SVO. Yet, SVO cannot avoid Mr. Jardini's testimony simply because it does not like the conclusions drawn. SVO has not met its burden to show that Mr. Jardini lacks the qualifications necessary to testify at trial.

Any question as to credibility should go to the jury rather than exclusion by the Court. *City of Pomona*, 750 F.3d at 1044; *Primiano*, 598 F.3d at 564. SVO will have the opportunity to cross-examine Mr. Jardini at trial and can point out any flaws SVO believes exists in the expert analysis. That disagreement though does not provide a basis to exclude this expert from testifying at trial. SVO had the opportunity to designate an allocation expert and chose not to do so. (Santos Dec., ¶ 3.) Therefore, the only manner in which SVO can rebut the allocation testimony is through cross-examination.

SVO's criticisms regarding Mr. Jardini's methodology and conclusions go to the weight of the evidence, an evaluation to be made by the trier of fact. The Court should not exclude Mr. Jardini's testimony for the reasons set forth in SVO's Motion. Rather, it is for the trier of fact to decide the weight to be given to the expert's opinions.

**1. SVO's Objections to Mr. Jardini's Methodology Stem from an Inherent Misunderstanding of the Buss Decision.**

SVO's Motion is fundamentally based on the misunderstanding of the standards set forth in *Buss*. The California Supreme Court set forth no specific or requisite methodology for an expert to follow in reaching an allocation between covered and uncovered claims. Rather, the *Buss* decision confirmed an insurer's right to seek reimbursement after a full defense of a mixed action, which includes covered and uncovered claims. *Buss*, 16 Cal. 4th at 39. Specifically, *Buss* held that an insurer may seek recovery of all fees and costs "that can be allocated solely to claims that are not even potentially covered," and, in seeking such damages, the insurer bears the burden of proof "by a preponderance of the evidence." *Id.* at 39-40.

*Buss* dealt with a similar situation as the one at hand. There, the insurer sought reimbursement of defense costs for uncovered claims, which amounted to 26 out of a total of 27 claims, where, like here, only the defamation cause of action was potentially covered. *Buss*, 16 Cal. 4th at 42. As discussed, *Buss* dealt with the level of proof necessary to establish a reimbursement claim, not with the **form** of that proof. *Buss* did not say that, to prove a reimbursement claim, an insurer's proof had to appear as a line-by-line allocation table embedded in an expert report as the Motion suggests. [Doc. 102, p. 4, Motion, 3:5-9, 20-25.[1]] Even though SVO manufactured the purported *Buss* requirement for a line-by-line allocation, Navigators' expert did in fact perform such an analysis. (Jardini Depo., 42:20-43:7; 43:14-44:16; 53:10-54:2; 57:15-20; 61:2-12, EX. A-12, 14-16.)

To further illustrate SVO's misunderstanding of *Buss*, during Mr. Jardini's deposition, SVO's counsel repeatedly questioned Mr. Jardini about the duty to defend standard, where the mere possibility of coverage triggered the duty to defend, rather than the allocation standard. Counsel often implied that the applicable standard was ***more*** than the "preponderance of the evidence" rule set forth in *Buss*. *Buss*, 16 Cal. 4th at 40. To that point, Mr. Jardini explained:

Q. … [D]o those two sentences set forth the standard that you applied in determining what fees would be reimbursable to Navigators under the *Buss*

[1] It seems that SVO's Motion was uploaded twice at Doc. 102. Navigators has not done a word-by-word comparison of the two documents to see if they are the same. Instead, Navigators responds to the first version of the Motion uploaded at Doc. 102 and utilizes the page numbers associated with that version. [Doc. 102, pp. 2-6, Motion, pp. 1-5.]

case?

A. In a very general way, a *Buss* allocation is a practical application of what actually happened in a case, measured against the obligation of the insurer to put on evidence that creates a preponderance on the issue of uncovered claims having been litigated. It's just a general statement of *Buss* that you're separating out between covered and uncovered claims. It's not meant to be a statement of the legal principles involved. That's not my place. My place is to sort out between those services that were rendered in pursuit of, for instance, in this case, the defense of the defamation claim, as opposed to the other 17 claims.

Q. Okay. Is it correct that you look at the particular claims in a case, and then, break them down into covered and uncovered?

A. You have to understand the situation that's presented, and here, Navigators defended the entire case because -- up until a point -- well, it defended the case in its entirety, but up until a point there was a defamation count which they provided under their personal injury coverage a defense for that – the defense -- duty to defend is quite broad, the allocation is a completely separate thing, but the defense was provided. So, you have to sort out what was the defense relating to the defamation count, as opposed to the intellectual property counts, the other 17 counts that were involved, and that was -- that's the task of allocating to understand in the real world what was being done and for what reason, and then, the jury can decide. You know, they could decide one out of 18, that would be within their province to do, or they could decide in other ways based on my opinion or on somebody else's opinion, but the point is, what does the preponderance of the evidence show as to the amount of time spent with regard to defamation, a minor claim that was dismissed and never re-litigated, as opposed to the main body of the case, which is intellectual property, the use of information, and so on, in a complicated business transaction.

* * *

Q. … My question is whether you need to know the burden in order to make the allocation under *Buss*?

A. I don't have a way to answer that about what the need is. That sounds like a question about the legal underpinning of opinions about things like this. I do know what the burden is, I have in mind, in doing my work, whether there's a preponderance of the evidence as to one point or another. It's not the same as duty to defend burden, it's a different burden. When you get to the *Buss* allocation, I have in mind applying that in doing the work that I do, but it comes down to my decision-making as to individual entries based on all the work that I and my staff did. So, I understand the burden.

Q. Well, when you say you understand the burden, what is the burden?

A. Well, like in every civil case -- I mean, that's a legal question, you'll have to argue if you believe differently -- it's a preponderance of the evidence.

Q. Okay.

A. That's 51 percent, you know, preponderance.

* * *

Q. **This isn't a duty to defend analysis where any stray allegation in any stray place could trigger a defense.** That happened. The company did defend from beginning to end. This is a different analysis. This is a different analysis about how did you really spend your time, what was the case really about, and were you spending time on these things that weren't defamation. And quite plainly, they were, and it can't possibly be the hundred percent your side is arguing. I mean, that doesn't make any sense in the real world. And so, I would -- I would say that under an appropriate analysis, looking at this entry or entries like it, applying the appropriate burden of proof, more likely than not, you end up with a fair conclusion that that's not related to defamation.

* * *

Q. So, would you agree that at least some of the time in reviewing the counterclaim would be spent reviewing the defamation cause of action?

A. If so, it would be a minuscule part of the time, since it's not the main part of the case, and also, there's a reference to the counterclaims, which aren't part of the defense at all. Those are affirmative claims that are completely aside from this. I thought the weight of that was that, more likely than not, it was not related in any meaningful way to defamation. You're suggesting that the mere possibility that eyes glanced upon a particular claim that said at the top of it "defamation," means you get paid for all the time, even though most of it isn't related at all to defamation. I don't buy into that. I think this entry is, more likely than not, not related to defamation.

(Jardini Depo., 19:25-21:16; 25:8-26:3; 67:5-19; 90:5-21, EX. A-6-8, 18, 24 (emphasis added); *see also*, 62:24-63:15, EX. A-17.)

*Buss* does not endorse any particular methodology for an insurer in allocating between covered and uncovered claims. It does not impose any pleading or report-format requirement or dictate an expert's presentation. *Buss*, 16 Cal. 4th at 61. As Mr. Jardini qualifies to provide an expert analysis for the reasons set forth above, it will be a matter for the trier of fact to evaluate how much credit this expert opinion receives.

**2. SVO's Criticisms of the Expert's Opinions Dramatically Mischaracterize the Jardini Report and Deposition Testimony.**

The inaccuracies in the Motion are too numerous to go through in detail and are completely unsupported by evidence. Rather than waste more time on specious arguments, Navigators instead directs the Court to the evidence that refutes the contentions made by SVO in the Motion:

- Mr. Jardini did not run a word search for "defamation" in the "Outlines for Services Performed." [Doc. 102, pp. 3-4, Motion, 2:26-3:1.] The witness testified that, as one part of the multi-step allocation evaluation, word searches were run on the **invoices**, further corroborated by the fact that word searches were performed for time periods where outlines do not exist. (Jardini Depo., 44:5-16; 71:13-72:8; 79:14-19; 109:23-110:7; 132:14-22, EX. A-12, 19, 21, 28, 29, 34.)

- The classifications of "P" or "D" were not done "while offering no insight as to how and in reliance upon what applicable methodology" nor were they "arbitrary." [Doc. 102, p. 4, Motion, 3:3-5, 26-27.] The allocation, which Mr. Jardini performed himself, involved evaluation of whether the task was even possibly related to the defamation claim. (Jardini Depo., 14:12-17, 20-25; 22:22-23:11; 58:2-14; 62:14-63:15; 88:1-16; 95:1-4; 130:6-9, EX. A-5, 7, 16, 17, 23, 25, 34.) The batching work was completed by professionals who do the work "every day, all day, and in Karen Scott's case, for more than 20 years." (Jardini Depo., 15:1-13; 17:8-25, EX. A-5.) Mr. Jardini further explained that the same task performed at different points of the litigation would be for different purposes, especially given the dismissal of the defamation cause of action. (Jardini Depo., 85:5-87:25; 93:4-10, EX. A-22-24.)

- Mr. Jardini did not create a methodology "primarily due to the fact that only one out of 18 causes of action assertedly [sic] involved a covered claim." [Doc. 102, p. 4, Motion, 3:10-12, 16-18.] Rather, he utilized the same procedure applied in all of his cases for decades. (Jardini Depo., 15:1-13; 17:6-25, EX. A-5.) The expert's testimony further shows he did not divide the time by 18 causes of action. (Jardini Depo., 21:22-22:16, EX. A-6, 7.)

- Mr. Jardini never opined "that a claim needs to be actively litigated to warrant coverage." [Doc. 102, p. 4, Motion, 3:12-13.] The expert never opined on coverage whatsoever, instead only allocating between defamation and non-defamation. (Jardini Depo., 19:25-20:14; 38:19-39:25; 44:23-45:22; 46:20-47:11; 82:25-83:11; 92:25-93:1; 100:5-101:4, EX. A-6, 11-13, 22, 24, 26.) The portion of the Jardini Report cited in the Motion states, "[t]he services rendered after March 24, 2021, the date the defamation claim was formally dismissed, are subject to reimbursement in total. After that date, the potential for [a] defamation claim did not exist. The claimant affirmatively withdrew that claim. The claim was thereafter not litigated at arbitration." [Doc. 102-1, p. 42, Jardini Report, ¶ 53.] This statement does include a word about coverage.

- Mr. Jardini never said "that settlement money has to be paid towards the specific claim in order to justify coverage." [Doc. 102, p. 4, Motion, 3:13-14.] The portion of the Jardini Report cited in the Motion states, "[t]here is no evidence that any amount was paid by SVO as to any defamation claim in settlement." [Doc. 102-1, pp. 42-43, Jardini Report, ¶ 54.] This statement does

include a word about coverage. The witness did not opine on coverage.

- The expert opinion shows that only 1% of the time was spent towards "defamation efforts," not 3%. [Doc. 102, p. 4, Motion, 3:15-16; Doc. 102-1, p. 43, Jardini Report, ¶ 59.] Rather, Mr. Jardini concluded, "[t]o account for any shortcomings in this analysis, I am of the opinion that certainly less than 3% of the fees before March 24, 2021 even arguably related to defamation." [Doc. 102-1, p. 43, Jardini Report, ¶ 60.] The math calculations in the Jardini Report are correct and do not add up to 5.5% nor does SVO explain how it calculated 5.5%. [Doc. 102, p. 4, Motion, 3:14-16.]

- There are not "numerical inconsistencies" in the Jardini Report. [Doc. 102, p. 5, Motion, 4:12-18.] Rather, SVO intentionally did not advise the Court of the expert's testimony that the totals in the report came from Navigators' Interrogatory responses, not calculations done by his office. (Jardini Depo., 77:11-18, EX. A-20 ("The outlines are information taken from the invoices themselves. The invoices from which they're taken are listed on Exhibit 10. The amounts paid, as it turns out I now know, were from interrogatories that Navigators answered under oath. So, my Paragraph 42, as to the amounts paid, are the amounts paid as detailed in answers to [SVO's] discovery.").)

- Mr. Jardini's analysis of the time incurred before SVO's tender of the claim does not make his opinion unreliable. [Doc. 102, p. 5, Motion, 4:20-24.] To the contrary, it makes his analysis more accurate in allocating between defamation and non-defamation claims and certainly does not mean that Navigators is seeking reimbursement of fees it did not pay. The allocation shows that Mr. Jardini's opinion was consistent for work performed throughout SVO's defense, even before the matter was tendered. If anything, this expanded allocation analysis works to SVO's advantage on the calculations: there would have been more time potentially spent on the defamation claim before tender than after given the claim was thereafter dismissed. (Jardini Depo., 76:16-20, EX. A-20 ("Well, it was counted by me, and they're getting three percent of that. So, bank error in [SVO's] favor.").)

- SVO falsely states that Mr. Jardini's "testimony lacks any attempt to do a *Buss* allocation for costs incurred." [Doc. 102, p. 6, Motion, 5:3-7.] To the contrary, the expert testified, "[i]t's not correct that we didn't review them. They are part of every invoice; at least the costs that

were fronted by the lawyers. The cost[s] would travel in the same atmosphere as the fees. Meaning, that if you had a maximum of three percent of the fees being non-reimbursable to Navigators, it's fair to conclude that three percent of the costs would follow in the same way, rough justice." (Jardini Depo., 116:12-24, EX. A-30.)

- The expert did not make a determination that "Navigators had no duty [to defend] after March 24, 2021." [Doc. 102, p. 6, Motion, 5:8-10.] Mr. Jardini repeatedly testified that he was not opining on coverage despite SVO's counsel's constant attempts to trap the witness into providing a legal conclusion. (Jardini Depo., 19:25-20:14; 38:19-39:25; 44:23-45:22; 46:20-47:11; 82:25-83:11; 92:25-93:1; 100:5-101:4, EX. A-6, 11-13, 22, 24, 26.)

SVO's manufactured issues with Mr. Jardini's testimony and report do not provide any basis for this Court to exclude the expert opinions from trial.

### C. **<u>The Motion Can Be Denied As SVO Failed to Comply with the Local Rules in Bringing the Motion.</u>**

SVO failed to comply with the Local Rules by not noticing the Motion for hearing. L.R. 7-2(b) requires:

> In one filed document not exceeding 25 pages in length, a motion must contain:
>
> (1) On the first page in the space opposite the caption and below the case number, the noticed hearing date and time;
>
> (2) In the first paragraph, notice of the motion including date and time of hearing;
>
> (3) In the second paragraph, a concise statement of what relief or Court action the movant seeks; … .

The Motion does not contain the requisite notice of the Motion. The only place in the document where the hearing date is referenced is in the caption as required by subsection (1). [Doc. 102, p. 1.] There is no paragraph with the notice of motion as required by subsection (2). The fact that these are separately listed in the statute is evidence that the Legislature required the hearing date to be included in two different sections. SVO knew of this requirement as it followed the requirement in the concurrently filed Motion for Summary Judgment. [Doc. 101, pp. 2-3.] SVO's failure to do so in connection with this Motion provides grounds to deny the requested relief.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Navigators requests the Court deny SVO's Motion. Mr. Jardini should be permitted to testify at trial and provide his expertise to the trier of fact in deciding how much SVO will owe in reimbursement based on the Rule 702 factors.

Dated: December 15, 2025

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By: */s/ Shannon L. Santos*
David Simantob
Shannon L. Santos
*Attorneys for Plaintiff/Counter-Defendant Navigators Specialty Insurance Company*