UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NAVIGATORS SPECIALTY INSURANCE   )
COMPANY,                         )
                                 ) Case No.
            Plaintiff,           ) 3:22-CV-07102-AMO
                                 )
      v.                         )
                                 )
SVO BUILDING ONE, LLC            )
                                 )
            Defendant.           )
                                 )
_____)
                                 )
AND RELATED CROSS-ACTION         )
_____)


VIDEOCONFERENCE DEPOSITION OF

ANDRE JARDINI - EXPERT

TUESDAY, NOVEMBER 18, 2025, 9:27 A.M.


Reported by Laurie A. Schmidt, CSR No. 12719

Job #11711

Page 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NAVIGATORS SPECIALTY INSURANCE )
COMPANY, )
) Case No.
Plaintiff, ) 3:22-CV-07102-AMO
)
v. )
)
SVO BUILDING ONE, LLC )
)
Defendant. )
)
_____)
)
AND RELATED CROSS-ACTION )
_____)

VIDEOCONFERENCE DEPOSITION OF ANDRE JARDINI, EXPERT, taken on behalf of the Defendant and Counterclaimant, commencing at 9:29 a.m., Tuesday, November 18th, 2025, remotely, via Zoom, before Laurie A. Schmidt, Certified Shorthand Reporter No. 12719.

Job No.: 11711

Page 3

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF NAVIGATORS SPECIALTY INSURANCE COMPANY:

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
BY: SHANNON L. SANTOS, ESQ.
555 South Flower Street
Suite 2900
Los Angeles, California 90071
(213) 443-5100
Shannon.Santos@wilsonelder.com

FOR THE DEFENDANT AND COUNTERCLAIMANT SVO BUILDING ONE, LLC:

PARKER SHAFFIE LLP
BY: BRUCE T. SMYTH, ESQ.  (SBN 89171)
800 West 6th Street
Suite 500
Los Angeles, California 90017
(213) 622-4441
smyth@parkershaffiellp.com

ALSO PRESENT:  Brad Bissegger, Videographer

Page 4

I N D E X

DEPONENT:  ANDRE JARDINI, EXPERT          PAGE:
EXAMINED BY MR. SMYTH                        6

E X H I B I T S

EXHIBIT NOS.:                             PAGE:

EXHIBIT 6:  NOTICE OF VIDEO DEPOSITION OF
            EXPERT WITNESS ANDRE JARDINI      7

EXHIBIT 7:  Expert Documents
            (N10515-N10519)                  11
EXHIBIT 8:  NAVIGATORS SPECIALTY INSURANCE
            COMPANY'S INITIAL EXPERT
            WITNESS DISCLOSURES              13
EXHIBIT 9:  Buss v. Superior Court
            16 Cal.4th 35 (1997)            26

EXHIBIT 10: Navigators' Document
            Production (redacted)
            (N03168-N03170)                 40

QUESTIONS INSTRUCTED NOT TO ANSWER:
                PAGE       LINE
                    (None.)

Page 5

VIA ZOOM VIDEOCONFERENCING;

TUESDAY, NOVEMBER 18, 2025; 9:27 A.M.

THE VIDEOGRAPHER:  Okay.  My name is Brad Bissegger.  I am a videographer associated with Express Deposition Services.

Today's date is November 18th, 2025, and the time is 9:27 a.m. Pacific Standard Time.

This deposition is being taken via Zoom in the matter of Navigators Specialty Insurance Company versus SVO Building One, LLC, and related cross-actions, in the United States District Court, Northern District of California.  Case Number 3:22-CV-07102-AMO.

This is the videotaped deposition of Andre Jardini.  This deposition is being taken on behalf of the Defendant and Counterclaimant.

Will Counsel please introduce themselves for the record?

MR. SMYTH:  Bruce Smyth of Parker Shaffie LLP, Counsel for SVO Building One, LLC.

MS. SANTOS:  Shannon Santos for Navigators Specialty Insurance Company.

MR. SMYTH:  Thank you.

Will the court reporter please swear in the witness?

Page 6

CERTIFIED SHORTHAND STENOGRAPHER:  Certainly.  Thank you.

(ANDRE JARDINI,
EXPERT WITNESS
Deponent, was sworn and examined
and testified as follows:)

CERTIFIED SHORTHAND STENOGRAPHER:  Do you solemnly state that the testimony that you shall give in this matter shall be the truth, the whole truth, and nothing but the truth, so help you God?

MR. JARDINI:  I do.

CERTIFIED SHORTHAND STENOGRAPHER:  Thank you.

I will state, my name is Laurie Schmidt.  I am a Certified Shorthand Stenographer.  My License Number is 12719.

Counsel, you may proceed.

MR. SMYTH:  Okay.

EXAMINATION
BY MR. SMYTH:

Q.  Mr. Jardini, could you just give your full name for the record, please?

A.  My full name is Andre, middle name Emilio,

Page 7

E-m-i-l-i-o, last name Jardini, J-a-r-d-i-n-i.

Q.  Mr. Jardini, you are testifying as an expert witness on behalf of the Plaintiff Navigators in this case; is that correct?

A.  That is correct.

Q.  Okay.  I know you've had your deposition taken probably over a hundred times.  Can I dispense with the admonitions?

A.  I'm perfectly fine with that, if you choose to do that.

Q.  Okay.  Are you under any medication or suffering from any condition that would prevent you from giving your best testimony today?

A.  No.

MR. SMYTH:  Okay.  Okay.  I'd like to bring up as Exhibit Number 1 the Notice of Deposition in this matter.

MS. SANTOS:  Are we going to mark this as Exhibit 6?

MR. SMYTH:  Yes.

(Exhibit 6 was marked for identification and is attached hereto.)

Q.  BY MR. SMYTH:  Mr. Jardini, were you provided a copy of this notice of deposition?

A.  Yes, I was.

Page 8

MR. SMYTH:  Okay.  Okay.  If we could go to the document request in this.  I'd like you to draw your attention to the Request No. 1.

Q.  Have you provided a copy of the resum  or CV of any person employed or retained by you who assisted you in any way in connection with this matter?

A.  I provided my CV attached to my report.  There's no other CV that exists concerning any other person.

Q.  Okay.  Were there employees or staff who assisted you in preparing the report?

A.  Yes.

Q.  Okay.  And who were they?

A.  My auditors, principally, Karen Smith -- I'm sorry.  Karen Scott -- my goodness.  Karen Scott and Lila Rosenberger, and then, Assistant Auditors, Kim Galloway and John Murphy.

Q.  Okay.  What does -- or strike that.

Does Karen Scott have a position with your company?

A.  She's an auditor, full-time, all the time.

Q.  Okay.  Does she have a law degree?

A.  No.

Q.  Okay.  And how about Lila Rosenberger?

A.  How about -- what about her?

Q.  Does she -- what is her position?

Page 9

A.  She's an auditor.

Q.  And does she have a law degree?

A.  No.

Q.  Okay.  And what is Kim Goldberg's [sic] position?

A.  Assistant auditor.

Q.  Okay.  The -- actually, let me -- let me move down to the next request, which was -- asks for [as read]:

"All court orders, issued in any case in which you were retained as an expert determining that any of your opinion or testimony was not admissible or where the court limited your opinion or testimony in any way."

Do you have any documents in response to that request?

A.  I do not.

Q.  Okay.  Let me ask you, are there any court orders in your possession where you were -- where it was determined that your testimony was not admissible or where the court limited your opinion?

A.  I'm not aware of any opinion not admitting my testimony.  I don't know how to deal with limiting the remaining part of your question about limiting my testimony.  I'm not sure what you're asking.  I've been allowed to testify in every case in which I've been

Page 10

retained.

Q. Okay. Was there ever a court order that basically said that you would be limited to specific opinions, and not others?

A. Not in that phraseology, no.

Q. Okay. What -- is there -- is there one -- are there -- were there court orders that limited your testimony in any way, that you're aware of?

A. I wasn't limited, in the sense that my testimony was considered. We are in an adversarial setting in these situations. Not always has a jury or judge or arbitrator agreed fully with my opinion, but my opinion has not been, quote-unquote, limited.

Q. Okay. Let me go to Question No. 3, asking for a retainer agreement in this matter.

And do you understand that that was provided to us?

A. My understanding is this: I directed -- once I received this Notice of Deposition, I directed my audit secretary to compile all of our file materials concerning this matter, those which should be produced in a federal case. Those were downloaded into some kind of an electronic form, that was transmitted to Counsel.

My understanding is it was likely that it was sent to you, but I don't have any personal information

Page 11

about that.

MR. SMYTH: Okay. If the assistant or the videographer could pull up the additional exhibit that I provided last night.

Yes, that, which we will mark as Exhibit Number 7.

(Exhibit 7 was marked for identification and is attached hereto.)

Q. BY MR. SMYTH: Does this appear to be the invoice that you or your company prepared in connection with the work for the Navigators in this matter?

A. Yes, this is our invoice current through its date of November 12, 2025.

Q. Okay. Let's go, if we could, to the last page of -- excuse me -- the second to the last page of this.

There is a Timekeeper Summary at the bottom of that page, and does that reflect the hours that each person put in on this project?

A. Yes, through the end of October.

Q. Is there additional time since then that was spent?

A. Yes.

Q. Okay. And that will be in a subsequent bill; is that right?

A. There is no subsequent bill as yet.

Page 12

Q. A subsequent bill will be prepared of the additional time; is that right?

A. That's my expectation.

Q. Okay. Now, there is a listing in the Timekeeper Summary, "JARDINI, A E Director," and it says 23.60 hours.

Does that reflect the time that you had spent on this matter as of the time of that invoice being prepared?

A. Yes.

Q. Okay. And the rest of the hours, let's see, of the total of 173.70 -- well, let me rephrase that.

A total of 173.7 hours were spent on the project as of the time of this billing?

A. Yes, that's correct.

Q. Okay. And all the time, other than 23.60 hours, was spent by the non-attorney personnel employed by KPC; is that right?

A. Yes, I had the benefit of their work.

MR. SMYTH: Okay. Now, you prepared -- and let's -- actually, let's go -- exhibit next in order, will be -- and we're going on hold onto this one, but we might as well make another exhibit, is the Initial Expert Witness Disclosures. I would like to make that as Exhibit Number, I believe it's "8."

Page 13

(Exhibit 8 was marked for identification and is attached hereto.)

THE VIDEOGRAPHER: I apologize. I missed -- which one did you want as "8"? What was the name of the --

MR. SMYTH: It's listed as the -- either the Initial Expert Disclosure or the Jardini --

THE VIDEOGRAPHER: Expert Report?

MR. SMYTH: Yes.

Okay. And if you could just scroll through it till we get to Mr. Jardini's report. Yes.

Q. Okay. And is Exhibit 8 the expert report you prepared in this matter?

A. Yes. You're showing me the first page, and I assume that the rest of it is going to follow in the same manner.

Q. Okay. And let's go to -- go down in the report to -- actually, let's go to Exhibit 5 to the report. It's one of the attachments.

Okay. Here we go.

Okay. Exhibit 5 is titled, well, "Murphy Austin Adams Schoenfeld LLP Outline of Services Performed."

Is that a schedule or outline that you had prepared in connection with this report?

A. Yes.

Page 14

Q. Okay. Who of your staff prepared that outline?

A. Karen Scott.

Q. Okay.

A. I believe. I think Lila Rosenberger may have done one of the -- one of the law firms, but I believe this is Karen Scott.

Q. Okay. And then, if you go a little bit further down on that exhibit -- oh, yeah, if you stop. Yeah, stop right at the entry for 8/5/2019. There is a letter, and the entry is entitled "Draft answer to 4th amended complaint," and on the right, there is a letter "P." What does the "P" signify?

A. The relationship to -- or at least the possible relationship to a defamation service.

Q. Okay. Did -- who inserted the "P" on this particular schedule, if you know?

A. I do know. I did it.

Q. Okay. There are a number of letters "P" in the various outlines that are attached to this report. Did you put the letter "P" in on all of them?

A. I did. I received a hard copy of each outline, I reviewed it in its entirety, and I made the allocation decisions using the initial P or D, and it's reflected at the conclusion of each outline the total of those decisions.

Page 15

Q. Okay. Now, when these outlines were prepared, did you provide Karen Scott or any other auditors instructions as to how they were to be prepared?

A. An outline of services is a basic schedule that we prepare in every audit. I've been retained in audits more than 1,900 times, 40 or 50 times a year. In every single case, an auditor prepares an outline of services. It serves numerous important functions. It makes the review of the invoices more readily ascertainable and transparent, and it doesn't require separate instruction. These are functions that these auditors do every day, all day, and in Karen Scott's case, for more than 20 years.

Q. Okay. And in doing that -- well, let me back up a little bit.

If you look at the one that we've talked about, the "P" there, it says "Timekeeper," and there are three timekeepers listed.

Do you see that?

A. I do.

Q. Okay. Now, first, how does Karen Scott, or whoever is preparing the outline, know how to amalgamate time from various time entries into a summary of multiple time entries?

A. The function of an auditor in this part of their

Page 16

work is to batch time concerning all the significant litigation events, not including stray e-mails, minor events, and other entries that don't go toward a particular litigation event. All of the entries concerning that event happen in the same time frame, typically, could be across several invoice periods, could be for more than one person in the entry that you are listing over the date range, which is listed there from August 5th, 2019 to August 7th, 2019. Those three individuals worked on the Draft Answer to the Fourth Amended Complaint. That time is pulled together and put in one place. You don't have to look at several entries, five entries, nine entries, whatever number of entries there might have been dedicated to that particular project. You now know, based on that entry, that three people did that task, and collectively, they billed 22 hours. That is useful information to know in any audit, and was useful information for me in this audit.

That process is the same across all invoices, including in cases with multiple, multiple millions of dollars, even well beyond the money involved in this case, and that is done daily by auditors in the same way, including breaking down block billing in order to do so, and performing a function that, in their

Page 17

judgment, makes for an accurate recitation of the description and the total hours, and the total number of timekeepers. It is valuable information that any auditor would be happy to have in order to make audit decisions.

Q. Now, is this -- is this approach or methodology one that KPC uses in all of its audit work?

A. In every single audit that involves review of attorney's fees, an outline of services is prepared for every law firm that's involved, for every invoice that's involved. It is the most common schedule that we prepare in every case because it is so valuable in assisting in doing the work of auditing.

Q. Okay. So, if -- if I were -- I had retained KPC to evaluate the attorney's fees bills of a particular law firm to determine whether they were excessive, is this the methodology that would be applied?

A. It would be applied across all of the issues that might arise in an audit, short of ethics issues and contract formation issues, retainer agreement issues, and such that are separate from the billing process.

In any issue involving attorney billing, including allocation, reasonableness, and the like, an outline of services would be prepared whether you asked me or someone else asked me.

EX. A-5

Page 18

MR. SMYTH:  Now, let me go to your report, and I'd like to go to Page 7 of the report, Paragraph 43, entitled "APPLICABLE STANDARDS."

Brad, can you get to that page, or do you need further guidance?  It's -- yeah, back up.

THE VIDEOGRAPHER:  What was the description again?  I apologize.

MR. SMYTH:  Yeah, just go to the beginning of the report, and then --

THE VIDEOGRAPHER:  Okay.

MR. SMYTH:  -- go to page 7 of that.

THE VIDEOGRAPHER:  Okay.

MS. SANTOS:  It should be Page 10 of the PDF.

MR. SMYTH:  Yes.

Q.  Okay.  There's a statement at Paragraph 33 under the heading "APPLICABLE STANDARDS," and the first refers -- the first sentence refers to the case "Buss v. Superior Court."

Did you review that case in connection with preparing this report?

A.  I've reviewed it many times.  I was an auditor in that case in the underlying proceedings, so I'm very familiar with the case.

Q.  Have you done audits evaluating the fees that are subject to reimbursement under the Buss case in other

Page 19

matters?

A.  I did it in Buss, itself, and many times thereafter.

Q.  Do you know how many times?

A.  I don't.  It's over a great many years.  The Buss case is from 1997, so that's 28 years of potential.  I'm retained, as I said, 40 or 50 times a year.  So, the possibility is dozens, but probably less than that.

Q.  Can you remember the name of a case where you've done a Buss allocation?

A.  Yes, Buss.

Q.  Other than Buss?

A.  No, I can't remember another name of a case.

Q.  Okay.

A.  Though I do know that they've occurred.

Q.  Okay.  The second line of Paragraph 43 says:
   "Recovery is permitted by an insurer against the insured as to claims that are not even potentially covered by the insurance policy."
   And the next paragraph says:
   "The court discussed that an allocation need be made between those claims that are not even potentially covered and those that are potentially covered."
   Now, in -- do those two sentences set forth the

Page 20

standard that you applied in determining what fees would be reimbursable to Navigators under the Buss case?

A.  In a very general way, a Buss allocation is a practical application of what actually happened in a case, measured against the obligation of the insurer to put on evidence that creates a preponderance on the issue of uncovered claims having been litigated.  It's just a general statement of Buss that you're separating out between covered and uncovered claims.  It's not meant to be a statement of the legal principles involved.  That's not my place.  My place is to sort out between those services that were rendered in pursuit of, for instance, in this case, the defense of the defamation claim, as opposed to the other 17 claims.

Q.  Okay.  Is it correct that you look at the particular claims in a case, and then, break them down into covered and uncovered?

A.  You have to understand the situation that's presented, and here, Navigators defended the entire case because -- up until a point -- well, it defended the case in its entirety, but up until a point there was a defamation count which they provided under their personal injury coverage a defense for that -- the defense -- duty to defend is quite broad, the allocation is a completely separate thing, but the defense was

Page 21

provided.  So, you have to sort out what was the defense relating to the defamation count, as opposed to the intellectual property counts, the other 17 counts that were involved, and that was -- that's the task of allocating to understand in the real world what was being done and for what reason, and then, the jury can decide.  You know, they could decide one out of 18, that would be within their province to do, or they could decide in other ways based on my opinion or on somebody else's opinion, but the point is, what does the preponderance of the evidence show as to the amount of time spent with regard to defamation, a minor claim that was dismissed and never re-litigated, as opposed to the main body of the case, which is intellectual property, the use of information, and so on, in a complicated business transaction.

Q.  So, if you look at Paragraph 45.  There's a discussion about the claims, and it says:
   "Here, it is undisputed that 17 of the 18 claims in the underlying action were not subject to coverage under the relevant insurance policy."
   Is that how you approached this case?  You divided the claim, which was potentially covered, the defamation, from the other claims when you were doing the review?

EX. A-6

Page 22

A. I have to be informed by what actually was occurring. In this case, there was one claim for damages for reputational injury, there were other claims for other kinds of damages, contractual damages, intellectual property, misuse damages, trade secrets, and so on, which are not related to defamation, and in the real world are not defamation.

So, you do have to understand that there are 17 claims that are not defamation, and that's a background fact. The devil is always in the details. You have to look at what was actually being done and for what purpose, but in a case in which the main action is everything but defamation, and defamation is thought so unimportant as to be dismissed by the claimant, that it's not remarkable to find that most of the effort was for non-defamation services.

Q. Well, let's take a circumstance where there is a billing entry that is fairly broad, you know, attend arbitration conference or attend -- strike that.

Let's take a broad undifferentiated one that says, "Attend conference with arbitrator."

How would you allocate that between defamation and the other non-potentially covered claims?

A. Well, in this case, I don't believe, frankly, it's unlikely that defamation came up in these meetings

Page 23

with the arbitrator, and there are a number of such meetings that are referenced in the billing, and I listed them as "P," and which I think is bending over backward, frankly, because defamation was unlikely to have been the topic of discussion. Every other thing in the world that happens in an arbitration is probably being discussed, but not that, but as I said, I allowed for that.

So, in that particular example that you have provided, I put that in the column of compensable. I mean, of -- the column of, potentially defamation.

Q. Okay. Now, what about a circumstance where the billing says in the underlying case, "Review documents for production," words to that effect, how would you allocate that?

A. I would say that, more likely than not, the standard that applies, that's not defamation because the documents in a case involving a number of sophisticated contracts, intellectual property, and trade secrets, those documents are not, let's say, an e-mail disparaging Liebert. I mean, that is -- that is not going to be in the column where you'd allocate that as being related to defamation, because more likely than not, it's not.

Q. Well, wouldn't you have to know the documents

Page 24

that were being reviewed in order to make the determination as to whether they're a document in the production related to defamation?

A. A decision has to be made upon available information. That information was not provided to Navigators or to me, nor were pleadings, nor were deposition transcripts. So, the likelihood is that that is not defamation-related, therefore, it's allocated in that way.

Q. Now, under Buss, do you understand that it is the burden of the insurer to support its allocation of expenses to wholly non-covered claims?

MS. SANTOS: Objection. Calls for a legal conclusion.

THE WITNESS: I was going to say that. That is really just asking for a legal conclusion.

They've retained me to provide testimony on that issue, and I will do so.

Q. BY MR. SMYTH: Do you have any understanding as to whether you would need to know who the burden was imposed upon in order to make an allocation between a potentially covered and potentially non-covered cost?

A. I have a full understanding of -- because I'm a lawyer, because I was in the Buss case, because I read the Buss case, because I've done Buss allocations,

Page 25

I have a full understanding of how this all works, but you're asking me to state on the record some legal conclusion. I don't think that's permissible or proper.

You will argue to the court what the burden is; I'll do my work based on my knowledge and understanding of the circumstances, which I have done.

Q. Well, my question is a little different.

My question is whether you need to know the burden in order to make the allocation under Buss?

A. I don't have a way to answer that about what the need is. That sounds like a question about the legal underpinning of opinions about things like this.

I do know what the burden is, I have in mind, in doing my work, whether there's a preponderance of the evidence as to one point or another. It's not the same as duty to defend burden, it's a different burden. When you get to the Buss allocation, I have in mind applying that in doing the work that I do, but it comes down to my decision-making as to individual entries based on all the work that I and my staff did.

So, I understand the burden.

Q. Well, when you say you understand the burden, what is the burden?

A. Well, like in every civil case -- I mean, that's a legal question, you'll have to argue if you believe

EX. A-7

Page 26

differently -- it's a preponderance of the evidence.

Q. Okay.

A. That's 51 percent, you know, preponderance.

MR. SMYTH: Okay. Okay. Well, let's -- while we're on this, I would like to call up the next exhibit, which I guess will be No. 9, which is the Buss case.

(Exhibit 9 was marked for identification and is attached hereto.)

MR. SMYTH: Okay. And could you go to -- this is going to be a little difficult. Go to Page 53 in the case, which is a good ways down. Yeah. No, you've got to be back. I believe it's on Page 10 of this document.

Q. Okay. So, Mr. Jardini, I want to draw your attention to the entry under Sub-Section C, at Page 10 of this exhibit. And let me just read it.

The first two paragraphs it says:

"The second question, which follows from the first, is this: In a 'mixed' action, for what specific defense costs may the insurer obtain reimbursement from the insured?"

And next paragraph reads:

"The answer is: Defense costs that can be allocated solely to the claims that are not even potentially covered."

Is that what you understand to be the standard

Page 27

for the allocation of costs in a mixed action under Buss?

A. The general overview, and then, in making that determination, the burden is the preponderance of the evidence.

Q. Okay. And let me ask a preliminary fact that it -- the language in there refers to a mixed action.

Do you understand a mixed action under Buss is an action in which there are both potentially covered and potentially uncovered causes of action?

A. Yes, mixed would mean that there are parts of the case that should not have been paid by the insurance company, if they can show that they're -- that they're not one of the covered --

Q. Okay. Now, the statement in this that says:

"Defense costs that can be allocated solely to the claims that are not even potentially covered."

Do you have an understanding under Buss that you should look to the cost first in making the allocation, and not to dividing up by claim?

MS. SANTOS: Objection. Calls for a legal conclusion.

THE WITNESS: I'm not sure what you're asking. If you're talking about costs, like court

Page 28

reporter fees, experts, and so on, I don't -- that's a disconnect for me.

MR. SMYTH: Okay. Let me -- let me rephrase it.

Q. Do you -- do you have an understanding that under this standard in Buss, that one looks at an individual time entry to determine whether it can be allocated solely to claims that are not even potentially covered?

MS. SANTOS: Objection. Calls for a legal conclusion.

THE WITNESS: The methodology can be whatever is reasonable in terms of deciding that. As I say, a jury could decide one out of 18. They're entitled to do that based on a case where one potentially covered claim exists, and 17 clearly not covered claims exist. It is not specified that it be done in any particular way.

We do look at the billing entries in order to have more particular information about the case as a whole, but it's not militated that it be one approach versus another.

So, that's the best I can answer that.

Q. BY MR. SMYTH: Okay. Is it correct to say that dividing up the claims by covered and non-covered, and then, assessing which expenses go in each category, is acceptable under the Buss case, in your view?

A. Whatever evidence is persuasive as a

Page 29

preponderance of the evidence, that is admitted and is considered by the jury, is appropriate. And that would be one way to do it. That's not the way I did it, but it is certainly a factor that could be considered because this is a case in which the immensity of the litigation was totally unrelated to defamation, and it would be an over-statement, frankly, in my mind, to have one out of 18 hours be compensated.

Q. So, let me see if I understand.

I understood that you had divided them up by covered and uncovered, and then, evaluated which ones were potentially covered and which ones were not potentially covered.

Did you use a different methodology than that?

A. I'm not sure what you're asking. Only defamation was covered. The defense was triggered by the personal injury coverage of defamation, as stated in the insurance policy. That's why they defended. The case was principally about many, many other things, many other things much more complicated that required many, many more services by the lawyers than anything related to defamation, which was thought of as such a weak claim that it was dismissed by the Claimants at a critical juncture.

So, there's only one potentially covered claim,

EX. A-8

Page 30

and most of the work was done on things that weren't that covered claim.

Q. Okay. Is it correct to say then that you -- in going through the determination as to what was covered or not covered, you determined which expenses were -- you believed -- well, let me rephrase that.

Is it correct to say that in doing your review, you looked at particular expenses, and then, determined whether they had any relation to the covered claim of defamation; is that the approach?

A. I didn't look at expenses, I looked at fees, and in looking at fees, to answer what I think is the import of your question, I determined whether or not in the real world it had, more likely than not, a relationship to a defamation claim. And if it didn't, I decided that it wasn't part of the defamation defense.

Q. Okay. Now, the statement in this -- in the case that, "Defense costs that can be allocated solely for the claims that are not even potentially covered," is that a different standard than the one you applied in determining which fees related to defamation?

A. No.

Q. It's not. Okay. So, let's take the example of a billing entry for an, you know, undifferentiated task, like "Attend deposition," if it said something like

Page 31

that, is it correct, you would allocate that as not relating to defamation?

A. Yes. Because in the circumstances of this case, it's more likely than not that it was not related to defamation.

Q. Okay. What if the case -- or what if the deposition involved questioning on defamation, would that change your view?

A. I'd have to see what the questioning actually was, and if somebody came forward with that, I would take new information into account, and maybe the field would shift by five or six hours. That's what we're talking about.

Q. Okay. And are you of the view that the determination as to whether the questioning involved defamation is something that is not the burden of the insurer?

A. That's a legal question. I will tell you this: That in allocation work by any auditor, and well accepted in the audit community, you don't parcel out defamation testimony line by line, you have to make a rather more broad determination. Nor can you go through interrogatories line by line, and the like. That level of micro-scrutiny does not help the analytical process. In fact, it hinders it. And so, that someone would come

Page 32

forward and say the word "defamation" was said on Page 98 of a 200-page deposition, that doesn't move the needle.

Q. Okay. When you have conducted fee audits in the past, the last 10 years, can you give an estimate as to what proportion would be for insurers, as opposed to policyholders?

A. The principal of people that retain me are lawyers; they're involved in lawsuits. I'm involved right now in Epic Games versus Google, in a $170 million fee claim. That's not insurance at all. Most cases don't involve insurance. And the lawyer that retains me may be a lawyer that represents an insurer or maybe a lawyer that represents an insured, but insurance being involved is a -- is a smaller proportion of my total work, if you look at the whole of it.

So, breaking it down by which side, insurer versus insured, isn't very meaningful in the work that I do because I've been on both sides repeatedly.

Q. Okay. Of the cases that involve a policyholder on one side, and an insurance company on the other side, do you know what proportion you represented -- or rather, your services were retained on behalf of the policyholder, as opposed to those on behalf of the insurer?

Page 33

A. I'm retained in so many non-insurance-related cases. One of the main ways that I'm retained are in prevailing party cases. For instance, the Attorney General of the State of California has retained me in at least 51 cases where they've lost a case and have to pay the fees in some, usually, environmental case, or the like, and that has nothing to do with insurance, and that's more likely to be the circumstance than being -- having insurance involved. I've been retained many times by insurers or attorneys for insurers.

The best I could say, looking back on a very long history, and a minimum percentage of the work that I do, it's probably something like 50/50.

MR. SMYTH: Okay. Let's go to -- actually, I'm sort of at a convenient break point now. Can we break for about five minutes, at this point?

THE VIDEOGRAPHER: All right. Off the record at 10:18 a.m.

MR. SMYTH: Thank you.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record at 10:25 a.m.

MR. SMYTH: I'd like to go back to your report at Page 3, Paragraph 19, if we can call that up.

MS. SANTOS: Actually, Page 6 of the PDF.

EX. A-9

Page 34

MR. SMYTH: It would be Page 6 of PDF, Page 3 of the report.

EXAMINATION [CONTINUED]:

BY MR. SMYTH:

Q. Okay. Mr. Jardini, it states in Paragraph 19 -- and I won't read it, I'll just summarize it -- that you've been requested to provide opinion testimony as to an appropriate allocation of attorney's fees, which would be recoverable in those, which are not those allocations that have been done in at least 100 cases, and I asked you before, but I'd like to ask it this way.

Of those at least 100 cases, do you have an understanding as to how many would be allocations for reimbursement of defense fees under the Buss standard?

A. I don't have a number for you. Some of them. More commonly, grant fee allocations or allocations between claims where the party is only entitled to recover as to certain claims, not insurance related, it could be intellectual property. There's a host of different situations in which an allocation might be required, but I don't know the specific number of Buss allocations. More than 20, I guess, if I had to just put a number on it, but that's, more or less, more a guess than an estimate.

Page 35

Q. Okay. Do you know if any of those cases have been reported Buss allocations?

A. I don't know. I don't usually follow up after I do my work.

Q. Okay. And I assume the Buss cases, they would all be cases that were litigated in California?

A. Well, Buss was, and I don't know if other jurisdictions have similar principles, I just don't know -- happen to know that. I've testified in 37 different states and a number of foreign countries, and I don't have a way to tell you whether they have Buss-type concepts in those other places, or if I've been retained to do something relating to those concepts.

Q. Okay. Let's go to the prior paragraph, and you -- and that paragraph basically discussed some occasions where judges have disagreed with some or all of your conclusions.

Do you know if any of those disagreements were in cases involving reimbursement under the Buss case?

A. I don't think so, but I haven't gone back to review 30 years of history to see if that's true or not, but I don't remember anything like that.

Q. You mentioned that you were involved in the Buss case. What was your involvement in that case?

Page 36

A. I did an analysis for, I believe the party was HH Sports, one of the parties, and it had to do with payment of fees to them, and I don't recall specifically beyond that. This is -- if the Buss case reaches the Supreme Court in '97 -- 1997, my work was probably three years before that, so I don't remember the details. I do remember being in the case because Buss is, of course, Jerry Buss of the Lakers fame, and so, it was memorable in that way, because he was a well-known figure in Los Angeles at that time, as well as in the later years.

Q. Do you know if your report was, in any way, involved in the Buss Supreme Court decision?

A. It's not referenced there, so I didn't follow the case as it wound its way through appeal. I did note that, ultimately, it resulted in the Buss decision, and then, that was revisited in other audits that I did after that.

Q. Okay. In Paragraph 18, you state that:

"In no past court finding has any specific opinion on a specific audit issue reached the basis and underpinning of my opinions in this Case."

Do you know if there is any court finding that

10:30

involved the opinions in a Buss reimbursement case?

Page 37

A. I'm not aware of it. I mean, in this venue, sometimes lawyers do a deep dive, and they bring to my attention something that happened in the past, or even the distant past.

I have no memory of any such issue arising relating to my work in any case involving a Buss analysis.

Q. Okay. Let's go to Paragraph 22 of your report, which states that:

"The defense was tendered to SVO by Navigators based on the inclusion of a claim for defamation in the underlying action."

Is it correct that, in most cases, the insured tenders the case to the insurer without specifying a particular cause of action that may trigger coverage?

MS. SANTOS: Objection. Outside the scope of his retention.

THE WITNESS: I haven't had the facility to examine every other tender. I've tendered insurers myself. I used to do insurance coverage work in my earlier years. So, I don't -- but I don't know.

Usually, if you're tendering, you have some sense of -- you know, you don't tender under an auto policy, for instance, this case, because you think, well, what would be the point of that.

Page 38

So, you know, you would have in mind that there might be a covered claim or potentially covered claim. I think that most people tendering would think it through like that, and not just fire blindly.

Q. BY MR. SMYTH: Okay. Do you know whether, in this case, when the relevant complaint, the Fourth Amended Complaint was tendered to Navigators, there was any mention of defamation in the tender?

A. I don't know that.

Q. Okay. Now, in this -- in Paragraph 23, you state that [as written and read]:

"The Navigators policy provided coverage for 'personal and advertising injury,' and that coverage extended to defamation."

And that is based on a review of the Navigators' policy in the relevant time period?

A. Yes, it's attached to the complaint that they filed against your client.

Q. Okay. Do you have an understanding as to whether disparagement was covered under the personal and advertising injury coverage of the Navigators policy?

A. It sounds like a --

MS. SANTOS: Objection.

THE WITNESS: -- legal question to me.

(Court Reporter's clarification for the record.)

Page 39

THE WITNESS: It sounds like a legal question to me. I'm not here to --

MS. SANTOS: And --

THE WITNESS: -- interpret the policy.

MS. SANTOS: And I spoke over the expert, saying, "Objection, legal conclusion."

CERTIFIED SHORTHAND STENOGRAPHER: Thank you.

Q. BY MR. SMYTH: Well, do you have an understanding as to whether disparagement is listed in the policy as one of the covered offenses under personal and advertising injury coverage?

A. That's -- again, it's a legal question. I've cited the language, defamation was alleged, a defense was picked up based on that basis.

Q. Okay. In order to know whether there was a duty to defend on the part of Navigators, wouldn't you have to know what the potentially covered causes of action or claims in a lawsuit entailed?

MS. SANTOS: Objection. Outside the scope of his retention. Calls for a legal conclusion.

THE WITNESS: Yeah, that's a legal conclusion, that question, and asking for a coverage opinion, and in the somewhat irrelevant area of duty to defend, which is not what I'm talking about in my testimony. So, I really don't want to get involved in that.

Page 40

Q. BY MR. SMYTH: Okay. With respect to Paragraph 22, stating that [as written and read]:

"The defense was tendered to SVO by Navigators based on the inclusion of a claim for defamation in the underlying action."

Do you know whether the defense could have been tendered to SVO based on the inclusion of a claim for disparagement in the underlying action?

A. Sounds like a legal question, or a coverage question, or hypothetical outside my area of testimony.

It was tendered, the defense was picked up, the claim on which the defense was provided, as I understand it, was defamation, defamation was dismissed. The case wasn't about defamation.

So, that's -- you know, these are background facts. I'm not here to talk about your coverage issues, whatever they might be.

MR. SMYTH: Now, let's go to the exhibit which is the Steven Murray letter, which we'll mark as exhibit next in order.

Do you see that, Brad?

MS. SANTOS: I have that as Exhibit 10.

MR. SMYTH: Okay.

(Exhibit 10 was marked for identification and is attached hereto.)

Page 41

THE VIDEOGRAPHER: Is that the right one that's on screen right now?

MR. SMYTH: Yes, that's correct.

THE VIDEOGRAPHER: Okay.

Q. BY MR. SMYTH: Have you seen that letter in connection with the documents you reviewed?

A. I don't believe so.

Q. Now, the -- if you could scroll down a little bit so we can get to the bottom of the page.

Mr. Murray asserts at the bottom of the page [as read]:

"The policy provided coverage for the personal injury offenses of slander, libel and disparagement, and alleges, or says that the complaint alleges allegations of disparagement."

Were you aware of those allegations in performing your report?

A. I had available to me the Fourth Amended Complaint, and I read what Mr. -- I think his name is Jassy, had to say about two particular parts of the complaint. One of them that he cites to contain -- doesn't contain the language that he refers to, and the other is some language in an intentional interference with contractual advantage.

It's not a claim for damages for libel, slander,

EX. A-11

Page 42

or disparagement; it's a claim for damages for interference with a contract.

In any event, that is a coverage issue that you have to debate with your opposing Counsel, and not seek an answer from me about, because I'm not here to provide that kind of testimony.

Q. Okay. Well, in determining the fees that were allocable to potentially covered and potentially non-covered claims, is it correct that you did not evaluate any fees that might have been incurred as covered in defense of an allegation of disparagement?

A. I looked at the entirety of the invoices. Any aspect of them that had to do with defamation, there's nothing specific to disparagement in those invoices, as you're suggesting something that doesn't exist, and I reviewed them in their totality against the backdrop of the case as it existed as to entry by entry whether it, more likely than not, related to defamation or to something else.

Q. When you said you looked at the entirety of the invoices, did you look at each individual entry?

A. I generally do look at the invoices, and I think I did. I don't recall specifically, but my auditors review every line with care in doing their work and preparing the outline of services, which is a very

Page 43

critical tool which permits me to do my work, and provides clarity in making those assessments, much better, frankly than the line-by-line invoices themselves, because the meaning is lost in the volume of the entries, and the meaning is best deciphered in looking at the outline of services which permits the work to be done in a ready and accurate way.

Q. Okay. Well, when you say that -- or strike that. There are about 8,000 fee entries in these invoices. Probably more than that. If you had looked at all of them, there would be a substantial amount of time reflected in your billing sheets; is that correct?

A. I'm not sure what you're asking.

Q. Yeah. I mean, if you look -- if you looked at each entry, that would have taken a substantial period of time; is that right?

A. Well, my auditors did bill substantial periods time, and they did look at every entry.

Q. No. I was asking if you personally did it.

A. I looked at them in general to understand format, billing style, and such other things. I didn't duplicate the work done at much lower cost, and much more efficiently by my auditors.

Q. Now, did you look through -- or strike that. Did, you, or anyone in connection with your

Page 44

review of the billing entries, investigate whether there was work performed in connection with the defense of the specific allegations set forth in Mr. Murray's letter under "disparagement"?

A. We looked at every line. We also, before doing that, did a word search. The word "disparagement," I don't believe, appears in the bills anywhere. We did a word search for "defamation," which appears a comparative handful of times. And that's an electronic word search, which doesn't substitute for a line-by-line review, which we did do, but it is an -- it is an adjunct which tells you I think fairly clearly that they're not litigating disparagement or defamation at least to any significant degree in a case that turns on intellectual property in a complicated business transaction.

Q. Did you do a word search for "disparagement"?

A. I don't recall. Somebody could. If they come up with the word, I'd be very surprised, and if it did come up, it would come up once, twice maybe. I don't know. I don't think it comes up at all, and I'll stick with that.

Q. Okay. Do you have an understanding as to whether a specific cause of action must be alleged in order to trigger the duty to defend?

Page 45

A. I'm not here --

MS. SANTOS: Objection. Outside the scope of his retention. Calls for a legal conclusion.

THE WITNESS: Yeah, duty to defend is a completely different thing with a different standard, and I'm not here to assist you in your arguments for or against duty to defend.

MR. SMYTH: Okay. Well, let me just make sure that we're clear on this.

Q. Do you have an understanding as to whether in order to trigger the duty to defend, under allegations of disparagement, a specific cause of action for disparagement must be alleged?

MS. SANTOS: Objection. Outside the scope of his retention. Calls for a legal conclusion.

THE WITNESS: Yeah, that's a legal conclusion. I haven't prepared myself -- I could, I suppose, given my background and experience, but I haven't prepared myself to speak to your coverage issues or to respond to the letter that you have up on the board there about complaining about whether disparagement is covered or not.

MR. SMYTH: Let's go to Paragraph 33 of your report, which says:

"After March 24, 2021, the defamation count

EX. A-12

Page 46

ceased to exist, was no" -- I believe it probably meant -- "not further litigated and was no part of the underlying action."

Q. Were you aware that the defamation count had been dismissed without privilege?

A. Yes, I saw the dismissal. It doesn't make a difference, my opinion is the same. It left the case and it wasn't coming back. It's extremely unlikely, even in an arbitration setting, that the arbitrator is going to allow a previously dismissed claim to come back into the case when the parties haven't had an opportunity to do discovery and to do all of the things necessary to prepare that case.

It was dismissed without prejudice, because that's the way things normally happen, if you don't have to dismiss with prejudice. Nonetheless, it was not a part of the case after the dismissal, all the way through the settlement, never mentioned again, never litigated, never paid for, not part of the case.

Q. Are you aware of a case stating that the duty to defend is not terminated by dismissal without prejudice of a potentially covered cause of action?

MS. SANTOS: Objection. Outside the scope of his retention. Calls for a legal conclusion.

THE WITNESS: I'm not here to talk about duty to

Page 47

defend. Look, if the case -- if the defamation case was resumed, then a decision could be made to continue to defend.

In point of fact, the carrier was defending even after the defamation count was dismissed, so it's somewhat academic to say what or wasn't the duty to defend. They did defend.

So, again, my first answer to that would be, I'm not here to speak to duty to defend at all, but I can't escape the notion that it was defended even after the dismissal.

Q. BY MR. SMYTH: Let's go to Paragraph 42 of the report, which summarized basically says that these records reflect that Navigators paid approximately $2,497,187.09 in fees and costs incurred prior to March 24, 2021.

And then, it goes on to say, the records reflect that Navigators paid $2,998,457.50 in fees and costs for the defense of the underlying action after March 24, 2021.

Where did you get those numbers?

A. From the invoices. There's a total fees and costs billed schedule for each firm attached as exhibits to this declaration, and that's what the invoices show when we totaled them.

Page 48

Q. Okay. And is that -- let me skip to it. Is that Exhibit 10 to your report?

A. Hold on a second. I'll confirm that, if I can. Yes, Exhibit 10. It goes firm by firm and breaks down the fees and costs billed both before and after the dismissal of the defamation count.

Q. Okay. And if you add those up, you get $2,497,187.09 prior to March 24, 2021?

A. I could go back through and do it again, but that will -- that was what was determined at the time I did my declaration.

Q. Okay.

A. It's easy to confirm.

Q. Okay. And for after March 24, 2021, Exhibit 10 will show $2,998,457.50 fees and costs were incurred; is that right?

A. I see the total for Tyson & Mendes, which is the firm involved post-March 24, 2021, as reflected on Exhibit 10, as $2,414,876.55. I don't know the disparity, but I think the table is probably correct.

Q. So, and you're looking at -- the number you quoted is on Exhibit 10 to your report at the last page under the Tyson & Mendes LLP Fees and Costs Billed?

A. Yeah, that list by invoice date, invoice number, each amount of fees and costs billed. So, it looks like

Page 49

it's a very correct recitation of the post-March 24, 2021 time. Recognizing that the April 29th, 2021 invoice had to be separated by date, the date of March 24, 2021. And so, most of that invoice was in the pre-period, and some of it was in the post-period, and it has an amount of $2,414,876.55, which I think is the correct number.

Q. Okay. And that's under the description post-March 24, 2021 total, total billed; is that right?

A. It's all specified on the Exhibit 10 recitation as to Tyson & Mendes. Every number in every place by every statement date and every invoice, all the fees and costs billed are accurately represented there.

Q. Okay. And you believe that that number is more accurate than the letter -- excuse me -- than the total in Paragraph 42 of $2,998,457.50?

MS. SANTOS: Objection. Mischaracterizes what Paragraph 42 says, which is the totals for fees and costs, and not just Tyson & Mendes.

THE WITNESS: Yeah, you have to look at each of the firms, and if you did, and added it all up, the number would be correct from Exhibit 10, and I will stick with what's in Exhibit 10, and if it went into the declaration at a different number, I would prefer the number that's specified by every statement date at the

EX. A-13

Page 50

amount of fees and costs that are applicable. So, that's going to be the best record of that.

Q. BY MR. SMYTH: Okay. Now, if in order to determine from Exhibit 10 the total of fees incurred prior -- fees and costs prior to March 24, 2021, you would add the totals in Exhibit 10 for the pre-March 24, 2021 fees incurred; is that right?

A. Okay. It's very clearly specified in the schedules, the fees and costs billed schedules.

You look at total fees and costs for Murphy Austin Adams & Schoenfeld, you'd add it to the total fees and costs billed by Morris James, LLP, you'd add that to total fees and costs billed by Law Offices of Sean Debruine, and then, you'd add total fees and costs billed by Gordon & Rees, then you'd add total fees and costs billed pre-March 24, 2021 by Tyson & Mendes, and those are the amounts billed.

Paragraph 42 is expressed in amounts paid. So, that may be the difference. I'm not sure, I'd have to go back and check, but they aren't necessarily the same thing, billed and paid.

Q. Well, do you know what other amounts would be paid to get the totals different?

A. I don't know the reason for the disparity. I just note that Exhibit 10 in painstaking detail has

Page 51

every invoice by all those firms broken down by the relevant date, and those are the amounts in the bills that we reviewed and that we saw. And in this Paragraph 42, I'm expressing it as to amounts paid. And so, those may be different numbers.

I don't know the answer to that, as I sit here today, but that is a potential reason for a disparity.

Q. Because of the disparity, do you have an understanding that the numbers that you have in Paragraph 42 came from another source, and the addition of the numbers in paragraph -- excuse me -- in Exhibit 10?

A. I think that we have all the invoices because they're specified by actual invoice number and date, we also have the entire claim file of Navigators, which would have payment information. So, there may be two different sources. I don't recall, as I sit here today, if that's the case or not.

Q. You don't -- you don't -- is it correct you don't recall what the source would be of the numbers in Paragraph 42?

A. Well, it says "Paid," so there would be some reference in the claims file of amounts paid. It's something that anyone could look at if they needed to, and then, the bills that we reviewed are specifically

Page 52

stated by invoice date and date in complete detail as to all of the five or six firms involved.

Q. Okay. Is it correct that the totals in Paragraph 42 were not based on a calculation that you made?

A. I don't recall. I have assistant auditors that do the total fees and costs billed analysis, and I was probably provided with a number, so that's the best I can tell you.

Q. Okay. Okay. Let's go to Paragraph 45 of your report. And the line is first:

"Here, it is undisputed that 17 of the 18 claims in the underlying action were not subject to coverage under the relevant insurance policy." Would you agree that Mr. Murray's letter disputed that?

A. I guess you could review that as a position taken by him. I don't think there's anything seeking damages for reputational harm, other than the defamation count, based on the complaint that I saw. So, I thought it would be undisputed, but apparently, he has different thoughts.

Q. Okay. And let's go to Paragraph 46. It says:

"I have reviewed carefully the billing records of the firms that defended SVO."

Page 53

And let's -- and you then, in the following paragraphs -- well, actually, in Paragraph 47, you have caused to be prepared useful schedules based on the billing records to assist in my review.

And is it correct that you caused to be prepared schedules directing auditors and other staff in your office to prepare the schedules?

A. Yes, that's the ordinary course of business at our -- at our firm.

Q. Okay. Have you reviewed the rebuttal report of Ken Mosgaret [phonetic] in this matter?

A. Yes.

Q. Okay. And in his report he questions why you created the outlines, instead of listing verbatim the time entries.

Do you have a response to that criticism?

A. Sure. He doesn't have an understanding of how we work, and have been accepted in doing that work across hundreds and hundreds of audits, every single audit, every single time, and have a profound expertise in doing it well in a way that delivers important information in an understandable way that simply reviewing the bills, which is what he's suggesting, cannot possibly do.

Bills, in the way that they're kept, and in the

Page 54

level of detail that they're kept obfuscate key information that's necessary to do work either as to reasonableness -- by the way, he didn't do it in that arena as well. I mean, he should have, but he didn't. He didn't break out the bills in ways that make it meaningful, he didn't have schedules prepared, and so on. But certainly as to allocation, it is a key, key tool that if you -- if you simply say, "Oh, I don't want to use that tool," you are -- you are leaving meaning and import on the table. Also, you are making it much more difficult for the trier of fact to understand what is being presented. Why don't you just throw a stack of $5 million in bills in front of a group of people and say, "Figure it out for yourself"? I mean, that is apparently what he's suggesting, and that approach hides the true light of meaning that our approach reveals time and time again, and has been praised for revealing.

So, he just doesn't seem to understand -- which he should by the way. He does audit work for a living, apparently. He should understand that this is an important methodology and tool approved by NALFA, approved by auditing professionals, approved by courts, and so on, and then, he disparages it, as saying, "Well, you have to list every item of the invoice."

There's no requirement that you look at every

Page 55

item of the invoice to do this work, and then, spell it out on a separate piece of paper, as if it's a separate piece of information. It isn't. It's all in the invoices.

If you want to see what's in the invoices, the outline of services has the date range and the description of the service and the timekeepers involved. Often, just one person on one date. Meaning, it's the exact entry from the time records.

So, you have available all levels of information, synthesized information that permits the work, and a reference back to the source documents that you could -- that anybody could look at, at any time, if you suspect that our work is skewed in some fashion, which it is not, and nor does he suggest that it is. I think he just had to say something in the rebuttal period. He didn't do an allocation analysis himself, he wasn't in a position to say, "The allocation analysis is incorrect," he says it's -- apparently, it's the position of SVO that a hundred percent of this case involving one dismissed claim for defamation and 17 unrelated claims, a hundred percent of it is related to covered claims, which is absurd, but that apparently is where he has to come down since he didn't do the allocation work himself.

Page 56

So, if he -- if he did do it, in a meaningful way, he would come to a number. He might disagree with my three percent, but he certainly wouldn't come to a hundred percent. That would be patently absurd.

And so, he was left with just criticizing methodology which he doesn't understand.

And if I had a chance to sit down with him and talk to him about what we did, I think he'd agree that what we did is reasonable and appropriate, but he needed to say something in the rebuttal period, and he had to attract -- distract from the fact that he didn't have a contrary opinion, nor did anybody else, and to say that process was somehow flawed, but it's not.

Q. Okay. Now, how would looking at each individual entry and stating why it was either potentially solely non-covered claims or a covered claim, how would that obscure the knowledge of whether that expense was one that should be reimbursable or not?

A. Invoices are designed for a very particular purpose. They tell you what a particular lawyer did that they want the client to pay for at the appropriate rate. It's not prepared -- those records are not prepared to assist in an allocation analysis. In fact, oftentimes, when we do allocation analysis, we deal with block billing and redacted entries, and there's a lot of

Page 57

things we have to do in order to have a fair interpretation of the document to do the analysis correctly.

Also, you'd be stymied by all the modest entries for review e-mail from Bob, send e-mail to Tony. This gives you no information whatsoever that allows for an appropriate allocation, but if you batch the time by litigation event, identifiable litigation event, recognizes that litigated matters go through a process where those particular events can be described and isolated and batched as to time, you can make one decision as to 25 entries, instead of 25 separate decisions, which is not only burdensome, but enhances the possibility of mistakes.

So, doing it the way we do it is better, more efficient, more transparent, and allows for clarity in the decision-making. Doing it line by line is just entering into a mud hole and coming out with an answer and I thinking it's the right answer. It doesn't help the process.

Q. Well, isn't it true that your categorization of multiple entries is not based on any specific determination under the Buss case?

A. I don't know what you're asking. I have no --
[Simultaneous discussion.]

Page 58

Q. Let me rephrase it.

In batching these various items, a determination is made by one of your staff members as to whether the items belong in a particular category.

A. Wrong.

Q. Right?

A. Wrong. They don't -- they don't determine any category; I determine that. They -- they look at every identifiable billing service, batch all the time that was spent with regard to that service, identify the timekeepers and date range of that service, and present it on an outline of services.

They have not categorized it in any way, shape, or form. The allocation analysis is mine alone.

So, the process of doing this has no impact on the ultimate answer to the question of how the entry should be allocated.

Q. Now, after your staff does the categorization of these various elements of -- or various time entries, do you do any kind of analysis to check to see whether their categorization is correct?

MS. SANTOS: Objection. Mischaracterizes testimony and argumentative as to the use of the word --

THE WITNESS: Yeah, they don't do a characterization, they do an objective batching of time.

Page 59

Let's put it down to its elements. They're working on answering interrogatories. Six people do it over 38 days; there are 26 entries on doing that. They're all put in one place, answering the interrogatories. Here's all the people involved, here's the date range. That doesn't categorize anything, other than to put all the time spent for doing that, answering the interrogatories, in one place so one decision could be made.

What apparently Mosgaret thinks is better is to make 26 separate decisions about the interrogatories, which is not helpful, by the way.

So, I reject your notion that the -- that the auditors categorize anything. They batch time objectively as described by the lawyers doing the services, expecting that lawyers do the services that they do in litigated cases. They don't invent new things every case. They're doing pleadings; they're doing discovery; they're doing pre-trial; they're doing motions, and so on. They're doing very specific things which they identify with those kinds of words in their billing because they're telling the client what they're doing, and it's valid to put all their time as to one thing. Let's say they worked on a motion to dismiss, put all the time as to the motion to dismiss in one

Page 60

place, here's the 53 hours, here's the four people that billed on it, now how do we allocate that?

The thought that you have to allocate as to every separate entry that went into the motion to dismiss is just multiplying the work for no reason.

Q. BY MR. SMYTH: Well, I -- respectfully, I think you misunderstood my question, but let's use your language in terms of the batching.

After the staff does the batching, say on answering interrogatories, is there any kind of check to determine whether they've done that correctly?

A. Well, they do it all day, every day, and in most cases, for more than 20 years. We don't go back and redo the work that they do. We have quality control in the work that we do, and there are -- there's backup information if there's ever a question as to how that was done, but I don't go back and check. Anybody could. We give you the date range, we give you the people that did the work, we give you the description that generally is the description that they used, if not identical.

So, if you don't think it's correct, go back and check it. All the information is there. It's like the fourth grade. Check your work, go do it. It's not impossible. In fact, it's readily done, and if you went back and did it, you'd see that there was a high degree

Page 61

of accuracy.

Q. Okay. And I want to be clear on this. Is it correct to say that you believe that you do not need to evaluate each entry to determine whether it can be solely allocable to claims not potentially covered?

A. Our process --

MS. SANTOS: Objection. Mischaracterizes testimony.

THE WITNESS: Our process does evaluate every entry, every entry that's -- that's dedicated to an identifiable litigation service, and that's most of the entries.

Q. BY MR. SMYTH: Okay. Now, let's take something -- some -- or strike that.

Is it correct that the analysis that was done in the outlines does not include all of the billing entries in the bills of the various law firms?

A. The process identifies the litigation services as described by the lawyers. There are minor entries, random e-mails, a phone call. Adding those to the outline would impede the analysis.

The ultimate analysis is done against the time reviewed, and the assumption is that the minor events, like an e-mail or phone call, and so on, would follow in approximately that proportion. That's a fair way to do

Page 62

it, that allows for the process to develop meaning and doesn't get bogged down in every stray entry that's made on the invoice.

Q. Do you know what percentage of invoice entries were not included in the outlines?

A. We list at the end of the outline the total hours on the outline, and you can compare it to the total hours billed, and you would define that readily. I don't have -- it's five or six different firms, it's probably five or six different answers.

Q. Now, let's -- I think I gave an example of -- earlier, and I want to go back to it, of attending a conference with the arbitrator.

And would you agree that somebody defending a defamation claim would have to attend a conference with the arbitrator as part of the defense of that claim?

A. Yes, the question is, was that -- was that event about defamation in any way, shape, or form, and I opted, even though it's very likely that it isn't going to be mentioned in that kind of conference in this case, I did opt to include that in the -- in the defamation-related -- very broadly stated defamation-related category.

Q. Well, let me ask you the question, though. Would a -- an arbitration conference is scheduled. Would you

Page 63

agree that somebody defending a defamation claim would have to attend that conference?

A. That's a, kind of, duty-to-defend kind of analysis.

Here, we are looking at whether it's more likely than not that it related to defamation, and the answer to that is, it's very unlikely that they're separately discussing defamation.

I included it anyway, in an abundance of caution, as a -- as a part of defamation, distantly defamation-related categories, that is, meeting with the arbitrator, but not on the basis that you're stating that you're there for the whole case, therefore, you're there for defamation. That's a duty-to-defend-type analysis that has no place in what we're doing here.

Q. You would -- the question I have, or the issue of whether the attorney has to defend some general conference, or not, does -- you believe that that does not go to the issue of whether the expense for that can be solely allocable to non-covered claims?

A. In all likelihood -- remember, the issue is more likely than not. In all likelihood, it's not related to that, but I permitted it, in any event. So, it's a bit of an academic question.

Q. Let's look at Exhibit 8 to your report. Let's go

Page 64

to that.

MS. SANTOS: It's Page 52 of the PDF.

MR. SMYTH: It's Exhibit 8. Let's see. Yes.

Q. Okay. Let me -- let's go to the next page. And I would like to draw your attention to the entry at "5/20/2020 Conference call with arbitrator Fisher."

Do you see that?

A. Yes.

Q. Okay. That is not listed with your -- either your "P" or your "D" designation.

Do you know why that is?

A. Yeah, I made a mistake. It should be.

So, if you add 5.7 hours, you're still well short of the three percent of my opinion.

Q. Okay. Now, let's look at -- let's look at Page 4 of 9, and there's an entry there, "Review and analysis of documents in preparation for discovery and production," and it's 26.9 hours. Now -- and it's not -- it's not marked.

How can you determine whether the review and analysis of documents in that circumstance is solely allocable to potentially non-covered claims?

A. So, you're addressing a notion that could it be possible that one second of that time was spent in connection with something that might be distantly

Page 65

related to defamation.

I'm looking at it in the context of a case in which defamation was dismissed voluntarily; meaning, it's not an important part of the case; that it was only one of 18 claims, and that that discovery, more likely than not, was related to things not defamation.

And so, under that kind of an analysis, the preponderance-of-the-evidence-type analysis, it's extremely unlikely, and that puts it, you know, below the 51 percent on preponderance of evidence.

Q. So, when you are evaluating whether an expense is solely allocable to non-covered claims, you're applying a standard of whether it's more likely than not that it's not covered; is that right?

A. Right. There's the standard, and then, there's the burden of proving that standard. And the burden of proof is 51 percent, or 50.1 percent, as some people argue, or less than that even.

And so, in this case, involving trademark, intellectual property, trade secrets, involving complicated business transactions, the clear likelihood is, this is not related to defamation, and I think that's a fair conclusion.

Q. So, in this particular case, if there were 50 pages that dealt with allegations relating to

EX. A-17

Page 66

defamation, you wouldn't know from just looking at the time entries; is that right?

MS. SANTOS: Objection. Vague and ambiguous as to what 50 pages are up.

THE WITNESS: Now, you're advocating, I suppose, perfect knowledge, being a percipient witness to who's looking at what document when.

Here, we're talking about a case where we know the parameters of the case. It's a business dispute. It's about trade secrets; it's about intellectual property. 17 of the 18 claims are clearly about those things. That's what they're litigating.

There was a defamation count at one point that was dismissed, plainly seen as not recoverable or unimportant by the -- by the claimant.

So, when you look at something like this, that's generally preparing discovery responses and producing documents, it is plainly more likely than not that those efforts, that 26.9 hours, was not related to defamation, and was related to those other non-covered claims. And I think that's a fair application of the burden of proof, understanding that you or I will never have perfect knowledge about how everybody spent every 10th of their time during that time.

Under these circumstances, it's quite clear that

Page 67

it's more likely than not that that's not related to defamation.

And I think that, you know, that's just objectively understanding how lawsuits proceed.

This isn't a duty to defend analysis where any stray allegation in any stray place could trigger a defense. That happened. The company did defend from beginning to end. This is a different analysis. This is a different analysis about how did you really spend your time, what was the case really about, and were you spending time on these things that weren't defamation. And quite plainly, they were, and it can't possibly be the hundred percent your side is arguing. I mean, that doesn't make any sense in the real world.

And so, I would -- I would say that under an appropriate analysis, looking at this entry or entries like it, applying the appropriate burden of proof, more likely than not, you end up with a fair conclusion that that's not related to defamation.

Q. BY MR. SMYTH: Okay. Is it correct, though, you cannot know whether the documents reviewed involved defense of the defamation allegation without knowing the documents that were, in fact, reviewed?

A. And you can't know it wasn't involving the defamation defense, and you can't carry a burden of

Page 68

proof that says that it was about defamation. What we do have is the information that we do have, and it's fair to assess that information in its entirety and to reach conclusions on what's more likely than not in the real world of how cases are litigated, not in the hypothetical world where everything might be about some claim that nobody has any faith in. That isn't the way things get litigated.

This case, when it went to settlement, undoubtedly was about who lost money on the deal, who used information impermissibly, what's the value of that, and who should pay whom for those circumstances. It was not about defamation.

Q. Okay. But my question was, and I'll rephrase it, you can't know whether the documents reviewed included ones that related to the defamation without actually knowing what documents were, in fact, reviewed; isn't that right?

A. I do not know which documents were reviewed and what discovery was answered, but more likely than not, based on the record that we all have, and have available to us, we don't have those documents, but based on the record that we do have, it's more likely than not that that's not related to defamation, and I'd stick with that answer.

Page 69

Q. Now, let's go further down on that page, 4 of 9.

If you -- there are a number of entries [as read]: "Preparing for deposition of U. Pelz," Ulrich Pelz, on 9/1/2020 through 9/8/2020.

And none of those have been categorized as not reimbursable.

And if you want to know whether those costs are solely allocable to claims not even potentially covered, isn't it correct, you'd have to know what was discussed in the deposition preparation meeting?

MS. SANTOS: Objection. Outside the scope of his retention, to the extent you're talking about the duty to defend standard.

(Court Reporter's clarification for the record.)

THE WITNESS: It's more likely than not, under the circumstance of this case, that that is not involving defamation, and there's no proof whatsoever that it, in any way, shape, or form had anything to do with defamation.

Q. BY MR. SMYTH: Okay. Now, if Ulrich Pelz says, "Yeah, we did discuss the defamation claim," that would establish that it was not solely allocable in non-covered claims; would it not?

A. Oh, I don't know. I guess that's witness testimony. His credibility would have to be assessed.

EX. A-18

Page 70

Was he testifying on behalf of the client?  Does he really remember what happened in 2020 in a particular conversation?  I would -- I would look at it as not really better than the entry that he made at the time that he did the work.

Going back after the fact, I don't think is very helpful to this process, especially by interested parties, if he is an interested party.

MR. SMYTH:  Okay.  We've been going for a while. Should we take a five-minute break now, and come back at 11:35?

THE WITNESS:  Just may I, Bruce --

MR. SMYTH:  Yeah.

THE WITNESS:  Take as long as you want, I mean, but just for my scheduling purposes, what's your expectation for the rest of the day for me?

MR. SMYTH:  I think we'll go into the afternoon.

THE WITNESS:  Okay.

MR. SMYTH:  You know, I just don't know how long. I don't anticipate -- and I don't want to be quoted on it, but I don't anticipate using the full seven hours.

THE WITNESS:  So, the general rule is, you double the estimate that you're given by a lawyer.  That's what -- so, I'm not going to do that to you.

As I say, take the time you want.  I'll plan to

Page 71

have myself here for this afternoon, as long as it takes.

MR. SMYTH:  Okay.  Thank you.

THE WITNESS:  All right.  Thank you.

MR. SMYTH:  Okay.

THE VIDEOGRAPHER:  Off record at 11:31 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record at 11:39 a.m.

EXAMINATION [CONTINUED]:

BY MR. SMYTH:

Q.  Now, in preparing these outline of services performed, it's correct that you did not provide any analysis for the time entries after March 24, 2021; is that right?

A.  There's not an outline of services for that period of time, but we did word searches, and looked at those just to be sure that there was nothing about defamation, which there wasn't.

Q.  And what -- how did you go about determining that there was nothing related to defamation in that time period --

A.  Well, first --

Q.  -- in the word searches?  I'm sorry.

Page 72

A.  Okay.  From -- we -- I don't know if we just used the word "defamation," but at least we used that word, and it doesn't come up in that period.  Also, the defamation claim had been dismissed, so it's not unusual that it wouldn't have come up.  But there was nothing to indicate that the position that no defamation-related defense activities happened after that date was correct. There was nothing that made me question that in any way.

Q.  Well, what did you do, other than the word search, in order to make that determination?

A.  Reviewed the bills, generally speaking, you know? I mean, kind of, understand the arc of what they were doing, preparing for arbitration, going to arbitration, and so on.

Q.  Okay.

A.  Settling the case.

Q.  Okay.  If there were an entry that referred to researching whether business tort claims survived the dismissal of the contract claims, would that not potentially include a defense of defamation?

A.  Defamation had been dismissed.  There was no claim for defamation.  There were other business torts being alleged, and so, there was an interest, perhaps, in that issue.  I don't remember that particular research being done, but it wasn't related to defamation

Page 73

or the fear of the return of defamation, which was just an unlikely, maybe impossible, turn of events, and if it had returned, then we'd deal with it.

Q.  Okay.  Were you of the view that the dismissal of the defamation claim without prejudice resolved the issue of whether there were any attorney's fees solely allocable to potentially non-covered claims?

A.  It's -- I agree with the position taken by Navigators that there was no defamation claim after it was dismissed, and therefore, the services rendered by Tyson & Mendes after that date, do not relate to the defamation claim or -- you know, or a potential return to a defamation claim, which is not a realistic issue.

Q.  Okay.  Did you understand that that issue was out of the case, as to whether there would be costs incurred for the defense of that claim?

A.  That issue was out of the case.  There was no claim for damages for reputational harm for defamation in the case after the defamation count was dismissed.

Q.  Did you make any determination as to whether there were any costs -- strike that.

Did you make a determination as to whether there were any attorney's fees that were incurred in connection with the defense of a disparagement claim?

A.  There was no disparagement claim.

EX. A-19

Page 74

Q. Okay. Were you aware of any -- or strike that.

Did you -- was there any costs incurred with respect to the defense of allegations of disparagement in the post-March 24, 2021 time period?

A. There was no claim for damages for reputational harm in the complaint under any claim after the defamation claim was dismissed, even in the intentional interference with contractual relations. That's not a -- that's not a reputational harm claim.

Q. Okay. We'll go back to that later.

Now, in preparing the various exhibits that were the outlines of services, which you included services up to March 24, 2021, when did you start those calculations? You know, which time period did you begin those calculations?

A. I think the outlines will reflect that there's a -- there's a tender date, that's one issue, and then, there's the non-recoverable period that we were informed about. So, we applied those dates.

Q. Okay. What date did you use as the tender date?

A. I don't remember exactly. It's reflected in the records somewhere.

Q. Okay.

A. But we were aware of the tender date, and then, the period during which there was non-cooperation, which

Page 75

was going to be defined as the non-recoverable period.

So, for instance, the Murphy Austin review started at -- at least on the outline of services, as July 1. You can look at the invoice list to see the exact invoice that is involved, and hence, Sean DeBruine started November 12, Morris James started February 5th, 2019. I should tell you the year, I suppose. This is on the outline of services.

The outline of services for Gordon & Rees started December 30th, 2019.

The outline of services for Tyson & Mendes started November 3rd, 2020.

And again, if you want to see the invoices that were reviewed, they're all listed out by date on Exhibit 10.

Q. Okay. Let's go to Exhibit 5, the Murphy Austin fees?

A. Okay.

Q. First page.

A. Okay. I'm there.

Q. Okay. Brad, can you -- yeah, I just want to -- okay.

Now, I have a tender date of July 24, 2019.

If my date is, in fact, correct, the first 14 entries were prior to the tender date.

Page 76

A. Okay.

Q. Do you have any reason to question the tender date of July 24, 2019?

A. I mean, I don't think you would tell me the wrong date.

Q. Okay.

A. But I just don't happen to know the date, but somewhere in the file materials the date is stated.

Q. Okay. And do you have an understanding that Navigators did not pay for defense fees prior to the tender date?

A. Yeah, that's customary. I didn't review that in detail certainly, but obviously, there's no obligation to defend until there's a tender. I mean, that's just black letter principles that apply.

Q. Okay. So, at least as to Murphy Austin, that cuts out probably well over a hundred hours.

As to --

A. Well, it was counted by me, and they're getting three percent of that. So, bank error in your favor.

Q. That's an interesting way of putting it. I don't think I agree, but okay.

Let's go to -- on, Morris James, it basically -- if you use the correct tender date, it excludes virtually all of those fees, if you look at Exhibit 6.

Page 77

A. Okay.

Q. Okay. And if you look at Exhibit 7, it excludes seven of the entries, all of which are in 2018 on the Sean DeBruine fees; is that right?

A. There are entries before the date of July 24, 2019.

Q. Okay. Now, do these outlines -- or strike that.

It's correct that these outlines do not necessarily include the fees that Navigators paid; is that right?

A. The outlines are information taken from the invoices themselves. The invoices from which they're taken are listed on Exhibit 10. The amounts paid, as it turns out I now know, were from interrogatories that Navigators answered under oath.

So, my Paragraph 42, as to the amounts paid, are the amounts paid as detailed in answers to your discovery.

So, whether those should be the same or different, I don't have an answer for you, but what we looked at is the Exhibit 10 invoices, and produced the outlines of services, which you've been going through.

Q. But it's correct though that the outlines of services include time periods for which Navigators did not reimburse?

Page 78

A. I don't know that for sure because I haven't lined up payments according to dates. You've shown me a few entries here and there, where pretender entries appear on our outline of services, they also appear on the invoices.

You're suggesting that that wasn't paid. Okay, it wasn't paid. But if that's the case, it doesn't change my opinion.

Q. Now, you know, you testified earlier that not all of the time entries in the bills were included in your outline of services performed.

How was the determination made as to which time entries would be included in the outlines and which ones would not?

A. All time entries which relate to an identifiable legal service are included, and batched to be put in one place. If it's a minor entry, telephone call, short letter, e-mail, that doesn't refer to any particular litigation service that's been rendered, it's not included because to include it is simply to regurgitate the bill, and this is meant to be a tool that permits analysis and extrapolation, and there's no point in putting a stray e-mail onto the outline of services, and so it's not included. That's part of the normal procedure. You don't end up with a hundred percent of

Page 79

the bill, or else you're just -- you just have the bill. You have a distillation to a meaningful level of the bill by litigation service, batched by each such service as they appear chronologically through the bill. As litigation happens, you're doing one thing in one period, and then, the next thing, and the next thing, and the next thing. Those all appear on the outline of services as identified by the lawyers and others who are billing the time.

So, it's a perfectly appropriate way to do it, and it's not necessarily required or helpful to include every modest little entry that doesn't relate to a litigation service.

Q. Okay. But is it correct that in excluding a fee entry that cannot be specifically identified, you are excluding fee entries that cannot be solely allocable to non-covered claims?

A. No, they're -- if they mentioned defamation, they would be included or be picked up by our word search.

These are entries that don't relate to defamation in any identifiable way, and they are, without doubt, more likely than not, not defamation-related entries. Therefore, those extra few hours get compensated at three percent, even though there's -- there's no realistic probability that they have anything to do with

Page 80

defamation.

Q. Let's go to -- on the Murphy Boston bills, let's go to the last page on those, which is 6 of 6 of this exhibit. Now -- I think you overshot it just a little bit. I think we're on Exhibit -- yeah.

THE VIDEOGRAPHER: Which exhibit is it? Is that it?

MR. SMYTH: Yeah, there we go. Oh, wait a second. No, maybe -- that's 7.

MS. SANTOS: Murray Austin is Exhibit 6 of his report.

THE VIDEOGRAPHER: You said Exhibit 6?

MS. SANTOS: Sorry. Murray Austin is Exhibit 5.

MR. SMYTH: I misspoke. I think it's "5."

THE VIDEOGRAPHER: Okay.

MR. SMYTH: Okay. Great.

Q. Now, the last entry on that is:
"Communication and emails re transfer of file to Gordon."

Now, you understand that this is the, basically, time, and it's 35.40 hours that was spent transferring the files in the case for Murphy Austin, who is the panel Counsel -- excuse me -- from Murphy Austin to the panel Counsel Gordon Rees; is that right?

A. They're transferring the file, they say, to

Page 81

Gordon, but that's got to be Gordon & Rees.

Q. Okay. Now, wouldn't that task relate to all of the causes of action that are being defended, including defamation?

A. That task is the transfer of the file, and it's more likely than not that it is not separately related in any way to defamation. It's simply, here's the file, we're set for arbitration on such and such a date, you know, they're not saying beware of the defamation claim.

I mean, there's no indication there that that would be anything more than normal transfer, and it's more likely than not that it doesn't relate to defamation.

Q. Well, if defamation is one of the claims that's being defended, why would it not be included in the transfer of the file to Gordon Rees?

A. The total file was transferred, but you're approaching it on a duty-to-defend-type basis. That's beside the point. The case is already being defended. You're saying, well, if it's -- if defamation appears somewhere in the stack of documents, therefore, you have to pay the whole amount.

This is the -- here, the burden of proof is preponderance of the evidence. The evidence in this case is that defamation is a minor claim, one of 18, and

Page 82

it isn't specifically called out in any way in these entries by SAL over that one-week period in February of 2020.

So, it's more likely than not that it's basic transfer-type activity, and in no way, shape, or form specific to defamation. I think that's -- that's the fair way to look at that in the real world, not in the, does it invoke a duty to defend kind of way. This is really, what does the evidence show? What's -- where is the weight of the evidence? The weight of the evidence says, this doesn't relate to defamation.

Q. Okay. So, it's correct that your standard is whether it's more probable than not that there was a specific discussion of defamation in these communications in order for it to be --

A. No, that's putting several things together.

The standard is preponderance of the evidence, which is, more likely than not, as the standard, and then, the question becomes is this particular entry more likely than not related to defamation. And knowing everything you know about the case, the lawyers, what they're doing, and when and how they've described it, how does that come down, you know, on the -- is it on the 51 percent side or the 49 percent side?

Q. So, you're -- is it correct that you're saying

Page 83

that the burden is on Navigators to prove that the entry of attorney's fees must be solely allocable to non-covered claims is not the correct standard?

MS. SANTOS: Objection. Mischaracterizes the testimony. Exceeds the scope of his retention. Calls for a legal conclusion.

THE WITNESS: Yeah, that's a legal question.

I think I've explained, as best I can, how we've approached this, and recouching it and putting concepts together doesn't help me, and I'm not here to give you a legal opinion.

Q. BY MR. SMYTH: Okay. The standard I mentioned is a legal standard, but the more-probable-than-not standard that you're using is not a legal standard?

A. It's how you weigh evidence, you know, you're -- that's the point of this. You know, you're weighing the facts in front of you, of which we have quite a few, and they all are brought to bear, item by item by item, and a determination is made on the basis of allocation.

Q. Okay. Let's go to Exhibit 9, which is the Tyson & Mendes --

MS. SANTOS: He's still talking about Exhibit 8 to the deposition within the expert report, and Exhibit 8 to the report starts on page 62.

I'm very sorry. You said Exhibit 8, and I gave

Page 84

the wrong number.

MR. SMYTH: Yeah, it's Exhibit 9.

MS. SANTOS: Oh, Exhibit 9, okay.

Q. BY MR. SMYTH: Okay. And I want you, Mr. Jardini, to look at the first entry there, which is from "11/3/2020 to 12/14/2020 Initial intake of file and review file, complaint regarding IP and discovery disputes 17.10 hours."

And my question is, isn't the review of the file in the initial intake going to necessarily include attorney's fees related to the defense of the defamation claim?

A. You're indicating some possibility which is contrary to what the lawyer actually wrote. They're looking at the complaint regarding IP. IP, meaning intellectual property. Meaning, that isn't defamation. They've told us what they're doing. I think we take them at their word. That tips the scale against the notion that they're looking at defamation.

Q. Okay. So, you're saying that the initial intake of file and review file does not necessarily include -- or would not include defamation; is that right?

A. Defamation is in the file in some general way, but what they're doing here, and what they should spend time on, the complicated issues regarding intellectual

Page 85

property, that's what they're looking at. That's what they say they're looking at, and I take them at their word. They wrote those words down at the time they did the service.

Q. Okay. If you look at the next entry, it has 11/5, "Lengthy telephone conference with Hosshie" -- I think it's "Hosshie of Gordon & Rees regarding allegations."

Wouldn't that include allegations of defamation or being defended?

A. There's no indication there that that was the subject of their phone call. In fact, the weight of the evidence would be that they're talking about intellectual property and contract issues in this complicated set of transactions, and the main part of the dispute that they're not off on a sidetrack about some added-in claims that are not going to be ultimately prosecuted.

Q. Well, they were still in -- the defamation claim was still in the complaint on 11/5/2020; isn't that right?

A. It would be for a few more months, yeah.

Q. Okay. And it's correct that you can't tell from the description whether the discussion included a claim for defamation or claims for the other 17 causes of

EX. A-22

Page 86

action from the entry?

A. You can't tell if they did or they didn't discuss defamation, but the weight of the evidence is that they were not talking about it because the case is much bigger than that, with more exposure, and more complicated issues on the intellectual property and business dealings kinds of claims, and more likely than not, that's the subject of that discussion.

That's the way lawyers work. They don't immediately jump to the minor claim that's about to be dismissed, they discuss the meat of the case. So, I think that's the -- that's a logical conclusion as to what happened there.

Q. Well, isn't that what would be called pure speculation on your part as to the content of that conference call?

A. There's a lot of information that supports the notion that that's what they were talking about.

Nobody knows, you don't know, there's no record, they don't write down, other than about allegations, the subject matter. They themselves might not recall specifically what they talked about, and yeah, we have to make a decision on an allocation basis, and the weight of the evidence is that this is about the main aspects of the case, which is what you would normally

Page 87

talk about when you're coming into a new case, what's this about, what are the exposures, what have you done up this point, and so on, and it's fair to conclude that that's what happened in this particular conversation, more likely than not, and that we don't know exactly, we don't have a transcript, that doesn't -- that doesn't prevent an allocation analysis from being made.

Q. Let's look at the -- an entry further down:
"11/10/2020 Prepare for and call with prior counsel regarding liability analysis 4.3 hours."
Now, wouldn't a liability analysis include a claim for defamation?

A. Depends how you interpret what happened in that call. This is during the same period that they were reviewing all the complaint, and file, and so on, regarding intellectual property and discovery disputes, and you're suggesting that they departed from that in some meaningful way to talk about some minor issue.

I think the weight of the evidence would be that they are talking about the intellectual property and discovery disputes, which they do write about.

And here are three people that are in this phone call. The likelihood, I think more likely than not, is that they're not talking about defamation in a separate way.

Page 88

Q. Well, if you look at -- let's look at the entry right above it:
"11/10/2020 Prepare memorandum regarding general scope of lawsuit 0.80."
You have included that as a "P," I guess potentially including defamation.
How does the general description there differ from the general description in the following entry?

A. Well, the likelihood is that GS, on that day, is preparing a memo of the case as a whole, and may well have mentioned defamation separately, may not have, but that tipped the balance slightly.

You can't conclude that that was about defamation; likely, that it's mostly not about defamation, but in abundance of caution, I put it in that category.

Q. Okay. Now, the entry up at the top, 11/5/2020, has the same person, "GS," in a lengthy telephone conference with Hosshie of Gordon & Rees regarding allegations.

And then, on 11/10, that same person prepares a memorandum regarding general scope of the lawsuit.

Now, why would the memorandum, which presumably included information from the conference with the attorney from Gordon & Rees, be not exclusively related

Page 89

to non-covered claims, and the call, you made a determination, was exclusively related to non-covered claims?

A. Well, they're two different entries described differently. One is a phone conversation. I don't assume in the phone conversation that it follows like an outline, like a memo does, about the case as a whole.

I think the tipping point, putting it maybe into the fringe of being about defamation, is that he's preparing a memorandum, which is a reasoned document that a lawyer would want to be complete.

In a phone conversation, they're going to talk about the important issues. That's my assumption.

And I gave you all the reasons why I think it's, more likely than not, not related to defamation.

Memorandum is different than a phone call. That's the way I differentiate.

You could convince me that the memorandum also is unlikely to be related to defamation, but I would still keep it in that category.

Q. Let's look at an entry below that, 11/11/2020 and 11/25/2020.
"Review 4th amended complaint and review client's counter claims 3.60 hours."
Now, it's correct, the 4th amended complaint

Page 90

includes a defamation cause of action at that point; isn't that right?

A.  It does include a defamation count.  It will be there for the next couple of months, yes.

Q.  So, would you agree that at least some of the time in reviewing the counterclaim would be spent reviewing the defamation cause of action?

A.  If so, it would be a minuscule part of the time, since it's not the main part of the case, and also, there's a reference to the counterclaims, which aren't part of the defense at all.  Those are affirmative claims that are completely aside from this.

I thought the weight of that was that, more likely than not, it was not related in any meaningful way to defamation.

You're suggesting that the mere possibility that eyes glanced upon a particular claim that said at the top of it "defamation," means you get paid for all the time, even though most of it isn't related at all to defamation.  I don't buy into that.  I think this entry is, more likely than not, not related to defamation.

Q.  Okay.  So, you -- is it correct, you would say that the insurer, with respect to this entry, has borne the burden of proving that the review of the fourth amended complaint is an expense solely allocable to

Page 91

non-covered claims?

MS. SANTOS:  Objection.  Mischaracterizes the testimony.  Exceeds the scope of the retention.  Calls for a legal conclusion.

THE WITNESS:  So, you or I don't get to decide who carries the burden of proof.  The jury will decide that, and they'll hear everything.  They'll know that defamation is only one of 18 counts; they'll know that counterclaims are not part of defamation, and aren't part of the duty to defend even.  They'll know that the likelihood that the lawyers spent any time at all about defamation on this entry is extraordinarily unlikely, and the basis for their conclusion on that -- in that regard will be all of those facts, including that the defamation count was dismissed not that long after this entry, but also, my testimony.  I mean, they're entitled to rely on that, that understanding the way litigation works, how lawyers work, how they describe their time, it's fair to conclude that this entry does not relate to defamation, or more likely than not, does not relate to defamation.  That's a fair conclusion for them to reach, based on my conclusion.  They could also reject it, but that's their choice, not yours.

Q.  BY MR. SMYTH:  Okay.  Is it correct that you're saying that the standard that the burden is on the

Page 92

insurer to prove that a given entry is solely allocable to claims that are not even potentially covered, is not the standard you're applying?

MS. SANTOS:  Objection.  Mischaracterizes testimony.  Calls for a legal conclusion, exceeds the scope of the --

THE WITNESS:  I don't know how to be anymore clear than I've been in my past answers.

The specific testimony as to specific entries has to do with, is it more likely than not that it relates to these other claims or to defamation, in the real world in which lawyers work, not in the artificial world where the mention of a complaint renders everything there and thereafter a hundred percent compensable.

I mean, you know, it's fair to say that the position that a hundred percent of every entry is not reimbursable to the insurer.  It just falls of its own weight.

There's so many entries that plainly have to do with the contract involved, the intellectual property involved.  These few entries that you're asking me about, more likely than not, don't relate to defamation, and that's an appropriate approach.  That's the approach that the jury will be instructed on.

I'm not telling you what the standard is.  It's

Page 93

not my place to do that.  And you can argue for a different standard when the time of jury instructions arrives, or in whatever motion practice that you engage in, but my testimony is, these entries that you're asking me about are not about this stray claim that will be gone in a few months, that nobody's serious about, that never came back, but about the main gist of the case, which is intellectual property, and this rather complicated business relationship and dispute that occurred between these parties.

If those things didn't exist, would there be a defamation claim?  No, there would not.  It was added to the complaint to add some spice at the end, along with, perhaps -- I don't remember, but punitive damages, things like that, but the importance of it was plainly reflected by the claimants' withdrawal or dismissal of that claim.

And so, to think that all these conversations and reviews are about defamation, I think is -- is to twist this circumstance and record in a way that it doesn't go.

Q.  BY MR. SMYTH:  Well, you know, my question really calls for, I think, a yes-or-no answer.  And the question, let me try it another way is, do you believe -- or strike that.

Page 94

Is the applicable standard to determine whether an attorney fee entry is reimbursable under the Buss case, is whether that entry can be solely allocable to a claim which is not potentially covered?

MS. SANTOS: Objection. Calls for a legal conclusion.

THE WITNESS: Yeah, that does call for a legal conclusion. You've had us already look at the Buss case. You're free to argue whatever you like about it. I've told you the basis of what I am doing.

In the real world of litigation, what were these lawyers doing, and did it relate to defamation, or not, and that's the best I can do for you today.

MR. SMYTH: Okay. Well, I don't think you've answered the question, but we'll move on. I've asked it a few times.

Q. Let's go to an entry on 11/12/2020, again on the first page of the Tyson & Mendes outline.

"File assessment regarding liability and damages and prepare outline 3.3 hours."

And you've given that a "P."

I guess you're saying it's reimbursable.

How does --

A. It's not reimbursable.

Q. I'm sorry?

Page 95

A. "P" means not reimbursable. You said "reimbursable." "Reimbursable" means, can the insurance company recover it; the "P" means, it might involve defamation, so the insurance company can't recover it.

Q. You're right. You're right. I have it -- I have it turned around.

A. I've done it myself.

Q. Sorry. That entry is -- the "P" indicates it's not reimbursable.

And why is that determination different from the entry right above it, reviewing the 4th amended complaint? How -- well, let me rephrase it.

The 11/12 entry is not reimbursable, it includes a general discussion of file assessment regarding liability, and the entry in front of it involves reviewing the 4th amended complaint.

And how do those -- why is one not reimbursable, and the other one is, in this outline?

A. Okay. We start in each circumstance with the notion that you cannot know exactly what these people were doing, and whether or not defamation even came up.

However, in the 11/12/2020 entry, DF prepared an outline, again, on the assumption that the outline is prepared in a complete way that discussed every claim in the way that lawyers do. And still without knowing

Page 96

whether that occurred, or not, whether defamation was ever raised, I determined that it shouldn't be reimbursable because it tips in that direction. That is, it's more likely than not that defamation was put on that outline. And in the previous instance, it's more likely than not that they weren't separately discussing defamation.

MR. SMYTH: Why don't we take a lunch break at this point? I mean, I think I'll go a little bit longer than another hour, so I think it makes sense to take a lunch break.

THE WITNESS: What do you think about the time for lunch? I mean, I'm not going to leave the office, so I don't care.

MR. SMYTH: Oh, okay.

THE VIDEOGRAPHER: Do you guys want to have this off the record?

MR. SMYTH: Yes. Yeah, we can go off the record.

THE WITNESS: Oh, yeah, sorry. Off the record.

MR. SMYTH: Sorry.

THE VIDEOGRAPHER: Off the record at 12:25 p.m.

(Luncheon recess taken from 12:25 p.m. to 1:00 p.m.)

THE VIDEOGRAPHER: Back on the record at 1 o'clock p.m.

Page 97

EXAMINATION [CONTINUED]:

BY MR. SMYTH:

Q. Okay. Mr. Jardini, I'd like you to look at, again, the outline of Exhibit 9, your report, and the entry for -- for 12/17/2020 and 12/23/2020:

"Review and analyze documents from prior counsel Murphy Austin regarding outstanding discovery issues and meet and confer issues 11.90 hours."

A. What page of the outline are you on.

Q. Oh, I'm sorry, Page 5 of 10.

A. Okay. Got it. Okay. Got it. All right.

Q. If there was, in fact, a discovery dispute over documents, wouldn't the discovery dispute relate to documents in the entire case, and thus, include a defamation claim?

A. No. The weight of the evidence would be that the dispute without further defining information in the invoices, or otherwise, the dispute would concern, more likely than not, the documents, of which there would have been a great many, concerning the business transactions that had occurred, and contracts related thereto, and the intellectual property trade secret cases -- parts of the case, rather than some document involving defamation. It's not even clear what

EX. A-25

Page 98

documents there would be, if any, regarding purported oral statements about reputation, or work, or tardiness, or whatever.

So, the weight of that evidence would be that, more likely than not, that related to non-defamation claims, part of the 17 out of 18 claims that were the main part of the case.

Q. Is it correct to say that unless there was a reference to defamation in this entry, you would not include it among the fees which were solely allocable to non-covered claims?

A. No. A broad word search as to the entries in the invoices as a whole, and a word search as to the entries that show up on the outline of services, would show very, very, very few mentions of defamation, but additional entries were determined by me to be non-compensable to the insurer under their Buss claim. You have to look at what they were doing. And in this case, the dispute over the documents, more likely than not, related to the other claims than defamation.

Q. Okay. When you say you'd have to look at what they were doing; is it correct that you did not actually make a determination as what documents from the prior Counsel were being viewed?

A. No. Those documents aren't available to me,

Page 99

or anyone else, at this stage of this case. We are dependent on the lawyers, and their descriptions, and the circumstances of the case broadly, which I have discussed at some length.

Q. Now, let's go to another entry on that same page. 12/21/2020 and 12/30/2020:

"Review and triage of Relativity database."

28.30 hours."

I'm not sure quite what I understand to be "triage." Do you have an understanding as to what they're referring to?

A. It's not a legal word. They probably mean it in its conventional meaning. Meaning, emergency priority of events, you know, like triaging patients. You take the -- in a medical context, you take the one that's most in need of medical care first, and you order out the limited resources you have for the things that are most important. So, they're saying, we're looking at the most important things, or at least suggesting that that's what they're doing, and they're looking at it in connection with this database that they're using for documents called "relativity."

Q. Okay. Did you have an understanding that -- that, in fact, that was a database that they were using to collect and store documents relevant to the case?

Page 100

A. Yeah, the context of that entry and my general knowledge about how cases are handled and documents managed led me to that conclusion. So, I assumed that to be the case.

Q. Okay. And is it true that you can't determine from that entry whether or not the review necessarily involved covered or non-covered claims?

MS. SANTOS: Objection. Exceeds the scope of the retention. Calls for a legal conclusion.

THE WITNESS: With regard to whether or not the triaging of documents in that database had to do with defamation, it's unlikely that that's true. I think it isn't a close question. When you use the word called "triage," you're looking at the issues that are most important in the case that bring with them the most exposure, and those would be the trade secrets kind of case, facts. And so, use of that word "triage" gives you a strong probability that this is about documents that aren't related to defamation.

Also, I have not been made aware that there are any documents that are specifically related to any claim for defamation.

It appears that the alleged statements were oral, not written, it's not a hundred percent clear, but that's the way it seems in the allegations in the

Page 101

complaint. I'm not sure what documents there would be. In any event, the weight of the evidence would show that that's not defamation-related, that it's related to the other claims.

Q. BY MR. SMYTH: Do you have an understanding that relativity database was used for storing and maintaining documents on all of the claims in the case?

A. Well, it would have all the documents they decided to put into the database. I'm suggesting to you that it's unlikely that there are defamation documents, as I understand the nature of the case, and in any event, the work done there relates to the non-defamation claims, more likely than not.

Q. If there are, in fact, documents relating to defamation, they would be maintained in the relativity database; isn't that right?

A. I don't know. It sounds like there's a level of selectivity by the use of the word "triage" as to what they're doing with that database. So, I really don't know the answer to that.

Q. Okay. Well, just in general, let's disregard the entry.

If there is a database of documents in the case that's maintained on the relativity database, it would include all the documents in the case --

EX. A-26

Page 102

[Simultaneous discussion.]

MS. SANTOS:  Objection.  Calls -- go ahead.

THE WITNESS:  That's an assumption, that may or may not be true.

At some point, the documents are whittled down to those that are important.

In my Google case, they claim there are 10 million documents.  At trial, Epic Games admitted 311 documents.

So, obviously, you maintain the important documents.  Whether you maintain the draws or not, I can't speak to that because I don't know what decisions they were making.

Q.  BY MR. SMYTH:  Okay.  Well, generally, aren't these databases used to maintain all of the documents obtained in discovery, rather than the ones that are just going to be used at trial?

THE WITNESS:  I --

MS. SANTOS:  Objection.  Calls for speculation.

THE WITNESS:  I can't, you know, espouse a generality on that.  People do what they need to do to marshal the evidence that they need to marshal in the ways that they do it, and those are individual decisions.  Probably, a lot of people put all the documents into one place; I'm sure some don't.

Page 103

Q.  BY MR. SMYTH:  You'd say, more probable than not, however, that they maintain all of the documents in the database of relativity; is that right?

A.  I'm not --

MS. SANTOS:  Objection.  Calls for speculation.

THE WITNESS:  I'm not familiar with the practices of all lawyers with that database, so I really can't give you percentages on that.

MR. SMYTH:  Okay.  Let's go to -- let's go to Page 7 of 10, and there is an entry for the period 1/1/2021 through 1/31/2021:

"Prepare for and attend documents production by opposing counsel designated as attorneys eyes only, review documents for production and production by subcontractors 439.70 hours."

Q.  Isn't it -- let's put it this way.  Using your standard of "more probable than not," isn't it more probable than not that at least some of the document production by opposing Counsel and the review of documents for production and production by subcontractors to include some documents relating to the defamation claim?

A.  This particular entry is for a rather involved one-month project involving a lot of attorneys, and the reason it's so involved is because these are

Page 104

attorneys-eyes-only documents.  Meaning, this is a trade secrets set of issues.  So, no, in fact, it's almost certain that this doesn't relate at all to defamation, but to trade secrets and intellectual property.

Q.  Well, isn't it true that the allegations involving trade secrets and violation of intellectual property can include allegations of defamation or disparagement?

A.  That's not what they alleged.  I mean, what could happen in a different world than this case, you know, I don't know, but that isn't what's alleged.  They allege they were late in their work.  There's very specific allegations.  It doesn't have to do with these people spending, you know, 439 hours looking at attorney's eyes only documents in the way -- it's probably a complicated way that that was permitted to be done, which resulted in a lot of time and a lot of people being involved, but that's -- that's almost certainly not related at all to defamation.  It's not just more likely than not, it's almost certainly not.

Q.  Okay.  Let's go to Page 9 of this exhibit, and there is an entry on 2/1/2021 through 2/8/2021:

"Continued preparation of arbitration brief, including case assessment, evidentiary issue and review complaint re defenses 56.70 hours."

Page 105

Why would these tasks not include an, at least, review or assessment of the claim for defamation and the defenses to that?

A.  My belief is that it's very likely that this did not involve, to any meaningful degree at all, or perhaps, at all, defamation.  I mean, this is the defamation count that within a few short weeks would be dismissed.  They've just spent hundreds of hours looking at trade secret documents in the previous period. They're looking at evidence -- evidentiary issues which wouldn't implicate defamation in any way, to my view, anyway.  And so -- and they did spend a little bit of time early on, and I've noted that when they said they did, of defamation defenses, but the defenses here are likely not defamation defenses, given that this case is rolling toward an involved arbitration of a complicated business dispute involving intellectual property and trade secrets.

So, I think the weight of the evidence would be that this does not involve defamation.

Q.  Okay.  Did you review the brief, and the complaint, and the defenses to determine whether it was solely allocable to non-covered claims?

A.  I reviewed the complaint, as I had mentioned earlier in my testimony.  Pleadings in the case were not

Page 106

made available to me, including this arbitration brief, nor -- and the reason for that, nor were they made available to Navigators. And so, the withholding of this information is a problem. It shouldn't have happened. I think a lot of these pleadings were supplied to your experts, but not made available to me, which is frankly unfair, and then, to say, as your exhibits do, "Well, he didn't look at these documents, he didn't look at these depositions," when they know they're not available to me, and they are available to them.

By the way, they didn't look at them either. Well, at least there's no evidence that reflects in their opinions that they looked at them.

So, could I have read it, and did it have this, that, or the other entry? Possibly, possibly not. But based on the case, in the posture it was, and the import of that arbitration going forward, it's more likely than not that this document related to the uncovered claims, the 17 uncovered claims out of the 18 that were originally brought, and the last claim would be gone in a matter of a few short weeks.

Q. Okay. I'm curious about -- are you saying that Navigators was not provided a copy of the arbitration brief in the course of the litigation?

Page 107

A. Yes, that's what I'm informed. I also had available to me the entire claim file and these basic pleadings that, to me, should have been there, were not there.

Q. Okay. And do you -- and did you attribute any fault to SVO as to why the arbitration brief is not in the Navigation file -- Navigators file?

MS. SANTOS: Objection. Exceeds the scope of his retention.

THE WITNESS: Yeah, that's a claims handling issue, or a conduct of the insured issue, or it's beyond my ability in this case to testify in the role that I've adopted. However, it is unfair that your experts would have access to information that was prevented from my access.

Q. BY MR. SMYTH: So, what information is that, that you're aware of, that our experts had access to, that you have not had access to?

A. Pleadings, deposition transcripts. Those are the main categories that I believe were certainly not made available to me, but I believe were made available to them.

Q. Well, and are you aware of any pleadings that were available to SVO, that were not available to you?

A. Part of the problem is when you don't have access

Page 108

to pleadings, you know some pleadings exist because they're mentioned in the bills, for instance, this arbitration brief that we've been discussing, but other than that, I don't know, you know, all of the level of pleadings and deposition transcripts. I mean, I know that they attended depositions, and there are some names of deponents, but no transcripts.

Q. Well, are you aware that SVO has sued the Tyson Mendes firm for legal malpractice?

A. I don't have any knowledge about the merits of that, or its status, or maybe generally somebody mentioned it at one time. It's not important to me.

Q. Okay. Well, do you understand that SVO's access to pleadings and documents in the possession of Tyson Mendes is limited because SVO was suing Tyson Mendes for legal malpractice?

A. I don't have any information about that, or who asked for what, when, or whether it was produced or not produced. I have no knowledge about that action, if it exists at all.

Q. Have you been retained for work on fee audits by the Wilson Elser firm in prior circumstances?

A. It's possible. I haven't gone back to look. I mean, I've done so many audits for so many people over so many years, I would hesitate to say no, because it's

Page 109

reasonably possible, given the nature of their work and that it could happen in a prevailing party context, or otherwise. I don't have any memory of that ever happening, however, as I sit here today.

Q. Okay. Would you have a record of it in your files as to whether you'd previously been retained by that law firm?

A. We don't keep records by name of attorney that hired us. So, I'm not sure, other than going through thousands of files to see if that did exist or didn't exist. I'm not sure how I would do that.

Q. You don't have a client list of clients who've retained you in the past?

A. No, I don't.

Q. Well, let's go to Paragraph 53 of your report. And there, you state that:

"The services rendered after March 24, 2021, the date the defamation claim was formally dismissed, are subject to reimbursement in total."

And what is the basis for that conclusion?

A. There's no claim for defamation after that date when the defamation claim was dismissed.

Q. Okay. Did you, or anyone from your firm, review the time entries for the law firms, I guess would just be Tyson & Mendes, for the period after March 24, 2021?

EX. A-28

Page 110

A. Yes, in two ways. We did the word search of those -- for defamation, perhaps, other words. There wasn't anything that came up from that. And we looked at the services, in general, about preparing an outline of services, to ensure that they weren't picking up defamation in some other way, or discussing it, or litigating it, and they weren't.

Q. Do you know who, when you say "we," was looking at the services, in general, from your office?

A. Karen Scott would be eyes on those invoices.

Q. Okay. Let's go to your fee bill. I'll ask which exhibit that is.

MS. SANTOS: "7."

MR. SMYTH: Okay. Let's go to Exhibit 7 then.

Q. Are there any entries on Exhibit 7 that reflect the review of the post-March 24, 2021 fee bills?

A. Probably. I haven't gone back and looked through the invoice in its totality.

Q. Okay. Let's scroll down. Okay. Let's start here.

I'm looking for -- under the entries for Karen Scott, I don't see anything about review of entries for time after March 24, 2021. Do you?

A. Well, there's no dates in most entries.

Lila Rosenberger is reviewing and analyzing

Page 111

invoices of Tyler -- Tyson & Mendes for significant work performed.

Are you saying that that's somehow limited to one period, instead of another? There's no dates, I don't know how you can make a blanket statement like that.

Q. Okay. I'm just asking you for which entries would reflect, if any, the review of time after March 24, 2021?

A. I don't know. I mean, you can see in each entry what they were doing, they say whose invoices they're looking at. That means invoices in their totality.

Q. Now, is it correct with respect to the determinations in your opinions that you did not consider whether there were fees allocable to the defense of the tort of disparagement?

MS. SANTOS: Objection. Mischaracterizes the prior testimony.

THE WITNESS: The complaint doesn't allege a tort of disparagement. It's mentioned, but only in connection with intentional interference with contractual advantage or with contract. It's not a separate standalone claim. There was no work done with regard to that particular point of an allegation in paragraph, whatever it is, 146.

So, there's a complete review of all of the

Page 112

invoices for whether there is a relationship to defamation, "defamation" broadly cast. If you think disparagement is part of defamation, I think some people would, and analyzing each entry with regard to whether or not it relates principally to the non-covered claims, or might somehow relate to defamation, and an independent judgement is made line by line on the basis of what's really happening in the case, not, you know, an unlitigated line in paragraph 146.

Q. BY MR. SMYTH: So, that's a long answer, but is your response that you did not give consideration as to whether the tort of disparagement was potentially covered in doing the review of the attorney's fees bills?

MS. SANTOS: Objection. Mischaracterizes the prior testimony and the response.

THE WITNESS: I think I just answered that. You know, I would give you the same answer. It isn't alleged that tort, quote-unquote, and the rest of my answer flows from that.

Q. BY MR. SMYTH: Okay. So, your view is, the tort is not alleged, so you did not do that review; is that right?

A. No --

[Simultaneous discussion.]

Page 113

MS. SANTOS: Objection. Mischaracterizes the testimony.

THE WITNESS: My answer was significantly more detailed than that.

We looked at every line on the outline of services, measured that against what they were doing. They weren't doing anything about a disparagement, any more than they were doing anything about defamation.

You can put the words together interchangeably, and all of my testimony about defamation would be equally applicable to disparagement.

The fact of the matter is, they were litigating complicated business transactions and intellectual property and trade secret claims, not defamation, and that bears itself out in the invoices, as you would expect in a case where the gist of the case is those business claims, and a throwaway was the defamation claim, which was thrown away at that time it was dismissed.

Q. BY MR. SMYTH: In Paragraph 54 you state:

"There is no evidence that any amount was paid by SVO as to any defamation claim in settlement."

It's correct that no amount was paid by SVO for any claim in the arbitration; isn't that right?

A. I don't know. I don't have the settlement

Page 114

agreement, but they're being sued in the mind of SVO, for this bristling defamation claim. Whether they didn't pay anything for anything, or they didn't pay anything specifically for defamation, the point remains true, they didn't pay anything for defamation. It can't be elevated to this crucial claim when it's a nothing in the case, as the parties actually litigated it.

Q. It's correct that you don't know that the settlement of the arbitration involved no payment by SVO to verdict?

A. I presume the settlement's confidential. I'm not sure anybody knows, other than the parties, but I don't have any particular information as to how the parties resolved their dispute.

Q. Well, when you say there's no evidence that any amount was paid by SVO, did you ask for a copy of the settlement agreement?

A. I didn't ask. I'm assuming it's not available. If it is, you'll put it into evidence. It'll show what I said is true, that nothing was paid for defamation.

Q. And it's also true that nothing was paid for the other 17 claims either?

A. They had claims against each other, and resolved them in the way that was satisfactory to each side. I don't know how that looks, or who gave up what under

Page 115

what circumstances. So, I can't measure it in some way to relativize claims.

Q. On page -- excuse me, Paragraph 58, you state: "I identified services that were possibly partially related to a defamation claim. In making this analysis, I had in mind the overwhelming import in the case of the various trade secret claims as opposed to the defamation claim as shown by both Liebert and SVO." How did you determine that the overwhelming import in the case were the trade secrets claims?

A. They outnumbered in number of claims, importance of claims, size of claims, and any other way you want to measure it. A defamation claim which Liebert thought, or his lawyers thought so little of, that they dismissed it without payment of any kind, and took it out of the case as of March 24th, 2021.

So, neither side spent time, effort, or money, or legal fees litigating the defamation claim. That's -- that record is clear from the bills that I reviewed.

Q. Okay. Is it correct that the ultimate value of the trade secret claims in the litigation was zero because nothing was paid by SVO to settle its claims?

A. I can't say that. Over $5 million was paid

Page 116

defending them. You can't say they have no import or value.

At the end of the day, settlements are entered into for a host of reasons. Some of them economic, some of them with trade-offs that you're not mentioning.

And I don't have the settlement agreement in front of me, so it's really unfair to have you have me characterize who won what in the settlement.

They spent $5 million defending those claims. They're not nothing claims. They're worth at least $5 million of attorney's fees.

Q. In your review, is it correct that you did not review the non-attorney expenses incurred in the defense of SVO?

A. You mean costs?

Q. Costs.

A. It's not correct that we didn't review them. They are part of every invoice; at least the costs that were fronted by the lawyers. The cost would travel in the same atmosphere as the fees. Meaning, that if you had a maximum of three percent of the fees being non-reimbursable to Navigators, it's fair to conclude that three percent of the costs would follow in the same way, rough justice.

Q. Okay. Is it correct, though, that you did not

Page 117

look at each cost in order to determine how it should be allocated?

A. I didn't make separate decisions on costs, other than that they should follow in the same proportion. They're not litigating in the cost arena defamation, anymore so than in the fee arena.

Q. And is it correct that you did not look at the expert fees to determine how those should be allocated?

A. I did, actually. I was informed and believe that none of the experts had anything to do with defamation, and that all of the amounts paid for the experts should be reimbursed to Navigators.

Q. And who --

[Simultaneous discussion.]

Q. I'm sorry.

A. Since they had nothing to do with defamation.

Q. Okay. Did you review those expert bills?

A. No, I did not.

Q. Okay. Did you review the consultant bills?

A. Well, most of the consultants were experts. You mean, document people or something like that? I'm not sure who you mean.

Q. Well, let's take -- well, let's take consultants who became experts. You didn't -- you didn't review those bills; is that right?

Page 118

A. No, I didn't review expert bills. There's no expert that gave testimony regarding defamation, though.

Q. Did you review the testimony of the experts who gave testimony?

A. No. The deposition transcripts were not made available, unfortunately.

Q. Okay. And when you said none of them testified on issues on defamation; is that information you received from Counsel?

A. It's an assumption that I make. It could have come from Counsel, or something in the claim file. I can't remember, but it's an assumption that I make, and I think it's true. There is no expert that was designated, or consultant, that spoke to the issue of defamation. It wouldn't have been done in the -- in all likelihood, given how the case went, and wasn't done, as my assumption.

Q. But as you're sitting here today, you cannot identify a particular expert invoice and state whether or not it related to a non-covered claim exclusively?

A. No, it's broader than that. None of them related at all to defamation. They weren't hired to speak to defamation; they didn't give opinions about defamation, and they can't be seen as related in any way, shape, or form to defamation. Every one of them, whether a

Page 119

consultant or an expert. If somebody wants to prove me wrong on that, they can go and look at that, but I'm convinced that that's true, based on what I assume.

Q. Based on -- okay. But you've not looked at any of the testimony, deposition or arbitration testimony, of any expert, and you've not looked at any of the bills of any expert; is that right?

A. That information has not been made available. The transcripts, not at all; actually, withheld. I don't remember seeing bills in the claims file.

In any event, my assumption is, none of them had anything to do with defamation, and I think that's true.

Q. Okay. But you did not look at the bills or the testimony; is that right; it's just an assumption on your part that there is no --

A. I don't recall in the claims file --

[Simultaneous discussion.]

A. I don't recall in the claims file if there were expert invoices. They may not have been. But given the nature of the case, and my review of what there was in the claim file, I assume that the experts had nothing to do with defamation.

And in a case like this, making decisions to hire experts, I would be shocked if any expert were hired to speak to defamation.

Page 120

Q. Is there anything in your report that speaks to the issue of whether expert or consulting fees are solely allocable to non-covered claims?

A. My general conclusion is broad enough to encompass that, and you're asking me about it, but it is my opinion.

Q. And is it correct that in your billing statement, that none of the entries refer to the review of expert bills or expert testimony?

A. That may be correct. I can't confirm it to you just on the surface. There's so many entries.

Q. Now, have you reviewed the initial report of Ken Mosgaret?

A. Yes.

Q. Okay. Do you have comments on that report?

A. Yes, I do. I don't think it's an appropriate analysis in the case; I don't think reasonableness of fees is really an issue in the case.

You have a case where Navigators has panel Counsel, various stripes of panel Counsel, ultimately, who are billing based on their billing guidelines or expectations, whose bills are reviewed on a monthly basis and commentary is made that they are paid by a sophisticated party that, under the circumstances and with no guarantee of ever having it repaid, there's no

Page 121

guarantee they'll win this case, or if they win, your client has any money to pay them the sizable amount they might win. Under those circumstances, that is very, very strong evidence, reaching almost preclusive evidence, of the reasonableness of the fees.

In the face of that, you would expect that Mr. Mosgaret would do a reasoned analytical line item kind of review to show that there were unreasonable charges, unlikely that there were under those circumstances, but he doesn't do that, he comes to broad conclusions, 33 percent, 40 percent, whatever it is. It's just a -- it's swinging a meat cleaver at it without -- I would expect, if you're going to challenge 5 million in fees, that you should explain to people exactly, line by line, where the fees are not reasonable, and why, and his report is far short of that.

I wouldn't have signed off on a report like that, as the auditor challenging the legal fees; especially under circumstances where the fees were paid after review, and after questioning, and after reductions under circumstances which present the very, very strongest evidence of reasonableness in the marketplace in which those fees were billed, and to come by after the fact in a drive-by, and say, "Well, I guess

EX. A-31

Page 122

Navigators was asleep at the switch, and let's say 40 percent is the number," and they paid 2 million that they didn't know. Why? Because Mosgaret thinks that they're unreasonable? Strange [inaudible]; don't think it has much weight; disagree heartily with it, and I don't think it's good work, that he's done in the past. He's done better in the past.

Q. Okay. Well, that's a lot.
Do you have any other opinions about that report that you would like to --
[Simultaneous discussion.]
A. No, those are the -- those are the general opinions --
Q. Okay --
A. -- that I have.
Q. Do you have any dispute with his use of the factors of Rule 1.5 that he references in his report?
A. Rule 1.5 factors can be useful. They're usually used by people that speak in support of invoices because they're very general; sophistication of the case, knowledge and experience of the lawyers, whether the lawyers could continue to do other cases, or this one took up all their time, but the single most important one when you're critical or potentially critical of legal fees, is time and labor required, and that's where

Page 123

he fails. I mean, that requires you to do a sophisticated analytical review: Staffing, rates, conferencing, block billing, overhead charges, every one of those specifically detailed, tabulated, and reported upon, not broad general categories, "Hey, wasn't that sophisticated?" "Hey, they're not such good lawyers." "Hey, it should be 40 percent less."

Rule 1.5 doesn't just let you make up your opinion because it has words that are generalities about practicing law.

Time and labor required. That's where he fails, where anybody doing a challenge to legal fees should spend 90 percent of their time, and can discuss on the way by, you know, how complicated the case is, and all the other factors that you might look at, but just relying on those to make such a wholesale reduction, that practice, in my view, unsupported and bad practice.

Q. Did you review his rebuttal report?
A. I did.
Q. Yeah. And do you have comments on that?
A. I did already comment earlier in the deposition on it. I don't have anything further.
Q. Okay. Did you review the initial report of Jean-Paul Jassy?
A. I did.

Page 124

Q. Okay. Do you have any comments on that report?
A. I mean, it would fit into his -- he's not really speaking to allocation. Neither he or Mosgaret speak to it at all.
So, to me, you have the opportunity to do an allocation, and you come forward and say, "A hundred percent should be paid, except the part that's unreasonable." To me, they failed miserably to address the main issue in the case. And so, in that regard, I would be critical.
And in his rebuttal he wants to make the further comment elevating the standard, this kind of duty to defend standard, as the standard that's now applicable, and correctly, I will submit, and then, to make the argument that because of that, presumably -- although they don't have the courage to say it out lout -- a hundred percent of the bills should be non-compensable to Navigators.
So, I think their failing is that they didn't do an allocation, which leaves them with the unenviable position of elevating the standard to the extent that they will now argue, presumably, that a hundred percent of these fees are not reimbursable to Navigators. Meaning nothing, not one entry. Even somebody saying, "I'm looking at the trade secret documents today," even

Page 125

that would be seen as defamation-related. I mean, it makes no sense, but that's where they are, so I'm critical of that.
Q. Have you reviewed any other reports in this case?
A. I'm not sure what you mean. Those are the --
Q. There were other -- other witnesses; I think Brian McNaughton and --
A. No.
Q. -- [Inaudible] Moore?
A. I didn't review -- they're claims people or coverage people, or something like that. I didn't look at that.
Q. Okay. Now, are there any opinions that you have, or intend to testify to at trial, that you have not discussed in the deposition today or in your report?
A. No. I've given you chapter and verse of what I intend to say.
Q. Okay. Is there any other work you intend to do in this case?
A. Well, sometimes, lawyers ask me to help them with demonstrative exhibits, or something like that.
I'm not going to do anymore substantive work. There might be presentation-type work, and only if I'm asked, and I haven't been asked, but I hold that open as a possibility.

Page 126

Q. Okay. Are there any further assignments you have in this case for future work at the current time?

A. No, I don't have any future assignments.

MR. SMYTH: Okay. I want to take about a 10-minute break now. I'm pretty much near the end, so I just want to review my notes, and see if I have anything else.

THE WITNESS: Okay. We'll see you in 10.

MR. SMYTH: Okay. Sounds good.

THE VIDEOGRAPHER: Off the record at 1:51 p.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record at 2:04 p.m.

MR. SMYTH: I want to go back to Exhibit 7, which is, I believe, the fee bill.

EXAMINATION [CONTINUED]:

BY MR. SMYTH:

Q. Mr. Jardini, the bill references conferences with Counsel on this matter. Who is the Counsel?

A. Ms. Santos is the Counsel that I principally dealt with.

Q. Anybody else?

A. The partner there, David. Last name, please.

MS. SANTOS: Simantob. S-i-m-a-n-t-o-b.

Page 127

THE WITNESS: Thank you. I should have remembered that.

(Court Reporter's clarification for the record.)

MS. SANTOS: S, as in Sam, i-m, as in month, a-n, as in Nancy, t, as in Tom, -o-b, as in boy.

THE WITNESS: David Simantob. So, those two people.

Q. BY MR. SMYTH: Okay. How many occasions did you talk to Mr. Simantob?

A. I remember three, I think, but they were -- most times, they were both on the call together. I didn't speak to him separately. And Ms. Santos, I could have had yet another call. I don't recall, early -- it would have been early on at the outset.

Q. Okay. And all those conferences are reported on the fee bill?

A. Well, the first one wouldn't be. We wouldn't have had a retainer agreement or a billing number. So, that wouldn't be there. Any other conference that I had would be on the bill.

Q. Have you worked with either of them on other fee audit matters?

A. Not to my recollection.

Q. Now, the entry -- there's an entry on October 1, 2025:

Page 128

"Review documents from client and review invoices for prior to dismissal date."

Is that what the assignment was, at that point, to review invoices solely for the period prior to the dismissal of the defamation cause of action?

A. No. We were looking at all of the invoices. Obviously, the more careful review, based on preparation of outlines of services, would be for the period prior to the dismissal of the defamation claim, but we were not limited in what we looked at, and we looked at everything.

Q. Okay. There's an entry 10/2/2025 from, also, KLS, which, I guess, is Karen Scott [as read]:

"Begin review and analysis of Gordon & Rees invoices for time period before covered claim dismissed."

Is that the work that, at least, she would be working on, Karen Scott, review and analysis prior to dismissal?

A. And she was looking at Gordon & Rees at that time, and she was preparing an outline of services for that firm, and the outline would have been for the period before the dismissal of the defamation claim.

Q. Okay. Is there any entry in this bill that refers to the review of attorney's fees after the

Page 129

dismissal of the defamation claim?

A. I'd have to look at all the entries. We did do it, so it'll be encompassed in some entry, somewhere.

Q. Well, it's not that long of a bill. Do you see an entry that refers to that?

A. I see entries that are generally about reviewing time. Obviously, there are certain firms that only bill time before the dismissal. You have to -- you have to get to the Tyson & Mendes bills to find the time billed after.

And so, whoever is looking at Tyson & Mendes, you'd look at that. And that's -- I mean, for instance, our Assistant Auditor, Kim, KMG, is reviewing the Tyson & Mendes invoices. That's all the invoices, that's not limited, you know, that's by number. So, it's not limited to any period.

Q. What is her role and responsibilities in --

A. Assistant --

Q. -- the company?

A. She's assistant -- an assistant auditor. Their role is to review data from the invoices that's objective in nature. They would prepare, if we did one, an index of billing personnel, all the people involved, their rates, and how many hours they each billed, and their positions, or a total fees and costs bill, which

Page 130

looks like what she's doing in that particular entry that we just referred to, and other kinds of entries that reflect information from the face of the bill, and don't require application of any auditing judgment, which is more part of what an auditor would do.

Q. Okay. So, is it correct to say that she would not be making a determination as to whether a fee entry related or not -- or did not relate to a covered claim?

A. I'm the only one that did that.

Q. Is there any of your time that shows review of the attorney's fees bills after dismissal of the defamation claim?

A. I might have an entry somewhere that says, "Review invoices."

I did look at the post dismissal period, just to see what it was. There's also a word search that was done for that period. There would probably be some entry that would encompass that as well.

Q. Well, there's only -- you only have, like, 23 hours on this. Do you see any of the entries on it that refer to review of the fee bills in a post-dismissal period?

A. You say, "only 23 hours." That's a lot of time for me. I'm a quick study. That's -- that's -- I know, my entries are spread all over the place, and you're

Page 131

showing me one page. You should look at them and see if there's anything that says that.

I mean, I did look at them, whether I said that in that many words. I have entries saying, "Review invoices." It's not specific as to what invoices, or whether there was a line drawn in the sand.

I did spend most of my time learning about the underlying circumstances of the case, reviewing the documents that were sent to me for review, including the claims file, and doing the allocation analysis on the outlines of services, but I did look at the invoices in total.

MR. SMYTH: Okay. Brad, can you scroll down so that we get to look at the full bill?

Let's see. Here's the next page.

You don't -- okay.

THE VIDEOGRAPHER: And if you'd like me to scroll down further, just let me know.

MR. SMYTH: Okay.

THE WITNESS: Yeah, the bill goes on. I mean, we're only to the middle of October yet.

MR. SMYTH: Okay. You can scroll down, if that's okay.

THE WITNESS: Okay.

Q. BY MR. SMYTH: Okay. Did you see any entries

Page 132

that referred to the review of the fees after --

A. I think --

Q. -- March 24, 2021?

A. -- what you see -- sorry.

CERTIFIED SHORTHAND STENOGRAPHER: Counsel, you went out in the middle of that sentence. I'm so sorry.

THE WITNESS: I talked too soon. My apologies.

MR. SMYTH: Did you miss my question?

CERTIFIED SHORTHAND STENOGRAPHER: I did.

MR. SMYTH: Okay.

CERTIFIED SHORTHAND STENOGRAPHER: The middle was cut out.

MR. SMYTH: Okay.

Q. My question is, did you see any entries in the bill that referred to the review of attorney's fees after the March 24, 2021 dismissal?

A. There are references to reviewing the claim file where the invoices were; there's references to reviewing the invoices without specificity as to date.

I can tell you that I did look at that time, not line by line. My auditors also looked at that time, and we did word searches for that time as well.

Q. Well, do you have some specific entries in mind as to where you had done that work?

A. No. I mean, where it says "Review invoices,"

Page 133

that's probably where it is.

Q. Okay. And is it correct that there's no entry for the review of expert bills or invoices?

A. Well, there's, "Review claim file," and I don't recall if that would have included that. So, there's no specific entry that mentions experts or expert invoices.

MR. SMYTH: Okay. Okay. I don't have anything further.

THE VIDEOGRAPHER: Ms. Santos, before we go off record, did you need a copy of the transcript?

MS. SANTOS: Transcript, yes; video, no.

THE VIDEOGRAPHER: All right. Thank you.

This concludes today's deposition. The time is 2:15 p.m., the date is November 18th, 2025, and we're off the record.

(Whereupon the deposition proceeding was concluded at 2:15 p.m.)

Page 134

I have read the foregoing deposition transcript and by signing hereafter, approve same.

Dated_____.


_____
ANDRE JARDINI - EXPERT

Page 135

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA      )
                         )s.s.
COUNTY OF LOS ANGELES    )

I, Laurie A. Schmidt, hereby certify:

I am a duly qualified Certified Shorthand Reporter, in the State of California, holder of Certificate Number CSR 12719 issued by the Court Reporters Board of California and which is in full force and effect.  (Bus. & Prof.   8016)

I am not financially interested in this action and am not a relative or employee of any attorney of the parties, or of any of the parties.  (Civ. Proc. 2025.320(a))

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the retrained was first placed under oath or affirmation by me. (Civ. Proc.   2025.320, 2025.540(a))

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given.  (Civ. Proc.   2025.540(a))

Page 136

I have not, and shall not, offer or provide any services or products to any party's attorney or third party who is financing all or part of the action without first offering same to all parties or their attorneys attending the deposition and making same available at the same time to all parties or their attorneys.  (Civ. Proc.   2025.320(b))

I shall not provide any service or product consisting of the deposition officer's notations or comments regarding the demeanor of any witness, attorney, or party present at the deposition to any party or any party's attorney or third party who is financing all or part of the action, nor shall I collect any personal identifying information about the witness as a service or product to be provided to any party or third party who is financing all or part of the action.  (Civ. Proc.   2025.320(c))

Dated:  November 24, 2025

*Laurie A. Schmidt*

Page 137

DECLARATION ERRATA SHEET

ASSIGNMENT NO.: 11711
CASE CAPTION: Navigators Specialty Insurance Company v. SVO Building One, LLC
DEPONENT: Andre Jardini- Expert

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the foregoing transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 2025.


_____
ANDRE JARDINI - EXPERT

EX. A-35