Shawn Shaffie (SBN 262002)
shaffie@parkershaffiellp.com
Bruce T. Smyth (SBN 89171)
smyth@parkershaffiellp.com
Adam J. Telanoff (SBN 159761)
telanoff@parkershaffiellp.com
Edward Baker (SBN 311439)
baker@parkershaffiellp.com
**PARKER SHAFFIE LLP**
800 W. 6th Street, Suite 500
Los Angeles, California 90017
Telephone: (213) 622-4441
Facsimile: (213) 622-1444

Steven W. Murray (SBN 41493)
swm@psilaw.com
**STEVEN W. MURRAY, APC**
14930 Ventura Boulevard #205
Sherman Oaks, CA 91403
Telephone: (818) 501-2277
Facsimile: (818) 501-8441

Attorneys for Defendant and Counterclaimant
**SVO BUILDING ONE, LLC**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,,<br><br>Plaintiff,<br><br>v.<br><br>SVO BUILDING ONE, LLC,<br><br>Defendant. | Case No. 3:22-CV-07102-AMO<br>[Assigned to Hon. Aracelí Martínez-Olguín]<br><br>**DECLARATION OF KEN MOSCARET IN SUPPORT OF SVO BUILDING ONE, LLC OPPOSITON TO NAVIGATORS SPECIALITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: March 5, 2026<br>Time: 2:00 p.m.<br>Dept.: Courtroom 10, 19th Floor |
| SVO BUILDING ONE, LLC<br><br>Counterclaimant,<br><br>v.<br><br>NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Counter-defendant. | |

**DECLARATION OF KEN MOSCARET**

I, Ken Moscaret, declare as follows:

1. I am a retained expert on behalf of Defendant and Counterclaimant SVO Building One, LLC ("SVO") in the above-entitled action. I am at least eighteen (18) years of age. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2. I make this declaration in support of SVO's Opposition to Navigators Specialty Insurance Company's ("Navigators") Motion for Summary Judgment filed in the matter of *Navigators Specialty Insurance Company v. SVO Building One, LLC*, in the Northern District of California, Case No. 3:22-CV-07102-AMO.

3. The scope of my expert engagement in the current action is to offer opinions on behalf of defendant SVO as to the reasonableness (or not) of the timekeeper fees billed by Tyson & Mendes ("Tyson") which are at issue in the current action ("Tyson's timekeeper fees").

4. A true and correct copy of Expert Report dated October 15, 2025, is attached hereto as **Exhibit 1** – it is fully incorporated here by reference. My Expert Report discusses in detail my qualifications, the scope of my opinions, the materials and documents relied upon in forming the basis of my opinions, and a summary of my opinions. The following is a brief summary of my opinions, which are discussed in detail in the Expert Report and incorporated herein by reference.

**Summary of Opinions**

5. There were very large economic stakes and risks for SVO in the underlying AAA arbitration. On one hand, SVO was seeking at least $30 million in consequential damages from Vertiv in connection with the latter's failure to properly complete the data center construction project. On the other hand, SVO was trying to defeat Vertiv's $9 million damages claims against SVO. So this was not some ordinary, garden-variety business dispute, but a large, complex, highstakes case. It was therefore very important to SVO as a client that Tyson be able to achieve SVO's litigation objectives in the underlying AAA arbitration.

6. Tyson fell far short of obtaining a successful outcome for SVO and also failed to

accomplish SVO's litigation objectives as a client in the case.

7. The majority of Tyson's main attorney team in the underlying AAA arbitration **did not appear to have sufficient substantive experience and background in commercial construction defects litigation to achieve SVO's important client objectives in the case**. Other than Tyson lead Partner David Frishman, I saw no evidence that the rest of the Tyson main attorney team in the Underlying AAA Arbitration possess the necessary skill, experience and ability to accomplish SVO's litigation objectives.

8. Despite being SVO's independent *Cumis* counsel after April 16, 2021, Tyson failed to disclose material facts to SVO senior management regarding Navigators' conduct in pressuring Tyson behind-the-scenes to conform its *Cumis* counsel billings in defending SVO to the more restrictive billing rules created and enforced by Navigators against its insurer-controlled panel counsel, which rules neither Tyson nor SVO were contractually or legally obligated to comply with. **From a litigation management and outside counsel relationship standpoint, Tyson should have promptly disclosed to SVO, but never did, that Navigators was trying to impose its restrictive panel counsel billing guidelines on Tyson's *Cumis* counsel defense work for SVO in the Underlying AAA Arbitration**. Bottom line, I believe *both* Navigators' and Tyson's conduct put Tyson in a very awkward, conflicted position as SVO's *Cumis* counsel from a litigation management and outside counsel relationship perspective.

9. It is my overall conclusion, based on the facts, methodology, evidence, and reasoning set forth above, in my opinion Tyson's timekeeper fees at issue in the current action should be reduced by 35% to 40% in order to be considered reasonable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 11th day of December 2025, at Sammamish, Washington.

Ken Moscaret

# EXHIBIT "1"

# Navigators v. SVO

# Report of Ken Moscaret
# October 15, 2025

# I. INTRODUCTION/OVERVIEW

## A. The Current Action

1. The scope of my expert engagement in the current action is to offer opinions on behalf of defendant SVO Building One LLC ("SVO")[1] as to the reasonableness (or not) of the timekeeper fees billed by Tyson & Mendes ("Tyson") which are at issue in the current action ("Tyson's timekeeper fees"). Those Tyson timekeeper fees were billed in the underlying American Arbitration Association (AAA) arbitration case no. 01-18-0003-1218 entitled *Liebert Corporation v. SVO Building One, LLC* ("underlying AAA arbitration").[2]

2. Tyson represented SVO in the underlying AAA arbitration in a dual role: both in defending against certain claims brought against SVO by Liebert/Vertiv[3] related to the construction of a data center by Vertiv for SVO ("the project") in Sacramento County, California; and in concurrently representing SVO in prosecuting certain SVO counterclaims for money

---

1 SVO is affiliated in the U.S. with Prime Data Centers, which functions as an administrative manager for SVO.

2 I am informed that the reasonableness of Tyson's timekeeper fees billed in the underlying AAA arbitration is a triable issue in the current action (*see* Fifth Affirmative Defense in SVO's Answer to First Amended Complaint).

3 Liebert Corporation changed its name to Vertiv Corporation. I may refer to both companies interchangeably in this report, i.e., Liebert means Vertiv, and vice versa.

damages[4] against Vertiv in the same arbitration (e.g., consequential damages[5]) arising from Vertiv's non-completion of the project in the specified manner.

3. Plaintiff in the current action, Navigators Specialty Insurance Company ("Navigators"), was one of SVO's insurers providing a defense for SVO in the underlying AAA arbitration. Navigators is now seeking to recoup from SVO some or all of Tyson's timekeeper fees previously paid by Navigators for defending SVO in the arbitration.

**B. <u>SVO's Defense in the Underlying AAA Arbitration</u>**

4. Focusing on SVO's defense against Vertiv's claims for the moment, SVO originally

---

[4] Tyson represented SVO in prosecuting SVO's "offensive" counterclaims for damages against Vertiv ("offensive counterclaims") under an initial legal services retention agreement between SVO and Tyson entitled "Legal Services Agreement." Nicholas Laag, CEO of SVO, signed that initial retention agreement on December 29, 2020. Tyson had actually begun billing time in the underlying AAA arbitration on SVO's behalf earlier on November 3, 2020.

Under the initial retention agreement, SVO agreed to pay for Tyson's offensive legal services under a combination hourly rate plus contingency fee structure (i.e., either 5% or 10%, based on a $9 million net damages recovery threshold), with a $10,000 advance retainer deposit by SVO. Since Navigators had appointed Tyson as its insurer panel counsel to defend SVO, there was no need for a "defense" retention agreement between SVO and Tyson in late 2020, just an offensive one.

That initial retention agreement was subsequently superseded by another retention agreement between SVO and Tyson effective April 16, 2021 entitled "Amended Legal Services Agreement." SVO CEO Laag signed the second retention agreement on April 27, 2021.

Per the amended agreement effective April 16, 2021, Tyson contractually changed its status as SVO's defense counsel in the underlying AAA arbitration from insurer-appointed panel counsel in a tripartite relationship to independent *Cumis* defense counsel under California Civil Code §2860.

Like the initial retention agreement in late 2020, the amended agreement contained the same combination hourly rate plus 5%-or-10% contingency fee structure for Tyson to continue prosecuting SVO's counterclaims against Vertiv, but this time with a $325,000 advance retainer deposit by SVO.

[5] SVO and Liebert/Vertiv had entered into a lump sum turnkey construction contract for the project in 2016. SVO's consequential damages from delays caused by Vertiv's inability or refusal to complete the project as specified included, among other items, lost profits from a loss of data center rental income, higher construction financing costs, and loss of equity in the project.

SVO's consequential damages were itemized to exceed $30 million in SVO's statements of damages submitted in the underlying AAA arbitration.

retained Murphy Austin Adams Schoenfeld ("Murphy Austin") in Sacramento, California as its first defense counsel after Liebert/Vertiv commenced the underlying AAA arbitration against SVO on or about August 17, 2018. Liebert/Vertiv was represented throughout the arbitration by Procopio Cory Hargreaves & Savitch ("Procopio").

5. SVO had originally retained Murphy Austin as its defense counsel because Navigators had not yet accepted the defense of SVO under a reservation of rights. SVO also concurrently retained Murphy Austin to serve as SVO's offensive counsel. Less than one month after Liebert/Vertiv commenced the underlying AAA arbitration, Murphy Austin filed SVO's original counterclaims for breach of contract and related claims for damages against Vertiv dated September 5, 2018 (as well as SVO's first amended counterclaims dated November 22, 2019).

6. Once Navigators had accepted the defense (by reservation of rights letter dated October 28, 2019 from Wilson Elser to Ulrich Pelz ("Pelz"), CFO of SVO), Navigators thereafter assigned its panel counsel firm Gordon Rees Scully Mansukhani ("Gordon Rees") to defend SVO in a tripartite attorney-client relationship.

7. Gordon Rees unexpectedly withdrew from SVO's defense after only about eight months (due to a discovered conflict for Gordon Rees involving one of Vertiv's primary subcontractors on the project, DPR Construction). This led to Navigators having to assign another panel counsel firm, Tyson, to defend SVO. Tyson's first time entry for work on the underlying AAA arbitration was dated November 3, 2020. Tyson's defense billings thereafter continued through Phase I and Phase II of the arbitration.

8. Phase I of the arbitration in or about August, 2021 was devoted to trying Vertiv's contractual claims against SVO as well as SVO's contractual counterclaims against Vertiv. SVO prevailed in Phase I on its contractual counterclaims against Vertiv and defeated all of Vertiv's

cross-contractual claims against SVO.

9. Phase II was devoted to establishing SVO's damages against Vertiv for SVO's successful contractual claims in Phase I, as well as whether SVO was allegedly liable to Vertiv on Vertiv's remaining non-contractual claims in arbitration, e.g., patent infringement, trade secrets misappropriation, California Business & Professions Code §17200 unfair competition violations, etc.

10. The underlying AAA arbitration was formally settled and mutually dismissed with prejudice on January 4, 2022. At the time of settlement, Phase II had not yet been completed.

11. Under the settlement agreement, I learned that Vertiv agreed to pay SVO $6 million cash, and that SVO agreed to purchase certain data center equipment from Vertiv at a discount in the future. I am informed that the cash settlement funds are presently being held in escrow (not in SVO's hands), subject to a lien claim by Tyson against SVO for alleged unpaid contingency fees under the Amended Legal Services Agreement.

### C. <u>Scope of My Expert Engagement in the Current Action</u>

12. As explained throughout this report, in my opinion, Tyson's timekeeper fees in the underlying AAA arbitration were unreasonable, in part, because they failed to satisfy certain fee reasonableness standards that I applied in my analysis, which were grounded in judicially-approved fee reasonableness factors set forth in California Rules of Professional Conduct, Rule 1.5 ("Rule 1.5").

13. At the present time, I am not offering any opinions at trial other than as stated immediately above. For example, I am not offering any opinions with respect to:

(i) any legal fees (whether offensive or defense) billed by Murphy Austin or Gordon Rees in the underlying AAA arbitration;

(ii) any allocation or apportionment of Tyson's timekeeper fees between offensive and

defense work for SVO in the underlying AAA arbitration, or any allocation or apportionment of Tyson's timekeeper fees between potentially covered versus non-covered claims under *Buss v. Superior Court* (1997) 16 Cal. 4th 35;

(iii) any issues related to insurance coverage, including the duty to defend, under insurance policies issued by Navigators or by any other SVO insurers, e.g., Hallmark Insurance Company ("Hallmark");

(iv) any issues related to the dismissal without prejudice dated March 24, 2021 by Vertiv of its defamation claim against SVO (i.e., 15th cause of action) in Vertiv's fourth amended complaint dated July 11, 2019 in the underlying AAA arbitration;

(v) any issues related to breach of fiduciary duty, legal malpractice, or breach of the duty of care by Tyson in the underlying AAA arbitration; and

(vi) any litigation costs, expenses, or expert/consultant charges in the underlying AAA arbitration, since the Rule 1.5 factors which inform my opinions herein pertain only to "legal fees" billed by law firm timekeepers.

## II. <u>BRIEF SUMMARY OF EXPERT QUALIFICATIONS</u>

14. For the past 34 years since 1991, I have specialized full-time in analyzing and opining on the reasonableness of attorneys' fees and the customs and practices of law firms in California and nationwide in handling, managing, staffing, and billing large, complex, high-stakes litigation.[6] The following paragraphs provide a brief summary of my credentials in this field, with

---

[6] My expert reports, expert declarations, and oral deposition testimony in other large, complex fee cases, especially involving major law firms, are typically covered by protective orders, sealing orders, redaction orders, confidentiality agreements, and/or attorney work product protection.

additional experience is listed in Exhibit A.

15. I was the sole lodestar (cross-check) fee reasonableness expert testifying in the *Enron* securities class action litigation in federal court in Houston in 2008 involving approximately $700 million in disputed legal fees. In that case, the plaintiffs' class attorneys who retained me sought an award of attorneys' fees after settling the case for approximately $7.2 billion. One of the disputed issues was the reasonableness of their requested fees.

16. Ultimately, the district court in *Enron* awarded attorneys' fees in the amount of $688 million, plus interest. The court used a percentage-of-the-settlement (a/k/a percentage-of-the-common fund) formula in making its actual fee award to prevailing plaintiffs' counsel. I opined and recommended to the court in *Enron* that 100% of the requested fees were also reasonable using the lodestar method as a cross-check.[7] The court made no reductions in its percentage fee award for unreasonableness or excessiveness under a lodestar analysis.

17. I was invited by JAMS on two occasions (in 2005 and again in 2008) to provide continuing legal education seminars for all of JAMS's retired federal and state court judges and justices in California and nationwide on making reasonable fee awards in large, complex fee-shifting arbitrations.

18. I acted as an outside counsel relationship manager, litigation manager, client representative, and billing "gatekeeper" continuously for 12 straight years (1996 - 2008) for the in-house legal department of the Los Angeles Unified School District ("L.A. Unified"), one of the largest public entities in California. L.A. Unified was either a plaintiff or defendant in many large, complex, high stakes lawsuits during my consulting tenure there. L.A. Unified had an annual

---

[7] The lodestar cross-check in class actions is applied as a second step to double-check the percentage fee award, so as to avoid awarding unreasonable or excessive fees to plaintiffs' counsel.

operating budget comparable to that of a Fortune 500 private corporation during that time.

19. For those 12 years, I helped oversee and manage L.A. Unified's day-to-day relationships with up to 50 large, midsize, and small law firms, including a number of major national law firms, such as BakerHostetler, O'Melveny & Myers, Arnold & Porter, and Manatt Phelps, among others. In that role, I regularly interacted and negotiated with top litigation partners and trial attorneys at those law firms. I acted as an authorized agent of L.A. Unified's General Counsel's Office in all of my dealings with L.A. Unified's outside law firms.

20. During my 12-year role as outside counsel billing gatekeeper for L.A. Unified's legal department, I conducted a first-pass review and tentatively approved (or rejected until re-submission) hundreds of outside counsel paper or electronic invoices submitted for payment each month on L.A. Unified legal matters (both litigated and non-litigated matters), including both routine, garden-variety litigation and large, complex, high-stakes lawsuits in federal and state courts involving L.A. Unified. Cumulatively, I estimate that I reviewed well over 30,000 outside counsel invoices for L.A. Unified's legal department from 1996–2008.

21. I have additionally reviewed many thousands of other law firm invoices in my expert engagements over the past 34 years in this field.

22. During my lengthy engagement with L.A. Unified, I worked with several different individuals who served in the role of General Counsel. One General Counsel, Richard K. Mason, Esq., provided a public testimonial about my consulting services to L.A. Unified's in-house legal department. In that testimonial, Mr. Mason stated:

> "I found [Mr. Moscaret's] service to be extremely valuable in helping manage my outside counsel relationships and litigation budget, and in gaining a better understanding of how legal fees were being incurred by my outside counsel in

complex litigation. Moscaret Consulting acted as a trusted go-between for me and my outside law firms."

*See* https://www.feedispute.com/getExpertBio.asp.

23. I have testified more than 60 times as an expert on the reasonableness of attorneys' fees and litigation management customs and practices for both plaintiffs and defendants in fee lawsuits, fee arbitrations, and prevailing party fee award proceedings involving multimillion-dollar fees billed in large, complex, high-stakes litigation in California and nationwide.

24. During my 34 years as a testifying fee expert, I have reviewed and evaluated for reasonableness the multimillion-dollar fees of many well-regarded law firms of all types and sizes in California and nationwide in large, complex, high-stakes litigation.

25. I have been retained as a testifying fee expert in other large, complex cases alleging breach of contract, intellectual property infringement (e.g., patent and copyright), and trade secrets misappropriation.

26. I have "first-chair" and "second-chair" business litigation trial experience. During my 10 years as a business litigator prior to becoming a fee expert, I tried a handful of lawsuits in Los Angeles County Superior Court alleging breach of contract, including:

(i) breach of insurance contracts between a joint powers authority (JPA) municipal insurance pool and one of its city members (City of Paramount, California);

(ii) breach of contract involving a seven-figure commercial real estate broker's commission in downtown Los Angeles; and

(iii) breach of contract involving television program syndication royalties.

27. I also have past experience as a non-testifying expert consultant in auditing defense fees incurred in underlying construction defects lawsuits. Early in my career, I was retained

approximately a dozen times by Golden Eagle Insurance Company to confidentially review and opine to Golden Eagle's claims department on the reasonableness of defense fees by panel counsel firms which Golden Eagle had appointed and was paying to defend its insureds. Golden Eagle had issued liability policies to certain subcontractors, under which general contractors were named as additional insureds. The underlying construction defects litigation in which Golden Eagle was providing a defense for both subcontractors and general contractors related to residential subdivisions and commercial buildings.

## III. BRIEF SUMMARY OF OPINIONS

28. There were very large economic stakes and risks for SVO in the underlying AAA arbitration. On one hand, SVO was seeking at least $30 million in consequential damages from Vertiv in connection with the latter's failure to properly complete the data center construction project. On the other hand, SVO was trying to defeat Vertiv's $9 million damages claims against SVO. So this was not some ordinary, garden-variety business dispute, but a large, complex, high-stakes case. It was therefore very important to SVO as a client that Tyson be able to achieve SVO's litigation objectives in the underlying AAA arbitration.

29. Tyson fell far short of obtaining a successful outcome for SVO and also failed to accomplish SVO's litigation objectives as a client in the case.

30. The majority of Tyson's main attorney team in the underlying AAA arbitration did not appear to have sufficient substantive experience and background in commercial construction defects litigation to achieve SVO's important client objectives in the case.

31. Despite being SVO's independent *Cumis* counsel after April 16, 2021, Tyson failed to disclose material facts to SVO senior management regarding Navigators' conduct in pressuring Tyson behind-the-scenes to conform its *Cumis* counsel billings in defending SVO to

the more restrictive billing rules created and enforced by Navigators against its insurer-controlled panel counsel, which rules neither Tyson nor SVO were contractually or legally obligated to comply with.

## IV. MATERIALS REVIEWED IN CONNECTION WITH THIS REPORT

32. All of the opinions, methodology, reasoning, and substantive analysis in this report are my own.

33. The materials which Parker Shaffie, SVO's counsel in the current action, provided to me and which I reviewed in preparing this report are listed on Exhibit D attached hereto, and are briefly summarized below:

(i) I reviewed Tyson billing invoices for SVO's defense in the underlying AAA arbitration dated from December 28, 2020 to March 30, 2022 (this last invoice was partially redacted), for defense work performed by Tyson from November 3, 2020 through January 5, 2022. These defense invoices amounted to $2,913,223.09 in hourly timekeeper fees.

(ii) I also reviewed a second, smaller set of Tyson invoices for purported offensive work by Tyson on SVO's behalf. This second set of invoices was dated from February 26, 2021 to February 9, 2022, for purported offensive work performed by Tyson from November 12, 2020 through December 13, 2021. These offensive invoices amounted to $189,310.50 in hourly timekeeper fees.

(iii) I reviewed pleadings, motions, briefs, evidentiary declarations, hearing transcripts, and other case documents and materials from the underlying AAA arbitration.

(iv) I reviewed pleadings in the current action in this Court.

(v) I reviewed pleadings and motions in the Los Angeles County Superior Court action entitled *SVO Building One, LLC v. Tyson & Mendes LLP, David M. Frishman, et al.* (Case No.

22STCV03736), as well as pleadings in the related pending Signature Resolution arbitration (Case No. XKPBM) involving the same parties before the Hon. Richard A. Stone (ret.).

(vi) I reviewed a 3,087-page Legal eXchange audit report ("audit report") prepared for Navigators covering Tyson's defense billings during the time periods when Tyson was acting as Navigators-appointed panel counsel as well as SVO's own *Cumis* counsel.[8]

(vii) I reviewed a chart prepared by Parker Shaffie which identified 27 different Tyson attorneys who billed time on the underlying AAA arbitration before it settled on January 4, 2022.[9] According to this chart, the vast majority of those 27 attorneys no longer work at Tyson less than four years after the settlement (Exhibit E).

34. Per my own independent research, I reviewed attorney search results from the State Bar of California's official website related to several Tyson attorneys whom I considered to be among the main Tyson attorneys working on the underlying AAA arbitration (Exhibit F).

35. In addition to reviewing the above-described case documents, Tyson invoices, and other materials:

(i) I spoke with Parker Shaffie attorneys Bruce Smyth and Brandon Brousseau about all of the above-mentioned lawsuits and arbitrations.

(ii) I reviewed certain court decisions (published or unpublished), as well as ethical rules and opinions, that I found to be relevant to my engagement.[10]

---

8 Legal eXchange e-billing software allows for automated invoice review and compliance with outside counsel billing guidelines. I worked with a competing e-billing system, DataCert, for years as L.A. Unified's billing gatekeeper.

9 I typically rely, in part, on such case staffing charts for certain of my opinions in my expert engagements, and did so in this report, as well.

10 Whenever I cite legal authorities that I have consulted or reviewed in connection with forming my opinions, I am not attempting to offer "legal" opinions by doing so, but rather citing

36. As a result of the above-listed investigative activities, I became sufficiently familiar with the factual background, legal issues, and procedural history in the underlying AAA arbitration.

37. My qualifications are summarized in Exhibits A - C attached hereto, which also list all publications authored by me in the previous 10 years and a list of all other cases in which I have testified as an expert at trial or deposition during the previous four years. My compensation is based on a rate of $495 per hour for all work in this engagement, and is not contingent on the outcome of this case.[11]

38. I estimate that, since early May, 2025 through mid-October, 2025, I have spent approximately 304 total hours on the above-described investigative activities and in preparing this report, or the equivalent of about 38 full work days, or nearly 7.6 full work weeks (based on eight hours per work day, and five days per work week).

## V. <u>EXPERT OPINIONS AND SUPPORTING BASES</u>

### 1. <u>My Methodology in this Report</u>

39. In addition to the "Materials Reviewed" section above, I based my opinions, methodology, reasoning, analysis, and conclusions in this report upon the following:

---

them so that the Court can understand how those authorities fit into my overall reasoning and form a supporting foundation for my opinions.

[11] However, my hourly rate in the current action for in-person oral deposition testimony is $950 per hour, as opposed to $495 per hour for remote livestreamed deposition testimony from my office.

(i) My familiarity with, my past experience testifying about,[12] my publication of legal media articles about,[13] and my consideration of the fee reasonableness factors set forth in Rule 1.5,[14] which took effect November 1, 2018.[15]

(ii) California published appellate decisions which have held that the Rule 1.5/4-200 factors can be applied by California courts as a test of attorney fee reasonableness, not just fee

---

12 *See, e.g.,* Statement of Decision dated August 27, 2010 in a Los Angeles County Superior Court bench trial, in which the trial judge cited my Rule 4-200 testimony at p. 18 thereof (Exhibit G hereto). The judge found that all of the $9 million in disputed legal fees were reasonable, which had been my expert opinion in that case.

13 Multiple articles in the Los Angeles/San Francisco *Daily Journal* legal newspaper.

14 Rule 1.5 currently states in pertinent part that:

(a) A lawyer shall not make an agreement for, charge, or collect an unconscionable or illegal fee.

(b) Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. The factors to be considered in determining the unconscionability of a fee include without limitation the following:

(1) whether the lawyer engaged in fraud or overreaching in negotiating or setting the fee;
(2) whether the lawyer has failed to disclose material facts;
(3) the amount of the fee in proportion to the value of the services performed;
(4) the relative sophistication of the lawyer and the client;
(5) the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(6) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(7) the amount involved and the results obtained;
(8) the time limitations imposed by the client or by the circumstances;
(9) the nature and length of the professional relationship with the client;
(10) the experience, reputation, and ability of the lawyer or lawyers performing the services;
(11) whether the fee is fixed or contingent;
(12) the time and labor required; and
(13) whether the client gave informed consent to the fee.

15 The Executive Summary section of Rule 1.5 on the State Bar of California's website labels Rule 1.5 as "Former Rule 4-200." I may occasionally refer to these fee reasonableness factors herein as the "Rule 1.5/4-200 factors," and other times just as the "Rule 1.5 factors." Nearly all of the current Rule 1.5 factors were also found in, and were carried over from, former Rule 4-200 (some with slight wording changes).

unconscionability.[16] I relied to a considerable degree, although not exclusively or completely, on the Rule 1.5/4-200 factors in my analysis herein.

(iii) California published appellate decisions which have validated trial court use of the Rule 1.5/4-200 factors as the basis for jury instructions on fee reasonableness at trial.[17]

(a) Regarding jury instructions based on the Rule 1.5/4-200 factors, in *Chodos*, *supra*, the court of appeal approved of the trial court's instruction to the jury to apply these factors in determining reasonable hours billed and reasonable hourly rates. The appellate court recited the trial court's jury instruction on fee reasonableness in its decision:

> "At trial, the trial court submitted a written instruction to the jury on calculating attorney fees that read as follows: 'In calculating a reasonable attorney's fee, the following factors should be considered: [¶] (1) The amount of the fee in proportion to the value of the services performed. [¶] (2) The novelty and difficulty of the factual and legal questions involved and the skill necessary to perform the services properly. [¶] (3) The likelihood, if apparent to the client, that acceptance of the employment will preclude other employment by the attorney. [¶] (4) The amount involved and the results obtained for the client. [¶] (5) Time limitations imposed by the circumstances. [¶] (6) The attorney's experience, reputation, and ability. [¶] (7) Any risk or delay carried by the attorney. [¶] (8) The time and labor required of the lawyer. [¶] (9) *An attorney is not entitled to recover fees from his client for time spent on matters which his client did not prevail or time that simply should not have been spent at all. You may consider [whether] he overlitigated the cases, spent excessive time, performed unnecessary work, performed duplicative work, or over-estimated his time.' "* 227 Cal.App. at 90 (emphasis added).

---

16 *See, e.g., Glendora Community Redevelopment Agency v. Demeter*, 155 Cal.App.3d 465 (1984) (citing former RPC DR 2-107, now RPC 4-200; trial court properly relied upon California Rule of Professional Conduct standards in determining reasonable attorney's fees); *People ex rel. Dept. of Transportation v. Yuki* 31 Cal.App.4th 1754, 1771 (1995) (citing factors contained in Rule 4-200 in determining fee reasonableness).

17 Rule 1.5/4-200 factors have been affirmed by the California court of appeal in at least two published decisions that I know of as a proper basis for jury instructions on fee reasonableness. *See, e.g.*, *Fergus v. Songer* (2007) 150 Cal.App.4th 552, 561; *Chodos v. Borman* (2014) 227 Cal.App.4th 76, 90.

(iv) My 10 consecutive years of experience as a business litigator with trial experience;

(v) My 12 consecutive years of experience acting as a day-to-day authorized client representative, outside counsel relationship manager, litigation manager, and outside counsel billing gatekeeper for the in-house legal department of L.A. Unified;

(vi) My 34 years of having opined many times regarding disputed issues of attorney fee reasonableness, law firm case staffing, law firm timekeeping and billing practices, and litigation management in all types of large, complex, high-stakes litigation; and

(vii) My knowledge of and experience with, including testifying many times about, customs and practices in the legal marketplace for how large, complex, high-stakes litigation is typically handled, managed, staffed, and billed.

**2. <u>The Four Key Fee Reasonableness Standards Which Were Highly Relevant to My Analysis Herein</u>**

40. Listed hereinbelow are four fee reasonableness standards which I found to be highly relevant to the fee reasonableness determination in the current action, and which I applied in my analysis of the reasonableness of Tyson's timekeeper fees. All four of these fee reasonableness standards are reflected in various Rule 1.5 factors:

1.) Whether there were high stakes or risks for the client in the underlying case, such that it was important to the client that their overall litigation objectives be successfully achieved.

2.) Whether a successful result or outcome was obtained by the law firm in the underlying case, and the extent to which the client's objectives were achieved due to the law firm's skill, ability, and experience.

3.) Whether the key members of the law firm's attorney team were truly qualified in terms of their skill, experience, reputation, and ability to successfully handle the underlying case and achieve the client's objectives.

4.) Whether the law firm adequately disclosed to the client in advance material information regarding how the law firm intended to bill for its work on the case, in order to ensure that the client's interests were always paramount and that the law firm would not be influenced by any outside pressure in its billing practices.

41. I focused my analysis in this report on these four above-mentioned fee reasonableness standards. There may be other fee reasonableness standards which other witnesses besides myself may address at trial.

42. I point out that, although Tyson allocated and separated its billed time in the underlying AAA arbitration into two separate sets of invoices (one for defense of SVO against Vertiv's claims and the other for purported prosecution of SVO's counterclaims against Vertiv), I did not separate Tyson's offensive versus defense timekeeper fees in my analysis.

43. Instead, I assumed in my analysis that all of Tyson's defense and offensive timekeeper fees were part of "one big ball of wax" arising out of the same core set of facts and legal issues that were inextricably entwined with one another. I applied my four fee reasonableness standards to all of Tyson's timekeeper fees without differentiating between them.[18]

[18] The fact that I may, from time to time in this report, make specific reference only to Tyson's defense work or offensive work in order to provide context, is therefore immaterial to my analysis.

**3. <u>The Underlying AAA Arbitration Was a Very Important Matter for SVO as a Client Because There Were Tens of Millions of Dollars in Consequential Damages For SVO At Stake</u>**

44. This first of my four fee reasonableness standards starts with asking how great the actual or potential stakes or risks were for the client (whether monetary or non-monetary) in a particular litigated matter, and the reasons why. I know from experience that some cases matter far more to clients than other cases. The higher the stakes, the more the client depends upon its law firm to accomplish the client's objectives in the case. Rule 1.5, Factor No. 3 provides foundation for this first fee reasonableness standard.

45. As part of my litigation manager and outside counsel relationship manager roles with L.A. Unified, I worked closely with L.A. Unified in-house counsel for 12 years as they assessed the potential stakes or risks for L.A. Unified in particular large, complex, high-stakes lawsuits in which L.A. Unified was a party. I learned firsthand how a major client relied on their chosen outside counsel to achieve the client's litigation objectives in important cases.

46. I do not believe there is any dispute about how much was at stake or at risk for SVO in the underlying AAA arbitration. In its counterclaims, SVO was seeking to recover its consequential damages (*see* fn. 5 above) in excess of $30 million. At the same time, on the defense side, SVO was determined to successfully prevail against all 18 of Vertiv's causes of action in Vertiv's fourth amended complaint, in which Vertiv was seeking $9 million in damages from SVO.

47. Hence, I will not belabor further the relevance of this particular fee reasonableness standard in my analysis.

**4. <u>The Phase II Damages Sanction Imposed By Arbitrator George Fisher on Tyson's "Watch" Precluded SVO From Achieving Its Litigation Objective of Recovering Its Substantial Consequential Damages From Vertiv, Which Resulted in a Very Unfavorable Outcome For SVO Overall</u>**

48. The U.S. Supreme Court has held that "results obtained," or degree of success, is an important element in determining a reasonable amount of attorney's fees.[19] Results obtained is a factor which, in my experience as a fee expert, is given considerable weight by courts in determining whether fees are reasonable.

49. When measuring the achievement (or not) of a client's litigation objectives, I look at the degree of success from the *client's perspective* (just as I did in my years of acting as a client representative). I examine whether the end result met the client's expectations, and whether the client displayed trust, confidence, and satisfaction with the law firm. Rule 1.5, Factor No. 7 ("the results obtained") provides foundation for this second of my fee reasonable standards.

50. I re-emphasize here that my opinions under this standard are confined, as I previously indicated, solely to the issue of the reasonableness of Tyson's timekeeper fees in the underlying AAA arbitration. My opinions here do *not* relate to any issue of potential liability or damages (including disgorgement of fees) arising from any breach of fiduciary duty, legal malpractice, or breach of the duty of care by Tyson.

51. Murphy Austin was SVO's originally-chosen defense counsel in the underlying

---

[19] For example, in *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983), the Court held that "the extent of a [litigant's] success is a crucial factor in determining the proper amount of an award of attorney's fees." In *City of Riverside v. Rivera*, 477 U.S. 561, 566 (1986), the U.S. Supreme Court again said, ". . . [T]he District Court had 'considered the degree of success . . . and found a reasonable relationship between the extent of that success and the amount of the fee award.' (citation omitted) . . . ."

AAA arbitration from about August, 2018 to about November, 2019. Thereafter, once Navigators agreed to defend SVO, there were two changes of Navigators-appointed panel defense counsel.[20]

52. With each change of defense counsel, I recognize that each defense firm had to "hand off" all of its work product and evidentiary document data base (managed by e-discovery vendor KLDiscovery) to successor counsel.

53. SVO prevailed in the Phase I contract cross-liability phase of the arbitration in August, 2021 when arbitrator Fisher ruled that, based on the witnesses and documentary evidence presented, Vertiv did not hold a valid general contractor's license to construct (and was therefore not legally-entitled to receive any compensation for constructing) the project under California Business and Professions (B&P) Code §7031.[21]

54. Under this second fee reasonableness standard, I credit Tyson with accomplishing SVO's objectives in Phase I. I viewed Tyson as having "won the battle" for SVO in Phase I, although I also recognize that Phase I was decided on a showing of Vertiv's non-compliance with the statutory licensure requirements of B&P Code §7031.[22]

---

[20] SVO relied upon outside counsel other than Tyson (i.e., Law Offices of Frank Watson, Esq.) to consummate the formal settlement with Vertiv in the underlying AAA arbitration.

[21] None of Vertiv's contract-based causes of action were viable after this Phase I decision by arbitrator Fisher.

[22] B&P Code §7031(a) prohibits a contractor from pursuing an action to collect under a contract where that party is unlicensed and, alternatively, cannot show substantial compliance with the licensure requirements. The statute prevents unlicensed entities from recovering compensation "regardless of the balance of equities or the manner in which the claim is framed." *MW Erectors, Inc., v. Niederbauser Ornamental & Metal Works Co.*, Inc. (2005) 36 Cal.4th 412, 444.

55. The parties then proceeded to Phase II in November-December, 2021. The arbitrator structured Phase II as SVO's contract counterclaims damages phase as well as Vertiv's non-contract claims liability phase. While Phase I was certainly a very good result toward achieving SVO's overall litigation objectives, it would be a hollow victory if SVO could not also recover its eight-figure consequential damages.

56. It was in Phase II that, in my opinion, Tyson "lost the war" for SVO.

57. The $6 million cash settlement from Vertiv was a far cry from the $30 million-plus in consequential damages which SVO was not allowed to prove up due to arbitrator Fisher's sanctions ruling against SVO in Phase II (whether it be properly charactered as an evidentiary, issue, or terminating sanction).

58. I understand the difference between a client's subjective belief about the amount of damages it believes it is entitled to recover versus the amount of damages that the client actually ends up proving by a preponderance of the evidence at trial. But when a client is completely foreclosed from even having the *opportunity* to prove up its damages, there is no way that outcome can be considered a "success" under this second fee reasonableness standard. That is what happened on Tyson's watch in Phase II, after Tyson had spent 13 straight months handling SVO's entire case from November, 2020 through December, 2021.[23]

59. The obvious question for me, as a litigation manager, is whether Tyson shares some or all of the blame for this unfavorable outcome for SVO, and if Tyson could have done anything differently in SVO's case to prevent the imposition of such a draconian sanction against SVO.

---

[23] Arbitrator Fisher's findings about SVO's alleged failure to comply with its document production obligations as the justification for precluding SVO from proving up its consequential damages in Phase II are referenced in the relevant pages from the December 7, 2021 AAA hearing transcript (Exhibit H).

Thus far, I have seen no evidence from Tyson's 13 months of representing SVO:

(i) that Tyson, once it replaced Gordon Rees as SVO's defense and offensive counsel in or about November, 2020, fully and completely investigated and assessed the current state of document production compliance (or not) by SVO in the underlying AAA arbitration. In my view as a litigation manager, such a full, complete assessment should have been an urgent, indispensable first step for Tyson to take in such a document-intensive case, where Vertiv was already aggressively accusing SVO of ongoing document production non-compliance and seeking sanctions against SVO;[24] and

(ii) that Tyson promptly documented in writing for SVO senior management (not just for CFO Pelz) the extent of any SVO non-compliance, along with a candid litigation risk assessment of how continuing, uncorrected non-compliance could jeopardize SVO's success in Phase I and Phase II and proposed solutions to avoid sanctions against SVO;[25]

---

[24] Accusations by Vertiv of SVO's document production non-compliance were pending with arbitrator Fisher even before Tyson became SVO's counsel, e.g., Vertiv's October 6, 2020 motion to compel production by SVO of redacted information. Since then, Fisher had repeatedly ordered SVO to comply.

I reviewed an April 12, 2021 sur-reply letter brief by Tyson in opposition to Vertiv's then-pending motion for sanctions. Vertiv argued that SVO had failed to timely produce all electronically-stored information (ESI) requested by Vertiv and had failed to comply with stipulated ESI production protocols. The disputed ESI included e-mails and e-mail storage folders.

[25] For example, a blunt, unvarnished assessment by Tyson in a written report to SVO senior management which essentially said, "Be forewarned that, if our side's discovery non-compliance continues, we may be penalized by not being allowed to prove up our tens of millions of dollars in damages against Vertiv."

As a litigation manager, I would have wanted such a "red flag" warning from outside counsel, and would have wanted them to take the initiative to provide it to me without my having to ask for it first.

**5. <u>Other Than Tyson Lead Partner David Frishman, I Saw No Evidence that the Rest of Tyson's Main Attorney Team in the Underlying AAA Arbitration Possessed the Necessary Skill, Experience, and Ability to Accomplish SVO's Objectives</u>**

60. My third fee reasonableness standard relates to whether the law firm's main attorney team was the most qualified, capable group of attorneys to obtain a successful result for the client and achieve the client's objectives in the case. Rule 1.5, Factor No. 3 provides foundation for this third of my four fee reasonableness standards.

61. Having worked closely for many years with both in-house counsel and many top-tier law firms (primarily *AmLaw* 100 and Second 100 firms) on large, complex, high-stakes cases, I consider having a well-qualified, experienced, savvy attorney team on the case to be an important element in the overall fee reasonableness determination, especially where there are significant stakes or risks for the client. The choice of outside counsel in such matters should be compatible with (i) the client's overall objectives in the case, (ii) the time, labor, and resource demands of the case, and (iii) the legal expertise and procedural experience necessary for the law firm to achieve the client's objectives.

62. The above criteria are all relevant to the amount of trust, confidence, and satisfaction that a client exhibits toward its law firm in a large, complex, high-stakes case.

63. I was mindful of this same criteria whenever I assisted L.A. Unified's in-house counsel with outside counsel vetting and selection, and in negotiating retainer agreements for L.A. Unified's legal department with its chosen law firms.

64. Although Tyson has a few hundred attorneys among a few dozen U.S. offices and advertises on its website that it has a construction litigation practice, under this fee reasonableness standard I am more concerned with the particular Tyson attorneys who staffed and handled the

underlying AAA arbitration, not the entire firm.

65. Mr. Frishman headed Tyson's main attorney team in the underlying AAA arbitration. Based on his credentials shown in his Tyson website bio, Mr. Frishman appears to have had the requisite commercial construction defects litigation experience to head SVO's attorney team.

66. However, from a litigation management standpoint, it was the *rest* of Tyson's main attorney team (i.e., four other attorneys besides Mr. Frishman[26]) whose qualifications I doubted. I could not find any evidence in my own independent research that any of those other four Tyson attorneys had any significant commercial construction defects litigation experience. For example:

<u>Richard P. Dieffenbach (Calif State Bar No. 102663)</u>

(a) no bio found on Tyson's website;

(b) no name of, or website for, a current employer to accompany the address and phone number listed on the State Bar of California website's attorney search page;

(c) no mention of any significant commercial construction defects litigation experience anywhere online.

<u>Jamie R. Tabrizi (Calif State Bar No. 326104)</u>

(a) no bio found on Tyson's website;

(b) no name of, or website for, a current employer to accompany the address (without phone number) listed on the State Bar of California website's attorney search page, although I was informed that he is currently general counsel of a start-up entity;

[26] These other four Tyson attorneys were all listed, along with Mr. Frishman, on the caption page of "SVO Building One, LLC's Opposition to Motion For Terminating Sanctions" dated November 5, 2021 after Phase I had been completed and shortly before Phase II was set to commence.

(c) no mention of any significant commercial construction defects litigation experience anywhere online.

Julee Fritsch Early (Calif State Bar No. 250089)

(a) currently a partner at Tyson, per her Tyson website bio;

(b) no indication of any significant commercial construction defects litigation experience on her Tyson website bio.

Cindy (Nguyen) Mader (Calif State Bar No. 213524)

(a) no bio found on Tyson's website;

(b) State Bar of California website's attorney search page currently lists her at an American Automobile Club (AAA) e-mail address; her listed employment address and phone number is a now-defunct law firm (Richardson Fair & Cohen);

(c) no mention of significant commercial construction defects litigation experience anywhere online.

67. Next, according to the chart attached as Exhibit E hereto, the vast majority of the 27 Tyson attorneys who billed time on the underlying AAA arbitration are no longer even working at Tyson today, only a few years after the underlying arbitration was concluded. Given my experience with so many other large, complex, high-stakes cases, I found this to be an extremely high (and unexplained) level of law firm attorney turnover in such a short time frame.

68. In my opinion, the lack of demonstrated commercial construction defects litigation experience among Tyson's main attorney team in such an important, high-stakes construction defects case for SVO failed to satisfy this third fee reasonableness standard.

69. Finally, to compound my concerns as a litigation manager and outside counsel relationship manager in one more way, I learned that Mr. Frishman was temporarily suspended

from practicing law in California in July, 2021 for non-disciplinary administrative reasons due to his failure to satisfy the State Bar of California's annual MCLE reporting requirements. In July, 2021, however, Frishman billed approximately 187 hours in the underlying AAA arbitration while suspended from law practice. Applying Mr. Frishman's $295 per hour partner rate from Tyson's Amended Legal Services Agreement in effect at that time, Mr. Frishman billed $55,165 while suspended from law practice.

70. While Frishman's suspension was not related to his overall qualifications to handle the underlying AAA arbitration, it was yet another "red flag" for me with respect to Tyson's representation of SVO in this case.

**6. From a litigation management and outside counsel relationship standpoint, Tyson should have promptly disclosed to SVO, but never did, that Navigators was trying to impose its restrictive panel counsel billing guidelines on Tyson's *Cumis* counsel defense work for SVO in the underlying AAA arbitration**

71. Rule 1.5, Factor No. 3, which states, "whether the lawyer has failed to disclose material facts," provides foundation for this fourth fee reasonableness standard.

72. Over 20 years ago, I helped L.A. Unified's in-house legal department create its first-ever outside counsel billing guidelines ("guidelines") for its 50 chosen law firms. I have also reviewed many other sets of such guidelines promulgated by insurance companies and large corporations to their outside counsel. I consider guidelines to be a client's billing "rulebook" for its outside counsel to follow.

73. I have testified as a fee expert about the enforceability of insurer-created guidelines against both panel counsel and *Cumis* counsel. I have also published legal media articles on guidelines and discussed them in MCLE seminars.

74. I am familiar with the provisions of California Civil Code §2860, known as the "*Cumis* counsel" (i.e., policyholder-selected independent counsel) statute in California. I have testified as a fee expert in binding arbitrations under §2860 on the issue of *Cumis* counsel defense fee reasonableness in multimillion-dollar fee disputes between insurers and corporate policyholders. I have also published legal media articles and given MCLE seminars on *Cumis* counsel issues under §2860.

75. In my 34 years in this field, I cannot recall ever before seeing a defense scenario like I found in the underlying AAA arbitration, where the previously insurer-appointed panel counsel defense firm (i.e., Tyson) in a large, complex, high-stakes case suddenly transformed into the client's *Cumis* defense counsel (again, Tyson). In every other *Cumis* counsel situation that I can recall, the policyholder's *Cumis* counsel had no simultaneous panel counsel business relationship with the policyholder's insurer, as Tyson did with Navigators throughout the underlying AAA arbitration.

76. If I were a litigation manager and outside counsel relationship manager (as I was with L.A. Unified for 12 straight years) for a hypothetical policyholder-client who had retained *Cumis* counsel to defend them in a large, complex, high-stakes case, I would want to be certain that the *Cumis* firm would bill its time on the case in a manner that was reasonable and customary for large, complex, high-stakes litigation, not according to the insurer's billing rulebook. I would also want to be certain the *Cumis* firm would not allow itself to be influenced in its billing practices by any outside pressure from the insurer.

77. That means I would want the *Cumis* firm to expressly disclose to the client and me, as the client's authorized representative, at the earliest possible opportunity (i) whether the insurer was imposing, or attempting to impose, the same guidelines on the *Cumis* firm as the insurer

imposed on its own insurer-appointed panel counsel, and (ii) whether the *Cumis* firm intended to try to comply with those insurer-created guidelines in the client's case, even if not legally or contractually required to do so.

78. Why would that matter to me? Because in my experience, insurer panel counsel guidelines are well-known for being much more restrictive than reasonable and customary billing practices in the legal marketplace for large, complex, high-stakes litigation.[27]

79. Because I consider insurer panel counsel guidelines to be more restrictive in terms of the defense billings they will allow and that the insurer will pay for, I consider an insurer's attempt to impose such guidelines on a policyholder's *Cumis* counsel to be "material" to the policyholder-client's trust relationship with its *Cumis* counsel from a litigation management and outside counsel relationship standpoint.

80. I am not the only one who criticizes the use of restrictive insurer panel counsel guidelines. There are California published appellate decisions which have disapproved of such billing guidelines when they impede or inhibit work by defense counsel which defense counsel considers appropriate and necessary, for example:

> "Under no circumstances can such guidelines be permitted to impede the attorney's own professional judgment about how best to competently represent the insureds.

---

[27] Such restrictions that I have seen many times in insurer panel counsel guidelines include, for example: limiting the number of attorneys allowed at depositions, at court hearings, in brief-writing, and in office conferences; needing the insurer's prior authorization for legal research projects; etc.

Such restrictions are, in my experience and opinion, wholly unrealistic in large, complex, high-stakes litigation that must be handled by diverse teams of attorneys and which typically involve many different claims, defenses, and legal issues.

Large, complex, high-stakes litigation is nearly always handled and billed by well-regarded law firms in a very different manner than the more restrictive approach common in insurer panel counsel guidelines.

> If the attorney's representation is to be limited in any way that unreasonably interferes with the defense, it is the *insured*, *not* the insurer, who should make that decision."

*Dynamic Concepts, Inc. v. Truck Ins. Exchange* (1998) 61 Cal.App.4th 999, 1009 fn.9 (in this instance, there was no evidence that the insurer had inhibited counsel's ability to adequately defend the entire case).

81. Even if a policyholder-client's *Cumis* counsel is under no legal or contractual obligation to adhere to the insurer's panel counsel guidelines, as a litigation manager and outside counsel relationship manager I would still want the opportunity to review and consider those guidelines. For example, I might advise the client to voluntarily consent to the insurer's guidelines, after full disclosure, if by doing so the client were able to negotiate and compromise with its insurer on other often-contentious *Cumis* billing issues, e.g., higher agreed-upon *Cumis* counsel hourly rates under §2860. I certainly would not be able to do that if *Cumis* counsel (or the insurer) has never disclosed the guidelines to me.

82. Conversely, I might advise my client to reject the insurer's panel counsel guidelines and to warn the insurer against putting any billing pressure on *Cumis* counsel with those guidelines, since such pressure might prejudice my client's interests in the subject litigation or put the client's *Cumis* counsel in an uncomfortable, conflicted position.

83. Under either scenario above, I would want and expect prompt full disclosure of such guidelines from my client's *Cumis* firm. I can think of no excuse or exception for the law firm not doing that if they were truly putting the client's interests first and not trying to cater to the insurer.

84. I saw no evidence in the underlying AAA arbitration that Tyson ever forwarded a copy of Navigators' panel counsel guidelines to SVO senior management (including CFO Pelz) for review after April 16, 2021 when Tyson contractually and officially became SVO's *Cumis* counsel (with Navigators' consent).

85. Likewise, I have not seen a copy myself of the panel counsel guidelines which Navigators was trying to enforce against Tyson's *Cumis* billings after April 16, 2021.[28]

86. However, the Legal eXchange audit report makes clear that Navigators was doing exactly that. It also left no doubt in my mind that Navigators' conduct was pressuring Tyson as SVO's *Cumis* counsel by restricting and objecting to Tyson's defense work for SVO on the basis of those panel counsel guidelines.

87. I have attached (Exhibit I hereto) a number of representative pages from that audit report showing Tyson billing entries dated after April 16, 2021.[29] One or more thin (sometimes incomplete) far right-hand columns of text on the Exhibit I pages show (i) comments, restrictions, and objections (by Navigators via Legal eXchange) to Tyson's billing entries based on its panel counsel guidelines, and (ii) Tyson's responses thereto. Instances of specific references in the audit report to Navigators' panel counsel guidelines are indicated by my checkmarks in the margins of the pages in Exhibit I.

88. I found many instances on many pages in that audit report of Navigators restricting and objecting to Tyson's billing entries after April 16, 2021, which would have caused me serious

---

28 Per my own independent research, I found a publicly-accessible website with what purports to be guidelines applicable to The Hartford's (which is Navigators' parent) panel counsel, but I was unsure if that website contained the particular panel counsel guidelines at issue here: https://www.thehartford.com/claims-panel-counsel/billing-guidelines

29 I am unsure of when the audit report was created by Legal eXchange.

concern as a policyholder-client's litigation manager and outside counsel relationship manager for the following reasons, among others:

(i) Tyson repeatedly reminded Navigators in some of Tyson's responses in the audit report that Navigators' panel counsel guidelines did not "technically" apply anymore in the case once Tyson became *Cumis* counsel. Yet that did not deter Navigators, who never backed off. Then, in the next breath, Tyson repeatedly wrote that it would nevertheless "make every effort to [voluntarily] comply" with those guidelines, even though Tyson was under no legal or contractual obligation to do so, and had never disclosed nor discussed those guidelines with SVO senior management.[30]

(ii) Worse, Tyson kept *apologizing* to Navigators for not submitting its post-April 16, 2021 billing entries in the panel counsel guidelines-approved manner (*see* pages in Exhibit I containing an x-mark in the margins), despite repeating telling Navigators that those guidelines did not apply to Tyson's billings after April 16, 2021.[31]

(iii) Tyson kept explaining to Navigators again and again why the panel counsel guidelines were *not* reasonable or appropriate for the underlying AAA arbitration, but Navigators kept ignoring that. For example, Tyson repeatedly pointed out that:

---

[30] By comparison, *Cumis* counsel in other large, complex, high-stakes cases which I have been involved with have typically objected very forcefully and unreservedly (not timidly and weakly, as I thought Tyson did) to any insurer panel counsel guidelines.

I know of no published case law in California nor any provision of Civil Code §2860 which obligates a policyholder-client or its *Cumis* counsel to have to consent to or adhere to such guidelines.

[31] In my 34 years in this field, I have *never* before seen *Cumis* counsel apologize like that to its client's insurer in a large, complex, high-stakes case.

(a) "This was a highly complex matter involving numerous legal and factual issues" (Exhibit I Bates-stamped page N09469);[32]

(b) "The data base of documents for this matter was in excess of 1 million documents" (Bates-stamped page N08873); and

(c) "As discussed with [Navigators] claims handler Angel Muth, this is a very unique case. . . . Those claims [by Vertiv against SVO], which center around construction of a data center and are highly complex and overlapping and involve multiple contractual issues and related claims, as well as Intellectual Property claims . . .." (Bates-stamped page N07744).

(iv) Not only did I consider Navigators' restrictions and objections to Tyson's *Cumis* billing entries to constitute completely improper billing pressure by Navigators on Tyson, but Tyson's expressed willingness to try to adhere to those restrictions and objections (even to the point of apologizing) would have caused a "flashing red light" about Tyson in my mind as a litigation manager and outside counsel relationship manager.

89. In my view, Tyson's behavior indicated divided loyalties on Tyson's part in the underlying AAA arbitration, i.e., trying to straddle the fence and keep one foot in both Navigators' and SVO's camps after April 16, 2021 (at a time when Tyson's *sole* loyalty as *Cumis* counsel should have been to SVO).[33]

---

32 Even arbitrator Fisher made a similar comment about case "complexity" in one of the hearing transcripts I reviewed.

33 I assumed that Tyson intended to continue its ongoing panel counsel business relationship with Navigators once the underlying AAA arbitration was concluded and SVO was no longer a client of Tyson's.

90. To my knowledge, SVO senior management (including CFO Pelz) never saw a copy of the audit report during the pendency of the underlying AAA arbitration. Thus, SVO was never aware of the extent of Navigators' behind-the-scenes billing pressure on Tyson.

91. Bottom line, I believe *both* Navigators' and Tyson's conduct put Tyson in a very awkward, conflicted position as SVO's *Cumis* counsel from a litigation management and outside counsel relationship perspective.

## VI. OVERALL CONCLUSION

92. Based on the facts, methodology, evidence, and reasoning set forth above, it is my opinion that Tyson's timekeeper fees at issue in the current action should be reduced by 35% - 40% in order to be considered reasonable.[34]

## VII. RESERVATION OF RIGHTS

93. I reserve the right to update, amend, and/or supplement this report based upon any new and/or additional facts, evidence, or other documents which may come to my attention, or based upon any other information, including other expert reports, declarations, or affidavits which may be produced.

Kenneth M. Moscaret

[34] The Rule 1.5 fee reasonableness factors are not limited to hourly fees. Factor No. 11 asks "whether the fee is fixed or contingent."

# EXHIBIT A

# EXPERT QUALIFICATIONS OF KENNETH MOSCARET, ESQ.

1. I have set forth below in this Exhibit "A" a complete set of my attorney fee expert credentials.

2. I have been specializing in this field for the past 34 years since 1991, and have been involved in well over 200 large fee disputes involving well over $2 billion in legal fees to date. During my career, I have been retained as a consultant and/or testifying expert by *both* sides in fee disputes, including by clients, policyholders, insurance carriers, public entities, and law firms nationwide.

3. Most of my expert engagements today involve seven-figure, eight-figure, and nine-figure legal fees billed by top-tier law firms in large, complex litigation in California and nationwide.

4. Since 1991, I have offered expert testimony over 60 times at trial, arbitration, deposition, and in written expert declarations in federal and state courts regarding the (i) reasonableness of legal fees, (ii) propriety of attorney billing practices, (iii) the lodestar issues of reasonable hourly rates and reasonable hours billed, and (iv) efficient litigation management and law firm case staffing practices.[1]

---

[1] Although the vast majority of my expert witness cases have settled prior to trial, I have testified orally 15 times as a qualified fee expert in court and arbitration hearings. I have submitted at least 20 written expert declarations in various courts which were admitted into evidence. I have also given oral expert depositions over 30 times.

5. I generally describe myself as a customs-and-practices expert who specializes in opining on prevailing customs and practices in the marketplace among sophisticated clients and top-tier law firms regarding how large, complex litigation is typically handled, managed, staffed, and billed. These litigation customs and practices are not merely "local" in nature. Rather, they are universal attorney billing, litigation management, and case staffing issues within the legal profession that arise in all 50 states and every jurisdiction. Hence, my expert opinions, such as I have offered here, are not dependent upon subjective, locally-acquired knowledge drawn from having practiced law in a particular legal market. They apply across the country.

6. I was found qualified to testify and offered attorney fee reasonableness expert testimony in February, 2008 in the *Enron* securities class action litigation before the U.S. District Court for the Southern District of Texas in Houston.

7. I was the sole lodestar cross-check fee expert testifying in the *Enron* case about reasonable hourly rates, reasonable hours billed, case staffing, litigation management efficiency, and other related fee and billing issues. *Enron* is the largest

---

I have testified in court, arbitration, deposition, or by written report/declaration in fee cases in federal courts, state courts, and arbitration venues in California, New York, New Jersey, the Washington D.C./Baltimore area, Texas, and other states.

securities class action lawsuit in U.S. history, and one of the largest business lawsuits generally ever litigated in this country.

8. The U.S. District Court in *Enron*, in its 209-page published fee ruling, awarded $688 million, plus interest, in attorney's fees to lead counsel Coughlin Stoia Geller Rudman & Robbins (now known as Robbins, Geller Rudman & Dowd) in that case in September, 2008, a record-setting fee award for a securities class action in the U.S.[2] The District Court described me as one of the "nationally prominent experts on fee awards" who was testifying in the case, as well as a "recognized fee expert," and found me to be "highly qualified to testify about attorneys' fees and market rates." *In re Enron Corporation Securities, Derivative & ERISA Litigation*, 586 F.Supp. 2d 732 (S.D.Tex. 2008).

9. Since *Enron* in 2008, I have been retained to testify or have actually testified in some capacity in well over 30 fee cases in federal and state courts and arbitration proceedings across the U.S. wherein the disputed legal fees in large, complex litigation ranged from seven-figures into nine-figures.

---

[2] I am informed that the final fee award, with accrued interest, exceeded $700 million.

10. I have opined in the past on all of the substantive fee reasonableness factors which I analyzed in this case. Judges and arbitrators have admitted into evidence my analysis of fee reasonableness under those factors.

11. Regarding my background, I graduated with a J.D. from Georgetown University Law Center in Washington, D.C. in 1980, and was admitted to practice in California the same year. From 1980-1990, I was primarily a business litigator practicing in Los Angeles in California state and federal courts. I have "first-chair" and "second-chair" trial experience.[3] As a litigator, I represented many large institutional clients in complex litigation, such as the Hearst Corporation and major savings and loan associations.

12. In addition to serving as an expert witness, I have given many educational and training seminars on attorney's fees to a variety of business and legal organizations. For example, in October, 2005 and then again in May, 2008, I was invited by the JAMS organization to conduct live CLE seminars on making reasonable attorney fee awards in large, complex fee-shifting arbitration cases for all of JAMS's retired federal and state court judges/justices in California and nationwide.

---

[3] Before I became a full-time attorney fee expert, I primarily litigated cases for corporate clients on both the plaintiff and defense side. Nearly all of those lawsuits settled before trial actually started. I did take about five to six cases to trial through judgment, mainly in California state courts. I was the sole trial counsel in half of those cases, second-chair in the rest. My prior litigation experience and attorney fee expert credentials, including articles which I have published, are listed and readily available on my firm's website at www.FeeDispute.com.

13. One of my CLE seminars was converted to DVD video and an audio podcast for JAMS judges to continue to access and use in the future. A copy of the acknowledgment letter which JAMS sent me afterwards is attached hereto as Exhibit "B."

14. I was invited to be a guest speaker at the annual meeting of the College of Commercial Arbitrators in Los Angeles in November, 2014 on the subject of reasonable attorney fee awards in fee-shifting arbitration cases. The College of Commercial Arbitrators is an invitation-only organization comprised of elite nationally- and internationally-recognized commercial arbitrators.

15. I was also invited to speak to the American Bar Association Section of Dispute Resolution at their 2015 annual spring conference in Seattle on the topic of attorney fee reasonableness in large, complex cases.

16. For 12 years from 1996 - 2008, I acted as an ongoing consultant each month to the Office of General Counsel of the Los Angeles Unified School District ("L.A. Unified"), the nation's second largest public school district, which would have been in the Fortune 500 back then were it a private corporation, based on the size of its annual budget. L.A. Unified had many high-exposure legal matters, as large corporations often have, and paid many millions of dollars each year in outside counsel fees.

17. One of my several ongoing responsibilities during those 12 years working with L.A. Unified's in-house legal department was to act as their outside counsel billing "gatekeeper." In that capacity, I reviewed and tentatively approved (or rejected until re-submission) hundreds of outside counsel paper or electronic invoices submitted for payment each month on L.A. Unified legal matters (both litigated and non-litigated matters), including both routine, garden-variety litigation and large, complex, high-stakes lawsuits in federal and state courts involving L.A. Unified. I performed that role each month from 1996 - 2008 before those law firm invoices were forwarded to L.A. Unified's in-house attorneys for final payment approval.

18. Those invoices were submitted by up to 50 different large, midsize, and small law firms which worked for L.A. Unified, many of which were major national law firms. Most of those law firms had their headquarters or major offices in Southern California. Some of them had their headquarters or major offices in the San Francisco Bay Area. Many of L.A. Unified's litigated cases were large, complex matters that were high-profile, hard-fought, and the subject of frequent reporting in the local news media in Los Angeles, including the following examples:

- Belmont Learning Center litigation (at the time called "the most-expensive high school in the U.S.," with many hundreds of millions of dollars in construction costs);

- Mayoral school district takeover litigation (i.e., AB 1381 litigation);
- Ambassador Hotel dispute (against developer Donald Trump, for control of this world-famous landmark near downtown Los Angeles);
- multibillion-dollar-exposure class action lawsuit by the ACLU alleging systemic failure to provide legally-mandated special education services to all qualifying L.A. Unified students (known as the "Chanda Smith" case);
- massive class action lawsuit by the ACLU against deteriorating public school facilities (known as the “Williams” case);
- school construction litigation;
- toxic school site cases

19. I estimate that, from 1996 - 2008, I reviewed well more than 30,000 law firm invoices in total in all manner of L.A. Unified cases from large, midsize, and small law firms that worked for L.A. Unified.[4] My invoice-review work for L.A. Unified was in addition to the many thousands of other law firm invoices that I have reviewed in the over 200 expert engagements that I have had over the years.

20. Throughout my consulting engagement with L.A. Unified, I also acted as an authorized "client representative" each month in dealing with L.A. Unified's

---

4 L.A. Unified received 300 - 600 outside counsel invoices each month, on average, from 1996 - 2008. My monthly invoice-review function for L.A. Unified was a substantial part of my expert consulting practice during those years.

outside counsel, meaning that I acted exclusively on the "client" side in dealing with those law firms for 12 years. In that capacity, I performed the following tasks:

(i) oversaw and made recommendations on litigation management practices by L.A. Unified's outside counsel on L.A. Unified cases;

(ii) monitored and made recommendations on outside counsel's billing, timekeeping, and case staffing practices on L.A. Unified cases;

(iii) communicated with outside counsel on any client relationship issues whenever necessary, with the full authority of the General Counsel's Office;

(iv) provided group training seminars as well as individual one-on-one advice on all of the above issues to L.A. Unified's in-house attorneys;

(v) assisted with law firm bidding competitions and selection of outside counsel for L.A. Unified legal matters; and

(vi) negotiated fee arrangements, hourly rates, and retainer agreements with L.A. Unified's outside counsel.

21. Toward the end of my consulting engagement with them, L.A. Unified asked me to negotiate multi-year hourly rate arrangements with approximately 40 different law firms who were bidders under L.A. Unified’s law firm RFP at the time. I spent months handling those rate negotiations. About one-third of the law firms with which I negotiated were major national law firms.

22. During my lengthy engagement with L.A. Unified, I worked with

several different individuals who served in the role of General Counsel. One General Counsel, Richard K. Mason, Esq., provided a public testimonial about my consulting services to L.A. Unified's in-house legal department. In that testimonial, he stated: "I found [Mr. Moscaret's] service to be extremely valuable in helping manage my outside counsel relationships and litigation budget, and in gaining a better understanding of how legal fees were being incurred by my outside counsel in complex litigation. Moscaret Consulting acted as a trusted go-between for me and my outside law firms."

*See* https://www.feedispute.com/getExpertBio.asp.

23. In 2006, the County of Los Angeles also retained me to conduct a litigation management review of the 270-attorney Los Angeles County Counsel's Office (Los Angeles County's in-house legal department). At the time, Los Angeles County had one of the largest, if not the largest, in-house county legal departments in the U.S. Among other things, I examined how the County Counsel's Office handled, managed, and disposed of some of its most difficult, complex, and high-stakes lawsuits. My expert's report was prepared for and submitted to the Los Angeles County Board of Supervisors.[5]

---

[5] I worked in parallel with the Los Angeles County Auditor-Controller's Office on this project. Both of us submitted our own separate written reports to the Los Angeles County Board of Supervisors, each covering different aspects of the County Counsel's operations. I focused on litigation strategy, litigation management efficiency, and outside counsel fees and billing practices.

24. I have published over 35 articles to date in the legal and business media on attorney's fees, billing, and litigation management (all of which are listed at www.feedispute.com/getPublishing.asp). I have also conducted over 40 CLE seminars and other presentations on these subjects for client groups, law firms, and bar associations.

25. I am familiar with various court decisions in California and from across the U.S., both federal and state, reported and unpublished, and with various ethical rules and opinions, which relate to attorney fee reasonableness and litigation management efficiency issues.

26. I have spoken to many law firm partners in California and outside the state about those same issues during my career in this field. I also read several statewide and national legal publications each day which often report on those issues, e.g., the online editions of the Los Angeles/San Francisco *Daily Journal, The (S.F.) Recorder, The National Law Journal, The American Lawyer*, and *Law.com*.

27. I do not limit myself to helping just big clients and big law firms with attorney fee and litigation management issues. I created a first-of-its-kind consumer legal cost management blog (*www.myLawCoach.com*) designed to help ordinary consumer clients manage all of the "dollars-and-cents" business aspects of their attorney-client relationships. My blog delivers practical tips and advice at no charge

over the Internet to the types of individuals who might not otherwise have access to that kind of information. These tips and advice are meant to apply only to simple, non-complex consumer lawsuits.

28. I try to offer expert opinions which are consistent, wherever possible, with judicial decisions and ethical rules and opinions that have addressed attorney fee reasonableness and litigation management issues. I may cite to any federal and state case law (both published and unpublished) and ethical authorities (both binding or advisory) which I have consulted, considered, reviewed, or relied upon in forming my own opinions. I do that only so that a court can understand how those case authorities and ethical opinions fit into my overall reasoning and form a supporting foundation for my opinions. I am not attempting to offer "legal" opinions.

# EXHIBIT B

JAMS

THE RESOLUTION EXPERTS

October 24, 2005

Kenneth Moscaret, Esq.
Moscaret Consulting
2240 275th Ct., S.E.
Sammamish, WA 98075

Dear Ken:

On behalf of the JAMS Institute, please accept my sincerest thanks for your October 20 CADRE presentation on Resolving Complex Attorney Fee Disputes.

The multi-site format of the program allowed us to reach JAMS Panelists throughout California, many of whom, as you know, handle cases involving fee disputes on a regular basis. We have already received a good deal of positive feedback on the presentation from participants around the state, and expect that a number of them will be contacting you with additional questions and inquiries.

The JAMS Institute was originally established to demonstrate JAMS' commitment to continuing education for its neutrals. By bringing in new ideas and fresh perspectives on the work we do, you have made an invaluable contribution to our role as the "Resolution Experts".

Thank you again.

Sincerely,

Jay Folberg
*Executive Director, JAMS Institute*

TWO EMBARCADERO CENTER SUITE 1100 SAN FRANCISCO, CA 94111 TEL 415-982-5267 FAX 415-982-5287

# EXHIBIT C

***<u>Published Articles (Previous 10 Years)</u>***

1. Association of Business Trial Lawyers (ABTL) Report, Northern California chapter, summer 2014; "Fee Awards: Fee-Shifting Cases Versus Attorney's Fees As Damages."
2. Los Angeles Daily Journal, June 12, 2015; "You Gotta Show Why Fees Are Reasonable."
3. Los Angeles Daily Journal, June 19, 2015; "Did Your Client Consent to Your Fees?"
4. Los Angeles Daily Journal, August 26, 2016; "Fighting to Show That Attorney Fees Are Reasonable."
5. Los Angeles Daily Journal, January 13, 2017; "Resolve Large Fee Disputes Effectively" (co-author).
6. Los Angeles Daily Journal, April 14, 2017; " Some Fee Fights Simply Mean More Litigation."
7. Los Angeles Daily Journal, January 7, 2022; "Early Evaluation Can Help Quickly Resolve Your Fee Disputes."
8. Los Angeles Daily Journal, March 19, 2024; "In a Fees-As-Damages Case, a Rule 26 Stipulation Can Protect Draft Reports and Communications."

***Past Live Expert Testimony (Previous 4 Years)***

1.) National Union Fire Insur. Co. v. Fresenious Medical Care: DEPOSITION
(a) New York County Supreme Court, Commercial Division (2021)
(b) retained by Gibson Dunn & Crutcher o/b/o Plaintiff

2.) Rafael Torres v. Technion Contractors TCI, Inc.: DEPOSITION
(a) Los Angeles County Superior Court (2022)
(b) retained by Glynn, Finley, Mortl, Hanlon & Friedenberg o/b/o Defendant and Cross-Complainant

3.) General Atomics v. U.S. Dept. of Defense (Defense Contract Management Agency): DEPOSITION
(a) Armed Services Board of Contract Appeals (ASBCA) (2023)
(b) retained by Gibson Dunn & Crutcher o/b/o Claimant

4.) Clean & Sober Media v. HUB Insurance: DEPOSITION
(a) Los Angeles County Superior Court (2023)
(b) retained by Parker Schaffie o/b/o Plaintiff

5.) Clean & Sober Media v. HUB Insurance: TRIAL
(a) Los Angeles County Superior Court (2023)
(b) retained by Parker Schaffie o/b/o Plaintiff

6.) DigitalBridge v. XL Specialty: DEPOSITION
(a) Los Angeles County Superior Court (2024)
(b) retained by Barnes & Thornburg o/b/o Defendant

7.) Roseburg v. Liberty Insurance: DEPOSITION
(a) USDC E.D. Cal (2024)
(b) retained by Hunton Andrews o/b/o Plaintiff

8.) DigitalBridge v. XL Specialty: TRIAL
(a) Los Angeles County Superior Court (2025)
(b) retained by Barnes & Thornburg o/b/o Defendant

# EXHIBIT D

1. SVO Building One LLC's Answer to First Amended Complaint and Counterclaim
2. Navigator Specialty Insurance Company's Complaint for Declaratory Relief
3. Navigator Specialty Insurance Company's First Amended Complaint
4. Navigator Specialty Insurance Company's Answer to Counterclaim

5. SVO Building One LLC's Demand for Arbitration, Dated January 3, 2025
6. Tyson & Mendes, LLP and SVO Building One LLC's Amended Legal Services Agreement Fully Executed
7. Tyson & Mendes, LLP and David M. Frishman's Answering Statement and Counterclaims
8. Tyson & Mendes, LLP and SVO Building One LLC's Legal Services Agreement (executed)
9. Gordon Rees Scully Mansukani and SVO's Legal Services Agreement 2020-03-19

10. Declaration of Shawn Shaffie In Support of SVO Building One LLC's Opposition to Motion to Compel Arbitration
11. Declaration of Ulrich In Support of SVO Building One LLC's Opposition to Motion to Compel Arbitration
12. SVO Building One LLC's Notice of Errata RE Opposition to Defendant's Motion to Compel Arbitration
13. Request for Judicial Notice in Support of Opposition to Motion to Motion to Compel Arbitration
14. SVO Building One LLC's Complaint
15. Defendant Tyson & Mendes LLP and David M. Frishman's Motion to Compel Arbitration
16. Defendant's Reply in Support of Motion to Compel Arbitration - FINAL
17. SVO Petition for Writ of Mandate including Exhibits FINAL

18. SAC 1 Data Center Project Description – [2682381_1_1988378]
19. Building 1 – Project chart [2682382_1_1988379]
20. AIA to Lumpsum Turnkey Agreement
21. Amendment One to Lump Sum Turnkey
22. Amendment Two to the Lump Sum Turnkey Agreement
23. Appendix C to Lump Sum Turnkey Agreement
24. Appendix E to Lumpsum Turnkey Agreement
25. Appendix F to Lumpsum Turnkey Agreement
26. Appendix H to Lump Sum Turnkey Agreement
27. Vertiv XTREAM Data Center - Basis of Design
28. Lump Sum Turnkey Agreement
29. Statement of Work

30. Vertiv Corporation (fka Liebert Corporation) Renewed Motion for Sanctions
31. SVO Building One LLC's Objections to Vertiv's Renewed Motion for Sanctions, dated November 11, 2021
32. SVO Building One LLC's Opp to Vertiv's Renewed Mtn for Terminating Sanctions, December 6, 2021

33. SVO's Sur-Reply to SVO's Opp to Motion for Sanctions for Non-Compliance with ESI Protocol, dated April 12, 2021
34. Email from Hon. Fisher to All Parties, dated September 17, 2021
35. Declaration of R. Taylor ISO Vertiv's Motion for Terminating Sanctions against SVO Building One, LLC, dated October 29, 2021
36. Declaration of S. Grela in support of Vertiv's MTN for Terminating Sanctions against SVO Building One, LLC, dated October 29, 2021
37. Declaration of Mark Budwig ISO Vertiv's Motion for Terminating Sanctions against SVO Building One, LLC, dated October 29, 2021

38. Vertiv's Motion for Terminating Sanctions against SVO Building One, LLC, dated October 29, 2021

39. Compendium of Evidence in support of against SVO Building One, LLC's Opposition to Motion for Terminating Sanctions

40. Declaration of J. Nazemi Tabrizi in support of SVO Building One, LLC's Opposition to Motion for Terminating Sanctions, dated November 5, 2021

41. SVO's Building One LLC's Opposition to Motion tor Terminating Sanctions, dated November 5, 2021

42. Vertiv's Reply in support of Motion for Terminating Sanctions, dated September 9, 2021

43. Declaration of U. Pelz in support of SVO's Building One LLC's Opposition for Terminating Sanctions

44. Vertiv's Motion for Terminating Sanctions, dated October 29, 2021

45. Motion Hearing Transcript, November 11, 2021

46. Arbitration Phase 2 Transcript LIEBERT, dated November 16, 2021

47. Agreement Regarding Stipulated Protective Orders Fully Executed

48. Stipulated Protective Order

49. SVO's Building One LLC's Objections to Vertiv's Renewed Motion for Sanctions, dated September 28, 2021

50. SVO's Building One LLC's Opposition to Vertiv's Renewed Motion for Terminating Sanctions, dated December 6, 2021

51. Transcript Excerpt of Hearing dated December 7, 2021

52. Transcript Excerpt of Hearing dated December 30, 2021

53. Commercial Arbitration Rules Demand for Arbitration, dated August 17, 2018

54. Claimant Liebert Corporation Complaint, dated August 17, 2018

55. SVO Building One LLC's Arbitration Answering statement and counterclaim, dated September 5, 2018

56. Plaintiff Counter-Respondent Liebert Corporation's Answer to, dated September 21, 2018

57. First Amended Complaint, dated September 29, 2018

58. Second Amended Complaint, dated March 19, 2019

59. Third Amended Complaint, dated April 8, 2019

60. SVO's Notice of Hearing of Demurrer and Motion to Strike TAC, dated April 29, 2019

61. SVO's MPA ISO Demurrer MTS TAC, dated April 29, 2019

62. SVO's Request for Judicial Notice ISO Demurrer & Motion to Strike Portions of TAC, dated April 29, 2019

63. SVO's Request for Judicial Notice ISO Demurrer & Motion to Strike Portions of TAC, dated April 29, 2019

64. Liebert's MPA's in OPP to Demurrer and MTS TAC, dated May 8, 2019

65. SVO's Reply MPA's ISO Demurrer MTS to TAC, dated May 15, 2019

66. Liebert's FAC Answer to Counterclaim of SVO, Dated June 14, 2019

67. Fourth Amended Complaint with Exhibits, dated July 11, 2019

68. Fourth Amended Complaint, dated July 11, 2019

69. SVO's Answer to Fourth Amended Complaint of Liebert Corporation, dated August 8, 2019

70. SVO's First Amended Countercaim for Breach of Contract, dated November 22, 2019

71. Plaintiff Counter-Respondent Liebert Corporation's Answer, dated December 3, 2019.12.03

72. Vertiv's Partial Dismissal in Fourth Amended Complaint, dated December 3, 2019

73. Legal Services Agreement between Tyson & Mendes and SVO, dated December 29-30, 2020.

74. Tyson & Mendes LLP Invoice No. 69380, Invoice Date 2020-12-28

75. Tyson & Mendes LLP Invoice No. 70077, Invoice Date 2021-01-19

76. Tyson & Mendes LLP Invoice No.71980, Invoice Date 2021-02-25

77. Tyson & Mendes LLP Invoice No. 70765, Invoice Date 2021-03-19
78. Tyson & Mendes LLP Invoice No. 74764, Invoice Date 2021-04-29
79. Tyson & Mendes LLP Invoice No. 76222, Invoice Date 2021-06-08
80. Tyson & Mendes LLP Invoice No. 77565, Invoice Date 2021-07-09
81. Tyson & Mendes LLP Invoice No.78408, Invoice Date 2021-07-26
82. Tyson & Mendes LLP Invoice No. 80276, Invoice Date 2021-08-30
83. Tyson & Mendes LLP Invoice No. 90149, Invoice Date 2021-10-18
84. Tyson & Mendes LLP Invoice No. 91756, Invoice Date 2021-11-18
85. Tyson & Mendes LLP Invoice No. 93312, Invoice Date 2021-12-20
86. Tyson & Mendes LLP Invoice No. 94549, Invoice Date 2022-01-18 [Hallmark]
87. Tyson & Mendes LLP Invoice No. 94549, Invoice Date 2022-01-18 [Navigators]
88. Tyson & Mendes LLP Invoice No. 95662, Invoice Date 2022-02-07
89. Tyson & Mendes LLP Invoice No. 98380, Invoice Date 2022-03-30
90. Tyson & Mendes LLP Invoice No. 98885, Invoice Date 2022-04-13
91. Tyson & Mendes LLP Invoice No. 100030, Invoice Date 2022-05 03
92. Tyson & Mendes LLP Invoice No. 72051, Invoice Date 2021-02-26
93. Tyson & Mendes LLP Invoice Date 2021-03-31, Inv. No. 73467
94. Tyson & Mendes LLP Invoice Date 2021-04-29, Inv. No. 74810
95. Tyson & Mendes LLP Invoice Date 2021-07-07, Inv. No. 77540
96. Tyson & Mendes LLP Invoice Date 2021-07-26, Inv. No. 78418
97. Tyson & Mendes LLP Invoice Date 2021-08-30, Inv. No. 80272
98. Tyson & Mendes LLP Invoice Date 2021-09-28, Inv. No. 81521
99. Tyson & Mendes LLP Invoice Date 2021-11-17, Inv. No. 91732
100. Tyson & Mendes LLP Invoice Date 2021-12-20, Inv. No. 93322
101. Tyson & Mendes LLP Invoice Date 2022-01-18, Inv. No. 94551

102. Tyson & Mendes LLP Invoice Date 2022-02-09, Inv. No. 95686

103. Navigators Document Production Bates Stamped N06428 – N09519

104. T&M Attorney Billing Single Sheet

# EXHIBIT E

| Last name | First name | Billing Initials | Original Claim Fees Billed Hours | Original Claim Fees Total Billing | Counter Claim Fees Billed Hours | Counter Claim Fees Total Billing | State / Bar No. | Registered Start Date with T&M | Registered End Date with T&M | First Date Billed Time on SVO | Last Date Billed Time on SVO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fornwalt | Amanda j. | AJF | 18.60 | $4,180.00 | | | CA 231593 | 3/25/2019 | 6/1/2021 - 7/1/2021 | 11/5/2020 | 3/3/2021 |
| Randolf | Alexander L. | ALR | 1401.80 | $231,297.00 | 109.80 | $24,705.00 | CA 334758 | 1/20/2021 | 9/6/2021 - 10/6/2021 | 12/1/2020 | 9/30/2021 |
| Smith | Andrew L. | AS/ALS | 12.10 | $2,601.50 | | | CA 262418 | 7/27/2018 | 8/27/2022 - 9/27/2022 | 2/9/2021 | 6/14/2021 |
| Bennett | Bonnie G | BGB | 63.50 | $10,477.50 | 6.80 | $1,530.00 | CA 240313 | 1/26/2021 | 3/12/2021 - 4/12/2021 | 7/2/2021 | 10/3/2021 |
| Bayliss | Blaire J | BJB | 27.70 | $6,067.50 | 0.70 | $206.50 | CO 55221 | | | 2/22/2021 | 3/31/2021 |
| Mader | Cindy Nguyen | CNM | 2003.30 | $434,312.50 | 0.20 | $4,661.00 | CA 213524 | 11/16/2020 | 7/79/2022 - 8/29/2022 | 11/16/2020 | 12/30/2021 |
| Frishman | David Mark | DMF/DF | 2170.00 | $487,845.00 | 57.90 | $17,080.50 | CA 129992 | 9/3/2020 | Still at T&M | 11/7/2020 | 12/31/2021 |
| Kraft | Ethan A. | EAK | 1530.30 | $252,499.50 | 99.10 | $22,297.50 | CA 334060 | 1/14/2021 | 1/8/2022 - 2/8/2022 | 2/8/2021 | 12/30/2021 |
| Dimaano | Elizabeth Chan | ECD | 7.20 | $1,185.00 | | | CA 332983 | 1/14/2021 | 8/21/2022 - 9/21/2022 | 7/1/2021 | 7/7/2021 |
| Arevalo | Gabriel | GA | 34.70 | $5,725.50 | | | NY 5566997 (or) WI 1116114 | | | 1/11/2021 | 1/15/2021 |
| Schultz | Greta Michelle | GMS | 109.60 | $24,831.00 | | | CA 290456 MD 2003250014 | 2/22/2018 | 6/29/2021 - 7/29/2021 | 11/3/2020 | 6/30/2021 |
| Lumsden | James Charles | JCL | 23.00 | $4,600.00 | | | CA 284600 | 5/3/2019 | 12/23/2021 - 1/23/2022 | 12/10/2020 | 1/14/2021 |
| Tabrizi | Jamie R. Nazemi | JCT | 2538.50 | $420,517.50 | 9.10 | $2,047.50 | CA 326104 | 11/23/2020 | 7/3/2022 - 8/3/2022 | 11/18/2020 | 12/29/2021 |
| Lien | Jie | JL | 9.80 | $1,617.00 | | | CA 305746 | 6/8/2021 | 10/28/2022 - 11/28/2022 | 10/7/2021 | 10/8/2021 |
| Earley | Julee M. Fritsch | JMF | 1501.30 | $323,652.00 | 317.60 | $93,692.00 | CA 250089 | 12/28/2020 | Still at T&M | 12/21/2020 | 12/30/2021 |
| Stiglich | John M. | JMS | 43.40 | $7,161.00 | | | CA 215347 | 2/2/2021 | 8/22/2022 - 9/22/2022 | 6/30/2021 | 7/22/2021 |
| Crittondon | Jennifer Noel | JNC | 9.90 | $2,128.50 | | | CA 334935 | 11/19/2018 | 2/21/2022 - 3/21/2022 | 10/9/2021 | 10/10/2021 |
| Argyopoulos | Nicolette | NA | 89.00 | $16,677.00 | | | NY 5862925 | | | 1/11/2021 | 8/4/2021 |
| Kourouyan | Nareg A. | NAK | 31.90 | $5,263.50 | 0.60 | $135.00 | CA 334081 | 4/8/2021 | 8/15/2022 - 9/15/2022 | 7/15/2021 | 10/8/2021 |
| Mulamekic | Omar | OM | 95.30 | $19,060.00 | | | NY 5856547 | | | 7/1/2021 | 7/30/2021 |
| Shetabi | Pegah | PS | 6.10 | $1,311.50 | | | CA 213130 | 4/9/2018 | 1/27/2025 - 2/27/2025 | 10/9/2021 | 10/9/2021 |
| Marvin | Rachael Hanna | RHM | 23.20 | $4,640.00 | | | NY 5837844 | | | 1/11/2021 | 1/14/2021 |
| Olson | Robert J. | RJO | | | 3.50 | $1,032.50 | CA 284736 | 4/1/2020 | Still at T&M | 9/19/2021 | 9/23/2021 |
| Dieffenbach | Richard Paul | RPD | 1975.20 | $427,807.50 | 30.40 | $8,968.00 | CA 102663 | 11/12/2020 | 11/3/2023 - 12/5/2023 | 11/9/2020 | 11/21/2021 |
| Vallone | Scharde C. | SCV | 8.90 | $1,468.50 | | | CA 331328 | 8/2/2021 | 8/17/2022 - 9/17/2022 | 10/7/2021 | 10/7/2021 |
| Ma | Tina C. | TCM | 53.70 | $11,545.50 | | | NY 4773107 | | | 1/11/2021 | 1/20/2021 |
| Sabaratnam | Thushan | TMS | 98.90 | $16,318.50 | | | IL | 11/22/2021 | 11/11/2022 | 6/30/2021 | 10/9/2021 |
| | | | **13886.90** | **$2,724,790.00** | **635.70** | **$176,355.50** | | | | | |

# EXHIBIT F

The State Bar *of California*

**Richard Paul Dieffenbach #102663**
**License Status: Active**

Address: 5050 E 2nd St, Unit 14656, Long Beach, CA 90853-5418
Phone: 562-434-9567 | Fax: Not Available
Email: Not Available | Website: Not Available

## More about This Attorney ▾

The table below shows an attorney's license status changes, disciplinary actions, and administrative actions. Some administrative suspensions are subject to automatic removal from the attorney profile page pursuant to the State Bar's **policy on removal of administrative actions**. Administrative suspensions are non-disciplinary actions resulting from noncompliance with administrative requirements, such as the requirement to pay licensing fees or comply with Minimum Continuing Legal Education. Administrative suspensions that meet the criteria in the State Bar's policy on removal of administrative actions would not be displayed below.

| Date | License Status | Discipline | Administrative Action |
|---|---|---|---|
| **Present** | Active | | |
| **6/10/1982** | Admitted to the State Bar of California | | |

**Additional Information:**

- **About the disciplinary system**

Copyright © 2025 The State Bar of California

The State Bar *of California*

**Jamie R. Nazemi Tabrizi #326104**
**License Status: Active**

Address: 633 W 5th St, Ste 1100, Los Angeles, CA 90071-2085
Phone: Not Available | Fax: Not Available
Email: Not Available | Website: Not Available

## More about This Attorney ▾

The table below shows an attorney's license status changes, disciplinary actions, and administrative actions. Some administrative suspensions are subject to automatic removal from the attorney profile page pursuant to the State Bar's **policy on removal of administrative actions**. Administrative suspensions are non-disciplinary actions resulting from noncompliance with administrative requirements, such as the requirement to pay licensing fees or comply with Minimum Continuing Legal Education. Administrative suspensions that meet the criteria in the State Bar's policy on removal of administrative actions would not be displayed below.

| Date | License Status | Discipline | Administrative Action |
|---|---|---|---|
| Present | Active | | |
| 6/4/2019 | Admitted to the State Bar of California | | |

**Additional Information:**

- **About the disciplinary system**

Copyright © 2025 The State Bar of California

The State Bar *of California*

**Cindy Nguyen Mader #213524**

**License Status: Active**

no website

Address: Richardson, Fair & Cohen, 2601 S Figueroa St, Los Angeles, CA 90007-3254

Phone: 213-741-4527 | Fax: 213-741-4190

Email: **Mader.Cindy@ace.aaa.com** | Website: Not Available

Amer Automobile Assn

## More about This Attorney ▾

The table below shows an attorney's license status changes, disciplinary actions, and administrative actions. Some administrative suspensions are subject to automatic removal from the attorney profile page pursuant to the State Bar's **policy on removal of administrative actions**. Administrative suspensions are non-disciplinary actions resulting from noncompliance with administrative requirements, such as the requirement to pay licensing fees or comply with Minimum Continuing Legal Education. Administrative suspensions that meet the criteria in the State Bar's policy on removal of administrative actions would not be displayed below.

| Date | License Status | Discipline | Administrative Action |
|---|---|---|---|
| Present | Active | | |
| 6/7/2001 | Admitted to the State Bar of California | | |

**Additional Information:**

- **About the disciplinary system**

Copyright © 2025 The State Bar of California

# EXHIBIT G

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| Date August 27, 2010 | | Dept: CE99 |
| Honorable Marvin M. Lager Judge | S.L. Williams | Deputy Clerk |
| Honorable Judge Pro Tem | | Court Assistant |
| Deputy Sheriff | None | Reporter |

BP066539 r/w BC344151;
BC342738; BC347052

In re the

Janice L. Taubman 1990 Revocable Trust

Counsel For Petitioner:

Counsel For Objector :

Nature of Proceedings: CERTIFICATE OF MAILNG OF COURT'S STATEMENT OF DECISION

**CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER**

I, the below named Executive Officer/Clerk of the above entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served Notice of Entry of the above minute order of August 27, 2010 and STATEMENT OF DECISION upon each party or counsel named below by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original entered herein in a separate sealed envelope for each, addressed as shown below with the postage thereon fully paid.

Date: August 27, 2010

John A. Clarke, Executive Officer/Clerk

By: [signature]
S.L. Williams, Deputy Clerk



DEPT: CE99

MINUTES ENTERED
8/27/10
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | | |
|---|---|---|---|---|
| Date | August 27, 2010 | | | Dept: CE99 |
| Honorable | Marvin M. Lager | Judge | S.L. Williams | Deputy Clerk |
| Honorable | | Judge Pro Tem | | Court Assistant |
| | | Deputy Sheriff | None | Reporter |

BP066539 r/w BC344151;
BC342738; BC347052

In re the

Janice L. Taubman 1990 Revocable Trust

Counsel For Petitioner:

Counsel For Objector :

John T. Blanchard
1900 Avenue of the Stars, Suite 1900
Los Angeles, CA 90067-4410

Adam H. Braun
1880 Century Park East, Suite 710
Los Angeles, CA 90067-1608

Paul L. Stanton
1250 Sixth Street, Suite 300
Santa Monica, CA 90401

Scott E. Gizer
Amman Khan
Brian Lysaght
Law Offices of
GLASER, WEIL, FINK JACOBS, HOWARD & SHAPIRO, LLP
Nineteenth Floor
10250 Constellation Blvd.
Los Angeles, CA 90067

Thomas H. Lambert
Lambert Law Corporation
P.O. Box 22530
San Diego, CA 92192-2530



DEPT: CE99

MINUTES ENTERED
8/27/10
COUNTY CLERK

FILED
LOS ANGELES SUPERIOR COURT
AUG 27 2010
JOHN A. CLARKE, CLERK
BY S.L. WILLIAMS, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

IN THE MATTER OF:

THE JANICE L. TAUBMAN 1990 REVOCABLE TRUST,

U. S. BANK, N.A., TRUSTEE.

AND ALL RELATED CASES

Case No. BP 066539

**STATEMENT OF DECISION RE:**

**(1) TRUSTEE U.S. BANK, N.A.'S FIRST ACCOUNT AND SECOND AND FINAL ACCOUNT AND REPORT OF TRUSTEE AND PETITION FOR INSTRUCTIONS, FILED SEPTEMBER 23, 2008, AS SUPPLEMENTED ON DECEMBER 12, 2008, AND ON MAY 15, 2009;**

**(2) BENEFICIARY ANNE C. TAUBMAN'S PRELIMINARY OPPOSITION TO U.S. BANK'S PETITION FOR APPROVAL OF ACCOUNTINGS; REQUEST FOR SURCHARGE OF $25,432,881.04, PAYMENT TO ANNE C. TAUBMAN OF $5,165,463.34 AND RELATED RELIEF, FILED ON OR ABOUT NOVEMBER 4, 2008; AND**

**(3) FORMER SPECIAL TRUSTEE AND BENEFICIARY ANNE C. TAUBMAN'S AMENDED ACCOUNTING RE: SEAPORT VILLAGE LTD.'S MERCHANT MARKETING AND PAYROLL ADJUSTMENT ACCOUNTS, FILED ON OR ABOUT SEPTEMBER 2, 2008**

**Trial:** **July 27, 28, 30, and 31; Aug. 3-7, 10-12, and 14; Sept. 8, 10, 14, 15, 22-25, and 29; Oct. 6 and 7, 2009**

**Dept.:** **99**

| | |
|---|---|
| JUDGE PRESIDING: | Marvin M. Lager |
| COUNSEL FOR TRUSTEE U.S. BANK, N.A.: | Brian C. Lysaght, Amman A. Khan, and Scott E. Gizer, Glaser, Weil, Fink, Jacobs, Howard & Shapiro, LLP |
| COUNSEL FOR ANNE C. TAUBMAN: | John T. Blanchard, Law Offices of John T. Blanchard, and Adam H. Braun, Law Offices of Adam H. Braun |
| COUNSEL FOR RICHARD J. TAUBMAN: | Paul L. Stanton, Law Offices of Paul L. Stanton |
| COUNSEL FOR WYATT TAUBMAN: | Thomas H. Lambert, Lambert Law Corporation |

**STATEMENT OF DECISION**

After a twenty-four day court trial held on July 27, 28, 30, and 31, 2009, August 3-7, 10-12, and 14, 2009, September 8, 10, 14, 15, 22-25 and 29, 2009, and October 6 and 7, 2009, the above-captioned matters were submitted to the Court for decision. On January 4, 2010, the Court issued its tentative decision on the matters. On January 11, 2010, Wyatt Taubman requested a statement of decision. On January 19, 2010, Anne Taubman requested a statement of decision. U.S. Bank, N.A.("Trustee"), pursuant to this Court's order, prepared a proposed statement of decision. Three hearings were held thereon.

## I. PRIOR ORDERS, JUDGMENTS, STATEMENTS OF DECISION AND APPELLATE OPINIONS

Many of the factual and legal issues presented by the Petitions at issue have been previously determined in this probate case. The following are of relevance:

1. Judgment under Section 631.8 of the Code of Civil Procedure on Anne C. Taubman's Petitions to Surcharge and Discharge Trustee for Breach of Fiduciary Duty and Conflict of Interest, entered June 12, 2003;

2. Statement of Decision On U.S. Bank's Motion for Judgment under Section 631.8 of the Code of Civil Procedure on Anne C. Taubman's Petitions to Surcharge and Discharge Trustee for Breach of Fiduciary Duty and Conflict of Interest, entered May 22, 2003;

3. Judgment of Superior Court of California, County of Los Angeles, Regarding San Diego Marwyn Action, *Anne C. Taubman v. U.S. Bank, N.A., et al.*, Case No. BC 283506, entered September 16, 2003.

4. Statement of Decision, Superior Court of California, County of Los Angeles, Regarding San Diego Marwyn Action, *Anne C. Taubman v. U.S. Bank, N.A., et al.*, Case No. BC 283506, entered September 16, 2003.

5. Order And Judgment: (1) Permanently Removing Anne Taubman As Special Trustee; (2) Substituting U.S. Bank As Temporary Special Trustee, And; (3) Requiring That Anne Taubman Provide An Accounting Of All Transactions Respecting Seaport Village, Particularly For Proceeds Of Transactions With GMS Realty, which was entered on September 16, 2003 in the Los Angeles County Superior Court, Case No.: BP066539, consolidated with BP073345.

6. Statement of Decision On U.S. Bank's Petition To Permanently Remove Anne Taubman As Special Trustee, To Suspend Her Powers As Special Trustee In Favor Of U.S. Bank Pending Removal And For An Order That Anne Taubman Provide An Accounting Of all transactions respecting seaport village, particularly for proceeds of purchase by GMS Realty, which was made on September 16, 2003 in the Los Angeles County Superior Court, Case No.: BP066539, consolidated with BP073345.

7. Order And Judgment on U.S. Bank's First Account Current and Report of Trustee and Petition for Instructions filed July 8, 2003, Supplement thereto, filed September 8, 2002, Second Supplement thereto, filed January 28, 2003, and Third Supplement thereto, filed May 16, 2003, which was entered on September 16, 2003 in the Los Angeles County Superior Court, Case No.: BP066539, consolidated with BP073345.

8. Statement of Decision on U.S. Bank's First Account Current and Report of Trustee and Petition for Instructions filed July 8, 2003, Supplement thereto, filed September 8, 2002, Second Supplement thereto, filed January 28, 2003, and Third Supplement thereto, filed May 16, 2003,

which was entered on September 16, 2003 in the Los Angeles County Superior Court, Case No.: BP066539, consolidated with BP073345.

9. Judgment and Decree on Anne Taubman's Supplemental and Amendment to Petitions for Orders Surcharging and Discharging Institutional Trustee for Breach of Fiduciary Duty, Etc., which was entered on September 16, 2003 in the Los Angeles County Superior Court, Case No.: BP066539, consolidated with BP073345.

10. Statement of Decision on Anne Taubman's Supplemental and Amendment to Petitions for Orders Surcharging and Discharging Institutional Trustee for Breach of Fiduciary Duty, Etc, filed October 31, 2002, which was entered on September 16, 2003 in the Los Angeles County Superior Court, Case No.: BP066539, consolidated with BP073345.

11. Judgment and Decree on Petitioner and Former Special Trustee Anne C. Taubman's Report and Account of Special Trustee; Petition for Approval of Accounting and Related Relief, which was entered on July 21, 2004 in the Los Angeles County Superior Court, Case No.: BP066539.

12. Corrected Statement of Decision on Petitioner and Former Special Trustee Anne C. Taubman's Report and Account of Special Trustee; Petition for Approval of Accounting and Related Relief, which was entered on August 4, 2004 in the Los Angeles County Superior Court, Case No.: BP066539.

13. Opinion of the Court of Appeal of the State of California, Second Appellate District, Division 7, *In Re Anne C. Taubman v. U. S. Bank, N.A., et al.,* Case Nos. B177712 and B185170, September 15, 2004.

14. Opinion of the Court of Appeal of the State of California, Second Appellate District, Division 7, *In Re Anne C. Taubman v. U. S. Bank, N.A., et al.,* Case Nos. B170609 and B173609, March 30, 2005.

15. Opinion of the Court of Appeal of the State of California, Second Appellate District, Division 7, *In Re Anne C. Taubman v. U. S. Bank, N.A., et al.,* Case Nos. B177712 and B185170, October 24, 2007.

16. Opinion of the Court of Appeal of the State of California, Second Appellate District, Division 7, *In Re Richard J. Taubman v. Anne C. Taubman,* Case No. B194074, June 18, 2008.

## II. FACTS.

### A. The Janice L. Taubman Revocable Intervivos Trust.

The Janice L. Taubman 1990 Revocable Trust was created by the Trustor, Janice L. Taubman (the "Trustor") pursuant to a written declaration of inter-vivos trust, dated August 13, 1990. The Trustor amended the trust ten (10) times. A Fifth Amendment and Restatement of the Trust was executed on March 15, 1994. It completely restated the original trust. The Trustor then amended the Fifth Amendment by the Sixth through the Tenth Amendments. The Fifth through the Tenth Amendments (collectively, the "Trust") are the relevant documents and were admitted into evidence. The Trustor died on September 5, 1999, and upon her death, the Trust became irrevocable.

The beneficiaries of the Trust are the Trustor's children, Anne C. Taubman ("Anne") and Richard J. Taubman ("Ricky"). There is also a named contingent remainder beneficiary, Wyatt Taubman ("Wyatt"), Ricky's son. The overarching intent of the Trustor was to treat her two children equally. She knew that there was hostility between them that could spawn litigation. Various parts of the Trust discourage litigation, including provisions to relieve the trustees from liability under many circumstances for breach of trust.

For the purpose of these proceedings, the Trust has two principal assets: (1) an ownership interest in a retail shopping center known as Seaport Village, the grounds of which are leased from the Port of San Diego, and (2) ownership in the Buffalo Oil Company and the Taubman Family Trust Gas and Oil Interests.

On the date of the Trustor's death, the Trust owned its interest in the Seaport Village shopping center through the following entities: 45% ownership of a limited partnership that was the ground leasee - San Diego Seaport Village Ltd. ("Limited"); 100% ownership of Limited's controlling general partner - San Diego Seaport Village, Inc. ("Inc."); and, general partner of and

owner of a 0.5% interest in Anton Ltd. ("Anton"), which owned about 53% of Limited.

At the time of the Trustor's death, Anne was the president of Inc.. She was also the president of another Seaport Village related entity, San Diego Marwyn ("Marwyn").

At the time of the Trustor's death, the Trust's oil and gas interests were, and continued to be, managed by the Bank of Oklahoma as trustee for the Taubman family. The oil and gas interests produce royalty income which is distributed monthly by the Bank of Oklahoma to the Trust.

Upon Janice's death, as provided by the Trust, Anne became the "Special Trustee" of the Trust's Seaport Village assets. During her tenure two highly controversial transactions occurred: (a) Anne's personal 1999 purchase, at a discount, from Yasuda Bank, of a promissory note made by Limited and secured by Seaport Village, and (b) Anne's 2003 refinancing with a concurrent sale of control of Seaport Village in a highly complex deal with GMS Realty, LLC ("GMS").

The Yasuda Bank note purchase was accomplished by Anne after the Trust – by the trustee U.S. Bank - declined to make the purchase. The GMS transaction was done without the knowledge of U.S. Bank, or Ricky. Anne was ultimately removed as Special Trustee in its shaddow, and surcharged $8,850,530.29, primarily consisting of money from the GMS deal she diverted to herself.

The Trust provides that Anne is the sole beneficiary of the Trust's Seaport Village assets (subject to an "equalizing payment" to Ricky), if she survives the Trustor by ten years, which has now occurred. Ricky was a contingent remainder beneficiary of the Trust's Seaport Village assets. As Anne has now survived the Trustor by ten years, his contingent interest has lapsed. Ricky's son, Wyatt, is a named contingent remainder beneficiary of the Trust, who accedes to a beneficiary of the trust only in the event that Anne and Ricky die before the ten year anniversary. This event has not occurred and Wyatt's interest in the trust has now lapsed.

Trustee U.S. Bank's predecessor-in-interest, Santa Monica Bank, assumed co-trusteeship in 1999 on the death of the Trustor. Gilda-Ulloa Ochoa was appointed its co-trustee. She died in March of 2002. U.S. Bank has been the sole trustee of the Trust since Ms. Ulloa-Ochoa's death.

Key personnel of the Trustee and Anne have long had a frosty, mutually suspicious, relationship. Anne and Ricky have had a highly contentious relationship since before the Trustor's

death. Ricky pressured the Trustee – through threats and otherwise - to litigate with Anne. She alleged in litigation with the Trustee that it favored Ricky.

**B. The Yasuda Note**

In 1999, while a Special Trustee, Anne personally purchased Yasuda Bank's $39.8 million "interest only" note given it by Limited and secured by Seaport Village (the "Yasuda Note"), at roughly a forty percent discount.

The principle amount of the Yasuda Note was due at that time and monies sufficient to meet the obligation were not available to Limited. Foreclosure by Yasuda Bank, or a third party purchaser of the note, would have meant the total loss of Seaport Village to the Trust. This prospect was avoided by Anne purchasing the note and extending its term.

Anne made the purchase through a limited liability company she formed, Seaport Lending Co., LLC ("Lending Co."). Lending Co./Anne borrowed most of the money needed for the purchase secured by Seaport Village's ground lease.

Anne profited personally from the differential in interest payments Limited made on the Yasuda Note and the interest payments Lending Co./Anne made on monies borrowed for its purchase. This Court by Judge Leonard Wolf (ret.) held the transaction was not itself a breach of Anne's duty as a fiduciary because the Trust was given notice and declined to purchase the Yasuda Note.

**C. The GMS Transaction**

By January, 2003, the Trust again faced the possibility that Seaport Village would be lost by foreclosure. Anne avoided this by – in substance - refinancing debt by way of a complex transaction with GMS. But, the deal spun-off cash that should have gone to the Trust. Instead it went to an entity controlled by Anne.

Pursuant to the deal Anne sold GMS a 50% interest in the Yasuda Note by selling it a

controlling interest in Lending Co. Simultaneously, Anne assigned to GMS the Master Lease of the entire Seaport Village, through the vehicle of a sub-lease to a new entity, Seaport Village Operating Company, LLC ("Operating Co."), with GMS as the controlling and managing member. GMS paid approximately $7.2 million in cash.

As a result of the transaction, the Trust received a 25% non-managing interest in Operating Co. and Anne's advisor, Michael A. Cohen, received a 25% non-managing interest. The $7.2 million was not paid to the Trust, but to Davanne LLC, an entity controlled by Anne.

**D. <u>Michael A. Cohen</u>**

Michael A. Cohen ("Cohen") is a sophisticated mortgage broker. He advised Anne in purchasing the Yasuda Note. He also advised her in the GMS transaction. As Trustee of the Marion #2 - Seaport Trust U/A/D June 21, 2002, Cohen acquired a 25% interest in Operating Co. in the GMS transaction. Anne testified at trial that while Cohen provided important services, it was not the agreement that he would receive a 25% interest in Operating Co. Anne testified, in substance, that Cohen obtained this interest by breach of fiduciary duty and fraud. He placed the 25% provision in the deal documents without her authorization.

In the prior surcharge trials, Judge Wolf found that Anne failed to meet her burden to establish what portion of Cohen's services were rendered in connection with the GMS transaction as opposed to the services he rendered in connection with Anne's purchase of the Yasuda Note. He held that Anne was accordingly responsible for any money due him.

In this trial, the Trustee seeks to set-off against any distribution to Anne an amount equal to the 25% of the value of Seaport Village that she allegedly "gave "to Cohen. It offered no proof that I credit that Cohen lawfully acquired his 25% interest. Anne established that the 25% interest was obtained by breach of fiduciary duty and fraud. Anne and the Trust were victims. The Trust benefitted from Cohen's expertise and participation in negotiating the GMS transaction. Without his involvement the deal would not have been accomplished; it avoided the complete loss of Seaport Village by foreclosure. Anne's breach of her duty to keep the Trustee and Ricky informed, and her

misappropriation of Trust monies, do not render her liable for Cohen's conduct. Also, the Trustee offered no proof that I credit of the value of Seaport Village. The amount of the purported set-off cannot be calculated from the evidence presented at trial and is speculative.

**E. Prior Actions for Removal and Surcharge**

**1. The Removal Petitions and the Trustee's First Account**

In May 2002, Anne filed a petition in this Court to remove and surcharge the Trustee for alleged excessive payments of attorneys' fees and costs. In June 2002, Anne filed a separate petition in this Court to remove and surcharge the Trustee due to an unequal distribution of Trust income to Anne and Ricky.

In May 2002, the Trustee filed its First Account Current through which the Trustee sought, among other things, approval of administrative costs and trustee's fees. The Trustee later filed a supplement to its First Account in which it sought instructions regarding the proper interpretation of the Trust's property allocation and distribution procedures.

On February 18, 2003, the Trustee filed its own action to remove Anne as Special Trustee. It alleged that Anne had concealed from the Trustee and from Ricky the GMS Transaction, in which Anne sold the Trust's Seaport Village assets and transferred the proceeds from the sale to entities outside the trust that she controlled.

On September 17, 2003, after an eight-day trial, this Court (by Judge Leonard Wolf, ret.) denied Anne's petitions and granted the Trustee's petition to permanently remove Anne as Special Trustee for breaches of fiduciary duty. The Court rejected Anne's defense that she was the sole beneficiary of the Seaport Village assets and, as a result, had no duty to anyone other than herself. The Court found that under the terms of the Trust, Ricky was a beneficiary of the Seaport Village assets contingent on Anne not surviving the Trustor by ten years. Also, Ricky was a beneficiary of Seaport Village assets, independent of Anne's survival, if utilization of those assets was needed to fund an "equalizing payment" due him. In other words, Ricky had an interest in the Seaport Village assets until, at a minimum, September 5, 2009, or the final distribution of the equalizing payment,

whichever was later. The Court approved all aspects of the Trustee's First Account, except for the issue of income distributions between Anne and Ricky. Lastly, the Court determined that the Trust's assets, including the Seaport Village assets, are appropriately valued as of the date of final allocation and distribution, which had not yet occurred.

The Court's decisions regarding the Trustee's Removal Petition against Anne and the Trustee's First Account were affirmed on appeal on September 15, 2004 in Appellate Case Nos. B177712 and B185170.[1]

**2. The Surcharge Trial against Anne**

While the appeal from the removal order was pending, Anne submitted an accounting of her administration of the Seaport Village assets in response to an order of the court. The Trustee and Ricky objected to the accounting reports. After a trial to address the Trustee's and Ricky's objections, the Court found Anne liable to the trust for $7,935,150 and $870,536 in prejudgment interest for breaches of fiduciary duty and misappropriation of Trust funds.[2] The surcharge award was affirmed on appeal on October 24, 2007. (Appellate Case Nos. B177712 and B185170.[3])

**3. The Marwyn Litigation**

In October 2002, Anne filed an action against the Trustee and Ricky for declaratory relief relating to Anne's purchase of Ricky's shares in Marwyn and also sought compensatory and punitive damages against the Trustee in an amount of not less than $1.8 million.[4] Ricky cross-claimed against Anne for rescission of the sale of his Marwyn shares on the grounds that Anne had committed constructive fraud by concealing from him the GMS transaction, which had a direct impact on the value of his Marwyn shares.[5] Anne dismissed her damages claim against the Trustee approximately one year after she filed her petition.[6] After a three day court trial, this Court denied Anne's declaratory relief action against the Trustee and Ricky, and granted Ricky's cross-claim for

[1] Ex. T-298.
[2] Ex. T-420, *5-6.
[3] Ex. T-402.
[4] Ex. T-62.
[5] Ex. T-183, p. 1:9-12.
[6] Ex. T-94.

rescission.[7] The Court's decisions regarding Marwyn were affirmed on appeal on March 30, 2005. (Appellate Case Nos. B170609 and B173609.[8])

### F. The Issues in This Trial

#### 1. Anne's Accounting of Limited's Merchant Marketing and Payroll Adjustment Accounts

Anne was generally ordered to account for all aspects of her administration of the Seaport Village assets by Judge Wolf on September 17, 2003, when she was removed as Special Trustee. She did not provide an accounting for two SPV accounts, informally referred to by their uses as the "Marketing' and "Payroll" accounts. The accounts are more accurately – but more confusingly- referred to as the "Merchant" and "Payroll Adjustment" accounts. The Trustee and Ricky sought to surcharge Anne based on her failure to account for the Marketing and Payroll accounts in proceedings before Judge Wolf primarily relating to the GMS transaction. On August 3, 2004 Judge Wolf held such issues could only be raised by a new Petition.

On July 19, 2007, the Trustee filed a Petition to Compel Anne to Account for Limited's SPV Merchant [Marketing] and Payroll Adjustment Accounts ("Marketing and Payroll Accounts"), and for Surcharge ("Marketing and Payroll Petition"). Anne was ordered to so account for the Marketing and Payroll Accounts by Judge Mitchell Beckloff and on August 12, 2008, Judge Beckloff denied approval of Anne's accounting. It was based on general ledger entries, which are summary in form. Anne was ordered to submit an amended accounting on or before September 5, 2008.

Anne filed her Amended Accounting on or about September 2, 2008. This Amended Accounting was detailed, based on copies of checks and computer generated information from the payroll service used by Limited. The Trustee filed objections to Anne's Amended Accounting on or about October 17, 2008.

---

[7] Ex. T-184.
[8] Ex. T-324.

### 2. The Trustee's Final Account and Petition for Instructions, and Anne's Surcharge Requests

On September 23, 2008, the Trustee filed a "First Account and Second and Final Account and Petition" seeking Orders and instructions from the Court to: (1) approve the Trustee's First and Second and Final Account; (2) terminate the Janice L. Taubman Trust, effective immediately; (3) approve the allocation of certain administration expenses of the Trust as between the two Trust beneficiaries, Anne and Ricky; (4) approve the request by the Trustee for extraordinary compensation; and (5) approve the Trustee's final allocation plan.

Ricky filed a joinder approving all aspects of the Trustee's Final Account and Petition for Instructions, and waived any objections thereto. Wyatt did not file a formal response to the Trustee's Final Account and Petition for Instructions; nor and did he take any position on the matter at trial.

On November 8, 2008, Anne filed her "Opposition to U.S. Bank's Petition for Approval of Accountings; Request for Surcharge of $25,432,881.04, Payment to Anne C. Taubman of $5,165,463.34 and Related Relief Based on the Trustee's Dissipation of Trust Assets and Related Acts of Misconduct."

## III. TRUSTEE U.S. BANK. N.A.'S PETITION TO COMPEL FORMER SPECIAL TRUSTEE ANNE C. TAUBMAN TO ACCOUNT FOR SPV MERCHANT AND PAYROLL ADJUSTMENT ACCOUNTS, AND FOR SURCHARGE, AND FORMER SPECIAL TRUSTEE AND BENEFICIARY ANNE C. TAUBMAN'S AMENDED ACCOUNTING RE: SEAPORT VILLAGE LTD. MARKETING ACCOUNT AND SEAPORT VILLAGE LTD PAYROLL ADJUSTMENT ACCOUNT

### A. The Trustee's Marketing and Payroll Petition and Anne's Amended Accounting

Anne was ordered to account as to Limited's Marketing and Payroll Accounts. She now has done so to the satisfaction of the Court and demonstrated that neither account was used for an improper purpose. Her Amended Accounting is approved.

The Marketing account was funded by a portion of the rent paid by the Seaport Village sub-tenants. It was used to pay for expenses incurred to promote Seaport Village as a tourist and shopping destination. It is common for shopping centers to maintain this type of account. Anne was not a signatory on the checking account. The Marketing Director and General Manager executed all checks. Neither Anne nor any entity under her control received any payment from the Marketing account, which was only used to promote Seaport Village.

The Payroll account was used to fund Limited's payroll. Salary checks to Limited's employees came from a payroll service, Pay-Net, which drew payroll checks on its own accounts. Each payroll period Limited sent Pay-Net a check for the amount needed from the Payroll account. Anne was not paid a salary by Limited. Deposits into and withdrawals from this account should have been - and were – significant. Neither Anne nor any entity under her control received any payment from the Payroll account, which was used only for its intended proper purpose.

The Trustee suggests the long delay (2003- 2008) until Anne provided a detailed accounting, i.e., the Amended Accounting, which it argues is still deficient, is evidence of Anne's bad faith and continuing misconduct. I disagree.

Anne was generally ordered to account in 2003, and in 2004 the Trustee and Ricky sought to surcharge her for the expenditure of all the money that had been deposited into the Marketing and Payroll Accounts, totaling $4,191,427. But, in his August 3, 2004 Corrected Statement of Decision Judge Wolf declined, citing essentially two reasons: (1) Anne did not have sufficient notice that the details of these accounts was needed, and (2) the amounts paid from the accounts for marketing and payroll was not "inherently suspicious." Judge Wolf concluded that any issue as to these two accounts that remained after the Trustee was able to analyze them "should be resolved by way of a future petition...which the Bank and Ricky may institute…." This did not happen until July 19, 2007.

Although Anne's obligation to account for the Marketing and Payroll Accounts was not unambiguously suspended pending the filing of a new Petition, it was not bad faith or misconduct for Anne to await one. A new Petition would telegraph that the Trustee had concluded that there was indeed something suspicious about the accounts and that it demanded a detailed accounting. This is what Judge Wolf arguably contemplated. Once the Trustee filed a new Petition, after a long hiatus suggesting that it did not intend to do so, Anne did not then have within her possession, custody or control the documents needed to provide one. As of trial, some documents could not be obtained because of the passage of time. The Court finds that Anne acted in good faith in accounting for the Marketing and Payroll Accounts.

Anne claims that the Trustee breached its duty and acted in bad faith by filing its Marketing and Payroll Petition, and for continuing to seek a surcharge against her following the submission of her Amended Accounting.

The Court finds no bad faith and no breach of duty by the Trustee (at least through the last attorney's fee invoice paid herein; i.e., prior to Judge Beckloff's order requiring advance court approval for the payment of attorney's fees.)

Anne finds support for her position in the October 3, 2004 Corrected Statement of Decision. Judge Wolf did reject a surcharge based on the pleadings before him but also noted that "Neither the Bank nor Ricky should be foreclosed from examining the expenditures made from these accounts and seeking recovery of any disbursement that Anne cannot justify." Judge Wolf was clear: "Anne is not now entitled to a finding absolving her from liability from any such improper disbursements and the denial of the imposition of a surcharge at this particular time cannot and should not be construed as a finding, either expressed or implied, that no such improper disbursements were made by Anne."[9] Anne was not, as she now seems to assert, clearly relieved of the duty to account or that it was made conditional; at a minimum, the Trustee acted in good faith and was justified in so concluding..

The Trustee was justified, breached no duty, and acted in good faith, in filing its Marketing and Payroll Petition, and pursuing the matter toward trial. During the 1999-2004 timeframe Anne

[9] Ex. T-289, p. 23:19-25.

oversaw the distribution of over $5,000,000 from the Marketing and Payroll Accounts; her oversight continued even after she was removed as President of Limited's general partner and removed as Special Trustee. Further, despite Anne's fiduciary duties to keep books and records, protect Trust assets, and to account for her use of the Seaport Village funds, no detailed accounting was provided for these Marketing and Payroll Accounts and no documentation was provided to explain these expenditures until the Amended Accounting. The Trustee examined 19 banker's boxes worth of documents provided by Anne via Ann Lane that supposedly contained the financial records of Limited, but none of these records explained how these funds were used. Indeed, there were no marketing or payroll records turned over to the Trustee whatsoever heightening the Trustee's reasonable suspicions that the Marketing and Payroll Accounts, like other accounts of Limited and Inc., were used improperly by Anne. Also, Ricky demanded action against Anne.

While the Amended Accounting ultimately produced by Anne has been found sufficient by this Court, that outcome could not be predicted with any reasonable degree of certainty. The Amended Accounting fails to include the probate schedules ordered by the Court on August 12, 2008, fails to provide back up documentation in support of the disbursements, and does not cover the entire time period that Anne was ordered to account for (September 5, 1999 through December 31, 2003). More than $1,000,998.00 in disbursements are undocumented.

**B. <u>Anne's Request for Attorneys' Fees</u>**

The Court grants Anne's request for attorneys' fees for the defense of her Amended Accounting. She may file a noticed motion in Department 99 to determine the amount.

## IV. TRUSTEE U.S. BANK, N.A.'S FIRST ACCOUNT AND SECOND AND FINAL ACCOUNT AND REPORT OF TRUSTEE AND PETITION FOR INSTRUCTIONS, ETC; AND BENEFICIARY ANNE C. TAUBMAN'S PRELIMINARY OPPOSITION...; REQUEST FOR SURCHARGE OF $25,432,881.04, ETC.

### A. Anne's Claims for Breach of Trust and Surcharge

In the context of this Trust, the Trustee is relieved from liability from breach of trust except where the misconduct is intentional, reckless, grossly negligent, or in bad faith. Probate Code section 16461(b); Trust, Fifth Amendment, section 5.09 A. This limitation of liability was granted "by reason of the Trustor's desire that the Trustee not act in a manner which the Trustor would find too conservative." Further, to give additional protection to the Trustee, the Trustor provided that "[r]eliance in good faith on any advice or recommendation given by any of the advisers reasonably employed or selected by the Trustee shall constitute evidence of an absence of fraud, willful misconduct, gross negligence." Trust, Fifth Amendment, section 5.09 A. The Court declines to find that the Trustee acted recklessly, with gross negligence or in bad faith with respect to all or any of its challenged conduct, as explained below.

#### 1. Anne's Claims re Alleged Excessive Attorneys' Fees and Costs

a. Retaining attorneys and agreeing to the rates charged was not a breach of trust.

"[T]he Probate Code is studded with provisions authorizing the trustee to hire and pay (or seek reimbursement for having paid) attorneys to assist in trust administration. For example, *section 16247* empowers the trustee 'to hire persons, including ... attorneys ... or other agents ... to advise or assist the trustee in the performance of administrative duties.' *Section 16243* provides, 'The trustee has the power to pay ... reasonable compensation of the trustee and of employees and agents of the trust, and other expenses incurred in the ... administration ... and protection of the trust.' And *section 15684, subdivision (a)* provides in part, 'A trustee is entitled to the repayment out of the trust property for ... [¶] [e]xpenditures that were properly incurred in the administration of the trust.' "

*Hollaway v. Edwards* (1998) 68 Cal.App.4th 94, 97; see also *Wells Fargo Bank v. Superior Court (*2000) 22 Cal.4th 201, 213 ("Under California law, a trustee may use trust funds to pay for legal advice regarding trust administration ....").

Attorneys hired by a trustee to aid in administering the trust, which would include preparing an accounting and responding to the beneficiaries' objections to that accounting, are entitled to reasonable fees paid from trust assets. *Kasperbauer v. Fairfield* (2009) 170 Cal.App.4th 785, 791. The Trust provides in its Fifth Amendment, paragraph 5.08 H, that the Trustee may hire lawyers and other advisors as it deems "helpful" and "to pay such persons reasonable compensation...." Reasonable compensation is broadly defined by the Trust: "the Trustee shall not be limited to customary charges for such services in the community, but instead may employ experts whose rates of compensation may be in excess of such customary charges..."

Paragraph 5.10 of the Fifth Amendment to the Trust states the Trustor intended to give the trustee "maximum flexibility" in administering the Trust and, for the "protection of the trustee," urged the trustee to "consult with legal counsel concerning the exercise of any power or discretion granted herein."[10]

The Trustee hired top tier lawyers who charged rates consistent with their skill. The selection of such lawyers was reasonable, and not an intentional, reckless, grossly negligent or bad faith breach of trust. The issues at hand were often complex requiring special expertise. Large sums were at issue. The attorney's billing rate charged is consistent with billing rates in Los Angeles of comparable law firms. In hiring the lawyers and other advisors that it did, or in agreeing to pay the compensation that it did, the Trustee breached no duty. [11]

---

[10] If an advisor is reasonably selected by the Trustee "Reliance in good faith on any advice or recommendation given...shall constitute evidence of an absence of fraud, willful misconduct, or gross negligence." Trust, Fifth Amendment, section 5.09 A.

[11] Further, the Trustee's reliance on the advice of its advisors, in the context of this litigation, was in good faith, as was the advice itself.

b. There was no intentional, reckless, grossly negligent or bad faith breach of trust.

Anne urges that the Trustee breached its duty by incurring attorneys' fees and costs that were grossly excessive in view of the circumstances of the Trust. Mindful of the intentional/reckless/gross negligence/bad faith standard mandated by the Trust, described above, I do not so conclude.

The testimony of the Trustee's employees, Robert Tiedemann and David Hilgenberg, and the Trustee's advisors, Barry E. Fink, Esq. and fiduciary consultant David Mackenzie, was that the Trustee was mindful of the attorneys' fees and costs being incurred and took measures to reduce and hold-down legal fees. I credit this testimony.

The Trustee had multiple persons reviewing its attorneys' fees bills, including employees both at its Los Angeles office, and its corporate headquarters in Minneapolis. Specifically, the following testimony which I credit was given:

- Mr. Tiedemann and Mr. Hilgenberg testified that all litigation engaged in, and all administrative acts carried out by the Trustee, were performed after consulting with counsel, accountants, or other consultants.
- Mr. Tiedemann and Mr. Hilgenberg also testified that they consistently consulted with in-house counsel, the Trustee's Chief Fiduciary Officer, and other internal experts regarding the administration of the Trust.
- Mr. Tiedemann and Mr. Hilgenberg testified that all invoices received from outside-counsel and consultants were reviewed both at the local level, and at corporate headquarters by an in-house attorney, before being approved. All attorneys' fees and costs were paid only after it was determined that they were reasonable and necessary.

- Mr. Mackenzie and Mr. Fink testified that all litigation undertaken by the Trustee was upon the advice of Mr. Fink or other attorneys, and that Mr. Mackenzie was regularly consulted.
- Mr. Tiedemann and Mr. Fink testified that the Trustee negotiated a 10% discount on the attorneys' fees incurred with the Glaser Weil firm, and made every effort to keep the costs of Trust administration down.
- Mr. Mackenzie testified that all of the attorneys' fees and costs paid by the Trustee were necessarily incurred.

In addition, the Trustee submitted the testimony of attorneys' fee expert, Ken Moscaret, through his report and supplement, to establish that all of the attorneys' fees and costs incurred by the Trustee were reasonable. He reviewed each of the factors set forth in California Rules of Court, Rule 4-200, as well as other factors, and concluded that the attorneys' fees and costs incurred by the Trustee were reasonable. Mr. Moscaret's full report was received in evidence in lieu of live testimony by stipulation of the parties.

As evidenced by Exhibits T-2 and T-3 and the testimony at trial, some of the attorney's fees and costs were incurred in defense of pleadings seeking relief against the Trustee. It was reasonable and appropriate for the Trustee to defend, and the Trust was benefited by a defense.

Anne argues that the significant attorneys' fees and costs incurred by the Trustee were objectively unreasonable, inappropriate, and did not benefit the Trust. She reasons that the high cost of attorney time (more then $9 million) cannot be justified when compared to the low value of the Trust's Seaport Village assets ($1 million or less[12]). Also, Anne argues that the price of litigation against her (more then $2 million), although the Trustee was successful (about $9.5 million recovered), was unreasonable. She reasons that as the beneficiary of the Seaport Village assets the money recovered from her ultimately would to be returned to her; hence, the litigation did not benefit the Trust.

---

[12] Anne's exact valuation position is unclear: "the Trust's interest in Seaport Village … is worth several million dollars and perhaps many million dollars…." BENEFICIARY ANNE C. TAUBMAN'S OBJECTIONS TO STATEMENT OF DECISION PROPOSED BY TRUSTEE U.S. BANK, pp. 17-18.

The problem with Anne's theory that the Seaport Village assets had a low value is that neither the Trustee – nor anyone else – could so conclude with reasonable confidence. This is because the answer to two central questions was unknown: (1) would the Port extend the term of the Seaport Village ground lease? and, (2) would the surrounding waterfront area be developed in a manner optimally beneficial to Seaport Village's business? At least some – apparently including a sophisticated GMS – thought the answer to both questions was "yes" and that the Seaport Village assets were accordingly of great value.

The Trustee knew of several valuations by apparently knowledgeable persons: In discussions with the Trustee, Ricky and his attorney valued the Seaport Village assets at as much as $100 million. GMS represented to a third party that its 50% controlling interest in Seaport Village had a value of approximately $39 million. Yasuda Bank valued Seaport Village at roughly $24 million (through its arms length sale of its $39.8 million note to Anne at about a 40% discount).

Anne's secretive conduct in the GMS transaction and her scorched -earth tactics vis-à-vis the Trustee and Ricky suggested that she placed a significant – although not quantified - value on Seaport Village.

The Trustee did not itself seek to value the Seaport Village assets. It undertook to preserve those potentially very valuable assets for the Trust based on the valuations described above and as demanded by Ricky. Doing so was not an intentional, reckless or grossly negligent breach of Trust.

The Trustee presented uncontroverted evidence that it undertook a cost-benefit analysis, through consultation with its counsel, an outside fiduciary consultant, and the inside Chief Fiduciary Officer at U.S. Bank, before initiating any litigation. The Trustee did not act in bad faith.

As to Anne's claim that the surcharge funds were to be returned to her by the Trust (about $9.5 million, including interest), Judge Wolf actually held these funds were to be paid-out according to the Trust instrument. This meant that all or a portion of the money <u>might</u> be returned to Anne in future distributions. It would not necessarily be "returned" to her. The Trustee incurred about $2 million in fees and costs in recovering the $9.5 million. The Court concludes that the Trustee did not act in bad faith, or engage in a breach of trust intentionally, recklessly or with gross negligence in incurring and paying these administrative costs.

**2. Anne's Claims re Alleged Excessive Trustee's Fees**

The Trustee is entitled to reasonable trustee's fees for its administration of the Trust. Pursuant to the Trustee's fee schedule, it collects a yearly fee of approximately 1% of the market value of the Trust's assets. This is a reasonable fee. Anne claimed that the Trustee overcharged Trustee's fees by (1) charging both an investment fee and a trustee fee for Trust assets that were invested in mutual funds owned by U.S. Bank; (2) improperly valuing the Trust's oil and gas interests; and (3) improperly valuing the Trust's Seaport Village assets.

Robert Tiedemann testified he was familiar with how the Trustee calculated its trustee's fees and stated that the Trustee (1) did not charge both an investment fee and a trustee fee on those assets invested in U.S. Bank's mutual funds; (2) did not charge a trustee's fee on the Trust's oil and gas interests; and (3) did not overcharge trustee's fees based on the Seaport Village assets. As to (3), Mr. Tiedemann testified the Trustee did not change its trustee's fee after the sale of the Seaport Village carousel. However, there was no overcharge because the Trust's Seaport Village assets (Limited and Inc. together) had a higher market value than the $989,500 amount that was used to calculate the fee, even after the sale of the carousel. I credit his testimony.

Anne offered the testimony of her expert Andrew Gifford. Mr. Gifford never reviewed the Trustee's fee schedule. He did not know how the Trustee's fees were calculated, did not know how the Trustee was valuing the Trust's assets for purposes of calculating its trustee's fee, and did not know if the Trustee actually overcharged any fees.

**3. Anne's Claims re Surcharge Funds Awarded to Limited**

Pursuant to Judge Wolf's August 3, 2004 Corrected Statement of Decision, approximately $1 million in surcharge funds were awarded against Anne independent of GMS because she had misappropriated those funds directly from Limited's bank accounts. Judge Wolf ordered that these funds were to be maintained by the Trustee on behalf of Limited. Anne claims the Trustee violated Judge Wolf's order and commingled Limited's surcharge funds with Trust assets, and thus, the Trustee should be surcharged. The evidence does not support Anne's claims.

David Hilgenberg and Robert Tiedemann both testified that the Trustee uses software that allows the Trustee to earmark funds that are the property of a particular entity, such as Limited, and

track all expenses paid on that entity's behalf. Mr. Hilgenberg and Mr. Tiedemann further testified that the surcharge funds recovered on behalf of Limited were spent defending Limited against several lawsuits filed against it as part of the "blowback" of the GMS transaction, and for other administrative activities, such as filing amended tax returns. It needed to incur expense to handle a potential tax liability problem for "cancellation of indebtedness" income. The issue arose because of Anne's discounted purchase of the Yasuda Note. As successor Special Trustee of the Trust's Seaport Village assets, the Trustee was authorized to hire attorneys to defend Limited in these lawsuits and use Limited's funds to pay the attorneys' fees. Likewise, as successor Special Trustee, the Trustee was authorized to pay its accountants a reasonable fee, using Limited's funds, to draft and file tax returns on Limited's behalf.

The evidence establishes that all of the funds recovered on behalf of Limited were earmarked by the Trustee's accounting software and then spent to satisfy reasonable and necessary expenses and liabilities incurred by Limited.

**4. <u>Anne's Claims re Accountings of Inc., Limited and Marwyn</u>**

Anne argues the Trustee was required to separately account for Inc., Limited and Marwyn. The Court disagrees. A trustee is not required to account for the activity of a business entity owned by a trust unless ordered to do so. A Trustee is only required to account for a change in value and any net income received by the Trust for a business. Probate Code Section 1061, et. seq. The Trustee provided this information in its accountings. There is no order requiring the Trustee to separately account for Inc., Limited and Marwyn. Thus, the Trustee satisfied its accounting duties regarding the Trust's Seaport Village assets under the Probate Code.

**B. <u>The Trustee's Final Account and Petition for Instructions</u>**

**1. <u>The Trustee's Second and Final Account Current</u>**

All aspects of the Trustee's Second and Final Account Current are approved, except as noted herein. The Final Account cannot be approved in its entirety.

The Final Account does not provide for equal distributions of income and principal to Anne and Ricky. As discussed in this subsection, it must do so.

(The Court has awarded attorney's fees to Anne, in an amount to be determined for her successful defense of her Amended Accounting, as discussed above. The Court does not approve the Trustee's distribution proposal, as discussed below. The Court does not grant a surcharge against Anne for alleged shortages in the Marketing and Payroll Accounts, as discussed above.)

The Trust instrument provides that Anne and Ricky are to receive equal distributions of income on a monthly or other periodic basis. "The Trustee may also pay to or apply for the benefit of the child so much of the principal of the Share as the Trustee shall deem necessary in the Trustee's sole and absolute discretion for the child's health and education … after taking into consideration, to the extent the Trustee deems advisable, any income or resources of the child outside of this Trust, known to the Trustee." Trust, Ninth Amendment, paragraph 3.02B(b)(i).

The discretion granted the Trustee as to principal distributions is broad but not unlimited. Before exercising its discretion to pay principal to a beneficiary the Trustee must consider evidence that allows it to decide what amount is "necessary" for his or her health and education; i.e., "The Trustee may … pay … principal … as necessary … for the child's health and education…." The Trustee never obtained evidence of Ricky's health and education status, his wants or needs, or reached a conclusion of the amount "necessary." Also, before the Trustee may pay principal to only one child, the Trustee must consider whether it is "advisable" to "take into consideration … any income or resources of the child outside this trust, known to the Trustee." The Trustee never did this.

The Court does not credit the testimony that distributions of principal were made to Ricky to allow him to participate in Trust-related litigation. Distributions of principal were made to Ricky because he demanded them.

Anne is entitled to be paid the aggregate total of monthly distributions, plus interest, that the Trustee has withheld from her while paying Ricky.

The Trustee did not make equal distributions to Anne because it concluded that Anne was liable for millions of dollars in offsets (such as for the Marketing and Payroll Accounts and Cohen's claim to 25% of Seaport Village Operating Co.), that easily exceeded the amount owing to her. This

conclusion was not reached in bad faith, and it was not an intentional, reckless or grossly negligent breach of trust to so conclude.

Anne argues that because the Trust now lacks the money to pay what was withheld from her, the Trustee should be surcharged for its improper administration.. I disagree. As explained below, Seaport Village assets that would otherwise be distributed to Ricky are sufficient to cover any deficiency in what Anne receives.

Anne is owed a total of $5,477,538.19 including interest through February 15, 2010. Interest accrues thereafter at the legal rate.

The Trustee is to submit an amended Final Account, taking into account the amounts owed to Anne that equalizes the Shares to be received by Anne and Ricky[13].

The Trustee is not required to utilize any of its own funds to make any payment to Anne or to equalize the shares of Anne and Ricky. The Trustee must distribute a greater pro-rata percentage of Trust assets (except for Seaport Village assets) to Anne in order to equalize - to the extent feasible - Anne and Ricky's Shares. Assets must be valued at their current fair market value.

The Trustee may not treat the 25% interest that Cohen received in Operating Co. as a distribution to Anne. First, the Trustee has not established the value of a 25% non-managing member interest in Operating Co. Second, the Trustee has not established that this 25% interest was "given" to Cohen by Anne. According to Anne, Cohen obtained his 25% by fraud. No convincing contrary evidence has been presented to me. I credit Anne's testimony.

Anne involved Cohen in the negotiations with GMS for a proper Trust purpose; specifically, to refinance Seaport Village and thereby avoid its total loss by foreclosure. While Cohen's compensation for his services might be Anne's responsibility (due to her failure of proof before Judge Wolf), his unauthorized act of taking the 25% is not her personal liability.

The Trustee shall demand that Ricky reimburse the Trust for any amounts he has been overpaid.

---

[13] Mention was made at trial regarding the potential for a significant tax refund to the Trust. Nowhere is it noted that the Trust has a potential for a tax refund. If there is such a potential it should be referenced and fully explained in the Trustee's Amended Final Account.

## 2. **The Trustee's Proposed Pro-Rata Distribution Plan**

The Trust contemplates that Anne will ultimately receive all of the Trust's Seaport Village assets, and will pay Ricky an equalizing amount based on the Trust's definition of fair market value of the assets, at the time of final allocation and distribution, essentially to compensate Ricky for not receiving half of the Seaport Village assets. "[F]air market value" includes "the value of any future expansion of Seaport Village." Trust, Tenth amendment, section 3.02 H. The Trustee has recommended and proposed a distribution schedule that deviates from the terms of the Trust. The Trustee proposes that the Trust be divided into two equal Shares, one for Ricky and one for Anne, and that all of the Trust assets be distributed equally and pro-rata between the Shares, subject only to the certain charges against Anne's share and Ricky's share.

Such a deviation from the Trust can only be permitted upon the finding of changed circumstances. *Leonardini v. Wells Fargo Bank & Union Trust Co.* (1955) 131 Cal.App.2d 9. On petition by a trustee, the court may modify the provisions of the trust if, owing to circumstances not known to the settlor and not anticipated by the settlor, the continuation of the trust under its terms would defeat or substantially impair the accomplishment of the purposes of the trust. The Court finds that changed circumstances do exist that were not anticipated by Janice and frustrate her intent. The Court primarily relies upon the testimony of Robert Tiedemann, Barry Fink and David Mackenzie in making this finding. Thus, an in-kind distribution of the Trust's assets, including the Seaport Village assets is warranted. Probate Code §15409.

Janice was well aware of the day to day involvement of Anne in the active management of the Seaport Village and Anne's desire that Ricky have no involvement or ability to interfere with the affairs of the shopping center. Ricky was to receive half of the fair market value of Seaport Village (as defined by the Trust) but its management was given to Anne. Accordingly, the Trust contemplated that Anne (but not Ricky) would manage Seaport Village first as a Special Trustee, and ultimately as the 100% owner of Seaport Village, and Ricky would receive a monetary "equalizing" payment. The GMS transaction, however, changed the nature of the Seaport Village

investment. It is no longer of import that Anne exclusively control the business, as it has been changed from an actively managed investment to one that is passive. The condition that caused Janice to allocate the Seaport Village interests to Anne (Ricky's potential interference with Anne's management) was eliminated by the GMS transaction, and as a result, there are changed circumstances not anticipated by Janice, and it would not frustrate Janice's intent to now allocate the remaining Seaport Village interests 50-50 between Anne and Ricky. What would frustrate her intent is for the Trust to needlessly incur the cost of compliance with the valuation procedure set forth in paragraph 3.02H of the Tenth Amendment, and to needlessly continue the high cost of administration. She contemplated the Trust would easily have the money on hand. But, the Trust appears to lack the funds needed to complete the valuation procedure and for continued administration. It has been depleted by costly litigation; litigation promises to begin again if the valuation procedure is undertaken. For these reasons, the Court approves the Trustee's pro-rata distribution plan, as modified hereby, and orders that all Seaport Village assets of the Trust are to be divided 50-50 between Anne and Ricky, subject to any amounts owed to Anne relating to overpayments to Ricky described above. The amount owed but unpaid to Anne, plus interest thereon at the legal rate, shall be an equitable lien on Ricky's distribution.

### 3. <u>The Trustee's Proposed Allocation of Administrative Expenses</u>

The Trustee proposed allocating a large amount of the administrative fees to Anne under the "tort of another doctrine." The Trustee argued that substantial attorneys' fees and costs were incurred initiating and defending litigation resulting from Anne's breaches of fiduciary duty as Special Trustee.

If a party, in order to protect its interests, is required to bring or defend an action due to the tort of another, that party is entitled to recover compensation for attorney's fees incurred from the person who committed the tort. This is the so-called "tort of another" or "third party tort" doctrine.

The expenses sought were not caused by Anne's breaches of fiduciary duty. Those breaches, for the most part, were based on her failure to disclose the GMS transaction to the Trustee and Ricky, and her failure to account for and deliver to the Trustee its proceeds. The transaction itself

was a benefit to the Trust and its beneficiaries. The shopping center would otherwise have been lost in foreclosure. Anne's decision as Special Trustee to enter into the GMS transaction was not - standing alone- a breach of fiduciary duty. The "tort of another" doctrine requires that the third party's tort cause the claimed loss; i.e. the tort must be a substantial factor in bringing about the claimed loss. That requirement is not met here[14].

Accordingly, the Trustee's proposed allocation of administrative expenses is not approved.

**4. The Trustee's Request for Confirmation of Ownership of Trust Assets**

The Trustee requested clarification as to the ownership of Limited. Anne originally claimed that the entity, Anton, owned a 53.73% interest in Limited. However, Judge Wolf's Corrected Statement of Decision, dated August 3, 2004, held that all of the income from Seaport Village, other than that allocated to GMS in the GMS Settlement, is income of the trust estate, to be delivered to the Trustee. The Corrected Statement of Decision dated August 3, 2004, pages 16 and 17, provides as follows: "If the GMS proceeds were specifically Limited's, as Anne now asserts, then she would have had the proceeds paid to Limited and Limited would have then distributed the proceeds to its partners, which included the Trust. Anne did not do that. She kept the money for herself. Under these circumstances, she is not entitled to receive a portion of the GMS proceeds through her ownership of Anton, Ltd. which has a roughly 53% limited partnership stake in Limited."

The import of Judge Wolf's holding is that Anton no longer has a stake in Limited and that, whatever its value, all of the interests in Limited (apart from the management share belonging to GMS) beneficially belong entirely to the Trust. Indeed, Anne has admitted in other proceedings that this is the import of Judge Wolf's ruling. In Anne's Respondent's Brief in In re the Janice L. Taubman 1990 Trust, Court of Appeal Case No. B194074, at page 3, Anne states as follows: "In prior proceedings, Seaport Village Ltd. has effectively been found – in its entirety (including both Janice's minority interest and Anne's pre-existing majority interest) – to be an asset of the Trust."

Accordingly, this Court follows Judge Wolf's equitable determination and finds that, as a result of the GMS Transaction, Limited is now beneficially owned 100% by the Trust.

---

[14] It is also worth noting that Anne was not "another." While an outside fiduciary – such as a broker - can be "another" the same is not true of a predecessor or co-trustee.

**5. <u>Anne's "Third Alternative"</u>**

Anne offers what she terms a "third alternative" as a means to resolve all controversies presented by this case. This "third alternative" would, in general terms, have Ricky purchase for cash all of Anne's interests in the Seaport Village assets, using a loan from the Trustee secured by Seaport Village, or by using money generated by a proposed surcharge of the Trustee, to finance the transaction. The Trustee declines to voluntarily make the needed loan and opposes any surcharge. Anne urges that it be compelled to make the loan, or be surcharged. The Court declines to do so. There is no breach of trust upon which to base a surcharge. Under the circumstances of this case this Court lacks the power to order a Trustee to loan the sums proposed.

**6. <u>Remaining Matters in the Trustee's Final Account and Petition for Instructions</u>**

The Trustee's request for extraordinary trustee compensation is deferred until a final accounting is approved.

The Trustee's allocation of surcharge sums to principal is approved.

The Trustee's allocation of oil and gas revenue is approved.

The Trustee's power to pay itself and its attorneys reasonable compensation under the Trust instrument without prior court order is reinstated. The Trustee may pay or protest outstanding fees it has already incurred, or pay or protest fees that it incurs in the future without the need for advance application to the Court. The Trustee must follow the Trust and the law. Anne may challenge such payments by future petition.

**C. <u>Wyatt's Request for Clarification</u>**

Wyatt has requested clarification on three matters: (1) his standing to participate in further Trust proceedings given that the Trust has now terminated by its own terms; (2) how the Trust estate is to be divided upon termination; and (3) Wyatt's interest in the "oil and gas" interests.

**1. Wyatt's standing to participate in further Trust proceedings**

The Trust was a 10-year Trust that terminated by its terms on September 5, 2009. While Judge Wolf previously held that the Trust could continue past the 10-year term if the necessary equalizing payment had not been to Ricky on or before September 5, 2009, the provision for the equalizing payment has now been eliminated. With both Anne and Ricky surviving the Trust's term it only exists to the extent the Trustee needs to wind -up the affairs of the Trust. Accordingly, Wyatt's contingent interest in the Trust no longer remains and with no interest in the Trust, he no longer has any standing to participate in further Trust proceedings.

**2. Wyatt's Request for Clarification regarding the Termination and Distribution of the Trust**

Once the Trustee submits its Amended Final Account, and it is approved, the Court will issue an order regarding the final termination and distribution of the Trust.

**3. Wyatt's Interest in the Trust's "oil and gas" interests**

Wyatt's interest in the Trust was eliminated once Anne and Ricky survived the Trust's term. There is no provision in the Trust that provides for Wyatt to receive a continuing interest in the Trust's "oil and gas" interests upon the Trust's termination. If Wyatt has any remaining interest in the "oil and gas" interests, it would only be through the estate of his father Ricky, either by will or intestacy. The Trustee is not required to consider this potential interest of Wyatt while it is winding-up the Trust for final distribution.

The Trustee shall forthwith prepare a concise final order, including updating interest.

Dated: AUG 27 2010, 2010

Marvin M. Lager
Judge of the Superior Court

# EXHIBIT H

MR. TABRIZI: That's fine with us. 3:26:48PM

THE ARBITRATOR: Okay. Let's take a five-minute break. Let's tack a ten minute break.

MR. PHILLIPS: Okay. Thanks Mr. Fisher.

MR. TABRIZI: Thank you. 3:26:55PM

THE ARBITRATOR: 3:40. 3:27 PM.

(A recess was taken.) 3:41 PM

THE ARBITRATOR: Shall we go back on the record? All right. I have received I believe all of the papers and have gone through them. As you know, the 3:41:34PM SVO papers were filed yesterday and I went through them yesterday and last night. And so I'm going to put the ball back in Mr. Phillips court. Do you have anything further to say Mr. Phillips.

MR. PHILLIPS: I will be brief. What struck me 3:41:53PM on the opposition is I think there's just a fundamental misunderstanding by SVO of what we are doing with this motion. Our initial motion was for terminating sanctions Mr. Fisher. You denied that without prejudice and suggested, you know, refiling it and I think you 3:42:11PM used the analogy of red card and yellow card and soccer. You weren't ready to, you know, bust out the red card.

So what we have asked for are lesser sanctions and I believe some of that has been lost on SVO. I thought we were pretty clear. I have the conclusion of 3:42:35PM

our renewed motion here very plainy sets forth that we 3:42:37PM are no longer seeking terminating sanctions but the lesser sanction, the incremental sanction that are referenced in both the law we cited and the law that SVO cited. 3:42:52PM

There, you know, I will just jump around a little bit. You know one of the requests is for negative inference relating to the damages post what we believe is an improper termination. We believe that the evidence that has been submitted, we have had an 3:43:12PM opportunity to hear from Mr. Laag which I don't believe he rebutted any of that evidence is that, as of the date of termination, according to SVO's own representation to its lender and title company, when asked the very pointed unambiguous question, is, you know, the project 3:43:31PM complete, the answer is it's complete and operational subject to the wall being -- being completed and punch list.

So SVO to suggest that that is an appropriate response to a lending institution and a title company 3:43:57PM when it was their position that at the time July 5th, that the project was not substantially complete, for them to give that answer to the lender and title company as contemplating loaning them millions of dollars, it's beyond the pale. I don't even know how to respond to 3:44:16PM

the sanctions are warranted and really required in order to establish a fair playing field. And you will recall and we will all recall, you know, that's one of the first things that Mr. Frishman was jumping up and down demanding when they first got involved in this case. They wanted a fair arbitration and that related to documents. The irony is that we are in that position now. That's been acknowledged. And something needs to be done about it. And we have given, you know, and Mr. Fisher, you know, we have given you what we request are the appropriate sanctions and we refiled a motion based on what we perceive to be an invitation to do so. But your acting as a trial court in these proceedings as agreed by the parties and expressly set forth in Section 9.3 of the turnkey agreement. You have the authority to sua sponte issue whatever sanctions remedies or whatever you feel is appropriate to carry out a fair proceeding. And that's exactly what we are asking you to do. So unless you have any other questions from us, you know, that's essentially -- we are not, you know, we have gone over the opposition and we are not,s, we don't think there is anything persuasive in there to really explain adequately the position that Vertiv has been unfairly put in. 3:45:56PM 3:46:12PM 3:46:30PM 3:46:47PM 3:47:09PM

THE ARBITRATOR: All right Mr. Dieffenbach, 3:47:28PM

lenders are -- are in Vertiv's possession. You know, this -- it just smacks to me of an attempt to, as our papers say, pound the table when there's really no -- no basis in law for -- for this motion or for the complaints that Vertiv is raising in the motion. You know we are putting on the best case we can, and the evidence is there to support our claims. They're not precluded from any evidence that would defeat those claims. We are not -- we are not interesting in hiding the ball. 3:50:50PM 3:51:13PM 3:51:31PM

THE ARBITRATOR: Okay. And my views I have expressed before. I went over them quite a bit in the November 10 hearing, and I was wrestling back and forth as we were going along here trying to deal with what I see is a difficult situation to kind of resolve. And that's basically trying to conclude the arbitration in the time we have fairly or to remove any doubts of fairness and put everything over, which SVO has kindly agreed to do for a period of time to examine all of these documents. And I also wanted to say to check to see what happened with the tenant and their case. And to see generally where we are going and how it's headed and what the relevance is of -- of the documents that are kind of -- I say in question. 3:51:50PM 3:52:08PM

So, excuse me. 3:52:31PM

completed. We have partial things that the owner has 4:03:34PM
agreed -- well has decided that they need to fix that
are apparently three to $7 million worth of -- three to
$7 million worth of invoices somewhere. But nothing
else. He's got 100 claims of additional things to do. 4:03:48PM
This isn't a gift that keeps on giving. This is a
construction case that needs to end. And I see it as a
big responsibility to end that case fairly.

Now with all of that in mind, the way I think
it should be done, what I will do so to -- sanctions is 4:04:06PM
a word that sounds punitive. I'm not trying to punish
anybody. But I am trying to fairly do, fairly proceed.
And I'm going to do that by limiting the evidence much
like a motion in limine. And I think that the evidence
should be the damage evidence should be limited. I 4:04:28PM
think the given all of this turmoil over the tenant and
all of that, lost profits, I'm going to bar evidence on
lost profits, lost rents, cost of capital, you know,
delay. I will leave open liquidated damages. And I
will leave open the covers to repair to complete or 4:04:53PM
repair which is a huge battle ground in itself. But I
think we can fit that in given what I understand the
records are.

So that's -- I'm not sure if that's a sanction
or not a sanction. But it's clearly a limitation on 4:05:11PM

evidence based upon work product, based upon obstruction -- notice providing records timely, of obstruction with third-party witnesses and documents and I've given everybody two opportunities to brief these issues. I do agree a little bit with Mr. Phillips. I read through all of those documents, and I was particularly interested if anybody was saying that going back that we didn't have documents, they didn't have or, you know, go back to this discrepancies between like Mr. Baker and his declaration and his deposition. He didn't deny the deposition he just vagued it up. But there's nothing further there. I received another one with the other experts that kind of come in say they have got all of this and there are things to say. But that doesn't change the real problem I've got. 4:05:15PM 4:05:32PM 4:05:52PM 4:06:08PM

So my intent is to go forward limiting -- if I just look at the third amended statement of damages, limiting damage evidence to the cost to repair or replace Liebert's Phase 1 scope of work, excluding evidence really of the damages related to lost profits in the $22 million, exclude damages related to increase financing costs of $6 million, exclude damages related to lost opportunity cost of equity of four or $5 million, and the delay damages on liquidated damages and whatnot I'm leaving open. And that we can proceed. 4:06:32PM 4:06:54PM

the hearing won't be closed until I get the two last and best offers. Then we will close the hearing and I have time to decide which one it is. The dates aren't that clear but that's what I'm thinking. 4:08:50PM

So. 4:09:05PM

MR. FRISHMAN: May we be heard Mr. Fisher.

THE ARBITRATOR: You can make your statements for the record in a American. Let me think what else I need to be done.

I don't think so on the -- I believe I'm in compliance with the although I'm not labeling it sanctions I am labeling it evidence control. And if little a sanction so be it, it is. But even if it is a sanction, I am authorized under rule 58 to order appropriate sanctions where party fails to comply with obligations under these rules or an order of the arbitrator and if I do limit or terminating, I do in writing and require the submission of evidence and legal argument prior to making the award or enter a default and provide a party that is subject to the request with an opportunity to respond prior to making a determination. 4:09:17PM 4:09:39PM 4:09:57PM

I believe we have done that. We have had two rounds with all kinds of stuff so that's all done. We have orders. The orders are to produce everything by 4:10:08PM

situation. It's not anything we -- we covered. 4:13:26PM Swinteron's produce all of their documents. And to issue such a harsh sanction, you know, you can call it evidentiary control. It's certainly not incremental. It's a jump almost to the finish line here. And it 4:13:42PM seems to me that the better course would be to do a continuance. This is a private arbitration. I understand that it's been three and a half years. That's not the fault of my office or my client per se or -- or for that matter Vertiv. The case is what it 4:14:02PM is. It's been a moving -- a moving target. There's been a lot that's happened. This thing started and it could never have been and I've said this to you before, and I say it again with all due respect. It could have never when you look at this case been -- been arbitrated 4:14:19PM so quickly. We could be in a long cause case, you know, if we were in the Superior Court. And I'm not advocating that but it's a big case with a lot of claims that we believe the evidence supports with a lot of claims that involve significant dollars with bona fide 4:14:37PM loss of rent, loss of profits. Those claims were always listed from day one on a statement of damages. And now you're going cut them all? I don't think so. I think the better way to do is say wait a minute, this is a private -- private arbitration. You guys are paying for 4:14:58PM

# EXHIBIT I

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | and expounding upon these issues. It should be noted that Hallmark Insurance, which was sharing in fees and costs at 50% paid for this charge without deduction, or similar) | |
| 05/19/2021 | 71 | L440 A104 | 1.00 | 1.00 | $694.64 | $233.39 | $694.64 | $233.39 | Pre arbitration preparation activities and related strategy | Time was Reasonable | This was a highly complex matter involving numerous legal and factual issues. The work related to this entry included the following: Assessment, including review of various matrices concerning wittinesses appearances, exhibit list, evidence tree concerning exhibits to be used with wittinesses, subpoena for records and wittiness appearances and related pre arbitration document needs and assessment and development of same, as well as status of arbitration report to carrier. TM was serving as Cumis counsel. As such carrier guidelines are technically not applicable. We do however, make every effort to comply with the guidelines and please accept our apologies for the lack of detail in the original entry with this additional information and detail, the entry is in order and we request it be paid. | O. Appeal allowed subject to Cost Share |
| 05/19/2021 | 72 | L120 A103 | 1.00 | 1.00 | $550.50 | $0.00 | $550.50 | $0.00 | Preparation of section of pre arbitration report to carrier specifically detailed factual background section regarding DPR contract and pre contract negotiations and activities as they relate to Vertiv's claims against SVO (5 pages) | Time was Reasonable | The preparation report was excess of 40 pages as initially drafted. Multiple drafts and iterations, including review , supplementing and annotation of the report were necessary. There was also involvement by the client. M was serving as Cumis counsel and portions of the document are privileged and therefore cannot be produced. The work involved in this highly complex matter involving numerous factual and legal issues was substantiative and necessary. With this additional detail the entry is in order and we request it be paid. | F. Document not attached |
| 05/20/2021 | 73 | L310 A103 | 1.00 | 1.00 | $135.03 | $0.00 | $135.03 | $0.00 | Draft timeline and summary related | Time was Reasonable | As discussed with claims handler | F. Document not attached |

✓ ✗

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | secret violations and patent infringement), as well as unfair business practices, etc. Time billed accurately reflects time spent completing task. Review and drafting of these materials are necessary and proper in order to determine next steps in handling of case. Further, the review and work completed are in the furtherance of developing a case strategy and are necessary in the evaluation of the case. It should be noted that Hallmark Insurance, which was sharing in fees and costs at 50% paid for this charge without deduction, or similar) | |
| 05/26/2021 | 127 | L120 A103 | 1.00 | 1.00 | $176.57 | $0.00 | $176.57 | $0.00 | Extensive revising and editing of drafted list of stipulated facts including detailed review of all prior pleadings by both parties to ensure completeness and to ensure that facts submitted are favorable to SVO as much as possible (6 pages edited) | Time was Reasonable | This was a highly complex matter involving numerous legal and factual issues. The work related to this entry included the following: Per order of the arbitrator the parties were required to meet and confer concerning prosed stipulations of fact and evidence for purposes of attempting to narrow issues and shorten the phase I arbitration hearing. The draft further stipulations, which were partial and related to critical issues concerning Vertiv's general contracting license status at the time Vertiv commenced actual construction of the project. One of SVO's primary defenses to Vertiv complainant and multiple alleged causes of action was that Vertiv was not a properly licensed contractor in the State of California and therefore was barred from maintaining its breach of contract and other related claims. TM was serving as Cumis counsel and therefore carrier guidelines are technically not applicable. We nonetheless make every effort to comply with the guidelines. We apologize for the lack of detail in the original entry. With this | F. Document not attached |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/26/2021 | 130 | L120 A103 | 1.00 | 1.00 | $186.96 | $0.00 | $186.96 | $0.00 | Drafting and revising list of stipulated facts including detailed review of all prior pleadings by both parties to ensure completeness and to ensure that facts submitted are favorable to SVO as much as possible (3 pages drafted) | Time was Reasonable | This was a highly complex matter involving numerous legal and factual issues. The work related to this entry included the following: Per order of the arbitrator the parties were required to meet and confer concerning prosed stipulations of fact and evidence for purposes of attempting to narrow issues and shorten the phase I arbitration hearing. The draft further stipulations, which were partial and related to critical issues concerning Vertiv's general contracting license status at the time Vertiv commenced actual construction of the project. One of SVO's primary defenses to Vertiv complainant and multiple alleged causes of action was that Vertiv was not a properly licensed contractor in the State of California and therefore was barred from maintaining its breach of contract and other related claims. TM was serving as Cumis counsel and therefore carrier guidelines are technically not applicable. We nonetheless make every effort to comply with the guidelines. We apologize for the lack of detail in the original entry. With this additional information, the entry is complete and we request it be paid. | F. Document not attached |
| 05/26/2021 | 131 | L120 A103 | 1.00 | 1.00 | $186.96 | $0.00 | $186.96 | $0.00 | Extensive revising and editing of drafted list of stipulated facts including detailed review of all prior pleadings by both parties to ensure completeness and to ensure that facts submitted are favorable to SVO as much as possible (6 pages edited) | Time was Reasonable | This was a highly complex matter involving numerous legal and factual issues. The work related to this entry included the following: Per order of the arbitrator the parties were required to meet and confer concerning prosed stipulations of fact and evidence for purposes of attempting to narrow issues and shorten the phase I arbitration hearing. The draft further stipulations, which were partial and related to critical issues concerning Vertiv's general | F. Document not attached |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | to comply with the guidelines. We apologize for the lack of detail in the original entry. With this additional information, the entry is complete and we request it be paid. | |
| 05/27/2021 | 133 | L350 A103 | 1.00 | 1.00 | $166.19 | $0.00 | $166.19 | $0.00 | Further preparation of proposed Stipulation of Facts (SVO 25-35). | Time was Reasonable | This was a highly complex matter involving numerous legal and factual issues. The work related to this entry included the following: Per order of the arbitrator the parties were required to meet and confer concerning prosed stipulations of fact and evidence for purposes of attempting to narrow issues and shorten the phase I arbitration hearing. The draft further stipulations, which were partial and related to critical issues concerning Vertiv's general contracting license status at the time Vertiv commenced actual construction of the project. One of SVO's primary defenses to Vertiv complainant and multiple alleged causes of action was that Vertiv was not a properly licensed contractor in the State of California and therefore was barred from maintaining its breach of contract and other related claims. TM was serving as Cumis counsel and therefore carrier guidelines are technically not applicable. We nonetheless make every effort to comply with the guidelines. We apologize for the lack of detail in the original entry. With this additional information, the entry is complete and we request it be paid. | F. Document not attached |
| 05/27/2021 | 134 | L120 A103 | 1.00 | 1.00 | $280.44 | $0.00 | $280.44 | $0.00 | Further drafting subsection regarding SVO's defenses to Vertiv's Patent liability case, including applicable law, burdens and support including expert and lay tesimony of pre arbitration report to carrier | Time was Reasonable | The preparation report was excess of 40 pages as initially drafted. Multiple drafts and iterations, including review , supplementing and annotation of the report were necessary. There was also involvement by the client. M was serving as Cumis counsel and portions of the document are privileged and | F. Document not attached |

✓

X

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | the project and careful review of any attached documents to view determine if they mentioned any table of values for scope determination by HKA expert Jeff Smith (75 documents reviewed with roughly 140 pages) | | |
| 06/22/2021 | Richard Dieffenbach | 1343 | L440 A109 | 0.80 | 0.80 | $215.00 | $215.00 | $172.00 | $81.74 | Review DPR privilege log for references to Joint Defense Agreement privilege claims pre-dating effective date of JDA for use in argument at evidentiary hearing | | |
| 06/22/2021 | David Frishman | 1359 | L340 A108 | 0.10 | 0.10 | $225.00 | $225.00 | $22.50 | $10.69 | Email to HKA expert Jeff Smith regarding confirmation of publication and production of report by expert | | |
| 06/22/2021 | Alexander Randolph | 1369 | L340 A109 | 1.00 | 1.00 | $165.00 | $165.00 | $165.00 | $78.41 | Attend alignment call for Jeff Smith expert report with Julee Fritsch, David Frishman, Ulrich Pelz, and Jeff Smith | | |
| 06/23/2021 | Alexander Randolph | 5 | L120 A103 | 0.80 | 0.80 | $165.00 | $165.00 | $132.00 | $62.73 | Drafting and revising memorandum of standard for gross negligence and CACI jury instructions for gross negligence to assist experts in drafting opinions regarding the standard of care in the construction (2 pages) | | |
| 06/23/2021 | Julee Fritsch | 10 | L340 A103 | 1.10 | 1.10 | $215.00 | $215.00 | $236.50 | $112.39 | Draft revisions to letter regarding Vertiv's failure to timely produce Nathan Moeder for deposition | | |
| 06/23/2021 | Julee Fritsch | 14 | L340 A104 | 0.40 | 0.40 | $215.00 | $215.00 | $86.00 | $40.87 | Review Ulrich Pelz's chart of comments regarding standard of care expert report | | |
| 06/23/2021 | Cindy Mader | 30 | L130 A104 | 1.30 | 1.30 | $215.00 | $215.00 | $279.50 | $132.83 | Review and analyze documents relied on and cited by Erik Laykin in Duff & Phelps report. | | |
| 06/23/2021 | Alexander Randolph | 67 | L120 A106 | 0.20 | 0.20 | $165.00 | $165.00 | $33.00 | $15.68 | Call with Ulrich Pelz and Marco Venero regarding Vertiv document productions and CPS reports | | |
| 06/23/2021 | Alexander Randolph | 73 | L120 A104 | 1.40 | 1.40 | $165.00 | $165.00 | $231.00 | $109.78 | Review and analysis of CPS productions looking for documents indicating a contractual agreement and terms between CPS and SVO for use in determining scope and justifiable termination issues (120 pages in 65 documents) | | |
| 06/23/2021 | Cindy Mader | 87 | L130 A107 | 0.10 | 0.10 | $215.00 | $215.00 | $21.50 | $10.22 | Communicate with John Bass of Duff & Phelps regarding time and details of deposition preparation for Erik Laykin. | | |
| 06/23/2021 | Julee Fritsch | 140 | L340 A103 | 1.60 | 1.60 | $215.00 | $215.00 | $344.00 | $163.48 | Draft letter regarding Vertiv's failure to timely produce expert Robert Taylor for deposition | | |
| 06/23/2021 | Richard Dieffenbach | 172 | L330 A109 | 4.70 | 4.70 | $215.00 | $215.00 | $1,010.50 | $480.22 | Attend and take deposition of Eric Crandall, Vertiv licensure expert | | |
| 06/23/2021 | David Frishman | 174 | L110 A103 | 0.70 | 0.00 | $225.00 | $225.00 | $157.50 | $0.00 | Prepare draft updated litigation budget | Overhead Expense/Fee | Pursuant to the app Guidelines, prepara and tasks related to considered to be fir which is a non-com overhead expense. questions, please re website: www.thehartford.co |
| 06/23/2021 | David Frishman | 240 | L120 A104 | 1.20 | 1.20 | $225.00 | $225.00 | $270.00 | $128.31 | Review and assess expert discovery status and strategy concerning potential continuance of arbitration hearing in light of Vertiv and DPR discovery tactics | | |
| 06/23/2021 | Ethan Kraft | 270 | L110 A104 | 1.50 | 1.50 | $165.00 | $165.00 | $247.50 | $79.16 | Review and Analysis from documents in Murphy Austin chronology list (Pages 1-700) in preparation of downloading to a shared exhibit folder for the final upload to Relativity for endorsing exhibits in preparation of review to client U. Pelz and the 7/9 Exhibit exchange. | Excessive Time | 10.4 hours billed to documents. The am billed appears dispr the task identified b type of records/pag |

**Legal eXchange Invoice from Tyson and Mendes LLP**

| | |
|---|---|
| **INVOICE NUMBER** | 100030-A1 |
| **INVOICE DATE** | 05/04/2022 |
| **DESCRIPTION:** | Liebert International v. SVO Building One, LLC |
| **MATTER NUMBER** | CGL325269 |
| **MATTER NAME** | Vertiv Company |
| **CUSTOMER PAY NAME** | |
| **CUSTOMER PAY NUMBER** | |
| **FIRM TAX ID** | 202119209 |
| **FIRM ADDRESS** | P.O. Box 744815<br>Los Angeles, CA 90074-4815 |

## FEES:

| Date | Timekeeper | LI # | Code | Orig Hours | Curr Hours | Orig Rate | Curr Rate | Orig Amt | To Pay | Description | Adj Reason | Adj Comment | Std Apl Reason | Custom Apl Reason | Std Apl Response Reason | Custom Apl Response Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*No Records Found.*

## EXPENSES:

| Date | Timekeeper | LI # | Code | Orig Units | Curr Units | Orig Rate | Curr Rate | Orig Amt | To Pay | Description | Adj Reason | Adj Comment | Std Apl Reason | Custom Apl Reason | Std Apl Response Reason | Custom Apl Response Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/01/2021 | | 1 | E110 | 1.00 | 1.00 | $18.00 | $0.00 | $18.00 | $0.00 | Weekend Parking - Expense Report of Nazemi Tabrizi, Jamie | | | Other reasons | As discussed with claims handler Angel Muth, this is a very unique case. The claims by Vertiv against SVO are multiple (see our prior pre-arbitration report of June 24, 2021). Those claims, which center around the construction of a data center and are highly complex and overlapping and involve multiple contractual issues and related claims, as well as Intellectual Property claims (i.e., alleged trade secret violations and patent infringement), as well as unfair business practices, etc. TM is serving a Cumis Counsel and therefore the carrier guidelines are not technically applicable to this matter. Notwithstanding, TM is familiar with the carrier guidelines and makes effort to comply with them. The travel activity and need for same was discussed with Hallmark Claims | E. Overhead | |

N07744

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | brief. This entry should be paid in full. | |
| 08/13/2021 | 99 | L430 A103 | 1.00 | 1.00 | $235.51 | $235.51 | $235.51 | $55.51 | Further review and argumentation of closing brief argument regarding communication requests of client SVO contact Ulrich Pelz concerning arbitration arguments concerning involved business related issues as well as evidence highlights | Time was Reasonable | This was a complex case involving multiple issues, causes of action, claims and defenses. The data base of documents for this matter was excess of 1 million documents. TM was the third firm to handle the matter and was serving as cumis counsel. As such, carrier guidelines are technically not applicable, although we are aware of them and make every effort to comply when we reasonably can. We note that Hallmark Insurance, which reached an agreement with Navigators to share in the cost of the defense at 50% has paid this charge without deduction. The closing phase I arbitration brief was comprehensive and involved marshaling of several thousand exhibits and related evidence support for the defense and clients position. The client was heavily involved in its preparation. The brief went through multiple drafts and iterations before being finalized. The brief, which was excess 40 pages included extensive legal citations and references to authorities as well as evidence cites, references and indexes. At the outset of this matter Navigators claims representative Angel Muth was advised of the complexity of the matter, the amount of work involved and that a team of seven (7) attorneys would be needed. This entry is in order and we request that it be paid. | O. Appeal allowed subject to Cost Share |
| 08/13/2021 | 100 | L120 A104 | 1.00 | 1.00 | $260.91 | $0.00 | $260.91 | $0.00 | Review and Analysis of case law related to GC and Licensure provided by J. Tabrizi in preparation for drafting closing | Time was Reasonable | Time billed accurately reflects time spent completing task. Review and drafting of these materials (40 documents | Q. Sufficient time allowed for task in this or other entries |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | furtherance of highlighting and expounding upon these issues. It should be noted that Hallmark Insurance, which was sharing in fees and costs at 50% paid for this charge without deduction, or similar). | |
| 09/20/2021 | 123 | L440 A104 | 1.00 | 1.00 | $1,019.79 | $1,019.79 | $1,019.79 | $209.77 | Phase II arbitration preparation regarding exhibits | Time was Reasonable | We apologize for the lack of detail with the original entry. This was a complex matter with multiple issues and a data base if over 1 million documents. Over 400,000 potential phase II exhibits existed. The work associated with this entry involved reviewing and screening excess of 1000 expert exhibits anticipated to be used and introduced during the second phase of arbitration and related handling of same, including strategy for exhibit list and related issues. The work was substantive and necessary in nature (the entire SVO team was working on exhibit review and related issues given the number of exhibits). TM was serving as Cumis counsel and carrier guidelines and therefore technically not applicable. We do however make an effort to comply whenever reasonably possible. Hallmark Insurance, which shared in the defense at 50% paid this entry without deduction. With this additional detail, the entry is in order and we request it be paid. | O. all su SI |
| 09/20/2021 | 124 | L440 A103 | 1.00 | 1.00 | $467.40 | $0.00 | $467.40 | $0.00 | Preparation of detailed letter to arbitrator regarding harm of Twitter subpoena and reasons to deny issuing | Time was Reasonable | As discussed with claims handler Angel Muth, this is a very unique case. The claims by Vertiv against SVO are multiple (see our prior pre-arbitration report of June 24, 2021). Those claims, which center around the construction of a data center and are highly complex and overlapping and involve multiple contractual issues and related claims, as well as Intellectual Property claims (i.e., alleged trade secret violations and patent infringement), as well as unfair business practices, etc. Time billed accurately reflects time spent completing task. Review and drafting of these materials requires careful legal analysis of the claims and contentions asserted to ensure that we are covering | B. re: cu ad re: |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | due to his separate version of identifying documents which required no only comparison of documents to evidence and admitted exhibits but also retracing and locating records individually in the Relativity database, analyzing them for content and relevance, and where necessary justifying their inclusion or exclusion due to client's overzealous but legally mistaken view of the admissibility of evidence | |
| 10/05/2021 | 58 | L430 A103 | 1.00 | 1.00 | $113.31 | $11.65 | $113.31 | $11.65 | Review revise and finalize further briefing regarding Phase II arbitration issues on behalf of SVO concerning SVO position regarding remaining claims of Vertiv in light of Phase I ruling | Time was Reasonable | This was a complex case involving multiple issues and a data base of excess of 1 million documents. The briefing that is the subject of this entry and related work, was excess of 10 pages and substantive in nature. It involved post arbitration I ruling dispute concerning Vertiv claims that notwithstanding the arbitrator's ruling that it could still maintain certain claims against the client based on theories other than contractually based. TM was serving as Cumis counsel. The briefing includes issues which are subject to the attorney client privilege and cannot be produced. As cumis counsel, TM is not technically subject to the carrier guidelines. Notwithstanding, we make an effort to comply when reasonably possible. With the additional detail provided, the entry is in order and we request it be paid. We note that Hallmark Insurance, which shared in the defense with Navigators at 50% paid this charge without deduction. | H. Partial reimbursement allowed |
| 10/05/2021 | 59 | L440 A104 | 1.00 | 1.00 | $200.00 | $0.00 | $200.00 | $0.00 | Continue to review issues listing and locate witness emails deposition testimony, and related documents in Relitivity to be used in examination in arbitration phase 2. 275+ pages | Task was not clerical | The work completed to assist the attorney in the furtherance of developing a defense strategy. A legal secretary could not complete the task because the review and work product takes into account the specific legal and factual underpinnings of the case file and | A. Appeal response does not justify additional payment |