Shawn Shaffie (SBN 262002)
shaffie@parkershaffiellp.com
Bruce T. Smyth (SBN 89171)
smyth@parkershaffiellp.com
Behnam M. Parvinian (331944)
parvinian@parkershaffiellp.com
**PARKER SHAFFIE LLP**
800 W. 6th Street, Suite 500
Los Angeles, California 90017
Telephone: (213) 622-4441
Facsimile: (213) 622-1444

Steven W. Murray (SBN 41493)
swm@psilaw.com
**STEVEN W. MURRAY, APC**
14930 Ventura Boulevard #205
Sherman Oaks, CA 91403
Telephone: (818) 501-2277
Facsimile: (818) 501-8441

Attorneys for Defendant and Counterclaimant
**SVO BUILDING ONE, LLC**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, WESTERN DIVISION

NAVIGATORS SPECIALTY INSURANCE COMPANY,

Plaintiff,

v.

SVO BUILDING ONE, LLC,

Defendant.

SVO BUILDING ONE, LLC

Counterclaimant,

v.

NAVIGATORS SPECIALTY INSURANCE COMPANY,

Counter-defendant.

Case No. 3:22-CV-07102-AMO
[Assigned to Hon. Araceli Martinez-Olguin]

**DECLARATION OF BRUCE T. SMYTH IN SUPPORT OF SVO'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF NAVIGATORS SPECIALTY INSURANCE COMPANY'S EXPERT WITNESS ANDRÉ E. JARDINI**

Date: March 5, 2026
Time: 2:00 p.m.
Dept.: Courtroom 10, 19th Floor

*[Filed concurrently with Reply]*

/ / /

**DECLARATION OF BRUCE T. SMYTH**

I, Bruce T. Smyth, declare as follows:

1. I am an attorney at law licensed to practice before the Courts of the State of California and have been admitted to the Bar of the United States District Court for the Northern District of California. I am Senior Counsel with Parker Shaffie, LLP, counsel of record for defendant and counterclaimant SVO Building One, LLC ("SVO"). In that capacity, I am aware of the facts set forth herein of my own personal knowledge.

2. I submit this declaration regarding SVO's reply in support of motion to exclude testimony of Navigators Specialty Insurance Company's expert witness André E. Jardini.

3. Attached hereto as Exhibit 1 are true and correct copies of excerpts from the certified copy of the deposition of Andre Jardini, which I took by video on November 18, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed December 22, 2025 at Los Angeles, California

Bruce T. Smyth

Bruce T. Smyth

# EXHIBIT "1"

CERTIFIED COPY

Express Deposition Services
by ExpressNetwork

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Navigators Specialty Insurance Company vs SVO Building One, LLC

Andre Jardini - Expert

November 18, 2025

Laurie A. Schmidt, CSR No. 12719, Job No. 11711

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br>Plaintiff,<br>v.<br>SVO BUILDING ONE, LLC<br>Defendant. | Case No. 3:22-CV-07102-AMO |
| AND RELATED CROSS-ACTION | |

VIDEOCONFERENCE DEPOSITION OF

ANDRE JARDINI - EXPERT

TUESDAY, NOVEMBER 18, 2025, 9:27 A.M.

Reported by Laurie A. Schmidt, CSR No. 12719

Job #11711

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY,<br>Plaintiff,<br>v.<br>SVO BUILDING ONE, LLC<br>Defendant.<br>_______________________________<br>AND RELATED CROSS-ACTION<br>_______________________________ | Case No. 3:22-CV-07102-AMO |

VIDEOCONFERENCE DEPOSITION OF ANDRE JARDINI, EXPERT, taken on behalf of the Defendant and Counterclaimant, commencing at 9:29 a.m., Tuesday, November 18th, 2025, remotely, via Zoom, before Laurie A. Schmidt, Certified Shorthand Reporter No. 12719.

Job No.: 11711

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF NAVIGATORS SPECIALTY INSURANCE COMPANY:

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
BY: SHANNON L. SANTOS, ESQ.
555 South Flower Street
Suite 2900
Los Angeles, California 90071
(213) 443-5100
Shannon.Santos@wilsonelder.com

FOR THE DEFENDANT AND COUNTERCLAIMANT SVO BUILDING ONE, LLC:

PARKER SHAFFIE LLP
BY: BRUCE T. SMYTH, ESQ. (SBN 89171)
800 West 6th Street
Suite 500
Los Angeles, California 90017
(213) 622-4441
smyth@parkershaffiellp.com

ALSO PRESENT: Brad Bissegger, Videographer

# I N D E X


| DEPONENT: ANDRE JARDINI, EXPERT | PAGE: |
|---|---|
| EXAMINED BY MR. SMYTH | 6 |


# E X H I B I T S


| EXHIBIT NOS.: | | PAGE: |
|---|---|---|
| EXHIBIT 6: | NOTICE OF VIDEO DEPOSITION OF EXPERT WITNESS ANDRE JARDINI | 7 |
| EXHIBIT 7: | Expert Documents (N10515-N10519) | 11 |
| EXHIBIT 8: | NAVIGATORS SPECIALTY INSURANCE COMPANY'S INITIAL EXPERT WITNESS DISCLOSURES | 13 |
| EXHIBIT 9: | Buss v. Superior Court 16 Cal.4th 35 (1997) | 26 |
| EXHIBIT 10: | Navigators' Document Production (redacted) (N03168-N03170) | 40 |


QUESTIONS INSTRUCTED NOT TO ANSWER:

PAGE LINE

(None.)

VIA ZOOM VIDEOCONFERENCING;

TUESDAY, NOVEMBER 18, 2025; 9:27 A.M.

THE VIDEOGRAPHER: Okay. My name is Brad Bissegger. I am a videographer associated with Express Deposition Services.

Today's date is November 18th, 2025, and the time is 9:27 a.m. Pacific Standard Time.

This deposition is being taken via Zoom in the matter of Navigators Specialty Insurance Company versus SVO Building One, LLC, and related cross-actions, in the United States District Court, Northern District of California. Case Number 3:22-CV-07102-AMO.

This is the videotaped deposition of Andre Jardini. This deposition is being taken on behalf of the Defendant and Counterclaimant.

Will Counsel please introduce themselves for the record?

MR. SMYTH: Bruce Smyth of Parker Shaffie LLP, Counsel for SVO Building One, LLC.

MS. SANTOS: Shannon Santos for Navigators Specialty Insurance Company.

MR. SMYTH: Thank you.

Will the court reporter please swear in the witness?

CERTIFIED SHORTHAND STENOGRAPHER: Certainly. Thank you.

(ANDRE JARDINI,
EXPERT WITNESS
Deponent, was sworn and examined
and testified as follows:)

CERTIFIED SHORTHAND STENOGRAPHER: Do you solemnly state that the testimony that you shall give in this matter shall be the truth, the whole truth, and nothing but the truth, so help you God?

MR. JARDINI: I do.

CERTIFIED SHORTHAND STENOGRAPHER: Thank you.

I will state, my name is Laurie Schmidt. I am a Certified Shorthand Stenographer. My License Number is 12719.

Counsel, you may proceed.

MR. SMYTH: Okay.

EXAMINATION

BY MR. SMYTH:

Q. Mr. Jardini, could you just give your full name for the record, please?

A. My full name is Andre, middle name Emilio,

E-m-i-l-i-o, last name Jardini, J-a-r-d-i-n-i.
Q. Mr. Jardini, you are testifying as an expert witness on behalf of the Plaintiff Navigators in this case; is that correct?
A. That is correct.
Q. Okay. I know you've had your deposition taken probably over a hundred times. Can I dispense with the admonitions?
A. I'm perfectly fine with that, if you choose to do that.
Q. Okay. Are you under any medication or suffering from any condition that would prevent you from giving your best testimony today?
A. No.
MR. SMYTH: Okay. Okay. I'd like to bring up as Exhibit Number 1 the Notice of Deposition in this matter.
MS. SANTOS: Are we going to mark this as Exhibit 6?
MR. SMYTH: Yes.
(Exhibit 6 was marked for identification and is attached hereto.)
Q. BY MR. SMYTH: Mr. Jardini, were you provided a copy of this notice of deposition?
A. Yes, I was.

Q. A subsequent bill will be prepared of the additional time; is that right?

A. That's my expectation.

Q. Okay. Now, there is a listing in the Timekeeper Summary, "JARDINI, A E Director," and it says 23.60 hours.

Does that reflect the time that you had spent on this matter as of the time of that invoice being prepared?

A. Yes.

Q. Okay. And the rest of the hours, let's see, of the total of 173.70 -- well, let me rephrase that.

A total of 173.7 hours were spent on the project as of the time of this billing?

A. Yes, that's correct.

Q. Okay. And all the time, other than 23.60 hours, was spent by the non-attorney personnel employed by KPC; is that right?

A. Yes, I had the benefit of their work.

MR. SMYTH: Okay. Now, you prepared -- and let's -- actually, let's go -- exhibit next in order, will be -- and we're going on hold onto this one, but we might as well make another exhibit, is the Initial Expert Witness Disclosures. I would like to make that as Exhibit Number, I believe it's "8."

A. I have to be informed by what actually was occurring. In this case, there was one claim for damages for reputational injury, there were other claims for other kinds of damages, contractual damages, intellectual property, misuse damages, trade secrets, and so on, which are not related to defamation, and in the real world are not defamation.

So, you do have to understand that there are 17 claims that are not defamation, and that's a background fact. The devil is always in the details. You have to look at what was actually being done and for what purpose, but in a case in which the main action is everything but defamation, and defamation is thought so unimportant as to be dismissed by the claimant, that it's not remarkable to find that most of the effort was for non-defamation services.

Q. Well, let's take a circumstance where there is a billing entry that is fairly broad, you know, attend arbitration conference or attend -- strike that.

Let's take a broad undifferentiated one that says, "Attend conference with arbitrator."

How would you allocate that between defamation and the other non-potentially covered claims?

A. Well, in this case, I don't believe, frankly, it's unlikely that defamation came up in these meetings

with the arbitrator, and there are a number of such meetings that are referenced in the billing, and I listed them as "P," and which I think is bending over backward, frankly, because defamation was unlikely to have been the topic of discussion. Every other thing in the world that happens in an arbitration is probably being discussed, but not that, but as I said, I allowed for that.

So, in that particular example that you have provided, I put that in the column of compensable. I mean, of -- the column of, potentially defamation.

Q. Okay. Now, what about a circumstance where the billing says in the underlying case, "Review documents for production," words to that effect, how would you allocate that?

A. I would say that, more likely than not, the standard that applies, that's not defamation because the documents in a case involving a number of sophisticated contracts, intellectual property, and trade secrets, those documents are not, let's say, an e-mail disparaging Liebert. I mean, that is -- that is not going to be in the column where you'd allocate that as being related to defamation, because more likely than not, it's not.

Q. Well, wouldn't you have to know the documents

Q. Okay. Do you know if any of those cases have been reported Buss allocations?

A. I don't know. I don't usually follow up after I do my work.

Q. Okay. And I assume the Buss cases, they would all be cases that were litigated in California?

A. Well, Buss was, and I don't know if other jurisdictions have similar principles, I just don't know -- happen to know that. I've testified in 37 different states and a number of foreign countries, and I don't have a way to tell you whether they have Buss-type concepts in those other places, or if I've been retained to do something relating to those concepts.

Q. Okay. Let's go to the prior paragraph, and you -- and that paragraph basically discussed some occasions where judges have disagreed with some or all of your conclusions.

Do you know if any of those disagreements were in cases involving reimbursement under the Buss case?

A. I don't think so, but I haven't gone back to review 30 years of history to see if that's true or not, but I don't remember anything like that.

Q. You mentioned that you were involved in the Buss case. What was your involvement in that case?

A. I did an analysis for, I believe the party was HH Sports, one of the parties, and it had to do with payment of fees to them, and I don't recall specifically beyond that. This is -- if the Buss case reaches the Supreme Court in '97 -- 1997, my work was probably three years before that, so I don't remember the details. I do remember being in the case because Buss is, of course, Jerry Buss of the Lakers fame, and so, it was memorable in that way, because he was a well-known figure in Los Angeles at that time, as well as in the later years.

Q. Do you know if your report was, in any way, involved in the Buss Supreme Court decision?

A. It's not referenced there, so I didn't follow the case as it wound its way through appeal. I did note that, ultimately, it resulted in the Buss decision, and then, that was revisited in other audits that I did after that.

Q. Okay. In Paragraph 18, you state that:

"In no past court finding has any specific opinion on a specific audit issue reached the basis and underpinning of my opinions in this Case."

Do you know if there is any court finding that

10:30

involved the opinions in a Buss reimbursement case?

defend. Look, if the case -- if the defamation case was resumed, then a decision could be made to continue to defend.

In point of fact, the carrier was defending even after the defamation count was dismissed, so it's somewhat academic to say what or wasn't the duty to defend. They did defend.

So, again, my first answer to that would be, I'm not here to speak to duty to defend at all, but I can't escape the notion that it was defended even after the dismissal.

Q. BY MR. SMYTH: Let's go to Paragraph 42 of the report, which summarized basically says that these records reflect that Navigators paid approximately $2,497,187.09 in fees and costs incurred prior to March 24, 2021.

And then, it goes on to say, the records reflect that Navigators paid $2,998,457.50 in fees and costs for the defense of the underlying action after March 24, 2021.

Where did you get those numbers?

A. From the invoices. There's a total fees and costs billed schedule for each firm attached as exhibits to this declaration, and that's what the invoices show when we totaled them.

Q. Okay. And is that -- let me skip to it.
Is that Exhibit 10 to your report?
A. Hold on a second. I'll confirm that, if I can.
Yes, Exhibit 10. It goes firm by firm and breaks down the fees and costs billed both before and after the dismissal of the defamation count.
Q. Okay. And if you add those up, you get $2,497,187.09 prior to March 24, 2021?
A. I could go back through and do it again, but that will -- that was what was determined at the time I did my declaration.
Q. Okay.
A. It's easy to confirm.
Q. Okay. And for after March 24, 2021, Exhibit 10 will show $2,998,457.50 fees and costs were incurred; is that right?
A. I see the total for Tyson & Mendes, which is the firm involved post-March 24, 2021, as reflected on Exhibit 10, as $2,414,876.55. I don't know the disparity, but I think the table is probably correct.
Q. So, and you're looking at -- the number you quoted is on Exhibit 10 to your report at the last page under the Tyson & Mendes LLP Fees and Costs Billed?
A. Yeah, that list by invoice date, invoice number, each amount of fees and costs billed. So, it looks like

it's a very correct recitation of the post-March 24, 2021 time. Recognizing that the April 29th, 2021 invoice had to be separated by date, the date of March 24, 2021. And so, most of that invoice was in the pre-period, and some of it was in the post-period, and it has an amount of $2,414,876.55, which I think is the correct number.

Q. Okay. And that's under the description post-March 24, 2021 total, total billed; is that right?

A. It's all specified on the Exhibit 10 recitation as to Tyson & Mendes. Every number in every place by every statement date and every invoice, all the fees and costs billed are accurately represented there.

Q. Okay. And you believe that that number is more accurate than the letter -- excuse me -- than the total in Paragraph 42 of $2,998,457.50?

MS. SANTOS: Objection. Mischaracterizes what Paragraph 42 says, which is the totals for fees and costs, and not just Tyson & Mendes.

THE WITNESS: Yeah, you have to look at each of the firms, and if you did, and added it all up, the number would be correct from Exhibit 10, and I will stick with what's in Exhibit 10, and if it went into the declaration at a different number, I would prefer the number that's specified by every statement date at the

amount of fees and costs that are applicable. So, that's going to be the best record of that.

Q. BY MR. SMYTH: Okay. Now, if in order to determine from Exhibit 10 the total of fees incurred prior -- fees and costs prior to March 24, 2021, you would add the totals in Exhibit 10 for the pre-March 24, 2021 fees incurred; is that right?

A. Okay. It's very clearly specified in the schedules, the fees and costs billed schedules.

You look at total fees and costs for Murphy Austin Adams & Schoenfeld, you'd add it to the total fees and costs billed by Morris James, LLP, you'd add that to total fees and costs billed by Law Offices of Sean Debruine, and then, you'd add total fees and costs billed by Gordon & Rees, then you'd add total fees and costs billed pre-March 24, 2021 by Tyson & Mendes, and those are the amounts billed.

Paragraph 42 is expressed in amounts paid. So, that may be the difference. I'm not sure, I'd have to go back and check, but they aren't necessarily the same thing, billed and paid.

Q. Well, do you know what other amounts would be paid to get the totals different?

A. I don't know the reason for the disparity. I just note that Exhibit 10 in painstaking detail has

every invoice by all those firms broken down by the relevant date, and those are the amounts in the bills that we reviewed and that we saw. And in this Paragraph 42, I'm expressing it as to amounts paid. And so, those may be different numbers.

I don't know the answer to that, as I sit here today, but that is a potential reason for a disparity.

Q. Because of the disparity, do you have an understanding that the numbers that you have in Paragraph 42 came from another source, and the addition of the numbers in paragraph -- excuse me -- in Exhibit 10?

A. I think that we have all the invoices because they're specified by actual invoice number and date, we also have the entire claim file of Navigators, which would have payment information. So, there may be two different sources. I don't recall, as I sit here today, if that's the case or not.

Q. You don't -- you don't -- is it correct you don't recall what the source would be of the numbers in Paragraph 42?

A. Well, it says "Paid," so there would be some reference in the claims file of amounts paid. It's something that anyone could look at if they needed to, and then, the bills that we reviewed are specifically

So, if he -- if he did do it, in a meaningful way, he would come to a number. He might disagree with my three percent, but he certainly wouldn't come to a hundred percent. That would be patently absurd.

And so, he was left with just criticizing methodology which he doesn't understand.

And if I had a chance to sit down with him and talk to him about what we did, I think he'd agree that what we did is reasonable and appropriate, but he needed to say something in the rebuttal period, and he had to attract -- distract from the fact that he didn't have a contrary opinion, nor did anybody else, and to say that process was somehow flawed, but it's not.

Q. Okay. Now, how would looking at each individual entry and stating why it was either potentially solely non-covered claims or a covered claim, how would that obscure the knowledge of whether that expense was one that should be reimbursable or not?

A. Invoices are designed for a very particular purpose. They tell you what a particular lawyer did that they want the client to pay for at the appropriate rate. It's not prepared -- those records are not prepared to assist in an allocation analysis. In fact, oftentimes, when we do allocation analysis, we deal with block billing and redacted entries, and there's a lot of

things we have to do in order to have a fair interpretation of the document to do the analysis correctly.

Also, you'd be stymied by all the modest entries for review e-mail from Bob, send e-mail to Tony. This gives you no information whatsoever that allows for an appropriate allocation, but if you batch the time by litigation event, identifiable litigation event, recognizes that litigated matters go through a process where those particular events can be described and isolated and batched as to time, you can make one decision as to 25 entries, instead of 25 separate decisions, which is not only burdensome, but enhances the possibility of mistakes.

So, doing it the way we do it is better, more efficient, more transparent, and allows for clarity in the decision-making. Doing it line by line is just entering into a mud hole and coming out with an answer and I thinking it's the right answer. It doesn't help the process.

Q. Well, isn't it true that your categorization of multiple entries is not based on any specific determination under the Buss case?

A. I don't know what you're asking. I have no --

[Simultaneous discussion.]

Q. Let me rephrase it.

In batching these various items, a determination is made by one of your staff members as to whether the items belong in a particular category.

A. Wrong.

Q. Right?

A. Wrong. They don't -- they don't determine any category; I determine that. They -- they look at every identifiable billing service, batch all the time that was spent with regard to that service, identify the timekeepers and date range of that service, and present it on an outline of services.

They have not categorized it in any way, shape, or form. The allocation analysis is mine alone.

So, the process of doing this has no impact on the ultimate answer to the question of how the entry should be allocated.

Q. Now, after your staff does the categorization of these various elements of -- or various time entries, do you do any kind of analysis to check to see whether their categorization is correct?

MS. SANTOS: Objection. Mischaracterizes testimony and argumentative as to the use of the word --

THE WITNESS: Yeah, they don't do a characterization, they do an objective batching of time.

Let's put it down to its elements. They're working on answering interrogatories. Six people do it over 38 days; there are 26 entries on doing that. They're all put in one place, answering the interrogatories. Here's all the people involved, here's the date range. That doesn't categorize anything, other than to put all the time spent for doing that, answering the interrogatories, in one place so one decision could be made.

What apparently Mosgaret thinks is better is to make 26 separate decisions about the interrogatories, which is not helpful, by the way.

So, I reject your notion that the -- that the auditors categorize anything. They batch time objectively as described by the lawyers doing the services, expecting that lawyers do the services that they do in litigated cases. They don't invent new things every case. They're doing pleadings; they're doing discovery; they're doing pre-trial; they're doing motions, and so on. They're doing very specific things which they identify with those kinds of words in their billing because they're telling the client what they're doing, and it's valid to put all their time as to one thing. Let's say they worked on a motion to dismiss, put all the time as to the motion to dismiss in one

place, here's the 53 hours, here's the four people that billed on it, now how do we allocate that?

The thought that you have to allocate as to every separate entry that went into the motion to dismiss is just multiplying the work for no reason.

Q. BY MR. SMYTH: Well, I -- respectfully, I think you misunderstood my question, but let's use your language in terms of the batching.

After the staff does the batching, say on answering interrogatories, is there any kind of check to determine whether they've done that correctly?

A. Well, they do it all day, every day, and in most cases, for more than 20 years. We don't go back and redo the work that they do. We have quality control in the work that we do, and there are -- there's backup information if there's ever a question as to how that was done, but I don't go back and check. Anybody could. We give you the date range, we give you the people that did the work, we give you the description that generally is the description that they used, if not identical.

So, if you don't think it's correct, go back and check it. All the information is there. It's like the fourth grade. Check your work, go do it. It's not impossible. In fact, it's readily done, and if you went back and did it, you'd see that there was a high degree

it, that allows for the process to develop meaning and doesn't get bogged down in every stray entry that's made on the invoice.

Q. Do you know what percentage of invoice entries were not included in the outlines?

A. We list at the end of the outline the total hours on the outline, and you can compare it to the total hours billed, and you would define that readily. I don't have -- it's five or six different firms, it's probably five or six different answers.

Q. Now, let's -- I think I gave an example of -- earlier, and I want to go back to it, of attending a conference with the arbitrator.

And would you agree that somebody defending a defamation claim would have to attend a conference with the arbitrator as part of the defense of that claim?

A. Yes, the question is, was that -- was that event about defamation in any way, shape, or form, and I opted, even though it's very likely that it isn't going to be mentioned in that kind of conference in this case, I did opt to include that in the -- in the defamation-related -- very broadly stated defamation-related category.

Q. Well, let me ask you the question, though. Would a -- an arbitration conference is scheduled. Would you

agree that somebody defending a defamation claim would have to attend that conference?
A. That's a, kind of, duty-to-defend kind of analysis.
Here, we are looking at whether it's more likely than not that it related to defamation, and the answer to that is, it's very unlikely that they're separately discussing defamation.
I included it anyway, in an abundance of caution, as a -- as a part of defamation, distantly defamation-related categories, that is, meeting with the arbitrator, but not on the basis that you're stating that you're there for the whole case, therefore, you're there for defamation. That's a duty-to-defend-type analysis that has no place in what we're doing here.
Q. You would -- the question I have, or the issue of whether the attorney has to defend some general conference, or not, does -- you believe that that does not go to the issue of whether the expense for that can be solely allocable to non-covered claims?
A. In all likelihood -- remember, the issue is more likely than not. In all likelihood, it's not related to that, but I permitted it, in any event. So, it's a bit of an academic question.
Q. Let's look at Exhibit 8 to your report. Let's go

to that.

MS. SANTOS: It's Page 52 of the PDF.

MR. SMYTH: It's Exhibit 8. Let's see. Yes.

Q. Okay. Let me -- let's go to the next page. And I would like to draw your attention to the entry at "5/20/2020 Conference call with arbitrator Fisher."

Do you see that?

A. Yes.

Q. Okay. That is not listed with your -- either your "P" or your "D" designation.

Do you know why that is?

A. Yeah, I made a mistake. It should be.

So, if you add 5.7 hours, you're still well short of the three percent of my opinion.

Q. Okay. Now, let's look at -- let's look at Page 4 of 9, and there's an entry there, "Review and analysis of documents in preparation for discovery and production," and it's 26.9 hours. Now -- and it's not -- it's not marked.

How can you determine whether the review and analysis of documents in that circumstance is solely allocable to potentially non-covered claims?

A. So, you're addressing a notion that could it be possible that one second of that time was spent in connection with something that might be distantly

related to defamation.

I'm looking at it in the context of a case in which defamation was dismissed voluntarily; meaning, it's not an important part of the case; that it was only one of 18 claims, and that that discovery, more likely than not, was related to things not defamation.

And so, under that kind of an analysis, the preponderance-of-the-evidence-type analysis, it's extremely unlikely, and that puts it, you know, below the 51 percent on preponderance of evidence.

Q. So, when you are evaluating whether an expense is solely allocable to non-covered claims, you're applying a standard of whether it's more likely than not that it's not covered; is that right?

A. Right. There's the standard, and then, there's the burden of proving that standard. And the burden of proof is 51 percent, or 50.1 percent, as some people argue, or less than that even.

And so, in this case, involving trademark, intellectual property, trade secrets, involving complicated business transactions, the clear likelihood is, this is not related to defamation, and I think that's a fair conclusion.

Q. So, in this particular case, if there were 50 pages that dealt with allegations relating to

proof that says that it was about defamation. What we do have is the information that we do have, and it's fair to assess that information in its entirety and to reach conclusions on what's more likely than not in the real world of how cases are litigated, not in the hypothetical world where everything might be about some claim that nobody has any faith in. That isn't the way things get litigated.

This case, when it went to settlement, undoubtedly was about who lost money on the deal, who used information impermissibly, what's the value of that, and who should pay whom for those circumstances. It was not about defamation.

Q. Okay. But my question was, and I'll rephrase it, you can't know whether the documents reviewed included ones that related to the defamation without actually knowing what documents were, in fact, reviewed; isn't that right?

A. I do not know which documents were reviewed and what discovery was answered, but more likely than not, based on the record that we all have, and have available to us, we don't have those documents, but based on the record that we do have, it's more likely than not that that's not related to defamation, and I'd stick with that answer.

Q. Okay. Were you aware of any -- or strike that.
Did you -- was there any costs incurred with respect to the defense of allegations of disparagement in the post-March 24, 2021 time period?
A. There was no claim for damages for reputational harm in the complaint under any claim after the defamation claim was dismissed, even in the intentional interference with contractual relations. That's not a -- that's not a reputational harm claim.
Q. Okay. We'll go back to that later.
Now, in preparing the various exhibits that were the outlines of services, which you included services up to March 24, 2021, when did you start those calculations? You know, which time period did you begin those calculations?
A. I think the outlines will reflect that there's a -- there's a tender date, that's one issue, and then, there's the non-recoverable period that we were informed about. So, we applied those dates.
Q. Okay. What date did you use as the tender date?
A. I don't remember exactly. It's reflected in the records somewhere.
Q. Okay.
A. But we were aware of the tender date, and then, the period during which there was non-cooperation, which

was going to be defined as the non-recoverable period.

So, for instance, the Murphy Austin review started at -- at least on the outline of services, as July 1. You can look at the invoice list to see the exact invoice that is involved, and hence, Sean DeBruine started November 12, Morris James started February 5th, 2019. I should tell you the year, I suppose. This is on the outline of services.

The outline of services for Gordon & Rees started December 30th, 2019.

The outline of services for Tyson & Mendes started November 3rd, 2020.

And again, if you want to see the invoices that were reviewed, they're all listed out by date on Exhibit 10.

Q. Okay. Let's go to Exhibit 5, the Murphy Austin fees?

A. Okay.

Q. First page.

A. Okay. I'm there.

Q. Okay. Brad, can you -- yeah, I just want to -- okay.

Now, I have a tender date of July 24, 2019.

If my date is, in fact, correct, the first 14 entries were prior to the tender date.

A. Okay.
Q. Do you have any reason to question the tender date of July 24, 2019?
A. I mean, I don't think you would tell me the wrong date.
Q. Okay.
A. But I just don't happen to know the date, but somewhere in the file materials the date is stated.
Q. Okay. And do you have an understanding that Navigators did not pay for defense fees prior to the tender date?
A. Yeah, that's customary. I didn't review that in detail certainly, but obviously, there's no obligation to defend until there's a tender. I mean, that's just black letter principles that apply.
Q. Okay. So, at least as to Murphy Austin, that cuts out probably well over a hundred hours.
As to --
A. Well, it was counted by me, and they're getting three percent of that. So, bank error in your favor.
Q. That's an interesting way of putting it. I don't think I agree, but okay.
Let's go to -- on, Morris James, it basically -- if you use the correct tender date, it excludes virtually all of those fees, if you look at Exhibit 6.

A. Okay.
Q. Okay. And if you look at Exhibit 7, it excludes seven of the entries, all of which are in 2018 on the Sean DeBruine fees; is that right?
A. There are entries before the date of July 24, 2019.
Q. Okay. Now, do these outlines -- or strike that.
It's correct that these outlines do not necessarily include the fees that Navigators paid; is that right?
A. The outlines are information taken from the invoices themselves. The invoices from which they're taken are listed on Exhibit 10. The amounts paid, as it turns out I now know, were from interrogatories that Navigators answered under oath.
So, my Paragraph 42, as to the amounts paid, are the amounts paid as detailed in answers to your discovery.
So, whether those should be the same or different, I don't have an answer for you, but what we looked at is the Exhibit 10 invoices, and produced the outlines of services, which you've been going through.
Q. But it's correct though that the outlines of services include time periods for which Navigators did not reimburse?

A. I don't know that for sure because I haven't lined up payments according to dates. You've shown me a few entries here and there, where pretender entries appear on our outline of services, they also appear on the invoices.

You're suggesting that that wasn't paid. Okay, it wasn't paid. But if that's the case, it doesn't change my opinion.

Q. Now, you know, you testified earlier that not all of the time entries in the bills were included in your outline of services performed.

How was the determination made as to which time entries would be included in the outlines and which ones would not?

A. All time entries which relate to an identifiable legal service are included, and batched to be put in one place. If it's a minor entry, telephone call, short letter, e-mail, that doesn't refer to any particular litigation service that's been rendered, it's not included because to include it is simply to regurgitate the bill, and this is meant to be a tool that permits analysis and extrapolation, and there's no point in putting a stray e-mail onto the outline of services, and so it's not included. That's part of the normal procedure. You don't end up with a hundred percent of

the bill, or else you're just -- you just have the bill. You have a distillation to a meaningful level of the bill by litigation service, batched by each such service as they appear chronologically through the bill. As litigation happens, you're doing one thing in one period, and then, the next thing, and the next thing, and the next thing. Those all appear on the outline of services as identified by the lawyers and others who are billing the time.

So, it's a perfectly appropriate way to do it, and it's not necessarily required or helpful to include every modest little entry that doesn't relate to a litigation service.

Q. Okay. But is it correct that in excluding a fee entry that cannot be specifically identified, you are excluding fee entries that cannot be solely allocable to non-covered claims?

A. No, they're -- if they mentioned defamation, they would be included or be picked up by our word search.

These are entries that don't relate to defamation in any identifiable way, and they are, without doubt, more likely than not, not defamation-related entries. Therefore, those extra few hours get compensated at three percent, even though there's -- there's no realistic probability that they have anything to do with

defending them. You can't say they have no import or value.

At the end of the day, settlements are entered into for a host of reasons. Some of them economic, some of them with trade-offs that you're not mentioning.

And I don't have the settlement agreement in front of me, so it's really unfair to have you have me characterize who won what in the settlement.

They spent $5 million defending those claims. They're not nothing claims. They're worth at least $5 million of attorney's fees.

Q. In your review, is it correct that you did not review the non-attorney expenses incurred in the defense of SVO?

A. You mean costs?

Q. Costs.

A. It's not correct that we didn't review them. They are part of every invoice; at least the costs that were fronted by the lawyers. The cost would travel in the same atmosphere as the fees. Meaning, that if you had a maximum of three percent of the fees being non-reimbursable to Navigators, it's fair to conclude that three percent of the costs would follow in the same way, rough justice.

Q. Okay. Is it correct, though, that you did not

that's probably where it is.

Q. Okay. And is it correct that there's no entry for the review of expert bills or invoices?

A. Well, there's, "Review claim file," and I don't recall if that would have included that. So, there's no specific entry that mentions experts or expert invoices.

MR. SMYTH: Okay. Okay. I don't have anything further.

THE VIDEOGRAPHER: Ms. Santos, before we go off record, did you need a copy of the transcript?

MS. SANTOS: Transcript, yes; video, no.

THE VIDEOGRAPHER: All right. Thank you.

This concludes today's deposition. The time is 2:15 p.m., the date is November 18th, 2025, and we're off the record.

(Whereupon the deposition proceeding was concluded at 2:15 p.m.)

I have read the foregoing deposition transcript and by signing hereafter, approve same.

Dated_______________________.

__________________________________
ANDRE JARDINI - EXPERT

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA )
)s.s.
COUNTY OF LOS ANGELES )

I, Laurie A. Schmidt, hereby certify:

I am a duly qualified Certified Shorthand Reporter, in the State of California, holder of Certificate Number CSR 12719 issued by the Court Reporters Board of California and which is in full force and effect. (Bus. & Prof. 8016)

I am not financially interested in this action and am not a relative or employee of any attorney of the parties, or of any of the parties. (Civ. Proc. 2025.320(a))

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the retrained was first placed under oath or affirmation by me. (Civ. Proc. 2025.320, 2025.540(a))

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given. (Civ. Proc. 2025.540(a))

I have not, and shall not, offer or provide any services or products to any party's attorney or third party who is financing all or part of the action without first offering same to all parties or their attorneys attending the deposition and making same available at the same time to all parties or their attorneys. (Civ. Proc. 2025.320(b))

I shall not provide any service or product consisting of the deposition officer's notations or comments regarding the demeanor of any witness, attorney, or party present at the deposition to any party or any party's attorney or third party who is financing all or part of the action, nor shall I collect any personal identifying information about the witness as a service or product to be provided to any party or third party who is financing all or part of the action. (Civ. Proc. 2025.320(c))

Dated: November 24, 2025



DECLARATION ERRATA SHEET

ASSIGNMENT NO.: 11711
CASE CAPTION: Navigators Specialty Insurance Company v. SVO Building One, LLC
DEPONENT: Andre Jardini- Expert

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the foregoing transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _______ day of ______________________________, 2025.

____________________________________

ANDRE JARDINI - EXPERT